UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,                         No. 10-CR-20403
                                                      Hon. Nancy G. Edmunds
vs.                                                   Hon. Gerald E. Rosen

KWAME M. KILPATRICK,
BOBBY W. FERGUSON,
BERNARD N. KILPATRICK, and
VICTOR M. MERCADO,

        Defendants.
_____/

AMENDED OPINION AND ORDER REGARDING KWAME
KILPATRICK'S MOTION FOR DISCLOSURE OF JURY
MATERIALS AND FOR AN EVIDENTIARY HEARING

At a session of said Court, held in
the U.S. Courthouse, Detroit, Michigan
on August 3, 2012

PRESENT:   Honorable Gerald E. Rosen
                     Chief Judge, United States District Court

## I. INTRODUCTION

Defendant Kwame Kilpatrick is charged in a multi-defendant 46-count Fourth Superseding Indictment with engaging in a RICO racketeering conspiracy and various other crimes including extortion, bribery, mail and wire fraud, and income tax evasion. On May 29, 2012, Kilpatrick filed a "Consolidated Motion and Memorandum in Support for Disclosure [of] Jury Wheel Materials and for an Evidentiary Hearing," in which two of his co-defendants, Bobby Ferguson and Bernard Kilpatrick, have joined. In this

Motion, Mr. Kilpatrick, who is African-American, seeks to review a broad array of juror-related materials for the purposes of demonstrating a discriminatory violation of the Jury Selection and Services Act of 1968 ("JSSA"), 28 U.S.C. § 1861 *et seq.,* and violations of his constitutional rights to equal protection and to a trial before a jury comprised of a fair cross section of the community.

Pursuant to Eastern District of Michigan Administrative Order No. 00-AO-060, the normal scope of discovery with respect to information concerning jurors and potential jurors afforded a party seeking to challenge the composition of a grand and/or petit jury on the basis of race or ethnicity is limited to "juror number; race; and Hispanic ethnicity." Admin. Ord. No. 00-AO-060. This Administrative Order further provides that

> in the event that a party moves for the provision of juror information beyond that contemplated in this Administrative Order, such motion will be referred to the Chief Judge [for] review[] and ruling upon the propriety of providing any such additional juror information for good cause shown by the movant, on a case-by-case basis.

*Id*.

Because Defendant Kilpatrick's Motion seeks such additional juror information, it has been referred for a determination by this Court. Having reviewed the parties' briefs and accompanying exhibits, the Court has determined that the relevant facts and legal arguments are adequately presented in these written submissions and oral argument would not aid the decisional process. Accordingly, Defendant's Motion will be decided "on the briefs." *See* E.D. Mich. Local Rule 7.1(f)(2).

## II. MATERIALS/INFORMATION REQUESTED BY DEFENDANT KILPATRICK

Defendant Kilpatrick seeks to review the following juror-related materials:

a. All information, materials, reports and/or data compilations regarding demographic data of the master and qualified jury wheels for grand and petit juries for the Eastern District of Michigan, Detroit Division;

b. All information, materials, reports, data compilations, and JMS reports regarding the selection and summoning process for grand and petit juries, including any compilation or series of reports compiled by the Jury Department for each county showing the number of questionnaires mailed and returned, from the years 2000 until present;

c. Any and all demographic data compiled on behalf of this Honorable Court, the Jury Department, or any other agency affiliated with or employed at the request of the Eastern District of Michigan as it relates to jury selection, and addressing the issue of underrepresentation of African Americans on juries;

d. The total number of persons in the source or sources and the actual copy or copies of the source list or lists from which the initial selections were made from 2000 until present;

e. The total number of persons at each subsequent step and the actual forms or materials used in those steps from 2000 until present;

f. The completed questionnaires of all persons qualified for service from 2000 to present;

g. The completed questionnaires of all persons disqualified, excused or exempted and any other materials or information concerning these determinations (including requests for excusal and exemption and orders or notations concerning excusals, exemptions and disqualifications) from 2000 until present;

