**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

**UNITED STATES OF AMERICA,**

                **Plaintiff,**          Case No. 10−CR−20403
                                      Hon. Nancy G. Edmunds

    **v.**

**D−1 KWAME M. KILPATRICK,**
**D−2 BOBBY W. FERGUSON, and**
**D−3 BERNARD N. KILPATRICK,**

                **Defendants.**
_____/

**JURY TRIAL**
**VOLUME 44**

      **Detroit, Michigan − Wednesday, December 5, 2012**

**APPEARANCES:**

**For the Government:**

Mark Chutkow
R. Michael Bullotta
Jennifer Leigh Blackwell
Eric Doeh
United States Attorney's Office
211 W. Fort Street, Suite 2001
Detroit, Michigan 48226

**Counsel for Defendant Kwame M. Kilpatrick:**

James C. Thomas
535 Griswold, Ste. 2500
Detroit, MI 48226
313−963−2420

**Appearances(continued):**

**Counsel for Defendant Kwame Kilpatrick (Continued):**

Harold W. Gurewitz
Gurewitz & Raben
333 W. Fort Street, Suite 1100
Detroit, MI 48226


**Counsel for Defendant Bobby W. Ferguson:**

Gerald K. Evelyn                    Susan W. Van Dusen
535 Griswold                        Law Offices of Susan W. VanDusen
Suite 1030                          2701 S. Bayshore Dr., Ste 315
Detroit, MI 48226                   Miami, FL 33133
313-962-9190                        305-854-6449

Michael A. Rataj
535 Griswold, Suite 1030
Detroit, MI 48226
313-962-3500

**Counsel for Defendant Bernard N. Kilpatrick:**

John A. Shea
Alexandrea D. Brennan
120 N. Fourth Avenue
Ann Arbor, MI 48104
734-995-4646


—    —    —


*Suzanne M. Jacques, Official Court Reporter*
*email: jacques@transccriptorders.com*

*Proceedings recorded by mechanical stenography.*
*Transcript produced by computer-aided transcription.*


—    —    —

*Jury Trial Volume 44*
*Wednesday, December 5, 2012*

# I N D E X
– – –

Government's Case in Chief                          Page

   **Robert Beeckman(Re-called)**

      Direct Examination By Mr. Bullotta          6

      Cross Examination By Mr. Thomas             27

      Cross Examination By Mr. Shea               43

      Redirect Examination By Mr. Bullotta        62

      Recross Examination By Mr. Thomas           68

      Recross Examination By Mr. Shea             70

      Redirect Examination By Mr. Bullotta        72

   **Rowena Schuch(Re-called)**

      Direct Examination By Mr. Bullotta          73

      Cross Examination By Mr. Shea               80

      Redirect Examination By Mr. Bullotta        95

      Recross Examination By Mr. Shea             96

   **Anthony Soave**

      Direct Examination By Mr. Bullotta          97


Certification of Reporter                          146

*Jury Trial Volume 44*
*Wednesday, December 5, 2012*


# E X H I B I T   I N D E X

- - -

Government's Exhibits

| Number | Received |
|--------|----------|
| BKF 5 | 75 |
| Cobo 3 through 7 | 6 |
| Cobo 9, 10, 12, 14, 25 | 6 |
| Cobo 24 | 79 |
| Cobo 24A | 77 |
| IN1-3 | 112 |
| IN1-64 | 123 |
| IN1-65 | 142 |
| JET3 | 128 |

- - -

Defendant's Exhibits

| Number | Received |
|--------|----------|
| D-Cobo 10A and 10B | 56 |
| D-Cobo 6 | 59 |

*Jury Trial Volume 44*                                                 5
*Wednesday, December 5, 2012*

1            **Detroit, Michigan**

2            **Wednesday, December 5, 2012**

3            **9:20 a.m.**

4                              –  –  –

5            THE COURT:  Good morning.

6            (Jury in 9:22 a.m.)

7            THE COURT:  Good morning.  Be seated.  Next witness.

8            MR. BULLOTTA:  Yes.  Thank you, Your Honor.  Good

9    morning.  United States calls Special Agent Robert Beeckman --

10   I should say recalls.

11           THE COURT:  Agent Beeckman, I remind you that you're

12   still under oath.

13           THE WITNESS:  Yes, ma'am.

14           MR. BULLOTTA:  Your Honor, before we get going, I'd

15   like to actually move to preadmit certain exhibits to save

16   time.

17           THE COURT:  Sure.

18           MR. BULLOTTA:  Specifically, we have some text

19   messages that are marked Cobo 3, Cobo 4, Cobo 5, Cobo 6,

20   Cobo 7, Cobo 12 and Cobo 14.  And then we also have a mayor's

21   calendar, two pages, Cobo 9 and Cobo 10, and then there's a

22   phone call on Bernard Kilpatrick's phone line which is marked

23   Cobo 25 that's been provided to the defense.

24           So I'd move all those exhibits in so we can have a

25   more seamless presentation.

*Robert Beeckman - Direct*
*Wednesday, December 5, 2012*

6

1          **MR. SHEA:**  No objection on behalf of

2    Bernard Kilpatrick.

3          **MR. THOMAS:**  And none on behalf of Kwame,

4    Your Honor.

5          **MR. BULLOTTA:**  Agent Beeckman, good morning.

6          **THE COURT:**  Well, let's -- and Ferguson?

7          **MR. RATAJ:**  Yeah, we don't have any.

8          **THE COURT:**  All right.  Received.

9          (Government's Exhibits Cobo 3 through 7, Cobo 9,

10         Cobo 10, Cobo 12, Cobo 14 and Cobo 25 received

11         into evidence.)

12                                      (9:23 a.m.)

13                    **DIRECT EXAMINATION**

14   **BY MR. BULLOTTA:**

15   Q.  Good morning.

16   A.  Good morning.

17   Q.  Were you present for the direct and cross examination of

18   Karl Kado the last two days?

19   A.  Yes.

20   Q.  And did you hear Mr. Shea on behalf of Mr.

21   Bernard Kilpatrick asking Mr. Kado about Bernard Kilpatrick

22   placing lottery number bets at Karl Kado's brother, Andrew

23   Kado's liquor store?

24   A.  Yes.

25   Q.  Do you know the name of the liquor store we're talking

*10-CR-20403   USA v. Kwame Kilpatrick, et al*

*Robert Beeckman - Direct*
*Wednesday, December 5, 2012*

7

1    about?

2    A.   Yes, it's called Tunnel Liquor.

3    Q.   And where is that located?

4    A.   In the Millender Center.

5    Q.   And during the course of the -- you've already testified

6    about this, that the FBI conducted wire interceptions of

7    Bernard Kilpatrick's cell phone between June of 2007 and April

8    of 2008?

9    A.   Yes.

10   Q.   And during that time, did you -- and you've listened to a

11   lot of those calls, haven't you?

12   A.   Yes.

13   Q.   Did you hear any calls involving phone calls to the Tunnel

14   Liquor by Bernard Kilpatrick to play those numbers on the

15   lotto?

16   A.   Yes.

17           **MR. BULLOTTA:**  And now I'd like to play, if I could,

18   Cobo 25.

19           **MR. SHEA:**  Could we have a date?

20   **BY MR. BULLOTTA:**

21   Q.   Yes, I'm sorry, could you --

22   A.   August 3rd, 2007.

23   Q.   August 3rd, 2007, thank you.

24           **THE COURT:**  Yes?

25           **A JUROR:**  Is this Cobo --

*10-CR-20403   USA v. Kwame Kilpatrick, et al*

*Robert Beeckman - Direct*
*Wednesday, December 5, 2012*                                          8

1           **MR. BULLOTTA:**  This is Cobo 25.

2           **THE COURT:**  These have been preadmitted.  We just

3   did that.  3 through 7, 9, 10 and 25 are all in evidence.

4           **MR. BULLOTTA:**  And 12 and 14, I believe, too.

5           **THE COURT:**  I'm sorry, 12 and 14.

6   **BY MR. BULLOTTA:**

7   Q.  So this is a call on August 3, 2007 on Bernard Kilpatrick's

8   cell phone?

9   A.  Yes.

10  Q.  And who is talking on the call?

11  A.  Bernard Kilpatrick and Andrew Kado.

12  Q.  And who is Andrew Kado?

13  A.  He's Karl Kado's brother.

14  Q.  And does he run the Tunnel Liquor?

15  A.  Yes.

16  Q.  Okay.

17           (Government's Exhibit Cobo 25, audiotape, was

18           played.)

19  **BY MR. BULLOTTA:**

20  Q.  Can you explain what's happening on that phone call?

21  A.  Yes.  It's -- Mr. Kilpatrick is playing the numbers over

22  the telephone and had run up a tab, and Mr. Kado is confirming

23  what that tab is, and he says that it's $720 for those two

24  days.

25  Q.  That was just for the two days?

*10-CR-20403   USA v. Kwame Kilpatrick, et al*

*Robert Beeckman - Direct*
*Wednesday, December 5, 2012*

9

```
1   A.  Right.
2   Q.  And did you listen to other calls that were like that,
3   similar to this --
4   A.  Yes.
5   Q.  -- where Mr. Kilpatrick was placing bets?
6   A.  Yes.
7   Q.  And how many other calls like this did you find?
8   A.  One hundred fifty-nine.
9   Q.  And did that include the time period through April of 2008?
10  A.  Yes, it goes from June of '07 to April of 2008.  There are
11  158 on his cell phone and then one in the one-month period that
12  we were intercepting his home phone.
13  Q.  And they were all to the Tunnel Liquor?
14  A.  Yes.
15  Q.  Yesterday, did you hear Mr. Shea cross examine Karl Kado
16  about speaking to you about what he referred to as dementia?
17  A.  Yes.
18  Q.  Can you explain when --
19          MR. SHEA:  Excuse me.  I didn't talk to Mr. Kado
20  about dementia at all.
21          THE COURT:  I think it was Mr. Thomas.
22          MR. BULLOTTA:  I'm sorry, it was Mr. Thomas.  I
23  apologize.  Mr. Thomas.  Thank you, Mr. Shea.
24  A.  You're right.  Mr. Thomas did, right.
25
```

*10-CR-20403   USA v. Kwame Kilpatrick, et al*

1    **BY MR. BULLOTTA:**

2    Q.   Tell us when, when Mr. Kado mentioned that to you, explain

3    the circumstances, if you could.

4    A.   Yes, it was last fall, I was speaking with Mr. Kado about

5    an unrelated topic, and he mentioned to me that he was possibly

6    getting dementia, and then I made a note of it, and then as we

7    were preparing for trial later in the spring, one of the

8    responsibilities of the case agent is to document exculpatory

9    information which could be used by the defense, and that's just

10   one of those particular things.

11          So I called Mr. Kado back to flesh out the details

12   of, you know, whether it had ever been diagnosed by a doctor

13   and so forth, and at that point --

14   Q.   Had it been diagnosed by a doctor?

15          **MR. THOMAS:**  Objection.  That's collateral.  It's

16   hearsay.

17          **MR. BULLOTTA:**  Goes to Mr. Kado's state of mind and

18   ability as a witness.  It was probed into by defense.

19          **MR. THOMAS:**  Judge, if that's the case, I want to

20   have --

21          **THE COURT:**  Sustained, sustained.

22          **MR. THOMAS:**  Can we do a side?  Sustained, okay.

23          **THE COURT:**  I said I'm sustaining your objection.

24   **BY MR. BULLOTTA:**

25   Q.   So Mr. Kado didn't call you back again to talk about

1   dementia, as Mr. Thomas asked Mr. Kado?

2          **MR. THOMAS:**  Objection.  Now he's testifying as to

3   what was said in court.  The jury is going to decide.

4          **THE COURT:**  Overruled.

5   A.  No, I was just calling Mr. Kado back to flesh out the

6   details and find out if that was a diagnosis by a doctor or if

7   that was just something that he was saying to me in the

8   previous conversation.

9          So I documented both of those conversations; the

10  first one when he brought it up the first time, the second time

11  when I was asking him the questions, put that in one report and

12  then we turned it over to the defense attorneys.

13  **BY MR. BULLOTTA:**

14  Q.  So it's fair to say that Mr. Kado didn't keep calling you

15  and telling you that he had dementia?

16  A.  That's right.

17  Q.  You were following up?

18  A.  Correct.

19  Q.  How many interactions do you think you've had with Mr. Kado

20  since when, 2006, January 2006?

21  A.  Yes, there was some --

22  Q.  And I'm talking about phone calls, in person.

23  A.  Yes, there was some testimony about that yesterday, and I

24  know Mr. Kado was asked, could there have been as many as 50

25  interviews.  There may have been 50 times where, you know, all

*Robert Beeckman - Direct*
*Wednesday, December 5, 2012*

1  together with meetings and so forth between the FBI, the IRS

2  and the U.S. Attorney's Office, and in addition to that, you

3  know, me calling Mr. Kado and asking my questions and so forth,

4  all together it's possible there were 50.  I don't have the

5  number off the top of my head.

6  Q.  But it was quite a few times?

7  A.  Yes.

8  Q.  And in any of your interactions with Mr. Kado, did he

9  appear to you to be forgetful or have some problem with his

10  memory?

11  A.  Nothing out of the ordinary, no.

12  Q.  And did he provide you information on, not only involving

13  this case, but on other, involving other political officials in

14  the City of Detroit?

15  A.  Yes.

16  Q.  And has his information ever proved to be false or

17  misleading to you?

18  A.  No.

19  Q.  I want to ask you about the contracts that Mr. Kado spoke

20  about in your investigation.  Do you remember Mr. Kado talking

21  about first getting the cleaning contract at Cobo Hall in the

22  spring of 2002?

23  A.  Yes.

24  Q.  And then the electrical contract in February of 2003?

25  A.  Yes.

*Robert Beeckman - Direct*
*Wednesday, December 5, 2012*                                    13

1    Q.  So the first contract he got was the maintenance contract

2    at Cobo?

3    A.  Yes.

4    Q.  And then the second one was the electrical, correct?

5    A.  Correct.

6    Q.  I'm going to show you now Cobo Exhibit 3.  If we could

7    publish that, and I'm going to ask you what this is.  Is this a

8    text message?

9    A.  Yes.

10   Q.  Between whom and whom?

11   A.  Bernard Kilpatrick and Derrick Miller.

12   Q.  And at the time in April of 2002, what was Derrick Miller's

13   position in the City of Detroit?

14   A.  He was the chief administrative officer.

15   Q.  And as part of his duties, based on your investigation, did

16   he oversee Cobo Hall?

17   A.  Yes.

18   Q.  And the director there?

19   A.  Yes.

20   Q.  Okay.  And what is this, can you read this text message

21   from Bernard Kilpatrick?

22              THE COURT:  I'm sorry, is this in evidence?

23              MR. BULLOTTA:  Yes, this is one of the ones I moved

24   in, Cobo 3.

25              THE COURT:  Which number is this?

*10-CR-20403    USA v. Kwame Kilpatrick, et al*

1          **MR. BULLOTTA:**   Cobo 3, Your Honor.

2          **THE COURT:**   Cobo 3.

3    A.   Okay.   "Mr. Kilpatrick:  Don't forget the two letters to

4    HUD.   One, Robert Brown 226-4375 ext 8145, director of

5    multi-housing.   Two, same guy, status of Rochdale on

6    Lafayette."

7          Reply from Derrick Miller is, "Yes."

8    **BY MR. BULLOTTA:**

9    Q.   I'm really interested, I'm sorry, in the last -- can we

10   blow up this last, the relevant portion here?

11   A.   Reply from Bernard Kilpatrick is, "Last thing for today,

12   you have to call Lou and give okay for Karl to deal with the

13   electrical contract in June."

14   Q.   So this is Bernard Kilpatrick telling Derrick Miller to do

15   what?

16   A.   To call Lou and give the okay for Karl to deal with the

17   electrical contract in June.

18   Q.   And who is Lou, based on your investigation?

19   A.   Lou Pavledes.

20   Q.   And what position did he have with respect to Cobo Hall?

21   A.   He was the director.

22   Q.   And who did Derrick Miller report to?

23   A.   Kwame Kilpatrick.

24   Q.   Thank you.  I want to show you now Cobo 4.  And this is

25   approximately one week later, April 24, 2002.

*Robert Beeckman - Direct*
*Wednesday, December 5, 2012*

15

```
 1              MR. BULLOTTA:  And this is Cobo 4, Your Honor.

 2              THE COURT:  Yes.

 3    BY MR. BULLOTTA:

 4    Q.  Is this another text message between Bernard Kilpatrick and

 5    Derrick Miller?

 6    A.  Yes.

 7    Q.  Can you tell us -- can you read this text message?

 8    A.  Yes.  This is Bernard Kilpatrick:  "It's time to call Lou

 9    on the Karl deal, exactly like the maintenance."

10              MR. BULLOTTA:  And then can we see the next part of

11    this message.  Is that the only part?  Okay.  Thank you.

12    BY MR. BULLOTTA:

13    Q.  And then show you Cobo 5, another text message.  Okay.

14    First of all, this is Cobo 5, and what's the date of this text

15    message?

16    A.  January --

17              A JUROR:  What was last one, Cobo 4?

18              MR. BULLOTTA:  Cobo 4.

19              A JUROR:  And this is Cobo 5?

20              MR. BULLOTTA:  Yes.

21              A JUROR:  Could you slow it down a bit?

22              MR. BULLOTTA:  Sure.

23    A.  The date of this text message --

24              MR. BULLOTTA:  Can I inquire, do we need to go back

25    for the juror?
```

*10-CR-20403   USA v. Kwame Kilpatrick, et al*

1          **A JUROR:**  No.

2          **THE COURT:**  No.

3          **MR. BULLOTTA:**  No?  Okay.  I'll just go slower.

4    A.  The date of this text message is January 25, 2003.

5    **BY MR. BULLOTTA:**

6    Q.  And who is talking in this text here?

7    A.  Bernard Kilpatrick.

8    Q.  And what does he say?

9    A.  Got to kind of interpolate the typographical errors.  It's

10   "HT," it seems obvious that it's, "What happened to the email,

11   brother?  Karl is getting real nervous.  I think Tuesday is the

12   deadline.  Call him at 248-866-0808 to reassure.  Thanks."

13   Q.  Do you recognize that phone number, 248-866-0808?

14   A.  Yes, that's Karl Kado's cell phone number.

15   Q.  So Bernard Kilpatrick is telling Derrick Miller to call

16   Karl Kado to reassure him?

17   A.  Yes.

18   Q.  Can we see the next, the reply from Derrick Miller?  Sorry,

19   it's not a reply from Derrick Miller, can you tell us what this

20   is?

21   A.  Yes, it's a second text message from Bernard Kilpatrick.

22   It says --

23   Q.  Let me stop you.  I'm sorry.  Who is Ziz, Z-i-z?

24   A.  That's a nickname for Bernard Kilpatrick.

25   Q.  Okay.  And what does Bernard Kilpatrick say?

*Robert Beeckman - Direct*
*Wednesday, December 5, 2012*

1    A.  "Did you hook Karl up with the Cobo Hall stuff?"

2    Q.  Does Derrick Miller reply?

3    A.  Yes, he replies, "Lou never sent the letter.  I checked.  I

4    will take care of it Monday."

5    Q.  And, again, who is Lou?

6    A.  Pavledes, he's the director of Cobo Hall.

7    Q.  And then does Bernard Kilpatrick reply to Derrick Miller

8    when he said that he would take care of it?

9    A.  Yes.  He says, "Cool.  They told me he sent the letter."

10   Q.  Okay.  Thank you.  And do you recall -- well, let me show

11   you Cobo 6 that's been admitted into evidence.  Is there one

12   more text message -- well, is there another text message

13   dealing with this?

14   A.  Yes, January 28, 2003, from Bernard Kilpatrick, "Did you

15   hook up the deal at Cobo today?"

16   Q.  And who is that to?

17   A.  That's to Derrick Miller.

18   Q.  And there's no reply to that, is that right?

19   A.  Correct.

20   Q.  And that date again, can we see that date again, the last

21   one I showed?  Can you see the date of this?

22   A.  January 28, 2003.

23   Q.  Okay.  And then I want to show you, actually, one more text

24   message.  Cobo 7.  What's the date of Cobo 7?

25   A.  January 31st, February 1st and 2nd of 2003.

*10-CR-20403   USA v. Kwame Kilpatrick, et al*

*Robert Beeckman - Direct*
*Wednesday, December 5, 2012*

18

1    Q.  Okay.  And who is talking, who is communicating in this

2    text exchange?

3    A.  Derrick Miller and Bernard Kilpatrick.

4    Q.  Can we -- can you tell us who is talking and read the text?

5    A.  First one is Derrick Miller.  "I have a meeting with Lou on

6    Monday.  Just like I thought this guy never sent a letter.  Now

7    he wants to talk in person."

8    Q.  Do you know what "this guy" refers to?

9    A.  I think he's talking about Lou Pavledes.

10   Q.  Okay.  So who is Derrick Miller saying he's going to talk

11   in person to?

12   A.  Lou Pavledes.

13   Q.  Okay.  And then what is Bernard Kilpatrick's response?

14   A.  "That's strange.  He told Karl he sent it to you.

15   Congratulations on the district, by the way, did they extend

16   the Paratransit contract for another year?  I'm having lunch

17   with Bob Polk."

18   Q.  Can we keep going?

19   A.  Miller replies, "Thanks, don't know, I will check on it.

20   Lou is shifty."

21   Q.  And again, Lou is Lou Pavledes, the director of Cobo?

22   A.  Yes.

23   Q.  At that time?

24   A.  Yes.

25   Q.  And then what is Bernard Kilpatrick's response?

*10-CR-20403   USA v. Kwame Kilpatrick, et al*

1   A.  "Cool."

2   Q.  And then is there another text, is there a text the

3   following day on February 2nd, 2003?

