**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

UNITED STATES OF AMERICA,

                    **Plaintiff,**          Case No. 10-CR-20403
                                   Hon. Nancy G. Edmunds

      **v.**

D-1 KWAME M. KILPATRICK,
D-2 BOBBY W. FERGUSON, and
D-3 BERNARD N. KILPATRICK,

                    **Defendants.**
_____/

**JURY TRIAL**
**VOLUME 45**

      **Detroit, Michigan - Thursday, December 6, 2012**

**APPEARANCES:**

**For the Government:**

Mark Chutkow
R. Michael Bullotta
Jennifer Leigh Blackwell
Eric Doeh
United States Attorney's Office
211 W. Fort Street, Suite 2001
Detroit, Michigan 48226

**Counsel for Defendant Kwame M. Kilpatrick:**

James C. Thomas
Michael C. Naughton
535 Griswold, Ste. 2500
Detroit, MI 48226
313-963-2420

**Appearances(continued):**

**Counsel for Defendant Kwame Kilpatrick (Continued):**

Harold W. Gurewitz
Gurewitz & Raben
333 W. Fort Street, Suite 1100
Detroit, MI 48226


**Counsel for Defendant Bobby W. Ferguson:**

Gerald K. Evelyn                    Susan W. Van Dusen
535 Griswold                        Law Offices of Susan W. VanDusen
Suite 1030                          2701 S. Bayshore Dr., Ste 315
Detroit, MI 48226                   Miami, FL 33133
313-962-9190                        305-854-6449

Michael A. Rataj
535 Griswold, Suite 1030
Detroit, MI 48226
313-962-3500

**Counsel for Defendant Bernard N. Kilpatrick:**

John A. Shea
Alexandrea D. Brennan
120 N. Fourth Avenue
Ann Arbor, MI 48104
734-995-4646


                              -    -    -

                   *Suzanne Jacques, Official Court Reporter*
                     *email: jacques@transcriptorders.com*

                *Proceedings recorded by mechanical stenography.*
               *Transcript produced by computer-aided transcription.*

                              -    -    -

*Jury Trial Volume 45*
*Thursday, December 6, 2012*
**UNITED STATES DISTRICT COURT**

# I N D E X
— — —

<u>Government's Case in Chief</u>                                    <u>Page</u>

  **Anthony Soave**

      Continued Direct Exam By Mr. Bullotta        4

      Cross Examination By Mr. Rataj              6

      Cross Examination By Mr. Gurewitz          91


Certification of Reporter                         147

— — —

<u>Defendant's Exhibits</u>

        <u>Number</u>                              <u>Received</u>

      DIN1-32 and DIN1-33                          110

*Anthony Soave - Direct*
*Thursday, December 6, 2012*

4

1          **Detroit, Michigan**

2          **Thursday, December 6, 2012**

3          **9:12 a.m.**

4                              –    –    –

5          (Jury in 9:12 a.m.)

6               **MR. BULLOTTA:**  Judge, I have a couple more

7     questions.

8               **THE COURT:**  Good morning, ladies and gentlemen.  We

9     are ready to proceed.  You may be seated.

10               Mr. Soave, I remind you that you're still under

11    oath.

12               **THE WITNESS:**  Yes.

13               **THE COURT:**  And I should just mention Mr. Thomas is

14    not here this morning.  He'll be here a little bit later.  He

15    had another matter that required him to be excused.

16    Mr. Gurewitz is representing Mr. Kilpatrick for this phase of

17    the proceedings.

18                    **DIRECT EXAMINATION (Continued)**

19    **BY MR. BULLOTTA:**

20    Q.  Good morning, Mr. Soave.  Yesterday, when I asked you about

21    you finding out that Bobby Ferguson had requested that on

22    future Detroit city contracts that you would bid as a partner

23    with Ferguson, a 50-50 partner, you indicated that you didn't

24    want to do that, not in those words, but you indicated that you

25    were not going to agree to that, right?

*10-CR-20403   USA v. Kwame Kilpatrick, et al*

*Anthony Soave - Direct*
*Thursday, December 6, 2012*
5

1    A.  That's right.

2    Q.  And you said yesterday that you'd rather lose the job than

3    partner with Ferguson?

4    A.  Yes.

5    Q.  Can you explain that a little bit more, what you meant by

6    that?

7    A.  I think after one of the meetings, he came up and they

8    said, you know, "I have a new one for you."  I said, "What is

9    it?"  And they said that he said the next bid, he wants to go

10   50-50.

11   Q.  The next city bid?

12   A.  Yes, the next bid on one of the lining jobs, I assume it

13   was, I forgot what job, and I told them that I wouldn't, that I

14   wouldn't.  Tell him to go fly a kite.

15   Q.  You've been contracting with the city, I think you said

16   since the '70s, with your various companies, or is it later

17   than that?

18   A.  No, in the '70s.

19   Q.  And so I assume that you've contracted with the city under

20   various mayors, including Coleman Young and Dennis Archer?

21   A.  Yes.

22   Q.  Have you ever had any of your contracts held by the mayor,

23   any of those mayors?

24   A.  No, I have not.

25   Q.  Have any of the other mayors ever told you to put a

*Anthony Soave - Cross*
*Thursday, December 6, 2012*                                6

 1    specific subcontractor on a particular bid?

 2    A.  Well, that I don't remember.  I mean, they could have

 3    suggested someone.  That I can't answer.  It's a long time ago

 4    so ...

 5    Q.  Did you ever feel like if you didn't put a certain

 6    subcontractor on, you might lose a contract?

 7    A.  I don't think that ever happened.  I don't know if -- I

 8    don't recall that.

 9    Q.  And yesterday you talked about a lot of things that you did

10    for Mayor Kilpatrick, the flights and the --

11    A.  Yes.

12    Q.  -- and the tickets and the stay down at the Ritz-Carlton.

13    Did you do similar things for Mayor Archer?

14    A.  No.

15    Q.  Thank you.

16              **MR. BULLOTTA:**  I have no further questions.

17              **THE COURT:**  Mr. Rataj.

18              **MR. RATAJ:**  Thank you, Your Honor.  Good morning.

19                                        (9:16 a.m.)

20                          **CROSS EXAMINATION**

21    **BY MR. RATAJ:**

22    Q.  Mr. Soave, good morning, sir.

23    A.  How you doing?

24    Q.  How you doing today?  Good.

25              I got a couple questions for you, sir, and I'd like

                 *10-CR-20403    USA v. Kwame Kilpatrick, et al*

*Anthony Soave - Cross*
*Thursday, December 6, 2012*

7

 1    to start out by asking you about Soave Enterprises.  You are

 2    the president and CEO of that corporation, correct?

 3    A.  Yes.

 4    Q.  And it is a holding company, is it not?

 5    A.  I don't -- sort of.  I don't know, you know, legally if

 6    that's what --

 7    Q.  I understand.

 8    A.  It's my holding.

 9    Q.  It's privately held, though, correct?

10    A.  Yes.

11    Q.  It's not publicly traded, you own that company, correct?

12    A.  Yes.

13    Q.  And it is Detroit-based, as was pointed out yesterday,

14    correct?

15    A.  Yes.

16    Q.  Okay.  And it's my understanding that Soave Enterprises

17    owns a lot of different kinds of companies, isn't that true?

18    A.  Yes.

19    Q.  I know that you started out basically in the metals

20    recycling business, if I'm not mistaken, correct?  Scrap

21    business?

22    A.  No, that's not true.

23    Q.  That's not -- where am I --

24    A.  That's what I'm doing now.

25    Q.  That's what you're doing now?

*10-CR-20403   USA v. Kwame Kilpatrick, et al*

*Anthony Soave - Cross*
*Thursday, December 6, 2012*

8

 1    A.  Yes.

 2    Q.  And we'll get into that in a little bit.  But you have a

 3    metals recycling business, correct?

 4    A.  Yes.

 5    Q.  What's the name of it?

 6    A.  It's called Ferrous Processing.

 7    Q.  Okay.  Do you own any other metal recycling type

 8    businesses?

 9    A.  Yes.  I own a company called SLC, I believe, and there may

10    be another one or two, but they're in that same business.

11    Q.  All right.  So it's fair to say that in terms of metal

12    recycling businesses, you could own as many three, four, five,

13    six companies, in that area, correct?

14    A.  I don't know if they're different companies, per se, but

15    they're different yards, I mean, different locations.

16    Q.  All right.

17    A.  But about companies, I'd have to -- I know there's two

18    companies anyway for sure.

19    Q.  For sure you know there's two.

20    A.  Yes.

21    Q.  And we know that Soave Enterprises has substantial real

22    estate holdings across the United States, am I right about

23    that?

24    A.  In two or three locations, yes.

25    Q.  Okay.  And I'd like to break down those real estate

*10-CR-20403   USA v. Kwame Kilpatrick, et al*

```
 1   holdings into the various subgroups, as I understand it, and
 2   you can correct me if I'm wrong.
 3   A.  Okay.
 4   Q.  You have luxury residential complexes, correct?
 5   A.  Yes, I have luxury condos in Florida.
 6   Q.  They're all in Florida?
 7   A.  No, I have something in Virginia also.
 8   Q.  The Brambleton, is that --
 9   A.  Yes.
10   Q.  That's in Florida?
11   A.  No, that's in Virginia.
12   Q.  That's in Virginia.  The Dunes?
13   A.  The Dunes is in Florida.
14   Q.  Okay.  Moraya Bay Beach Tower?
15   A.  That's in Florida.
16   Q.  This is all in the Naples, southwestern Florida?
17   A.  Yes.
18   Q.  Museum Towers?
19   A.  No, Museum Towers is Phoenix.
20   Q.  That's in Phoenix?
21   A.  Yeah.
22   Q.  That's, those are --
23   A.  That's just a piece of land.
24   Q.  Just a piece of land?
25   A.  Yeah.
```

1    Q.  Nothing developed on it at this point?

2    A.  No.

3    Q.  The Regatta at Vanderbilt Beach?

4    A.  That's, like, sold out.

5    Q.  I'm sorry?

6    A.  That's sold out already.  That's an old project.

7    Q.  Okay.  But you've sold it?

8    A.  Yes.

9    Q.  Okay.  Are there any other luxury residential properties

10   that Soave Enterprises owns?

11   A.  Okay.  Well, you mentioned Moraya.  I think that's it.

12   Q.  You think that's it?

13   A.  Yeah.

14   Q.  And then we have -- well, let me ask this, we have

15   commercial real estate holdings as well, correct?

16   A.  Yes.

17   Q.  Bay Dunes Country Club?

18   A.  That's gone.

19   Q.  You sold that?

20   A.  Yes.

21   Q.  All right.

22   A.  Gave it away, matter of fact.

23   Q.  Brambleton Town Center?

24   A.  That's still there.

25   Q.  Where is that, sir?

1    A.  That's in Virginia.

2    Q.  Okay.  City Sports Center, that's down there on Lafayette,

3    isn't it?

4    A.  Yes.

5    Q.  The two ice rinks?

6    A.  Yes.

7    Q.  And then luxury offices around the area?

8    A.  Well, where, in Brambleton?  No, I don't have luxury

9    offices.

10   Q.  You don't own any luxury office complexes?

11   A.  No.

12   Q.  Did I miss anything in terms of commercial real estate

13   holdings?

14   A.  I have some, some other pieces in Michigan, Rochester and

15   something around Lapeer, and I think that's it.

16   Q.  Okay.  And then Soave Enterprises also owns a number of

17   residential real estate holdings, correct?

18   A.  Yes.  Well, some of these I mentioned were residential.

19   Q.  Well, they were condominiums, luxury condominiums, correct?

20   A.  Yes.

21   Q.  But then you also own some subdivisions, if I'm not

22   mistaken, correct?

23   A.  Yes.

24   Q.  Huron Pointe subdivision?

25   A.  Huron Pointe is a vacant piece of land.  It was never

```
 1   built.
 2   Q.  How about Mill Town?
 3   A.  Mill Town is, it's still vacant.  That's in Rochester.
 4   Q.  The Moors of Oxford.
 5   A.  I think that's, part of it is built and part of it's still
 6   vacant.
 7   Q.  All right.  Overlook?
 8   A.  I don't know where that's at.
 9   Q.  All right.
10   A.  Doesn't --
11   Q.  But it's listed on your website as one of your residential
12   holdings.
13   A.  Yeah, I just, it doesn't ring a bell.
14   Q.  Got it.
15   A.  It's not substantial.
16   Q.  All right.  Tullamore?
17   A.  Tullamore, it's in Oakland County, and -- I think it's
18   Oakland County.  It's a development.  There's a few lots.  I
19   don't know how many lots are left.
20   Q.  Understood.  And then there's White Oaks Crossing.
21   A.  Yes.
22   Q.  Where is that at, sir?
23   A.  You know, I believe that's manufactured homes and I think
24   it's in, I think it's in Genesee County, I believe.
25   Q.  All right.  Did I miss any other residential holdings that
```

1    Soave Enterprises might own?

2    A.  I don't think so.  I can't remember all of them.  I have to

3    see them on a sheet of paper.

4    Q.  Understood.  There could be some more?

5    A.  Maybe, there could be another one or two.

6    Q.  All right.  And then Soave Enterprises owns industrial real

7    estate as well, correct?

8    A.  Well, some of it is owned in conjunction with the scrap

9    business and stuff, I have some industrial property.

10   Q.  Northline Industrial complex?

11   A.  Yes.  That's a rental piece.

12   Q.  And where is that at?

13   A.  That's in Romulus by the airport, Metro Airport.

14   Q.  The Trident-Lyon, L-y-o-n, Corporate Center, where is that,

15   sir?

16   A.  That's in, I think, Lyon Township.

17   Q.  That's up there in North Oakland County?

18   A.  Yes, by Wixom.

19   Q.  Any other industrial real estate holdings that are owned by

20   Soave Enterprises?

21   A.  I don't think so.

22   Q.  All right.  And Soave Enterprises also owns a number of

23   industrial services type companies, correct?

24   A.  Um --

25   Q.  Like Inland, for example, that would fall under the

```
 1    industrial services arm of Soave Enterprises, am I right or
 2    wrong about that?
 3    A.   That's part of work that they do, yes.
 4    Q.   Yeah, any other companies that would fit --
 5    A.   MPS.
 6    Q.   MPS?
 7    A.   Yeah.
 8    Q.   What does that stand for, sir, for the record?
 9    A.   You know, I don't know, I just know the initials.  I didn't
10    choose that name so I --
11    Q.   But you own it?
12    A.   I'm a partner in it.
13    Q.   All right.  You're also -- I should say, Soave Enterprises
14    is also in the beverage distribution business, am I right or
15    wrong about that?
16    A.   No longer.
17    Q.   You don't own any beverage distribution businesses?
18    A.   No.
19    Q.   All right.  You would agree with me that Soave Enterprises
20    owns a number of car dealerships, correct?
21    A.   Yes.
22    Q.   And here in Michigan and elsewhere, correct?
23    A.   No, not here, it's in Kansas City.
24    Q.   They're all in Kansas City?
25    A.   Uh-huh, yes.
```

*Anthony Soave - Cross*
*Thursday, December 6, 2012*                                    15

1    Q.  Porsche dealership?

2    A.  Yes.

3    Q.  Mercedes-Benz dealership?

4    A.  Yes.

5    Q.  Jaguar dealership?

6    A.  Yes.

7    Q.  Am I missing anything?  Cadillac dealership?

8    A.  Jaguar, Range Rover, Maserati.

9    Q.  And these are all in Kansas City?

10   A.  Yes.

11   Q.  And then I believe that Soave Enterprises is also involved

12   in hydroponic greenhouse operations.

13   A.  Yes.

14   Q.  Can you describe for the jury, sir, what kind of business

15   that is?

16   A.  We grow tomatoes in a greenhouse.

17   Q.  Okay.  And how many hydroponic greenhouse operations does

18   Soave Enterprises own?

19   A.  Just the one -- two.  It's a seedling operation, and one is

20   a, one grows big tomatoes and small tomatoes, too.

21   Q.  You did own, and going back to your beverage distribution

22   businesses that I asked you about earlier, you did own a,

23   several years ago, an Anheuser-Busch --

24   A.  Yes.

25   Q.  -- distributorship?

*10-CR-20403   USA v. Kwame Kilpatrick, et al*

*Anthony Soave - Cross*
*Thursday, December 6, 2012*

16

 1    A.   Yes.

 2    Q.   And that was here locally in the State of Michigan?

 3    A.   No, it was in Chicago.

 4    Q.   That was in Chicago?

 5    A.   Chicago area.

 6                **MR. BULLOTTA:**  Could we have a sidebar, Judge?

 7                **THE COURT:**  Yes.

 8                (The following sidebar conference was held:)

 9                **MR. BULLOTTA:**  I object to the relevance of all of

10    Mr. Soave's holdings.  It's a waste of the jury's time and it's

11    absolutely irrelevant.

12                **MR. RATAJ:**  Your Honor, this is a man who is worth

13    $2.5 billion.  They --

14                **THE COURT:**  Well, you can do this more quickly, I

15    think.  I mean, I'm not going to preclude you from doing it.

16                **MR. RATAJ:**  They don't want the jury to know that

17    the man is loaded, and there's no way that Bobby Ferguson or

18    Kwame Kilpatrick could have ever put a fear of economic harm.

19                **THE COURT:**  I'm not saying you can't do it.  Just,

20    you know, do we have to do, you know, in excruciating detail

21    where every subdivision is?  I don't think that's necessary.

22    Just try and tighten it up a little.

23                **MR. RATAJ:**  Yes, ma'am.

24                (End of discussion at sidebar.)

25

*10-CR-20403    USA v. Kwame Kilpatrick, et al*

1    **BY MR. RATAJ:**

2    Q.  Soave Enterprises also owns various warehouses in the State

3    of Michigan and possibly elsewhere, isn't that true, Mr. Soave?

4    A.  I don't think there are anymore warehouses.

5    Q.  You had warehouses at one time?

6    A.  No, I do.

7    Q.  You do?

8    A.  Yeah, that Northline one in Romulus, that's a warehouse.

9    Q.  Okay.  And we know that you owned a company called City

10   Aviation?

11   A.  Yes.

12   Q.  And you owned, I think you testified yesterday, three

13   planes, or City Aviation does?

14   A.  Yes.

15   Q.  And then we know that you own Checker Cab, correct?

16   A.  Yes.

17   Q.  All right.  And at one time I believe you owned a company

18   called City Management Corporation, correct?

19   A.  Yes.

20   Q.  And that was a multi-state waste management and

21   environmental service company, am I right or wrong?

22   A.  It wasn't multi-state.  It was just in Michigan.  I don't

23   think we had anything out-state.

24   Q.  It was, what, you ultimately sold that in 1998, I believe?

25   A.  Yes.

*Anthony Soave - Cross*
*Thursday, December 6, 2012*

18

 1   Q.  And now is it part of the Waste Management system?

 2   A.  Yes.

 3   Q.  And that is the largest waste management corporation in the

 4   United States, is it not?

 5   A.  Yes.

 6   Q.  Okay.  In fact, it's one of the largest in the world, isn't

 7   that true?

 8   A.  I believe so.

 9   Q.  Yeah.  Now, we know that you were asked questions by

10   Mr. Bullotta regarding your purchase of Inland Waters Pollution

11   Control.

12   A.  Yes.

13   Q.  All right.  And you indicated yesterday that you owned that

14   company -- or you bought that company about 20 years ago,

15   correct?

16   A.  Yes.

17   Q.  And it started out as a small business when you first

18   purchased it, correct?

19   A.  Yes.

20   Q.  And it basically had to do, as you testified yesterday, you

21   know, cleaning plants during down time, correct, in and around

22   machines?

23   A.  Yes.

24   Q.  Maybe some hazardous waste cleanup?

25   A.  Yes.

*Anthony Soave - Cross*
*Thursday, December 6, 2012*

19

1    Q.  And you have grown that company over the years, and got

2    involved in sewer repair work, correct?

3    A.  Yes.

4    Q.  And that's what we're really talking about here today,

5    Inland's role as a sewer repair company, correct?

6    A.  Yes.

7    Q.  Now, just so the jury understands, basically, and the way I

8    understand Soave Enterprises' holdings, is you have four

9    separate portfolios of companies that are under the umbrella of

10   Soave Enterprises, am I right or wrong about that?

11   A.  I don't know, explain that to me.  I don't know what you

12   mean by four.

13   Q.  Well, I read in some of the documents that have been

14   produced by the government that Soave Enterprises is broken up

15   into four separate portfolios run by four individuals that are

16   under you, like Kathleen McCann, Yale Levin.

17   A.  Oh, okay.

18   Q.  Do you understand what I'm asking you now?

19   A.  Yeah, I understand.

20   Q.  Okay.  So there are four portfolios that fall underneath

21   the umbrella --

22   A.  Okay, yes.

23   Q.  -- of Soave Enterprises, right?  Yes?

24   A.  Yes.

25   Q.  And Kathleen McCann at one time ran one of those

```
 1    portfolios, correct?
 2    A.   Yes, we have, we have a small management group so we
 3    interface with each other --
 4    Q.   Sure.
 5    A.   -- quite a bit, so ...
 6    Q.   Do you know the different names of groups, the portfolio
 7    groups that hold these various companies?
 8    A.   No.
 9    Q.   Industrial services wouldn't be one of them?
10    A.   Industrial services, yeah.
11    Q.   Real estate would be another one?
12    A.   Yes.
13    Q.   The auto dealerships would be another one?
14    A.   Yes.
15    Q.   And the other one, would it be called a diversified
16    holdings portfolio?
17    A.   Yes.
18    Q.   And under those different portfolios, there's a number of
19    different companies, correct?
20    A.   Yes.
21    Q.   Do you know how many different companies you own?
22    A.   No.
23    Q.   Would you estimate that it's over 50?
24    A.   To me, like, it's all one, you know, it's Soave Enterprises
25    and I own it all, so I don't -- that's why when I say I don't
```

*Anthony Soave - Cross*
*Thursday, December 6, 2012*

1   know, you know --

2   Q.  But there could be as many as 50 companies involved in

3   those various four portfolios, maybe even more, correct?