h. All records related to the summoning of jurors for grand jury or petit jury service, including all records or documents relating to the excusal or disqualification of any potential grand or petit juror summoned;

    i.        All records, data compilations, and/or surveys regarding the composition of the master and/or qualified jury panel; including any analysis and/or plan to address the high rate of non-responses by Wayne County prospective jurors;

    j.        Any statistical analysis or data compilation from 2000 to present, as it relates to the proportion of African American prospective jurors who have either been placed in the qualifying wheel for the Eastern District of Michigan, Detroit-Division, but were excused due to factors including but not limited to prosecution or conviction of felonies, were immigrants with lack of sufficient understanding of English, persons who lack child care services, or persons with lack of access to healthcare;

    k.        Any statistical analysis, data compilation or plan from 2000 to present, as it relates to the effectiveness of follow-up to non-responses by prospective African American jurors in the Eastern District of Michigan, Detroit-Division.

[*See* Motion for Disclosure, Dkt. # 94, pp. 7-8.]

Through these requests, Defendant seeks more than 12 years' worth of records and information. (Some of the information is requested without any time limitation whatsoever.) Mr. Kilpatrick proposes to examine these materials to determine if, as a result of the method employed by the Eastern District of Michigan, there is an under-representation of African-Americans in the jury pool. He anticipates that a numerical examination of the demographic juror responses will determine if the master jury wheel has (1) a fair cross section of the community; and (2) determine whether or not African-Americans are systematically excluded as a cognizable group in the nine counties that comprise the Eastern District of Michigan, Detroit Division jury pool. Kilpatrick posits that if, after a review of the data and an evidentiary hearing, it is empirically found that African-Americans are systematically under-represented on the master jury wheel, then

his indictment by a grand jury drawn from that master wheel is constitutionally infirm and, consequently, must be dismissed.[1]

In response, the Government counters that Defendant's request for disclosure is overly broad, and further argues that Defendant has failed to demonstrate good cause for the broad array of materials requested. However, the Government does not object to the Court allowing limited disclosure juror of the juror number, race and Hispanic ethnicity of the jurors in the master wheel used in this case.

III. DISCUSSION

A.   THE MASTER JURY WHEEL

Under the juror selection plan adopted by the Judges of this District in 2000 and subsequently approved by the Judicial Council of the Sixth Circuit, potential jurors are drawn from a "master jury wheel" in which "each county within a division is proportionately represented." *See* Administrative Order No. 00-AO-083, Juror Selection Plan § (h)(2); *see also United States v. O'Reilly*, No. 05-80025, 2008 WL 115537, at *2-3 (E.D. Mich. Jan. 10, 2008) (Friedman, C.J.) (describing this District's current juror selection plan). The exact percentages of this mandated "proportional representation," in turn, are determined by reference to the numbers of registered voters in each county

---

[1] Inasmuch as Defendant's present objective is to secure information that he views as necessary to establish that there were statutory and constitutional infirmities in the grand juror selection process, this Court views its inquiry as limited to Defendant's request for juror selection information and records, as opposed to the merits of any JSSA or constitutional challenges he might subsequently elect to pursue. Nonetheless, as discussed below, the substantive law governing such challenges has some bearing upon this Court's disposition of the present motion.

5

within the division. Upon applying this formula to the current master jury wheel for the Detroit division, which was created in February of 2011, it was determined that Wayne County residents were to comprise 38.013 percent of the master wheel, or 114,039 of the 300,000 names on this wheel. *See* Administrative Order No. 11-AO-006. Defendant Kilpatrick was indicted on June 23, 2010, eight months before Administrative Order 11-AO-006 was entered, and before the creation of the current master jury wheel in February 2011.[2]

The process of creating the master jury wheel for the Detroit Division was recently described in detail in *United States v. Ferguson,* ___ F. Supp. 2d ___, 2012 WL 1957059 (E.D. Mich. May 31, 2012):