4   A.  Yes.

5   Q.  From Bernard Kilpatrick to Derrick Miller?

6   A.  Yes.

7   Q.  And what does he say?

8   A.  "Make sure he leaves your office with the letter.  I would

9   really like a copy of it to check on both Lou and Karl.  Is

10  your meeting in the morning?"

11  Q.  And then is there a response from Derrick Miller?

12  A.  Yes.

13  Q.  Okay.  Can we go back -- and then this is February 2nd of

14  2003?

15  A.  Yes.

16  Q.  Let me show you what's already been marked and what we've

17  already seen, shown to the jury as Cobo 8.  So three days

18  later, is there a letter February 5th of 2003 from the

19  director, Lou Pavledes, the director of Cobo, to Karl Kado?

20  A.  Yes.

21  Q.  And what does that letter say?

22  A.  Says, "The Civic Center Department has approved and on

23  February 5th, 2003, obtained from the City of Detroit its

24  agreement for the assignment of the Cobo Hall electrical

25  services contract to MSO from Trade Show Electrical (TSE)."

*Robert Beeckman - Direct*
*Wednesday, December 5, 2012*

1   Q.  So two days after that last Derrick Miller exchange with

2   Bernard Kilpatrick, Karl Kado gets a letter saying he's got the

3   electrical contract, right?

4   A.  Yes.

5   Q.  Thank you.  Now, did you in your investigation look for

6   evidence of contact between former Mayor Kilpatrick and

7   Karl Kado?

8   A.  Yes.

9   Q.  Was one of the items you looked at the mayor's calendar?

10  A.  Yes.

11  Q.  Did that include the mayor's official calendar for 2003,

12  2004?

13  A.  Yes.

14  Q.  I want to show you what's been marked as Cobo 9, and what

15  is this?  Can we see the top, the date at the top.

16  A.  Yes.  This is the calendar page for Friday, April 11, 2003.

17          **MR. BULLOTTA:**  Okay.  Scroll down, Ms. Facchini.

18  **BY MR. BULLOTTA:**

19  Q.  Okay.  Do you see a meeting on the schedule from 6:00 p.m.

20  to 7:00 p.m.?

21  A.  Yes.

22  Q.  And who is that meeting with?

23  A.  Karl Kado.

24  Q.  And that's a meeting between the mayor and Karl Kado,

25  according to this?

*10-CR-20403   USA v. Kwame Kilpatrick, et al*

*Robert Beeckman - Direct*
*Wednesday, December 5, 2012*

21

1   A.  Yes.

2   Q.  And then I want to show you Cobo, I don't want to go too

3   fast though, Cobo Exhibit 10, Cobo 10.  Is this another

4   calendar page from Mayor Kilpatrick's calendar?

5   A.  Yes.  It's for Saturday, August 9, 2003.

6            **MR. BULLOTTA:**  Okay.  Sorry, there's a question in

7   the back.

8            **A JUROR:**  Yes, just having a little trouble with the

9   last document, what the date was.

10           **MR. BULLOTTA:**  Can we go back to Cobo 9 and look at

11  the date.

12  A.  Friday, April 11, 2003.

13           **A JUROR:**  Thank you.

14  **BY MR. BULLOTTA:**

15  Q.  Okay.  And then Cobo 10, what's the date on Cobo 10?

16  A.  Saturday, August 9th, 2003.

17  Q.  And can we go down to 3:00 p.m.  Do you see the mayor

18  having an appointment at 3:00 p.m.?

19  A.  Yes.

20  Q.  And what do you see?

21  A.  "3:00 p.m. to 3:15 p.m., Jessica Kado, Karl's daughter,

22  graduation from medical school.  White coat ceremony,

23  Maverick's, 630 Woodward.  Contact Karl Kado," and that's his

24  telephone number.

25  Q.  That's Mr. Kado's cell phone number?

*10-CR-20403    USA v. Kwame Kilpatrick, et al*

*Robert Beeckman - Direct*
*Wednesday, December 5, 2012*

22

1    A.  Yes.

2    Q.  Thank you.  Now, you heard Mr. Kado testify that

3    Kwame Kilpatrick contacted him and then they met and he gave

4    Mr. Kilpatrick money?

5    A.  Yes.

6    Q.  Did you see any text involving, any text messages involving

7    Karl Kado and the Mayor Kilpatrick?

8    A.  Yes.

9    Q.  Let me show you Cobo 12.  First of all, what's the date on

10   Cobo 12?

11   A.  January 14, 2004.

12   Q.  And who is sending this text?

13   A.  This is Meagan Pitts.

14   Q.  And do you know whether Meagan Pitts was a secretary for

15   the mayor or worked in the --

16   A.  That's a staffer in his office, not sure of her title.

17   Q.  And what does she say to the mayor?

18   A.  "Mr. Mayor, Karl Kado just called you.  He missed your call

19   just now," and that's Mr. Kado's cell phone number.

20   Q.  So she's telling the mayor that Mr. Kado missed the mayor's

21   call?

22   A.  Yes.

23   Q.  Thank you.  Can we see Cobo 14.  What's the date on

24   Cobo 14, please?

25   A.  January 23rd, 2004.

*10-CR-20403   USA v. Kwame Kilpatrick, et al*

*Robert Beeckman - Direct*
*Wednesday, December 5, 2012*

23

1   Q.  And is it from another staffer, someone named Samara?

2   A.  Yeah, that's Samara Bradley.

3   Q.  Samara Bradley worked in the mayor's office?

4   A.  Yes.

5   Q.  And she's sending a text to the mayor?

6   A.  Yes.

7   Q.  And what does her text say?

8   A.  "Karl Kado," and his telephone number.

9   Q.  So she's supplying the mayor with Karl Kado's cell phone

10  number?

11  A.  Yes.

12  Q.  Based on your involvement in this case -- you can turn

13  around now.  I'm done showing you things.

14          Were you involved in the investigation of Karl Kado

15  himself?

16  A.  Yes.

17  Q.  And are you aware that he has been sentenced?

18  A.  Yes.

19  Q.  And does he have any pending charges?

20  A.  No.

21  Q.  In any of your meetings with Karl Kado, did Karl Kado ever

22  tell you that he hired Bernard Kilpatrick as a consultant?

23  A.  No.

24  Q.  And after Mayor Kilpatrick left office, did Karl Kado tell

25  you that he ever gave anything of value, any money to

*10-CR-20403   USA v. Kwame Kilpatrick, et al*

1    Mayor Kilpatrick after Mayor Kilpatrick left office?

2    A.  No.

3    Q.  And Mr. Kado made a number of recordings at your direction,

4    is that right?

5    A.  Yes.

6    Q.  And when he was -- the jury heard the recordings from

7    February and March of 2008, the first one at Tom's Oyster Bar

8    and the second one at the breakfast spot?

9    A.  Yes.

10   Q.  What was -- at that point, Kado was cooperating, is that

11   right?

12   A.  Yes.

13   Q.  Was he trying to hire Bernard Kilpatrick at that point or

14   what was he -- can you explain to the jury what he was doing?

15   A.  Yes, we had debriefed him with his attorney, and he said

16   that he was still having conversations with Bernard Kilpatrick

17   and would be able to carry on a conversation with

18   Bernard Kilpatrick, and he told us that -- Mr. Kado told us

19   that Mr. Kado was owed this money from the city, and that

20   Bernard Kilpatrick wanted to assist him and obtain some of

21   that --

22          MR. SHEA:  Your Honor, I'm going to object to the

23   extent this goes beyond just the agent explaining why it was he

24   had Mr. Kado wired for these meetings.  I don't think we need a

25   history of the investigation.

*Robert Beeckman - Direct*
*Wednesday, December 5, 2012*

25

1           **THE COURT:**  I don't think we're getting a history,

2     but I agree that this should be confined to why he was wired

3     for these meetings.

4           **MR. SHEA:**  I mean, I think it's fairly obvious from

5     Mr. Kado's testimony, to be honest.

6           **MR. BULLOTTA:**  I just want to get at, what was the

7     goal, what were they trying to accomplish by wiring --

8           **THE COURT:**  Why don't you ask that specific

9     question.

10    **BY MR. BULLOTTA:**

11    Q.  What was the goal there?

12    A.  Okay, I'll trim it up.  We had a reason for them to talk,

13    that was the point, so we had Mr. Kado reach out to

14    Mr. Kilpatrick and say let's talk about this business with the

15    money that was owed to him, and in the course of that

16    conversation I had a certain number of things that I asked

17    Mr. Kado to bring up in the conversation.

18    Q.  So he was bringing up things that you had prompted him or

19    told him to try to bring up?

20    A.  That's correct.

21    Q.  And were you trying to corroborate what he had previously

22    told you?

23          **MR. SHEA:**  Well -- okay.

24    A.  Yes.

25

*10-CR-20403   USA v. Kwame Kilpatrick, et al*

*Robert Beeckman - Cross*
*Wednesday, December 5, 2012*

26

1      BY MR. BULLOTTA:

2      Q.  And prior to making the tapes, he told you a lot of

3      information, didn't he?

4      A.  Yes.

5      Q.  And on the tapes, one of the things he had told you was

6      about the $100,000 payoff to Bernard Kilpatrick, right?

7      A.  Correct, yes.

8      Q.  And then after he told you that, those tapes were made,

9      right?

10             **MR. SHEA:**  Your Honor, I'm going to object because

11     now we're get into bolstering.  There's no prior inconsistent

12     statement with respect to that.  It's not necessary.

13             **THE COURT:**  I agree.

14     BY MR. BULLOTTA:

15     Q.  Okay.  Well, you heard --

16             **THE COURT:**  I don't think we need to have

17     Mr. Beeckman kind of bolster Mr. Kado's testimony here.  I

18     don't think it's appropriate.

19     BY MR. BULLOTTA:

20     Q.  But you listened to the recordings that we heard in court,

21     correct?

22     A.  Yes.

23             **MR. BULLOTTA:**  Thank you.  No further questions.

24                                          (9:49 a.m.)

25

*10-CR-20403    USA v. Kwame Kilpatrick, et al*

1                          **CROSS EXAMINATION**

2    **BY MR. THOMAS:**

3    Q.  Morning, Agent Beeckman, how are you?

4    A.  Morning.

5    Q.  I have a couple of areas I want to go into as a result of

6    the redirect by the government.  You had indicated that on two

7    occasions that you had spoken to Mr. Kado regarding his

8    dementia?

9    A.  Yes.

10   Q.  And that would have been in April of 2012?  March or April

11   2012?

12   A.  Yeah, I don't have the date memorized, but I'm sure you

13   have it in my report.

14   Q.  We already talked about it, it was earlier on in this year.

15   A.  Correct.

16   Q.  And then at some point later, as the case agent, you were

17   reviewing the files to take a look at Brady and Giglio material

18   and see whether or not that could be or should be something

19   that would be turned over to the defense?

20   A.  That's right, yes.

21   Q.  There had been a request, had there not been, for

22   Brady/Giglio material to be disclosed?

23   A.  Yeah, there is in every case.  I'm sure there was.

24   Q.  There was in this one?

25   A.  Yes.

*Robert Beeckman - Cross*
*Wednesday, December 5, 2012*                                    28

1    Q.  And so you didn't want to get caught flatfooted if we found

2    out about this allegation of dementia?

3              **THE COURT:**  Excuse me for interceding here, but just

4    so the jury understands, Brady and Giglio material is material

5    that may be exculpatory for the defense, and may go to

6    undermining the witness in some way, so that's what Brady and

7    Giglio materials, and it is a rule of all criminal proceedings

8    that the prosecution, if they become aware of material which

9    may lead to exculpatory evidence for the defense, must turn it

10   over.

11             **MR. THOMAS:**  Thanks, Judge.

12   **BY MR. THOMAS:**

13   Q.  And so when we're talking about exculpatory information,

14   we're talking about information that might be helpful to the

15   defense?

16   A.  Correct.

17   Q.  And it might undermine the credibility of a witness?

18   A.  Yes.

19   Q.  Or impeach him?

20   A.  Yes.

21   Q.  And when we say "impeachment," that is call into question

22   his credibility?

23   A.  Correct, yes.

24   Q.  All right.  Now, you are a former prosecutor.

25   A.  Yes.

*10-CR-20403    USA v. Kwame Kilpatrick, et al*

*Robert Beeckman - Cross*
*Wednesday, December 5, 2012*

29

1    Q.  And you're an FBI agent?

2    A.  Yes.

3    Q.  And you've probably had training in exculpatory evidence

4    and how to look for it?

5    A.  Yes.

6    Q.  And you recognize this as a potential --

7    A.  Yes.

8    Q.  -- exculpatory thing that we would use in cross

9    examination?

10   A.  Yes.

11   Q.  Now, you weren't surprised that we were using it?

12   A.  No.

13   Q.  And the reason why you weren't surprised is because it

14   calls into question his ability to recall.

15            MR. BULLOTTA:  Your Honor, I'm going to object as to

16   why he was using it and his opinion as to why he was using it.

17   It's irrelevant.

18            THE COURT:  Overruled.

19   A.  I'm sorry, I missed the last --

20   BY MR. THOMAS:

21   Q.  It calls into question his ability to recall?

22   A.  That's a potential, yes.

23   Q.  Well, I mean, if a person has dementia, that's a medical

24   term, but he told you that he was getting lost and he was

25   having difficulty remembering things.

*10-CR-20403    USA v. Kwame Kilpatrick, et al*

*Robert Beeckman - Cross*
*Wednesday, December 5, 2012*

30

1   A.  I don't think he said he was getting lost.  I think he said

2   he was having difficulty remembering things and --

3   Q.  Confused.

4   A.  I don't think he even said confused.  I think he said he

5   was having trouble remembering things and that sort of thing,

6   he was noticing a problem with his memory so --

7   Q.  Well, you had had, you say, 50 contacts with him over the

8   five -- 2005 to 2012, so that's seven years that you had with

9   him, correct?

10  A.  Correct.

11  Q.  And in those 50 communications, he's talking to you about

12  things relating to Mr. Kwame Kilpatrick and Bernard Kilpatrick,

13  as he had testified to.

14  A.  True.

15  Q.  And so I want to get to the area that you said that there

16  was nothing that he said was false or misleading.  Is that what

17  you represented, that nothing he said was false or misleading?

18  A.  Not to me.

19  Q.  Well, you recognize the disparity of his communication on

20  the witness stand from what it was that he told you on

21  February 22nd, 2006, don't you?

22  A.  What do you mean, he was inconsistent on a detail?

23  Q.  Yes.

24  A.  Yes.  I don't recognize that as being, somebody being false

25  or misleading me if somebody's incorrect on a detail.

*10-CR-20403   USA v. Kwame Kilpatrick, et al*

*Robert Beeckman - Cross*
*Wednesday, December 5, 2012*

1  Q.  Well, if he says that Kwame Kilpatrick called him and asked

2  him for a specific amount of money, that's not, that's not what

3  he said in his statement to you on February 22nd, 2006, is it?

4  A.  I'd need to see it.

5          **MR. THOMAS:**  I'm going to approach with his FBI 302

6  dated February 22nd, 2006, all right.

7  **BY MR. THOMAS:**

8  Q.  I'm referring to Page 2 of the 302.

9  A.  It would help me if you asked me a specific question rather

10 than read this whole thing.

11 Q.  Here's my specific question.  Have you reviewed it?

12 A.  Yes.

13 Q.  Does it refresh your recollection as to what it was that he

14 had said to you?

15 A.  Yes.

16 Q.  Did he review this 302 at any time shortly after you had

17 generated it?

18 A.  You know, there were some that he reviewed shortly after

19 they were generated, I sent them to his attorney.  I don't

20 remember if this was one of them or not.  That's something that

21 I do occasionally but I can't say for certain.  He's reviewed

22 it at some point in the process.

23 Q.  Okay.  Well, as I'm sitting here looking at you and you're

24 not looking at me, but I need you to look at me.

25 A.  Oh, sorry.

*10-CR-20403   USA v. Kwame Kilpatrick, et al*

1   Q.  As we're sitting here, you recognize a difference between a
2   phone call for the mayor and a phone call from Kwame Kilpatrick
3   who was not yet mayor?
4   A.  Correct.
5   Q.  You understand -- because the latter would imply that he
6   wasn't in office and wasn't in position to give him any benefit
7   at that point?
8   A.  If he's not mayor?
9   Q.  Yeah, if he's not mayor.
10  A.  Yeah --
11  Q.  He might have the potential, but he's not the mayor, he's
12  got no power over Pavledes, does he?
13  A.  Not yet.
14  Q.  Okay.  And do you recognize the difference between saying
15  that the mayor called him and said I need $10,000 versus the
16  mayor calling him and saying that he needs funds for his bid,
17  his mayoral bid?
18  A.  That would be a difference, yes.
19  Q.  Because he's not asking for a specific amount, number one,
20  right?
21  A.  Correct.
22  Q.  And the second part is that that would imply that at that
23  time that he wasn't in office.
24  A.  Yes.
25  Q.  Because he's bidding for office, he hasn't gotten it yet,

1   right?

2   A.   Right.

3   Q.   And when you talk to him, he had given you information that

4   was inconsistent with Mr. Kilpatrick being in office at the

5   time, which is what he testified to.  You were here, you heard

6   that part, right?

7   A.   Yes.

8   Q.   Because he said that it was just after the debate at Cobo

9   Hall that he was contacted.

10  A.   In the interview, you're talking about, right?

11  Q.   Right, in his 302.

12  A.   Right.

13  Q.   And the debate at Cobo Hall was in October of 2001.

14  A.   Right.

15  Q.   Which was before the election, correct?

16  A.   Correct.

17  Q.   The election was done on October, I'm sorry, November,

18  whatever, early November?

19  A.   First Tuesday.

20  Q.   And he actually doesn't take office until January of 2002.

21  A.   Right.

22  Q.   Right.  So, and in his report, did he -- I'm sorry, in his

23  statement to you, did he not say that Kwame Kilpatrick

24  contacted Kado and asked him to financially support his mayoral

25  bid?  Isn't that what he said to you back in 2006?

1    A.   Yes.

2    Q.   The contact approximately one week after the debate between

3    Kwame and Gil Hill at Cobo Hall?

4    A.   Yes.

5    Q.   Did he not say that to you?

6    A.   Yes.

7    Q.   Now, you're a federal agent, you've gone to Quantico, and

8    you and I have had a lot of cases together.  I mean, you're

9    trained in how to take notes, right?

10   A.   Yes.

11   Q.   And you want to take as accurate of notes as you can?

12   A.   True.

13   Q.   These are accurate notes?

14   A.   I'm sure they are, yes.

15   Q.   All right.  And it was Kado that provided Miller with an

16   envelope containing $10,000, correct?

17   A.   Yes.

18   Q.   That's what he told you.  Not a brown paper bag?

19   A.   Correct.

20   Q.   Now, we just saw the Cobo exhibits, 12 and 14, which were

21   in January of 2004, correct?

22   A.   Yes.

23   Q.   And those show a communication between Karl Kado and

24   Kwame Kilpatrick, correct?

25   A.   Correct.  Well, showed me -- are you talking about the

1   mayor's calendar?

2   Q.  No, let's -- can we see 12.1, please.  I misspoke.  This is

3   not a -- well, this is a communication between the mayor and

4   somebody in his office, Meagan Pitts?

5   A.  Right.

6   Q.  "Karl Kado just called you," right?

7   A.  Yes.

8   Q.  And this is supposed to corroborate the fact that Mr. Kado

9   and Mr. Kilpatrick are communicating.

10   A.  Correct.

11   Q.  Right?  And that there's a phone number between them,

12   right?

13   A.  Correct.

14   Q.  But there's nothing in here that implies that there is any

15   money going to be paid.

16   A.  It doesn't say that, no.

17   Q.  It's Karl Kado just calling Mayor Kilpatrick, correct?

18   A.  Correct.

19   Q.  Now, can you tell me what's going on in January 2004 as it

20   is in January of every year in Detroit downtown?

21   A.  It would be either getting ready for the auto show or the

22   show itself.

23   Q.  The auto show itself?

24   A.  Yes.

25   Q.  Big event?

*Robert Beeckman - Cross*
*Wednesday, December 5, 2012*

36

1   A.   Yes.

2   Q.   The largest event Detroit has every year except for maybe

3   the Super Bowl that we had?

4   A.   Yes.

5   Q.   It's a chance for Detroit to showcase their automobiles and

6   the automobiles throughout the world to the world, right?

7   A.   Yes.

8   Q.   And Karl Kado was at that point, what was his position at

9   Cobo Hall?

10  A.   He was the exclusive contractor on the electrical and the

11  cleaning.

12  Q.   It's important, then, if we're showcasing the City of

13  Detroit for it to be clean?

14  A.   Yes.

15  Q.   And to make sure that things are getting done correctly?

16  A.   Yes.

17  Q.   And so it would not be unusual, then, for the mayor to have

18  contact with the person who is in charge of that at Cobo Hall,

19  would it?

20  A.   No.

21  Q.   He also had a food concession there, too, right?

22  A.   You asked me if it would be unusual for him to have contact

23  with the, a contractor --

24  Q.   You would expect --

25  A.   -- well --

*10-CR-20403   USA v. Kwame Kilpatrick, et al*

1    Q.  -- that he would have contact or communication.

2    A.  Well --

3           **MR. BULLOTTA:**  Your Honor, can I ask that he be

4    allowed to answer?  He was cut off.

5           **MR. THOMAS:**  Well, I thought he was asking me --

6           **THE COURT:**  I think he was answering the question

7    and you jumped in.

8    A.  I guess I should say, I mean, I don't think it's unusual

9    that the mayor would care if Cobo Hall was clean and things

10   were running correctly and so forth, but he's got two or three

11   levels of supervision below him.  I think him calling a

12   contractor directly to talk about whether it's clean or

13   whatever, I do think that's extremely unusual.