4   A.  I don't know.  I suppose there could be.  I'd have to check

5   for you if you want.

6   Q.  Sure, I understand, but you would agree with me that the,

7   at least for purposes of our discussion here today, Soave

8   Enterprises owns a lot of different companies.

9   A.  Yes.

10  Q.  And we talked about how each portfolio is run by various

11  individuals.  I mentioned two other folks.  Who are the two

12  others that I'm missing, do you know?

13  A.  Yale Levin.

14  Q.  Yeah.

15  A.  Kathleen McCann, and then I think Mike Piesko, there used

16  to be someone else, and he retired, so there's Mike Piesko who

17  is the chief financial officer.

18  Q.  And so he may run a couple of the other portfolios?

19  A.  Yes.

20  Q.  Okay.

21  A.  Oh, and there's a real estate guy named Mike Hollerbach.

22  Q.  He runs the real estate group?

23  A.  Yes.

24  Q.  Now, would you agree with me that Soave Enterprises is

25  worth approximately $2.5 billion?

*10-CR-20403   USA v. Kwame Kilpatrick, et al*

*Anthony Soave - Cross*
*Thursday, December 6, 2012*                                    22

1  A.  I don't know where you got that, so I -- I don't know that.

2  Q.  You don't know that?  You know, I checked Forbes --

3          **MR. BULLOTTA:**  Your Honor, I'm going to object to

4  his testimony.  He can ask a question, but I don't want to hear

5  what he did.

6          **THE COURT:**  Show him something to help, see if it

7  jogs his memory.

8          **MR. RATAJ:**  Sure.  May I approach the witness,

9  Your Honor?

10          **THE COURT:**  Yes, you may.

11  **BY MR. RATAJ:**

12  Q.  I'm showing you a Forbes 500, America's Largest Private

13  Companies, Mr. Soave, and the first one --

14          **MR. BULLOTTA:**  I'm going to object.

15          **THE COURT:**  Mr. Rataj, just show him the -- you

16  don't get to describe it.

17  A.  So you said worth 2.5 billion.  This is revenues of

18  2 billion.

19  **BY MR. RATAJ:**

20  Q.  Well, take a look at the year there on the first page.  See

21  if that refreshes your -- and then flip it over.

22  A.  2008.

23  Q.  Then flip it over after you look at the first page and then

24  I have a few questions for you.

25          **THE COURT:**  Mr. Soave, don't read from the article

*10-CR-20403   USA v. Kwame Kilpatrick, et al*

*Anthony Soave - Cross*
*Thursday, December 6, 2012*                                          23

1    or from the paper right now.  He has questions, but that's not

2    in evidence.

3                    **MR. RATAJ:**  Right.

4                    **THE COURT:**  Don't read from it, just look at it for

5    the moment.

6                    **THE WITNESS:**  Oh, okay.

7                    (Brief pause.)

8                    **THE WITNESS:**  Okay.

9    **BY MR. RATAJ:**

10   Q.  Okay.  Thank you, sir.

11              Now, you would agree with me that, as of 2006, Soave

12   Enterprises was the 251st largest private company in the United

13   States with revenues of $1.5 billion as of that particular

14   point in time.  That's what it says, doesn't it?

15   A.  That's what it says.

16                    **THE COURT:**  Again, Mr. Rataj, that's improper.  The

17   question that you're entitled to ask him is if that refreshes

18   his recollection with respect to the value of the company.

19   **BY MR. RATAJ:**

20   Q.  Does that refresh your recollection, sir?

21   A.  Well, that's not the value of the company.  That's what

22   we're doing in sales.

23   Q.  Revenues.

24   A.  Revenue, yes.

25   Q.  Yeah, right.  And then did it refresh your recollection as

*Anthony Soave - Cross*
*Thursday, December 6, 2012*                                    24

1    to where your ranking, Soave Enterprises' ranking was as of

2    2009?  216th, does that refresh your recollection?

3    A.  216 what?

4    Q.  Largest privately-owned corporation in the United States.

5    A.  I didn't even realize that.

6    Q.  You didn't realize that?

7    A.  No.

8    Q.  Did it refresh your recollection as to the revenues in

9    2008 --

10   A.  I --

11   Q.  -- being 2.2 --

12           **THE COURT:**  No, Mr. Rataj, that is not proper

13   questioning.  You can't take the information on that, read it

14   into the record and ask him if that refreshes his recollection.

15   You show him the document, you ask him if it refreshes his

16   recollection, but you can't read it into the record.

17           **MR. RATAJ:**  Well, I have to be able to ask him

18   what's, based on what's in the document.

19           **THE COURT:**  No, that's not true.

20   **BY MR. RATAJ:**

21   Q.  Does it refresh your recollection, Mr. Soave, as to the

22   revenues in 2008 for Soave Enterprises?

23   A.  I don't remember, but it says two-five there, two-eight --

24   in two-oh-eight?

25   Q.  Yes, sir.

*Anthony Soave - Cross*
*Thursday, December 6, 2012*

25

```
 1    A.  It said two billion five.
 2    Q.  Right.  And you would agree with me that probably, as we
 3    sit here today in 2012, it's probably even more than that,
 4    isn't it?
 5    A.  No, I don't think it is.
 6    Q.  You don't think it is?
 7    A.  No.
 8    Q.  But you can't say for certain, can you?
 9    A.  Well, I think things went backwards a little bit.
10    Q.  All right.  But that's still a lot of money, isn't it?
11    A.  That's a lot of muchachos, yeah.
12    Q.  Sure.
13    A.  It sounds a lot more glamorous than it is, okay.  It's
14    not --
15    Q.  I'd take about one-tenth of that, to be honest with you.
16    A.  It's, it's a lot of hard work.
17    Q.  Maybe even one one-hundredth of it.  Anyways --
18    A.  It's wide open for you out there.  You should go for it.
19    Q.  Boy, I'd love to.  Maybe I'll come work for you, how's
20    that?
21          All right.  Now, you started out early '70s, right,
22    Mr. Soave?
23    A.  I started out earlier than that.
24    Q.  Late '60s even, eh?
25    A.  Yes.
```

*Anthony Soave - Cross*
*Thursday, December 6, 2012*                26

1   Q.  And you started out your company with one truck, didn't

2   you?

3   A.  Yes.

4   Q.  And I apologize because I know you testified to this

5   yesterday and I forget, but your first business was, what,

6   scrap, scrapping, or was it waste management?

7   A.  It was, it was contracting.  I was a small -- I had a truck

8   and a bulldozer.

9   Q.  You had a truck and a bulldozer?

10  A.  Yeah, I drove a truck for awhile, and then I bought a truck

11  and then I, you know, I progressed.

12  Q.  And that would have been in the late '60s?

13  A.  Yes.

14  Q.  And here we are today in 2012?

15  A.  Actually in earlier '60s or the mid '60s.

16  Q.  Sure.  One truck, one bulldozer, and here we are today, a

17  $2.5 billion enterprise, yes?  Pretty impressive.

18  A.  Yes.

19  Q.  Yes?

20  A.  You know, I don't, I don't talk about myself.  It is what

21  it is.

22  Q.  It is what it is.

23  A.  Yeah.

24  Q.  And along the way, and I've read some of the things that

25  you have told the government, obviously, and along the way, you

*Anthony Soave - Cross*
*Thursday, December 6, 2012*                        27

1    acknowledge that you had help from various politicians as you

2    were coming up, isn't that true?

3    A.  Help?

4    Q.  Well, let me ask it this way, Coleman Young, you know who

5    he was, right?

6    A.  Yes.

7    Q.  I mean, he ran the city for many, many years, correct?

8    A.  Yes.

9    Q.  And he mentored you, didn't he?

10   A.  He mentored me -- I mean, he -- I mean, we got along.

11   Q.  Well, did you not tell the grand jury that when you were

12   starting out he mentored you and helped you get city contracts?

13   A.  No, no, I think you -- I think you misunderstood.  He asked

14   me to mentor some people.

15   Q.  Oh, he didn't get you started?

16   A.  I didn't say he mentored me.  I think you mis -- I think

17   we'd have to take a look.

18   Q.  Well, may I show you your grand jury transcript?

19   A.  Yeah, show it to me.

20   Q.  Yes, sir.  Thank you.  Directing your attention to Page 78.

21             **MR. RATAJ:**  May I approach, Your Honor?

22             **THE COURT:**  You may.

23   **BY MR. RATAJ:**

24   Q.  Look at the bottom here, Mr. Soave, you can read the whole

25   thing if you like, but I'm really directing your attention down

*10-CR-20403   USA v. Kwame Kilpatrick, et al*

1    here to Line 20.

2    A.  "He got me started mentoring people."  He didn't mentor me

3    so, you see, I mean, "Mayor Young got me started --

4            "Okay.

5            "-- mentoring people."

6    Q.  Is it your testimony that Coleman Young didn't help you out

7    along the way when you were a young man, a young contractor and

8    got you going?  Isn't that what you're really saying here?

9    A.  What I said is, "He got me started mentoring people."

10   That's what I meant there.

11   Q.  That's what you meant, okay.

12   A.  Yes, exactly.

13           **MR. BULLOTTA:**  Your Honor, that's what he said

14   there.  I'm going to object as not being inconsistent.  It's

15   exactly what he said in the transcript.

16           **MR. RATAJ:**  That's fair enough.

17   **BY MR. RATAJ:**

18   Q.  But you knew Coleman Young, didn't you?

19   A.  Yes, I did.

20   Q.  He was a friend of yours, wasn't he?

21   A.  He was the mayor for a long time, and I knew him, I was

22   working in the city.

23   Q.  He was a friend of yours, wasn't he?

24   A.  I was friendly with him.

25   Q.  Yes, sir.  And you will admit that it's good to be friends

1    with politicians, will you not?

2    A.   It's good to be friends with the mayor of the city where

3    you're working.

4    Q.   That's right.  And over the years, you've been friends with

5    Coleman Young, correct, as we indicated?

6    A.   Yes.

7    Q.   You were friends with Dennis Archer?

8    A.   Yes.

9    Q.   You were friends with John Engler, the former governor of

10   the State of Michigan?

11   A.   Yes.

12   Q.   You were friends with Ed McNamara, former county executive

13   for the -- for Wayne?

14   A.   Yes.

15   Q.   And Kwame Kilpatrick even, correct?

16   A.   Yes.

17   Q.   Am I missing anybody else, other politicians?

18   A.   I'm friends with Brooks Patterson, also.

19   Q.   All right.  How about in other cities, are you friends with

20   different politicians?  You do business in Kansas City.  Are

21   you friends with politicians in Kansas City?

22   A.   No.

23   Q.   None?

24   A.   No.

25   Q.   Okay.  You will acknowledge that you've been doing business

*Anthony Soave – Cross*
*Thursday, December 6, 2012*                            30

1   in the City of Detroit for well over 40 years, correct?

2   A.  Yes.

3   Q.  And you know, when you go to other cities and other states,

4   it's normal to have certain politicians to have certain people

5   that they prefer, correct?

6   A.  Explain that to me, please.

7   Q.  Well, when you go into other -- you've testified before the

8   grand jury that when you go in to compete in other locations

9   it's been your experience that certain politicians in those

10  locales have their favorite people, their favorite contractors,

11  correct?

12          **MR. BULLOTTA:**  I'm going to object to this question

13  referring to the grand jury.  He should ask the question to see

14  whether it's consistent with the grand jury.

15          **THE COURT:**  Sustained.

16  **BY MR. RATAJ:**

17  Q.  Sir, isn't that true that when you have gone to other

18  locales to compete, it's been your experience, in many years in

19  the business world that you've run into situations where those

20  politicians in those cities or those locations have had their

21  favorite contractors, isn't that true?

22  A.  Yes.

23  Q.  Okay.  And it's normal, isn't it, based on your experience

24  as a businessman?

25  A.  Normal for what?

*10-CR-20403   USA v. Kwame Kilpatrick, et al*

*Anthony Soave - Cross*
*Thursday, December 6, 2012*                    31

1    Q.  It's just normal, that's the way of the world.

2    A.  That they like certain --

3    Q.  Yeah.

4    A.  Yes.

5    Q.  And you would agree with me that the reason that you tried

6    to create friendships with politicians is for access, correct?

7    That's one of the main reasons that you want to be friendly

8    with politicians, you want access to those folks, correct?

9    A.  Yes.

10   Q.  And you want to be able to pick up a phone and call the

11   governor or call the mayor and have direct contact with those

12   folks, correct?

13   A.  Yes.

14   Q.  You want to cut through the bureaucracy and you want to go

15   right to the boss, correct?

16   A.  Yes.

17   Q.  All right.  And you will agree with me that you have stated

18   previously that it's nice to be friends with the mayor or the

19   governor, correct?

20   A.  Yes.

21   Q.  That there's a good feeling being friends with politicians,

22   correct?

23   A.  Yes.

24   Q.  And you would agree with me, sir, would you not, that it's

25   good to have former politicians on your team, correct?

*10-CR-20403   USA v. Kwame Kilpatrick, et al*

```
 1   A.  Say that again.
 2   Q.  You would agree with me that it's good to have politicians
 3   associated with your, with your Soave Enterprises, correct, or
 4   with some of your companies?
 5   A.  I don't understand that at all.  What do you mean
 6   "associated"?
 7   Q.  They work for you.
 8   A.  Politicians?
 9   Q.  Yeah, former politicians.
10   A.  Well, the only one I can remember is Jim Sharp.
11   Q.  What about Charlie Williams?  Charlie Williams was somebody
12   who worked for the City of Detroit in a political capacity,
13   isn't that true?
14   A.  Well, he was not a politician, he worked for
15   administration.
16   Q.  Right.  He was the former director of the Detroit Water and
17   Sewer Department, correct?
18   A.  Yes.
19   Q.  Not just once, but twice, correct?
20   A.  Yes.
21   Q.  And you were helping him get started in business, according
22   to your testimony, correct?
23   A.  Yes.
24   Q.  And as we indicated, he was a former DWSD director, he had
25   friends and contacts within the City of Detroit, correct?
```

*Anthony Soave - Cross*
*Thursday, December 6, 2012*

33

1    A.  Yes.

2    Q.  He had relationships with various people in City of Detroit

3    government, true?

4    A.  Yes.

5    Q.  Okay.  And he knew -- he had relationships with people

6    within DWSD, correct?

7    A.  Yes, I'm sure.

8    Q.  Okay.  And you would agree with me that putting

9    Mr. Williams, you know, having him on your team as a

10   subcontractor assisted Inland Waters to get business with the

11   City of Detroit, wouldn't you agree with that?

12   A.  Listen, with the water board, okay, with DWSD, we bid all

13   our contracts there, so --

14   Q.  I understand that.

15   A.  -- when you say help get it, I mean, he was familiar with

16   the people there so ...

17   Q.  Right, and that helped Inland Waters, true?

18   A.  Well, he was working with familiar people, so ...

19   Q.  You'd have to agree with me, wouldn't you?

20   A.  I would assume after you bid the job and you get it, yes,

21   he knew the people.

22   Q.  Well, prior to the bidding process, they see Charlie

23   Williams' name, that helps Inland Waters, doesn't it, because

24   the people involved with DWSD, they know Charlie Williams,

25   isn't that right?

*Anthony Soave - Cross*
*Thursday, December 6, 2012*

34

1    A.   I would assume, I would assume the bid process over there

2    doesn't have a box checked to see if it's your favorite person,

3    you know.  You go through the bidding process, and after that,

4    if you have familiar people, you're working with familiar

5    people, I think they get along better.

6    Q.   All right.  Well, you would admit to me that -- and we're

7    going to get into these contracts here in a minute, okay, but

8    you would agree with me that Mr. Williams did not have a real

9    company, did he?  He didn't have any employees, did he?

10   A.   No, he did not.

11   Q.   And he didn't have any equipment, did he?

12   A.   No, he did not.

13   Q.   And he didn't do water main installations, did he?

14   A.   No, he did not.

15   Q.   And he didn't do sewer repair, did he?

16   A.   No, he did not.

17   Q.   And he didn't do pipe rehabilitations either, did he?

18   A.   No, he did not.

19   Q.   All right.  You used Mr. Williams -- or what he brought to

20   the table, I should say, was relationships and access, that's

21   what he brought to the table, isn't that true?

22   A.   We were mentoring him.  I told you that before.

23   Q.   Sir, I would like you to answer my question.  Isn't that

24   what he brought to the table, relationships and access?

25   A.   He brought much more than that.  He's an attorney and he's

*10-CR-20403   USA v. Kwame Kilpatrick, et al*

*Anthony Soave - Cross*
*Thursday, December 6, 2012*

35

1    an astute -- I mean, his mind and my mind think alike, and I

2    thought he would be a good person to mentor.

3    Q.  And you've known Charlie for 35 years, isn't that true?

4    A.  Known him a long time.

5    Q.  Going way back to the Coleman Young days, true?

6    A.  Yes.

7    Q.  And I understand your answer, but I'd like to get an answer

8    to my question.  Besides the things that you just mentioned --

9    A.  Yes.

10   Q.  -- he brought access and relationships to the table, isn't

11   that true?

12   A.  He brought relationships.  I mean, he knew people at the

13   water board, yes.

14   Q.  Which would give you access to DWSD, isn't that true?

15   A.  I don't know, "access," what -- explain that, please,

16   "access."

17   Q.  Well, I mean, look, Charlie Williams knew who to call, he

18   knew what buttons to push because he used to run the

19   department.

20   A.  He was familiar with the process, yes.

21   Q.  That's right, okay.  But you would agree with me that at

22   the end of the day, Charlie Williams was nothing more than a

23   minority front, isn't that true?

24   A.  That is not true.

25   Q.  That's not true?  Isn't it true, sir, that you were going

*10-CR-20403    USA v. Kwame Kilpatrick, et al*

```
 1    to use CJ Williams & Associates as a passthrough company?
 2    A.  That is definitely not true.
 3    Q.  That's not true?
 4    A.  Definitely not true.
 5    Q.  Well, he didn't have any employees, right?
 6    A.  He did not.
 7    Q.  He didn't have any equipment.
 8    A.  He did not.
 9    Q.  He didn't have any experience digging up pipes.
10    A.  He had experience, he had overview, you know, of 35,000
11    people.  He knew the process, he was the director.  For you to
12    say he didn't know anything about it, he did, but he didn't
13    have any employees and he didn't have any equipment and we were
14    going to mentor him.
15    Q.  So CJ Williams & Associates, sir, didn't have anybody
16    capable of putting boots on the ground, getting their boots
17    muddy and digging down and doing real work, isn't that true?
18    A.  I don't know if that's needed, okay.
19    Q.  Sir, answer my question.  It will take a lot longer --
20    A.  Say it one more time then.
21    Q.  Okay.  Isn't it true that Mr. Williams did not have a real
22    company where he could put boots on the ground to get all
23    muddied up and get in there and dig up those pipes?
24    A.  He had a real company.  He had CJ Williams Associates, but
25    he did not have a company that did that work.
```

1   Q.  Well, that's what my question --

2   A.  Put boots on the ground and --

3   Q.  That's my question.

4   A.  Right.

5   Q.  And you would agree with me that he was a minority-based

6   enterprise, correct?  He was a minority, he had a minority

7   company, correct?  Mr. Williams is African American, correct?

8   A.  Yes.

9   Q.  He had a Detroit-based business, yes?

10  A.  Yes.

11  Q.  And he had a Detroit-headquartered business?

12  A.  Yes.

13  Q.  And those helped in the bid process, did they not?  They

14  got Inland more points when they bid against other contractors,

15  isn't that true?

16  A.  That's one of the goals in the, in the bid documents.

17  Q.  That's right.  Now, I'd like to direct your attention for a

18  minute and I want to focus your attention, if I may, on the

19  contracting business in general, okay?

20  A.  Yes.

21  Q.  Now, you would agree with me that the contracting business

22  is no walk in the park, would you agree with that?

23  A.  It's definitely not.

24  Q.  It's pretty rough out there, correct?

25  A.  Yes, it is.

*Anthony Soave - Cross*
*Thursday, December 6, 2012*                    38

1    Q.  There's always people elbowing other people out all the

2    time.  It's very competitive, isn't it?

3    A.  It's very competitive.

4    Q.  Yeah, and you would also agree that it's even more

5    difficult for minority contractors, correct?

6    A.  And that's why they have mentoring programs.

7    Q.  Well, that's -- and we'll get into other -- but there's

8    other things that help minority contractors at least with, as

9    we've talked about the City of Detroit, correct?  They had a

10   policy, right, that you have --

11   A.  They have goals.

12   Q.  -- so many -- they have goals, right?

13   A.  They have goals, yes.

14   Q.  Sorry.

15           **THE COURT:**  Mr. Soave, you need to wait until he

16   finishes his question, otherwise Suzanne can't get the

17   transcript down.

18           **THE WITNESS:**  Sorry.

19   **BY MR. RATAJ:**

20   Q.  And we know that you're familiar with the City of Detroit's

21   policy on minority contractors, correct?

22   A.  Yes.

23   Q.  Detroit-based businesses getting priorities, correct?

24   A.  Yes.

25   Q.  Detroit-headquartered businesses getting priorities,

*Anthony Soave - Cross*
*Thursday, December 6, 2012*

39

1    correct?