> The jury-selection process begins when the Eastern District's Jury Department obtains three lists from the Michigan Secretary of State: registered voters, licensed drivers, and holders of state-issued identification documents. Juror Selection Plan § (f); . . . [s]ee also 28 U.S.C. § 1863(b)(2) (a district must use "some other source or sources of names in addition to voter lists" if doing so is necessary to ensure representativeness and avoid excluding jurors on the basis of race, color, religion, sex, national origin, or economic status).[3] The Jury Department provides the list of registered

---

[2] The previous master jury wheel was created in August 2008. *See* Administrative Order 08-AO-033. Pursuant to this 2008 Administrative Order, the percentage of Wayne County residents comprising the wheel was not significantly different from the current wheel -- Wayne County residents made up 38.4% of the 2008 master wheel. *See id.* Of the earlier master wheels, created in 2006 and 2004, Wayne County residents made up 39.62 % and 39.4%, respectively. *See* Administrative Orders 06-AO-005 and 04-AO-016.

[3] While this District's jury selection plan makes use of state-provided lists of licensed drivers and state ID holders as a supplement to the list of registered voters, it is important to note that this effort to augment the jury pool has been voluntarily implemented rather than legally compelled. The Sixth Circuit has recognized that "[v]oter registration lists are the presumptive statutory source for potential jurors," and that "[t]he circuit courts are in complete agreement that neither the [JSSA] nor the Constitution require that a supplemental source of names be added to

voters to Sutera Data Systems ("SDS"), a data-processing firm contracted to compile the Master Wheel. Juror Selection Plan § (g)(3) (Jury Department may hire outside contractors to implement the Plan). . . . SDS determines the number of registered voters in each of the nine counties comprising the Detroit Division, and calculates each county's proportionate share of the Division's total voting population. Based on these figures, the Court issues an Administrative Order to create a new Master Wheel for the Division, in which it specifies the number of people to be drawn from each county for possible jury service. Juror Selection Plan § (h)(2) (voter-registration lists must be used to determine the proportion of jurors from each county). . . .

The Jury Department next provides the list of licensed drivers and holders of state-issued ID cards to SDS, with instructions to create the Master Wheel; it is to be filled with actual names of potential jurors. SDS begins by making separate lists of licensed drivers and state ID holders for each county in the Division. Next, for each county, SDS merges the three lists (registered voters, licensed drivers, people with state-issued IDs) and eliminates duplicate names. . . . Finally, SDS selects names at random from the merged list for each county, based on the proportions set forth in the Administrative Order, to create the Master Wheel. . . .

In the next step, the Jury Department randomly draws 5,000 names from the Master Wheel and sends juror questionnaires to these people. See Juror Selection Plan § (i)(1) (Clerk of the Court decides how many names are necessary to maintain "an adequate number of names" in the jury wheel). At this point, questionnaires may fall into one of three categories: (1) "non responses," which are questionnaires never returned; (2) "undeliverables," questionnaires returned unopened by the Post Office; and (3) "completed" questionnaires filled out and returned by their intended recipients.

---

voter lists simply because an identifiable group votes in a proportion lower than the rest of the population." *United States v. Odeneal,* 517 F.3d 406, 412 (6th Cir. 2008) (internal quotation marks, alteration, and citations omitted). Indeed, so far as the Court is aware, this District's use of lists of licensed drivers and state ID holders is rare, if not unprecedented, among the federal district courts. Moreover, the plan used in this District prior to this supplementation was approved by the Judicial Council of the Sixth Circuit, and the addition of licensed drivers and state ID holders was made at the recommendation of a jury analyst, rather than as a result of any perceived legal obligation to do so. *See United States v. Jones,* No. 01-80571, slip op. at 9, 13 (E.D. Mich. May 14, 2004) (Zatkoff, C.J.).