14   **BY MR. THOMAS:**

15   Q.  But he's not calling the contractor; the contractor is

16   calling him.

17   A.  Yes, but you asked me if it would be unusual for them to

18   have a conversation about whether it's clean or not.  I do

19   think that's unusual, yes.

20   Q.  Okay.  How many employees did Mr. Kado say on his direct

21   examination that he supervises over there?

22   A.  I don't remember.

23   Q.  Hundreds, maybe even thousands at any given time, correct?

24   A.  Maybe, yes.

25   Q.  Issues relating to the union might come into play?

*Robert Beeckman - Cross*
*Wednesday, December 5, 2012*

38

1    A.   True.

2    Q.   Issues relating to maybe a concession or making sure that

3    things are going to be appropriate for the mayor, who will be

4    entertaining at Cobo Hall, would be something that you might

5    consider that they would be talking about.

6    A.   Again, I agree that's an area of interest for the mayor, I

7    think that's something he'd be concerned about, but you got a

8    lot of people between the mayor and Karl Kado.

9    Q.   Okay.  You may have, and I'll grant you that, but you can't

10   rule out the possibility that this is an innocuous conversation

11   that has nothing to do with payoffs?

12   A.   True, I'm not privy to the conversation.  I can't say.

13   Q.   And unless you're a mind-reader, you have no idea what the

14   heck it is going to be.

15   A.   True.

16   Q.   But I'm trying to give you alternatives to your theory.

17   You're a former prosecutor and FBI agent, you're naturally

18   suspicious, but there might be other reasons.

19   A.   Yeah, well --

20   Q.   Wouldn't you agree?

21   A.   Yeah, I suppose that's possible, yes.  I agree to

22   everything except for the "naturally suspicious" part.

23   Q.   I embrace possibilities, do you?

24   A.   Sure.

25   Q.   Okay.  Now, Cobo-13, and not to go too far with any of

*10-CR-20403    USA v. Kwame Kilpatrick, et al*

*Robert Beeckman - Cross*
*Wednesday, December 5, 2012*

39

1   this, but January 15, 2005, that is, that's a year later,
2   correct?
3   A.  Yes.
4   Q.  And this is a communication with -- that doesn't relate to
5   Mr. Kilpatrick, correct?
6   A.  Correct, yes.
7   Q.  And is this -- can I have 14, please.  Phone message to
8   Mr. Kilpatrick, correct?
9   A.  Yes.
10  Q.  On January 23, 2004?
11  A.  Correct.
12  Q.  And in essence, Karl Kado and his number, I guess if you
13  wanted to extrapolate, Samara is telling him to call Karl Kado.
14  A.  Yes.
15  Q.  Again, in 2004, similar to what we were talking about
16  relating to Cobo Exhibit 12.1, at or about the time of the auto
17  show?
18  A.  True.
19  Q.  To the guy who is in charge of food, electrical,
20  concessions and keeping it clean?
21  A.  Yes.
22  Q.  And a call to the mayor?
23  A.  Yes.
24  Q.  Now, you heard Mr. Kado testify that he and the mayor had a
25  personal relationship and that not all these calls were about

*Robert Beeckman - Cross*
*Wednesday, December 5, 2012*                    40

1    money, assuming that we give him credibility.

2    A.  Right, that's what he said, yes.

3    Q.  Now, Mr. Bullotta then asked you, at the present time there

4    were no pending charges against Mr. Kado, correct?

5    A.  Correct, yes.

6    Q.  The government never charged him with racketeering?

7    A.  No.

8    Q.  You were investigating him in the beginning as it relates

9    to tax matters, correct?

10   A.  Not me personally on the tax matters.  That was an IRS

11   agent that was assigned to investigating the tax matters.

12   Q.  Does the FBI investigate money laundering?

13   A.  Yes.

14   Q.  Money laundering would be skimming money from a business,

15   wouldn't it?

16   A.  Could be --

17   Q.  Money --

18   A.  -- depending on how you hide it.

19   Q.  I'm sorry, I'll slow down.

20   A.  Depending on how you hide it, it could be.

21   Q.  I give cash that's from ill-gotten gains to some other

22   person, rather than a check, that could be construed as money

23   laundering?

24   A.  It could be.

25   Q.  He didn't get charged with money laundering?

*10-CR-20403    USA v. Kwame Kilpatrick, et al*

*Robert Beeckman - Cross*
*Wednesday, December 5, 2012*

41

1    A.  No.

2    Q.  He didn't get charged with mail fraud?

3    A.  No.

4    Q.  He negotiated a reduced charge and the elimination of other

5    charges.

6    A.  I don't know about that.  I don't know if he got a reduced

7    charge or --

8    Q.  Well, let's talk --

9    A.  I mean, he pled to a tax count, but whether it was reduced

10   or not, that's not my area.

11   Q.  You were in -- okay.  Let's just talk about what your area

12   is.  When you opened your case file against Karl Kado, what

13   were the charges that you initially opened your case file?

14   A.  I didn't have any charges.  We don't have charges when we

15   open a case file.

16   Q.  No, but you have investigation into.  He's not charged

17   until actually he's indicted, right?

18   A.  Right.

19   Q.  But you were looking into allegations relating to mail

20   fraud, money laundering.

21   A.  Yeah, I'm not, I'm not sure where you're going with the

22   mail fraud on Karl Kado.  We were looking at bribes that were

23   paid at Cobo Hall.  We had a number of people saying that there

24   were bribes being paid and that's the reason we were

25   investigating.

*Robert Beeckman - Cross*
*Wednesday, December 5, 2012*                                    42

1    Q.  And that's a federal offense.

2    A.  Right.

3    Q.  Those are higher penalties, are they not, than tax charges?

4    A.  Yes.

5    Q.  Money laundering, were you looking at him for money

6    laundering?

7    A.  No.  I'm not saying that possibility wouldn't have existed

8    down the road, but that's not something that was --

9    Q.  If he hadn't come in and said he was going to cooperate

10   right away, that possibility existed, correct?

11   A.  Sure.

12   Q.  Money laundering penalties are much higher than tax

13   consequences, are they not?

14   A.  Yes.

15   Q.  Were there any other charges that you were looking at for

16   him?

17   A.  No.

18   Q.  But you would agree with me that if he was made part of a

19   racketeering conspiracy because he was engaged in bribery or

20   corruption, that his racketeering guidelines would be through

21   the roof?

22   A.  They'd be significantly higher, yes.

23          **MR. THOMAS:**  I don't think I have anything further.

24   Thank you, Judge.

25          **THE COURT:**  Mr. Shea.

*10-CR-20403   USA v. Kwame Kilpatrick, et al*

*Robert Beeckman - Cross*
*Wednesday, December 5, 2012*

43

1          **MR. SHEA:**  Thank you, Judge.

2                                         (10:07 a.m.)

3                          **CROSS EXAMINATION**

4     **BY MR. SHEA:**

5     Q.  Morning, Agent Beeckman.

6     A.  Morning.

7     Q.  How are you doing?

8     A.  Terrific.

9     Q.  You'll recall that I cross examined Karl Kado regarding a

10    statement he made in the March 1, 2008 recording regarding a

11    lotto tab that he claimed to have covered on behalf of

12    Bernard Kilpatrick, correct?

13    A.  Yes.

14    Q.  All right.  Now, I want to set the stage for this a little

15    bit.  You interviewed Mr. Kado a lot of times in the course of

16    this investigation?

17    A.  Yes.

18    Q.  Correct?  You had one interview, before he received a

19    target letter, in January of '05, but the remainder of those

20    interviews -- and I recognize some of these are telephone

21    contacts -- were after he received that target letter in early

22    September of 2005, correct?

23    A.  Yes.

24    Q.  And the first of those post-target letter interviews was on

25    February 22, 2006, is that correct?

*Robert Beeckman - Cross*
*Wednesday, December 5, 2012*                                    44

1    A.  Right.

2    Q.  And shortly after that, on March the 2nd, 2006, you had a

3    second interview with him, correct?

4    A.  Yes.

5    Q.  Both of those were rather lengthy, is that fair?

6    A.  Yes.

7    Q.  And both of those covered, among other things, Karl Kado's

8    relationship with Bernard Kilpatrick?

9    A.  Correct, yes.

10   Q.  At some length, right?

11   A.  Yes.

12   Q.  I mean, not to put too fine a point on it, but essentially

13   you shook him upside down and wanted to know everything he knew

14   about Bernard Kilpatrick?

15   A.  Well, that was the point of asking the --

16   Q.  Yeah.

17   A.  -- the questions.

18   Q.  Sure, I get it, I get it.

19          Now, in the March 2nd, 2006 interview, he reported

20   to you that he had covered a $20,000 lottery tab that

21   Bernard Kilpatrick had run up to his brother Andrew Kado,

22   correct?

23   A.  Right.

24   Q.  So Bernard Kilpatrick was purchasing lottery tickets at

25   Andrew Kado's store, correct?

*Robert Beeckman - Cross*
*Wednesday, December 5, 2012*

45

1   A.  Correct.

2   Q.  Ran up a $20,000 tab, correct?

3   A.  Yes.

4   Q.  Karl Kado paid it or -- I think what he said is he loaned

5   his brother the money to cover it, correct?

6   A.  Right.

7   Q.  Bernard Kilpatrick paid off Andrew Kado for what he owed,

8   correct?

9   A.  Wait a minute, Bernard Kilpatrick paid off Andrew Kado.

10  Q.  Yes, and then Andrew Kado paid Karl Kado back?

11  A.  Yeah, I know --

12  Q.  Want me to --

13  A.  Yeah, I need to see that.

14  Q.  I know it's awhile ago.

15  A.  Is it February 22nd?

16  Q.  No, this is March 2nd, '06, the second interview after the

17  target letter.

18  A.  Yes, okay, you're correct, yes.

19  Q.  Right?  Okay.  So that's what he describes to you on

20  March 2nd, 2006, correct?

21  A.  Yes.

22  Q.  All right.  Now, on March 1st, 2008, you've got Mr. Kado

23  wired for this meeting at, this breakfast meeting he's going to

24  have with Bernard Kilpatrick, correct?

25  A.  Correct.

*Robert Beeckman - Cross*
*Wednesday, December 5, 2012*

46

1    Q.  And at that time you hear Karl Kado discussing this $80,000
2    lotto tab that he claims to have covered for
3    Bernard Kilpatrick, correct?
4    A.  True.
5    Q.  And you hear Bernard Kilpatrick say, "No, no, no, no way it
6    was anywhere close to that," correct?
7    A.  Correct.
8    Q.  Now, between March 2nd, 2006 and March 1st, 2008 when that
9    breakfast meeting occurred, you'd had numerous contacts with
10   Karl Kado?
11   A.  I'm sure I did, yes.
12   Q.  Including numerous contacts in, very shortly before this
13   March 1st, 2008 breakfast meeting, correct?
14   A.  True.
15   Q.  I mean, starting in early February, February 4th, I
16   believe, you and Mr. Kado were discussing Mr. Kado monitoring
17   his contacts with Bernard Kilpatrick regarding the amounts that
18   the City of Detroit owed Karl Kado, correct?
19   A.  I'm sorry, say that again.
20   Q.  Obviously, before Mr. Kado recorded Bernard Kilpatrick on
21   March 1st, he had to have had discussions with you about that?
22   A.  Right.
23   Q.  And that was actually the second recorded meeting, right?
24   A.  Yes.
25   Q.  The first recorded meeting was on February 8th, 2006,

*10-CR-20403    USA v. Kwame Kilpatrick, et al*

1   correct?

2   A.  The Tom's Oyster Bar, you talking about?

3   Q.  I'm sorry, February 8, 2008, yes.

4   A.  Yeah.

5   Q.  Tom's Oyster Bar.

6   A.  Right.

7   Q.  So we've got -- and he was recording that meeting as well?

8   A.  Correct, yes.

9   Q.  Obviously, you had had discussions with Mr. Kado prior to

10  that about making that recording.

11  A.  Right.

12  Q.  All right.  So there's at least a month, probably longer,

13  of you having pretty regular contact with Karl Kado about his,

14  your continuing investigation of Bernard Kilpatrick and his

15  cooperation in that.

16  A.  True.

17  Q.  All right.  Never, from March 2nd, 2006, when he first

18  tells you about this $20,000 lotto tab, to March 1, 2008 when

19  you hear him talking about an $80,000 lotto tab, does he tell

20  you about any $80,000 lotto tab, is that correct?

21  A.  Correct.

22  Q.  First you hear of it is in the recording on March 1, 2008.

23  A.  True.

24  Q.  And that wasn't something you had asked him to follow up

25  with Bernard Kilpatrick on in his discussions.

*Robert Beeckman - Cross*
*Wednesday, December 5, 2012*                                    48

1    A.  Yeah, I don't think so.

2    Q.  He's ad libbing at this point, right?

3    A.  Well, you know, I told him, "I want you to corroborate the

4    cash that you've given to Bernard Kilpatrick," and so forth,

5    and I'm sure he took that as part of the instructions.  I

6    didn't say corroborate lotto payments, it wasn't --

7    Q.  Absolutely.

8    A.  -- one of the specific things --

9    Q.  Right.

10   A.  -- I told him --

11   Q.  Right.

12   A.  -- to do.

13           **THE COURT:**  One at a time.

14   **BY MR. SHEA:**

15   Q.  No, that's my point, that's fine.

16           And, in fact, in that March 1, 2008 breakfast

17   meeting, Karl Kado isn't talking about two different instances

18   of Bernard Kilpatrick running up a lotto tab, is he?

19   A.  No, it's a longer period of time, yes.

20   Q.  One single time he covered this tab.

21   A.  A single time that he covered --

22   Q.  He's talking about one -- he's talking about one instance,

23   he talks about just one time that he covered a lotto tab for

24   Bernard Kilpatrick?

25   A.  Yeah, I don't -- I don't think that's right.  I think it

*Robert Beeckman - Cross*
*Wednesday, December 5, 2012*

49

1  was a -- I mean, he talks about one, a single amount of money

2  to cover it.  It's just, I don't think that's the way it works.

3  Q.  Well, when he described it to you on March 2nd, 2006, it's

4  the way it works, isn't it?

5  A.  Well, he said he covered the $20,000 of it.  It's just, I

6  know from talking to him in prep that that's not the way the --

7  they have to balance that terminal at the end of the week, and

8  so it can't be -- for him to ring up an $80,000 lotto tab,

9  Andrew Kado would have to be paying that off every week and

10 just floating $80,000.  That's -- so I'm not 100 percent sure

11 that this was a one-time payment of $80,000, the way you're

12 asking me.

13 Q.  Well, but what Karl Kado is talking about is loaning his

14 brother money to cover a tab.

15 A.  Right.

16 Q.  And he's not talking about it, he didn't talk about it with

17 you on March 2nd, 2006 as if he made a bunch of small loans to

18 his brother, he doesn't say that.

19 A.  Yeah, he didn't say that, no.

20 Q.  Nor did he say that in the March 1, 2008 breakfast meeting.

21 A.  No, he just says the figure.

22 Q.  Right.  And the figures are starkly different.

23 A.  Well, we're talking about a significant difference in time

24 here.  This was in '06 that he's saying 20,000, and then it's

25 '08 that he's talking 80,000.

*10-CR-20403    USA v. Kwame Kilpatrick, et al*

1   Q.  But you're having regular contacts with him, correct?

2   A.  True.

3   Q.  You're shaking him upside down and saying, "Tell me

4   everything you know about Bernard Kilpatrick," correct?

5   A.  I don't know, shake him upside down.  I --

6   Q.  You know what I mean.

7   A.  -- asked him some detailed questions.

8   Q.  I mean it figuratively.  Let me take it back because you're

9   taking it pejoratively, and I don't mean it that way.

10  A.  No.

11  Q.  You want --

12          **THE COURT:**  Mr. Shea, you've got to slow down.

13          **MR. SHEA:**  Okay.  Gee, I was doing so good

14  yesterday.

15  **BY MR. SHEA:**

16  Q.  You obviously want to know as much information as you can

17  get from the people you are interviewing about the subjects you

18  are covering.

19  A.  True.

20  Q.  Okay.  So when I say "shake him upside down," I don't mean

21  that you're literally doing that.

22  A.  And I didn't take it that way, I didn't take it that way.

23  Q.  Okay.

24  A.  But I'm saying, even with the way that you're asking the

25  question, that I'm shaking him upside down sort of implies like

*Robert Beeckman - Cross*
*Wednesday, December 5, 2012*

1    I'm grilling him or something, and I just wanted to tell you,

2    it's just not like that.  It's not --

3    Q.  Of course.  But clearly, after two-plus years of this man

4    cooperating with you, he knows that you want information about

5    Bernard Kilpatrick, correct?

6    A.  True.

7    Q.  And at no point after March 2nd, 2006 does he tell you he

8    is continuing to loan money to his brother to cover

9    Bernard Kilpatrick's lotto tab, is he?

10   A.  You're correct, true.

11   Q.  Okay.  Now, I also cross examined Mr. Kado regarding his

12   recollection of a meeting with Bernard Kilpatrick in early

13   September, very shortly after the time he received the target

14   letter from Mr. Bullotta, do you recall that?

15   A.  Yes.

16   Q.  All right.  Now, again, you had a lengthy interview with

17   Mr. Kado on February 22nd, 2006.

18   A.  True.

19   Q.  That was the first meeting you had with him after he

20   received the target letter.

21   A.  Correct.

22   Q.  You covered a number of subjects during that meeting.

23   A.  True.

24   Q.  One of those subjects would have been explaining -- I don't

25   know whether it was you or other participants in the meeting,

*10-CR-20403    USA v. Kwame Kilpatrick, et al*

1   but it was more people just besides you and Mr. Kado at that

2   meeting, correct?

3   A.  Yes.

4   Q.  So somebody certainly in your presence, whether it was you

5   or somebody else in your presence, would have explained

6   generally why he received the target letter, correct?

7   A.  Yeah, I'm sure.

8   Q.  You'd cover it?

9   A.  Yes.

10  Q.  Someone would have explained the government's interest in

11  whether Mr. Kado was, would cooperate with them, correct?

12  A.  True.

13  Q.  Somebody would have explained generally what that

14  cooperation might entail, correct?

15  A.  Yes.

16  Q.  And at some point during that meeting, somebody obtained

17  Mr. Kado's signature on a cooperation agreement, correct?

18  A.  Yes.

19  Q.  All right.  And, again, at this meeting and then at the

20  follow-up meeting on March 2nd, you were trying to cover, among

21  other things, all things Bernard Kilpatrick, is that fair?

22  A.  As best we could, yes.

23  Q.  It is standard, is it not, in these debriefing sessions to

24  ask a person who is cooperating whether they've had any prior

25  discussions about the correspondence they received from the

 1   government, including a target letter, right?

 2   A.  If they've had prior discussions about it?

 3   Q.  Yeah, you want to know whether they've discussed this case

 4   with anybody else outside of the meeting with you.

 5   A.  Well, that could be a topic, I suppose, yes.

 6   Q.  Well, for one thing you want to know if they need to be

 7   protected from anybody, right?

 8   A.  Well, physically protected, you're talking about?

 9   Q.  Well, you want to know, "Does anybody know that you're

10   here?"

11   A.  Yeah, I -- it depends on the case.

12   Q.  Okay.

13   A.  I do mostly white collar stuff.  It's, that's an unusual

14   kind of a circumstance.

15   Q.  Well, you'd want to know whether they, whether they had had

16   any discussions with anybody about the fact they might be

17   cooperating with the government, right?

18   A.  You might ask them that, yes.

19   Q.  I mean, so you'd certainly want to know whether anybody had

20   tried to influence their cooperation, correct?

21   A.  Yeah, you might ask them that, yes.

22   Q.  All right.  And it's true, is it not, that at neither the

23   March 22nd, 2006 interview nor at the March 2nd, 2006 interview

24   did Mr. Kado report to you that he had this meeting with

25   Mr. Kilpatrick in early September, 2005.

*Robert Beeckman - Cross*
*Wednesday, December 5, 2012*

54

1    A.  Yeah, I don't think he did.

2    Q.  Okay.  Isn't it true that it first appears, in terms of the

3    government's investigation record, on August 27th, 2006 in an

4    IRS interview?

5    A.  I think that's right, yes.

6    Q.  Now, you were involved in a meeting with Mr. Kado six weeks

7    ago on October 27th, 2012, correct?

8    A.  Sounds right.

9    Q.  And just for the record, it's just a coincidence, but my

10   previous reference to October 27th, 2006 is accurate, my

11   reference to October 27th, 2012 is also accurate, so it is the

12   same date, the same date on the calendar.

13         And at that time you asked him about this

14   September 2005 meeting with Bernard Kilpatrick, correct?

15   A.  Yes.

16   Q.  Was it the first time you'd had this discussion with him?

17   A.  Me personally, I think it is the first time, yes.

18   Q.  And he added a detail in his description to you of that

19   meeting that did not appear in the investigation record of

20   October 27, 2006, isn't that correct?

21   A.  You're talking about the pat-down?

22   Q.  Yes.

23   A.  Yes.

24   Q.  He added that detail six weeks ago.

25   A.  Yes.

*10-CR-20403   USA v. Kwame Kilpatrick, et al*

1    Q.  I want to talk about, a little bit about the text messages

2    that were put up.  I think those were 3 through 7.

3                   **THE COURT:**  3 through 7?

4                   **MR. SHEA:**  Right.

5    **BY MR. SHEA:**

6    Q.  They don't -- all you can, all you can glean from those

7    text messages is that there was a communication between two

8    people, in this case, Bernard Kilpatrick and Derrick Miller,

9    and some semblance of a subject, right?

10   A.  Right.

11   Q.  It doesn't tell you what other work Bernard Kilpatrick was

12   doing in connection with the subjects that are addressed in

13   those text messages, right?