2    A.   Yes.

3    Q.   And you would agree with that policy, would you not?

4    A.   I'm a Detroit contractor, yes, so --

5    Q.   You would agree --

6    A.   Yes.

7    Q.   -- that it's good to help minorities out in the City of

8    Detroit which is primarily made up of African American people,

9    correct?

10   A.   Yes.

11   Q.   But, in general, the contracting business is a bare knuckle

12   fight on a day-to-day business, isn't it?

13   A.   Yes.

14   Q.   And you have prime contractors trying to elbow out other

15   prime contractors, correct?

16   A.   Yes.

17   Q.   You've got pushback between subcontractors and prime

18   contractors, correct?

19   A.   Yes.

20   Q.   You've got negotiations that can get pretty intense at

21   times between subs and primes, correct?

22   A.   Yes.

23   Q.   And you have to -- and to be successful in the contracting

24   business, you have to be able to stand your ground, isn't that

25   true?

*10-CR-20403   USA v. Kwame Kilpatrick, et al*

*Anthony Soave - Cross*
*Thursday, December 6, 2012*                    40

1    A.  Yes.

2    Q.  And you can't be intimidated, can you?

3    A.  Yes.

4    Q.  You agree with me, you cannot be intimidated?

5    A.  I agree with you.

6    Q.  Right.  And you can't threaten easily, can you?

7    A.  No.

8    Q.  Right.  And so you have previously described in your

9    testimony yesterday that Mr. Ferguson was basically a pain in

10   the butt, correct?  Isn't that -- is that a good way to put the

11   overview of your testimony --

12   A.  Yes.

13   Q.  -- regarding Mr. Ferguson?  I mean, obviously, you didn't

14   have direct contact with him, correct?

15   A.  I did not.

16   Q.  And the people that were -- the things that you learned

17   about Mr. Ferguson came from your employees, correct?

18   A.  Yes.

19   Q.  The negotiations regarding contracts between Ferguson

20   Enterprises, Inc. and Inland Waters Pollution Control were

21   handled by others that worked for you, am I right or wrong?

22   A.  Yes.

23   Q.  All right.  And --

24   A.  Except for the first one.  You know, the first negotiation

25   was to put 'em on the job.

*Anthony Soave - Cross*                              41
*Thursday, December 6, 2012*

1    Q.   I understand that, but --

2    A.   Okay.  But that was --

3    Q.   But we're talking numbers.

4    A.   That was the one I handled.  After that, I didn't handle

5    the rest.

6    Q.   Right.  You're talking -- that will be handled by somebody

7    else, but you're talking about your meeting with

8    Mr. Kilpatrick?

9    A.   Yes.

10   Q.   But you didn't deal with Mr. Ferguson on that directly?

11   A.   I did not.

12   Q.   Right.  As a matter of fact, you never dealt with

13   Mr. Ferguson directly?

14   A.   I didn't know him.

15   Q.   Right.  But my question to you is this, Mr. Ferguson, as it

16   was reported to you and as it was perceived by you through your

17   employees, was a burr in your saddle, I believe you used that

18   phrase as well, correct?

19   A.   Well, not before he started.

20   Q.   After?

21   A.   Yes.

22   Q.   After?

23   A.   Yes.

24   Q.   Right.  And you will admit, sir, that being in business for

25   40 years and starting out with one truck and a bulldozer and

*10-CR-20403    USA v. Kwame Kilpatrick, et al*

1   ending up with a 2.5 billion-dollar enterprise, along the way,

2   you probably have rubbed some folks the wrong way, correct?

3   Wouldn't you agree with that?

4   A.   There are different, there are different burrs underneath

5   your saddle.  Some of them are some kind of problems, some of

6   them are other kind of problems.  His --

7   Q.   Well, do you think everybody -- hold on now.

8            MR. BULLOTTA:  Can he finish his answer?

9            MR. RATAJ:  I don't think he's answering my

10  question, Judge.

11           MR. BULLOTTA:  He's answering.

12           THE COURT:  I think he is.  You can answer.

13  A.   There are different kind of burrs, okay?

14  BY MR. RATAJ:

15  Q.   Different kind of burrs?

16  A.   Yes.

17           A JUROR:  Can you turn around so we can see the side

18  of your face?

19           MR. RATAJ:  Oh, I'm sorry.  I certainly don't want

20  to show you my back side, that's for sure.

21           A JUROR:  The sound is better.

22           MR. RATAJ:  Fair enough.  Can everybody hear me?

23           A JUROR:  There you go.

24  BY MR. RATAJ:

25  Q.   You would agree with me, Mr. Soave, that during the course

*Anthony Soave - Cross*
*Thursday, December 6, 2012*                                      43

1    of your career, you've had to wake up in the morning and you've

2    had to sharpen your elbows as well, correct?

3    A.  Yes.

4    Q.  And in doing so, wouldn't it be a fair statement that you

5    probably have rubbed some folks the wrong way?

6              **MR. BULLOTTA:**  Your Honor, I'm going to object as

7    being irrelevant, and also it calls for speculation.

8              **THE COURT:**  Sustained.

9    **BY MR. RATAJ:**

10   Q.  Not being a pushover, Mr. Soave, is a key to success in the

11   contracting business, would you agree with that?

12   A.  Would you say that again?

13   Q.  Sure.  Not being a pushover, okay, not being someone who's

14   got no spine, that's not the way to be successful in the

15   contracting business, wouldn't you agree with that?

16   A.  It's a tough, it's a rough and tough business.

17   Q.  And you got to be tough to be successful, correct?

18   A.  Yes, you do.

19   Q.  And you're a tough guy, aren't you?

20   A.  No, I'm a loveable guy.

21   Q.  You're a loveable guy.  I can see that, Mr. Soave, but you

22   know what, I didn't have to deal with you out there on

23   contracts, so the bottom line is is that being successful in

24   that business, you know --

25   A.  You have to be on your toes.

*10-CR-20403    USA v. Kwame Kilpatrick, et al*

```
 1    Q.  -- you got to be on your toes and you got to be pretty
 2    tough, don't you?
 3    A.  Yes.
 4    Q.  All right.  Now, you acknowledge that Mr. Ferguson had a
 5    real company, didn't he?
 6    A.  Yes, he did.
 7    Q.  He had real employees, didn't he?
 8    A.  Yes, he did.
 9    Q.  He had equipment, didn't he?
10    A.  Yes, he did.
11    Q.  He had experience, didn't he?
12    A.  Well, that, I wasn't familiar with him, you know, in the
13    beginning, but I understand he did.
14    Q.  You learned afterwards that he did have a body of work
15    under his belt?
16    A.  He had a company and he was doing work, yes.
17    Q.  Right.  Did you know that he started out working for his
18    dad back in the late '60s, probably around the same time that
19    you started out, did you know that?
20    A.  I did not know that.
21    Q.  Did you know his father worked at General Motors and had a
22    little excavating business on the side?
23    A.  I did not know that.
24    Q.  Did you know that Mr. Ferguson --
25                  MR. BULLOTTA:  Your Honor, I'm going to object to
```

*Anthony Soave - Cross*
*Thursday, December 6, 2012*                                    45

1    this line of questioning.  He doesn't know.

2               **THE COURT:**  Sustained.  Let's move along, Mr. Rataj.

3    **BY MR. RATAJ:**

4    Q.  Did you know that Mr. Ferguson --

5               **MR. BULLOTTA:**  Your Honor, same objection.

6               **MR. RATAJ:**  Your Honor, I haven't even asked a

7    question yet.

8               **THE COURT:**  He hasn't asked a question yet.

9    **BY MR. RATAJ:**

10   Q.  Did you know that Mr. Ferguson dug up Ford Field?  Did you

11   find that out?

12   A.  No, I didn't know that.

13   Q.  Did you know that he dug up Comerica Park?

14   A.  No, I didn't know that.

15   Q.  Did you know that he had done the MGM Grand?

16              **MR. BULLOTTA:**  Your Honor, I'm going to object.  He

17   said he knows nothing about Ferguson's background, and all he's

18   doing is using this to get it in.

19              **THE COURT:**  Again, Mr. Rataj, let's move through

20   this, please.

21              **MR. RATAJ:**  I'm not trying to waste anybody's time,

22   Your Honor, I'm trying to do my job, so if you want to admonish

23   me, I would appreciate it if we'd do it at sidebar, because I'm

24   not trying to waste anybody's time.

25              **THE COURT:**  Move along, Mr. Rataj.

*Anthony Soave - Cross*
*Thursday, December 6, 2012*                                    46

1    **BY MR. RATAJ:**

2    Q.  Now, from your perspective, Mr. Soave, Mr. Ferguson, as

3    reported to you, was always pushing the envelope, is that a

4    fair statement?

5    A.  Yes.

6    Q.  He was always trying to get more job, more of the job,

7    correct?

8    A.  And more of the money.

9    Q.  And more of the profit, correct?

10   A.  More of the job, more of the money, yeah.

11   Q.  Yeah, and from your understanding, he was an aggressive

12   individual, wasn't he?

13   A.  Yes.

14   Q.  And, like you, did you have an impression as to whether he

15   was a proud man like yourself?

16   A.  I understood he was, you know.  I don't know about proud, I

17   mean, he was, he was a tough businessman.

18   Q.  He was a tough businessman.  And you're a tough

19   businessman, true?

20   A.  I try to be tough and fair, you know, so ...

21   Q.  You're a tough businessman.  And you admit that during the

22   course of Ferguson Enterprises' relationship with Inland

23   Waters, you instructed your people to push on Mr. Ferguson, to

24   push back, correct?

25   A.  No.  One of the problems we had with Mr. Ferguson --

*10-CR-20403    USA v. Kwame Kilpatrick, et al*

```
 1    Q.  Sir, I would like you to answer my question.
 2    A.  Okay.  Well, would you state it again, please.
 3    Q.  Yes, sir.  Did you instruct your people to push back on
 4    Mr. Ferguson?
 5    A.  I don't quite understand that, "push back."  I mean, we did
 6    normal business.  I mean, we would negotiate the way we
 7    normally do.  We weren't picking on him to push back.  It was
 8    the way --
 9    Q.  You didn't let him run over your company, did you, and
10    dictate terms to your company, isn't that true?
11    A.  No.  He tried.  No, he did not.
12    Q.  He tried?
13    A.  He tried, and at times he tried -- I was getting reports
14    back that he wanted to get paid for work he didn't do, and
15    that's, that's really what the main problem was.
16    Q.  All right.
17    A.  Okay?  And we did not --
18    Q.  Mr. --
19    A.  -- but he worked for everything that he got from us.
20    Q.  That's right, he did the work.
21    A.  Yes, he did.
22    Q.  He did the work, yes.
23    A.  Yes, we made him do the work.
24    Q.  You made him do the work.
25    A.  Yes, we did.
```

1    Q.  But you made him tow the line, didn't you?

2    A.  Yes, we did.

3    Q.  And you didn't care whether he knew the mayor, isn't that

4    true?

5    A.  That's true.

6    Q.  Right.  And you admit --

7    A.  No, we cared that he knew the mayor, we just told him he

8    had to do the work.  That was beside the point because we're

9    not going to pay him for not working.

10   Q.  But we've already established that he did the work,

11   correct?

12   A.  We made him do the work.

13   Q.  You made him do the work.  Okay.

14   A.  For what he got paid for, yes.

15   Q.  But you admit that you have stated in the past that you

16   didn't care whether he knew the mayor or not, isn't that true?

17   A.  Well, I care.  I'm saying we still made him do the work.

18   Q.  Sir --

19               **MR. RATAJ:**  May I approach the witness, Your Honor?

20               **THE COURT:**  You may.

21               **MR. BULLOTTA:**  Can you give me a page number?

22               **MR. RATAJ:**  24.

23               **MR. BULLOTTA:**  What line?

24               **MR. RATAJ:**  20 and on.

25   A.  Okay.

                    *10-CR-20403   USA v. Kwame Kilpatrick, et al*

1    **BY MR. RATAJ:**

2    Q.  Yes, sir.  Does that refresh your recollection there?

3    A.  Yes.

4    Q.  And you admit that you have stated in the past under oath

5    that you didn't care whether he knew the mayor, you were going

6    to make him do the work, you were going to make him tow the

7    line, isn't that true?

8    A.  Yes.

9    Q.  You had -- you would agree with me -- this is what I meant

10   by "push back."  Do you understand what I mean when I use the

11   phrase "push back," Ferguson is pushing you guys and you're

12   pushing him back, right?  You understand what I'm saying now?

13   What I'm asking you?

14   A.  Yes.

15   Q.  Okay.  And that happened, didn't it?  Despite Ferguson's

16   relationship with Mr. Kilpatrick, as you indicated, you didn't

17   care, you were going to make him tow the line, you were going

18   to make him do the work, isn't that right?

19   A.  Yes.

20   Q.  And you will acknowledge, will you not, that you thought

21   that maybe on a couple of times when you had your people push

22   back on Mr. Ferguson you expected some kind of retaliation

23   possibly from city hall, didn't you?

24   A.  I thought it could possibly happen.

25   Q.  But nothing happened, did it?

*Anthony Soave - Cross*
*Thursday, December 6, 2012*                    50

1    A.  It did not.

2    Q.  Right.  And Inland still got work, didn't they?

3    A.  Yes.

4    Q.  Yes?

5    A.  Yes.

6    Q.  Now, yesterday, in response to Mr. Bullotta's questions, he

7    asked you about perceived threats by Mr. Ferguson in dealing

8    with your people, correct?

9    A.  Yes.

10   Q.  Do you remember that?

11   A.  Yes.

12   Q.  And we know that you didn't deal with Mr. Ferguson, so

13   these threats, quote-unquote, threats, came from, I believe,

14   Ms. McCann in reporting back to you, correct?

15   A.  Yes.

16   Q.  All right.  And the -- and I want you to correct me if I'm

17   wrong, Mr. Soave, okay?

18   A.  Okay.

19   Q.  Because I thought I wrote down exactly what you said, and

20   the quote, the threat was, "You are here because of me."

21   That's what Mr. Ferguson allegedly said to Ms. McCann, correct?

22   A.  Yes.

23   Q.  And if I understood your testimony correctly, and please

24   correct me if I'm wrong, you took that to mean that we better

25   get along with this guy.

*10-CR-20403   USA v. Kwame Kilpatrick, et al*

*Anthony Soave - Cross*
*Thursday, December 6, 2012*                    51

```
 1    A.  Yes.
 2    Q.  All right.  Now, you testified here today that you pushed
 3    back on Bobby Ferguson, that you kept him in line, correct?
 4    A.  Yes.
 5    Q.  And that you didn't care that he was friends with the
 6    mayor, correct?
 7    A.  That's right.
 8    Q.  And that you agreed -- you will agree with me, will you
 9    not, that you're a hands-on type of a guy, correct?
10    A.  I wasn't hands-on on that job.  I was not on that job.
11    Q.  I understand that you're not down there with muddy boots on
12    and everything like that, but in terms of --
13    A.  I'm in touch.
14    Q.  You're in touch?
15    A.  Yes.
16    Q.  In terms of running your operation --
17    A.  Yes.
18    Q.  -- you know what the heck's going on, correct?
19    A.  I hope I do.
20    Q.  Yeah.  And you're loyal to your people, correct?
21    A.  Yes.
22    Q.  You're very protective of your people, aren't you?
23    A.  Yes.
24    Q.  And you would agree with me that at no time did you ever
25    step in and deal with Mr. Ferguson directly, true?
```

*10-CR-20403    USA v. Kwame Kilpatrick, et al*

*Anthony Soave - Cross*
*Thursday, December 6, 2012*

52

1   A.  No.

2   Q.  You didn't pick up the phone and call Mr. Ferguson and say,

3   "Hey, Mr. Ferguson, quit threatening my people."  You never did

4   that, did you?

5   A.  No, I did not.

6   Q.  No.  And you didn't call Mr. Kilpatrick when he was the

7   mayor and you didn't say to him, "Hey, you know, Kwame, reel

8   this guy in, he's out of control."  You never did that, did

9   you?

10  A.  I made some remarks to the mayor about him.

11  Q.  Yeah, you told the mayor that you were basically going to

12  push back on Bobby, that you were going to make him tow the

13  line, that's what you told him, isn't it?

14  A.  No, I don't know exactly what I told him, but I just told

15  him that he's, I asked him if he's still your friend.  We would

16  have dealt with him a little differently.

17  Q.  Yeah, but the bottom line is that you never told

18  Mr. Kilpatrick that, "Hey, Ferguson's threatening my people."

19  You never told him that?

20  A.  Look, look --

21  Q.  Sir --

22  A.  -- Mr. Ferguson --

23  Q.  No, no, no.

24  A.  Okay, excuse me.

25  Q.  Answer my question.

*10-CR-20403   USA v. Kwame Kilpatrick, et al*

```
 1    A.  Excuse me, sir, I'm sorry.  Ask the question again.

 2    Q.  My question is that you never told Mr. Kilpatrick, okay,

 3    "Would you please tell Ferguson to stop threatening my people?"

 4    A.  No, I didn't.

 5    Q.  You never did that, did you?

 6    A.  No.

 7    Q.  Okay.  And you will admit that you had plenty of

 8    opportunities to do that, correct, talk to Mr. Kilpatrick about

 9    Mr. Ferguson, right?

10    A.  I had plenty of opportunities, yes.

11    Q.  You testified yesterday you went on a bunch of trips

12    together, right?

13    A.  Well, not a bunch of trips.  We went on two or three.

14    Q.  Yeah.

15    A.  New York trips.

16    Q.  Sure.  And you went to some, a Pistons game, correct?

17    A.  No, I didn't go to the Pistons game.  He went.

18    Q.  Oh, you didn't go with Mr. Kilpatrick?

19    A.  No.

20    Q.  Oh, I misunderstood.  I apologize.  But the bottom line is

21    that --

22    A.  I couldn't afford anymore tickets.

23    Q.  You couldn't afford anymore?  Yeah, it's kind of crazy, to

24    watch a basketball game, I agree.

25              But, sir, the bottom line to where I'm getting at
```

*Anthony Soave - Cross*
*Thursday, December 6, 2012*

54

1   this is that it's true, is it not, that you really never took

2   this perceived threat very seriously because you never injected

3   yourself into it?

4   A.  No, no -- well, look, I mean, he said it on more than one

5   occasion.  You want me to answer your question first and --

6   Q.  Well, I'd just like you to answer my question.

7   A.  I'm learning, I'm learning.

8   Q.  Mr. Bullotta can go on further.

9   A.  Ask me the question again, I'm sorry.

10  Q.  I mean, it's true, is it not, sir, I mean, here you are,

11  Mr. Tony Soave running Soave Enterprises, you never really took

12  that threat very seriously because you never injected yourself

13  into it, isn't that true?  Isn't that true?

14  A.  No, that's not true.

15  Q.  That's not true.  But you would agree with me that the

16  problem never arose to the level that caused you to call

17  Mr. Ferguson up yourself and deal with him directly, isn't that

18  true?

19  A.  No, that's not true because I thought in the back of my

20  mind that it may hurt us if we didn't give in to him a little

21  on some things, and it never did happen, it never did happen.

22  Q.  Nothing ever happened, did it?

23  A.  No, we thought maybe it could, but we felt the threat,

24  okay, and he was asking for things that were just -- you ask

25  Mrs. McCann about that, okay?  She'll tell you.

*Anthony Soave - Cross*
*Thursday, December 6, 2012*

55

1    Q.  Yeah, okay.

2    A.  She'll be able to tell you.

3    Q.  That's fair.  But from your perspective as the CEO of Soave

4    Enterprises, you know, you didn't, you didn't really take it

5    that seriously because, as you indicated, you thought that

6    there may be some problems from city hall, but nothing ever

7    happened.  Inland still got work, isn't that true?

8    A.  No, it's not true.

9            **MR. BULLOTTA:**  Your Honor, I --

10   A.  I did take it seriously.  There were no repercussions,

11   but...

12   **BY MR. RATAJ:**

13   Q.  Well --

14   A.  But I did take it seriously.

15   Q.  Seriously, but at least give me this, not serious enough

16   for you, Mr. Tony Soave, to pick up the phone and call

17   Bobby Ferguson and get in his face, correct?  Just answer that

18   one.

19   A.  I didn't feel the need because we didn't get any

20   repercussions from it.

21   Q.  No repercussions, all right, fair enough.  All right.  Now,

22   Mr. Soave, you would agree with me, sir, that you're not the

23   kind of person that threatens very easily, wouldn't you agree

24   with that?

25            **THE COURT:**  You mean is threatened, or makes a

*10-CR-20403   USA v. Kwame Kilpatrick, et al*

*Anthony Soave - Cross*
*Thursday, December 6, 2012*                                    56

1    threat?  It's not --

2    **BY MR. RATAJ:**

3    Q.  You would agree, sir, that you're not the kind of person

4    that someone can intimidate or threaten easily, isn't that

5    true?

6    A.  Well, I listen very carefully when someone says something

7    and I, you know, I --

8    Q.  But, sir, you're not the kind of person that can get pushed

9    around, will you give me that?

10   A.  By certain people, I can get pushed around.

11   Q.  Like your mother maybe or something like that?

12   A.  My grand kids and --

13   Q.  Your grand kids, okay.  But certainly not in the business

14   world, wouldn't you agree with that?

15   A.  Well, I mean --

16   Q.  No one pushes you around, Mr. Soave, isn't that true?

17   A.  I mean, I think I have been pushed around before, so I try

18   to, you know, I try to be a good businessman.

19   Q.  You try to be a good businessman, but you have acknowledged

20   here on the record --

21             **THE COURT:**  Yes?