> The Jury Department's procedure for following up on undeliverables and nonresponses is limited. If the Post Office provides a forwarding address for an undeliverable, the Department mails a questionnaire to the new address; if no address is provided, no further action is taken. . . . . The Jury Department also sends follow-up questionnaires to nonresponses; however, there is no standard practice if the second mailing elicits no response. . . . Juror Selection Plan § (j).
>
> The Jury Department then processes the completed questionnaires and decides who is not qualified or who should be excused. Noncitizens, convicted felons, and people who cannot read and write English, among others, are disqualified from jury service under federal law. Juror Selection Plan § (k); 28 U.S.C. § 1865(b). Active members of the armed forces, police and fire department members, and certain public officials are also exempt. Juror Selection Plan § (m); 28 U.S.C. § 1863(b)(6). The Eastern District also exempts people over 70, firefighters and ambulance crews, and persons who served on a jury within the last two years. Juror Selection Plan § (l). Once unqualified and exempt respondents are eliminated, what remains are the completed questionnaires of people who will make up the Detroit Division's Qualified Jury Wheel ("the Qualified Wheel").
>
> * * *
>
> Each Master Wheel is kept in service for two years. . . . After two years, the Master Wheel is retired, even if some names remain which were never sent questionnaires or selected for placement in the Qualified Wheel. For example, the 2004–2006 Master Wheel contained 100,000 names, but the Jury Department mailed only 50,650 questionnaires; the remaining names were not used. . . . Records relating to old jury pools, Master Wheels and Qualified Wheels, are kept for a minimum of four years and are available for public inspection. Juror Selection Plan § (s)(2); 28 U.S.C. § 1868.

*Id.* at *1-3 (quoting *United States v. Bates*, No. 05–81027, 2009 WL 5033928 (E.D. Mich. 2009), *aff'd*, 2012 WL 1071806 (6th Cir. Apr. 2, 2012)).

B.   DEFENDANT KILPATRICK'S MOTION

Defendant Kilpatrick contends that the Grand Jury that indicted him (and

potentially the jury that will be selected in the trial of this case) "may have been chosen by a constitutionally questionable process," Defendant's Reply Brief, Dkt. # 160, p. 2, and he seeks information to make that determination. Specifically, Kilpatrick seeks to show from the requested information that the Court's failure to timely address the undeliverability and high non-response rate to jury questionnaires -- in particular, the high non-response rate of Wayne County residents[4] -- has resulted in an under-representation of African-Americans in the master wheel from which his grand jury was selected, and may result in a similar under-representation in the pool from which his petit jury will be selected.

1.  The Standards Governing Defendant's Motion

To the extent that a party seeks more detailed information and records regarding this District's process for juror selection, and not merely the disclosure of juror number, race, and Hispanic ethnicity, Administrative Order No. 00-AO-060 provides that such requests will be reviewed on a "case-by-case basis," and will be granted only upon a showing of "good cause." As explained by former Chief Judge Lawrence P. Zatkoff, a party may establish the requisite "good cause" by showing that the requested information is necessary to prepare and present a motion challenging the jury selection process. *United States v. Montini*, No. 03-80228, 2003 WL 22283892, at *3 (E.D. Mich. Sept. 3, 2002) (Zatkoff, C.J.); *see also O'Reilly*, 2008 WL 115537, at *3 (Friedman, C.J.)

---

[4] Wayne County has the largest concentration of African-Americans in the Detroit Division.

9

Accordingly, to establish entitlement to the information sought through the present motion, Defendant must show that these materials will be of assistance in proving a violation of the JSSA or a Fifth or Sixth Amendment violation.

2.   Defendant Has Not Shown a Need for Information Beyond That Which Is Ordinarily Available in Order to Determine Whether the Jury Selection Process in His Case Violated the JSSA or his Fifth or Sixth Amendment Rights

As this Court previously has explained, "[t]he Sixth Amendment guarantee of an 'impartial jury' has been construed as encompassing the right to a jury drawn from a fair cross section of the community." *United States v. Brown*, 128 F. Supp. 2d 1034, 1038 (E.D. Mich. 2000) (internal quotations and citations omitted). Likewise, the JSSA articulates a "policy of the United States that all litigants in Federal courts entitled to trial by jury shall have the right to grand and petit juries selected at random from a fair cross section of the community in the district or division wherein the court convenes." 28 U.S.C. § 1861.[5]

A claim that jury selection violates the "fair cross section" requirements of the Sixth Amendment and the JSSA can be proven through direct or indirect evidence. *See United States v. Ovalle*, 136 F.3d 1092, 1099 (6th Cir. 1998); *see also Brown*, 128 F. Supp. 2d at 1039. Where, as here, there is no direct evidence that the jury selection

---

[5] While the elements of a claim under the JSSA and an equal protection claim are not identical, *see United States v. Allen*, 160 F.3d 1096, 1103, 1105 (6th Cir. 1998), there is a "significant overlap[]" in the two standards. *United States v. Brown*, 128 F. Supp. 2d 1034, 1043 (E.D. Mich. 2000).