14   A.  Correct.

15   Q.  All right.  Doesn't tell you who he was meeting with,

16   right?

17   A.  Right.

18   Q.  Doesn't tell you what efforts he was making in connection

19   with Mr. Kado and those contracts, right?

20   A.  Right.

21   Q.  All right.  And those text messages range from -- the first

22   two are in April of 2002, correct, those would be text messages

23   Cobo 3 and 4, right?

24   A.  I think that's right, yes.

25   Q.  And there's a couple in January of 2003, correct?

*Robert Beeckman - Cross*
*Wednesday, December 5, 2012*

1   A.   Yes.

2   Q.   And then there's one between Mr. Kilpatrick and Mr. Miller

3   in February of 2003, correct?

4   A.   Yes.

5   Q.   But, in fact, you know that Mr. Kilpatrick exchanged texts

6   with Derrick Miller about Karl Kado and his interaction with

7   the city even after that, right?

8   A.   I'm sure he did, yes.

9           **MR. SHEA:**   Okay.  So could we have Cobo 10A and 10B,

10   please.

11           Actually, I better take it down.  Your Honor, by

12   stipulation, Your Honor, we're going to offer Cobo 10A and 10B

13   into evidence.  They weren't part of the original package.

14           **THE COURT:**   Received.

15           (Defendants' Exhibits D-Cobo 10A and 10B received

16           into evidence.)

17           **MR. SHEA:**   All right.  Now, Ms. Facchini, could you

18   please give us 10A.

19   **BY MR. SHEA:**

20   Q.   This is a text message exchange between Bernard Kilpatrick

21   and Derrick Miller eight months after the last one that was

22   introduced this morning on August 13, 2003, correct?

23   A.   Yes.

24   Q.   And at this time, it appears --

25           **MR. SHEA:**   I'm sorry, could we get the substance,

*10-CR-20403   USA v. Kwame Kilpatrick, et al*

1   Ms. Facchini.

2   **BY MR. SHEA:**

3   Q.  Mr. Kilpatrick is reaching out to Derrick Miller regarding,

4   trying to arrange a meeting between he, Derrick Miller and

5   Karl Kado, correct?

6   A.  Yes.

7   Q.  Derrick Miller doesn't even know who he's talking about,

8   does he?  He says, "Who's Karl?"  Correct?

9   A.  Yes.

10  Q.  But it does indicate that Mr. Kilpatrick and Mr. Kado have

11  a relationship in August of 2003, correct?

12  A.  Yes.

13  Q.  And then could we go to 10B, and this is a follow-up email

14  again between Bernard Kilpatrick and Derrick Miller on

15  August 18, 2003?

16  A.  Yes.

17  Q.  Five days after the one I just showed you?

18  A.  Right.

19  Q.  And it appears that he's -- that Bernard Kilpatrick is

20  prodding Derrick Miller to catch up with Karl, correct?

21  A.  Right.

22  Q.  All right.  Thank you.  And finally, back to the early 2008

23  involvement of Karl Kado and Bernard Kilpatrick.  You viewed

24  the fact that Mr. Kado was owed money by the City of Detroit

25  and the fact that he was enlisting the assistance of

```
1   Bernard Kilpatrick in connection with that as an opportunity
2   for you to further your investigation into Bernard Kilpatrick?
3   A.  Right.
4   Q.  Okay.  You did not think it was illegitimate for Karl Kado
5   to be seeking reimbursement for these monies, did you?
6   A.  Not at all.
7   Q.  It was cool by you that he was going to try to get paid?
8   A.  Right.
9   Q.  And if he had gotten paid through Mr. Kilpatrick's
10  assistance, that would have been just fine with the FBI?
11  A.  Right.
12  Q.  All right.  Now, you know from a February 4th, 2008
13  telephone call between Bernard Kilpatrick and Karl Kado that
14  was played yesterday that Bernard had begun work already as of
15  the time of that phone call, correct?
16  A.  That's what he said, yes.
17          MR. SHEA:  All right.  And that phone call was, just
18  for the record, was on February 4th, 2008 at 1:31 p.m.
19          And now, Your Honor, I'd like to play what we would
20  offer as Defense Cobo 6, a call on February 4, 2008 at
21  12:21 p.m., an hour before the one I just referenced, and
22  that's call number 14839.
23          MR. BULLOTTA:  No objection.
24          THE COURT:  February 4th?
25          MR. SHEA:  February 4th, 2008, this is at
```

*Robert Beeckman - Cross*
*Wednesday, December 5, 2012*

```
 1   12:21 p.m., Your Honor, so it's an hour earlier than the other

 2   February 4th, 2008 call.

 3               (Defendants' Exhibit Cobo 6 received into

 4               evidence.)

 5

 6   BY MR. SHEA:

 7   Q.  And just to set the stage, this is a call that you

 8   intercepted pursuant to wiretap, right?

 9   A.  Yes.

10   Q.  And it's a call between Kwame Kilpatrick and

11   Bernard Kilpatrick, right?

12   A.  Right.

13               (Defendants' Exhibit D-Cobo 6, audiotape, was

14               played.)

15   BY MR. SHEA:

16   Q.  At this point it appears Kwame Kilpatrick has called

17   Bernard Kilpatrick, correct?

18   A.  Yes.

19   Q.  And it appears from the context that it appears to be a

20   call in follow-up to some contact they had had previously on

21   the subject of the DAH reimburse -- DAH Building reimbursement?

22   A.  Yes.

23   Q.  And Kwame Kilpatrick is advising Bernard Kilpatrick that

24   they owe him some money, but they don't owe as much as he's

25   claiming, right?
```

 1    A.  Right.

 2    Q.  And that they can't pay for certain things that are -- that

 3    Karl is seeking reimbursement for, correct?

 4    A.  Correct.

 5    Q.  And Medina, do you know who Medina is?

 6    A.  Medina Noor, N-o-o-r.

 7    Q.  And she had what position at that time?  She worked for

 8    building safety or purchasing --

 9    A.  I think so.

10    Q.  -- or something like that?

11    A.  I think that's it.

12    Q.  Okay.

13    A.  Something to do with building construction or something.

14    Q.  All right.  Worked for the City of Detroit, though?

15    A.  Right.

16            (Defendants' Exhibit D-Cobo 6, audiotape, was

17            played.)

18            **MR. SHEA:**  That's fine.

19    **BY MR. SHEA:**

20    Q.  The rest of it is personal, it appears, talking about

21    football --

22    A.  Right.

23    Q.  -- and politics and stuff like that.

24            All right.  So who is Amru that they were referring

25    to there?

*Robert Beeckman - Cross*
*Wednesday, December 5, 2012*

61

1   A.   Amru Meah, he was the director of building safety and
2   engineering department.
3   Q.   Now, to be clear, Mr. Kado described that he actually had
4   three separate beefs with the city regarding collections,
5   right?
6   A.   Run them by me real quick.
7   Q.   He was owed money, he claimed, on the DAH Building?
8   A.   Right.
9   Q.   He was owed money, he claimed, on the electrical contract
10  from when he had the contract?
11  A.   True.
12  Q.   And he thought he was owed money on the cleaning contract
13  as well?
14  A.   Right.
15  Q.   And all we were discussing here is the DAH portion,
16  correct?
17  A.   Correct.
18  Q.   And it seems like a run-of-the-mill payment dispute, right?
19  A.   In that conversation, it does, yes.
20  Q.   Yeah, and you've got Karl Kado and Bernard Kilpatrick on
21  one side of it, correct?
22  A.   Right.
23  Q.   And you've got Kwame Kilpatrick and the City of Detroit on
24  the other side of it?
25  A.   Right.

*10-CR-20403   USA v. Kwame Kilpatrick, et al*

*Robert Beeckman – Redirect*
*Wednesday, December 5, 2012*

62

1          **THE COURT:**  Let's take a break.

2          **MR. SHEA:**  Let me just say, I don't think I have

3    anything further.

4          **THE COURT:**  Okay.  All right.

5          **MR. SHEA:**  Thank you, Agent.

6          **THE COURT:**  Twenty minutes, please.

7          (Jury out 10:36 a.m.)

8          (Recess taken 10:36 a.m. until 10:55 a.m.)

9          (Jury in 10:57 a.m.)

10         **THE COURT:**  Be seated.  Ladies and gentlemen, there

11   was some issue that one of you raised with Carol about

12   transcripts.  If there is a transcript, we give it to you.

13   There's not -- not every single call and message is

14   transcribed, so if we're not giving you a transcript, that's

15   why.  If you need us to replay, just say so.

16         Redirect.

17         **MR. BULLOTTA:**  Yes.

18              **REDIRECT EXAMINATION**

19   BY MR. BULLOTTA:

20   Q.  Agent Beeckman, on cross examination Mr. Shea played a

21   telephone recording on February 4th between Kwame Kilpatrick

22   and Bernard Kilpatrick, and that's D-Cobo 6.  And with the

23   permission of Mr. Shea, I just want to ask you without playing

24   that again about a couple of things that were on that.  You

25   want me to use the transcript to do that?

*10-CR-20403    USA v. Kwame Kilpatrick, et al*

*Robert Beeckman - Redirect*
*Wednesday, December 5, 2012*                                    63

1             On that call that we just heard, D-Cobo 6, do you

2    see -- did you hear what Kwame Kilpatrick said with regard to

3    the money that Karl Kado was owed in reference to the DAH?

4    A.   Yes.

5    Q.   Can you read the highlighted portion?

6    A.   "We ready to pay him, you know."

7    Q.   Okay.  And then on the bottom of the page here, can you

8    read the highlighted portion that Kwame Kilpatrick says about

9    the payment?

10   A.   "We owe them.  You know, uh, we have not, we have not met

11   our obligation with them."

12   Q.   And that's February 4, 2008?

13             **A JUROR:**  Could you put that up one more time?

14             **MR. BULLOTTA:**  Absolutely, I will.

15   **BY MR. BULLOTTA:**

16   Q.   So the first part you said Kwame said -- Kwame Kilpatrick

17   said, "We're ready to pay him, you know."

18   A.   Correct.

19   Q.   Meaning Karl Kado?

20   A.   Yes.

21   Q.   And then on the bottom --

22             **A JUROR:**  Bring it up.

23             **THE COURT:**  Bring it up.

24             **MR. BULLOTTA:**  Bring it up?

25             **A JUROR:**  The bottom, we can't see it here.

*10-CR-20403   USA v. Kwame Kilpatrick, et al*

1    **BY MR. BULLOTTA:**

2    Q.  Can you read that highlighted portion by Kwame Kilpatrick?

3    A.  "We owe them.  You know, uh, we have not, we have not met

4    our obligation with them."

5    Q.  And, again, this is February 4 of 2008?

6    A.  Yes.

7    Q.  And when you were directing Karl Kado, did you direct him

8    to offer to pay Bernard Kilpatrick?

9    A.  To offer to pay him?

10   Q.  Yes.

11   A.  Yes, to speak about it and agree to paying him.

12   Q.  Now, was there a meeting after this, after Kwame Kilpatrick

13   said that they're ready to pay and that there's an obligation,

14   a meeting on March 1st, 2008?

15   A.  Yes.

16   Q.  And at that time, did you give a different direction to

17   Karl Kado about what to say about paying Bernard Kilpatrick?

18   A.  Yes.

19   Q.  And what did you tell Kado to do?

20   A.  I told him to tell Mr. Bernard Kilpatrick that it was his,

21   Kado's money, and he shouldn't agree to pay.

22   Q.  And why did you do this?

23   A.  Just to see what Mr. Kilpatrick would say.

24   Q.  Okay.  I'm going to show you, instead of playing the tape

25   again, Government's Exhibit 17.  I'm just going to refresh

*Robert Beeckman - Redirect*
*Wednesday, December 5, 2012*

65

1    your -- refer to a transcript for ease, with Mr. Shea's

2    permission.  This is Page 6 at the bottom.  This is after that

3    conversation we just saw on February 4th, 2008.  This is

4    March 1, 2008?

5    A.   Correct.

6    Q.   And then can you read what Mr. Kado said.

7    A.   Kado says, "But the point is about 10 percent.  It's very

8    high, very hard for me to pay that."

9    Q.   Is that what you directed Mr. Kado to do, to say he's not

10   going to pay Mr. Bernard Kilpatrick?

11   A.   Yes.

12   Q.   And can you read what Bernard Kilpatrick said?

13   A.   "You don't even want to pay me though?"  Kado says, "It's

14   very hard."

15   Q.   And then on the top of Page 7, can you read what

16   Bernard Kilpatrick says.

17   A.   He says, "Shit.  This is, this, this wouldn't even be, it

18   would be so far back on the table it would take you two years

19   to go through lawyers to get your money, man.  And you don't

20   even want ..."

21         Kado responds, "Thank you very much."

22         BK says, "You don't even want to pay me," and

23   expletive.

24   Q.   And then, as far as you know, did Mr. Kado, during the

25   Kilpatrick administration ever get paid that money?

*10-CR-20403    USA v. Kwame Kilpatrick, et al*

*Robert Beeckman - Redirect*
*Wednesday, December 5, 2012*

66

1   A.  No.

2   Q.  Now, Mr. Shea asked questions about the first time that

3   Karl Kado mentioned the parking lot conversation where,

4   according to Mr. Kado, Bernard Kilpatrick offered him ten more

5   years on the contracts if he wouldn't cooperate with the

6   government.

7   A.  Yes.

8   Q.  And you said that -- well, let me show you Exhibit 17A.

9   During the conversation at the breakfast spot on March 1 of

10  2008.  Can you --

11           **MR. SHEA:**  Your Honor, I'm sorry, I believe

12  Mr. Bullotta made a reference to -- I'm going to withdraw it

13  for a moment.

14  **BY MR. BULLOTTA:**

15  Q.  Was there a conversation in the tape that the jury heard

16  from this meeting, breakfast meeting on March 1, 2008,

17  referencing that parking lot conversation and the ten years?

18  A.  Yes.

19  Q.  And can you read that for the jury, please?

20  A.  "When you told me stay here ten years, I said no, I'm

21  leaving."

22  Q.  And then there's more statements and then

23  Bernard Kilpatrick replies.

24  A.  "Yeah."

25  Q.  Thank you.  Mr. Thomas asked you whether or not you

*10-CR-20403    USA v. Kwame Kilpatrick, et al*

*Robert Beeckman - Redirect*
*Wednesday, December 5, 2012*

67

1   disclosed information pursuant to your constitutional

2   obligations, that information that's helpful to the defense?

3   A.  Yes.

4   Q.  Now, is that something you do in every case?

5   A.  Every case, yes.

6   Q.  Does it matter whether or not there's a request by the

7   defense?

8   A.  No.

9   Q.  It's your obligation, is that right?

10  A.  Yes.

11  Q.  And it's our obligation, correct?

12  A.  Yes.  I give it to you, you give it to them.

13  Q.  Thank you.  And you did that in this case?

14  A.  Yes.

15  Q.  And Mr. Thomas asked you about Mr. Kado's testimony and he

16  said, asked you whether or not he was being false or

17  misleading, and you said that -- you drew a distinction between

18  false and misleading and inconsistent details, do you remember

19  that?

20  A.  Yes.

21  Q.  Can you explain that?

22  A.  Yes, I was asked the question on direct whether there had

23  been instances where Mr. Kado had either provided false

24  information or lied or something like that, and the distinction

25  I was drawing is, as we saw in cross examination, certainly,

*Robert Beeckman - Recross*
*Wednesday, December 5, 2012*

1    there were certain things that he testified to which were

2    different in some respects from what he had said in previous

3    interviews, but I've never seen any instances where I've been

4    able to determine that he lied to me or tried to mislead me in

5    anything.

6         **MR. BULLOTTA:**   Thank you.   I have no further

7    questions.

8                                           (11:05 a.m.)

9                    **RECROSS EXAMINATION**

10   **BY MR. THOMAS:**

11   Q.  Agent Beeckman, he wasn't talking to you when he was

12   testifying here in court?

13   A.  No, he was testifying.

14   Q.  And you did acknowledge that there were differences between

15   what he had said early on in your debriefings than what he had

16   said in court, you're not taking that back, are you?

17   A.  Not at all.

18   Q.  And you're not taking back the fact that your report is

19   inconsistent with his testimony as it relates to the points

20   that I brought out in my cross examination of you?

21   A.  Yes, that's correct.

22   Q.  All right.   Now --

23   A.  You're correct, I'm not taking it back.

24   Q.  Mr. Bullotta just asked you about March 1st, 2008 and

25   whether or not Mr. Kado was ever paid by the Kilpatrick

*10-CR-20403   USA v. Kwame Kilpatrick, et al*

1    administration.

2    A.   Correct.

3    Q.   You're aware, are you not, that in March of 2008, he was

4    being charged by Kym Worthy?

5    A.   That Mr. Kilpatrick was?

6    Q.   Yes.

7    A.   Yes.

8    Q.   Kwame Kilpatrick.  We started talking about the Kilpatrick

9    administration.  The Kilpatrick administration folded when

10   Mr. Kilpatrick resigned from office as a result of the guilty

11   plea negotiation in his state case, isn't that right?

12   A.   True, he left office, yes.

13   Q.   And that was when?

14   A.   October of 2008.

15   Q.   October 28, 2008, he went into jail, but he had already

16   pled guilty before that, right?

17   A.   True.

18   Q.   Part of that guilty plea was to resign and to leave office?

19   A.   Yes.

20   Q.   And so during the Kilpatrick administration, Karl Kado

21   wasn't paid.

22   A.   Right.

23   Q.   That's what your testimony is?

24   A.   Yes.

25   Q.   But are you aware whether he got paid by Kenny Cockrel's

1    administration?

2    A.   I don't think he's ever been paid.

3    Q.   Dave Bing's administration?

4    A.   Correct.

5    Q.   And so he hasn't been paid, period?

6    A.   Right.

7    Q.   On a deal that he could have taken $200,000 on as early as

8    his discussions with Mr. Bernard Kilpatrick.

9    A.   That's what it says in here.  Whether they made him that

10   settlement offer, I don't know, but it seems like there was a

11   willingness to give him that amount of money.

12   Q.   Yes.  And there was discussions on that tape that you just

13   read or heard that he had walked out on a conversation where

14   settlement negotiations were made regarding the DAH Building?

15   A.   That's what he said, yes.

16          **MR. THOMAS:**  All right.  Nothing further.

17          **MR. SHEA:**  Very briefly, Your Honor.

18                                        (11:08 a.m.)

19                    **RECROSS EXAMINATION**

20   **BY MR. SHEA:**

21   Q.   Mr. Bullotta had you read for the jury that purple looking

22   phrase or sentence in his redirect where Kwame says, "We ready

23   to pay him, you know."  You see that?

24   A.   Yes.

25   Q.   And then Kwame says, down at the bottom, "We owe him.  You

*Robert Beeckman - Redirect*
*Wednesday, December 5, 2012*

71

1    know, we have not met our obligation with them."  Right?

2    A.  Right.

3    Q.  All right.  Now, isn't it true that earlier in that

4    conversation what Kwame told Bernard Kilpatrick is, "But what

5    we want with him is" -- I'm paraphrasing.

6            Well, I'll read it directly for the record.  "But

7    what we want is that with him is a settle figure."  Does it say

8    that?

9    A.  Right.

10   Q.  So what Kwame Kilpatrick is describing in this conversation

11   are efforts that his administration has made in terms of

12   meeting with Karl Kado in an attempt to reach resolution of the

13   dispute, correct?

14   A.  Yes.

15   Q.  And that they're ready to pay him what they believe they

16   have an honest obligation to pay him, correct?

17   A.  Yes.

18   Q.  But they need a settlement figure for him in order to have

19   the thing tied up, isn't that right?

20   A.  That's what he says, yes.

21   Q.  Thanks.

22           **MR. SHEA:**  Thank you, Your Honor.

23                                   (11:09 a.m.)

24

25

*Robert Beeckman - Redirect*
*Wednesday, December 5, 2012*                                    72

1                          **REDIRECT EXAMINATION**

2      **BY MR. BULLOTTA:**

3      Q.  One really brief issue that Mr. Thomas brought up about

4      Mr. Kado not being paid, are you aware whether there's

5      litigation pending involving Mr. Kado getting paid what he's

6      owed by the city?

7      A.  Yes.

8      Q.  And is one of the defenses of the city for not paying him

9      the fact that the contracts were corrupted --

10     A.  Yes.

11     Q.  -- and involved payments, illegal payments?

12     A.  Yes.

13     Q.  Thank you.

14                **MR. SHEA:**  Your Honor, I'm going to object.  The

15     answer is already on the record, but how can it be relevant

16     that the city is interposing a defense in a lawsuit by

17     Karl Kado, and the city, the city's defense is, well --

18                **MR. BULLOTTA:**  Can we do this at sidebar instead of

19     arguing?

20                **THE COURT:**  I'm going to strike the question and the

21     answer and tell the jury to disregard it.

22                **MR. SHEA:**  Thank you.

23                **THE COURT:**  Done?

24                **MR. BULLOTTA:**  I guess, yes.

25                **THE COURT:**  Thank you.  Next witness.

*10-CR-20403    USA v. Kwame Kilpatrick, et al*

*Rowena Schuch - Direct*
*Wednesday, December 5, 2012*                                    73

1          Thank you.  You may be excused, Agent Beeckman.

2          (Witness excused at 11:10 a.m.)

3          **MR. BULLOTTA:**  Government calls Rowena Schuch.

4          **THE COURT:**  Agent Schuch, I remind you that you're

5   still under oath.

6          **THE WITNESS:**  Yes.

7                                              (11:10 a.m.)

8                          **DIRECT EXAMINATION**

9   **BY MR. BULLOTTA:**

10  Q.  Good morning.

11  A.  Good morning.

12  Q.  Agent Schuch, did you conduct a financial investigation

13  involving Mr. Bernard Kilpatrick?