22             **A JUROR:**  You had mentioned a woman's name to ask?

23             **THE COURT:**  Mrs. McCann.

24             **MR. RATAJ:**  Kathleen McCann.

25   A.  She -- should I explain who she is?

*10-CR-20403   USA v. Kwame Kilpatrick, et al*

*Anthony Soave - Cross*
*Thursday, December 6, 2012*                               57

1              **THE COURT:**  It's not necessary.

2     BY MR. RATAJ:

3     Q.  No, and for the record, she's coming up as a witness later

4     on, so we'll hear from her, okay?

5     A.  Okay.

6     Q.  But you would agree with me, Mr. Soave, that you, starting

7     out with a truck and a bulldozer and ending up over here with a

8     2.5 billion-dollar corporation, you couldn't have possibly been

9     pushed around along the way to become so insanely successful,

10    won't you agree with that?

11    A.  Well, I just, I mean, I chose hard work.  I mean, being

12    pushed around, you keep on using the word "pushed around."  I

13    think you're overusing it, okay, you know.

14    Q.  All right.  But you're not -- I mean, give me at least

15    this, Mr. Soave, you're not someone who can be easily

16    intimidated, isn't that true?

17             **MR. BULLOTTA:**  I'm going to object.  This has been

18    asked and answered a number of times.

19             **MR. RATAJ:**  I don't think I really got an answer to

20    it, Judge.

21             **THE COURT:**  All right.  You can answer, last time.

22    A.  Oh, okay.  No.

23    BY MR. RATAJ:

24    Q.  Nobody can intimidate you, besides your grand kids maybe?

25    A.  No.

*Anthony Soave - Cross*
*Thursday, December 6, 2012*                                    58

1   Q.  Right?

2   A.  No.

3   Q.  Okay.

4   A.  And you.  My grand kids and you.

5   Q.  I don't think I intimidate you, Mr. Soave, but I appreciate

6   the compliment, you know --

7   A.  Okay.

8   Q.  -- for whatever that's worth.

9           Now, I mean, let's face it, we've heard testimony

10  here that when Mr. Ferguson approached Ms. McCann with this

11  notion, I believe it's Mrs. McCann, with this notion of FEI,

12  Ferguson Enterprises, joining up or teaming up in a joint

13  venture with Inland, you had a very colorful response, did you

14  not?

15  A.  Yes, I did.

16  Q.  Yeah, and your response was, "Tell him to go fuck himself,"

17  isn't that true?

18  A.  "Go F himself."  I don't, you know --

19  Q.  I know, we're not supposed to use it, but for the record,

20  that's the words you used, isn't it, you didn't say that to

21  Kathleen McCann --

22  A.  Oh, I don't recall, it was Mrs. McCann, and she doesn't

23  swear, so I don't know what I said to her, but I certainly

24  meant it.

25  Q.  You certainly meant it, that's right.

*10-CR-20403   USA v. Kwame Kilpatrick, et al*

*Anthony Soave - Cross*
*Thursday, December 6, 2012*                                    59

1    A.  If I didn't say it --

2    Q.  That's right, okay.  And, you know, you would agree with me

3    that in all of the years that you've been involved in business,

4    you know, you've dealt with people who claimed that they were

5    friends with this politician or that politician, right?

6    A.  Yes.

7    Q.  And sometimes you believe it and sometimes you don't, isn't

8    that true?

9    A.  That's true.

10   Q.  Right.  Now, going back to this perceived threat that you

11   had testified to yesterday attributed to Mr. Ferguson through

12   Ms. McCann, "You are here because of me," okay?

13   A.  "You don't get it, you're only here because of me."

14   Q.  Right, okay.  You would agree with me that, within that

15   particular threat, Mr. Ferguson never threatened Ms. McCann to

16   take work away from Inland Waters, isn't that true, that

17   statement?

18   A.  You'd have to ask her that.  I don't -- you have to ask her

19   that.  I can't answer that.

20   Q.  All right.  But you didn't take it that way, it's not in

21   the statement.  He didn't threaten to take any work away from

22   Inland Waters, did he?  "You're here because of me"?

23          **MR. BULLOTTA:**  I'm sorry, Your Honor, there's like

24   three questions there.  Is he asking what he believed that

25   statement to mean or is he asking what is contained in the

```
 1    statement?  It's unclear.
 2    A.  You know, I believe we can --
 3              THE COURT:  I think Mr. Soave can answer it.
 4    A.  You know, I believed we could have a potential problem.
 5    BY MR. RATAJ:
 6    Q.  Well, we already established that there never was a
 7    problem, true?
 8    A.  Was not, no.
 9    Q.  Never was a problem.  But isn't it true, Mr. Soave, that
10    Mr. Ferguson could have been referring to his belief that he
11    helped you get those contracts because of his --
12    A.  No.
13    Q.  -- minority status?
14    A.  No, I don't think that was it at all.
15    Q.  Do you know what's in his mind, sir?
16              MR. BULLOTTA:  Your Honor, I'm sorry, he just asked
17    him what --
18    A.  You asked me what I had in my mind.  You asked me what I
19    had in my mind and --
20    BY MR. RATAJ:
21    Q.  Well, I'm asking you --
22    A.  -- I just told you.
23    Q.  Couldn't Mr. Ferguson have meant that --
24    A.  I just told you what I had in my mind, sir.
25    Q.  Sir --
```

*Anthony Soave - Cross*
*Thursday, December 6, 2012*                    61

1    A.  I did not think --

2    Q.  -- isn't it possible that that's what Mr. Ferguson could

3    have meant?

4         **MR. BULLOTTA:**  Objection, calls for speculation.

5         **THE COURT:**  Sustained.

6    **BY MR. RATAJ:**

7    Q.  You knew -- isn't it true, Mr. Soave, that you knew that

8    when Mr. Kilpatrick took office, he was trying to get rid of

9    passthrough contractors, isn't that true?  Did you have that

10   understanding?

11   A.  No.  I don't think -- no, I didn't have that understanding.

12   Q.  You didn't have that understanding?

13   A.  Never heard that before.

14   Q.  All right.

15   A.  No.  I don't think he wanted it, but --

16   Q.  Well, we already know --

17   A.  I don't think any mayor wants it.

18   Q.  No mayor wants passthrough companies?

19   A.  I don't think so.  They want to help contractors become

20   contractors.

21   Q.  That do real work, correct?

22   A.  Exactly.

23   Q.  Like Mr. Ferguson had.

24   A.  Yeah.

25   Q.  Real employees.

*Anthony Soave - Cross*
*Thursday, December 6, 2012*                                    62

1    A.   That's what --

2    Q.   Right?

3    A.   -- the mentoring program is supposed to do.

4              **THE COURT:**  Gentlemen, if we're going to have a

5    record here, you're going to have to let the other person

6    answer.

7              **MR. RATAJ:**  Understood, Your Honor.

8    **BY MR. RATAJ:**

9    Q.   Mr. Ferguson had a real company with real employees and

10   real equipment, isn't that true?

11             **THE COURT:**  Yes?

12             **A JUROR:**  I'm not sure I understood the question.

13   Did you say "past due"?

14             **THE COURT:**  "Passthrough."

15             **MR. RATAJ:**  "Passthrough," which is another word

16   synonymous with minority fronts, okay.

17   **BY MR. RATAJ:**

18   Q.   And just -- I don't want to, you know, beat this to death

19   but we've already established --

20   A.   You have.

21   Q.   -- Mr. Ferguson had a real company, real employees, a real

22   body of work, correct?

23   A.   Yes.

24   Q.   Charlie Williams didn't have any of that, did he?

25             **MR. BULLOTTA:**  Objection, Your Honor, this has been

*10-CR-20403   USA v. Kwame Kilpatrick, et al*

*Anthony Soave - Cross*
*Thursday, December 6, 2012*                                    63

 1    asked and answered a number of times.

 2    A.   That's not --

 3              **THE COURT:**  Yeah, can we please not go over ground

 4    that's already been well covered here.

 5    **BY MR. RATAJ:**

 6    Q.   Now, Mr. Soave, back in the late, back in the mid to late

 7    '90s, Inland Waters was awarded a contract known as CS-1325.

 8    Are you familiar with that, sir?

 9    A.   No, I don't know the number.  Was that the --

10    Q.   It was a contract that preceded contract 1368 that you were

11    asked about yesterday.  Do you know about that?

12    A.   1368, was that the contract that we got during the --

13    Q.   The Archer administration.

14    A.   -- Archer administration?

15    Q.   Yes, sir.

16    A.   So there was one before that, is that --

17    Q.   Yes, sir.

18    A.   Okay.  I'm not familiar with it.

19    Q.   You're not familiar with that?

20    A.   No.

21    Q.   Okay.  All right.  But if I told you that Inland Waters did

22    have --

23              **MR. BULLOTTA:**  Objection, Your Honor, this has no

24    foundation.  He doesn't know about the contract, that's what he

25    said.

*10-CR-20403   USA v. Kwame Kilpatrick, et al*

*Anthony Soave - Cross*
*Thursday, December 6, 2012*

64

 1          **THE COURT:**  Well, let's hear what the question is.

 2          **MR. RATAJ:**  I'd like to at least be able to get out

 3     the question, Judge.

 4          **THE COURT:**  I just told him that you had to ask the

 5     question first, so ask the question.

 6     **BY MR. RATAJ:**

 7     Q.  Did you have an understanding, Mr. Soave, that prior to

 8     being awarded contract 1368 during the Archer administration

 9     Inland Waters had another contract known as CS-1325?  You don't

10     have that understanding?

11     A.  No, I'm not familiar with it.

12     Q.  Okay.  But if I told you that's the case, would you have

13     any reason to disagree with me?

14     A.  Not coming from you, I wouldn't, no.

15     Q.  All right, good.  That's what we want to hear.

16          Now, I won't ask you about the particulars of 1325

17     because you've indicated that you're not familiar with that.

18     A.  No, I'm not familiar with it.

19     Q.  I'm going to show you some documents in a minute that may

20     refresh your recollection, okay, but let's talk about contract

21     1368 for a minute, okay?

22     A.  Yes.

23     Q.  All right.  Now, you will agree with me that 1368 was a

24     contract that was basically two contracts that became one

25     contract, did you have that understanding?

*10-CR-20403    USA v. Kwame Kilpatrick, et al*

*Anthony Soave – Cross*
*Thursday, December 6, 2012*

65

1    A.  I don't recall that.

2    Q.  All right.  Let me show you a document, DIN1-6.

3             **MR. RATAJ:**  May I approach, Your Honor?

4             **THE COURT:**  Yes.

5    **BY MR. RATAJ:**

6    Q.  Take a look at the very first page where it says "Motion,"

7    Mr. Soave.  Just read this part right there and see if that

8    helps refresh your recollection.

9    A.  Okay.

10   Q.  Yes, sir.  Does that refresh your recollection as to

11   whether 1368 was basically two contracts; 1362 and 1368?

12   A.  Yes, that's what it says there.

13   Q.  It says there.

14   A.  Yeah.

15   Q.  And were you familiar as to who Inland Waters was bidding

16   against as to those two contracts?

17   A.  No.

18   Q.  Okay.  I'm going to again show you the same document,

19   DIN1-6, and see if that helps refresh your recollection, and if

20   you'll just bear with me -- I keep doing that.  If you'll just

21   bear with me one second, I'll find it.

22             Start here and go down.

23   A.  Okay.

24   Q.  Okay.  And you can hang onto that document for a second

25   because you'll probably need it to refresh your recollection on

*10-CR-20403    USA v. Kwame Kilpatrick, et al*

1    some others.

2    A.   Okay.

3    Q.   But does that refresh your recollection as to whether 1368

4    and 1362 were bid against the same contractor, prime

5    contractor, correct?

6    A.   Yes.

7    Q.   And it was Lanzo Construction, correct?

8    A.   Yes.

9    Q.   And you would agree with me that bid, okay, on both of

10   those contracts took place on, I believe, October 25, 2001,

11   correct?  It's in the same area that I showed you.

12   A.   Is that the --

13   Q.   Just read it to yourself.

14   A.   Where is the October?  Show me.

15   Q.   Yeah.

16   A.   Yes.

17   Q.   Okay.  So just to sum up here, on October 25, 2001, the

18   mayor of the City of Detroit was Dennis Archer, correct?

19   A.   Yes.

20   Q.   All right.  And October 25, 2001 Inland Waters bid for

21   contract 1362 and 1368, both against Lanzo Construction,

22   correct?

23   A.   Yes.

24   Q.   And as it turns out, Inland Waters was awarded both

25   contracts, correct?

*Anthony Soave - Cross*
*Thursday, December 6, 2012*

1   A.  Yes.

2   Q.  And then -- and they were each $25 million contracts,

3   weren't they?

4   A.  Yes.

5   Q.  And ultimately, 1362 was rolled into 1368, making 1368 a

6   $50 million contract, would you agree with that?

7   A.  Yes.

8   Q.  And contracts, to your understanding, were awarded to --

9   both to Inland Waters, correct?

10  A.  Yes.

11          **MR. RATAJ:**  All right.  Do you want to stop now for

12  the break, Judge?  Good place?  Or do you want to keep going?

13          **THE COURT:**  If this is a good breaking point.

14          **MR. RATAJ:**  I think it's a good place to stop.

15          **THE COURT:**  All right.  Take 20 minutes.

16          (Jury out 10:27 a.m.)

17          (Recess taken 10:27 a.m. until 10:50 a.m.)

18          (Jury in 10:50 a.m.)

19          **THE COURT:**  Be seated.

20  **BY MR. RATAJ:**

21  Q.  Ready, Mr. Soave?

22  A.  Yes, sir.

23  Q.  Just to sum up from where we left off and then we'll move

24  on to another area, back in October 25 of 2001, Inland bid

25  against Lanzo Construction contracts 1362 and 1368, yes?

*10-CR-20403   USA v. Kwame Kilpatrick, et al*

*Anthony Soave - Cross*
*Thursday, December 6, 2012*

1    A.  Yes.

2    Q.  And we know that Inland won both contracts from Lanzo,

3    correct?  Yes?

4    A.  That's what it said there.

5    Q.  Yeah.  And also, ultimately -- and each was a $25 million

6    contract, correct?

7    A.  Yes.

8    Q.  And then, ultimately, 1362 was rolled into 1368, and 1368

9    became a $50 million contract, correct?

10   A.  Yes.

11   Q.  All right.  Now, and this was during the Archer

12   administration, at the end of the Archer administration, you

13   would agree with that?

14   A.  Yes.

15   Q.  Now, remember when I asked you whether or not you had an

16   understanding about contract 1325, CS-1325?

17   A.  Yes.

18   Q.  Let me just show you one little thing about that and see if

19   it refreshes your recollection, okay?  Maybe it will, maybe it

20   won't, but let's try it.

21            **MR. RATAJ:**  Same document, Mr. Bullotta, and for the

22   record, Ms. Jacques, DIN1-6.

23   **BY MR. RATAJ:**

24   Q.  Mr. Soave, kindly, sir, look, just read this last paragraph

25   of the document, and let us know whether that refreshes your

1  recollection.

2  A.  I mean, I read it, but I don't know what you want me to --

3  I don't --

4  Q.  The only thing I'm trying to see, if that refreshes your

5  recollection that Inland had 1325 and that contract 1368 was

6  just a continuation of 1325.  Does that refresh your

7  recollection that that was the case?

8  A.  No, it doesn't, but -- I mean, I read this, but it doesn't.

9  Q.  Okay.  That's fair.

10              Now, at the time that Inland outbid Lanzo

11  Construction for contracts 1362 and 1368, you would agree with

12  me that Kathleen Leavey was the director of DWSD, yes?

13  A.  I think she was.

14  Q.  You think she was?

15  A.  I think I saw her name on there.

16  Q.  Yeah, so you wouldn't have any reason to take issue with me

17  on that, correct?

18  A.  No, I --

19  Q.  That she was the director at that time.

20  A.  Okay.

21  Q.  And would you agree with me, sir, that Mr. Williams and

22  Ms. Leavey had a relationship?

23  A.  I don't know what that means, "had a relationship."  They

24  worked together, I know that.

25  Q.  They were good friends, weren't they?

*Anthony Soave - Cross*
*Thursday, December 6, 2012*

70

1    A.  I think they were.  Ask them.  Ask them.  Don't ask me.

2    Q.  I'm just --

3    A.  I know that they worked together.  Whether they were good

4    friends or not, you ask them.

5    Q.  Okay.  That's fair.

6              Now, you know what an inspection and in-place

7    rehabilitation of existing circular and noncircular sewers type

8    of contract is, don't you?  It's a little long.

9    A.  Say that again.

10   Q.  Yeah, you know, did you have an understanding -- let me ask

11   it a different way, maybe a little better -- that contract 1368

12   which became two contracts, one $50 million job, was a rehab, a

13   pipe rehab job?

14   A.  Yes.

15   Q.  Let me simplify it.  Yeah.  And you understood that that

16   kind of job was a situation where they would pull that resin

17   sock through the pipes, fill it with the hot water and then it

18   would expand, and basically you would have a brand new inside

19   of an existing pipe that could be 50, 60, 70 years old,

20   correct?

21   A.  Yes.

22   Q.  And that's what this kind of job was, correct?

23   A.  I believe so, yes.

24   Q.  And that process, that resin sock, that was patented,

25   wasn't it?

*10-CR-20403   USA v. Kwame Kilpatrick, et al*

*Anthony Soave - Cross*
*Thursday, December 6, 2012*

71

1   A.  It was.  I don't know if the patent was up yet or not.

2   Q.  Right, but that was a patent that was held by a company

3   called Insituform, correct?

4   A.  Insituform had had it, yes.

5   Q.  Yeah.  And prior to contract 1368 and maybe even prior to

6   contract 1325, which I know you're not familiar with, it didn't

7   refresh your recollection, but Inland would be -- was a

8   subcontractor to Insituform, isn't that true?

9   A.  Yes.

10  Q.  Right.  And ultimately, because other companies were coming

11  up with a process similar to what Insituform had, Inland was

12  able to basically do the work that Insituform was doing prior

13  to contract 1368?

14  A.  I believe that's correct.

15  Q.  Yeah, and, as a matter of fact, Inland ultimately elbowed

16  Insituform out of the way and started bidding on these

17  contracts as the prime contractor, isn't that true?

18  A.  I know they were subcontractor, then they bid to be the

19  prime contractor.

20  Q.  Right.  Inland, correct?

21  A.  Inland, yes.

22  Q.  Right, and ultimately, Insituform became a subcontractor to

23  Inland, correct?

24  A.  Yes.

25  Q.  Now, we know that -- we've established that the bid process

*10-CR-20403   USA v. Kwame Kilpatrick, et al*

*Anthony Soave - Cross*
*Thursday, December 6, 2012*

72

```
 1    took place on October 25, 2001, right at the end of the Archer
 2    administration, correct?
 3    A.  Yes.
 4    Q.  Right.  And then, you know, you've got this period of time
 5    here where you've got Thanksgiving, you've got Christmas,
 6    you've got New Year's, and then you've got a new administration
 7    coming in, correct, during this time period?
 8    A.  Yes.
 9    Q.  All right.  And we know that in early 2002, January,
10    Mr. Kilpatrick became mayor of the City of Detroit, correct?
11    A.  Yes.
12    Q.  All right.  Now, were you aware, or do you recall in
13    February of 2002 -- you know who Mr. Oszust is, correct?
14    A.  Who?
15    Q.  Dennis Oszust?
16    A.  Oszust.
17    Q.  Oszust.  He worked for you, right?
18    A.  Yes, he did.
19    Q.  And he, I won't say he ran Inland, but he was one of the
20    upper level employees at Inland, right?
21    A.  Yeah.
22    Q.  And he was the one who was involved pretty much, him and
23    Ms. McCann, in terms of the nuts and bolts of negotiating this
24    contract with DWSD, correct?
25    A.  Yes.
```

*Anthony Soave - Cross*
*Thursday, December 6, 2012*                              73

 1   Q.  And with the subcontractors, as well, correct?

 2   A.  Yes.

 3   Q.  All right.  Do you recall Mr. Oszust, I keep saying it --

 4   Oszust?

 5   A.  Oszust.

 6   Q.  Okay -- Mr. Oszust supplying performance bond and payment

 7   bond documents to the City of Detroit in February of 2002?  Do

 8   you recall that?

 9   A.  No.

10   Q.  May I show you a document that may refresh your

11   recollection?

12              **MR. RATAJ:**  May I approach, Your Honor?

13              **THE COURT:**  Yes.

14              **MR. RATAJ:**  I'm showing the witness, for the record,

15   Ms. Jacques, DIN1-9, as well as, Mr. Bullotta.

16   **BY MR. RATAJ:**

17   Q.  Take a look at that, sir.

18   A.  Okay.  What, what do you want me to --

19   Q.  Give me that document back, if I may.  Then I'll ask you

20   some questions.  First of all, let me get to the mic.

21              Does that refresh your recollection as to what was

22   going on in February of 2002 regarding performance and payment

23   bonds?