10

process used in this District invariably leads to the underrepresentation of the groups identified by Defendant Kilpatrick, Defendant must rely upon indirect evidence to sustain his claim.  Defendant's initial burden is to establish the three elements of a *prima facie* showing of a "fair cross section" violation: "(1) that a 'distinctive group' is being excluded from the jury pool; (2) that the representation of this group in venires from which juries are selected is 'not fair and reasonable' in comparison to the group's representation in the community at large; and (3) that this disparity is attributable to systematic exclusion of the group in the jury selection process."  *Duren v. Missouri*, 439 U.S. 357, 364, 99 S.Ct. 664, 668 (1979); *see also United States v. Buchanan*, 213 F.3d 302, 309-10 (6th Cir. 2000); *Brown*, 128 F. Supp. 2d at 1039.  Each of these elements must be established in order to make out a *prima facie* case.  *Allen*, 160 F.3d at 1103; *United States v. Grant*, 2009 WL 3275926, at *12 (S.D. Ohio 2009).[6]

As a threshold matter, to the extent that Defendant identifies "citizens of Wayne County" as a group that qualifies as a "distinctive group" whose exclusion from a jury pool could establish the first prong of a *prima facie* case under the Sixth Amendment and the JSSA, *see* Reply Brief, Dkt. # 160, p.5, although the Sixth Circuit has not spoken on this issue, a district court within this Circuit thoroughly surveyed the relevant case law

---

[6] An equal protection challenge requires the defendant to show that the grand or petit jury was selected in an intentionally discriminatory manner.  *Allen,* 160 F.3d at 1104.  "A defendant may establish a *prima facie* case of such discrimination by making one of two showings: (1) that the defendant's race was substantially underrepresented on the particular venire from which the defendant's jury was selected AND that the venire was selected under a practice providing an opportunity for discrimination; or (2) that there has been systematic, long-term underrepresentation of defendant's race on jury venires."  *Id*. at 1105 (emphasis in original).

and found it to be uniformly held "that residents of a geographic area are not a distinct, cognizable group based on their place of residence alone." *United States v. Traficant*, 209 F. Supp. 2d 764, 780 (N.D. Ohio 2002); see also *United States v. Fieger,* No. 07-20414, 2008 WL 1902054 (E.D. Mich., Apr. 29, 2008); *United States v. Butera*, 420 F.2d 564, 572 (1st Cir. 1970) (holding that residents of a particular county do not qualify as a "distinctive group" for purposes of a fair cross section analysis), *overruled on other grounds by Barber v. Ponte*, 772 F.2d 982, 998 (1st Cir. 1985). Rather, place of residence is relevant to a fair cross section analysis only to the extent that it serves as a proxy for another, recognized distinct group." *Traficant*, 209 F. Supp. 2d at 782.

Nonetheless, it is unnecessary for present purposes to decide whether, and to what extent, Defendant may pursue a fair cross section challenge based upon the purported underrepresentation of Wayne County citizens in his or other pools of potential jurors formed pursuant to this District's juror selection plan. Defendant's motion does not rest solely on this ground, but also cites African-Americans as a distinctive group that is underrepresented. It is clear that African-Americans qualify as a "distinctive group" whose alleged exclusion would satisfy the first prong of a *prima facie* case. Accordingly, the Court proceeds to the remaining two prongs of a *prima facie* showing of a fair cross section violation.