14  A.  Yes.

15  Q.  And one of the things that you're going to testify to later

16  in this trial involves Mr. Kilpatrick and tax charges, is that

17  right?

18  A.  Yes.

19  Q.  We're not going to talk about the tax charges right now.  I

20  just want to ask you about your review of his financial

21  records.  Did you look through both his records for his

22  company, Maestro and Associates, as well as his personal bank

23  records?

24  A.  Yes, I did.

25  Q.  And looking through those records, did you ever find any

                    *10-CR-20403    USA v. Kwame Kilpatrick, et al*

1   checks that were written by either Karl Kado or his entities,

2   Metro Services Organization or Ogden J?

3   A.  No.

4   Q.  Did you look through Bernard Kilpatrick's records to see if

5   there was any cash deposits in any of, either his personal

6   accounts or his Maestro accounts?

7   A.  Yes, there were cash deposits, mainly into his personal

8   accounts.

9   Q.  And you were here when Karl Kado testified that he paid

10  Bernard Kilpatrick between 180,000 and $300,000, in that range?

11  A.  Yes.

12  Q.  And that was during the course of the time that

13  Kwame Kilpatrick was mayor, is that right?

14  A.  Yes.

15  Q.  I want to show you what's been marked BKF, standing for

16  Bernard Kilpatrick Finances, BKF 5, and I'm going to ask you if

17  you prepared this chart.

18  A.  Yes, I did.

19  Q.  How do you prepare the chart?

20  A.  This was going through Mr. Bernard Kilpatrick's personal

21  bank records and coming up with the total of all the cash being

22  deposited into those accounts.

23          **MR. BULLOTTA:**  Okay.  I'd move to admit BKF 5,

24  Your Honor.

25          **MR. SHEA:**  No objection.

1          **THE COURT:**  Received.

2              (Government's Exhibit BKF 5 received into

3          evidence.)

4    **BY MR. BULLOTTA:**

5    Q.  I only want to ask you about the first page of BKF 5.

6              **MR. BULLOTTA:**  Can we see that, Ms. Facchini.

7    **BY MR. BULLOTTA:**

8    Q.  Can you explain what this chart represents, this first page

9    of BKF 5?

10   A.  It's a summary of all of the cash being deposited into

11   Bernard Kilpatrick's personal bank accounts.

12   Q.  Okay.  So these are not the Maestro and Associates

13   accounts, these are personal accounts?

14   A.  Yes, these are personal accounts.

15   Q.  In the name of whom?

16   A.  Bernard Kilpatrick.  One of the accounts is a joint account

17   with his daughter.

18   Q.  Is that Diarra O. Kilpatrick?

19   A.  Yes.

20   Q.  And what was the total amount of cash deposited for 2002?

21   A.  For 2002, it was $118,810.

22   Q.  Okay.  And what about 2003?

23   A.  2003, $140,240.

24   Q.  And you can go through the different years.

25   A.  2004, 123,700; in 2005, 88,300; 2006, 59,905; 2007, 50,200;

*Rowena Schuch - Direct*
*Wednesday, December 5, 2012*

76

1   2008, 23,900.

2   Q.  So the total amount of cash deposited during the time

3   Kwame Kilpatrick was mayor into Bernard Kilpatrick's personal

4   accounts was what?

5   A.  $605,055.

6   Q.  And did you review Bernard Kilpatrick's tax returns for

7   these years, 2002 through 2008?

8   A.  Yes.

9   Q.  And on any of those returns, did he ever declare that he

10  won money in gambling?

11  A.  For --

12  Q.  That exceeded any losses?

13  A.  No.

14  Q.  Did you hear Karl Kado testify the last two days?

15  A.  Excuse me?

16  Q.  Did you hear Karl Kado testify yesterday and the day

17  before?

18  A.  Yes.

19  Q.  And did you hear the discussion about Archie Clark and his

20  company, National Media, Incorporated?

21  A.  Yes.

22  Q.  And during the course of your review of

23  Bernard Kilpatrick's records, did you find any checks to

24  Maestro, Bernard Kilpatrick's company, from Archie Clark's

25  company, National Media, Inc.?

*10-CR-20403   USA v. Kwame Kilpatrick, et al*

*Rowena Schuch - Direct*
*Wednesday, December 5, 2012*                                    77

1    A.  Yes.

2    Q.  I have what's been marked Cobo 24A, and I also have a

3    summary of that which is Cobo 24.  I want to show the witness.

4    First of all, what's Cobo 24A?

5    A.  These are checks that were deposited into Maestro

6    Associates' bank account that are from National Media, Inc.

7    Q.  And that's Archie Clark's company?

8    A.  Yes.

9              **MR. BULLOTTA:**  I'd move in the checks, Cobo 24A.

10             **THE COURT:**  Received.

11             (Government's Exhibit Cobo 24A received into

12             evidence.)

13   **BY MR. BULLOTTA:**

14   Q.  And I'm just going to pick a couple to show you.

15             **MR. BULLOTTA:**  Can we see Page 6, Ms. Facchini, of

16   Cobo 24A, the checks from Archie Clark's company to

17   Bernard Kilpatrick?

18   **BY MR. BULLOTTA:**

19   Q.  What is this check that we're showing you?

20   A.  It is a check drawn up from an account of National Media,

21   Inc., payable to Maestro Associates, dated January 4, 2008 in

22   the amount of $15,000.

23   Q.  And does it appear to be signed by Archie Clark?

24   A.  Yes.

25   Q.  And you heard the tapes that were played involving

*10-CR-20403    USA v. Kwame Kilpatrick, et al*

1    Karl Kado and Bernard Kilpatrick where they were discussing

2    Karl Kado partnering with Archie Clark on a food contract, and

3    that conversation was held in March of -- February and March of

4    2008, is that right?

5    A.  Yes.

6    Q.  And this payment of $15,000 is in January of 2008?

7    A.  Yes.

8    Q.  Is that right?  Thank you.  Can we see Page 7 of this

9    exhibit, this check.

10            What's this check?

11   A.  This is a check from National Media, Inc. to Maestro

12   Associates, LLC, in the amount of $15,000 dated April 1, 2008.

13   Q.  And does this appear to be also signed by Archie Clark?

14   A.  Yes.

15   Q.  And that would -- April of '08, that would be one month

16   after the last call that the jury heard in March 2008, the

17   meeting -- I'm sorry, the meeting at the breakfast spot?

18   A.  Yes.

19   Q.  Okay.  Can we see Page 8.  And what's the date of this

20   check?

21   A.  April 10, 2008.

22   Q.  And what is this check for?

23   A.  It is a check from National Media, Inc. to Maestro

24   Associates, LLC in the amount of $15,000.

25   Q.  Okay.  Also signed by, appears to be Mr. Archie Clark?

1    A.   Yes.

2    Q.   And did you, were there a number of other checks like this?

3    A.   Yes, there were other checks.

4    Q.   And did you prepare a summary of all the checks from

5    National Media, Mr. Archie Clark's company, to Maestro,

6    Mr. Bernard Kilpatrick's company?

7    A.   Yes.

8    Q.   Is that -- do you see that summary in front of you as

9    Cobo 24?

10   A.   Yes.

11            **MR. BULLOTTA:**   I'd move in Cobo 24, Your Honor.

12            **MR. SHEA:**   No objection.

13            **THE COURT:**   Received.

14            (Government's Exhibit Cobo 24 received into

15            evidence.)

16   **BY MR. BULLOTTA:**

17   Q.   Can you explain what your summary shows.

18   A.   It's a summary of all of the checks that were deposited

19   into Maestro Associates' bank account from National Media, Inc.

20   Q.   Okay.  And the date range is from what to what?

21   A.   The date range is from December 5, 2006 through July 3rd,

22   2008.

23   Q.   And looks like most of the checks except for one are for

24   15,000, and one's for 14,000?

25   A.   Yes.

*Rowena Schuch - Cross*
*Wednesday, December 5, 2012*

80

1   Q.  And what's the total amount?

2   A.  The total is 134,000.

3   Q.  And were these deposited into, do you know, the business

4   account of Maestro?

5   A.  Yes, they were deposited into the Maestro Associates, LLC

6   account at Comerica Bank.

7   Q.  Thank you.

8         **MR. BULLOTTA:**  Thank you, I have no further

9   questions.

10                                        (11:20 a.m.)

11                        **CROSS EXAMINATION**

12  **BY MR. SHEA:**

13  Q.  Good morning, Agent Schuch.

14  A.  Good morning.

15  Q.  How are you?

16  A.  Good.

17  Q.  Good.  Now, you had, although you were not the agent who

18  was primarily responsible for the tax investigation of

19  Karl Kado, you were involved in some of the interviews that

20  were part of that investigation, correct?

21  A.  I don't recall being part of interviews in that

22  investigation.  I did interview Karl Kado, but that was not

23  part of the Kado investigation.

24  Q.  Well, the agent who was the primary on the Karl Kado

25  investigation accompanied you to the interview you just

1    referred to, correct?

2    A.  Yes.

3    Q.  So the fact of the matter is that interview served two

4    different purposes from the IRS perspective, correct?

5    A.  I don't -- I can't say for what purpose the other agent was

6    there.  I know he had previously interviewed him and he was the

7    one who got me in contact with Mr. Kado and his attorney.

8    Q.  Well, you knew, at least generally speaking, what the tax

9    investigation involving Karl Kado was about, is that fair?

10   A.  I really don't have any idea what his case was in regards

11   to.

12   Q.  You didn't know that it was a case that involved suspicion

13   of skimming cash?

14   A.  I know there was a tax case, but the details I really

15   wasn't involved with.

16   Q.  All right.  Well, let's talk generally.  Have you been

17   involved in investigations of retail store owners in the past?

18   A.  No.

19   Q.  You never have been?  How about any other retail service

20   providers like restaurants or bars?

21   A.  I have.

22   Q.  Do you know what cash skimming is?

23   A.  Yes.

24   Q.  What is it?

25   A.  It's basically when somebody is skimming cash from their

1   business and not reporting it on their tax returns.

2   Q.  All right.  And to make that hopefully even clearer, it

3   means when the business is not recording sales of whatever it

4   is they are selling, cash sales of whatever it is they are

5   selling, is that right?

6   A.  Yes.

7   Q.  All right.  So if I'm a bar owner, I'm selling drinks to

8   patrons and I'm pocketing the cash instead of running it

9   through my cash register and I'm not reporting those cash

10  receipts to the IRS, right?

11  A.  Right.

12  Q.  And the same thing if I'm running a sundries store, I'm

13  selling a candy bar to somebody and that buck and a quarter

14  goes in my pocket instead of putting it in the cash register

15  and I'm not reporting that buck and a quarter to the IRS,

16  right?

17  A.  Right.

18  Q.  Right?  Okay.  And then assuming your expenses are being

19  accurately reported, if your sales are understated, your net

20  income is understated, correct?

21  A.  Yes.

22  Q.  And then you're paying tax on a lower net income amount

23  than you should be paying tax on, correct?

24  A.  Yes.

25  Q.  Now, you did interview Karl Kado on March the 28th of 2007,

*Rowena Schuch - Cross*
*Wednesday, December 5, 2012*                                    83

1    is that right?

2    A.   I think so.

3    Q.   Okay.  I've got a copy for you.  And at that time, that's

4    the interview that we were just describing that Agent Brian --

5    is it Pegher?

6    A.   It's Brett Pegher.

7    Q.   Brett, I'm sorry, Brett Pegher, he accompanied you to that

8    interview?

9    A.   Yes.

10   Q.   And he was the agent who was in charge of the Karl Kado tax

11   investigation?

12   A.   Yes.

13   Q.   And he was the person who was the go-between between you

14   and Karl for this particular interview, is that right?

15   A.   Yes.

16          **MR. SHEA:**  All right.  If I may approach, Your

17   Honor.

18   **BY MR. SHEA:**

19   Q.   Is that a copy of your report, Agent Schuch?

20   A.   Yes, it is.

21   Q.   And is it dated March 28, 2007?

22   A.   Yes.

23   Q.   All right.  So that was the date of the interview, correct?

24   A.   Yes.

25   Q.   And that interview, the subject of that interview was

*10-CR-20403   USA v. Kwame Kilpatrick, et al*

```
1    Mr. Kado's relationship with Bernard Kilpatrick?
2    A.  Yes, it was in regards to financial transactions between
3    Kado and Mr. Bernard Kilpatrick.
4    Q.  Right.  Including cash payments by Karl Kado to
5    Bernard Kilpatrick, correct?
6    A.  Yes.
7    Q.  'Cause that was important to you, it was central to you in
8    certain respects with respect to your tax investigation of
9    Bernard Kilpatrick.
10   A.  There was information that there was cash being paid, and I
11   noticed that there was cash being deposited into his accounts.
12   Q.  And you were investigating whether Bernard Kilpatrick, in
13   fact, was reporting all the cash that he was supposed to be
14   reporting to the IRS?
15   A.  Correct.
16   Q.  That's why it was relevant to you to know what cash
17   payments Karl Kado made to him, correct?
18   A.  Yes.
19   Q.  All right.  Now, so in the course of that investigation or
20   in the course of this interview, you described -- I'm sorry,
21   you discussed that with him, with Karl Kado, correct?
22   A.  Yes.
23   Q.  And isn't it true that in that interview Mr. Kado told you
24   that Bernard Kilpatrick did not -- did not specify that he
25   wanted cash?
```

*Rowena Schuch - Cross*
*Wednesday, December 5, 2012*

85

```
 1    A.  Yes.
 2    Q.  What he said was, because you probably said, "Well, why did
 3    you pay him cash then?"  Right?
 4    A.  Right.
 5    Q.  What he said was, "Well, he didn't specify, it was well
 6    known that he was to be paid in cash."
 7    A.  Right.
 8    Q.  He didn't explain to you why he thought it was well known
 9    that, did he?
10    A.  No, he did not.
11    Q.  All right.  It wasn't important to you, you were just
12    trying to figure out whether he paid him cash and whether it
13    was reported or not, right?
14    A.  I believe I asked him why he was paid in cash, and his
15    answer was, "It was well known he was to be paid in cash."
16    Q.  Okay.  That's what he said?
17    A.  Yes.
18    Q.  But he didn't explain it?
19    A.  No.
20    Q.  He didn't tell you why it was in his mind he was supposed
21    to pay Bernard Kilpatrick in cash when Bernard Kilpatrick
22    himself didn't specify he wanted to be paid in cash, correct?
23    A.  Correct.
24    Q.  All right.  Now, in fact, you did a pretty thorough
25    investigation of Mr. Kilpatrick -- Mr. Bernard Kilpatrick's
```

1   finances, right?

2   A.  Yes.

3   Q.  All right.  And you had to have noticed any, you know,

4   probably hundreds of checks that he had received in the course

5   of his conducting business, correct?

6   A.  He did receive checks.

7   Q.  Lots of checks, didn't he?

8   A.  Yes.

9   Q.  From lots of different people, correct?

10  A.  Yes.

11  Q.  All right.  Now, could we see BKF 5, please.  It's fair, is

12  it not, Agent Schuch, that for any of these years you have no

13  personal knowledge what was the source of the cash that went

14  into Mr. Kilpatrick's accounts, is that fair?

15  A.  That's correct, I don't know the source of the cash.

16  Q.  There's no, there's nothing on the dollar bills themselves

17  that say who they're from, correct?

18  A.  Even if they did, I wouldn't -- I didn't see the actual

19  dollar bills.  All I saw was the deposit slip and a slip from

20  whatever the financial institution produces in terms of what

21  the deposit consisted of.

22  Q.  Right, and the cash tickets don't tell you what the sources

23  of the cash are?

24  A.  No, they don't.

25  Q.  Deposit slips don't tell you what the sources of the cash

1   are?

2   A.   No.

3   Q.   It's just a total amount of cash that's being deposited.

4   A.   Correct.

5   Q.   Now, Mr. Bullotta asked you about whether you had heard

6   agent -- or Karl Kado's testimony yesterday, and you did hear

7   that testimony, correct?

8   A.   Yes.

9   Q.   And you heard him testify from the stand that he thought he

10  had only paid Bernard Kilpatrick in the years 2002 and 2003,

11  correct?

12  A.   I know that there was a final payment in 2005, he said.

13  Q.   Oh, there was $100,000 in 2005, okay.  Setting that aside,

14  2000 -- in terms of the regular payments he claimed to have

15  been making, 2002 and 2003, correct?

16  A.   I believe so.

17  Q.   And you heard a recording where he -- well, one of the

18  things he says to Mr. Kilpatrick is, "You got this amount in

19  2003," and Mr. Kilpatrick said, "Wait a minute, what are you

20  talking about 2003?"  And Karl Kado says, "Oh, wait, you didn't

21  get that in 2003."  You heard that as well, correct?

22  A.   I don't recall that part.

23  Q.   Okay.  Well, we can, we can, we can, we can argue that

24  later.  The fact of the matter is that you can't -- you don't

25  have any personal knowledge that the cash that you tracked into

*10-CR-20403   USA v. Kwame Kilpatrick, et al*

*Rowena Schuch - Cross*
*Wednesday, December 5, 2012*

88

 1   Bernard Kilpatrick's accounts, whether they were business

 2   accounts or personal accounts, came from Karl Kado?

 3   A.  No, it's cash.  I can't trace where cash came from.

 4   Q.  Could have been from any number of sources?

 5   A.  That's correct.

 6   Q.  All right.  And in terms of -- Mr. Bullotta asked you

 7   whether there were any years in which Mr. Kilpatrick's gambling

 8   losses exceeded his winnings.  Do you recall that?

 9   A.  He asked if, based on the tax returns, that if his, he had

10   any additional gambling winnings that weren't offset by the

11   losses.

12   Q.  Well, I took the question to be broader.  Let me ask a

13   different question.

14          In terms of your investigation of

15   Bernard Kilpatrick, you investigated his gambling activities as

16   well, correct?

17   A.  Yes.

18   Q.  All right.  And were there any years where his winnings

19   exceeded his losses?

20   A.  No.

21   Q.  No.  Nonetheless, there were some days he won, correct?

22   A.  Yes.

23   Q.  There were some days he lost, correct?

24   A.  Yes.

25   Q.  On the days he won, presumably he walked out with cash,

*10-CR-20403   USA v. Kwame Kilpatrick, et al*

1    didn't he?

2    A.  I would assume.

3    Q.  Okay.  One can lose money over the course of the year in

4    gambling and still be depositing cash on the day that one wins,

5    or the day after one wins, into an account, correct?

6    A.  That's correct, but I also did an analysis of the days

7    Bernard Kilpatrick was at the casino and what his gaming

8    activity was at the time and compared it to what was happening

9    at the financial institutions, whether he was depositing or

10   withdrawing cash.

11   Q.  Sometimes people squirrel away cash, though, don't they?

12   A.  Yes, they do.

13   Q.  And when it gets to a certain amount or when they have a

14   certain need or purpose, a bill to pay, they'll deposit cash at

15   that time, correct?

16   A.  Right.

17   Q.  Doesn't need to be tied to a particular gambling activity

18   or even a particular business activity, does it?

19   A.  No.

20   Q.  All right.  And he played lotto as well, didn't he?

21   A.  Yes.

22   Q.  And some days he won, and probably most days he lost,

23   correct?

24   A.  I don't know.

25   Q.  All right.

*Rowena Schuch - Cross*
*Wednesday, December 5, 2012*

90

1   A.   Probably.

2   Q.   We'll just play the odds.  Probably that, right?  Again,

3   he'd be presumably receiving cash on the days that he won,

4   correct?

5   A.   Yes.

6   Q.   All right.  So the point is you don't know in any of these

7   years with respect to any of these numbers what portion of them

8   represented deposits from gambling winnings.

9   A.   Correct.  But also on some of these years, he didn't report

10  any gambling at all.

11  Q.   I appreciate that, you know.  I'm not suggesting that

12  $605,000 worth of deposits were gambling winnings.  What I'm

13  suggesting is, or just trying to re-make the point is, you

14  don't know to what extent these amounts represent Karl Kado's

15  money, right?

16  A.   Correct.

17  Q.   Birthday gifts, right?

18  A.   Correct.

19  Q.   Gambling winnings, correct?

20  A.   Correct.

21  Q.   Lotto winnings, correct?

22  A.   Right, I don't know the source.

23  Q.   Any number of innumerable kinds of sources of cash, right?

24  A.   Correct.

25  Q.   To the extent that a person did pay Bernard Kilpatrick in

*10-CR-20403    USA v. Kwame Kilpatrick, et al*

*Rowena Schuch - Cross*
*Wednesday, December 5, 2012*

1   cash, there's nothing necessarily illegal about that, is there?

2   A.  No.

3   Q.  Might be illegal if he's not reporting it to the IRS and

4   paying taxes on it, but there's nothing illegal about receiving

5   cash for services, correct?

6   A.  Correct.

7           **MR. SHEA:**  Could we see Government Exhibit Cobo 24,

8   please.  Let's make it 24A, starting with 24A.1.

9   **BY MR. SHEA:**

10  Q.  This exhibit is a compilation of a number of checks that

11  you discovered from National Media to Maestro Associates, and

12  you discovered these in the course of your investigation of

13  Bernard Kilpatrick, correct?

14  A.  Yes.

15  Q.  And the first such check was written on December 5, 2006,

16  according to the document, correct?

17  A.  Yes.

18  Q.  And that's the document that's on the screen, 24A.1?

19  A.  Yes.

20  Q.  And we know that was endorsed and went into

21  Mr. Kilpatrick's Maestro Associates account, correct?

22  A.  Yes.

23  Q.  And what does the memo line say?

24  A.  "Consulting."

25          **MR. SHEA:**  All right.  Now, can we go to the next

*Rowena Schuch - Cross*
*Wednesday, December 5, 2012*

92

1    one, 2, please, A.2.