24   A.  No.

25   Q.  Do you have an understanding that before a contract could

*10-CR-20403   USA v. Kwame Kilpatrick, et al*

```
 1    be approved that the contractor, the prime contractor, has to

 2    provide performance and payment bonds?  Do you have that

 3    understanding?

 4    A.  I don't know if you give it to them after they approve it

 5    or before.

 6    Q.  You don't know, do you?

 7    A.  No.

 8    Q.  Okay.  But clearly this document does show that that was

 9    what was going on at least --

10    A.  Yes.

11    Q.  -- as of February 4, 2002?

12    A.  Yes.

13    Q.  Right?  Okay.  And, you know, it mentions a company called

14    Mid-State Surety Corporation.

15              MR. BULLOTTA:  I'm sorry, I'm going to object to him

16    going into the document.  The witness said it doesn't refresh

17    his recollection.  There's no foundation for any of this.

18              MR. RATAJ:  That's not my -- Your Honor --

19              THE COURT:  I understand what you're doing, it's

20    fine.  Go ahead.  Overruled.

21              MR. RATAJ:  Thank you.

22    BY MR. RATAJ:

23    Q.  Mid-State Surety Corporation was the company that was

24    providing the bonds as to 1368.

25    A.  Yes.
```

*Anthony Soave - Cross*
*Thursday, December 6, 2012*                                    75

1    Q.  You saw that, correct?

2    A.  Yes.

3    Q.  That was your company, wasn't it?

4    A.  Yes.

5    Q.  And do you still own that company today?

6    A.  No, I do not.

7    Q.  Sold it?

8    A.  Yes.

9    Q.  Okay.  So at least -- it shows, at least what I've showed

10   you as of February, bond documentation is being provided to the

11   City of Detroit from Inland Waters, yes?

12   A.  Yes.

13   Q.  Now, do you have a recollection in March of 2002 providing

14   an invoice to the Detroit Water and Sewage Department in

15   connection with contract 1368?  And the amount of that bill is

16   $291,250.

17   A.  No.

18   Q.  May I show you a document to see if it refreshes your

19   recollection?

20   A.  Okay.

21            **MR. RATAJ:**  May I approach, Your Honor?

22            **THE COURT:**  Yes.

23   **BY MR. RATAJ:**

24   Q.  Take a look at that, sir.  Okay?

25   A.  Yeah.  But I still don't understand.  I don't understand

*10-CR-20403    USA v. Kwame Kilpatrick, et al*

1    where you're going so ...

2    Q.  Well, you don't really need to understand where I'm going.

3    You just need to answer my questions --

4    A.  Yes, sir.

5    Q.  -- with all due respect.

6    A.  Okay.

7    Q.  So bottom line is this, does that --

8    A.  No.

9    Q.  -- refresh your recollection --

10   A.  It does not.

11   Q.  -- as to whether or not -- let me get the question out

12   first -- as to whether or not Inland had supplied an invoice in

13   March of 2002 in the amount of $291,250 to DWSD in connection

14   with contract 1368?  Does it refresh your recollection?

15   A.  No, it does not.

16   Q.  Okay.  But that's what it appears the document says,

17   correct, you agree with me on that, right?

18           THE COURT:  Mr. Rataj, that is not appropriate.

19   He's testified that he doesn't -- none of these documents, or

20   this document does not refresh his recollection with respect to

21   this bond issue.  So you've asked him a few questions about

22   it --

23           MR. RATAJ:  It wasn't a bond issue, Your Honor, it

24   was an invoice, just to be clear.

25           THE COURT:  An invoice or a bond issue, so you need

*Anthony Soave – Cross*
*Thursday, December 6, 2012*                                    77

1    to move on.

2              **MR. RATAJ:**  And I'm going to do that.

3    **BY MR. RATAJ:**

4    Q.  Now, do you have a recollection as to whether or not that

5    payment was held up because city council had not approved the

6    contract?

7    A.  No.

8    Q.  All right.  Let's show you a document, see if that

9    refreshes --

10             **THE COURT:**  No, again, that's improper because you

11   don't have the foundation to ask that question.  He doesn't

12   remember anything about the invoice and so -- or the bond or

13   anything related to this, so he can't answer these questions

14   because you don't have a foundation.

15             **MR. RATAJ:**  Well, Your Honor, that may be the case

16   as to the documents that I've shown him before, but now I'm

17   going to show him another document and maybe that might refresh

18   his recollection.

19             **THE COURT:**  Overruled.  I mean, sustain the

20   objection.

21             **MR. RATAJ:**  I didn't hear an objection.

22             **THE COURT:**  He stood.  Same objection he's been

23   making.

24   **BY MR. RATAJ:**

25   Q.  Did you have an understanding as to whether Inland was

                 *10-CR-20403   USA v. Kwame Kilpatrick, et al*

1  already doing work in connection with contract 1368 as early as

2  January of 2002?

3  A.  No.

4  Q.  You didn't?

5  A.  No, I didn't.

6  Q.  Okay.  Did you know, do you know, Mr. Soave, that before a

7  contract can be approved that there's numerous steps that have

8  to take place within the City of Detroit before a contractor is

9  actually awarded the contract?  Are you aware of that process?

10 A.  I'm aware that there are numerous steps, yes.

11 Q.  That's right.  I showed you a letter, okay, that Inland had

12 bid on a contract in October of 2001, correct?

13 A.  Yes.

14 Q.  And then I showed you another document that there was bonds

15 being provided to the City of Detroit by your employee,

16 Mr. Oszust, correct?

17 A.  Yes.

18 Q.  Then I showed you an invoice, correct, that you didn't

19 recollect, but it showed that Inland was billing for work,

20 correct?

21             **MR. BULLOTTA:**  Objection.

22             **THE COURT:**  That's an improper question.

23             **MR. RATAJ:**  He just admitted that he knows the

24 process.

25             **THE COURT:**  You can't, you cannot refer to the

1    contents of the document that's not in evidence and that he

2    says does not refresh his recollection.

3                **MR. RATAJ:**  They are in evidence.  Those documents

4    are in evidence.

5                **THE COURT:**  Then you can read it into the record and

6    do it that way, but he doesn't recall.  You can't do it that

7    way with him.

8                **MR. RATAJ:**  Okay.  Well, then I'm going to go back

9    because these documents are all in evidence.

10               **THE COURT:**  Okay.  Then do it some other way --

11               **MR. RATAJ:**  All right.

12               **THE COURT:**  -- than the way you've been doing it.

13   **BY MR. RATAJ:**

14   Q.   Remember when I asked you about the invoice which is marked

15   as DIN1-12?  Remember, I asked --

16   A.   Yes.

17   Q.   -- you about the $291,000?

18   A.   Yes.

19   Q.   Okay.  And I asked you whether or not you knew Inland was

20   doing work as early as January of 2002.  You said you didn't

21   know.

22   A.   No, I don't --

23   Q.   Do you know why that invoice wasn't paid, sir?

24   A.   No, I do not.

25   Q.   Okay.  Did you know that it wasn't paid because city

 1   council had not approved that contract?

 2           **MR. BULLOTTA:**  Objection, he said he doesn't --

 3   A.  No, I don't know.  I told you --

 4           **THE COURT:**  Wait, wait, Mr. Soave.

 5           **MR. BULLOTTA:**  Objection, there's no foundation and

 6   he's --

 7           **THE COURT:**  Sustained.

 8           **MR. BULLOTTA:**  And then I have a further objection,

 9   Your Honor, if he's going to attempt to publish these, my

10   objection is cumulative and an unnecessary waste of the jury's

11   time.  He's published all these already with Mr. Latimer, and

12   there's no reason to do this all over again with a witness who

13   doesn't even recognize them or have any --

14           **MR. RATAJ:**  Let's have a sidebar please.

15           **THE COURT:**  Do you get to call the sidebars now?

16           **MR. RATAJ:**  I'm asking for a sidebar.

17           (The following sidebar conference was held:)

18           **MR. RATAJ:**  That is about the most disingenuous and

19   hypocritical thing I've heard in this case so far.  They want

20   to sit there and say that they held up the contract.  I'm

21   showing documents that have already been put into evidence that

22   show that the contract was not held up; as a matter of fact,

23   that Mr. Kilpatrick had nothing to do with the process.  So

24   it's disingenuous and hypocritical for them to say that or

25   suggest that.

*Anthony Soave - Cross*
*Thursday, December 6, 2012*

81

1      **THE COURT:**  I am not going to let you do what you

2   did with Mr. Latimer and put in document after document after

3   document to show that the contract wasn't finalized at this

4   time.  You can ask him about knowing whether there were steps

5   to go through and whether it was final at that time, and then

6   you need to move on.

7      I'm not going to let you do the same thing.  It took

8   an hour to put in 35 documents.  We're not doing it again.

9      **MR. RATAJ:**  Well, first of all, if I may, I'm not

10  putting in 35 documents.  I'm showing him -- and I'm not

11  showing him 35 documents.  I'm showing him a very selected

12  sampling of the documents I put in through Latimer which show,

13  Mr. Bullotta, okay, that the contract was not held up by

14  Mayor Kilpatrick.  That is the sum and substance of this cross

15  examination.

16      **THE COURT:**  I'm going to let you put in a few, but

17  I'm going to tell you right now, if I think they're getting

18  cumulative, I'm going to sustain his objection.

19      **MR. RATAJ:**  You're going to --

20      **THE COURT:**  And you better watch the way you speak

21  to me in court because you are out of line.

22      **MR. RATAJ:**  If you -- you have insinuated that I'm

23  wasting the jury's time in front of the jury.

24      **THE COURT:**  Get going.

25      (End of discussion at sidebar.)

*10-CR-20403    USA v. Kwame Kilpatrick, et al*

*Anthony Soave - Cross*
*Thursday, December 6, 2012*

82

1     **MR. RATAJ:**  Well, Your Honor, may I -- I want to

2     follow the Court's order.  May I put this up on the Elmo and

3     show him this document?

4              **THE COURT:**  Which?

5              **MR. RATAJ:**  DIN1-13.

6              **THE COURT:**  And what's that?

7              **MR. RATAJ:**  It is the interoffice memorandum from

8     DWSD regarding the refusal to pay the invoice that I showed

9     Mr. Soave.

10             **THE COURT:**  You may.

11             **MR. RATAJ:**  Thank you.

12    **BY MR. RATAJ:**

13    Q.  Mr. Soave, I'm showing you what we've marked already as an

14    exhibit, DIN1-13, and what it is is an interoffice memorandum,

15    DWSD interoffice memorandum, dated April 1, 2002.  It's from a

16    Sergio Dioso to a Jackie Jordan, and it's regarding DWSD

17    contract number 1368, invoice payment one, which is the one I

18    showed you, okay?  Are you with me so far?  Are you with me so

19    far?

20    A.  Yeah, I'm reading that, yes.

21    Q.  I understand you're reading, I'm just asking, are you with

22    me so far?  Yes?

23    A.  Yes.

24    Q.  Okay.  All right.  Now, you can turn your head up there if

25    you want, and you can see that this document shows that,

*10-CR-20403    USA v. Kwame Kilpatrick, et al*

*Anthony Soave - Cross*
*Thursday, December 6, 2012*

83

1   regarding Invoice Number 1 in the amount of $291,250 has been

2   reviewed and is not approved for payment.  We have not received

3   a notice about city council's approval of contract CS-1368, you

4   see that?

5   A.  "We have not received notice about city council's" -- yes,

6   I see that.

7   Q.  Okay.  So the bottom line, you would agree, is that Invoice

8   Number 1 wasn't paid because city council had not approved

9   contract 1368, at least as of April 1, 2002, would you agree

10  with that, sir?

11  A.  No, I don't agree.  It says they didn't get notice.  That

12  doesn't mean it wasn't approved by council.  They just didn't

13  get notice.

14  Q.  Okay.

15  A.  So I really don't know, you're asking me things that I

16  don't know.  These are technical terms, sir, and you're asking

17  me stuff that I'm not familiar with these.

18  Q.  Well, do you understand the process of --

19  A.  No.

20  Q.  -- approval?

21  A.  No.

22  Q.  You don't.  Okay.  You don't know the various steps that a

23  contract has to go through prior to being approved?

24  A.  No.

25  Q.  Okay.  But you've testified that Mr. Kilpatrick held up

*10-CR-20403   USA v. Kwame Kilpatrick, et al*

1    your contract, isn't that true?

2    A.  My people were telling me it was held up so --

3    Q.  All right.  That's an important point.  So let's focus on

4    that, okay.  Your people were telling you that the contract was

5    held up, correct?

6    A.  Yes.

7    Q.  But you don't have any personal knowledge as to whether or

8    not Mr. Kilpatrick had anything to do with approving contract

9    1368, do you?

10   A.  Say that one more time, sir.

11   Q.  You don't have any personal knowledge that Mr. Kilpatrick

12   had anything to do with holding up contract 1368, do you?

13   A.  I don't know where it was in the process.  They said it was

14   being -- no, I don't know.

15   Q.  You don't know.  Right.  And anything that you've heard

16   regarding contract 1368 being held up was from your people,

17   correct?

18   A.  Yes.

19   Q.  Right?  But you have no personal knowledge of that,

20   correct?

21   A.  No.

22   Q.  Sir, did you know that Mr. Kilpatrick had nothing to do

23   with approving 1368?

24           **MR. BULLOTTA:**  I'm going to object.  That assumes

25   facts not in the record, Your Honor.

*Anthony Soave - Cross*
*Thursday, December 6, 2012*                    85

1              **MR. RATAJ:**  Oh, no, there's --

2              **THE COURT:**  Overruled.

3              **MR. RATAJ:**  -- certain --

4              **THE COURT:**  Overruled, go ahead.

5              **MR. RATAJ:**  Thank you.

6   **BY MR. RATAJ:**

7   Q.  Sir, did you know that Mr. Kilpatrick had nothing to do

8   with approving contract 1368?  Did you know that?

9   A.  No, I didn't know.  But can I explain my answer?

10  Q.  No, I just asked you that question.

11             **THE WITNESS:**  Your Honor, can I explain an answer?

12             **THE COURT:**  No, you have to wait, and Mr. Bullotta

13  will ask you --

14             **THE WITNESS:**  Okay.

15             **THE COURT:**  -- will give you an opportunity to

16  explain.

17             **THE WITNESS:**  Okay.

18  **BY MR. RATAJ:**

19  Q.  Sir, do you know when contract 1368 was actually approved?

20  A.  No.

21             **MR. RATAJ:**  May I approach the witness, Your Honor?

22             **THE COURT:**  You may.

23             **MR. RATAJ:**  I'm showing the witness DIN1-14A.

24  **BY MR. RATAJ:**

25  Q.  Take a look at that document, sir, and I'm directing your

*10-CR-20403    USA v. Kwame Kilpatrick, et al*

*Anthony Soave - Cross*
*Thursday, December 6, 2012*                    86

1    attention down there to the highlighted portion.

2    A.  Okay.

3    Q.  One second, sir.  All right.  Let me take that back from

4    you, sir.

5            Does that refresh your recollection as to when city

6    council approved the contract, that being 1368?

7    A.  No.

8            **MR. RATAJ:**  Okay.  May I publish this, Your Honor,

9    and show it?

10           **THE COURT:**  You may.

11           **MR. RATAJ:**  Thank you.

12   **BY MR. RATAJ:**

13   Q.  You see down there, if I could direct your attention up to

14   the screen, Mr. Soave, you can see that the contract was

15   approved by the city council on June 26, 2002.  You see that?

16   A.  Yes.

17   Q.  And you would agree with me, sir, that this signature page

18   contains Mr. Oszust from your company, from Inland Waters,

19   correct?

20   A.  Yes.

21   Q.  Wayne Lambert?

22   A.  Yes.

23   Q.  Okay.  And then a Robert Williams?

24   A.  Yes.

25   Q.  Those are all Inland people, aren't they?

*Anthony Soave - Cross*
*Thursday, December 6, 2012*                                    87

1    A.  Yes, they are.

2    Q.  And then we've got a signature by Mr. Fujita on behalf of

3    the Board of Water Commissioners, correct?

4    A.  Yes.

5    Q.  And it was approved by the law department, yes?

6    A.  Yes.

7    Q.  It was approved by the purchasing director for the City of

8    Detroit?

9    A.  Yes.

10   Q.  And then the contract was approved by the city council on

11   June 26, 2002, yes?

12   A.  Yes.

13   Q.  And you would agree with me that nowhere on this document

14   is there a signature for the mayor of the City of Detroit.

15   A.  Well --

16   Q.  Sir.

17   A.  No, I don't see the mayor's signature.

18   Q.  Thank you.

19          **A JUROR:**  Mr. Rataj, can you tell us what document

20   that is?

21          **MR. RATAJ:**  Yeah, I apologize.  DIN1-14A.

22   **BY MR. RATAJ:**

23   Q.  Do you know when Inland Waters received its

24   right-to-start-work letter from DWSD?

25   A.  No, I do not.

*10-CR-20403    USA v. Kwame Kilpatrick, et al*

*Anthony Soave – Cross*
*Thursday, December 6, 2012*

88

1          **MR. RATAJ:**  All right.  May I approach the witness,

2     Your Honor?

3          **THE COURT:**  You may.

4          **MR. RATAJ:**  And I'm almost done, just so you know.

5     **BY MR. RATAJ:**

6     Q.  Take a look at that.

7     A.  Okay.

8     Q.  Okay?  Does that refresh your recollection as to when

9     Inland Waters received its right-to-work letter regarding

10    contract 1368?

11    A.  No, it does not.

12         **MR. RATAJ:**  May I publish it, Your Honor?

13         **THE COURT:**  You may.

14         **MR. RATAJ:**  Thank you.  And for the record, this is

15    DIN1-17.

16    **BY MR. RATAJ:**

17    Q.  You would agree with me, sir, that on July 16, 2002,

18    Victor Mercado, then director of the Detroit Water and Sewer

19    Department, sent Mr. Oszust of Inland Waters Pollution Control

20    a letter regarding the start work -- regarding a start-work

21    letter for DWSD contract number 1368, correct?

22    A.  Yes, that's what it says.

23    Q.  Yes, and it also says, "This letter is to confirm that the

24    city council awarded Inland Waters Pollution Control the above

25    named contract on June 26, 2002."

*10-CR-20403    USA v. Kwame Kilpatrick, et al*

*Anthony Soave - Cross*
*Thursday, December 6, 2012*                          89

1          That was the signature document I just showed you,

2     okay?

3     A.  Yes.

4     Q.  All right.  "The start-work date for project services on

5     Detroit Water Sewerage Department(DWSD) contract number CS-1368

6     has been established as July 19, 2002.  The completion date for

7     this contract will be July 19, 2005."

8          Do you see that?

9     A.  Yes.

10    Q.  So would you agree with me, sir, that it was the city

11    council who needed to approve that contract, not the mayor of

12    the City of Detroit?

13         **MR. BULLOTTA:**  Object, that calls for speculation.

14         **MR. RATAJ:**  All right.  I'll withdraw the question.

15    The documents speak for themselves.

16    **BY MR. RATAJ:**

17    Q.  If I may, you would agree with me, Mr. Soave, that from the

18    bid date of August 25, 2001 -- I'm sorry -- October 25, 2001

19    through July 16, 2002 is about nine months, correct, would you

20    agree with me, roughly?

21    A.  Yes.

22    Q.  So from the time that Inland Waters outbid Lanzo

23    Construction on two $25 million contracts which ultimately

24    became one $50 million contract, it was approved nine months

25    later, isn't that true?

*10-CR-20403   USA v. Kwame Kilpatrick, et al*

*Anthony Soave - Cross*
*Thursday, December 6, 2012*

90

1    A.   That's what it said, yes.

2    Q.   That's what it says, okay.  Do you know how many amendments

3    there were to contract 1368?

4    A.   No.

5            **MR. RATAJ:**  May I approach the witness, Your Honor?

6            **THE COURT:**  If this witness has no knowledge of

7    the -- I mean, you can ask if it refreshes his recollection,

8    but if he has no knowledge of the course of the contract and

9    its amendments, then you're going to have to wait and do that

10   with Ms. McCann when she comes in.

11           **MR. RATAJ:**  All right.  Well, let me just see if it

12   helps, okay?

13           **THE COURT:**  Okay.

14           **MR. RATAJ:**  I'm showing the witness DIN1-20.

15   A.   No.

16   **BY MR. RATAJ:**

17   Q.   Doesn't refresh your recollection?

18   A.   No.

19           **MR. RATAJ:**  It is in evidence, Your Honor.  May I

20   publish it?

21           **THE COURT:**  To what end?

22           **MR. RATAJ:**  To show how many amendments there were

23   and the total amount of the contract.

24           **MR. BULLOTTA:**  I would object as being cumulative

25   and this witness has no knowledge.

*10-CR-20403   USA v. Kwame Kilpatrick, et al*

1           **MR. RATAJ:**  Well, he runs --

2           **THE COURT:**  I'll let you use that one document and

3   then you need to move on.

4           **MR. RATAJ:**  All right.  Your Honor, thank you.

5           Mr. Soave, thank you very much.  I have no further

6   questions.

7           **THE COURT:**  Any other cross?  Mr. Gurewitz.

8                                        (11:23 a.m.)

9                        **CROSS EXAMINATION**

10  BY MR. GUREWITZ:

11  Q.  Good morning, Mr. Soave.

12  A.  Good morning.

13  Q.  We met in the hallway briefly yesterday afternoon, I'm

14  Harold Gurewitz, and I'm here on behalf of Mr. Kilpatrick,

15  Kwame Kilpatrick.  Ask you some questions?

16  A.  Yes, sir.

17  Q.  Okay.  If there's anything I ask you that you have -- that

18  you don't understand, please let me know.

19          **A JUROR:**  Please spell your last name.

20          **MR. GUREWITZ:**  Sure, G-u-r-e-w-i-t-z.

21          **A JUROR:**  Thank you.