To satisfy the second element of his *prima facie* case, Defendant must show that the representation of African-Americans in the pool from which juries are selected in this District is not "fair and reasonable" in comparison to the representation of these groups in

the community-at-large. *See United States v. Fieger, supra*. Under the third prong of this standard, Defendant must show that any such disparity in the representation of African-Americans is "attributable to systematic exclusion of the group in the jury selection process." *Id*.

At present, Defendant's showing on these points rests upon (i) the numerical disparity of African-Americans on the jury in the separate criminal case brought against co-defendant Bobby Ferguson,[7] (ii) the percentage of African-Americans in the overall population of the geographic area making up the Eastern District, (iii) published articles noting the under-representation of African-Americans on federal juries, and (iv) the Court's acknowledgment of, and plans to rectify, this under-representation.

This Court has previously held that "statistics concerning only one jury venire and one pool of summoned jurors is patently insufficient to establish a systematic under-representation." *United States v. Greene*, 971 F. Supp. 1117, 1128 (E.D. Mich. 1997). Nevertheless, the question at the present juncture is not whether Defendant has made a *prima facie* showing of a fair cross section violation, but whether the additional information he seeks would aid him in establishing the elements of such a showing. Specifically, the Court must consider the prospect that the requested materials will enable Defendant to overcome the deficiencies in his present showing. The Court finds that they would not.

---

[7] *United States v. Ferguson*, No. 10-cr-20535.

To the extent that Defendant Kilpatrick seeks information concerning undeliverable juror questionnaires and non-responses, the Sixth Circuit has explicitly rejected those matters as too speculative to establish a *prima facie* showing of systematic exclusion. *See Bates, supra*, 2012 WL 1071806, at *5 (holding that "speculation that an issue might contribute to the under-representation of African-Americans is not enough to establish a *prima facie* Sixth Amendment violation" (citing *Berghuis v. Smith*, ___ U.S. ___, 130 S.Ct. 1382, 1395 (2010))).

As for the low response rate, as noted in *Ferguson*, *supra*, "this Court has adopted the practice of summoning non-responding jurors to show cause under 28 U.S.C. § 1866(g). Although that practice is forward-looking and would have no direct effect on the present trial, it underscores the absence of a systematic tolerance of habitual non-responders." 2012 WL 1957059 at *7. Furthermore, in *Bates*, the Sixth Circuit expressly determined that "[n]on-responses . . . are not a problem 'inherent' to the jury selection procedures, but are the result of individual choice." *Bates*, 2012 WL 1071806, at *5. Other courts have reached the same conclusion. *See Smith v. Berghuis*, 543 F.3d 326, 341 n.5 (6th Cir. 2008) (failure to send additional letters to individuals who did not respond to jury questionnaires was not "systematic exclusion" within the meaning of *Duren*), *rev'd on other grounds*, 130 S.Ct. 1382 (2010); *United States v. Orange*, 447 F.3d 792, 800 (10th Cir. 2006) ("Discrepancies resulting from the private choices of potential jurors do not represent the kind of constitutional infirmity contemplated by *Duren*."); *United States v. Cecil*, 836 F.2d 1431, 1447 (4th Cir. 1988) (observing that

disparities attributable to "personal predilection" cannot form the basis of a fair cross section claim); *United States v. Craft*, 165 F.3d 28, 1998 WL 702348, at *3 (6th Cir.1998) (holding that the failure to respond to a jury summons is not a systematic defect in a jury selection plan, but a "private sector influence[ ]"); *United States v. Murphy*, 1996 WL 341444, at *5 (N.D. Ill. June 18, 1996) ("The jury selection system . . . is not excluding African–Americans as a group, but many African–American individuals are excluding themselves by not responding to jury questionnaires."). Therefore, the information Defendant seeks concerning undeliverable jury questionnaires, non-respondents, and low response rates would not assist him in making a *prima facie* showing.[8]

---

[8] Although Defendant has not shown good cause for his request to review this information, it bears emphasis that this Court has actively explored and implemented a number of measures over the years to ensure that its jury pools reflect a fair cross section of the community. *See Jones, supra,* No. 01-80571, 5/14/2004 slip op. at 18-20 (recounting various efforts which, while "not required . . . under the Constitution," were pursued "with the intention of ensuring that the [District's] jury wheels are as fair of a cross-section of the community as possible, without violating the JSSA or the Constitution").