2    **BY MR. SHEA:**

3    Q.   January 5, 2007 in the amount of $14,000, again, National

4    Media to Maestro Associates, correct?

5    A.   Yes.

6    Q.   Again, endorsed, deposited into Mr. Kilpatrick's account,

7    correct?

8    A.   Yes.

9    Q.   Memo line says "Consulting," correct?

10   A.   Yes.

11          **MR. SHEA:**   Can we go to the last one, which would

12   be, is it 9?

13   **BY MR. SHEA:**

14   Q.   July 3rd, 2008, in the amount of $15,000, again, endorsed

15   and deposited into the Maestro Associates account, correct?

16   A.   Yes.

17   Q.   All right.

18          **MR. SHEA:**   Could we have 24 now, please,

19   Ms. Facchini.

20   **BY MR. SHEA:**

21   Q.   So this is your summary table of these nine checks ranging

22   in date from 12/5/06 to July 3rd, '08, correct?

23   A.   Correct.

24   Q.   And with two exceptions, they're essentially quarterly, is

25   that correct?

*10-CR-20403    USA v. Kwame Kilpatrick, et al*

*Rowena Schuch - Cross*
*Wednesday, December 5, 2012*

93

1  A.  It appears so.

2  Q.  Regular amounts with the exception of the $1,000 difference

3  in the second one, correct?

4  A.  Yes.

5  Q.  And the first two have the word "consulting" in the memo

6  line, correct?

7  A.  Yes.

8  Q.  Now, Mr. Bullotta brought this up in the context of the

9  Karl Kado testimony, but the fact is the vast majority of these

10 checks were written and issued to Bernard Kilpatrick before

11 February of 2008 when he was working with Karl Kado in

12 connection with the amounts owing him by the City of Detroit,

13 correct?

14 A.  Yes.

15 Q.  And, frankly, you don't have any idea what specific work

16 Bernard Kilpatrick was doing for National Media in order for

17 him to receive these checks from them, is that correct?

18 A.  I believe I did review an FBI 302 of Archie Clark.

19 Q.  Well, let me put it this way, you don't have any personal

20 knowledge of why National Media, Inc. issued these checks to

21 Bernard Kilpatrick?

22 A.  No.

23 Q.  You do know, or you learned in the course of your

24 investigation there was a business relationship between

25 Bernard Kilpatrick and Archie Clark, who was the principal of

*10-CR-20403   USA v. Kwame Kilpatrick, et al*

*Rowena Schuch - Cross*
*Wednesday, December 5, 2012*

94

1    National Media?

2    A.   Yes.

3    Q.   There was some testimony regarding Bernard Kilpatrick

4    buying lottery tickets from Andrew Kado's Tunnel Liquor store

5    over a period of time.   Do you recall that?

6    A.   Yes.

7    Q.   All right.   And I think it's been established that there

8    were times when that store, as well as Mr. Kado's earlier

9    store, were extending lines of credit to -- I don't want to be

10   too formal about this, were allowing him to make purchases on

11   credit, fair?

12   A.   Yes.

13   Q.   Now, in the course of your financial investigation of

14   Bernard Kilpatrick, you reviewed -- well, you obtained lots of

15   copies of checks by Bernard Kilpatrick to Tunnel Liquor,

16   correct?

17   A.   Yes.

18   Q.   Whether they were from his personal account or from the

19   Maestro Associates account, he was writing lots of checks to

20   Tunnel Liquor, isn't that correct?

21   A.   Yes.

22   Q.   And, in fact, in the year 2007, he wrote checks that

23   exceeded $45,000 to Tunnel Liquor, is that correct?

24   A.   I don't know the exact amount.

25   Q.   I'm placing before you a table that represents, I believe,

*10-CR-20403   USA v. Kwame Kilpatrick, et al*

*Rowena Schuch – Redirect*
*Wednesday, December 5, 2012*

95

1   a summary of your analysis of Tunnel Liquor checks that

2   Mr. Kilpatrick wrote from his personal account.

3   A.  Yes.

4   Q.  And does that table reflect that in the year 2007 he wrote

5   $44,669 worth of checks to Tunnel Liquor?

6   A.  It was between his personal and his business accounts, and

7   the total is 45,000.

8   Q.  What did I say?

9   A.  Forty-four.

10  Q.  I'm sorry.

11  A.  $45,669.19.

12  Q.  Thank you very much, Agent Schuch.

13         **MR. BULLOTTA:**  Just very briefly.

14         **THE COURT:**  Okay.

15                                        (11:38 a.m.)

16                    **REDIRECT EXAMINATION**

17  **BY MR. BULLOTTA:**

18  Q.  Agent Schuch, you were asked by Mr. Shea about whether

19  those deposits into Bernard Kilpatrick's accounts, his personal

20  accounts, could have reflected gambling winnings?

21  A.  Yes.

22  Q.  And then you mentioned you did some analysis.  I just want

23  to ask you what analysis you did.

24  A.  I just compared what was happening on a specific day when

25  he did have gambling winnings, was it possible that cash was

*10-CR-20403    USA v. Kwame Kilpatrick, et al*

1    being deposited from these winnings.  For the most part, when

2    cash was deposited, it didn't coincide with a gambling win.

3    Gambling activity, it appeared that there were cash withdrawals

4    the days that there was some gambling activity, but there were

5    just a few possible deposits that coincided with gambling

6    winnings, but there weren't very many.

7    Q.  So are you saying that the withdrawals from his account

8    coincided more with the days of gambling activity?

9    A.  Yes.

10   Q.  Thank you.  Nothing further.

11                                            (11:40 a.m.)

12                      **RECROSS EXAMINATION**

13   **BY MR. SHEA:**

14   Q.  Agent Schuch, Bernard Kilpatrick gambled all the time,

15   didn't he?

16   A.  There was quite a bit of gambling activity.

17   Q.  Lots of it?

18   A.  Yes.

19   Q.  It is not uncommon for gamblers, even gambling addicts, to

20   withdraw cash before going, from an account before going to

21   gamble, is it?

22   A.  Correct.

23   Q.  All right.  It's also not uncommon for gamblers to hoard

24   cash and not necessarily deposit it in close conjunction with

25   winning.

1    A.  Right.

2    Q.  Thank you.

3              **THE COURT:**  Okay.  You may step down.

4              (Witness excused at 11:40 a.m.)

5              **THE COURT:**  Next witness.

6              **MR. BULLOTTA:**  Yes.  United States calls

7    Anthony Soave.

8              **THE COURT:**  Morning, Mr. Soave.

9                        **ANTHONY SOAVE,**

10   at 11:41 a.m., being first duly sworn by the Court to

11   tell the truth, was examined and testified upon his oath

12   as follows:

13             **THE COURT:**  Take the stand, try and speak right into

14   the microphone.

15                                           (11:41 a.m.)

16                    **DIRECT EXAMINATION**

17   **BY MR. BULLOTTA:**

18   Q.  Good morning, Mr. Soave.

19   A.  Good morning.

20   Q.  Could you say your name for the record and spell your last

21   name?

22   A.  Anthony Soave, S-o-a-v-e.

23   Q.  You might want to pull the microphone a little closer.

24   A.  How's that?

25   Q.  That's good.  Mr. Soave, what is your current occupation,

1   what do you do for a living?

2   A.  I, I own some companies, I have a holding company and I own

3   several companies.

4   Q.  Okay.  And did you get your start working in the landfill

5   business?

6   A.  I was a small contractor, and then I wound up going into

7   the landfill business and into the waste business.

8   Q.  Okay.  And have you always been based in the City of

9   Detroit?

10  A.  Since about, I think, '74, something like that.  Before

11  that, I think I was in Macomb County.  I forgot.

12  Q.  But since 1974, your businesses have been in Detroit, is

13  that fair?

14  A.  Yes.

15  Q.  And your current business is Soave -- one of your current

16  businesses, your holding company, is Soave Enterprises?

17  A.  Soave Enterprises, yes.

18  Q.  And where is that located in Detroit?

19  A.  On Lafayette and Mt. Elliott.

20  Q.  And so is that a Detroit-based and Detroit-headquartered

21  company?

22  A.  Yes.

23  Q.  Now, about 20 years ago, Mr. Soave, did you purchase a

24  company called Inland Waters?

25  A.  Yes.

*Anthony Soave - Direct*
*Wednesday, December 5, 2012*

1  Q.  And at that time that you purchased it, what did Inland

2  Waters do?

3  A.  They were an industrial cleaner.  They used to, to do work

4  in, in the industrial plants.  They would clean around the

5  machinery and clean machinery and stuff on the down time, when

6  the plants have a down time, the cleaners go in and clean paint

7  booths and stuff like that.

8  Q.  Talking about the auto plants?

9  A.  Auto plants, yes.  Well, other plants also but primarily

10 the auto plants.

11 Q.  And was that company located, is that company located in

12 Detroit also?

13 A.  Yes, it is.

14 Q.  And is that in the area of I-75 and Schaefer?

15 A.  Yes.

16 Q.  Now, over the years, since you purchased Inland Waters, did

17 it develop from a small industrial cleaning company into

18 something else?

19 A.  Yes.  Well, I was also -- I also was a sewer contractor and

20 so it was M&M Contracting.

21 Q.  M&M Contracting?

22 A.  M&M Contracting, yes.  So I --

23      **A JUROR:**  I'm sorry, sir, I'm having a little bit of

24 trouble hearing you.  Can you move the microphone just a tiny

25 bit closer.

*10-CR-20403    USA v. Kwame Kilpatrick, et al*

*Anthony Soave – Direct*
*Wednesday, December 5, 2012*                    100

1           THE WITNESS:  Okay, okay.  Let me --

2           A JUROR:  Did you say you were a soil contractor?  I

3    missed that.

4    BY MR. BULLOTTA:

5    Q.  Were you a soil contractor?

6    A.  Soil?

7    Q.  Or sewer?

8    A.  Sewer.

9           THE COURT:  Sewer.

10          THE WITNESS:  Yes.

11          MR. BULLOTTA:  And I'll go a little slower also.

12   A.  No, it's okay.  I'll answer fast.

13          THE COURT:  Well, it's sometimes hard because of the

14   sound system, it's sometimes hard to pick up every word that

15   you're saying.

16          THE WITNESS:  Oh, okay, all right.

17   BY MR. BULLOTTA:

18   Q.  So we were talking about moving the Inland Waters business

19   from being an industrial cleaning company into something else

20   involving the sewers.

21   A.  I gradually moved them into the sewer business, Inland

22   Waters, besides doing the cleaning.  They still did the

23   cleaning, but then they were, they graduated or they moved into

24   the sewer business.

25   Q.  Did that include having contracts with DWSD?

*10-CR-20403   USA v. Kwame Kilpatrick, et al*

```
 1    A.   Yes.  I think at first they were subcontractors.
 2    Q.   And over the years, have your companies, the various
 3    companies that you've held and owned, have they had contracts
 4    with the City of Detroit?
 5    A.   Yes.
 6    Q.   And how far does that go back, your relationship, business
 7    relationship with the city?
 8    A.   Well, to '74, I think, I think that was the first time.
 9    Q.   And is there someone named Dennis Oszust, spelled
10    O-s-z-u-s-t?
11    A.   Yes.  He was a superintendent out in the field for M&M, and
12    then eventually into Inland Waters.
13    Q.   So Mr. Oszust worked at Inland Waters?
14    A.   Yes, he did.
15    Q.   And then as far as your company, Soave Enterprises, who was
16    Kathleen McCann?
17    A.   She's a vice president Soave Enterprises.  Or she was.  She
18    just re -- left.
19    Q.   Is there someone named Yale Levin?
20    A.   Yes.
21    Q.   Who is Yale Levin?
22    A.   Yale Levin, he's an executive vice president at Soave
23    Enterprises.
24    Q.   And as far as other companies in the City of Detroit, did
25    you also have a scrap business?
```

 1  A.  Yes, I still do.  It's called Ferrous Processing, and we

 2  have yards here and in Ohio and in Florida.

 3  Q.  Did you also own a, I don't know if you still own it, but

 4  the Checker Cab Company?

 5  A.  Yes, I still do.

 6  Q.  And that's, is that -- does that operate --

 7  A.  It's located in Detroit.

 8  Q.  And during the Kwame Kilpatrick administration, 2002 to

 9  2008, did you have these companies that we were talking about?

10  A.  Yes.

11  Q.  So you had a lot of companies that interacted with the city

12  and that --

13  A.  Yes, I, I did.

14  Q.  Was it important for you to be on good terms with the city?

15  A.  Yes.

16  Q.  And why is that?

17  A.  Because it's good business practice to be.

18  Q.  And you had a number of business concerns here in the City

19  of Detroit?

20  A.  Yes.

21  Q.  I want to direct your attention to the year 2001, the last

22  year that Mayor Dennis Archer was in office.  In that year, did

23  Inland Waters receive a contract or at least were they told

24  that they were going to get a contract known as 1368, a pipe

25  relining contract?

```
 1    A.  Yes, they did.
 2    Q.  And was that a small contract, a large contract, do you
 3    know?
 4    A.  It was about 50 million.
 5    Q.  And in putting the bid together on that contract, was
 6    there, did Inland Waters have a minority component?
 7    A.  Yes, they did.
 8    Q.  And who was that?
 9    A.  His name was Charlie Williams.
10    Q.  And who is Charlie Williams?
11    A.  Charlie Williams is, he's a gentleman, he's an attorney,
12    and he was the former director of the DWSD.
13    Q.  And was he the director on a couple of occasions of the
14    DWSD, do you think?
15    A.  Was he --
16    Q.  On two different occasions, was he --
17    A.  Yes, I think he left and then he went back.  I don't know
18    what the reasons were, but I think he was there for a total of
19    five or six, seven years, something like that.
20    Q.  And he's also an attorney?
21    A.  Yes, he is.
22    Q.  Did you, back in 2001, did you do something called
23    mentoring of minority contractors?
24    A.  Yes.
25    Q.  Can you describe for the jury what mentoring a minority
```

1    contractor involves?

2    A.   It involves helping a contractor to become a full-fledged

3    contractor, a viable contractor, eventually, so they bid on

4    their own jobs, instead of just being a subcontractor.

5    Q.   And what does it involve, what does it entail on your part

6    for Soave Enterprises or Inland to mentor -- and by the way,

7    was Charlie Williams, was that someone you were mentoring?

8    A.   Yes.

9    Q.   What's entailed --

10   A.   Well, for that job.  Before that, I hadn't been.

11   Q.   What were you planning on doing with Charlie Williams in

12   relationship to contract 1368?

13   A.   Well, we knew that he knew generally about that business

14   because he was the director, so he surely knew about it, and we

15   were going to get him into -- I was an old friend of Charlie's,

16   I knew Charlie for years, so it wasn't like I just met him.

17   And so he -- we were going to mentor him and have him do some

18   work on the job and help him do it and get him equipment and,

19   you know, help him become a contractor.

20   Q.   Was he going to have his own company?

21   A.   At the end, yes.  Well, he was going to have it, his

22   company, I mean, you mentor the company, you know, not the

23   person, so ...

24   Q.   But by the end, it would be a viable company?

25   A.   Well, not, you know, maybe not viable at the end of the

*Anthony Soave - Direct*
*Wednesday, December 5, 2012*

1   first job, but maybe after a job or two, you know.  Sometimes

2   it happens in one job, but usually it takes some time.

3   Q.  And was Charlie Williams mentioned on the bid when --

4   A.  Yes, he was listed as my minority subcontractor.

5   Q.  Did you have any relationship with Kwame Kilpatrick before

6   he became mayor in 2002?

7   A.  No, I did not.

8   Q.  Did you support him when he ran for office in 2001 for

9   mayor?

10  A.  No, I did not.

11  Q.  Did you support his opponent, Gil Hill, do you know?

12  A.  Yes.

13  Q.  Shortly after Kwame Kilpatrick was elected, did he pay you

14  a visit to your office at Soave Enterprises?

15  A.  Yes, Kwame came to my office and paid me a visit.

16  Q.  Can you describe what happened during that visit?

17  A.  He just came to say hi and asked me, asked me why I didn't

18  support him, and I told him I didn't know him, and we

19  chitchatted and that was about it, you know.  We just talked

20  about some things.  I forgot exactly what, but basically it was

21  just a social visit.

22  Q.  What happened in early 2002 with respect to the 1368

23  contract?  Were you waiting for your letter to start work?

24  A.  We were waiting.  We had heard that it passed all the, all

25  the committees and the council, the city council, and it was,

*Anthony Soave - Direct*
*Wednesday, December 5, 2012*

 1    it was on the mayor's desk to be signed, and I don't know what

 2    happened.  It was at the end of the Archer administration.

 3    Q.  So now we're in the Kilpatrick administration in early

 4    2002, and was there, was your company ready to start work?

 5    A.  We were waiting, yes.  We were anxious, you know, waiting,

 6    you know, to start the job.

 7    Q.  Okay.  And did you, in April of 2002, did you set up a

 8    meeting with Mayor Kilpatrick?

 9    A.  Yes.  After three or four months we're waiting, and I

10    called him up, you know, asked if I could see him, and there

11    had been some noise or something, said you better go see the

12    mayor because this thing's not going to move unless you go see

13    him.  So I went to see him.

14    Q.  Did you go to the mayor's office?

15    A.  Yes, I did.

16    Q.  And who was at that meeting, if you remember?  Did you

17    bring anybody with you?

18    A.  No, I did not.

19    Q.  Do you know if the mayor had anyone in his office?

20    A.  You know, I don't remember if he had anybody there or not.

21    I can't remember.

22    Q.  But you came alone, though, right?

23    A.  Yes, I did.

24    Q.  Describe what occurred at the meeting.

25    A.  I asked him what the holdup was on the job because we were

1    anxious, and I have, I had a lot of people waiting to go to

2    work, and it was, it was a big, important thing.  That was a

3    large, you know, contract for us and I just wanted to know what

4    the holdup was.

5    Q.   And did you ask the mayor what the holdup was?

6    A.   Yes, I did.

7    Q.   And what did he tell you?

8    A.   He told me I had the wrong subcontractor.

9    Q.   And what did you say?

10   A.   I don't know exactly how it was, but, you know, I --

11   Q.   What did you communicate to Mr. Kilpatrick?  Did you ask

12   any questions?

13   A.   Well, I don't know exactly.  I just asked him what was

14   wrong, and he said I had the wrong subcontractor, and I think I

15   asked him, "What's the right one?"  So he told me, he told me

16   Ferguson was the right one.

17   Q.   Did you know Bobby Ferguson at that time?

18   A.   No, I did not.

19   Q.   So what did you tell him after he told you that Ferguson

20   was the right minority subcontractor and you had the wrong one?

21   A.   I told him, "Okay, I'll make a change."

22   Q.   Did that conclude the meeting?

23   A.   You know, we might have said a few other things, but that

24   was the important thing.

25   Q.   And then what did you do after meeting with the mayor?  Did

*Anthony Soave – Direct*
*Wednesday, December 5, 2012*

1   you speak with Ms. McCann?

2   A.  Well, I went back to my office.  I don't know if I spoke to

3   her right away, but I probably did, you know.

4   Q.  Did you talk to Mr. Levin about it?

5   A.  I talked to both of them.  Our offices were together, you

6   know, so I told him we had to make a change.

7   Q.  And did you make a change?

8   A.  I didn't hear what you --

9   Q.  Did you make a change?

10  A.  Yes, we did.

11  Q.  And what happened to Charlie Williams?

12  A.  I told Charlie Williams that we had to make a change and,

13  of course, he was very disappointed.

14  Q.  Did Charlie Williams put any work in on the bid process?

15  A.  He had helped us, you know, put the bid together, yes.  And

16  he was getting, you know, getting prepared, you know, to assume

17  the responsibilities.

18  Q.  Why did you agree to make the change?

19  A.  Because I wanted the job.

20  Q.  Did you have any money invested in the job or --

21  A.  Certainly, I mean, all kinds of money.  I mean, it costs

22  money to bid jobs, but that was our livelihood.  I mean, Inland

23  was, that was a big deal for Inland.  So we were all -- there

24  were a lot of people depending on it.

25  Q.  Were you in any way worried about losing the contract?

1    A.   Was I worried about what?

2    Q.   Losing the contract?

3    A.   Well, yes, I was worried about it.  I wanted to -- that's

4    why we were, we were all waiting.  Everybody was asking me,

5    "Hey, go see the mayor, find out what's wrong," because we

6    wanted to get started, and --

7    Q.   What were the financial --

8    A.   I didn't --

9    Q.   I'm sorry, go ahead.

10   A.   I didn't know what the problem was.

11   Q.   What would the financial impact have been, if any, on

12   Inland if you had lost the contract?

13   A.   It would have been terrible for us, I mean, there were a

14   lot of people would have been out of work.  There were, I mean,

15   hundred -- I don't know how many people, but it would have been

16   a lot of people out of work, and it would have been a hardship

17   on the company also.

18   Q.   Why so?

19   A.   Well, because $50 million worth of work is a lot of work

20   for a company the size of Inland.

21   Q.   Did you tell Charlie Williams, then, that you had to make a

22   change?

23   A.   Yeah, I did, yes, I did.

24   Q.   What was his reaction?

25   A.   His reaction was he was very disappointed and so, I mean,

*Anthony Soave - Direct*
*Wednesday, December 5, 2012*

110

 1    that was a, that was the extent of it.  He was just very, very

 2    disappointed.

 3    Q.  Did you feel bad about it?

 4    A.  I felt bad, yes.  I didn't know Bobby Ferguson and I knew

 5    Charlie Williams, and I put him in as my contractor, and we

 6    were -- you know, I was disappointed also, yes.