22  BY MR. GUREWITZ:

23  Q.  I'm going to try not to go back over the same area of

24  questions that Mr. Rataj asked you about.  There's some things

25  I want to fill in some spaces on, however, so going back to the

*Anthony Soave - Cross*
*Thursday, December 6, 2012*                                    92

1    beginning of your testimony yesterday and your cross
2    examination today, it's pretty clear that you've said that you
3    are a pretty modest man with regard to your accomplishments, is
4    that right?
5    A.  Yeah, I don't know.  Did I say that?  I --
6    Q.  Well, maybe what you said was --
7    A.  I don't brag about what I do, if that's what you mean.
8    Q.  Well, that's one part of what I mean, thank you.
9    A.  Okay.
10   Q.  Yeah.  You were asked what you do and you said you own some
11   companies, right?
12   A.  Yes.
13   Q.  That's just the way you present yourself, isn't that true?
14   A.  I guess so, yeah, yes.
15   Q.  That's what you testified to here yesterday when
16   Mr. Bullotta asked you some questions about what it is that you
17   do?
18   A.  Yes.
19   Q.  And, in fact, when you appeared in front of the grand jury
20   back in 2010, you were asked a similar question and your answer
21   was almost the same, "I own some companies," right?
22   A.  Yes.
23   Q.  Another part of who you are that you told us about earlier
24   this morning is that you're a loveable guy, at least to your
25   grandchildren, right?

*Anthony Soave - Cross*
*Thursday, December 6, 2012*                        93

1   A.  Yes.

2   Q.  Okay.  You've testified here this morning about many

3   different businesses that you own or that you have owned.  Just

4   want to ask you about a little bit more of your background.

5   You grew up in Detroit, didn't you?

6   A.  Yes.

7   Q.  And your father owned a grocery store on the east side of

8   Detroit?

9   A.  Yes, he did.

10  Q.  And so when you started working, you got into business with

11  a truck and a trailer and bulldozer?

12  A.  Yes.

13  Q.  What kind of business was that?

14  A.  It was a grading business, you know, lots, little corners.

15  I would do grading work, haul sand, a load of sand in.

16  Q.  About when was that?

17  A.  I don't know, '60s.

18  Q.  Okay.  There are a few more things I'm going to touch on

19  about some of your businesses as we go through the details, but

20  I'll try to make them more specific to the particular things

21  I'm going to ask you about on behalf of Kwame Kilpatrick.

22          In these businesses, you began at some point in your

23  career doing work with the City of Detroit or for the City of

24  Detroit, isn't that right?

25  A.  Yes.

*10-CR-20403   USA v. Kwame Kilpatrick, et al*

*Anthony Soave - Cross*
*Thursday, December 6, 2012*

94

1    Q.  About when was that?

2    A.  I believe it was, I think it was '74.

3    Q.  Do you remember what company it was that you had at that

4    time?

5    A.  I bought a company that was, that had a contract in the

6    city.

7    Q.  Which company, do you remember?

8    A.  It was called Sanitas.

9    Q.  Okay.  At some point you became the owner of another

10   company called City Management?

11   A.  Yes.

12   Q.  And that company also had contracts with the City of

13   Detroit?

14   A.  That's the company that bought Sanitas that had a contract

15   with the city.  They had a contract with a transfer station and

16   a landfill.

17   Q.  What department were you dealing with then?

18   A.  I think it was DPW.

19   Q.  Is that the first time you met Mr. Williams, Charlie

20   Williams?

21   A.  After that, after, a little while after that, but that's

22   during that period he worked there.

23   Q.  You've known him since that time?

24   A.  I've known him, I think, a couple years after '74.

25   Q.  So sometime in the early '70s, is that right?

*10-CR-20403    USA v. Kwame Kilpatrick, et al*

*Anthony Soave - Cross*
*Thursday, December 6, 2012*

95

1    A.  No, I think in the later '70s, I think, or the mid '70s.

2    Q.  So from that time up to the present in this much --

3    obviously much, much bigger form of all these businesses that

4    you now control through Soave Enterprises, you're doing, still

5    doing business with the City of Detroit.

6    A.  Yes.

7    Q.  And one of the things that has been a guiding principle for

8    you in developing your businesses throughout your successful

9    career has been that it's always a good practice to be on good

10   terms with the city, right?

11   A.  Yes.

12   Q.  What do you mean by that?

13   A.  Just to do what they tell you, you know.  I mean, perform

14   your job and satisfy them.

15   Q.  All right.  And part of that is just to be a friendly

16   person, right?

17   A.  Well, I mean, by nature I'm a friendly person, but you have

18   to do the work, and I know you have to perform what you're

19   doing, they have to be happy with your work.

20   Q.  So it's good to be able to do that so that you know who to

21   talk to if there's some problem that comes up during the course

22   of the contract, isn't it?

23   A.  Would you ask that again, please.

24   Q.  Sure.  It's good to have a good friend relationship with

25   the part of the city that you're doing business with so that if

*Anthony Soave - Cross*
*Thursday, December 6, 2012*

96

1    there's an issue that comes up --

2    A.  Yes.

3    Q.  -- in carrying out the contract, you agree with that?

4    A.  Yes.

5    Q.  It is -- as you've testified this morning, the contracting

6    business in the area particularly of doing underground work

7    relating to sewers, it is a very hard, difficult area of work,

8    isn't it?

9    A.  Yes.

10   Q.  And it's competitive, as you've said, there are lots of

11   contractors who are doing the work, right?

12   A.  Yes.

13   Q.  And part of that is that you always -- do you need some

14   more water?

15   A.  Okay.

16   Q.  You always need to make sure that you're not going to have

17   difficulties with people from the city, isn't that right?

18   A.  You have to be sure you perform the work so they're happy,

19   you know.

20   Q.  Right, right.  Some of these contracts, in fact,

21   specifically provide that they can be terminated at any time at

22   the direction, at the instance of the city, right?

23   A.  I'm sure they have a clause in there.  I don't remember,

24   but I'm sure there's a clause like that in there.

25   Q.  When you get to be a contractor who specializes in this

*10-CR-20403    USA v. Kwame Kilpatrick, et al*

```
 1    kind of work and has these large contracts, you're dealing with
 2    a select number of customers.  There aren't many other
 3    customers around like the Detroit Water and Sewer Department
 4    with which you can do business, is there?
 5    A.  Yes.
 6    Q.  Well, in fact, the Detroit Water and Sewer Department has a
 7    very, very large area of southeastern Michigan in which they
 8    provide both sewage and water services, right?
 9    A.  Yes.
10    Q.  So it's a big customer, right?
11    A.  Yes.
12    Q.  So there's always reason to be concerned.  It's just a part
13    of business, isn't it?  There's always some anxiety when you
14    wake up in the morning that everything's going to go okay, is
15    that right?
16    A.  Sure, yes.
17    Q.  And if you're bidding on a contract, you're always
18    concerned, "Am I going to be the one who is going to win?"
19    Right?
20    A.  Yes.
21    Q.  Sometimes it doesn't happen?
22    A.  That's true.
23    Q.  And then once you get it, there's always concern that
24    everything's going to go okay, right?
25    A.  Yes.
```

*Anthony Soave - Cross*
*Thursday, December 6, 2012*                                98

1    Q.  That's part of work, that kind of anxiety, right?

2    A.  Yes.

3    Q.  You had contact after you met Charlie Williams with him

4    when he worked in the Detroit Water and Sewer Department,

5    didn't you?

6    A.  Yes.

7    Q.  And during some part of the time period, you remember that,

8    in fact, during the Coleman Young administration that he was

9    the director?

10   A.  Director of?

11   Q.  Of the water and sewer department?

12   A.  DWSD, yes.

13   Q.  And he was also Mayor Young's chief of staff for awhile,

14   wasn't he?

15   A.  Yes.

16   Q.  You developed a substantial amount of work with the city

17   during that time period, didn't you?

18   A.  Yes.

19   Q.  And in a way, you could say that, sort of -- you were the

20   guy, your company was doing well getting contracts with the

21   city, then, right?

22   A.  I don't know what that means.  What --

23   Q.  Okay.  Maybe I didn't ask you a good question.

24   A.  Explain.

25   Q.  Let me try to be better about that.

*10-CR-20403   USA v. Kwame Kilpatrick, et al*

*Anthony Soave - Cross*
*Thursday, December 6, 2012*

99

```
1              I'm not suggesting that you were doing anything in
2     any way wrong --
3     A.  I understand.
4     Q.  -- but you were doing well, you were successful?
5     A.  I didn't quite -- just, I mean, rephrase it.
6     Q.  Sure, thank you.  That's what I'm supposed to do.
7              You had a good relationship with the water and sewer
8     department, is that right?
9     A.  I think so.  You'd have to ask them.
10    Q.  Well, you believed you did, right?
11    A.  Yes.
12    Q.  And part of that was by doing good work, right?
13    A.  Yes.
14    Q.  Being available to answer questions?
15    A.  Yes.
16    Q.  Right?
17             About when was it that you formed Soave Enterprises?
18    A.  Gee, I don't know.  I can't remember.  I think it was after
19    I sold the waste business, I think.
20    Q.  And --
21    A.  I'm not sure.  I can't answer because I'm not sure what the
22    date is.
23    Q.  Okay.  About when was it that you sold --
24    A.  Find out.
25    Q.  -- City Management, about?
```

*10-CR-20403   USA v. Kwame Kilpatrick, et al*

*Anthony Soave - Cross*
*Thursday, December 6, 2012*

100

1    A.  But I don't know if that's when I formed Soave Enterprises.

2    I might have had Soave Enterprises before.  I think I formed it

3    after, but I'd be speculating so --

4    Q.  I'm not going to ask you to speculate because really --

5    A.  All right.

6    Q.  -- what I want to ask you to do is to tell us about what

7    your job is.  How do you describe what you do at Soave

8    Enterprises?

9    A.  Well, I kind of do what an owner does, you know.  I poke my

10   nose into things, and I know generally, I have an overview of

11   what's going on.

12   Q.  Now, poking your nose into things means you've got a lot of

13   things to look at on a regular basis.

14   A.  Yeah.

15   Q.  That's been the case going back to the time period we're

16   talking about here until at least 2001, 2002, right?

17   A.  Yes.

18   Q.  During that time period, as the owner, you would have to

19   poke your nose into things relating to not just Inland Waters

20   but into real estate, steel, and car dealerships, and all those

21   things on an ongoing basis?

22   A.  Yes, people would report to me and tell me things.

23   Q.  So with that kind of an overall responsibility, you didn't

24   usually get involved into the details, the nuts and bolts of

25   the everyday kind of decisions that would have to be made by

*Anthony Soave - Cross*
*Thursday, December 6, 2012*

101

1  Inland Waters, did you?

2  A.  No, I did not.

3  Q.  You depended, then, on the people who worked for you for

4  information, didn't you?

5  A.  Yes, I did.

6  Q.  Going back to 2001 and 2002, I think we've heard that those

7  people included Kathleen McCann?

8  A.  Yes.

9  Q.  How long had you worked with her?

10 A.  I think she was with me 20 years.

11 Q.  She's no longer with you?

12 A.  She just recently went.

13 Q.  What was her specialty that she brought to you, her special

14 area?

15 A.  She's a CPA.

16 Q.  Okay.  And she had responsibility for certain areas of the

17 businesses that you owned back in 2001 and 2002?

18 A.  Yeah, yes, and from time to time they would change from,

19 you know, overseeing something, overseeing something else, but

20 at the time she was overseeing Inland.

21 Q.  Another person that you relied upon, you mentioned his

22 name, is Yale Levin?

23 A.  Yes.

24 Q.  He's also a CPA, isn't he?

25 A.  Yes, he is.

*10-CR-20403    USA v. Kwame Kilpatrick, et al*

*Anthony Soave – Cross*
*Thursday, December 6, 2012*                        102

1    Q.  And what kind of things did you rely upon him to do for

2    you?

3    A.  Yale used to get involved -- I said previously that we were

4    small, the management group is, you know, fairly small, so we

5    would be, I mean, together on a lot of things, you know.  They

6    would move back and forth, and Yale would, I forgot what he was

7    doing at that time, but he worked with Kathleen also on Inland.

8    Q.  Okay.  You had other people that worked for you that

9    brought in contracting experience like Mr. Oszust?

10   A.  Yes, he was a field man, and the other people I'm talking

11   about, they're more administrative.

12   Q.  Inland back in 2001 and 2002 had its offices located on the

13   southwest side of Detroit, at I-75 and Schaefer?

14   A.  Yes.

15   Q.  And Soave Enterprises was located over here, just east of

16   downtown Detroit at 3400 East Lafayette, right?

17   A.  Still there.

18   Q.  Still there, okay.  And it's been there for quite a long

19   time, hasn't it?

20   A.  Yes.  Before that, it was on Frederick Street, and before

21   that it was on Harper, so it's been on the east side for,

22   forever.

23   Q.  But when we hear about what was going on at Inland and

24   what's going on at Soave Enterprises, it is important that

25   there's a distinction.  They're not even located in the same

*10-CR-20403    USA v. Kwame Kilpatrick, et al*

*Anthony Soave - Cross*
*Thursday, December 6, 2012*

103

1    place, are they?

2    A.  No, you know, no.

3    Q.  I'm not trying to --

4    A.  You're not trying to trick me, are you?

5    Q.  No, I'm not.  You didn't think I was, did you?

6    A.  No, I understand, I understand.

7    Q.  I'm not a tricky person.

8    A.  Okay, I was just kidding, by the way, so ...

9    Q.  I thought you were.

10          Okay.  So in your capacity, Mr. Soave, this is

11   really what I'm getting to here, in your capacity as the

12   executive and owner of Soave Enterprises, in order for you to

13   know about what's going on on particular matters at Inland

14   Waters back in 2001 and 2002, you would have to get briefed by

15   the people who were involved in those details like, whoever it

16   might be, Ms. McCann, Mr. Levin or Mr. Oszust, right?

17   A.  Yes.

18   Q.  And that's who you relied upon for information?

19   A.  Yes.

20   Q.  One of the contracts that we had been focused on here, and

21   that's the reason that I have to ask you some questions about

22   it, is this one referred to as 1368, and that's a contract for

23   $50 million that Inland had that was approved.  You saw a

24   document in 2002.  You were aware of that, right?

25   A.  Yes, I was.

*Anthony Soave - Cross*
*Thursday, December 6, 2012*

104

1   Q.  In your capacity, it was important, obviously, a

2   $50 million contract, no matter how big the company is, was

3   something that was important to you, isn't it?

4   A.  Absolutely.

5   Q.  But, nevertheless, you were not the person, even the

6   executive at your companies at that time, who was the guy who

7   worked through the details, everyday details of putting

8   together the documents to submit to the city, were you?

9   A.  No, I was not.

10  Q.  And you weren't the person who waited or watched for them

11  on an everyday basis to see exactly what was going on, right?

12  A.  No, I was not.

13  Q.  Those phone calls didn't come to your office, did they?  If

14  there were phone calls to Inland Waters about --

15  A.  From?

16  Q.  From anybody, from the city, from the subcontractor --

17  A.  No, no, they would come to me via Kathleen or Yale or

18  someone like that.

19  Q.  You were asked some questions, more particularly, I'm going

20  to ask you now about questions relating to Mr. Kwame Kilpatrick

21  about your first meeting with him, and tell me if I'm correct

22  about this, but your testimony was yesterday that that happened

23  sometime after he was elected in very early 2002, right?

24  A.  Yes.  I think, I think they had his schedule or something,

25  you know, I think the date was on his agenda.  I forgot what it

*10-CR-20403   USA v. Kwame Kilpatrick, et al*

*Anthony Soave - Cross*
*Thursday, December 6, 2012*

105

1    was.

2    Q.  Let me show that to you, okay.  Just so we can see what

3    this is, it's Government Exhibit INI3, and this was introduced

4    as a page from Mayor Kwame Kilpatrick's calendar, right?

5    A.  Yes.

6    Q.  And that's what you're talking about.  There's a meeting

7    there from 11:00 to 11:30 that has your name?

8    A.  Yes.

9    Q.  That's what you're referring to, right?

10   A.  Yes.

11   Q.  Well, first of all, I was going to ask you about this

12   later, but since I've got it here, this obviously is not your

13   calendar, right?

14   A.  No, it's not.

15   Q.  You had nothing to do with making it up?

16   A.  No, I don't know where it came from.

17   Q.  Okay.  And if somebody made this up to show that you were

18   scheduled to have an appointment, you don't remember the

19   specific day that you were there, do you?

20   A.  No, I do not.

21   Q.  So if, in fact, you didn't go there on that day but you

22   were written down for that day and it didn't happen, then you

23   don't know that at all, do you?  It could have been some other

24   time?

25   A.  I don't know if it was that date, but that coincides with

*Anthony Soave - Cross*
*Thursday, December 6, 2012*

```
 1    about when we were talking about.  I know I had the meeting.
 2    Q.  Well, what I was asking you about, though, was even before
 3    that time, you had a first meeting with Mayor Kilpatrick, but
 4    he came to Soave Enterprises to --
 5    A.  Yes, he did.
 6    Q.  Right?
 7    A.  Yes, he did.
 8    Q.  That was a nice thing to happen for you, wasn't it?
 9    A.  Yes.
10    Q.  You were at that time not just only a successful
11    businessman who has maintained, has kept his business presence
12    located in the City of Detroit since you started, but you were
13    also a person who was giving back to the community in a lot of
14    charitable ways, weren't you?
15    A.  Yes.
16    Q.  What were those kind of things that you've done for the
17    city?  I'm not going to ask you to give a laundry list, but --
18    A.  I don't know, I'm always donating money to some, you know,
19    city charities and --
20    Q.  If somebody has a good charity, you're a guy with a big
21    heart and they come to see you, right?
22    A.  I have been, yes.
23    Q.  Okay.  And you're also, because of your success, you're a
24    guy who has also been active in supporting candidates in
25    political campaigns, right?
```

*10-CR-20403   USA v. Kwame Kilpatrick, et al*

*Anthony Soave - Cross*
*Thursday, December 6, 2012*                                    107

1    A.  Yes.

2    Q.  And it was known at the time that Mayor Kilpatrick came to

3    see you that, in fact, you had supported his opponent,

4    Gil Hill, right?

5    A.  Yes.

6    Q.  So he came to see you and you just talked a little bit to

7    get to know each other, right?

8    A.  Yes.

9    Q.  And did you believe that that was a good thing for you to

10   be able to know the mayor of the City of Detroit on a

11   first-name basis?

12   A.  Yes.

13   Q.  How was the meeting?

14   A.  It was a pleasant meeting and we joked around a little bit

15   and it was, it was -- I don't think it was very long but, you

16   know.

17   Q.  You've got a pretty good sense of humor, don't you?

18   A.  Yes.

19   Q.  We've seen a little bit of it here today --

20   A.  Yes.

21   Q.  -- or yesterday.

22   A.  It was mostly the previous guy, what's his name.  He was

23   really the funny guy.

24   Q.  And you found Mr. Kilpatrick to be an easy person to talk

25   to as well?

*10-CR-20403    USA v. Kwame Kilpatrick, et al*

*Anthony Soave - Cross*
*Thursday, December 6, 2012*

1    A.  Yes.

2    Q.  Before you met with him, you had heard good things about

3    him, hadn't you?

4    A.  Yes.

5    Q.  You talked to Governor Engler about him, didn't you?

6    A.  Yes.

7    Q.  And you heard good things, right?

8    A.  Yes.

9    Q.  You talked to Ed McNamara who was the county executive at

10   that time and heard good things?

11   A.  Yes.

12   Q.  You had hopes, because you're a Detroiter in your business,

13   that there would be good things happening in the city, right?

14   A.  Yes.

15   Q.  And you wanted to be part of it.

16   A.  I was a city guy, and I've been here a long time and my

17   business has been here forever.

18   Q.  So when you got to this later date on April 23rd, 2002, or

19   whenever it happened, you don't have the specific memory, you

20   weren't just going to visit a stranger, were you?

21   A.  Well, I met him one time.

22   Q.  You had met him one time?

23   A.  I didn't know him before that.

24   Q.  Right.  Okay.  But when you went up to his office to see

25   him, it wasn't like you were knocking on a door cold to the

1    executive, to the mayor of the City of Detroit who you had

2    never met and you're the businessman who, who was out there

3    supporting his opponent, Gil Hill?

4    A.  Well, I mean, I called, and he accepted an appointment with

5    me so ...

6    Q.  Okay.  This meeting that happened at the mayor's office

7    that you talked about is something that you testified about

8    when you appeared in the grand jury back in March of 2010,

9    isn't it?

10   A.  Yes.

11   Q.  And you've read over your grand jury testimony before you

12   came here, right?

13   A.  Yes.

14   Q.  But when you were called into the grand jury to testify

15   about it, it wasn't a topic that had come up in your life

16   except for whenever you found out that you'd have to testify, I

17   suppose.  It was eight years earlier, right?

18   A.  Yes.

19   Q.  And so did you go back and look to see if you had any notes

20   about that meeting?

21   A.  No, no, but it was just -- it was one subject I went there

22   for so, no, I didn't have any notes.

23   Q.  Okay.  You didn't.  Did you have any other kind of record

24   of what happened on the day that you had that meeting?

25   A.  You mean written down?

1    Q.  Yeah.

2    A.  No.

3    Q.  Okay.  Before you went to the meeting, you did communicate

4    with the people who worked for you, like Ms. McCann and

5    Mr. Levin, to find out what the issues were, right?

6    A.  They were filling me in, you know, telling me to go.  They

7    said, "We better go find out what's wrong."

8    Q.  Without the information from them, you really wouldn't have

9    been prepared to talk to Mayor Kilpatrick, would you?

10   A.  No, I mean, no, they're the ones that would fill me in on

11   what's going on at Inland.

12              **MR. GUREWITZ:**  What's the next exhibit?

13              **MR. RATAJ:**  Let's go DIN1-32.

14              **THE COURT:**  This is a new exhibit, Mr. Gurewitz?