In fact, within the past two years, the Court has formed an *ad hoc* committee and commissioned an expert to once again review this District's jury selection plan and procedures. The "[k]ey [f]indings" of the expert's December 20, 2010 final report were as follows:

> The findings from this review suggest that the underrepresentation of African-Americans in the Court's divisional jury pools results primarily from a combination of two factors: (1) undeliverable qualification questionnaires due to inaccurate or stale addresses on the master jury wheel; and (2) disproportionately high non-response rates in Wayne County, which has the largest concentration of African-Americans within the Detroit, Ann Arbor, and Port Huron Divisions . . . . [A] substantial portion of the non-response rates since September 2009 may consist of undeliverable questionnaires that have not been returned by the U.S. Postal Service.

To the extent that Defendant wishes to pursue a broader challenge to this District's jury selection procedure, he may obtain the information needed to make such a challenge from publicly available sources. The JSSA only prohibits the Court clerk from disclosing records and papers involved in the creation of a master wheel until the wheel has been emptied and all jurors selected from that wheel have completed their service. 28 U.S.C. § 1867(f). The records and papers from all other master jury wheels are kept on public record in the Court clerk's office for at least four years. 28 U.S.C. § 1868. Thus, the pertinent materials for this District's past, retired and emptied master wheels are available to Defendant Kilpatrick without court order.[9]

As noted, in many instances, Defendant did not specify a time period for which he seeks information. However, even if he seeks to challenge the jury selection process as a whole, and not simply the composition of the jury pools from which the grand and petit

---

12/20/2010 Review of the Jury Selection Plan for the U.S. District Court, Eastern District of Michigan at i (report available on request from Eastern District Court Administrator's Office). As evidenced by this and other studies and initiatives over the years, while this Court has no constitutional or statutory mandate to rectify the underrepresentation of African-Americans in its jury pools, it nonetheless has made a steadfast commitment to address this concern within the confines of the law.

[9] The Court notes, however, that the records for the 2008 master jury wheel from which Defendant Kilpatrick's grand jury was drawn are not yet publicly available. As noted above, the JSSA provides that the records and papers relating to a master jury wheel may not be disclosed "until after the master jury wheel has been emptied and refilled . . . and all persons selected to serve as jurors before the master wheel was emptied have completed such service." 28 U.S.C. § 1867(f). Because not all of the individuals drawn from the 2008 master jury wheel have completed their jury service, the records used in connection with the creation of this master jury wheel are not yet available, and the Court has been advised that this is likely to remain the case until late this year.

juries in his case have been or will be drawn, then the historical records that are publicly available are sufficient. Further, under the applicable administrative order, E.D. Mich. Admin. Order No. 00-AO-060, the Court will allow Defendant access to information regarding juror number, race and Hispanic ethnicity for the current jury wheels, from which the petit jury that will hear his case will be drawn. Against this backdrop, Defendant has not shown good cause for gaining access to the additional materials and information sought in his motion.

## IV. CONCLUSION

For the foregoing reasons,

IT IS HEREBY ORDERED that Defendant Kwame M. Kilpatrick's May 29, 2012 motion for disclosure of jury wheel materials and for an evidentiary hearing (docket # 94) is DENIED. Defendant is entitled, however, to review the information regarding juror number, race, and Hispanic ethnicity for the current jury wheel. Defendant also may review any records relating to old jury pools, master wheels, and qualified wheels that have been retained in the jury department and are available for public inspection pursuant to Juror Selection Plan § (s)(2) and 28 U.S.C. § 1868.

Dated: August 3, 2012  s/Gerald E. Rosen
Chief Judge, United States District Court

I hereby certify that a copy of the foregoing document was served upon counsel of record on August 3, 2012, by electronic and/or ordinary mail.

s/Shawntel R. Jackson for Ruth A. Gunther
Case Manager