 7    Q.  You were going to mentor Charlie Williams?

 8    A.  Yes.

 9    Q.  Did you give Charlie Williams some money, around $200,000?

10    A.  Yes, I did.

11    Q.  And why did you do that?

12    A.  Well, it was my feeling that I had -- I wanted to do

13    something.  I don't think, I don't think I had to, but I wanted

14    to do something to help him.  I don't know, I just thought -- I

15    was feeling bad for him, and I wanted to, I wanted to help him

16    out.  He worked on it with us, and so I just came up with a

17    number.  There was no formula or anything.  It was just

18    something I just, I came up with a number.  I bounced it off a

19    couple people that work for me, and we came up with the

20    200,000.

21    Q.  And do you currently -- are you currently partners with

22    Charlie Williams in a company?

23    A.  Yes.

24    Q.  What's the name of that company?

25    A.  It's MPS.

*Anthony Soave - Direct*
*Wednesday, December 5, 2012*                              111

1    Q.   Is that MPS Industrial Services?

2    A.   Yes.

3    Q.   And who owns the majority of that company?

4    A.   Charlie owns, I think it's 52 percent.

5    Q.   All right.  Did you mentor him into owning that company?

6    A.   Yes.

7    Q.   And how much money does Charlie Williams' company do a year

8    now, currently, approximately?

9    A.   MPS is doing, I don't know, 35, 40 million, something like

10   that.

11   Q.   What kind of work do they do?

12   A.   They do cleaning, industrial cleaning, sort of like Inland

13   started.

14   Q.   Is Charlie Williams successful in your view?

15   A.   Is he what?

16   Q.   Successful as a business owner?

17   A.   Well, I mean, we're working hard at it, we're trying to

18   grow the company and we're getting better, yes, it's

19   successful.  I mean, it's making money so ...

20             **A JUROR:**  What was the revenue of MPS?

21   **BY MR. BULLOTTA:**

22   Q.   What was the revenue again approximately, did you say 35?

23   A.   Approximately 35 or 40 million, I'd say, or maybe 45 going

24   to 50, somewhere in that range.

25   Q.   Per year?

*10-CR-20403    USA v. Kwame Kilpatrick, et al*

1   A.  Yeah, per year.

2           **MR. BULLOTTA:**  Okay.  I have what's been marked IN1,

3   for Inland 1-3, and I'd like to show -- I would like to move

4   that into evidence.  It's a page --

5           **MR. RATAJ:**  No objection.

6           **THE COURT:**  Received.

7           (Government's Exhibit IN1-3 received into

8           evidence.)

9           **THE COURT:**  Want to take a five-minute break now?

10  This may be a good place.  Take five minutes.

11          (Jury out 12:02 p.m.)

12          (Recess taken 12:02 p.m. until 12:10 p.m.)

13          (Jury in 12:11 p.m.)

14          **THE COURT:**  Be seated.

15  BY MR. BULLOTTA:

16  Q.  Mr. Soave, before we broke, we were talking about a meeting

17  that you had with Mayor Kilpatrick in April of 2002 in which

18  you were told that you had the wrong minority contractor on

19  your bid for 1368?

20  A.  Yes.

21  Q.  I want to show you what's been introduced as IN1-3, and I

22  want to show you for the record a page of Mayor Kilpatrick's

23  official calendar dated Tuesday, April 23rd, 2002.

24          **MR. BULLOTTA:**  And can you, Ms. Facchini, scroll --

25          **THE COURT:**  Have you moved this in?

*Anthony Soave - Direct*
*Wednesday, December 5, 2012*

113

```
 1              MR. BULLOTTA:  Yes.

 2              MR. RATAJ:  Your Honor, can we have a sidebar on

 3    this?

 4              MR. BULLOTTA:  I thought I moved it in.

 5              THE COURT:  I'm sorry, is it in evidence?

 6              MR. BULLOTTA:  I did right before the break, moved

 7    it in.

 8              MR. RATAJ:  And I made a mistake because I thought

 9    it was a different document.  And now that I've looked at it,

10    it's --

11              (The following sidebar conference was held:)

12              THE COURT:  Do I need to see it?

13              MR. RATAJ:  Yeah, you need to see it.  I'm sorry,

14    Mr. Bullotta, that was my mistake, and I apologize.  Judge,

15    that is not the same -- that is not a calendar.  That looks

16    like it's a compilation, okay.  That is not the format that the

17    government has been putting in regarding Mr. Kilpatrick's

18    calendar.

19              I know I'm making the argument for Mr. Gurewitz, so

20    I'll let him get in here.

21              MR. GUREWITZ:  Well, Your Honor, I had that issue

22    and I haven't talked to Mr. Rataj about this, but I went to the

23    U.S. Attorney's Office yesterday to look at the calendars, and

24    they have some of them compiled in notebooks, particularly for

25    that year, 2002, and I did find that that one is in the same
```

*10-CR-20403    USA v. Kwame Kilpatrick, et al*

 1   format as all the other ones from January through the end of

 2   May.

 3                **MR. RATAJ:**  Okay.  So --

 4                **THE COURT:**  So this is a compilation, it's not the

 5   actual calendar page, is that correct your objection?

 6                **MR. GUREWITZ:**  No, I'm satisfied that it's in the

 7   same format as all the other calendars for that year --

 8                **MR. RATAJ:**  Okay.

 9                **MR. GUREWITZ:**  -- and based upon the government's

10   representation that they got those from, from the city, or

11   through the county and the city.

12                **MR. CHUTKOW:**  I'm guessing that they went to a

13   different format.  He had Microsoft Outlook.

14                **MR. BULLOTTA:**  He saw this page in the actual

15   calendar, copy of the calendar that we had yesterday.

16                **THE COURT:**  All right.  Then I'll admit it.

17                **MR. RATAJ:**  My mistake, I'm sorry, on two scores.

18                **THE COURT:**  It's okay.

19                (End of discussion at sidebar.)

20                **THE COURT:**  All right.  IN1-3 has been admitted.

21   **BY MR. BULLOTTA:**

22   Q.  Mr. Soave, directing your attention to the mayor's calendar

23   for Tuesday, April 23, 2002, specifically a meeting that's on

24   his schedule for 11:00 to 11:30.  Do you see what that says

25   there?

1    A.  Yes, I do.

2    Q.  What does it say?

3    A.  It says, "Meeting with Tony Soave."

4    Q.  At the mayor's office, right?

5    A.  The mayor's office.

6    Q.  Is that timeframe, can we go back to the date at the top,

7    please?

8    A.  I think so.  I didn't look at my records to see, but I --

9    that's about the time.

10   Q.  So you said it was several months after Mayor Kilpatrick --

11   you said you waited a few months before --

12   A.  Yes.

13   Q.  -- meeting with him?

14   A.  Yes.

15   Q.  So would this be consistent with your memory?

16   A.  Yes.

17   Q.  Okay.  Thank you.

18            Now, you were in charge, ultimately, of Inland

19   Waters?

20   A.  Yeah, I was the owner, I was the owner.

21   Q.  And Bobby Ferguson's company worked with Inland Waters on

22   contract 1368, is that --

23   A.  Is that the --

24   Q.  The sewer relining contract.

25   A.  You mean the contract that we're talking about that we were

1    waiting for?

2    Q.   Yes.

3    A.   Yes.

4    Q.   So the work started, correct?

5    A.   Yes.

6    Q.   And Ferguson worked with folks at your company?

7    A.   Yes, he did.

8    Q.   And did that include dealings with Kathleen McCann and --

9    A.   Yes, she was the overseer, and she would deal with Oszust,

10   you know, Dennis Oszust.

11   Q.   And did Mr. Oszust and Ms. McCann, did they tell you about

12   their interactions with Bobby Ferguson?

13   A.   Mrs. McCann, she would tell me mostly.

14          **MR. RATAJ:**  Your Honor, I'm going to object, that's

15   hearsay, hearsay.

16          **MR. BULLOTTA:**  I'm going to --

17          **THE COURT:**  He hasn't asked for the hearsay yet.  If

18   he asks what she said, then it's hearsay.

19          **MR. BULLOTTA:**  Well, I intend -- can we have a

20   sidebar then?  This is going to go to why he did what he did

21   later, and I can give an offer of proof at sidebar if you'd

22   like.

23          **THE COURT:**  All right.

24          (The following sidebar conference was held:)

25          **MR. BULLOTTA:**  I intend to ask this witness about

1   conversations that he had with Kathleen McCann about Ferguson's

2   interactions where he threatened them using his relationship

3   with the mayor, and it affects the reasons why he decided not

4   to cut off Ferguson, to keep him working on these contracts,

5   and it also affects, he'll say why he did certain things for

6   the mayor, he wanted to make the mayor happy, and he wanted to

7   make Ferguson happy.

8           So it goes directly to his state of mind.  It's not

9   offered for the truth that these things were said.  That's

10  going to come in through McCann herself who is testifying.

11  They can cross examine McCann about that.  This is going to his

12  state of mind.  He's the ultimate decision-maker.

13          **THE COURT:**  Okay.  I'll permit it.

14          (End of discussion at sidebar.)

15          **THE COURT:**  And I should just tell the jury that I

16  have ruled that the statements that Mr. Bullotta is about to

17  elicit are admissible, but you should understand that they're

18  not admitted for the truth of what those statements are.  In

19  other words, he's going to ask what Ms. McCann said, and

20  they're not offered for the truth of what she said, but just to

21  establish the witness's state of mind for what he did on this

22  contract.

23  **BY MR. BULLOTTA:**

24  Q.  Mr. Soave, did you have conversations with Kathleen McCann

25  about Bobby Ferguson and her dealings with him?

*Anthony Soave - Direct*
*Wednesday, December 5, 2012*

1   A.  Yes.

2   Q.  And can you describe some of the issues that she told you

3   about?

4   A.  Well, she was always having issues with him, I mean,

5   regarding one thing or another.  She was always negotiating or

6   meeting with him, and she would come back and tell me that she

7   was having, she was having problems or he's a handful.

8   Q.  Did she ever talk to you about, specifically about Ferguson

9   making statements about his, about why you got the contract?

10  A.  Well, yes.  I mean, he on occasions would say, "Do you

11  realize you're here because of me?"  You know, so that used to

12  not make us feel good.

13  Q.  Why did you say that didn't make you feel good?

14  A.  Well, because it sounds like a little threat, you know,

15  when you hear that.

16  Q.  Would Ms. McCann talk to you about the fact that Ferguson

17  would remind her of his relationship with Mayor Kilpatrick?

18  A.  I don't know exactly how he stated it, but, you know,

19  saying, "Do you realize you're here because of me?" that says a

20  lot.  Saying, "See, you don't get it.  You realize you're here

21  because of me?"  So that's what she came back and told me, so I

22  understand what that means.

23  Q.  What did you take that to mean?

24  A.  That means that, that "You probably better get along with

25  me."

1    Q.   Why?

2    A.   "Or it could be consequences," you know, I guess.  I mean,

3    he didn't say "or," he didn't say what would happen.  He just

4    said that, and people understand that very well.

5    Q.   Were you happy as the head of, an owner of Inland Waters,

6    were you happy with Ferguson's work performance?

7    A.   Well, he was, he was -- he was a troubling contractor for

8    us.  We had a lot of problems with handling him one way or

9    another, and with his wanting more work, more money, you know,

10   more things all the time.  So Kathleen could probably address

11   that a little better, but she would come back and complain to

12   me all the time.

13            Now what happened?

14            **MR. SHEA:**  Sometimes the mic cuts out.

15            **THE COURT:**  It's just the sound system, it's not

16   you, nothing personal.

17            **THE WITNESS:**  Okay.  Thank you.

18   **BY MR. BULLOTTA:**

19   Q.   Can you repeat that last part where you -- the microphone

20   malfunctioned?

21   A.   She would complain to me, you know, all the time about her

22   meetings with him because they were, they were not fun meetings

23   for her, you know.  She was having trouble with him asking for

24   things all the time, and I had -- on certain occasions there

25   was some work that wasn't being done, and we had a problem with

1   him.  But that was over the period of time now, you know,

2   because he worked for us for a long time.

3   Q.  And then was there an occasion when these problems were

4   occurring where you spoke with Mayor Kilpatrick about their

5   relationship?

6   A.  I think a couple times I brought it up to him.  I mentioned

7   to him --

8   Q.  Mentioned to whom?  I'm sorry.

9   A.  I mentioned to the mayor, "Is Bobby Ferguson still your

10  guy?"  And he said, "Yes, he's still my guy."  So I understood

11  he was still friends with him.

12  Q.  Why did you ask the mayor, "Is Bobby still your guy?"

13  A.  Well, I mean, we would be able to act accordingly then, you

14  know, because we would've probably, I don't know, we would have

15  probably cut his workload down, or we would have done some sort

16  of thing like that.

17          It was unusual for a subcontractor to talk to us the

18  way he was talking to us.

19  Q.  So it wasn't a normal subcontractor relationship?

20  A.  No, it definitely wasn't.

21  Q.  At some point during the contract, did you learn that

22  Bobby Ferguson wanted to become a partner with Inland?

23  A.  Oh, that was the, one of the meetings that he, Mrs. McCann

24  came back and said, "Do you want to hear the latest?"  I forgot

25  exactly how she said it.  I said, "Yes, tell me."

*Anthony Soave - Direct*
*Wednesday, December 5, 2012*                    121

1          And she said that Bobby said the next time we bid on

2    the next contract, he wants to be our partner, he wants to bid

3    50-50 or something like that.

4    Q.  And what --

5    A.  Either a partner or 50-50.

6    Q.  And how was that received by you?

7    A.  I told her you can tell him to go F himself.  I'd rather

8    not have the work than be partners with him.

9    Q.  In 2005, did you sell your majority shares, your 80 percent

10   shares of Inland Waters?

11   A.  Yes, I did.

12   Q.  Was that to a company called Strong Capital?

13   A.  Yes.

14   Q.  But you still retained 20 percent share?

15   A.  Yes.

16   Q.  Did you become less involved then with Inland Waters?

17   A.  Yes.

18   Q.  Do you know if Inland Waters went on to do additional work

19   with Ferguson?

20   A.  I believe they did, yes.

21   Q.  But you weren't involved in that?

22   A.  I wasn't.  We still owned 20 percent, and Kathleen, I

23   think, was on the board, her and Yale Levin, I think, were both

24   on the board, so they had to have some contact.  It wasn't like

25   we didn't have any contact.

*Anthony Soave – Direct*
*Wednesday, December 5, 2012*

122

1    Q.  Now, I want to ask you about something called the

2    Kilpatrick Civic Fund.  Are you aware of what the Kilpatrick

3    Civic Fund is?

4    A.  Yes.

5    Q.  And did you, did Soave Enterprises make contributions to

6    the Kilpatrick Civic Fund?

7    A.  Yes, we did.

8    Q.  I'm sorry, going back to the last topic area.

9            **A JUROR:**  When did this witness sell his shares in

10   the company?

11   **BY MR. BULLOTTA:**

12   Q.  Was that in 2005 that you sold your shares?

13   A.  I don't know the exact date.  I don't have that, we'd have

14   to look that up, but it was about that time.

15           **THE COURT:**  About 2005, was that it?  Yes?  About

16   2005?

17           **THE WITNESS:**  You know, I don't know exactly.  I

18   would have to look it up.  I think that sounds right, but you

19   know --

20           **THE COURT:**  Okay.

21           **THE WITNESS:**  -- if it's real important, we should

22   probably look it up for you.

23   **BY MR. BULLOTTA:**

24   Q.  Okay.  I'm going to show you what's been marked IN1-64.

25   Actually, it's in front of you.  Do you see IN1-64?

*10-CR-20403   USA v. Kwame Kilpatrick, et al*

1    A.   Yes, yes.

2    Q.   And do you see three checks there?

3    A.   Yes.

4    Q.   And are those checks from Soave Enterprises to the

5    Kilpatrick Civic Fund?

6    A.   Yes.

7              **MR. BULLOTTA:**   I would move in IN1-64, Your Honor.

8              **THE COURT:**   Received.

9              (Government's Exhibit IN1-64 received into

10             evidence.)

11   **BY MR. BULLOTTA:**

12   Q.   Let me show you the first, down here, the first check.   I

13   know that the number is kind of hard to read, but do you see,

14   can you read the amount here?

15   A.   Who, me?

16   Q.   Yes.

17   A.   75,000.

18   Q.   Okay.   And is this your signature --

19   A.   Yes, it is.

20   Q.   -- on the lower right corner?

21   A.   Yes, it is.

22   Q.   And this is pay to the order of the Kilpatrick Civic Fund?

23   A.   Yes.

24   Q.   And is the date on that, does it appear to be August 3rd of

25   2004?

*Anthony Soave - Direct*
*Wednesday, December 5, 2012*

1    A.  Yes.

2    Q.  How did you come to give $75,000 to the Kilpatrick Civic

3    Fund?

4    A.  I believe the mayor asked me if I would contribute and I

5    did.

6    Q.  And did you know what the purpose of the Kilpatrick Civic

7    Fund was?

8    A.  I believe it was, I thought it was to do something with the

9    city kids, some kind of civic thing.

10   Q.  Okay.  And did you give again?  Let me show you Page 2.

11   Did Soave Enterprises give again on November 6 --

12   A.  Yes.

13   Q.  -- of 2006?  And this time, how much was it?  Can you tell

14   how much that is?

15   A.  It was 50,000.  Is that the next one?

16   Q.  Yeah.  Do you see the date on this?

17   A.  Yes.

18   Q.  November 6, 2006?

19   A.  Yes.

20   Q.  And is that your signature stamp maybe?

21   A.  Yes, it is.

22   Q.  And then can we see -- I don't want to go too fast.  Now

23   can we see Page 3?

24   A.  Yes, that's 50,000, and that's my stamp also.

25   Q.  And this is the third check and this is for -- on the date

*10-CR-20403    USA v. Kwame Kilpatrick, et al*

1    of April 15, 2008?

2    A.   Yes.

3    Q.   And that's also for $50,000?

4    A.   Yes.

5    Q.   And to the Kilpatrick Civic Fund?

6    A.   Yes.

7    Q.   Okay.  So a total of $175,000 you gave?

8    A.   Yes, 75 and two 50s, yes.

9    Q.   Thank you.  During the time that Kwame Kilpatrick was mayor

10   of the City of Detroit, did you own any private airplanes?

11   A.   Yes, I did.

12   Q.   And did you own them through a company called City

13   Aviation?

14   A.   Yes.

15   Q.   Can you describe the private planes that you owned?

16   A.   I owned three, three of them.  One was a Lear 45 and one

17   was a Falcon 20 and one was a Turbo Commander.

18   Q.   The Lear 45 and Falcon 20, are those jets?

19   A.   Yes, they are.

20   Q.   And the Turbo Commander, is that a combination of a

21   propeller and a jet too?

22   A.   Yes, it's still considered a jet, but it's a turbo prop, I

23   guess, but yes.

24   Q.   And how many people do those planes seat?

25   A.   I think eight.  The one, you can get ten in it.  The

*Anthony Soave - Direct*
*Wednesday, December 5, 2012*

1   Falcon's a little larger, you can get ten in.  The other two, I

2   think it was eight, I believe.  The Lear is eight and a jump

3   seat, that's nine, so -- and the Turbo Commander, I think that

4   was eight.  I don't have that any longer.

5   Q.  Directing your attention back to August of 2003, do you

6   recall that there was a blackout in the Midwest, including the

7   Michigan area, southeast Michigan area?

8   A.  Yes.

9   Q.  And did you at some point provide a private jet for the use

10  of Kwame Kilpatrick?

11  A.  Yes.  We couldn't pick him up, but I think we brought him

12  back.  Our plane couldn't get out to go pick him up.

13  Q.  Could you maybe back up a little bit from the microphone?

14  A.  Okay.  How is that?

15  Q.  That's good.  So you said that you took him back, you're

16  talking about Mayor Kilpatrick?

17  A.  Yes.

18  Q.  And back to where?

19  A.  We were asked if we could pick him up, and we tried but we

20  couldn't get out, the plane couldn't get out, so we didn't pick

21  him up.  I don't know how he got here.  He was in the Bahamas,

22  I believe, and so --

23  Q.  In the Bahamas?

24  A.  I think he was in the Bahamas.  I think that's where he

25  was.

*10-CR-20403    USA v. Kwame Kilpatrick, et al*

*Anthony Soave – Direct*
*Wednesday, December 5, 2012*                              127

1              And we brought him back after it got stabilized here

2     or whatever happened.

3     Q.  Do you know who asked you to get involved, do you know?

4     A.  I think that Derrick Miller called me.  I think he called

5     for a plane to go pick him up.

6     Q.  Okay.  But then you said that you couldn't do that.  Was

7     that because of the blackout conditions?

8     A.  Yes, we couldn't get out.  The pilot couldn't get clearance

9     to get out of the airport.

10    Q.  But then you said Mayor Kilpatrick got here and then --

11    A.  Yes.

12    Q.  -- then he wanted to go back to Nassau --

13    A.  Yes.

14    Q.  -- to the Bahamas?

15    A.  Yes.  His family was down there.

16    Q.  And did you provide a jet for him to, a jet flight for him

17    back down there?

18    A.  I believe I brought him back down, and I don't know if I

19    brought the family back or not.  I don't remember.  I think so.

20    Q.  And after that, the flight that you were talking about

21    there, were there additional times where you provided jet

22    service for Kwame Kilpatrick?

23    A.  Yes.

24    Q.  And how many flights in total, do you recall,

25    approximately?

*10-CR-20403    USA v. Kwame Kilpatrick, et al*

*Anthony Soave – Direct*
*Wednesday, December 5, 2012*

128

1    A.  Well, I think we have a list here, and I think it's about

2    20 round trips.

3    Q.  Okay.  So 40 flights, 20 rounds trips about?

4    A.  Yes.

5    Q.  I have what's been marked JET, JET3.  Do you see JET3 in

6    front of you?  Do you see that chart?