15              **MR. GUREWITZ:**  There are two of them, DIN1-32 and

16   33.  Just for the record, Your Honor, I'd move their admission.

17              **MR. BULLOTTA:**  No objection.

18              **THE COURT:**  Received.

19              (Defendants' Exhibits DIN1-32 and DIN1-33

20              received into evidence.)

21              **MR. GUREWITZ:**  If I may, Your Honor, I'd like to

22   provide the witness with copies of each of these.

23              **THE COURT:**  Sure.

24   **BY MR. GUREWITZ:**

25   Q.  I put two documents in front of you, Mr. Soave, and they

1    have dates on them.  One is March 14, and the other one is

2    March 22nd.  To make it clear, let's do it in order of the

3    dates.  Let's start on March 14th.  First of all, that -- I'll

4    put it up here as well so the jury can see it.

5            Can you see that?  All right.  So, first of all,

6    it's in the form of a letter with the address being to

7    Honorable Kwame Kilpatrick, is that right?

8    A.  Uh-huh, yes.

9    Q.  And on the second page down at the very bottom is a

10   signature box for Anthony Soave, do you see that?

11   A.  Second page?

12   Q.  Yes, at the bottom where there's a space for signature.

13   A.  Yeah.

14   Q.  And this one isn't signed, is it?

15   A.  Yes.

16   Q.  That's a yes, it's not signed?

17   A.  It's not signed.

18   Q.  Okay.  The topics covered by this letter begin with an

19   introduction that says, "Dear Mr. Mayor, as a follow-up on your

20   conversation with Kathleen McCann, I'm writing to request a

21   meeting with you to discuss a number of issues."  Do you see

22   that?

23   A.  Yes.

24   Q.  And the first one, it says, "First," there's a discussion

25   of your company's commitment to the city, do you see that?

1   A.  Yes.

2   Q.  And it refers down a little bit farther to something

3   called, our use of advertising for something called Cops, Kids,

4   Clean Initiative, do you see that?

5   A.  Yes.

6   Q.  All right.  At that time, one of the companies that you

7   were operating was Checker taxi or sedan?

8   A.  Yes.

9   Q.  And do you recall that your company did make available

10  advertising space that wasn't being used?

11  A.  Yes.

12  Q.  Tell us about that, please.

13  A.  Well, they have signs, I mean, cabs have signs on them, and

14  I think they offered -- I don't remember this, you know, but

15  it's a long time ago, but I know the cab has signs.  We

16  offered -- I don't remember this, this memo.

17  Q.  Okay.  But one of the things that your company did at that

18  time was to make space available that wasn't being sold for

19  advertising to advertise city programs, is that right?

20  A.  We made it available.

21  Q.  To use for advertising the city programs that

22  Mayor Kilpatrick was promoting?

23  A.  I mean, that's what this says.  I mean, I don't remember

24  this, so I'm just telling you that.

25  Q.  Okay.  The second topic here concerns a company called

*Anthony Soave - Cross*
*Thursday, December 6, 2012*

1   Strong Steel Products.  Do you see that?

2   A.   Yes.

3   Q.   Could you tell the ladies and gentlemen of the jury what

4   that company was at that time?

5   A.   Strong Steel is a scrap processing facility.

6   Q.   It's a company that would take in abandoned cars --

7   A.   Yes.

8   Q.   -- and crush them, right?

9   A.   Yes.

10  Q.   And sell the metal for scrap?

11  A.   Yes.

12  Q.   One of the issues that there is in that particular kind of

13  business is that often cars have oil and gas in them, and

14  that's a problem when you're crushing them, right?

15  A.   Yes.

16  Q.   And about that time, do you remember that your company had

17  a problem with getting a citation or a fine because of that

18  kind of issue?

19  A.   Yes.

20  Q.   And you needed some help with the city to try to put in a

21  good word for your company to get that worked out with the EPA,

22  right?

23  A.   Yes.

24  Q.   And that's what this letter refers to, at the top of the

25  next page, isn't it, where it says, "We need Detroit's active

*10-CR-20403   USA v. Kwame Kilpatrick, et al*

*Anthony Soave - Cross*
*Thursday, December 6, 2012*                          114

1    and enthusiastic endorsement of the project to the U.S. EPA

2    which is considering the project as settlement of an

3    outstanding compliance issue."  Right?

4    A.  Yes.

5    Q.  And that compliance issue, in fact, was one where the

6    government, the federal government was asking your company to

7    pay hundreds of thousands of dollars --

8    A.  Yes.

9    Q.  -- to rectify this problem.

10   A.  And we did.

11   Q.  And you did.  And it's a problem that you tried to work out

12   and you couldn't because it's just an inherent part of that

13   kind of business, right?

14   A.  Yes.

15   Q.  So that was a topic addressed here, and the second one

16   refers to a contract that was ongoing that came to, it was one

17   that Inland had before the 1368 that Mr. Rataj asked you

18   questions about this morning for similar kind of work, or the

19   same work, in fact, that was coming to an end and there was a

20   problem with not getting paid, right?

21   A.  Well, I mean, I mean, I don't remember these things, so are

22   you asking me, do you just want me to read them?

23   Q.  No, let me -- I'm not trying to ask you for things you

24   don't remember, Mr. Soave.

25   A.  Well, I don't remember these.

*Anthony Soave - Cross*                                    115
*Thursday, December 6, 2012*

1    Q.   Okay.  But, in fact, that was the kind of thing that your

2    company would, with the assistance of others, ask you to bring

3    to the attention of the city to take care of these problems,

4    right?

5    A.   Yes.

6    Q.   And so we get down here to the last item, DWSD contract

7    1368, and that is the one that you eventually testified that

8    you went to see the mayor about?

9    A.   Yes.

10   Q.   And this says that, "This is the new contract which Inland

11   Waters was recently awarded and which will replace CS-1325."

12   Do you see that?

13   A.   Say that again.

14   Q.   Sure.  I'm reading from the paragraph under this heading

15   that says "DWSD Contract 1368."

16   A.   Yes.

17   Q.   It says, "This is the new contract which Inland Waters was

18   recently awarded and which will replace CS-1325."

19          Do you see that?

20   A.   Yes.

21   Q.   If somebody in your company prepared that for you at that

22   time --

23   A.   Yes.

24   Q.   -- you would expect that to be correct even if you don't

25   have the memory now, right?

*10-CR-20403   USA v. Kwame Kilpatrick, et al*

*Anthony Soave - Cross*
*Thursday, December 6, 2012*                                    116

1    A.  Yes.

2    Q.  And it goes on to say, "After a competitive bid, Inland's

3    proposal which provides substantial savings to DWSD, was

4    approved by the Board of Water Commissioners."

5    A.  Yes.

6    Q.  And then the last sentence in that paragraph is,

7    "Similarly, it is our understanding that the mayor's office may

8    have some questions regarding the contract which we may be able

9    to answer."

10            Did I read that correctly?

11   A.  Yes.

12   Q.  This was all information that somebody working for Soave

13   Enterprises put together in the form of a letter for you to

14   send to the mayor's office, isn't that right?

15   A.  Yes.

16   Q.  And that's an alternative, isn't it, to going to personally

17   visit the mayor, right?

18   A.  Yes.  I don't, I don't remember doing this.  I know when I

19   went there I just had this contract.  On these other items, I

20   don't remember.

21   Q.  Well, if, in fact, that meeting happened --

22   A.  Yeah, I don't know.  This -- I don't know if this was sent.

23   I really don't know --

24   Q.  Okay.  Well --

25   A.  -- or if they typed it up for me.  That's why I'm kind of

*Anthony Soave - Cross*
*Thursday, December 6, 2012*

117

1    at a little --

2    Q.  I'm not trying to ask you to --

3    A.  Okay, all right.

4    Q.  -- testify about anything you can't remember, Mr. Soave,

5    but if this letter was prepared for you back on March 14, and

6    if that meeting happened on April 23rd, this is about five

7    weeks before you went to see the mayor.

8    A.  Okay.

9    Q.  And all somebody at your company prepared in a letter for

10   you to say was that maybe the mayor's office had some questions

11   that needed to be answered, right?

12   A.  Okay.

13   Q.  And you would expect that if somebody in your company

14   prepared a letter like this for you to consider sending, they

15   would have done it accurately, right?

16   A.  I would assume so.

17   Q.  Okay.  Now, you have in front of you also --

18   A.  See, I don't know who even prepared this.

19   Q.  I'm sorry?

20   A.  I don't know who prepared this.

21   Q.  Okay.  Whoever actually prepared it didn't put the initials

22   down at the bottom, but maybe this will help you a little bit.

23   I'd like to show you the next one here which is DIN-33.  Do you

24   see that?

25   A.  Yes.

```
 1    Q.  Up there, you have a copy of it right in front of you.
 2    A.  Yes.
 3    Q.  And it says up at the top, "Memo," and that's addressed to
 4    you from Susan L. Johnson, do you see that?
 5    A.  Yes.
 6    Q.  Who is she?
 7    A.  She is an attorney that worked for us.
 8    Q.  She was obviously working for you back on March 22, 2002,
 9    wasn't she?
10    A.  Yes.
11    Q.  What kind of responsibilities did she have working for your
12    company as an attorney at that time?
13    A.  She was like -- she helped us with contracts and she's an
14    environmental attorney.
15    Q.  What do you mean by "she helped us with contracts"?
16    A.  Well, she would have -- she would do more than just one
17    thing.  She was an attorney and helped us with legal matters.
18    Q.  So if there were legal issues that came up concerning
19    contracts that your companies had, she was the person who could
20    get involved, right?
21    A.  She would be one that would be get involved, yes.
22    Q.  The date on that last one I showed you, that letter was
23    March 14, remember that?
24    A.  Yes.
25    Q.  And this one is a memo, and it's dated March 22nd, eight
```

1    days later, right?

2    A.   Yes.

3    Q.   And the issues here are described up at the top, the

4    subject, do you see what those are?  It's right on the paper

5    you have in front of you where it says, "Subject DWSD-1325."

6    A.   Yes.

7    Q.   And "CS-1368," right?

8    A.   Yes.

9    Q.   This doesn't refer to the matter concerning the Strong

10   Steel Products, but otherwise it refers to the two contract

11   matters that were in the subject of that letter, right?

12   A.   Yes.

13   Q.   Okay.  I'd like to go through a couple points relating to

14   this.  And it says that, as to 1325, it says that "Contract has

15   run out of money and there is still urgent work DWSD needs done

16   before the new contract CS-1368 will kick in."

17            **A JUROR:**  Can you slide it up so we can see?

18            **MR. GUREWITZ:**  Sure, happy to.  Okay.  Is that

19   better?

20            **A JUROR:**  Yes, thank you.

21   **BY MR. GUREWITZ:**

22   Q.   And that says, goes on, "We have already exceeded the

23   contract amount by $700,000 and have identified -- and have

24   identified by DWSD for another 3.5 million."

25            Do you see that?

*Anthony Soave - Cross*
*Thursday, December 6, 2012*

120

1   A.  Yeah.

2   Q.  And it says that the amendment for 7 million was approved

3   by the Board of Water Commissioners and is supposedly being

4   held up in the mayor's office.  Do you see that?

5   A.  Yes.

6   Q.  And Miss Johnson was a pretty good attorney, wasn't she?

7   A.  Yes.

8   Q.  She wouldn't give you information that she didn't believe

9   to be absolutely factual, right?

10  A.  Supposedly be -- so obviously, she heard it from, she heard

11  that from someone.

12  Q.  Right.  She didn't tell you who she heard it from, right?

13  A.  No.

14  Q.  But she used -- you read it and you're the person who it's

15  addressed to.  I mean, she said "supposedly" because it just

16  was information that came from somebody, right?

17  A.  Yeah.

18  Q.  And it says, "We don't know why this one is being held up

19  as Charlie is not involved."

20          Did you have discussions at Soave Enterprises up to

21  that time that you can remember, if you do, that maybe there's

22  some issue about these contracts because Charlie Williams is

23  associated with 1368?

24  A.  I mean, I don't recall.  I wouldn't be surprised, but I

25  don't recall.

*10-CR-20403    USA v. Kwame Kilpatrick, et al*

*Anthony Soave - Cross*
*Thursday, December 6, 2012*

121

1    Q.  No, I'm only asking for what you remember.

2    A.  I don't recall.

3    Q.  And then it says, "We have heard through several sources,"

4    you see that?

5    A.  Yes.

6    Q.  And further down the paragraph where I've got it

7    highlighted, it says, "Procedurally, Gary Fujita, acting deputy

8    director of DWSD, was going to talk to the mayor yesterday."

9    Do you see that?

10   A.  Yes.

11   Q.  Based upon all of your experience up to that time,

12   Mr. Soave, was it really the case that these contract matters

13   are really intense, aren't they, because so much is at stake,

14   right?

15   A.  Uh-huh, yes.

16   Q.  And everybody is talking about what's going on?

17   A.  Uh-huh.

18   Q.  And that's also just sort of the nature of the kind of

19   relationship that exists between a contractor trying to get

20   things settled with the city until it's done, signed, sealed,

21   and delivered, everybody's anxious, right?

22   A.  Yes.

23   Q.  So Miss Johnson is reporting to you on things that have

24   been supposedly heard from other people, right?

25   A.  Yes.

*Anthony Soave - Cross*
*Thursday, December 6, 2012*                                    122

1    Q.  And this information was then something provided to you so

2    you could understand what was going on before you went to see

3    the mayor, right?

4    A.  Yes.

5    Q.  In the next paragraph --

6    A.  I would assume that's why this -- you know --

7    Q.  It certainly looks like it, doesn't it?

8    A.  Yeah.

9    Q.  The timing's right, isn't it?

10   A.  Well, I mean, my meeting with the mayor was when?

11   Q.  Well, the calendar says --

12   A.  Calendar.

13   Q.  -- that's April 23rd.  But you don't remember the exact

14   date, right?

15   A.  No, and I don't remember this either so ...

16   Q.  Okay.

17   A.  I don't remember any of it, so we're talking about things

18   that I don't remember.

19   Q.  Okay.  I appreciate your candor.

20   A.  Okay.

21   Q.  Yeah, that's what we want to hear.

22          It goes on to say in the next paragraph about 1368,

23   and the second sentence I've highlighted, it's up on the

24   screen, "Again, we are being told through our sources that it

25   has to do with Charlie and these other supposedly 'more

*10-CR-20403   USA v. Kwame Kilpatrick, et al*

1  deserving' minority contractors."

2              Do you see that?

3  A.  Yes.

4  Q.  And "our sources," is it the case that the people who

5  worked on a day-to-day basis interact with the people in the

6  DWSD, the water department, have, talk about this kind of

7  stuff, right?

8  A.  There's a lot of talk.

9  Q.  Lot of talk all the time, right?

10 A.  All the time.

11 Q.  And that's probably what, if you know, and I'm not asking

12 you to guess, that's certainly the kind of thing that you would

13 get reports on when this kind of matter would filter up to your

14 level at 3400 East Lafayette, right?

15 A.  Sometimes it wouldn't even get to me, but these are the

16 kind of things I would get.

17 Q.  This paragraph goes on to say that, Miss Johnson says that

18 she has, "Already called Gerarda McCarthy, the mayor's liaison

19 with the city with the council, and she said Derrick Miller

20 never heard of these contracts."

21 A.  Yes.

22              **A JUROR:**  Could you please pull that over.

23              **MR. GUREWITZ:**  Okay.  It's becoming more than just a

24 problem with my deficient coordination.

25              **THE COURT:**  Well --

*Anthony Soave - Cross*
*Thursday, December 6, 2012*

124

1          **MR. GUREWITZ:**  Is that better?

2     **BY MR. GUREWITZ:**

3     Q.  It says, "She said that Derrick Miller never heard of these

4     contracts(which is a lie-Gary Fujita has spoken to him)."

5          Do you see that?

6     A.  Yes.

7     Q.  And this is also the kind of information that in this

8     situation would get reported back to you, right?

9     A.  Yes.

10    Q.  And that comes from reports that filter down through people

11    like Ms. McCann to people like to Mr. Oszust who talked to the

12    people in the water department, right?

13    A.  Yes.

14    Q.  And then it says, "The DWSD staff is suggesting that if it

15    isn't cut loose soon, it may have to be rebid."

16         Do you see that?

17    A.  Yes.

18    Q.  What does that mean to you?

19    A.  That's what it says, I don't know.

20    Q.  Well, let me ask the question differently.  If it would

21    have gotten to the point of having to be rebid, that would be a

22    problem for your company, right?

23    A.  I guess it would have been a problem for these guys at the

24    water board, too.  It seems like they want it to happen, so,

25    yeah, yes.

1    Q.  Well, going back to what had happened, the contract, this
2    1368 had been bid originally back in October of 2001?
3    A.  Yeah.
4    Q.  And it went through processes up to the end of December of
5    2001, right?
6    A.  Uh-huh.
7    Q.  The election happened in November of that year?
8    A.  Yes.
9    Q.  And get to the end of December and the city council goes on
10   vacation, doesn't it?
11   A.  Yes.
12   Q.  And so at the beginning of January of 2002, there's a new
13   administration, right?
14   A.  Yes.
15   Q.  And one of the things that you would have expected to
16   happen was that the new administration would step back and look
17   at the contracts that are before it that still are waiting to
18   be approved, right?
19   A.  Yes.
20   Q.  So there was reason for your company to be concerned that
21   maybe you might have to go back and start over again, right?
22   A.  Yes.
23   Q.  And that's a reason that Ms. Johnson would have brought
24   this to your attention, isn't that true?
25   A.  Yes.

*Anthony Soave - Cross*
*Thursday, December 6, 2012*

126

1    Q.  And it says, in fact, at the very bottom of that paragraph,

2    "We have already invoiced $291,250 for bonds and insurance for

3    this job."  That refers to 1368?

4    A.  Eight, yes.

5    Q.  That's the contract that hasn't been approved yet, isn't

6    that right?

7    A.  I --

8    Q.  According to what you've seen?

9    A.  Yeah.

10   Q.  And that's a little bit unusual, isn't it, to send in an

11   invoice to the city department and charge an administrative

12   contract before the city council approves it?

13   A.  It would be.  I don't understand this, so it probably would

14   be helpful if you asked Susan Johnson why she wrote this, not

15   me.  I don't even remember this, you know what I mean?  This

16   is --

17   Q.  Well, it's helpful for me to know, for us to hear that from

18   you, Mr. Soave.

19   A.  I see so many memos.  You ask me about a memo ten years

20   ago, I --

21   Q.  And then it finally says in that paragraph, "Also, without

22   a signed contract, Insituform has not rebonded to us and our

23   bonding ability is limited for other work."

24          That company referred to there, Insituform, it was

25   working with you on doing the sewer relining, is that right?

1   A.  Yes.

2   Q.  So your relationship with them was something that was at

3   stake at that time, as well, right?

4   A.  I assume, yes.

5   Q.  And a conclusion, Mr. Soave, then, is written there in this

6   memo to you by Mrs. Johnson.  Could you read that please, for

7   the ladies and gentlemen?

8   A.  "We basically need to know what are the issues and what do

9   we have to do to get them to send the contracts on through the

10  city council."

11  Q.  So this happened, then, if these dates are correct, that

12  this was actually prepared on March 22nd, and if you really had

13  a meeting on April 23rd, this was about one month before you

14  went to the mayor's office to speak with them.

15  A.  Yes.

16  Q.  And I respect that your present memory isn't so good about

17  the details, but do you remember at the present time

18  conversations that you had with Ms. McCann or Mr. Levin about

19  these issues between about that time and up to the time you

20  went to see the mayor?

21  A.  No, I do not.

22              **THE COURT:**  Let's take a five-minute break.

23              (Jury out 12:15 p.m.)

24              (Recess taken 12:15 p.m. until 12:27 p.m.)

25              (Jury in 12:27 p.m.)

*Anthony Soave - Cross*
*Thursday, December 6, 2012*

128

1          **THE COURT:**  Be seated.

2          Mr. Gurewitz.

3   **BY MR. GUREWITZ:**

4   Q.  Right before we broke, Mr. Soave, I put up this Exhibit

5   DIN1-14A, and this is the signature page from the agreement,

6   and the, you see there, the bottom where it says, "This

7   contract was approved by the city council on June 26, 2002"?

8   A.  Yes.

9   Q.  And there is no signature of Kwame M. Kilpatrick on this

10  page, is there?

11  A.  No.

12  Q.  Would it be better if I show it to you directly instead of

13  on the screen?

14          **THE COURT:**  Mr. Gurewitz, he's already testified to

15  this.

16          **MR. GUREWITZ:**  I understand, Your Honor.

17  **BY MR. GUREWITZ:**

18  Q.  Did you understand as part of the contracting process at

19  that time, Mr. Soave, that the finance department of the city

20  worked for the city council?

21  A.  No.

22  Q.  Did you have a specific understanding at that time about

23  the procedural details that needed to be followed in order for

24  a contract to be, to get to the point where it gets the

25  approval by the city council?

*10-CR-20403   USA v. Kwame Kilpatrick, et al*

1    A.  No.

2    Q.  So when you had this conversation with the mayor on

3    April 23rd or whenever it happened -- first of all, as you've

4    testified here today, this is a long time ago, and you have

5    some difficulty with remembering specific details, don't you?

6    Is that true?  I'm sorry?

7    A.  Well, I don't have dementia, if that's where you're headed.

8    I mean, I'm telling you that I don't remember these memos.  I

9    get memos and memos and memos.  This is ten years ago.  I

10   remember what I went to see the mayor about.  I didn't forget

11   that.