7    A.  Yes.

8    Q.  And is that a chart that was prepared by individuals in

9    your organization, Soave Enterprises?

10   A.  Yes.

11           **MR. BULLOTTA:**  I would move in JET3, Your Honor.

12           **THE COURT:**  Received.

13           (Government's Exhibit JET3 received into

14           evidence.)

15           **MR. BULLOTTA:**  Can we see, maybe we could highlight

16   this first, this first column.

17   **BY MR. BULLOTTA:**

18   Q.  We were talking about August of 2003 and the blackout, do

19   you remember?  Do you see --

20   A.  Yes.

21   Q.  Do you see a departure date of August 16, 2003 and the

22   departure city, Detroit, destination city --

23           **A JUROR:**  I can't see it.

24           **THE COURT:**  He can't really see it.  You need to

25   blow it up a little more.

*10-CR-20403   USA v. Kwame Kilpatrick, et al*

1    **BY MR. BULLOTTA:**

2    Q.  Departure date of August 16, 2003.  See that?

3    A.  Yes.

4    Q.  And then where is the departure city, what does it say for

5    departure city?

6    A.  Detroit to Nassau.

7    Q.  And --

8    A.  And Nassau --

9    Q.  And destination city is Nassau?

10   A.  Yes.

11   Q.  And that's in the Bahamas?

12   A.  Yes.

13   Q.  And it says, "Drop off."  Do you see that?  Do you see

14   that, "Drop off"?

15   A.  Yes.

16   Q.  What number is that?

17   A.  One.

18   Q.  Would that have been Mayor Kilpatrick then?

19   A.  Yes, I assume, I think that's it.

20   Q.  And then what's this under the hours?

21   A.  That's the approximate flight time.

22   Q.  Does it say which of your planes was used?

23   A.  It says the Falcon.

24   Q.  And does it have a retail value cost, the cost of the

25   flight?

1    A.  Yeah, that's a cost that -- it's not our cost, but that's a

2    retail.

3    Q.  Okay.  Thank you.  And back out a little bit.  And then

4    does it also show a pickup on -- I'm sorry, would that be --

5    the next night that's listed here, would this be, on the same

6    day, would this be the pilots returning?

7    A.  Yes.

8    Q.  So the pilots had to fly back, right, to Detroit?

9    A.  Right, right.

10   Q.  And then was there a -- about five days later, was there a

11   pickup of the Kilpatrick family on August 21, 2003?

12           **MR. GUREWITZ:**  Objection, Your Honor, I think

13   there's no foundation.  He's asking for speculation about who

14   was in the party.

15           **MR. BULLOTTA:**  I'll back up.

16           **THE COURT:**  You just need to ask a few more

17   foundation questions.

18           **MR. BULLOTTA:**  Sure, I will, no problem.

19   **BY MR. BULLOTTA:**

20   Q.  Do you see this flight, August 21, 2003?

21   A.  Yes, I do.

22   Q.  Okay.

23           **MR. BULLOTTA:**  And the -- Ms. Facchini, can you

24   please go to the right?

25

1    **BY MR. BULLOTTA:**

2    Q.  All right.  This is from Detroit to Nassau, do you see

3    that, Detroit to Nassau?

4    A.  Yes.

5    Q.  And then looks like it's, I can't see -- can you back out?

6    I don't know what that column is, says, "Pickup," and it has

7    the number 6.

8    A.  Yes.

9    Q.  Do you know who was being picked up, the six people that

10   were being picked up?

11   A.  I think it was his family but, you know --

12   Q.  And then again it's the Falcon?

13   A.  Yes.

14   Q.  Thank you.

15          **MR. BULLOTTA:**  Can you back out?

16   **BY MR. BULLOTTA:**

17   Q.  So I'm not going to go through every flight, but you see

18   there are various flights listed, there's one from Detroit to

19   Nassau, there's others, Detroit to Orlando.  Do you see a

20   number of flights?

21   A.  Yes.

22          **MR. BULLOTTA:**  And then can we see Page 2?

23   A.  Yes.

24   **BY MR. BULLOTTA:**

25   Q.  Looks like there's various flights to different cities.

1   Can you tell us some of the cities that --

2   A.  On Page 2 or --

3   Q.  Page 2, yes, just give us an idea of some of these flights.

4   A.  Detroit to Mackinac Island, let me see, Detroit to East

5   Hampton; Boston to Detroit; Detroit to Houston, Houston to

6   Detroit; Detroit to Greensboro, Greensboro to Detroit; Detroit

7   to Cleveland, Cleveland to Detroit; Detroit to Pellston,

8   Pellston to Detroit; Detroit to Houston, Houston to Detroit.

9            **MR. BULLOTTA:**  Can we see the Page 3.

10  **BY MR. BULLOTTA:**

11  Q.  These are all involving Mayor Kilpatrick, is that right?

12  A.  Yes.  Detroit to Norfolk.

13  Q.  I want to -- let's do the -- okay.  I want to ask you about

14  this one, August 6, 2006.  Or, sorry, August 2nd, 2006, do you

15  see departure city, Detroit, then Norfolk, Virginia?

16  A.  Yes.

17  Q.  And then from Norfolk, where does it go?

18  A.  To Bermuda.

19  Q.  Okay.  And then can you see -- can we go over here,

20  Ms. Facchini -- how many people were dropped off in Bermuda?

21  A.  Says nine.

22  Q.  Okay.  Do you know what that trip was for?

23  A.  No, I do not.

24  Q.  Okay.  And when you loaned out your jets for these various

25  trips, how did you -- how were you asked for the plane, do you

 1    know?

 2    A.  Someone, either the mayor or Derrick or someone from his

 3    office would call.

 4    Q.  Okay.  And could you back out.  A number of more additional

 5    flights, looks like Detroit to Miami?

 6    A.  Yes.

 7    Q.  Detroit to Tallahassee, see that one?

 8    A.  Right, right, yes, I see Detroit to Tallahassee.

 9    Q.  Can you go to the next page.

10    A.  Detroit to Tallahassee again.

11    Q.  Looks like more Tallahassee trips, and there's a Chicago

12    trip in here?

13    A.  Yes, Chicago Midway to Tallahassee.

14    Q.  And then a trip from Detroit to Tallahassee?

15    A.  Detroit to Tallahassee again.

16    Q.  Then from Tallahassee to Miami?

17    A.  Tallahassee to Miami, where is that?

18    Q.  On the very bottom.

19    A.  Very bottom?

20    Q.  Page 4.

21    A.  Yeah, Tallahassee to Miami, yeah.

22    Q.  And then Miami back to Detroit?

23    A.  Yes.

24    Q.  Can we see the next page.  And then there's additional

25    trips, looks like --

1    A.  Yeah, Detroit to Nassau.

2    Q.  Another trip back down to the Bahamas?

3    A.  Yes.  Let me see, Nassau to Fort Lauderdale, Fort

4    Lauderdale to Detroit; Detroit to Tallahassee again.  And we

5    have from Naples to West Palm Beach, and then West Palm Beach

6    to Tallahassee.  Let me see, Detroit to Tallahassee again,

7    Tallahassee to Metro, and Detroit to Naples and Naples to

8    Tallahassee, Tallahassee to Detroit.

9    Q.  Okay.

10           **MR. BULLOTTA:**  The next, can we go down to the

11   bottom.  Can you highlight this area here.  This one here.

12   A.  Yes.

13   **BY MR. BULLOTTA:**

14   Q.  Okay.  Does this, this is the total number of flight hours,

15   135.7?

16   A.  Yes.

17   Q.  And is this number, $389,874, is that the retail cost of

18   the flights?

19   A.  Yes.

20   Q.  And who was the only person that could -- or who could

21   authorize these flights?

22   A.  Who from my company?

23   Q.  Yeah.

24   A.  I primarily, and I mean, Yale or Kathleen probably could,

25   too, but I primarily did it.

*Anthony Soave - Direct*
*Wednesday, December 5, 2012*                    135

1   Q.  You did?

2   A.  I primarily did it, yes.

3   Q.  Okay.  Thank you.

4           **A JUROR:**  Could you repeat what that retail cost was

5   again?

6           **MR. BULLOTTA:**  Okay.  Can we see the bottom of the

7   last page, please, Ms. Facchini.  Just if you can blow this up

8   right here.

9           **A JUROR:**  And you said the authorizers were Tony

10  Soave, Ms. McCann and who else?

11          **THE WITNESS:**  Yale Levin.

12  **BY MR. BULLOTTA:**

13  Q.  Do you think you knew about all of these flights when they

14  were happening?

15  A.  Yes, I think I did.

16  Q.  Did you approve them?

17  A.  Did I?

18  Q.  Yes.

19  A.  I don't know if I approved every one, but if not, maybe one

20  I didn't, somebody else did, but I primarily did.

21  Q.  Okay.  At some point during the, providing these flights to

22  the mayor, did you ever talk to him about billing him for the

23  flights?

24  A.  It came up.

25  Q.  Tell us about that.

*10-CR-20403    USA v. Kwame Kilpatrick, et al*

*Anthony Soave - Direct*
*Wednesday, December 5, 2012*

1    A.   I know one time anyway.

2    Q.   Tell us about that conversation with Mayor Kilpatrick.

3    A.   Well, I brought up to him that maybe, you know, I should be

4    billing him for some of these because they're getting to be a

5    lot of flights.

6    Q.   And what did the mayor say?

7    A.   He said he would look into it.

8    Q.   And what happened after that, as far as paying for it?

9    A.   Nothing, and I also think Yale met with Christine Beatty to

10   try to figure some way to --

11   Q.   To pay for it?

12   A.   Yeah, yes.

13   Q.   Well, let me ask you this, then, Mr. Soave.  It sounds like

14   you were getting a little bit -- well, were you getting a

15   little bit concerned about all these flights?

16   A.   Well, yes, I was getting concerned, and it was getting to

17   be more than a little bit.  And some of the flights were, I

18   mean, like during the blackout or something, that, that

19   certainly was not a problem, and there were a couple other

20   times when he came down to one of my projects in Virginia and

21   looked at some of our condos, and so that was business that I

22   felt was okay.

23          But some of them that were, you know, purely for the

24   family, I just thought that had to be handled some way.

25   Q.   Were you going with Mayor Kilpatrick on most of those

*10-CR-20403    USA v. Kwame Kilpatrick, et al*

*Anthony Soave - Direct*
*Wednesday, December 5, 2012*

137

1   trips, were you flying with them?

2   A.  No, I was not on them, on most of them.  I was on three or

3   four, I don't know.  I mean, I'd have to look real close, see

4   how many, but not most of them, no.

5   Q.  Well, why did you keep -- even though he didn't pay you,

6   why did you keep allowing him to use the jets?

7   A.  Because he's the mayor.

8   Q.  What do you mean by that?

9   A.  It's hard to turn the mayor down, you know.  I didn't want

10  to get on the wrong side of him.

11  Q.  What do you mean by that?

12  A.  Well, I wanted to keep him happy.  You know, I don't want

13  him -- I don't want him holding another job up, okay.  There

14  was one job held up, and I had that in my mind all the time, I

15  didn't want it to happen again.

16  Q.  Did you ever take the mayor on one of your jets to New York

17  to do some Christmas shopping?

18  A.  Yes, I did.

19  Q.  And how many times do you think you did that?

20  A.  I think two times.  I was going, and I don't know how it

21  came about that we got together, whether I asked him or he

22  asked me, but we went.

23  Q.  Before I get to the Christmas shopping, I forgot to ask you

24  this question, how did you -- because City Aviation was

25  providing these flights to the mayor?

*10-CR-20403   USA v. Kwame Kilpatrick, et al*

*Anthony Soave - Direct*
*Wednesday, December 5, 2012*                                    138

1    A.  Yes.

2    Q.  How did you treat that on your tax returns?  Did you, what

3    did you do?

4    A.  I took it -- I did not expense it.

5    Q.  Meaning what?

6    A.  I paid taxes on the flights.

7    Q.  So you took it as income to yourself?

8    A.  Yes, I did.

9    Q.  Now, as for the two trips to New York City, did you go with

10   Mayor Kilpatrick on those trips?

11   A.  Yes, I did.

12   Q.  And who else went on the trips, do you know?

13   A.  You know, he had one person and I don't remember exactly, I

14   know he had somebody with him one time, maybe the other time he

15   didn't.  I don't remember.

16   Q.  Do you know if Christine Beatty ever went on a trip?

17   A.  I think she went one time.

18   Q.  And what did you --

19   A.  I know he had a bodyguard one time.  I don't --

20   Q.  And did you invite the mayor to go with you?

21   A.  I don't recall whether I invited him or he said he wanted

22   to go.  I forgot how it came about, but I know we went

23   together, and I was going so ...

24   Q.  And what did you do in New York City?

25   A.  We had dinner and we went shopping.

*10-CR-20403    USA v. Kwame Kilpatrick, et al*

*Anthony Soave - Direct*
*Wednesday, December 5, 2012*

139

```
 1    Q.  Did you pay for any items for Mayor Kilpatrick?
 2    A.  Yes, I did.
 3    Q.  Can you describe to the jury what you paid for?
 4    A.  I paid for, I think, a pair of shoes and a purse and a
 5    watch.
 6    Q.  Do you remember, what kind of watch, do you know?
 7    A.  It was a man's watch for his dad.
 8    Q.  Was it a Cartier watch, do you know?
 9    A.  Yes, it was.
10    Q.  Do you know how much it was worth or how much you paid?
11    A.  It was $6,000.
12    Q.  And you said it was for the mayor's dad?
13    A.  Yes.
14    Q.  Was that a Christmas present, do you know?
15    A.  It was around Christmastime, so I don't know, I --
16    Q.  And you said, also you mentioned a purse and shoes?
17    A.  Yes.
18    Q.  Do you know how much the purse was?
19    A.  No, I don't.  I think it was, the purse was 1,200 or
20    something like that, and the shoes were 800.
21    Q.  And why did you pay for these items?
22    A.  I don't know, I just, I just paid for them.
23    Q.  Let me ask you about -- do you have some property down in
24    Naples, Florida?
25    A.  Yes, I do.
```

*10-CR-20403    USA v. Kwame Kilpatrick, et al*

*Anthony Soave - Direct*
*Wednesday, December 5, 2012*

140

1   Q.  And I want to direct your attention to Exhibit -- IN1,

2   IN1-65.

3            **MR. GUREWITZ:**  Mr. Bullotta, could you say that

4   number again?

5            **MR. BULLOTTA:**  Sure, it's IN1-65.

6   **BY MR. BULLOTTA:**

7   Q.  I want to direct your attention to the timeframe,

8   Mr. Soave, of April of 2007.  In that timeframe, did you --

9   were you on vacation at your property down in Naples?

10  A.  Yes.

11  Q.  And did you, do you recall receiving a phone call from

12  Mayor Kilpatrick?

13  A.  Yes, I do.

14  Q.  Do you recall where you were when you got that call?

15  A.  I was in the exercise room at the Ritz-Carlton.

16  Q.  Okay.  Do you belong to the Ritz-Carlton down there?

17  A.  Yes, I belong.  They have, they have some kind of a club,

18  and I belong to it.

19  Q.  So you work out there?

20  A.  Yeah, occasionally.

21  Q.  And so what did Mayor Kilpatrick tell you on --

22  A.  He wanted him -- him and his family wanted to come down and

23  he couldn't get any rooms.  He wanted to know if I could help

24  get some rooms.

25  Q.  What did you tell him?

*10-CR-20403    USA v. Kwame Kilpatrick, et al*

1    A.   I told him I would check and see and I'd call him back.

2    Q.   Okay.  Was there someone in the workout area that you

3    talked to?

4    A.   There was a trainer that I was working with, and I asked

5    him if he could help and he said he thought he could, so he

6    went upstairs and he said that he, I think he said he got two

7    rooms, he locked two rooms up.

8    Q.   For the mayor, this was for the mayor?

9    A.   Yeah, two rooms, I asked him for, I told him it was for the

10   mayor, as a matter of fact.

11   Q.   And did you have to give him some money?

12   A.   Yes, he said he needed some money so I gave him some money.

13   This is a little confusing to me how much, but it was, I

14   thought I gave him 3,000, it could have been 3,500.

15             **THE COURT:**  I'm sorry, the "him" we're talking about

16   is the trainer who got the --

17             **THE WITNESS:**  The trainer, yes.  He went upstairs to

18   the reservation desk, and he said that he locked up a couple

19   rooms, but he needed some money to keep them, so I gave him the

20   money.

21   **BY MR. BULLOTTA:**

22   Q.   Okay.  And then did Mayor Kilpatrick and his family come

23   down to stay at the Ritz-Carlton?

24   A.   Yes.

25             **MR. BULLOTTA:**  I have records, invoices from the

1    Ritz-Carlton.  I'd like to move IN1-65 into evidence.

2              **THE COURT:**  Received.

3              (Government's Exhibit IN1-65 received into

4              evidence.)

5    **BY MR. BULLOTTA:**

6    Q.  First, do you see the name of the person on this document,

7    the Ritz-Carlton document?  What does that say?

8    A.  Are you asking me?

9    Q.  Yes.

10   A.  "Kwame Kilpatrick."

11   Q.  Okay.  It says, "Mr. Kwame Kilpatrick"?

12   A.  Yes.

13   Q.  And then is there a company listed?

14   A.  Yes, Soave Enterprises.

15   Q.  And that's your company?

16   A.  Yes.

17   Q.  And it shows an arrival date and a departure date, arrival

18   date of April 7, '07 and departure April 12, '07?

19   A.  Yes.

20             **MR. BULLOTTA:**  And can we scroll down, Ms. Facchini.

21   Can we stop here.

22   **BY MR. BULLOTTA:**

23   Q.  Do you see where it says, "Prepaid deposit," and then I

24   don't know if that's a credit card number, and then $1,500 and

25   then cash, $2,000?

*Anthony Soave - Direct*
*Wednesday, December 5, 2012*

1    A.   Yeah, I don't remember that transaction.  I know it

2    happened.  I just don't remember the amounts and --

3    Q.   Okay.  Are these records that reflect the stay of the

4    Kilpatrick family?

5    A.   Yes.

6    Q.   Okay.  And then can we scroll down.  And then I see another

7    cash credit for $4,000?

8    A.   Yes.

9    Q.   Do you know if you provided that 4,000 or if that was

10   Mayor Kilpatrick?

11   A.   You know, I don't know if I did or if he did.

12   Q.   Okay.  Thank you.

13           **MR. BULLOTTA:**   And then can we scroll down, please?

14   And then go to the next page, please.

15   **BY MR. BULLOTTA:**

16   Q.   Looks like there's some more charges, the room charge,

17   looks like it's -- how much is the room charge per night?

18   A.   Well, it says, says 1,499.

19   Q.   There are two rooms, you say?

20   A.   Yeah, it was two, I think I got two rooms.  I don't

21   remember.  I think it was two rooms.

22   Q.   Okay.  Do you see the total bill, total amount?

23   A.   It says 9,398.

24   Q.   Do you know if any money was charged to your credit card,

25   if you know?

*Anthony Soave - Direct*
*Wednesday, December 5, 2012*

144

1   A.  You know, I don't know.  I mean, we paid part with a check

2   and part with, part with a credit card, I guess.

3   Q.  Do you remember?

4   A.  No, I don't.

5   Q.  But in addition to the money you gave to the trainer?

6   A.  Yes.

7   Q.  Did you also --

8   A.  We paid something else, I just don't know what.

9   Q.  You paid for some additional costs?

10  A.  Yes.

11  Q.  You don't remember what?

12  A.  No.

13  Q.  Thank you.  And then finally, last area I want to ask you

14  about is, did you -- in 2004, did you provide tickets to the

15  Detroit Pistons NBA Finals --

16  A.  Yes.

17  Q.  -- to Mayor Kilpatrick?  Is that yes?

18  A.  Yes, I did.

19  Q.  How did that come about?

20  A.  You know, I don't know if he asked me if I had any tickets

21  or if I asked him if he wanted to go.  I don't really recall

22  that.  I just know I got them from a broker.

23  Q.  And where were the seats, do you know?

24  A.  They were on the floor.  They were great seats.

25  Q.  And how much --

*10-CR-20403    USA v. Kwame Kilpatrick, et al*

*Anthony Soave - Direct*
*Wednesday, December 5, 2012*                                    145

1    A.  And it was a championship.  It was the second-to-last game

2    or something.  It was a very important game.

3    Q.  Do you know how much you paid for those tickets?

4    A.  Yeah, $10,000.

5              **THE COURT:**  Total, or each?

6              **THE WITNESS:**  No, for the two tickets.

7    **BY MR. BULLOTTA:**

8    Q.  At any point, Mr. Soave, did Kwame Kilpatrick offer to

9    reimburse you for the flights?

10   A.  No.

11   Q.  Or the trip to -- at Naples that you paid for?

12   A.  No.

13   Q.  Or any of the items, the watch or anything that was

14   purchased in New York?

15   A.  No.

16   Q.  Or the -- okay.  I think I'm done.  I don't think I have

17   any further questions.

18              **THE COURT:**  Okay.  Let's break until tomorrow

19   morning.  See you back in the morning.  Thank you.

20              (Jury out 12:55 p.m.)

21              (Proceedings adjourned at 12:55 p.m.)

22

23

24

25

*10-CR-20403    USA v. Kwame Kilpatrick, et al*

*Anthony Soave - Direct*
*Wednesday, December 5, 2012*

146

- - -

# C E R T I F I C A T I O N

I, Suzanne Jacques, Official Court Reporter for the United States District Court, Eastern District of Michigan, Southern Division, hereby certify that the foregoing is a correct transcript of the proceedings in the above-entitled cause on the date set forth.

Date: December 5, 2012

s:/Suzanne Jacques
Suzanne Jacques

Official Court Reporter