12   Q.  Okay.  What I'm asking you about is a little more specific.

13   A.  I don't know the process, you asked me about the process,

14   and I don't know.  I should, but I don't.

15   Q.  We're not here to grade you for --

16   A.  Okay, all right.  I'm glad of that.

17   Q.  What I asked you, Mr. Soave, wasn't about the process.  My

18   last question to you was with regard to your memory of what

19   happened when you went to the mayor's office to talk with him,

20   and what I had asked you was, your memory about the details

21   aren't so good, are they?

22   A.  My memory about when I went to see him, I asked him what

23   the holdup was on the contract, and I mean, that was my mission

24   when I went there, so that's why I remember distinctly.

25   Q.  And what you believed from what you had heard before you

*Anthony Soave - Cross*
*Thursday, December 6, 2012*

130

1   went there in preparation for this was that the contract was

2   sitting on the mayor's desk, right?

3   A.  Yes, that's what I heard.

4   Q.  And if that wasn't true because the procedures that you

5   didn't know about didn't really require that, then you would

6   have been just wrong about that aspect of the reason for your

7   meeting, right?

8   A.  I know, but then when I asked the mayor why it was held up,

9   why would he tell me because I have the wrong contractor?  He

10  was acting like he knew it was held up.

11         So I'm just telling you that's the way it went.

12  When I went there, I asked him why it was held up.  He said I

13  had the wrong contractor and he told me to use Mr. Ferguson.

14  Q.  Let me ask you the question that I started with here when

15  we got back from the break.

16  A.  Okay.

17  Q.  And that, Mr. Soave, is about the contents of the meeting

18  that you had at the mayor's office.  You've told us that you

19  remember why you went there.  What I asked you was how good

20  your memory is about all the words that were said during that

21  meeting.

22  A.  I can only tell you what I remember when I --

23  Q.  No, I'm only asking you --

24  A.  The words --

25         **MR. BULLOTTA:**  Your Honor, I'm sorry, can he let him

1    answer the question?

2              **MR. GUREWITZ:**  But he's not answering my question,

3    Your Honor, I'm asking him only about how good his memory is,

4    not what he remembers.

5              **THE COURT:**  And he started to say, "I can only tell

6    you what I remember."  Finish your answer, Mr. Soave.

7              **MR. BULLOTTA:**  Thank you, Your Honor.

8    A.  I can only tell you what I remember.  When I left there, I

9    knew what I had to do, and I had to change contractors.  That's

10   what I was told, okay, and that's what I did.

11             **THE COURT:**  Mr. Soave, that's not the question he

12   asked.  He wants to know if you remember the specific words and

13   the specific sentences that were exchanged back and forth

14   between you and the mayor.

15             **THE WITNESS:**  No, I do not.

16             **THE COURT:**  Okay.

17   **BY MR. GUREWITZ:**

18   Q.  Now, before you'd come here to testify, you, in the course

19   of times that you've had to remember about this, you first had

20   your appearance in the grand jury back in 2010, isn't that

21   right?

22   A.  Yes.

23   Q.  And then since that time, you've been given the transcript

24   of that testimony to review before you come here, right?

25   A.  Yes.

*Anthony Soave - Cross*
*Thursday, December 6, 2012*

1   Q.  And you've talked about this topic with other people

2   like -- and I'm not suggesting anything wrong with doing that,

3   that's the right of witnesses to talk with people.  You've gone

4   over it with others in advance, haven't you?

5   A.  I've read it over a couple times, yes.

6   Q.  And one of the things that is said when you talked about it

7   was that you don't remember the words, right?

8   A.  I just said that I don't remember the exact words.

9   Q.  Okay.  And one of the other things that you said to the

10  grand jury was that the mayor never said to you to use any

11  specific contractors, isn't that right?

12  A.  Said what?  Say that again?

13  Q.  The mayor never said that if you don't use a particular

14  contractor, you won't get the work, right?

15  A.  He did not say that.

16  Q.  Let me show you --

17          **MR. GUREWITZ:**  I thought the advantage of putting it

18  in the notebook, Your Honor, would be easier to get to, but

19  it's harder to get to the page.  Page 72.

20  **BY MR. GUREWITZ:**

21  Q.  Mr. Soave, I'm just going to ask you to read to yourself

22  this at Lines 6 through 11.

23  A.  Okay.

24  Q.  I'll ask you another question.  The question I asked you a

25  moment ago I'm going to attempt to ask again, and that is that

*10-CR-20403   USA v. Kwame Kilpatrick, et al*

*Anthony Soave - Cross*
*Thursday, December 6, 2012*                                    133

1   what you said was in answer to a question from somebody in the

2   grand jury which was this, you said that, "If I recall

3   correctly," this is a question that was put to you.  You said

4   that, "If I recall correctly that the mayor never said that if

5   you didn't use Bobby Ferguson you wouldn't get any work."  And

6   your answer was, "No."

7              Isn't that right?

8   A.  That's not the way it went.

9   Q.  Wait a minute.

10  A.  No.

11  Q.  That's what you testified to, isn't that right?

12  A.  I said, "No," that's what he --

13             **MR. BULLOTTA:**  Your Honor, I'm going to object.

14  This is not at all inconsistent with the witness's testimony.

15             **MR. GUREWITZ:**  Well, that's his argument,

16  Your Honor.

17             **THE COURT:**  I think I need to see it.

18             **MR. BULLOTTA:**  Okay.

19             **MR. GUREWITZ:**  I've got it right here.

20             (Brief pause.)

21             **THE COURT:**  Well, I mean, I think if you're going to

22  use this, you have to use the whole thing for the context.

23             **MR. GUREWITZ:**  Your Honor --

24             **THE COURT:**  Because, first of all, there's a

25  one-word answer that's not -- that is ambiguous.

*10-CR-20403   USA v. Kwame Kilpatrick, et al*

*Anthony Soave - Cross*
*Thursday, December 6, 2012*

134

1         **MR. GUREWITZ:**  I understand, Your Honor.  I think

2    that Mr. Bullotta's questions can ask that.  I'm attempting to

3    put this into my context.

4         **THE COURT:**  Well, I don't think you can do it that

5    way.  I mean, if you want him to read the answers, then you've

6    got to read before and after.

7         **MR. GUREWITZ:**  All right.

8    **BY MR. GUREWITZ:**

9    Q.  You read the rest of this page when you looked at it,

10   Mr. Soave?

11   A.  I didn't read the rest of the page.

12   Q.  Oh, you didn't?

13   A.  Want me to read the whole page?

14   Q.  I think that's a directive from the Court.

15        **THE COURT:**  Yes, please.

16        Just to be clear, if you want to use the excerpt

17   that you were talking about and read it into the record or have

18   him read it into the record, you may do so, but the rules

19   require that if the prosecution requests that the whole

20   surrounding context be read, that needs to go in as well.  So

21   you can use it, but the rest of it has to be read in as well.

22        **MR. GUREWITZ:**  Your Honor, I've only asked him about

23   his memory.  I've shown it to him to refresh his memory.  Now,

24   that's the part --

25        **THE COURT:**  No, you asked him about a specific

*10-CR-20403    USA v. Kwame Kilpatrick, et al*

1   question that was asked by a grand juror that has a one-word

2   answer in the transcript.  Now, you can have him read that, but

3   there's more before and after it.

4            **MR. GUREWITZ:**  I understand.

5   **BY MR. GUREWITZ:**

6   Q.  Are you finished?

7   A.  Yes.

8   Q.  So, Mr. Soave, what you said was that you thought it was

9   implied that you had to use a particular contractor, right?

10  A.  You want -- how do you want me to answer this, yes or no

11  or --

12  Q.  Yes, yes or no.

13  A.  Say it again.

14  Q.  What you thought was that it was implied that you use a

15  particular contractor, right?

16  A.  Wasn't thought.  What I knew when I left there, okay, what

17  I knew that I had to use Bobby Ferguson.  I asked what the

18  holdup was on the job.  He said, "You have the wrong

19  contractor."

20  Q.  Mr. Soave, did you answer this question?  I just wanted --

21  the answer is at Line 19, "It was implied to use him.  It

22  wasn't like use one of these three others, you know, it was,

23  use him."  It was implied, wasn't it?  Was that your answer?

24  A.  I don't know, read that to me and I'll -- why don't you

25  read it.

*Anthony Soave - Cross*
*Thursday, December 6, 2012*

136

1    Q.  It says --

2              **MR. BULLOTTA:**  I'm sorry, can we have the question

3    first and not just the answer?  Because we don't even know what

4    he's answering in the grand jury.

5              **THE COURT:**  Read the question and the answer,

6    please.

7    **BY MR. GUREWITZ:**

8    Q.  Juror says, "Okay.  I just wanted --"

9              And your answer was, "Answer:  It was implied to use

10   him.  It wasn't like use one of these three, you know, it was,

11   use him."

12             **MR. BULLOTTA:**  Objection, he didn't read the

13   question, Your Honor.

14             **THE COURT:**  Read the first question.

15             **MR. GUREWITZ:**  The first question is --

16             **MR. BULLOTTA:**  On Line 12.

17             **MR. GUREWITZ:**  Well, let me go back to the

18   beginning, Your Honor.

19   **BY MR. GUREWITZ:**

20   Q.  Question was, "Can I ask you to clarify one of the answers

21   you gave earlier?  You said that, if I recall correctly, that

22   the mayor never said that if you didn't use Bobby Ferguson you

23   wouldn't get any work?"

24             The answer was, "No."

25             That was your answer, wasn't it?

*10-CR-20403   USA v. Kwame Kilpatrick, et al*

*Anthony Soave - Cross*
*Thursday, December 6, 2012*

137

1   A.   That's right, that's not the way he said it.

2   Q.   Mr. Soave, I'm asking you about your testimony now, right?

3   A.   Okay, okay.  You have --

4   Q.   You have to stick with my questions.

5   A.   You have it.

6   Q.   Okay.  "Question:  But this is after this first

7   conversation, correct?  I mean, because that was the clear --

8   whether it was explicitly said or just implied that you had to

9   use Bobby to get the water contract.

10         "Answer:  Yeah."

11         Do you remember that answer?  You looked at it, that

12   was your answer?

13   A.   Yeah.

14   Q.   Right?  And then the juror said, "I just wanted --" and

15   your answer, "It was implied to use him.  It wasn't like, use

16   one of these three, you know, it was, use him."

17         Right?  That was your answer?

18   A.   Yes, yes.

19   Q.   Now, what I've been trying to get to, Mr. Soave, is just to

20   understand that at the time that you were there, you had

21   obtained background information by which you were led to

22   believe that for some reason there was the -- the contract was

23   not approved yet, right?  You knew that, isn't that true?

24   A.   Yes.

25   Q.   And you also knew that this was a contract that had just

*10-CR-20403   USA v. Kwame Kilpatrick, et al*

*Anthony Soave - Cross*
*Thursday, December 6, 2012*                                    138

1    been bid in October of 2001 about three months before the end

2    of that year, right?

3    A.  Yes.

4    Q.  And when you went to see the mayor, you also knew that the

5    contract had been, that Inland Waters had been submitting

6    documents to get things taken care of so it could proceed up

7    through February, at least, of 2002, right?

8    A.  No, I didn't know that.

9    Q.  You didn't know that?

10   A.  No.

11   Q.  So you didn't know that at the beginning of that year all

12   the steps hadn't been taken --

13   A.  No, I did not know.  I told you that, I did not know.  I

14   didn't know those documents were going back and forth, I did

15   not know that.

16   Q.  Okay.  Someone who didn't tell you then that -- tell you

17   that then also led you to believe that for some reason this was

18   sitting in the mayor's office and that's what --

19   A.  That's what I was told.

20   Q.  Okay.  And you were also a guy who was, had been around the

21   city a long time and you could kind of make your assessments of

22   what was the safest thing for you to do at that time, right?

23   A.  I don't know what that means.

24   Q.  Okay.  What you said was that there weren't -- you don't

25   remember specific words, but you got the drift, you concluded

*10-CR-20403    USA v. Kwame Kilpatrick, et al*

*Anthony Soave - Cross*
*Thursday, December 6, 2012*

1   that it was in your best interest to go ahead and go back and

2   tell Ms. McCann and Mr. Levin about what to do in order to

3   proceed with the contract, right?

4   A.  You keep on not understanding me.  I told you exactly when

5   I went there, I was told I had the wrong contractor.  I said,

6   "Who's the right one?"

7           He said, "Use Bobby Ferguson."

8           And when I left there, that's what I knew I had to

9   do.  I can't -- I mean, you don't want to hear it.  I just keep

10  on telling you that's the way it went.

11  Q.  Mr. Soave, I'd like to talk to you about, ask you some

12  questions, this isn't exactly a conversation, about the

13  relationship that you developed with Mr. Kilpatrick --

14  A.  Yes.

15  Q.  -- over the time period after that, up through 2010.

16  A.  Yes.

17  Q.  During that time period, you had occasions to meet with him

18  one on one in a lot of different kind of situations, isn't that

19  right?

20  A.  Yes.

21  Q.  You testified about being together with him on your

22  airplane, is that right?

23  A.  Yes.

24  Q.  And you've testified about -- well, there were other --

25  there were occasions when Mr. Kilpatrick came to your house,

*Anthony Soave - Cross*
*Thursday, December 6, 2012*

140

1   isn't that right?

2   A.  Yes.

3   Q.  Do you still live in the same place?

4   A.  Yes.

5   Q.  Is that in Grosse Pointe?

6   A.  Yes.

7   Q.  And about how many times do you think that you and he got

8   together at his house?

9   A.  Maybe two or three times.

10          **THE COURT:**  "At his house?"  Is that what you meant

11  to say?

12          **MR. GUREWITZ:**  At Mr. Soave's house.

13          **THE COURT:**  Okay.

14  **BY MR. GUREWITZ:**

15  Q.  You met with him in your living room, watched television?

16  A.  Yes.

17  Q.  Talked about politics?

18  A.  Yeah, yeah, we talked about politics.

19  Q.  You talked about your life?

20  A.  Yeah, I guess.  I don't remember exactly what we talked

21  about, but we talked about things.

22  Q.  He told you -- or excuse me, you told him about how you

23  started out in business?

24  A.  I don't recall doing that at my house.  I mean, I, I don't

25  know, he might have asked me how I started and I told him.  I

*10-CR-20403   USA v. Kwame Kilpatrick, et al*

*Anthony Soave - Cross*
*Thursday, December 6, 2012*

1    don't remember.

2    Q.   Okay.   You developed a friendship with him?

3    A.   Yeah, we were, we were friendly.

4    Q.   What do you mean by that?

5    A.   I don't know, we were friendly.   I don't know what you mean

6    by that.   We were friendly.

7    Q.   Did you pick up the phone sometimes and just call him up to

8    talk to him?

9    A.   I think I did.   It wasn't like a regular thing to call him

10   up and just say hi, but we were, I was friendly with him.

11   Q.   And you had respect for what he was doing?

12   A.   I liked him.

13   Q.   Were you aware at that time that there were a lot of things

14   going on in the city between January and June of 2002 in

15   addition to the Inland Waters contract that Mr. Kilpatrick had

16   responsibility for?

17   A.   Yes.

18   Q.   Were you aware that at that time there was a national

19   search going on that Mr. Kilpatrick had responsibility for for

20   a new director for the water department?

21   A.   I don't remember that, no.

22   Q.   Do you remember that there was a national search going on

23   for the city for a new police chief?

24   A.   No, I don't remember.

25   Q.   There were issues about snow removal in the city that were

*Anthony Soave - Cross*
*Thursday, December 6, 2012*

1    of concern when Mr. Kilpatrick took over the administration of

2    the city in January of 2002, weren't there?

3    A.  I kind of remember that, that there were snow issues.

4    Q.  And --

5         **MR. BULLOTTA:**  Your Honor, I'm sorry, if we're going

6    to go off into snow area -- snow issues, I'm going to have to

7    object as being irrelevant.

8         **MR. GUREWITZ:**  Well, that's the only question I'm

9    asking about snow, Your Honor.

10         **THE COURT:**  Yes, I do think --

11         **MR. GUREWITZ:**  We're not going into snow areas.  I

12    don't think so.

13         **THE COURT:**  I think he's acknowledged that there

14    were a lot of issues that demanded Mr. Kilpatrick's attention

15    when he took office.

16         **MR. GUREWITZ:**  Well, what I want to ask him,

17    Your Honor, if he talked with Mr. Kilpatrick about them.

18    That's why I'm asking the questions.

19         **THE COURT:**  Okay.

20         **MR. GUREWITZ:**  And I want to explore Mr. Soave's

21    relationship with him.

22    **BY MR. GUREWITZ:**

23    Q.  Are these the kind of things that you talked with

24    Mr. Kilpatrick about?

25         **THE COURT:**  If you recall.  Do you recall what you

1    talked to Mr. Kilpatrick about?

2    A.  We talked about a bunch of things.  I don't recall.

3    **BY MR. GUREWITZ:**

4    Q.  I understand.  I'm asking you more particularly.

5    A.  I don't recall.

6    Q.  I'm sorry?

7    A.  I don't recall.

8    Q.  You don't recall.  Do you remember talking with him about

9    your family, your children, and about your daughter's wedding?

10   A.  Yeah, I probably talked to him about my daughter's wedding.

11   I think I invited him to it, so --

12   Q.  Okay.  And I, really, I'm not going to dwell on personal

13   kinds of matters, Mr. Soave, and I apologize for getting into

14   this area, but one particular thing, might be a little bit more

15   sensitive is, did you talk to him about when you got a divorce?

16   A.  I don't recall specifically, but I would not be surprised

17   if I did.

18   Q.  Okay.  That was a significant thing that happened in your

19   life, obviously.

20   A.  Yeah.

21   Q.  And did you talk to him, and the term has probably been

22   overused here, in a mentoring kind of way about his life?  You

23   were a lot -- let me withdraw that question.

24           You're not the same age as Mr. Kilpatrick?

25   A.  I'm a lot older than him, is that what you --

*Anthony Soave - Cross*
*Thursday, December 6, 2012*                                    144

1   Q.  Well, that's not exactly what I asked, but is it true?

2   A.  If what?

3   Q.  That you're older than him?

4   A.  I think so.  I have to ask him.  Yeah, I think I am.

5   Q.  About how much older are you than him?

6   A.  A lot older.

7   Q.  Okay.  You had a very good relationship with him then

8   during his administration, didn't you?

9   A.  We had a very friendly relationship, yes.

10  Q.  And you liked him a lot?

11  A.  Yes.

12  Q.  You are generous with people you like, your friends, right?

13  A.  Yes.

14  Q.  That's just how you are.

15  A.  Yes.

16  Q.  One of the ways that you wanted to show your friendship and

17  commitment as well to the city was in connection with the major

18  blackout that occurred in August of 2003 when the lights went

19  out all over the northeastern part of the United States, isn't

20  that right?

21  A.  What was the question about the blackout?

22  Q.  Well, let me be a little bit more specific so I get to it.

23  I'm asking about the offer of the use of one of your planes at

24  that time for Mr. Kilpatrick, who was on vacation in the

25  Bahamas when this occurred.

*10-CR-20403   USA v. Kwame Kilpatrick, et al*

*Anthony Soave - Cross*
*Thursday, December 6, 2012*                    145

1   A.  Yeah, I was called to see if I could go pick him up, and I

2   tried to.

3   Q.  And do you recall that, in fact, that Mr., that the city

4   airport, because of this blackout, for sometime was itself shut

5   down where your planes are located?

6   A.  Yes.

7   Q.  And that Mr. Kilpatrick flew back to Detroit and you were

8   gracious enough to offer your plane to take him back so he

9   could finish his vacation after he tended to business in

10  Detroit?

11  A.  Yes.

12  Q.  And that was something I think that you testified about

13  before, that you did it as -- for the benefit of the city,

14  right?

15  A.  Yes.

16  Q.  Now, you were shown an exhibit that had a list of airplane

17  flights that went on, and I'll show you that in a moment.

18  During this time period you had -- you've described now three

19  separate airplanes, right?

20  A.  Yes.

21  Q.  Do you recall that back in prior administrations,

22  particularly when Coleman Young was mayor, that the city had

23  its own airplane which was made available for the mayor?

24  A.  Yes.

25  Q.  All right.  And did you talk with Mr. Kilpatrick about

*10-CR-20403    USA v. Kwame Kilpatrick, et al*

*Anthony Soave - Cross*
*Thursday, December 6, 2012*                          146

1    that?

2    A.  About the previous administration or --

3    Q.  Yes.

4    A.  About their plane?

5    Q.  Yes.  No, not about the cost of it, about the fact that the

6    previous administration, under the Young administration, had

7    its own airplane.

8    A.  I don't remember specifically talking about it, but it

9    certainly could have been something that came up.

10   Q.  Now, after --

11          **MR. GUREWITZ:**  Your Honor, I just looked at my

12   watch.

13          **THE COURT:**  You have -- it's five minutes 'til 1:00.

14   Is this a better breaking point?

15          **MR. GUREWITZ:**  It would be.

16          **THE COURT:**  All right.  We'll conclude for the day.

17   We'll see you tomorrow.  Thank you.  Have a good evening.

18              (Jury out 12:55 p.m.)

19              (Proceedings adjourned at 12:55 p.m.)

20

21

22

23

24

25

*Anthony Soave – Cross*
*Thursday, December 6, 2012*

147

- - -

# C E R T I F I C A T I O N

I, Suzanne Jacques, Official Court Reporter for the United States District Court, Eastern District of Michigan, Southern Division, hereby certify that the foregoing is a correct transcript of the proceedings in the above-entitled cause on the date set forth.

Date: December 6, 2012


s:/Suzanne Jacques
  Suzanne Jacques

Official Court Reporter