**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

**UNITED STATES OF AMERICA,**

**Plaintiff,**

**Case No. 10-CR-20403**
**Hon. Nancy G. Edmunds**

**v.**

**D-1 KWAME M. KILPATRICK,**
**D-2 BOBBY W. FERGUSON, and**
**D-3 BERNARD N. KILPATRICK,**

**Defendants.**
**_______________________________/**

**JURY TRIAL**
**VOLUME 46**

**Detroit, Michigan - Friday, December 7, 2012**

**APPEARANCES:**

**For the Government:**

Mark Chutkow
R. Michael Bullotta
Jennifer Leigh Blackwell
Eric Doeh
United States Attorney's Office
211 W. Fort Street, Suite 2001
Detroit, Michigan 48226

**Counsel for Defendant Kwame M. Kilpatrick:**

James C. Thomas
535 Griswold, Ste. 2500
Detroit, MI 48226
313-963-2420

**Appearances(continued):**

**Counsel for Defendant Kwame Kilpatrick (Continued):**

Harold W. Gurewitz
Gurewitz & Raben
333 W. Fort Street, Suite 1100
Detroit, MI 48226

**Counsel for Defendant Bobby W. Ferguson:**

Gerald K. Evelyn
535 Griswold
Suite 1030
Detroit, MI 48226
313-962-9190

Susan W. Van Dusen
Law Offices of Susan W. VanDusen
2701 S. Bayshore Dr., Ste 315
Miami, FL 33133
305-854-6449

Michael A. Rataj
535 Griswold, Suite 1030
Detroit, MI 48226
313-962-3500

**Counsel for Defendant Bernard N. Kilpatrick:**

John A. Shea
Alexandrea D. Brennan
120 N. Fourth Avenue
Ann Arbor, MI 48104
734-995-4646

\- - -

*Suzanne Jacques, Official Court Reporter*
*email: jacques@transcriptorders.com*

*Proceedings recorded by mechanical stenography.*
*Transcript produced by computer-aided transcription.*

\- - -

**INDEX**

Government's Case in Chief — Page

**Anthony Soave**

Continued Cross Exam By Mr. Gurewitz 4

Redirect Examination By Mr. Bullotta 27

Recross Examination By Mr. Rataj 37

Recross Examination By Mr. Gurewitz 49

**Kathleen B. McCann**

Direct Examination By Mr. Chutkow 52

Cross Examination By Ms. Van Dusen 109

Certification of Reporter 135

Government's Exhibits

| Number | Received |
| --- | --- |
| IN1-1A | 80 |
| IN1-31 | 94 |
| IN1-47 and IN1-50 | 103 |

\- - -

Defendant's Exhibits

| Number | Received |
| --- | --- |
| DIN1-34 | 8 |
| DIN1-35 | 9 |
| DIN1-36 | 13 |

**Detroit, Michigan**

**Friday, December 7, 2012**

**9:00 a.m.**

\- - -

**THE COURT:** Good morning, everyone.

(Jury in 9:00 a.m.)

**THE COURT:** Good morning, everyone. Be seated.

Mr. Soave, I remind you that you're still under oath.

**THE WITNESS:** Thank you.

**CROSS EXAMINATION (Continued)**

**BY MR. GUREWITZ:**

Q. Mr. Soave, one of the companies that you testified about now two days ago is MPS?

A. Yes.

Q. And you said that's an industrial cleaning company?

A. Yes.

Q. One that at some point Mr. Williams became involved with?

A. Yes.

Q. And you think it's up to now an annual income of somewhere between 35 and 55 million?

A. I think it's 35 and 50, but something like that.

Q. Okay. This company existed and you were an owner of it along with someone else before Mr. Williams, right?

A. Yes, Roderick Rickman.

Q. And was Mr. Rickman one of the owners of the company back in about 2002?

A. Yes, I believe so.

Q. As one of the owners of that company, did he have access to the airplanes that I asked you questions about yesterday at the end of the day?

A. Did he have access to the airplane?

Q. Was he able to use them?

A. Well, if he asked me and I gave it to him, he would. It wasn't MPS's plane. It was --

Q. I'm sorry, you have to speak up. I didn't understand.

A. I don't know what you mean by "access," you know. They were not MPS's planes, so he would have to ask me if I could fly him somewhere if he wanted.

Q. But if you did that, he would be able to -- he could ask someone for approval to use the plane, right?

A. Yes, I think we may charge MPS for it, I don't know. You know what I mean? There would be intercompany charge maybe. I don't think it would be free, you know.

Q. Okay. And if he wanted to, he could also ask to invite other people to use the plane along -- or one of the planes along with him back at that time, right?

A. Well, if I gave him the plane, he could fill the seats the way he wanted to.

Q. Do you recall if, in fact, Mr. Rickman was the first person

who invited Mr. Kwame Kilpatrick to fly on one of your airplanes back in about 2002?

A. I don't recall that, no.

Q. Is it fair to say that out of those flights that were shown to you, this is -- well, I'll turn it around -- Government JET Exhibit 3, and it's got a listing of dates and destinations on it. You were shown that by Mr. Bullotta when you first testified. Do you recall that?

A. Yes.

Q. Is it fair to say, Mr. Soave, that you don't have exact memory of each one of these flights, do you?

A. No, I do not.

Q. And so you don't have memory to be able to say from your own personal knowledge whether, or which ones of these flights were for personal purposes, if they were; isn't that right?

A. For personal services for me, you mean, or --

Q. For anybody.

A. No, I don't know if we have the listing of who was on the plane or not.

Q. There was a procedure used by City Aviation to keep track of that, wasn't there?

A. Yes. Keep track of who was on it, you mean?

Q. Yes.

A. Yes.

Q. And so at some time there was actually a list that was

provided of the exact names, right?

A. Yes.

Q. And do you know at some time that changed so that there wasn't any longer a record kept for the company that listed the names of the people who flew as passengers?

A. No, I don't -- I think I heard there was a change, but I didn't make the change, I don't know.

Q. I'd like to direct your attention here to a line here that is for the date of February 25, 2004 from Detroit to Washington DC and return, do you see that?

A. Yes.

Q. Do you recall that Mr. Kwame Kilpatrick flew on one of your planes at that time to Washington to give testimony at a Senate hearing about the light blackout that I asked you questions about that happened in August of 2003?

A. No. I mean, I wouldn't know by looking at that.

Q. Well, let me show you, then, something particularly about the one that I've got highlighted under that, March 11, 2004, Detroit/Leesburg, Virginia. You're familiar with Leesburg, aren't you?

A. Yes, I am.

Q. And that's because one of the properties that you've testified about that your company has developed is nearby, Leesburg?

A. Yes.

Q. How far is that from Washington?
A. Very -- 35, 40 minutes into DC.

**MR. GUREWITZ:** The next number is 34, I believe.

**MS. VAN DUSEN:** Yes.

**MR. GUREWITZ:** Your Honor, I'd like to move the admission of a page from the Soave Enterprises website concerning Brambleton.

**MR. BULLOTTA:** No objection.

**THE COURT:** What's the number?

**MR. GUREWITZ:** I'm sorry, DIN1-34.

**THE COURT:** Received.

(Defendants' Exhibit DIN1-34 received into evidence.)

**BY MR. GUREWITZ:**

Q. Can you see that, Mr. Soave?
A. Yes.
Q. What exactly is Brambleton?
A. It's a community of homes and a town center.
Q. The description that you have on your website for Soave Enterprises describes it as a 2,200-acre award-winning master planned community about 32 miles from Washington, DC.
A. Yes.
Q. That's accurate, isn't it?
A. Yes.
Q. And do you remember, in fact, that you flew there with

Mayor Kilpatrick so that you could show him the development, isn't that right?

A. Yes, I remember very well.

Q. Part of the reason for doing that was that you and he had discussions about the possibilities of development in Detroit, and you wanted to show him an example of what could be done.

A. Yes.

**MR. GUREWITZ:** Your Honor, at this time I'd move for the admission of DIN1-35.

**THE COURT:** Received.

(Defendants' Exhibit DIN1-35 received into evidence.)

**BY MR. GUREWITZ:**

Q. Do you recognize the kind of format that this is, Mr. Soave, request for company plane?

A. No, I don't usually see that.

Q. When the plane was used back in 2004, who had the responsibility, if you can remember, where was the responsibility to make up these kinds of records?

A. I don't -- I really don't know.

Q. This is, though, consistent with what you've just described as a trip that you took with Mayor Kilpatrick on that occasion?

A. Yes. I don't know if that was the date, but, yes, I mean, we went, we went there.

Q. This was one of the times that you testified about that you

and Mr. Kilpatrick traveled together.

A. Yes.

Q. And during that, did you go up and come back on the same day, if you remember that?

A. Yes.

Q. You obviously talked about what Brambleton was at that time, right?

A. Yes.

Q. And you talked about how that, how real estate development could then fit into the plans for Detroit, right?

A. Yes, and he liked certain, one of the condo layouts, he really liked, I remember.

Q. That was in March of 2004. The first one that's listed on this sheet that you testified about yesterday that happened in connection with the power going out was in August of 2003, and from this time period, then, we've got these trips following after that, including the one up to Leesburg.

Do you remember after that that your plane was, or a plane from the company was provided to transport people up to the Mackinac conference in June of 2004?

A. I mean, vaguely.

Q. And is that something that you have gone to yourself?

A. Yes.

Q. It's a yearly conference, isn't it?

A. Yes, it is.

Q. Why do you go to it?

A. I don't know why I used to go. I know why I don't go now.

Q. Why is that, Mr. Soave?

A. There are too many politicians up there when you go.

Q. When did you stop going?

A. I don't know, a few years ago.

Q. And before that how many times did you go?

A. You know, I don't know, three, four times, maybe five, I don't know. It was a long time, you know.

Q. You made your plane available to take people up such as Brooks Patterson?

A. Yes.

Q. How many times did he fly up there with you?

A. I don't know. Whatever, I mean, I would, especially when I was going, I would ask people if they want to go so I brought --

Q. -- politicians?

A. Yes.

Q. That Mackinac conference is one that happens every year with people talking up policy in the State of Michigan?

A. Yes.

Q. Those are things that are certainly of interest, they have been to you and your company, right?

A. Yes.

Q. So that there would be, in addition to you, there would be

other people from your company who would go along as well?
A. Yes.
Q. So that you all could have an opportunity to participate in discussions, right?
A. Yes.
Q. Formal and informal?
A. Yes.
Q. That is to go to meetings and to socialize with people, right?
A. Yes.
Q. Because that's an important part of the business that your company has done?
A. Yes.
Q. And at the top of the second page of Exhibit JET3 is a reference to a flight on June 4. Do you see that, to Mackinac Island?
A. Yes, I do.
Q. Now, below that, on July 24, 2004, is a record of a flight from Detroit to East Hampton and East Hampton to Boston.
I'm sorry?
**A JUROR:** Could I have the, see DIN1-35?
**MR. GUREWITZ:** You'd like to see that again?
**A JUROR:** No, you said it's Page 2.
**MR. GUREWITZ:** Page 2 is JET3, JET-3, Page 2.
Your Honor, at this time I'd like to move for

admission of DIN1-36.

**MR. BULLOTTA:** No objection.

**THE COURT:** Received.

(Defendants' Exhibit DIN1-36 received into evidence.)

**BY MR. GUREWITZ:**

Q. This is another document that's called a request for a company plane. It's the kind of record that was kept by your company, right?

A. Yes.

Q. And this indicates that the date of the flight was July 24, 2004, do you see that?

A. Yes.

Q. And the place is Detroit to Long Island, and then it says Long Island -- I'm sorry, Long Island/Hampton and then Logan/Boston, do you see that?

A. Yes.

Q. At the bottom of this page it indicates that part of the purpose of this trip was to go -- was a democratic convention after Logan/Boston, do you see that?

A. Yes, I see it.

Q. Do you recall that you agreed to make your plane available to fly the mayor to public functions of a political nature to what is described there as a democratic convention?

A. I must have. I mean, I must have agreed to it, you know.

Q. You don't have specific memory right now of the details of this?

A. I don't have a specific memory but ...

Q. Do you have memory that Mr. -- that Mayor Kilpatrick was a member of the Democratic National Committee back in 2004?

A. I mean, not exactly, but I know he was very involved in democratic politics.

Q. And it would have been part of his responsibility to attend meetings of that, of the controlling body of the democratic party for the country and speak at those occasions?

A. I would assume, yes.

**THE COURT:** Yes?

**A JUROR:** Could you please place the exhibit back on and bring it up so we can see the bottom of it.

**MR. GUREWITZ:** Sure.

**BY MR. GUREWITZ:**

Q. This indicates that the passengers included Mayor Kilpatrick, DeDan Milton and Sergeant DeWayne, do you see that?

A. Yes, I do.

Q. And at the bottom, it also indicates that, as recorded in the records of your company, the approval on this is ALS. Those are your initials, aren't they?

A. Yes.

Q. And the approval that you provided was for the mayor to fly

out that way and to fly back on a commercial flight, isn't that right?

A. Yes.

Q. You agreed to do this because you thought it was an appropriate thing for your company to make its plane available for the mayor of the City of Detroit and his party to attend an event such as that, isn't that right?

A. Sure, yes, I did.

Q. Now, going back to Page 2 of JET Exhibit 3, there is an entry for May 19, 2006. Do you see that? Detroit to Cleveland?

A. Yes.

Q. You're familiar with a gentleman named Dan Gilbert, aren't you?

A. Yes.

Q. Who is he?

A. He's, he owns Quicken Loans.

Q. Did he also own a, or does he own a basketball team?

A. Oh, yes, yeah, he owns Cleveland.

Q. What team is that?

A. The Cleveland Cavaliers.

Q. So you, did you have conversations with Mayor Kilpatrick about his attempts to talk to Mr. Gilbert about moving people from Quicken Loans back into the City of Detroit?

A. I think we did have a conversation about it, and I think

they went to a game there, I believe.

Q. For the purpose of -- I'm sorry, I didn't mean to cut you off.

A. Yeah, I don't know if the Pistons were playing Cleveland or what. I vaguely remember. I know there was a game.

Q. Like what you described happens at Mackinac Island, sometimes official kind of business is conducted at sports occasions when people can get together and talk, right?

A. Yes.

Q. And one of the things that you understood was going to happen was that Mayor Kilpatrick was going to talk with Mr. Gilbert about moving people from his company into downtown Detroit, right?

A. I think he was talking to him at that time about that, yes.

Q. And since that time, that, in fact, has happened, hasn't it?

A. Yes, in a big way, too.

Q. Do you know if this particular meeting played a significant part in reaching an agreement on that happening?

A. I would not know that. You'd have to ask the mayor that. I wasn't on the trip.

Q. Do you know, though, that it was Mayor Kilpatrick who reached the agreement and closed the deal on that happening?

A. I believe it was. I was happy to help. If that was any help, that's great.

Q. So during this time period, Mr. Soave, you were happy to provide the planes of City Aviation, one of the companies that you own, to help the city carry out its civic purposes, isn't that right?

A. Yes.

Q. You've provided some testimony about spending time in Naples, Florida, isn't that right?

A. Yes.

Q. You have a residence, a home, condominium there, don't you?

A. Yes.

Q. And, in fact, you also own property there yourself, don't you?

A. Yes. I build, I build condos there.

Q. Nearby Naples, Florida, the developments that you have there include one called the Towers of Moraya Bay, M-o-r-a-y-a?

A. Yes.

Q. What is that, please?

A. It's a beach-front condo building.

Q. It's a high-rise?

A. High-rise, yes, 72 units.

Q. Okay. You have developed a property there called The Dunes?

A. Yes.

Q. And that's in the same general area?

A. Yes. It's seven buildings, about 600 units.

Q. And the third one that you have there is called Regatta at Vanderbilt Beach, right?

A. Yes.

**MR. BULLOTTA:** I'm just going to object. We've already gone over this, I think, what he owns.

**THE COURT:** Yeah, Mr. Rataj did this.

**MR. GUREWITZ:** This is a different subject, though, Your Honor. I just wanted to lay the foundation for the next question.

**THE COURT:** Okay.

**BY MR. GUREWITZ:**

Q. I appreciate Mr. Bullotta's impatience, but let me direct your attention to an occasion that you traveled to Naples with Mayor Kilpatrick to look at those developments.

A. Yes.

Q. I'm going to show you Page 3 of the same summary exhibit that I've been referring to, JET-3, and there's an entry there for a round trip from Detroit to Naples and Naples back to Detroit on December 27, 2006. Do you see that?

A. Yes.

Q. Do you remember if that's about the time that you invited Mayor Kilpatrick to travel on your plane with you to go look at your developments there?

A. No, I don't, but I know I -- I know I did invite him. I don't remember, you know, the dates.

Q. Do you remember if this was a day trip?
A. I don't remember.
Q. Did you go down there particularly to show this development to Mayor Kilpatrick because of interest in developing property, residential property in the downtown area along the waterfront of Detroit?
A. I think at one point he was looking for a place, and maybe at another point he was looking at some development. Both.
Q. One of the things that you spent some time talking with Mayor Kilpatrick about was the importance of creating residential housing in the central part of the city to help its growth, right?
A. Yes, I did.
Q. And this, your developments of three different kinds in Naples was an example of that, wasn't it?
A. Well, I don't, I don't remember those particular times but it was a couple times. Same thing with Brambleton, you know, he liked some of those units and he thought it might be a possibility. It was the same type of thing.
Q. During this time period, you obviously were developing the relationship that you began with Mayor Kilpatrick as a friend, isn't that right?
A. Well, it was a dual purpose. I mean, anything to help the city. I thought they needed some, some housing downtown. I think we were talking about the property where, you know,

between Stroh's and the Renaissance, at one point I know we talked about that, and he thought some of those condos could work in there.

Q. You were developing a relationship with this young mayor who you liked, weren't you?

A. Well, yes.

Q. And you continued to feel generous about making your planes available for his use, isn't that right?

A. I mean, yes.

Q. There came some point in time that you indicated that your company issued for tax purposes an IRS form called 1099 to you which meant that you received personal income for the plane usage, isn't that right?

A. Yes.

Q. You were given advice from somebody else, you employ professionals to give you tax advice and they said that was a necessary thing to do?

A. They just handled it, you know. We didn't talk about it. They handle it the way they think it's the best way.

Q. Somebody made a decision, created the document and gave it to you and you just took care of it, is that right?

A. No, no, I didn't take care of it.

Q. They took care of it?

A. They file my -- huh?

Q. I'm sorry, I didn't mean to cut you off.

A. They file the way they -- they know what's going on. It's my financial people and they thought that they should handle it that way. They didn't discuss it with me, you know.
Q. Well, were you aware or advised in connection with that that if this expense that was shown on these 1099's was handled in that way for you that that would make the plane usage a deductible expense for your company?
A. I think they said if it was used the wrong way, it would be, so they made it as a -- I don't know. I don't know what you just asked me. Ask me again.
Q. Well, if you don't understand --
A. No, I don't understand. You wanted to know if it was going to be a deduction for the company?
Q. Right. If you don't know --
A. I don't know.
Q. -- that, I'm not pushing for an answer.
A. I know they didn't want it to be a political contribution, so they handled it the way they did.
Q. You did have conversations with people at the company about whether this could be considered to be a political contribution, didn't you?
A. Well, you know, at some time we did. I don't know exactly when.
Q. So that the people who you relied upon for advice talked about a concern they had -- let me rephrase that -- talked to

you about a concern that maybe this could all be viewed as a political contribution, isn't that right?

A. They discussed it, they got some outside opinion, I think, they told me, "This is the way we want to handle it." I said, "Fine."

Q. Do you remember that they, somebody consulted with a well-respected lawyer named John Pirich to get an opinion about whether this could be viewed as a political contribution?

A. I believe that's true.

Q. And do you remember that the opinion you got back was that this would not be treated as a political contribution?

A. Yes. I don't remember that exactly, but they acted accordingly.

Q. Do you think this happened around 2004?

A. No, I don't -- no. There's a file for that.

Q. Okay. Whenever this happened after you got, you got the opinion -- or the company, whoever actually got the opinion got it, the company went on providing the use of the plane for Mayor Kilpatrick, didn't it?

A. Yeah, I believe so.

Q. And that's because the concern that was expressed to you by the people you work with was resolved by that opinion, wasn't it?

A. You know, I don't know if they were resolved in their mind, but they acted the way they thought they should after they got

the opinion.

Q. Do you know that after the year 2006 that your company didn't any longer keep any records of the names of the passengers on the flights that were done by your airplanes?

A. No, I didn't know then, but I heard about it later.

Q. So, then, it's not really possible by looking at the records to go back and check to see who is actually on a particular flight, right?

A. I think not. I think that's true.

Q. There are just a couple more things I want to ask you about, Mr. Soave, and I'll be finished. One is that you testified about going to New York with Mayor Kilpatrick and others on two occasions, is that right?

A. Yes.

Q. Had you gone to New York before the first one of these two trips around Christmastime to go shopping yourself?

A. Are you talking about the same year or --

Q. No, any time.

A. Yes, yes.

Q. And had you done it more than once?

A. Yes.

Q. Was it just something that you liked to do?

A. Yes.

Q. Did you discuss that with Mayor Kilpatrick?

A. I very well could have. I mean, I -- it was something I

did.

Q. And did you suggest to him, maybe even a little bit more directly, did you invite him to go along with you?

A. I could have. I don't remember the exact, you know, but I could have. I invited other people so, I mean, that's something that's --

Q. That's something that you did just because you wanted to be kind to somebody you knew, right?

A. Yes.

Q. Okay. You testified about basketball tickets that got purchased that you gave to Mayor Kilpatrick, right?

A. Yes.

Q. They were pretty expensive, weren't they?

A. I didn't realize they were going to be that expensive.

Q. So that means that you didn't really contact somebody directly yourself to do it. Somebody did it for you?

A. Somebody contacted a broker and, you know, then I was, I said I was going to get the ticket, and so I never thought it was going to work out that way but it did.

Q. And before you knew it, you had the tickets and they were paid for, right?

A. You know, I don't remember exactly how it went but, you know.

Q. Okay. And you gave these two tickets to Mayor Kilpatrick to go to a basketball game for the Detroit Pistons, the Detroit

team, right?

A. Yes. It was a big game, I know that. I forgot -- I don't think -- were the Pistons playing it? I don't even know who was playing. I just know it was a big game, it was nationally televised, I think, and I wanted the mayor to be in the right seats, didn't want him to be in the fifth row or eighth row, or he should be --

Q. Throughout this time period, you continued to have a personal relationship with Mayor Kilpatrick, didn't you?

A. Yes.

Q. You considered him to be a friend?

A. I liked Mayor Kilpatrick.

Q. And you were generous to him in the ways that you testified about here this morning, right?

A. Yes.

Q. And that's why you did these things, isn't that right?

A. Well, he had a lot to say with the things I was doing in the city, so you understand. I mean, there was a dual purpose.

Q. That's true when you go talk to people at the Mackinac conference, as well. There's always a whole range of things happening that are in your mind, right?

A. I don't understand what you're asking me.

Q. Maybe that's not a good question.

A. Yeah, that's not too good.

Q. I'll remember that, Mr. Soave. I'll try to be a little bit

more direct.

You did not discuss with Mayor Kilpatrick how much these tickets cost, did you?

A. No, I did not.

Q. In fact, you were a little --

A. I don't think he knows --

Q. -- bit embarrassed about how much you paid?

A. And still am.

Q. The relationship that you had with Mayor Kilpatrick was, what you just talked about is your purposes, right? You said what you had in mind were the things that were from your side of this relationship. You talked about more than, more than just friendship, right?

A. Well, there was the sort of, I mean, thoughts in my mind that I wanted to keep the mayor happy. He was very, he was a very likeable guy and I liked the mayor.

Q. Those were your reasons, is that right?

A. My reasons were that I wanted to keep him happy.

Q. And you understood that, from what you could tell, that he liked you and enjoyed being with you, is that right?

A. I think he did, you know.

Q. And because of your age difference, he respected, from your vantage point, all the things that you told him about your business career and your thoughts about the city, is that right?

A. You'd have to ask him that.

Q. Thank you very much. That's all I have. Thank you.

**THE COURT:** Mr. Bullotta.

(9:40 a.m.)

**REDIRECT EXAMINATION**

**BY MR. BULLOTTA:**

Q. Good morning, Mr. Soave.

A. Good morning.

Q. I think this will be over soon for you.

A. I hope so.

Q. I want to show you what's been marked DIN1-32. This is a memo, and the date of that memo is March the 22nd of 2002, and this would be a month before you went to go see the mayor, according to your direct testimony, to talk about why the contract was being held up, the $50 million contract.

Now, this memo is to you from your attorney, your in-house attorney, correct?

A. Yes.

Q. And I want to focus on the bottom here. Can you read this conclusion into the record, please.

A. You want me to read it?

Q. Yes, would you?

A. "We basically need to know what are the issues and what do we have to do to get them to send the contracts through to city council."

Q. Okay. Who do you understand the "them" to be? Do you know?

A. I think the mayor's office or purchasing, one of the two.

Q. Okay. But the administration needs to send the contracts to the city council, correct?

**MR. THOMAS:** Well, objection, he's already answered.

**MR. GUREWITZ:** Your Honor, I think that Mr. Thomas is suggesting that I object.

**MR. BULLOTTA:** Hey, no fair.

**THE COURT:** I inferred that.

**MR. BULLOTTA:** I'll rephrase the question.

**THE COURT:** Just for the jury's edification, the rule is one lawyer, one witness, that is, the same -- you can't have multiple lawyers questioning and objecting on behalf of the same defendant, so -- or even on behalf of the government.

**BY MR. BULLOTTA:**

Q. So Mr. Soave, then, the information that you were getting at the time prior to you going to see the mayor to talk about what the holdup was, was that it was stopped somewhere, correct?

A. Yes, that was the indication.

Q. And where did you think it was stopped, based on the information you were getting?

A. You know, I don't know exactly. I just know that -- I think she knew I was going to see the mayor, I think, when I

got that memo.

Q. And we've seen --

A. And I don't know when she sent me that memo, but --

Q. Okay. So you believed the contract was being held, correct?

A. Yes. That's the information I was getting, it was being held up.

Q. So you went to go see the mayor, right?

A. Yes, I called him and tried to set up a meeting and I got a meeting with him.

Q. And you testified that when you got to the meeting, you went by yourself, right?

A. Yes.

Q. And you testified that you asked the mayor what the holdup was, correct?

A. Yes.

Q. And did the mayor, when you asked that question, Mr. Soave, did the mayor say, "What holdup, I don't know what you're talking about"?

**MR. GUREWITZ:** Objection, Your Honor, I understand this is redirect, but it's been asked and answered many times.

**MR. BULLOTTA:** No, it was suggested that --

**THE COURT:** Overruled. You may answer.

**BY MR. BULLOTTA:**

Q. Did he say he didn't know what holdup you were talking

about?

A. I don't know the exact words, but I know what went on at the meeting. I asked him what the holdup was, he said I had the wrong subcontractor.

Q. So then is it your testimony that he did not indicate to you that he was unaware of a holdup? Do you understand my question?

A. No. Say that again.

Q. Did he appear to be aware that it was being held?

**MR. GUREWITZ:** Objection, Your Honor, that's asking for speculation. He can ask if he remembered what he said but not for what was in his mind.

**THE COURT:** Sustained.

**MR. BULLOTTA:** I'll rephrase it.

**BY MR. BULLOTTA:**

Q. Did he say anything at all to you that would indicate to you that he didn't know it was being held?

A. No, he didn't. He answered, he said -- you know, I don't remember the exact words, but I mean, the gist of the conversation, I remember. He said I had the wrong subcontractor, I asked him, "Who should I get?" He told me I should get Bobby Ferguson and that was, like, I mean, you know, it was a quick message and I understood it.

Q. Okay. Did he ever indicate to you that he didn't have the authority to hold the contract or approve the contract?

A. No.
Q. Did he ever tell you at that meeting that he was waiting for city council to approve the contract?
A. No.
Q. Is there any doubt in your mind that he was holding that contract until you put Ferguson on the contract?
A. I know it was being held up. I didn't know who was holing it up. I assume it was in his hands. He's the boss.
Q. He's the boss of all those folks that you were -- you were shown a document?
A. He's the mayor, so I, you know --
Q. Well, let me show you. Yesterday you were shown this document, it's the signature page for that contract we're talking about, and there are a number of folks that are highlighted, like Gary Fujita, the interim deputy director of the DWSD, and looks like the purchasing director and the corporation counsel. These are all folks that work for the City of Detroit, correct?
A. Well, they worked for the water board and --
Q. Right, but I mean the ones --
A. -- the law department.
Q. -- are highlighted.
A. Yeah.
Q. And Mayor Kilpatrick, you said he's the boss, right?
A. He's the mayor so ...

Q. Now, in your 30-plus years of doing business with the City of Detroit, since, you said, in the '70s, had you ever had a mayor hold up one of your contracts until you put a specific subcontractor on the contract?

**MR. RATAJ:** Your Honor, I'm going to object. I mean, that is so leading.

**MR. BULLOTTA:** I'm asking if it's ever happened.

**MR. RATAJ:** There's no foundation.

**THE COURT:** Overruled. If you recall. You may answer.

A. No, I do not.

**BY MR. BULLOTTA:**

Q. And you were asked about, at length by Mr. Rataj about all the different businesses and property that Soave Enterprises owns. Despite that, did you still have concerns or did you have concerns about the effect on Inland Waters if this contract didn't go forward?

A. So are you asking me because I have a lot of properties and a lot of other businesses whether I was concerned about --

Q. Right.

A. -- the Inland job?

Q. Right.

A. I was very concerned about the Inland job. It was a $50 million job.

Q. Did Inland have any other contracts pending at that time of

that size?

A. I don't -- no, no, not of that size.

Q. Were there people whose jobs depended on that contract going forward?

A. There were many people. Everyone was concerned and that's why I was getting urged to go see the mayor.

Q. Did you care about your employees?

A. Very much so.

Q. You were concerned enough to go to the mayor, you said, right?

A. Yes.

Q. And you were asked by Mr. Rataj, he suggested that Charlie Williams was what he termed a minority front. Do you remember those questions?

A. Yeah, I think I told him it was absolutely not true.

Q. And you were asked a lot of questions about the fact that Charlie Williams didn't own equipment, he didn't have employees at the time that you were doing this, you were bidding on this contract. Do you recall that?

A. Yes.

Q. And that, Mr. Rataj talked about how Bobby Ferguson had employees and had equipment, do you remember those questions?

A. Yes.

Q. When you are doing a mentoring relationship with somebody who is just starting out in the business, does the mentee, the

person you're mentoring, does that person usually have an established business with equipment and employees?

A. Well, usually they're related to the work somehow, you know. You try to, anyway. Not always, but you try to. And Charlie certainly had some skills. I mean, he had managerial skills.

Q. Okay. We'll get into that in a second.

A. Oh, okay, all right.

Q. I just want to ask you if, when you're doing a mentoring relationship --

A. Yes.

Q. -- when you initially start off, does the person that you're mentoring usually already have an established business?

A. Sometimes they do; sometimes they don't.

Q. Okay. Now, you said Charlie Williams had managerial experience, is that right?

A. Obviously, he was the director of the, of DWSD, and they had 2,000 employees and so he --

Q. So he was already --

A. You have to have something on the ball to run an organization, and he did it for a long time, too, it wasn't for a short period.

Q. Was it around almost ten years?

A. I don't know if it was ten years, I thought I heard five or six or seven, you know.

Q. Did he --

A. I don't know.

Q. Did he seem like a good person in your view to have as a mentee, someone to mentor?

A. I thought he had a lot on the ball, and I still do, you know.

Q. After you took him off of this project, 1368, that we're talking about, and put on Ferguson, later did you continue to mentor Charlie Williams?

A. Well, he became my partner at MPS, so we are doing it, I mean, right now.

Q. And is Charlie Williams in charge of that company, MPS?

A. Yes.

Q. Do you know how many employees MPS has?

A. No.

Q. Is it more than ten people?

A. Yes.

Q. You said it's --

A. Hundred, it's over a hundred.

Q. Over a hundred?

A. Yeah, 30, 40 engineers. It's a nice, it's a nice company.

Q. Finally, last area I want to ask you about, you were asked questions about whether you reported the statement by Ferguson that, where Ferguson, as you found out from your, I think,

Kathleen McCann, said that, "You only got the job because of me," do you remember that?

A. I said he said, "You're only here because of me."

Q. Sorry, "You're only here because of me." And you were asked why didn't you report that, or asked whether you reported that to the mayor. Do you remember those questions? I'm just asking if you remember the questions. I'm not asking for an answer substantively. Do you understand?

A. No, I don't remember.

Q. Okay.

A. Do I remember when I was questioned why didn't I go see the mayor about that?

Q. Yes. Remember that?

A. No, I don't remember.

Q. Okay. Well, at some point you did talk to Mayor Kilpatrick about problems that you were having with Ferguson, is that right?

A. Yes.

Q. And you said that you asked him, "Is Bobby still your guy?"

A. Yes.

Q. And what was his answer?

A. He said, "Yes, he's still my guy."

Q. Now, if he had said, "No, he's not my guy," what would you have done, how would you have treated Ferguson?

**MR. RATAJ:** Your Honor, I'm going to object. That's

absolutely irrelevant.

**THE COURT:** Overruled. You may answer.

A. I think we would have taken some sort of action, and we would have probably lessened his workload and --

**BY MR. BULLOTTA:**

Q. What if you still had problems after that?

A. You know, I don't know. I would have, we would have probably have done what the people told me needed to be done, you know, the people in the field. They would probably do, you know, if you lessen the workload and you're still having problems, then you probably would not do anymore work with him.

**MR. BULLOTTA:** Thank you, I have no further questions.

**THE COURT:** Okay. Mr. Rataj.

**THE WITNESS:** This is going to keep on going.

**THE COURT:** I think this is the last round, and it will be short.

(9:53 a.m.)

**RECROSS EXAMINATION**

**BY MR. RATAJ:**

Q. Good morning, Mr. Soave.

A. Good morning.

Q. I wouldn't ask you any questions if Mr. Bullotta didn't stand up and ask you some more questions.

A. I didn't have any control over him.

Q. Yeah, I know. What can you do?

Mr. Soave, I just have a few, and we do want to get you out of here.

Mr. Bullotta had just asked you a question as to whether or not if you knew who was holding up that contract in your mind, correct? Do you remember that? He just asked you that.

A. I was told by my -- yes.

Q. And you indicated just now that it was either the budgeting or the mayor, do you remember that answer?

A. Well, I didn't say budgeting, did I?

Q. Purchasing, my mistake.

A. Purchasing, okay.

Q. I'm sorry.

A. Okay.

Q. You said purchasing or the mayor, you didn't know, though, did you?

A. No, I did not know. I was told from my -- my people told me that the mayor's office was holding up the contract.

Q. But you just answered in response to Mr. Bullotta's questions that it was --

A. Well --

Q. -- either purchasing or the mayor but --

A. Well, then let me, let me rephrase it then.

Q. No, I just wanted to make sure that I understood your

previous answer to Mr. Bullotta's questions, and that's what you just said under oath, isn't that true? Purchasing or the mayor, you weren't sure, isn't that what you just testified to?

**MR. BULLOTTA:** I'm sorry, can he just ask the question as opposed to asking him what he said. We all heard what he said.

**MR. RATAJ:** Well, I just want to confirm that, Judge.

**THE COURT:** It's okay. Go ahead.

**BY MR. RATAJ:**

Q. Right? That's what you just testified to?

A. If that's what I answered. I'm just telling you what -- yes.

Q. All right. Mr. Bullotta showed you what was marked DIN1-33, I believe it was -- 32. First of all, I don't want to belabor the point, but I just --

**MR. GUREWITZ:** It's 33.

**BY MR. RATAJ:**

Q. I'm sorry, DIN1-33, and that was the memo.

**MR. RATAJ:** It's in evidence, Your Honor. May I put it up?

**THE COURT:** It's 1-32.

**MR. RATAJ:** Is it? I thought it was 32.

**THE COURT:** 1-32.

**MR. RATAJ:** Okay.

**THE COURT:** It's 33? You know, when he just put it back up, he said 1-32, so I have to go back and look from yesterday.

**MR. RATAJ:** It's 33, Your Honor. I'm sorry for the confusion.

**THE COURT:** Yes, 33.

**MR. RATAJ:** It's 33.

**BY MR. RATAJ:**

Q. Again, not to belabor the point, but that was information provided to you by Susan Johnson, who was a lawyer that had worked for you at that time, correct?

A. Yes.

Q. All right. Now, I want to direct your attention, sir, if I can find this right, the second paragraph where it says, "CS-1368, $50 million contract was similarly approved by the Board of Water Commissioners, law department and finance department." Do you see that?

A. Yes.

Q. Sir, do you have any knowledge as to whether or not the law department or the finance department had signed off on that contract --

A. I have no --

Q. -- at that time, which was --

A. No.

Q. -- March 22?

A. I would not know that, no.
Q. You wouldn't know that?
A. No, I would not.
Q. Let me show you something, and this is DIN1-14A, which is the signature page that is already into evidence.

Do you see when the law department -- directing your attention to right here, sir, do you see when it was approved by the law department? Do you see that?
A. 6/19?
Q. Yeah, 2002.
A. Yes.
Q. So when you got that information from Ms. Johnson regarding the law department having signed off on the contract, that wasn't correct information, now, was it?
A. No, you'd have to ask her where she got that information.
Q. Well, I just showed you.
A. I don't know.
Q. She said that --
A. Yeah, I can't speak for her. That's what she said.
Q. Right.
A. That's her memo. You have to ask her.
Q. But I just showed you a document that the law department had not signed off on it until June, correct?

**MR. BULLOTTA:** Object, Your Honor, this witness has no knowledge, and the fact that they signed it on that date

doesn't mean --

**THE COURT:** Well, he's acknowledged that he doesn't have any information personally about whether it was or was not.

**MR. RATAJ:** That's fine.

**BY MR. RATAJ:**

Q. Now, again, directing your attention to DIN1-33, back in the second paragraph, it says, "In addition to Insituform-CJ Williams was using Superior Engineering" -- or strike that.

"In addition to Insituform-CJ Williams, we are using Superior Engineering, a minority supplier we were asked to use by DWSD." Do you see that?

A. Yes, I see it.

Q. Okay. So at least according to what Ms. Johnson told you, DWSD was telling Inland Waters who to use as a minority supplier, correct? Isn't that what it says?

A. You use --

Q. That's what it says, doesn't it?

**MR. BULLOTTA:** Your Honor, I'm sorry, this is two questions. Is he asking him whether that happened or if that's what it says? We can all see what it says.

**BY MR. RATAJ:**

Q. All right. You see what it says there, right?

A. I see what it says, yes.

Q. So, at least according to what Ms. Johnson had learned, DWSD was telling Inland Waters who to use as a minority supplier, isn't that true?

A. That's what it says.

Q. Okay. Now, we know that when you had this meeting with Mr. Kilpatrick, according to you, in April of 2002, you've testified that you don't remember exactly what words were used, correct, isn't that true?

A. Exact words, no.

Q. Right. But let me ask you this. You went there to see him about 1368, correct?

A. Yes.

Q. Because it was your understanding from what you were advised by your people that that contract was being held up, correct?

A. Yes.

Q. Did you ever ask Mr. Kilpatrick, "Mr. Mayor, are you holding up the contract on 1368, and if you are, why are you holing it up?" Did you ever ask him that?

A. I did not, and I told you time and time again --

Q. Sir, did you ask him --

A. -- what I said.

Q. Sir, no, no, no.

A. I said, "What's the holdup?"

Q. No. Mr. --

A. Okay.
Q. -- Soave. I asked you for a simple yes or no question, and the answer was, "No," am I right or wrong?
A. Ask me the question again, please.
Q. At no time during the meeting with Mr. Kilpatrick in April of 2002, you never asked him, "Mr. Mayor, are you holding up our contract on 1368, and if you are, why?" You never asked him that question, did you?
A. I never used those words, no.
Q. Okay. Now, you had testified yesterday in response to some of my questions, sir, regarding your experiences in other parts of the country where you went to do business. Do you remember some of those questions?
A. No. Ask me.
Q. Well, okay. Let me just set it up for you. I asked you some questions yesterday that when you went to other cities to compete, it was your experience that certain politicians had certain favorite contractors, isn't that true? Do you remember me asking you that question?
A. I said that they liked certain contractors.
Q. Sure. And you indicated that, you know, you would have to compete with that kind of a situation when you would go to another city, for example, like Cleveland, I believe you referenced at one time.
A. Yes.

Q. Okay. And you testified yesterday that that was normal, wasn't it, certain politicians --
A. For them to like certain contractors, yes.
Q. Right, it's normal, right?
A. It's normal.
Q. It's absolutely, 100 percent normal, correct?
A. That's right.
Q. Now, I want to make sure that we're all clear on this, and to the best of your recollection when you met with Mr. Kilpatrick in 2002 regarding this contract, you would agree with me that in addition, at no time -- let me rephrase it -- at no time during your conversation with Mr. Kilpatrick, he never said to you "Mr. Soave, if you don't use Bobby Ferguson you're not going to get anymore work in the City of Detroit." He never said that to you, did he?
A. No, and I explained that the last --
Q. Sir, I just asked you --
A. -- two, two days.
Q. Sir, listen --
A. No, he did not say those words.
Q. All right. I don't want to disrespect you, sir, I just want to get an answer to my question.
A. I answered that yesterday.
Q. Thank you. Now, when you talked about mentoring other businesses along the way, along your long, illustrious business

career, you testified that you're mentoring the company, not the person, am I right or wrong about that?

A. Yes.

Q. Okay. Now, we know, and you would agree with me, that Charlie Williams didn't have any equipment, any employees or any experience doing any kind of pipe rehabilitation, sewer work and work of that nature, correct?

A. In this case, the person is the company. He was, he was a lawyer, he had a law firm.

Q. But no employees whatsoever and, as we indicated --

A. Not that I know of.

Q. -- not the ability to get in there, put on --

**MR. BULLOTTA:** Your Honor, I object. We've gone through this over and over again. We did it yesterday, and --

**THE COURT:** Well, you raised it --

**MR. RATAJ:** He just raised it.

**THE COURT:** You raised it on redirect, so he can --

**MR. BULLOTTA:** We can't keep going over the same stuff or else I'll get -- I'll have to get back up and go back through it.

**BY MR. RATAJ:**

Q. Mr. Williams did not have any experience, he had no ability to put boots on the ground, to get in there and get muddy and get dirty and do actual work, am I right or wrong?

A. I disagree when you say he doesn't have any experience. He

didn't have boots and he didn't have, what, what else did you say?

Q. He didn't have people.

A. But when you say he didn't have any experience and he ran the DWSD, I don't know how you can say he didn't have any experience so ...

Q. Well, he had -- sir, he had experience running DWSD, but that's a different animal than having employees and equipment that know how to go out into the field and deal with problems regarding pipes and sewers and things of that nature, am I right or wrong?

A. I was mentoring him and that was part of what we were going to do for him, and you can phrase it the way you want. I obviously -- and that's your opinion, he didn't. I thought that he would be a good, you know, company to mentor, because he did have some experience around DWSD, and we were going to help him with the part he didn't have, and hopefully, at the end it was going to, it was going to be fruitful.

Q. Well, you would agree with me that in terms of contract 1368 he didn't have the ability to go out and do what Mr. Ferguson had the ability to do because he didn't have any employees and he didn't have any equipment and he didn't have any actual work experience, am I right or wrong about that, sir?

A. Say that one more time, please. I didn't quite --

Q. In terms of carrying out, in terms of carrying out the provisions of contract 1368, and the goal of that contract was pipe rehabilitation, Mr. Ferguson is the one who had real employees, real equipment and experience to go out and actually do the job, am I right or wrong, to do the work, the grunt work?

A. He had the equipment and he had a company that was doing work like that, so he would -- I don't know if he did lining work before, but he was equipped to do that.

Q. Right. And in terms of carrying out the provisions and the goals of contract 1368, Mr. Williams did not bring to the table the same things that Mr. Ferguson brought to the table, am I right or wrong?

A. No, but we didn't choose Mr. Ferguson.

Q. Sir, am I right or wrong about that?

A. Sir, we didn't choose Mr. Ferguson. We chose --

Q. Sir, am I right or wrong about what I just asked you? Mr. Ferguson had the ability to go out and do the work, he had employees, he had equipment, he had experience, Mr. Williams did not have those three things in terms of doing actual work, am I right or wrong?

A. He had experience. He did not have the equipment, and what else did you say?

Q. People.

A. When you say he didn't have experience --

Q. People.

A. No, he didn't have people.

**MR. RATAJ:** Thank you. I have nothing further.

(10:06 a.m.)

**RECROSS EXAMINATION**

**BY MR. GUREWITZ:**

Q. Mr. Soave, I believe that just a few moments ago when Mr. Bullotta asked you questions you said that you assumed when you went to see Mayor Kilpatrick at this meeting that you've now been asked about more times than you like, that you assumed that Mayor Kilpatrick was the boss and that's why you went to see him?

A. Yes.

Q. It is just the view that all of us who live in Detroit believe that the mayor's the boss. That's where the buck stops, right?

A. Yes.

Q. And, in fact, you know, because you're a real consumer of news about what's happening in the city, that there are a lot of other positions and people, like the city council and the corporation counsel, that have some role in what gets done and when it gets done, isn't that right?

A. Yes.

Q. And just this exhibit that you've seen before, DIN1-14A, doesn't, in fact, have a place for the mayor to sign on it,

does it?
A. Well, I don't know if purchasing is part of the mayor's office.
Q. You don't know.
A. No, I don't see his -- I don't see a --
Q. Okay.
A. -- place for the mayor to sign.
Q. What you had on your mind at the time you went to see him was that if it wasn't getting done someplace, you thought that maybe he's the guy who could get it moving, right?
A. It's like when people come to see me in my company, I don't exactly do those things, but they think I can make it happen, I guess.
Q. That's what you thought when you went to see Mayor Kilpatrick?
A. I thought there was -- I was told there was a holdup in the mayor's office.
Q. And you wanted to get it going and you thought he's the guy who can shake it up if it has to be, right?
A. Yes.
Q. And just to be clear, if, in fact, purchasing isn't in the, under the mayor's control but relates to the city council, that's just, if that's true, you don't know that, do you?
A. I do not know that, no.
Q. So that may be the case and it may have, in fact, have been

the case then, that the mayor had nothing to do with controlling the purchasing department and you didn't know it.

A. Maybe he has no control over anything, I really don't know. I believe he does, did, so that's what my belief was.

Q. In April of 2002, the mayor did not control the finance department, did you know that?

A. No, I didn't know that.

**MR. BULLOTTA:** I'm going to object. He has no knowledge of this area. He said that --

A. No, I don't know.

**MR. GUREWITZ:** Well, I asked the question if he knew it.

**THE COURT:** Sustained. I mean, he's indicated that he went on the basis of the memo and what he was told from his people. This has been gone over ad nauseam.

**MR. GUREWITZ:** That's all I have.

**THE COURT:** All right. Done?

**MR. BULLOTTA:** None.

**THE COURT:** Thank you, Mr. Soave.

**THE WITNESS:** And thank you. Thank you, folks.

**THE COURT:** You may be excused.

**THE WITNESS:** That's it?

**THE COURT:** Yes, that's it.

**THE WITNESS:** You sure?

**THE COURT:** I'm sure.

(Witness excused at 10:10 a.m.)

**THE COURT:** Next witness.

**MR. CHUTKOW:** Government calls Kathleen McCann.

**THE COURT:** Good morning, Ms. McCann.

**THE WITNESS:** Good morning, Judge.

**THE COURT:** How are you?

**THE WITNESS:** I'm fine, thank you.

**THE COURT:** I need to swear you in. Would you raise your right hand, please.

**KATHLEEN B. MCCANN,**

at 10:11 a.m., being first duly sworn by the Court to tell the truth, was examined and testified upon her oath as follows:

**THE COURT:** Thank you. You may take the stand, please.

**DIRECT EXAMINATION**

**BY MR. CHUTKOW:**

Q. Good morning, Ms. McCann.

A. Good morning.

Q. Could you please state and spell your name for the record for the jury.

**MR. THOMAS:** Your Honor, can we approach?

**THE COURT:** Sure.

(The following sidebar conference was held:)

**MR. THOMAS:** Not to be petty, but when I had my law

clerk come into this building, I wanted her to sit behind me, she was told by the marshal service that she couldn't do it.

At this point now, not only is the lawyer for Mr. Soave and an unidentified person sitting behind the prosecutor's desk, there's also Mr. Soave. We have a sequestration order. I think that that's --

**THE COURT:** He's done, he's been excused.

**MR. THOMAS:** He may be, but there has obviously been communication between his lawyer and he relating to this case, and the effect of the sequestration order is subverted to the extent that Mr. Soave now has a chance to listen and talk to Ms. McCann, who he's very close with and who's just recently left his company.

**THE COURT:** No, he's been excused, and I don't see anything improper about him sitting here. I can instruct Ms. McCann not to discuss the matter with Mr. Soave.

**MR. THOMAS:** And Mr. Soave to do the same.

**THE COURT:** And Mr. Soave to do the same.

**MR. THOMAS:** I don't necessarily mean that in front of jury.

**THE COURT:** No, I'll do that at the break.

**MS. VAN DUSEN:** Your Honor, would you consider, I think there's just a little -- it's kind of intimidating that he's right behind the government's table like where the agents sit. I mean, I know it sounds so petty, but I looked over

there, and I have to say I was a little taken aback.

**THE COURT:** I'm not going to -- I think to make an issue of it now, I think, would be inappropriate.

**MS. VAN DUSEN:** Well, at the break.

**THE COURT:** At the break, I'll ask him to move back a row.

**MS. VAN DUSEN:** If we took our break now -- I don't mean to be so forward, but if we took our break now, then he could rearrange himself.

**THE COURT:** I don't really want to take a break right now.

**MS. VAN DUSEN:** Okay. Fine.

**BY MR. CHUTKOW:**

Q. Ms. McCann, you were about to state your name and spell it for the record.

A. Sure. It's Kathleen B. McCann, K-a-t-h-l-e-e-n, B., M-c-C-a-n-n.

Q. Ms. McCann, where do you currently work?

A. I currently work for an organization called United Road Services, Inc.

Q. What is your title?

A. I'm the chief executive officer.

Q. The CEO?

A. Yes.

Q. What is United Road Services?

A. We're a leading finished vehicle logistics provider, which means we move cars throughout the nation.

Q. How many employees do you -- work under you?

A. Approximately a thousand.

Q. And what are your annual revenues?

A. Approximately $300 million.

Q. Is United Road connected to Soave Enterprises in any way?

A. No.

Q. How long have you been working as CEO for United Road?

A. I joined the company in January of 2011.

Q. And before that, where were you working?

A. I was working with Soave Enterprises.

Q. What was your title there?

A. Senior vice president.

Q. And as senior vice president, what were your responsibilities?

A. At the time I left the company, I had recently during the past years been responsible for our beer distribution operations, I worked with various corporate initiatives and I also served on the board of directors. Up until 2005, I had responsibility for our industrial services portfolio. At one point I had responsibility for our car dealership group and other companies.

**THE COURT:** Ms. McCann, you need to slow down a little bit.

**THE WITNESS:** Oh, sure.

**BY MR. CHUTKOW:**

Q. We'll break those down. You said the first one was beer distribution?

A. Yes.

Q. And you were in charge of that division of Soave Enterprises?

A. Right. I had responsibility for that group of portfolio companies, so they had on-site management, but I served as the board liaison overseeing the investments.

Q. And then you mentioned something else about, was it automotive transport or car dealerships?

A. Right. Soave had a group of dealerships in Kansas and Missouri that I had responsibility for for a period of time.

Q. And the last one I think you mentioned was industrial services?

A. Correct.

Q. What does that entail?

A. The industrial services group included the Inland companies, MPS Group, and a small sewer and lining company we had called ProLine. Obviously, we sold, I think you've heard, sold that group in 2005 and I remained on the board for some period of time subsequently.

Q. Who else was in the management group at Soave Enterprises?

A. Well, Tony obviously was the CEO and chairman. I was a

member of a group of five individuals; myself, Mike Piesko, our CFO; Yale Levin who was executive vice president; Mike Hollerbach handled our real estate group; Rick Brockhaus was our treasurer.

Q. How long did you work for Soave Enterprises?

A. Twenty-one years.

Q. Starting when, what year?

A. Early 1990, I believe, yes.

Q. And before that where were you working?

A. I ways CPA with Coopers & Lybrand.

Q. That's one of the Big Eight or big, whatever, big nine?

A. Right, at the time it was part of the Big Eight, correct, yes.

Q. I want to direct your attention to a contract with the Detroit Water and Sewerage Department called 1368. Do you recall that contract?

A. I do.

Q. And can you tell us approximately when Inland Waters submitted a bid for that?

A. It would have been in 2001 sometime.

Q. Sometime before, while Dennis Archer was the mayor?

A. Correct.

Q. And at the time what was your responsibilities as it related to Inland Waters?

A. I was a member of the board and, again, the executive

liaison from Soave, so Inland had its own president and leadership team who ran the day-to-day operations, and I would, I would interact with them from a corporate perspective.

Q. Now, we've seen some records in this case that there were, in fact, two smaller contracts that were merged together. Do you recall that?

A. Yes.

Q. Can you just tell us generally what type of contracts those were and why they were merged together from your perspective?

A. My recollection is that there were two bids, one for large pipelining and one for smaller pipelining, and Inland bid them both and was the low bidder in both cases, and ultimately, both of those contracts were merged together into one.

Q. And when you say pipelining, are you talking about that cured-in-place procedure?

A. Indeed, yes.

Q. And the only difference between the contracts was what, the width of the pipes that were being lined?

A. I think so. It's been a long time since I've looked at the contract, but the large differentiation was that one was a bigger diameter pipe and the other was a smaller diameter pipe.

Q. Are you actually involved as the -- I guess you said you were a senior vice president. Would you be involved in putting together the bids, or at what level are you?

A. Not typically. That would have been handled by the folks

at Inland. It was obviously a very large bid. Inland at the time was probably a company with 50 million in revenues or so, so this was a very large bid for them, so would have had familiarity that the bid was going in and that folks were comfortable with the pricing.

Q. Who at Inland would have been primarily responsible for putting together the bid, if you know?

A. Dennis Oszust.

Q. And what was his position and title at Inland?

A. Senior vice president, I believe, at Inland. He'd been there quite a long time.

Q. And do you recall, did Inland put in bids for both of these contracts with the same teams in place, proposed teams?

A. My recollection is they did, but I'm not a hundred percent sure.

Q. Who were just the main players on these contracts, as you can recall?

A. Well, Insituform would be the largest subcontractor. They were a well-known national lining company, cured-in-place pipe lining company that we had done work with for many years at Inland. We also bid with CJ Williams & Associates, and there were a number of other smaller contractors.

Q. And what is your understanding as to what happened with the contract after the bids were submitted?

A. Well, once we knew the bids had been opened and it had been

determined that we were, Inland was the low bidder, Inland further received notice from the DWSD water board, I believe, that these were the results. Kathleen Leavey at the time, in charge of the water and sewer department, put forth a recommendation that this contract be approved, and then it became stuck.

Q. How did you hear about that, how it became stuck?

A. Well, at the time, Inland was completing an existing contract with the city, and as they were finishing that work, they started running out of revenues and were paying more and more attention to when that contract was going to be released. So as time went on, there was more urgency and, you know, we would ask more questions, "When is the contract going to come?" So I don't know there was a point in time, but it was an evolutionary process.

Q. And this existing contract, was that doing the same sort of work that ultimately 1368 would entail?

A. In large part, I believe so.

Q. So cured-in-place lining of old sewers?

A. Yes.

Q. And why was there an urgency to get the 1368 going? Can you explain? Like, was it -- did it have to do with your crews or the equipment, or what?

A. Well, yes. I mean, we have, we have a lot of employees that depend on that revenue stream. We have equipment that had

been invested in at Inland that needed to be kept busy, and we would have essentially had to lay off employees had the work not continued subsequent to the end of the existing contract.

Q. So in a situation like that, you're making lots of inquiries of the department, the Water and Sewerage Department, or not you but people beneath you, to try to figure out what's, what the holdup is?

A. Yeah.

**MS. VAN DUSEN:** Objection, Your Honor, that's leading.

**BY MR. CHUTKOW:**

Q. Well, do you know?

**THE COURT:** Overruled. You may answer.

A. The employees at Inland would have been making regular inquiries as to the status of the contract.

**BY MR. CHUTKOW:**

Q. And then reporting back to you?

A. With some regularity, yes.

Q. Now, you mentioned a CJ Williams. Is that Charlie Williams?

A. Indeed.

Q. What were the plans for Mr. Williams as it relates to these lining contracts?

A. When Inland chose Mr. Williams to be the minority subcontractor, the primary minority subcontractor on this

particular piece of work, there was a lot of excitement about the potential. Clearly, Charlie did not have a big company that was already doing this work. However, he had been the CEO, if you will, of the Detroit Water and Sewer Department, one of the largest departments in the world, let alone the State of Michigan, and there was tremendous opportunity to teach him the other, the game from the other side of the ball and potentially build a national scope minority company in this particular area. So we were very excited about working with Mr. Williams and building a company together.

Q. Now, you're a CEO of a large company yourself. Is that something you just learn in a day, how to administer a thousand employees, I guess you'd say you have?

A. No, no, certainly it's a -- happens over a number of years.

Q. I know the private sector and public sector are different, but from your perspective, is somebody with managerial skills in the public sector somebody that can have the potential to do the same in private sector?

A. Oh, very clearly. There was --

Q. Now -- I'm sorry.

A. There was no question in our mind that Charlie would be a very successful leader of a company doing this type of work.

Q. Was Mr. Williams the director of the Water and Sewerage Department for a short period of time, or what was your understanding how long he had been doing that job?

A. As I sit here, I don't recall how many years Charlie was the director of the water and sewer board, but he had a very impressive resumé. He's an attorney, he had done consulting. I think he had other jobs within the City of Detroit that he had proven to be very successful at. We'd had a long relationship with him at Soave and had a lot of confidence in his abilities.
Q. You trusted him?
A. Very much so.
Q. His judgment?
A. Yes.
Q. And the plan at the time, did Inland Waters have its own lining company that it could do this kind of work, this technical work?
A. No, not at that time. We were -- we were using Insituform who had that lining technology and -- to do that portion of the contract.
Q. And is that, that specialized lining work, is that where a lot of the revenues come in these, in this type of rehabilitation of sewers?
A. Yes. If you were to look at the breakdown of that $50 million contract, a big portion of it would have been associated with the lining. That was something that Mr. Soave had always wanted us to get into directly, and was part of the future planning.

Q. So given that industrial services was part of your portfolio, was there a significant business interest for your company to try to establish this sort of lining business?
A. There was. As I mentioned, we had been encouraged regularly by Mr. Soave to expand into that part of the business. As the years went on, we ended up buying a small sewer lining company called ProLine in order to begin to establish that expertise ourself.
Q. And then was the plan that Mr. Williams would come in, take over that and expand it?
A. We knew that eventually we would evolve the overall operation, so that whether it was in the, in project management or in the lining or in the equipment management, whatever the technical needs were, that the minority company we could establish would be capable of really doing this work soup to nuts, so that would be an evolutionary process.
Q. And you would provide the equipment and the know-how, and Mr. Williams would provide the managerial expertise?
A. Well, we never actually had an opportunity to do that, but the expectation was that Mr. Williams would build up his company, we would provide the mentoring, we would provide the expertise, we would provide, help him build crews since we knew how to bring those types of people into the organization, and that over time there would be the establishment of a company that was able really to do it all.

Q. You said you never had the opportunity to do that. What did you mean by that?
A. Well, once the contract got stuck, for lack of a better description, there was -- it became clear that there was a reason why, and Mr. Soave went and met with the mayor and was asked or instructed to replace Mr. Ferguson -- or Mr. Williams with Mr. Ferguson.
Q. Now, I'll get to that in a moment.
A. Yeah.
Q. But I want to still understand what the plans had previously been with Mr. Williams. Where was it envisioned that he would establish his business?
A. In Detroit.
Q. And at the time were there any minority companies doing this technical type of lining work?
A. Not to my knowledge.
Q. And then when you said you were going to take it nationally, why did you think that that was a possibility with Mr. Williams?
A. Well, the opportunity was pretty, was pretty significant. He had, again, an incredible resumé. He'd led the largest water and sewer department, maybe in the country. He had certainly established credibility for his own name, and Detroit was obviously well-known throughout the nation. There are many large cities that have contract -- that let contracts that

require minority content, and so to have a company in that space, particularly one that was credible, that had technology, that had the experience working with a company like Inland who also had a good reputation, would have been in a position to really take advantage of these opportunities across the country.

Q. Now, after, and we'll get to the issues with Mr. Ferguson in a moment, but after replacing Mr. Williams with Mr. Ferguson, did you all just basically wash your hands of Mr. Williams?

A. Well, Mr. Williams was talked to and told of the current circumstances. He was disappointed, but we ended up making an economic payment to him to help ease the, you know, ease the hurt of being asked to remove himself from this contract which, you know, he had been an active part of the bidding process with.

Q. I'll get to that in a moment, but I'm just talking about going forward in the future, did you guys have continuing business relationships with Mr. Williams?

A. Yes, we did, yes, we did.

Q. Can you describe that to the jury?

A. Sure. An example of one of those relationships is that Soave was an investor in a company called MPS Group, is still today, as a matter of fact.

MPS Group is a minority business enterprise.

General Motors had come to us and asked us to invest as a minority -- what I mean, percentage ownership minority, so 48 percent of the business -- to help mentor this company in the industrial services space.

At the time, Mr. Soave invested in MPS Group, Charlie became a member of the board of directors, and was engaged with us in helping to mentor that company. Further, as time went on, Mr. Williams became an owner of MPS Group and today serves as its CEO and majority owner.

Q. And what is his percentage of ownership, do you know?

A. I think it's 52 percent.

Q. So he's the controlling owner?

A. That's right.

Q. And he's also an executive of MPS Group?

A. I believe he's the CEO.

Q. Now, did Soave Enterprises continue to make investments in Mr. Williams' company over the years before he became the CEO in terms of, like, capital investments and things like that?

A. Certainly, there was a lot of support from a number of different angles. I don't remember the exact dollar amounts. The company, when we originally invested, was doing about $6 million of revenue per year; ultimately, before the automotive meltdown, grew to $55 million a year in revenue, and today they're somewhere, I understand, in the $40 million range. So there's been a continued capital support as well as

other mentoring support for this business.

Q. And Soave Enterprises still has some component of ownership interest in the company?

A. Yes, I believe it's the other 48 percent.

**THE COURT:** Let's take a 20-minute break.

(Jury out 10:33 a.m.)

(Recess taken 10:33 a.m. until 10:55 a.m.)

(Jury in 10:56 a.m.)

**THE COURT:** Be seated. Proceed.

**MR. CHUTKOW:** Thank you, Your Honor.

**BY MR. CHUTKOW:**

Q. Ms. McCann, you mentioned briefly that there had been -- that you understood that there had been a holdup in this 1368 contract, and what did you do with that information? Did you let Mr. Soave know that?

A. Either Dennis Oszust or I would have let him know, yes.

Q. And then at some point in time, did --

**THE COURT:** Wait, wait.

**A JUROR:** Can you bring up your voice? We can hear her fine. We just can't hear you.

**MR. CHUTKOW:** Okay. I'll lean forward. Let me know if I'm not talking loud enough.

**BY MR. CHUTKOW:**

Q. Now, at this point, was this of some concern -- what period of time are we talking about here where you started having

concerns about this holdup?
A. It would have been the spring of 2002, so within months of the contract decision being made.
Q. And you had been managing this industrial services portfolio for some time at this point?
A. Well, I had been the assigned executive for maybe a couple years, would be the appropriate timeframe.
Q. Had you had any other city contracts of this magnitude held up before?
A. Not to my knowledge, no.
Q. And where was your understanding where the holdup was?
A. Our understanding was the holdup was in the mayor's office.
Q. And did you know how the mayor related to the city council, like what the -- what the steps in the process were?
A. I may have had a better understanding back then than I do today, but certainly the folks at Inland would have known all those steps.
Q. Okay. And they were advising you about that?
A. Correct.
Q. And then at some point, did Mr. Soave go and see the mayor? Did he tell you that he did?
A. Yes.
Q. And when he came back, what did he tell you?

**MS. VAN DUSEN:** Your Honor, I would object on the grounds of hearsay.

**MR. CHUTKOW:** It goes to the state of mind.

**MS. VAN DUSEN:** Could we have a sidebar, please?

**THE COURT:** Yes.

(The following sidebar conference was held:)

**MS. VAN DUSEN:** Your Honor, the reason I'm objecting is I think this fits within the hearsay objection. I'm sure that Mr. Chutkow is going to speak in terms of the climate of fear. If they want to talk about the climate of fear, him coming back and advising her what the mayor told him, which was, "Use Ferguson," has nothing to do with the creation of a climate of fear, so, and that's why, most respectfully, I don't believe that it fits within the exception and certainly not within the cases, as I understand them in the Sixth Circuit, regarding the hearsay exception in the climate of fear.

**MR. CHUTKOW:** This is so within the wheelhouse of Collins, I don't even know what to say. These --

**THE COURT:** I think it is, too. Overruled.

**MS. VAN DUSEN:** Okay.

(End of discussion at sidebar.)

**BY MR. CHUTKOW:**

Q. What did Mr. Soave tell you about his meeting with the mayor regarding the holdup of the contract?

A. Just the essential message was that Williams was out and Ferguson was in.

Q. He told you that the mayor had told him, Mr. Soave, that?

A. Not in those exact words, but yes.

Q. Now, at that time, did you know who Mr. Ferguson was?

A. No, I did not.

Q. And did you investigate to determine who he was?

A. I don't recall doing a deep investigation. I know that we asked the folks at Inland if they were familiar with him and they had -- they were indeed.

Q. Did you have any discussions with Mr. Williams to break the news to him that he had been replaced?

A. Yes.

Q. What was his reaction?

**MR. GUREWITZ:** Objection, Your Honor.

**MS. VAN DUSEN:** Your Honor --

**MR. GUREWITZ:** Hearsay.

**MS. VAN DUSEN:** Clearly calling for hearsay.

**THE COURT:** What was -- you can describe how he acted. Don't repeat what he said. You can just describe his reaction without articulating any specific words that he said.

A. Mr. Williams was very disappointed.

**BY MR. CHUTKOW:**

Q. Now, at some point, did you have a meeting with Mr. Ferguson?

A. Yes.

Q. About when did that occur?

A. It was later in the spring of 2002.

Q. And what prompted you to go see him? Did someone instruct you to do that?
A. Mr. Soave instructed Yale Levin and I to go visit with Mr. Ferguson.
Q. And you mentioned Yale Levin before. Who is he?
A. He's an executive vice president with Soave.
Q. And you went to where, to Mr. Ferguson's offices?
A. Yes, we went to his office on Wyoming.
Q. Just the three of you, then, Mr. Levin, you and Mr. Ferguson?
A. That's right.
Q. And tell us about your discussions with him.
A. It was an initial introduction, so we told each other about our backgrounds, our companies. As I recall, Mr. Ferguson told us about his family history and ownership of the business, the types of work that he had done. We shared with him our experience, the various businesses that Soave was in, our previous experience in mentoring minority companies, et cetera.
Q. And what was -- did he tell you what it was that he could do for your company?
A. Well, Mr. Ferguson clearly had a company with yellow iron. He had done contracts in the City of Detroit, and for not just the city, but for other folks, so he made clear that he had contracting expertise and the like. As it relates to what he would specifically do on this contract, I don't recall that he

specifically said what he would do on this contract.

Q. Did he have a -- did it appear to you that he had a focus in what he wanted to talk about?

A. One of the focuses was how much money he would make on the contract.

Q. And specifically what was he saying in regards to that?

A. My recollection is that he was interested in realizing a material portion of the profits from the contract, and 3~percent was his target.

Q. He wanted 3~percent of the entire contract?

A. It wasn't completely clear to me during the course of our conversation what he meant. Yale believed that he meant he wanted 3~percent of the profits --

**MS. VAN DUSEN:** Your Honor, I would object.

A. -- on the entire contract.

**THE COURT:** Wait, wait.

**THE WITNESS:** Sorry.

**MS. VAN DUSEN:** Yes, I would object to Ms. McCann recounting what Mr. Levin told her.

**MR. CHUTKOW:** It goes to their decision-making process later, Your Honor.

**THE COURT:** No, I sustain the objection.

**BY MR. CHUTKOW:**

Q. Now, when -- but 3~percent, from your understanding, did that just cover 3~percent of the work that he would, do or a

broader amount?

A. It was confusing to me, to be honest. The focus on profit as opposed to how much revenue I will do under the contract was unusual, so there was not a lot of diving into detail during this initial conversation.

Q. Why was it unusual to you that Mr. Ferguson was focusing on the profits he would receive rather than the revenues?

A. Most contractors focus on the top line and internally determine how much profit they're going to make based on the efforts that they provide for that revenue.

Q. And, but that wasn't what he was expressing to you in this conversation.

A. That's not my recollection.

Q. Now, 3~percent profit on a $50 million contract is what?

A. A million and-a-half dollars.

Q. Now, did you talk to him about areas that you thought that he could assist your company?

A. Whether it was in that meeting or subsequent meetings, we talked about various opportunities. Dig-up support, material support, equipment support, lining support by providing labor and crews, so there were a number of different ways that Mr. Ferguson's company could have contributed to the contract.

Q. And when you would discuss these things, these opportunities, at least early on in your conversations, what was his reaction?

A. Well, it was luke warm, might be the right way to describe it. It took us a long time to get to the finish line of what exactly the work was going to be, how it would be papered, and how it would be executed. So there were a number of discussions that the folks at Inland had, and subsequently that I had as well, to try and get us to that point of how the 20 percent minority content target was going to be met with Ferguson Enterprises.

Q. Did you perceive that he was being helpful in that process? Did he explain to you what he could do?

A. I wouldn't describe it as helpful, no.

Q. How would you describe it?

A. Difficult.

Q. Now, he didn't help you on your bid in any way, did he?

A. No, he did not.

Q. Did it -- because of that, did it surprise you that he wanted 3~percent of the profits?

A. I did not understand the 3~percent to -- I really didn't understand the 3~percent. It was a, kind of a nonsensical focus, for me a little slow on the uptake, I guess. But ultimately, we knew that there was work that we could have him do. We focused on that.

Q. Now, you've dealt with lots of contractors and subcontractors in negotiations, have you not?

A. Yes.

Q. Is it typically in that situation where, if you're the prime, you're the customer, so to speak?

A. Yes.

Q. Did you feel like in your --

**MS. VAN DUSEN:** Your Honor --

**THE COURT:** Are you going to object?

**MS. VAN DUSEN:** No.

**BY MR. CHUTKOW:**

Q. Did you feel in this situation when you met with Mr. Ferguson on this first encounter that he was treating you like the customer?

A. No, no, we didn't.

Q. And why not?

A. Normally, when you have an opportunity for a subcontractor to do $10 million of work with you, they will be very aggressive in trying to get to the finish line, "Get the contract signed, put me to work, here's what I can do," and quickly reconcile issues that are in the way so you can get to work.

This was not that type of circumstance at all.

Q. How did you perceive his attitude in these initial meetings?

A. Again, difficult. There was a substance-over-form issue. There could be conversation that he was interested in getting to work, but the actual movement on getting contracts to the

appropriate place would take a very long time, so that happened repeatedly, not just with me, but with the folks at Inland.

Q. Given that kind of attitude and the fact that you described yourself as the customer, why didn't you just tell him, "We can go find somebody else"?

**MS. VAN DUSEN:** Your Honor, it's an entirely hypothetical question which I think is improper and not based on the facts.

**THE COURT:** Overruled. You may answer.

A. We were essentially in a forced marriage, and we knew that this was a relationship that we were going to have to endure, and so we did our very best to ultimately get to these contractual arrangements in order to satisfy the promise we made to the City of Detroit to do this work under the DWSD contract.

**BY MR. CHUTKOW:**

Q. When you say "forced marriage," who did you perceive was forcing you to be in this marriage?

A. Well, Mr. Ferguson's company had been chosen by Mayor Kilpatrick as our subcontractor.

**MR. CHUTKOW:** Your Honor, if I may, I apologize for this, may I have a brief sidebar on an issue that's just about to come up?

**THE COURT:** Yes.

(The following sidebar conference was held:)

**MR. CHUTKOW:** This is going to be very brief, and when she was in this meeting with Mr. Levin, as they left, she was very confused about why Mr. Ferguson was behaving the way he was and why he wasn't being helpful, and she had a conversation with Mr. Levin, and he said, "The guy wants money for nothing, he wants to -- basically for no work," and they used that, they had the discussions with Mr. Soave and that was the basis for which all of their future discussions with Ferguson, which is going to all come out, that they kept on trying to press him to do work because they didn't believe that he wanted to do it. And without me being able to articulate that, a lot of what comes is going to seem nonsensical, so it's, and Mr. Levin is going to be here to testify to the same issue.

**MS. VAN DUSEN:** Fine. Then --

**THE COURT:** Yeah.

**MS. VAN DUSEN:** -- he can testify that that's what he told her.

**THE COURT:** I don't think she can testify to what he said about that. He is going to be here?

**MS. VAN DUSEN:** Next witness, Your Honor.

**THE COURT:** Next witness?

**MS. VAN DUSEN:** Well, I don't mean to -- assuming he's available, but on our list, he's the next.

**THE COURT:** Okay.

(End of discussion at sidebar.)

**BY MR. CHUTKOW:**

Q. Ms. McCann, I now want to ask you about a Mackinac Island policy conference which occurred in early June of 2002. Do you recall that?

A. I do.

Q. And did you actually attend that meeting?

A. I did.

Q. While you were up there in Mackinac, did you meet with Mr. Ferguson again?

A. Yes.

Q. And what discussions did you have with him at that time?

A. It was again around the breakdown of the contract and what his potential performance under the contract might be and for what dollar amounts.

Q. What was his focus at these meetings?

A. It was general conversation around what it would be, whether it was, whether it was going to be crew support, equipment support, dig-up support, et cetera.

Q. Did you come to a rough understanding of allocation of work at that point?

A. I believe we did, yeah.

Q. And just roughly what was it that you recall saying that he could do for the company?

A. Well, there were -- the contract is broke down into some

primary components; cleaning and TV-ing and lining and then dig-ups, and so we had identified a percentage of the dig-up work that would be targeted for him to do and then looked to the balance of work and said that we'll figure out crews, equipment, whatever the case may be, materials, in order to meet the remaining amount of the $10 million target.

Q. The target that you had originally allocated to Mr. Williams?

A. That's right.

Q. Now, when you say dig-up, what does that mean?

A. I'm not a technical expert on this, but oftentimes in sewer work you'll have to go in with heavy equipment and dig out dirt around pipes and do that type of thing, so we would have cured-in-place pipe lining, but you may also have to go in and dig up the earth and excavate and do some particular work underground.

Q. I want to show you what's been marked as Exhibit IN1-1A.

**THE COURT:** Are you --

**MR. CHUTKOW:** I'll move to admit it.

**THE COURT:** Received.

(Government's Exhibit IN1-1A received into evidence.)

**BY MR. CHUTKOW:**

Q. If you can look up at the screen here and tell us what we're looking at here.

A. This looks like a memo from the -- or to the DWSD from Dennis Oszust, our vice president at Inland, regarding 1362 and 1368 contracts.

Q. And if we could go down to the various consultants and subconsultants. Do you see the --

**A JUROR:** Would you please go back to the top and slow down a little bit, please.

**BY MR. CHUTKOW:**

Q. The date of this is again?

A. December 4, 2001.

Q. And if we can go down to the list of consultants and subconsultants, what does IWPC stand for?

A. Inland Waters Pollution Control.

Q. And then DBE stands for?

A. I think Detroit-based enterprise.

Q. And percentage of the contract is 35 percent?

A. Correct.

Q. And then the next subconsultant is what?

A. Insituform.

Q. And what was their percentage?

A. 30 percent.

Q. They were going to do the specialized lining of the pipes?

A. Correct.

Q. And then CJ Williams is also listed?

A. That's correct.

Q. And what is his percentage?
A. 20 percent.
Q. Now, it was your testimony that he was going to then be working with you and Insituform to develop an expertise in the lining area?
A. Right. The lining, project management, et cetera. TV, cleaning, the whole thing. We intended to really have Charlie learn the business from the other side.
Q. Then we, at the bottom, have listed Willie McCormick, L D'Agostini & Sons and Superior Construction, do you see that?
A. Yes.
Q. Were these going to be your excavators for the project?
A. That's likely true, but I didn't know these firms. Inland folks would know that better.
Q. And they were all Detroit-based enterprises?
A. Correct.
Q. If Mr. Ferguson was going to be doing this excavation work, do you know if he was going to be displacing your other existing, some of the work from your existing excavators?
A. I don't know really.
Q. And that would be something for someone else to answer?
A. Yes.
Q. Now, when you were at this policy conference, did you have any meetings with members of the mayor's office or encounters with members of the mayor's office?

A. I had encounters. There are a number of events at the island over this three-day conference, so it's not uncommon to run into people.

Q. What about a gentleman by the name of Derrick Miller?

A. I probably ran into Derrick a few different times. One particular time was at an event at one of the island's hotels that was a celebratory event. I don't remember the exact reason for the event, but there were a number of folks including the mayor there. Pretty packed room.

Q. Was Mr. Ferguson there, too?

A. Yes.

Q. And Derrick Miller, do you know what his position was at that time with the city?

A. I don't recall. Chief of staff or -- maybe. I don't recall his title.

Q. Someone within the mayor's cabinet?

A. That's right, yes.

Q. And then what happened when you met him at this party with the mayor?

A. He asked me how our negotiations were going with Ferguson.

Q. Did you bring that up, or did he?

A. He brought it up.

Q. And how did you feel about that?

A. I was uncomfortable. This was a very public setting. There were great sensitivities that we had as a company. The

contract was not done, our numbers had been on the street for some time. We were concerned about the fact that Mr. Williams had been replaced by another contractor and that our competitors could use this as an excuse to protest and ask for the contract to be rebid.

I didn't, I didn't -- while it was not a lengthy conversation, it didn't seem appropriate to me to be asked the question from someone in the administration as to where our negotiations stood.

Q. In your experience, you know, doing industrial services, had you had other cabinet level officials come to you and ask you about how your negotiations are going with a subcontractor?

A. This was the first time I'd experienced that.

Q. Now, you said that you had concern because your numbers were on the street. What did you mean by that?

A. Well, we had bid this contract in the end of 2001, and the, the results had been published that Inland had indeed ended up as the low bidder on both the small diameter pipe contract and the large diameter pipe contract, and so those results had been published, and it was well-known that the Inland bid was 15 to 40 percent less than the next bidder.

So to the extent that we now had a change in the participants in the bid, and there was a -- there were still competitors out there who wanted this work, it would have been an easy opportunity to protest and suggest a rebid. So we were

very nervous about losing this opportunity based on the delays, and to have these conversations in a public setting like this seemed inappropriate and was an anxiety increasing moment.

Q. Did you actually record what had happened shortly thereafter?

A. Well, I took some notes of some of the thoughts that I'd had at the conference, and once the meeting was done and I'd gotten back to my phone, reached out to Mr. Soave and Mr. Levin and had a conversation with them about my concerns at the conference.

Q. Now, what is the competitive disadvantage for you to have your pricing information out on the street?

A. If a competitor was successful in suggesting that a contract be rebid, the numbers that Inland had worked up and put in under, you know, sealed bid have now been opened and are available for the public and our competitors to see. For the contract to be rebid, we would have been at a distinct disadvantage as our numbers were public.

Q. So can you explain to us just what this means, a sealed bid, what happens and what's the purpose?

A. Well, it's really to ensure appropriate levels of competition and that the community is spending its money in the most prudent way, so it's not uncommon for municipalities, indeed for for-profit companies, to go out for bids and ask folks to submit sealed bids and do so in that type of setting

so the bids are -- however they administratively deal with it inside the department, I don't know, but obviously they open all the bids and they rank the various bids that have been submitted based on the criteria that they use to judge their appropriateness for the city.

Q. And the fact that a cabinet level official had approached you about your negotiations with Mr. Ferguson, did that concern you as, that there was undue influence? What was your concern?

**MS. VAN DUSEN:** Your Honor, objection to the leading nature.

**THE COURT:** Yeah, let's just take the question, what was your concern, the question as originally phrased. What was your concern?

A. My concern was that our contract was not yet done, and to the extent that a member of the cabinet was asking me how the negotiations were going with Mr. Ferguson, not only in a public setting but paying that close of attention, it let me know again that these negotiations needed to be completed before the contract was let.

**BY MR. CHUTKOW:**

Q. While you were at the policy conference, did you run into the mayor of Detroit?

A. Yes.

Q. And did you have any conversations with him about Mr. Ferguson?

A. The mayor is very friendly, and just a passing conversation on the way out that, you know, Bobby was a good guy and we said -- you know, I told him that we were working on it, and he said, "I know you are."

Q. "We are working on it," meaning what?

A. We'll figure this out.

Q. Figure what out?

A. We'll figure out how to identify $10 million worth of revenue for Mr. Ferguson to do on this job, was my intention.

Q. Were you comfortable talking with the mayor about this at all?

A. It wasn't a long conversation so ...

Q. Now, you mentioned that Insituform was your specialized lining company. Did you have any meetings with them to try to figure out how to fit Mr. Ferguson into your project?

A. Yes, we did. We had a number of conversations with them around lining support, materials management, equipment. Most of these conversations were had by the Inland staff directly.

Q. And who would that be?

A. Dennis Oszust and his team.

Q. Did you ever have any direct meetings with the executives at Insituform about this?

A. On occasion, yes.

Q. Who in particular at Insituform would you have talked to?

A. I had a meeting that I recall, or email exchange with John

Marich, who was, I think, a regional executive for Insituform, and also Tim Tousignant, another regional VP. I think, I don't remember, one or the other succeeded each other, so --

Q. Did you come to a rough understanding with Insituform as to how you were going to fit Mr. Ferguson in on your project?

A. The Inland folks, Dennis and his team, did work out those details with Insituform.

Q. And do you know what the general parameters were in terms of profit sharing or anything like that?

A. Well, the ultimate goal was to ensure that Ferguson Enterprises did work, to the extent that they were going to earn reasonable profits on that work, everybody was fine with that, so there was a review of the types of work that could be done, and then a desire to work out how many crews it would take, how much labor, how much equipment, et cetera, that would allow for those targets, for both revenue and profit to be reached.

Q. Were there any specific discussions with Mr. Ferguson about point repair work and whether that would be a separate profit item for him?

A. I don't recall specific questions around point repair work.

Q. Did you ever have discussions with Mr. Ferguson about the need for him to actually do work for the profits that he wanted?

A. Yes. I mean, that was common sense. We pay subcontractors

to work on contracts.

Q. But was that something that you felt you had to press with him?

A. Well, it was interesting. The actions speak louder than words, and to the extent that ultimately the contract started and we still had not gotten to a point where we had negotiated contracts with Ferguson Enterprises, we were wondering really how serious they were about really doing work on this contract.

Q. And what about Insituform, were you able to come to an agreement with them about what their scope of work was?

A. Yes, Insituform's subcontract with Inland was signed shortly after our contract being released by the City of Detroit.

Q. And was the difficulties coming to an agreement with Mr. Ferguson having -- causing you concern at all as the contract -- or as the project moved forward?

A. We had a very large concern that we were going to be unable to meet the minority requirement as promised to the City of Detroit. The contract had started, and Inland has begun to recognize revenues, they were working very quickly under the contract, there were a lot of tasks being released, and we still did not have meaningful work from Ferguson Enterprises because basic contracts had not been negotiated fully and signed.

Q. And did that become an area of focus for you, to try to get

this contract done with Mr. Ferguson?
A. Yes.
Q. And did you work directly with him on that?
A. Most of the work really was directly between Inland, Dennis Oszust, their attorney, and Ferguson Enterprises. From time to time, I would interject myself to try and turn up the heat and get everybody to the finish line.
Q. Now, what ultimately -- did you guys come to some agreement with him as to how he was going to get his profits and what type of work he would do?
A. Ultimately, there was a labor lease agreement signed with Insituform and a materials management agreement signed with Insituform.
Q. And what does that mean? Can you describe those two things just generally?
A. Yeah, the labor lease agreement, as I understand it, was really for Ferguson to provide crews, so labor at the job site to help with the installation of the lining. And then from a materials management perspective, this was acquiring the various materials, I think resins and liners and whatever the case may be, and helping to manage logistics and those types of things.
Q. In your own interactions with Mr. Ferguson on these negotiations, did he appear to be reasonable to you from, you know, your experience in doing these kinds of things?

A. The difficulty -- there was more difficulty than we have typically experienced with subcontractors. There was an express desire to do work, but there was an unwillingness to accept financial risk or insurance risk or those types of things.

There were specific requirements in the city contracts that we really had to have in our subcontract agreements, and whether or not the city required them, our internal policies required them, and many of those clauses and particular risk mitigation measures proved very difficult to get over the threshold with Mr. Ferguson. Ultimately, I think it was in early 2003, those contracts were indeed signed.

Q. And this assumption of risk, I mean, he was getting a percentage of your profits from the entire project, is that right?

A. Well, he was, he was slated to earn profit on the work that he performed on the contract. The challenge was we couldn't give him revenue until he had the signed contracts.

Q. And in your experience, when somebody shares in profits, do they also put forward some, also sharing in the risk of the project?

A. Oh, absolutely, no profit without risk, for sure.

Q. Now, did Mr. Ferguson have a specialized lining company to do this cured-in-place procedure that you were going to be doing on this contract?

A. No, he did not.

Q. Did he -- did you extend any offers to help to mentor him so that he could develop some of those skills?

A. Yes, we did.

Q. And what was his reaction?

A. He was not interested in mentoring.

Q. Did that prove to be a problem for you in terms of finding work for him?

A. Well, this question would be, I think, well posed to the folks at Inland. From my perspective, there were continued difficulties in trying to figure out how to get him to do work without some coordination and some support.

Ultimately, on the labor leasing contract, I know that Insituform helped him to build some crews, for instance.

Q. Now, you mentioned earlier that the intention was to get Charlie Williams involved in some of this specialized lining work from an administrative perspective and to grow it nationally. From your discussions with Mr. Williams, did he seem willing to be mentored, to develop this kind of company that you envisioned?

A. Mr. Williams was very enthusiastic about coming into an opportunity to work with the Soave companies. He obviously understood this business from an administrative perspective based on his historical experience. To learn it from the other side and to build a minority company that had this specialized

activity was, I think, very appealing to him, whether it was in Detroit or national.

Q. Eventually, you were able to enter into a contract with Mr. Ferguson?

A. Yes.

Q. But it was delayed after you had already entered into your agreements with the other companies then?

A. The Insituform subcontract was, I believe, executed before the two Ferguson contracts were executed with Insituform. I don't know the exact date that Inland did the dig-up contract with Mr. Ferguson.

Q. Once Mr. Ferguson's company actually started doing work, were there problems?

A. As communicated to me, there were --

**MS. VAN DUSEN:** Your Honor, I have to object here.

**MR. CHUTKOW:** She can only take action based on what she -- is communicated to her, so it's not for the truth.

**THE COURT:** Well, no, I don't -- I mean, I think I'll have to sustain this objection. She can testify with respect to her own knowledge of any problems that existed, but if someone told her about problems, that's not admissible.

**BY MR. CHUTKOW:**

Q. Did you have to take any sort of action based on issues with Mr. Ferguson's work performance?

A. There were a number of challenges that occurred over time.

One particular incident is we received a stop-work order from the City of Detroit at Inland, and it essentially said, "Do not provide your subcontractor any additional work until he corrects the work that is either behind or deficient."

So we had to, we had to work with him in order to get that caught up. There were a number of circumstances where billings were inappropriate, either in error or too high, that needed to be corrected. There were any number of things that the folks on the team working with him had to deal with.

Q. I'm going to show you what's been marked as IN1-31.

**MR. CHUTKOW:** Well, I'll move to admit it first.

**THE COURT:** IN1-31?

**MR. CHUTKOW:** Correct.

**THE COURT:** Received.

(Government's Exhibit IN1-31 received into evidence.)

**MR. CHUTKOW:** We can put it on the screen.

**BY MR. CHUTKOW:**

Q. Is this the stop-work order that you were describing?

A. Yes, it is.

Q. And it's kind of hard to read, so do you mind giving it a shot to tell us what it exactly says from the top up there?

A. I'm not sure what the first word is, but it might be "avoid verbal order."

Q. Tell what you, I'll read it since I have a better copy, and

tell me if I've got it right.

A. All right. Great.

Q. "Avoid verbal order, August 19, 2004." Do you see that?

A. Yes.

Q. And then it says, "To: Dennis Oszust"?

A. Yes.

Q. That again is someone at Inland?

A. Yes.

Q. And then it says, "Be advised that spot sewer repair work performed by Ferguson Construction Company, contracted by Inland Waters Pollution Control, be stopped until the issues of restoration for the attached job work sites be resolved."

Do you see that?

A. Yes.

Q. And then it's signed out, "Ronald Holloway, Principal Construction Inspector, Detroit Water and Sewerage."

Do you see that?

A. Yes.

Q. And then on Page 2 on the very top it says, "Deficiency list, August 2004, sewer spot repairs."

Do you see that?

A. Yes.

Q. And then there's just a list of different locations, is that correct?

A. Correct.

Q. Now, is this the stop-work order that was one of the examples of concern to you?
A. Yes.
Q. What does restoration work mean? What is that?
A. Again, I typically would not deal with this level of detail, but my general understanding is that restoration work is once dig-ups have been done or lining has been done and the soil and land has been disturbed that you go back in and make things new for the homeowners or the community where the work was done.
Q. So they have a sidewalk and curbs and no holes, and things like that?
A. They restore things to their prior existence.
Q. Now, did you have to have meetings with Mr. Ferguson about these performance issues?
A. I didn't have a meeting with him on this right as it happened. We had a subsequent conversation around this.
Q. Did Mr. Ferguson ever tell you -- what was his reaction when you did have a conversation with him about it?
A. Well, he was upset that he was unfairly blamed for this type of activity. It was not uncommon for people to have complaints once their homes had been disturbed in some way or another, and so he felt he was being a scapegoat.
Q. Did he ever make mention to you about his role in the contracts that you had received from the water department?

A. Mr. Ferguson took credit for the contracts that Inland had with the Detroit Water and Sewer Department, even 1368, the $50 million contract that we had won through the bidding process.

Q. And he had not been on the bid?

A. He had not.

Q. Did he explain how he should receive credit for getting you that contract?

A. His theme was he was disrespected, we did not give him the credit that he deserved for us having this contract, that he could have done this work with anyone and chose to do it with us. That was a recurrent theme.

Q. Even though your company was the one that had won the contract?

A. Yes.

Q. Did he ever take credit for amendments to the contracts that you received?

A. Thematically, yes. 15 Mile Road was a big sinkhole that Inland came in and was the emergency contractor on, and he took the responsibility for that, saying that we were there only because of him.

Q. Did you take any sort of diary notes or keep any sort of records of your interactions with Mr. Ferguson?

A. I did. I kept some records of conversations and memorialized in longer form longer conversations.

Q. And did you encourage anyone else that interacted with him to also do the same?

A. Yes. The folks at Inland that interacted with Ferguson Enterprises were instructed to memorialize their conversations, take good notes, make sure that they stayed within the guardrails, but we had a sense that some day we were going to be telling the story and thought it important to, to have a documentation.

Q. What did you mean that some day you'd be telling the story?

A. Well, there were a couple of concerns. Firstly, to the extent that there were these ongoing, sometimes direct, sometimes veiled threats, we knew that the risk of losing the work kind of was hanging over our heads.

Furthermore, at the beginning, when we had gotten so far down the road into the 1368 contract with no minority content to speak of, we were wondering whether or not we were intentionally being crippled, and so the contract could be taken away and given to someone else since we clearly weren't doing whatever needed to be done on Ferguson's terms.

So it was a combination of things. It's like breathing the air where there was a constant threat, again veiled and sometimes direct, around our contractual relationship, so we tended to take notes.

Q. What did you mean by "stay within the guardrails"?

A. There was a strong message throughout our organization that

we wanted to make sure that, at the end of the day, whatever happened with Mr. Ferguson, we didn't know, we didn't know all the back stories that are now quite public, that we didn't find ourselves or our company tainted by that, so our folks were instructed, make sure that Mr. Ferguson works for any of the work that he's -- or any of the monies that he earns, and if it takes us $20 million into our contract before we can give him any meaningful work, so be it. So we weren't -- what the message to the people was, in staying inside the guardrails, is don't pay for anything that has not been earned.

Q. No no-show payments?

A. No.

Q. Was that something that you were concerned that Mr. Ferguson was looking for?

**MS. VAN DUSEN:** Your Honor, I will object to this as leading.

**THE COURT:** Sustained.

**BY MR. CHUTKOW:**

Q. Is this something that you normally do as part of your business practice, kind of keeping a log of your interactions with a subcontractor?

A. Well, I typically at this level wouldn't have had as much interaction. This was a particularly difficult circumstance, so I stayed closer to it than I would otherwise have for this company. But I will confess to being a general note-taker, but

this, this particular circumstance rose to a different level, so we were more meticulous about documenting meetings and the like.

Q. Now, you earlier testified about a, this stop-work order that your company had received in connection with Mr. Ferguson's work in August of 2004. As a result of that, did you or any other members of your organization go to speak to the mayor?

A. Mr. Soave went and had a meeting with the mayor. He was concerned about the stop-work order and wanted to make sure that there wasn't some other message there.

Q. And when Mr. Soave came back, what did he tell you that the mayor had told him?

A. No, everything was fine.

**MS. VAN DUSEN:** Your Honor, I would object on the same grounds as we discussed before.

**THE COURT:** Overruled on the same grounds.

**BY MR. CHUTKOW:**

Q. What did Mr. Soave tell you?

A. That Mr. Ferguson was still our subcontractor.

Q. That that was what the mayor had told him?

A. Yes.

Q. Your other partner in this contract was Insituform. Do you know whether they had meetings with the mayor regarding Mr. Ferguson?

A. I am aware that members of their team had conversations with the mayor.

Q. Who in particular?

A. Bernard Parker.

Q. Anybody else?

A. I may have other things in my notes, but as I sit here, that's the only one I remember.

Q. All right. Do you remember a gentlemen by the name of Paul Jorgensen?

A. Paul Jorgensen, right, Insituform, uh-huh.

Q. Did he ever tell you about a conversation he had had with the mayor?

**MR. GUREWITZ:** Objection, Your Honor, hearsay.

**MR. RATAJ:** Yes.

**THE COURT:** Same ruling.

**BY MR. CHUTKOW:**

Q. Did Mr. Jorgensen ever tell you about a conversation he had had with the mayor about Mr. Ferguson?

A. My understanding, my recollection is that Mr. Jorgensen indicated that Bobby was the guy.

Q. That the mayor had told him that Bobby was the guy?

A. Yes.

Q. You mentioned a sinkhole on 15 Mile, I believe it was in Sterling Heights?

A. Yes.

Q. This was an emergency matter that Inland got involved in?
A. That's correct.
Q. Did Mr. Ferguson want to get a portion of that work, too, the profits from any work that was done on the sinkhole?
A. Yes.
Q. And what specifically did he want?
A. Well, Mr. Ferguson wanted essentially the same targeted deal that he had had under the 1368 contract which was 20 percent of revenues and the associated profit.
Q. Now, this emergency work up in Sterling Heights, was this specialized type of stuff, not like the normal sewer repair work that you were doing?
A. That's right. It was an emergency, and there was a huge chasm in the ground, and much specialized equipment was brought in, specialized crews, et cetera. The pricing under emergency type work is different, so there were a number of things that were different about this particular piece of work.
Q. And I believe you earlier testified that this was one of the projects that Mr. Ferguson took credit for getting to Inland?
A. Yes. Mr. Ferguson was ultimately very disappointed with the level of revenues that he received on this job which, if I recall correctly, was in excess of $50 million, and his portion was very small, and so it had to do with disappointment that it wasn't the same amount, but it was all we could do for his

particular, the value that he could bring to that type of work.

**MR. CHUTKOW:** Your Honor, if I may have one moment.

(Brief pause.)

**MR. CHUTKOW:** I'm going to move to admit a couple of documents, Your Honor. I just spoke with Ms. Van Dusen, and there's no objection. They are IN1-47 and IN1-50.

**THE COURT:** Received.

(Government's Exhibits IN1-47 and IN1-50 received into evidence.)

**BY MR. CHUTKOW:**

Q. If we could put IN1-47 up first. And I'll give you a copy if it's easier to read. Can you start with the first email, and that is dated, I believe, September 15, 2005. Just tell us from whom, to whom, date and content.

A. Right. This is an email from Dennis Oszust, the VP at Inland to me regarding Amendment Number 4, and he's indicating here that he heard from Tim Tousignant, who is the Insituform VP, that he heard from his source in administration, whoever Bernard Parker's contact is, that the amendment is being held up because of the 15 Mile issue with Bobby.

Q. And I'll just stop you there. Did you understand that to mean the, what percentages or what revenues he would receive from that sinkhole amendment?

A. Yes.

Q. Okay.

A. Yes. So it appears that either Dennis or someone from Insituform checked with a number of other sources to check on where the signed amendment was, and they heard that it's awaiting executive approval.

He goes on to say that he's going to be meeting with Bobby to settle outstanding issues with his invoices on 15 Mile tomorrow and we'll see what he has to say then.

Q. Do you know who Victor is?

A. Victor Mercado, the head of the DWSD.

Q. And then you respond, "What are the outstanding issues with Bobby?"

A. Right. That was in response to Dennis' last sentence, where he said he was going to settle outstanding issues, and I asked, "What are the outstanding issues?"

Q. What did you understand the issues to be?

A. Well, at the time, I asked, but I believe that they had to do with the amount of revenue he was able to earn on that job and how much profit he was going to be able to earn on that job.

Q. I'm going to now show you what's been marked and admitted as IN1-50. Put this up on the screen. If you could do the same for this one.

A. Sure. This is an email dated October 11, 2005 from Dennis Oszust again at Inland to me regarding Amendment Number 4, and he's saying that there's info from Bernard Parker who, again,

he is an Insituform employee, who talked to QK during the weekend and the amendment is held up until Ferguson Enterprises is satisfied.

Q. Do you know who QK is?

A. The mayor.

Q. It's Kwame Kilpatrick, but it's misspelled there?

A. That's right.

Q. What is Amendment Number 4, is that related to the sinkhole?

A. This was, as I recall, an amendment that was subsequent to the sinkhole.

Q. Was it for funding a portion of the proceeds that needed to be appropriated to pay for the sinkhole?

A. I don't recall that it was for the sinkhole or additional lining work that was going to follow once the sinkhole was done. It was at the end of the sinkhole work, so it may have had some overflow, I just don't recall.

Q. Okay. Earlier, you testified that in, I think it was, was it December of 2005 you'd had a conversation with Mr. Ferguson about some of the issues?

A. Yes.

Q. And when was this in connection, was there any sort of a political event that this was shortly thereafter?

A. The mayor's reelection.

Q. Mayor of Detroit?

A. The mayor of Detroit's reelection.

Q. So at that point what happened, did Mr. Ferguson come and pay you a visit?

A. He had called and requested a meeting with Dennis, again from Inland, and I, to cover a number of topics.

Q. This particular election, was there a period of time where it looked like someone else was going to win?

A. I think it was a close election for awhile, yes. I don't remember the exact result.

Q. Okay. So after the election, Mr. Ferguson pays you a visit. Can you tell us about that conversation.

A. Mr. Ferguson essentially came to deliver a message, and that was that he was dissatisfied with the historical relationship, it had been too difficult for him, and that he wasn't going to go forward under these same circumstances, and then he proceeded to describe a number of different areas that had been troubling to him, all of which I documented in a memo subsequent to the conversation.

But they included a litany of items. He felt he had been disrespected, he felt he had not been given appropriate credit for getting Inland its work over the last four or so years. He was upset about the fact that he had been required to sign a note for a receivables advance from the company to help him with cash flow, he was upset about conversations that had been had directly by Mr. Soave or Mr. Levin with the

administration, and felt that that was a violation of their relationship.

There were a number of other things on the -- during the conversation, but he essentially said we have also some things to fix and your people know what they are, and I'm surprised they haven't told you, but essentially I suggest you find out, and then we'll make a decision about how to go forward.

Q. Now, I may have misheard you. Did you say this was a troubling meeting for you?

A. Yes.

Q. And why was that?

A. Well, the litany of topics covered, the fact that Inland was still essentially, had this sword dangling over their head, the fact that Mr. Ferguson acted as if if he had full power in order to keep Inland getting work or not getting work. This was going to be his decision about whether or not he went forward with us.

Q. Did he have anything to say about Victor Mercado who was the director of the water department?

A. There was a, as part of the conversation regarding 15 Mile and his disappointment that he received so little revenue on that job, we explained to him that we had made repeated attempts to look for work that he could do, and indeed Inland had had a conversation with Victor Mercado about minority

content and was there more that he could do. Victor responded to Inland, "Don't worry about that, do the job and do it well." And we explained that to Bobby, and he responded that, "This was a smoke screen, Kathleen." We described it to him as more of a firewall, I mean, we literally tried, we looked, I know the folks at Inland looked for additional work to give him, but his further response was, "You act like Victor Mercado has ever made a single decision there ever."

Q. Now, you said that you felt like there was a sword dangling over your head. What did you mean by that?

A. Well, by this time, Soave had sold the majority of its interest in Inland, but nonetheless, Inland had been a contractor with the city, particularly DWSD for many, many years, and the threat of potentially losing that work because we had a powerful subcontractor that was unsatisfied was a threat to the company.

Q. Now, you mentioned before that you described your relationship with Mr. Ferguson as a forced marriage --

A. Right.

Q. -- do you recall that?

If you didn't have this sword dangling over your head, would you have stayed in that marriage?

**MS. VAN DUSEN:** Your Honor, I will object to the tone of this question. It's totally speculative, aside from being ridiculous.

**THE COURT:** Let's just rephrase the question. I think you can rephrase it.

**BY MR. CHUTKOW:**

Q. Were you concerned about keeping your contracts with the city at that time?

A. Inland was concerned about keeping contracts with the city, indeed.

Q. And if you hadn't been concerned about keeping your contracts with the city, would you guys have continued your relationship with Mr. Ferguson?

A. No.

**MR. CHUTKOW:** I have no further questions, Your Honor.

**THE COURT:** All right. Let's take a five-minute break.

(Jury out 12:00 p.m.)

(Recess taken 12:00 until 12:13 p.m.)

(Jury in 12:13 p.m.)

**THE COURT:** Be seated.

Ms. Van Dusen.

(12:13 p.m.)

**CROSS EXAMINATION**

**BY MS. VAN DUSEN:**

Q. Ms. McCann, I'm Susan Van Dusen, one of the lawyers for Bobby Ferguson. Nice to see you.

A. Nice to see you, too.

Q. Thank you.

**A JUROR:** Could you pull the mic in front of you.

**MS. VAN DUSEN:** Oh, okay.

**BY MS. VAN DUSEN:**

Q. Ms. McCann, you began working for Mr. Soave, I guess, what is it, about 21 years ago now?

A. Almost 23.

Q. Okay. And before that, and I know Mr. Chutkow reviewed some of your background with you, but I just want to go over it. You started as a CPA at Coopers & Lybrand?

A. Correct.

Q. Then you became an auditor of a company owned by Soave called City Management?

A. Correct.

Q. And after that you became a controller for a waste group owned by Mr. Soave?

A. Of City Management, correct.

Q. Yes.

A. Yes.

Q. And eventually rose to become part of his executive team, I believe that you indicated that there were five individuals holding portfolios or four individuals holding portfolios, and the fifth person being the treasurer, correct?

A. Correct.

Q. And in that role, you were -- part of your portfolio was what you called the industrial services group which included Inland, correct?

A. Correct.

Q. And you described, in terms of your role as -- and I wrote this down, that you were to interact from a corporate perspective. Could you expand on that a little bit for us, please?

A. Sure. I think one of the things that makes Soave Enterprises work so well is that there is a group of professionals at the corporate headquarters that have expertise in various things, whether it be legal, risk management, human resources, tax, finance, et cetera, et cetera, so these professionals will support the operating businesses of the Soave portfolio depending on what's needed.

Sometimes it has to do with the level of maturity of the business, sometimes it has to do with the type of business, but there's general support for all the businesses in a portfolio.

Q. I see, and you left Soave Enterprises, correct?

A. Correct.

Q. And you assumed the position, I believe you told us, in January of 2011 as the CEO for United Road Services, correct?

A. Technically, I joined as president and became CEO earlier this year.

Q. Okay. And that's a company that has over a thousand employees and has 300 million in revenues?

A. Approximately.

Q. That's an impressive position, and we congratulate you on it. You have certainly risen through the corporate hierarchy, I would say.

A. Thank you.

Q. Do you not feel that way?

A. I've been very fortunate.

Q. Yes. Now, let's go back in time to the contract CS-1368, and your role in terms of your supervision of your portfolio and your supervision of Inland was basically that, as an overseer, correct?

A. I would say I was a surrogate for the owner, might be a better way to describe it. There is a, there are a number of strategic or other major issues that could happen at a company at any point in time, where what would typically be a board or someone else would come in and provide advice. So my, my role was detailed in some circumstances, and not so detailed in others.

Q. And while you were acting in that capacity you, I assume, had other duties in your role with Soave Enterprises, correct?

A. Yes.

Q. And those other duties related to, what, your supervision of the beer group?

A. Right, my --

Q. For example?

A. For example.

Q. So there was no way in which this role that you were playing took up the majority of your time, correct?

A. Correct.

Q. You would just sort of drop in and out of the situation, and I'm assuming that you would come into the situation perhaps when there was a problem that you could help solve, correct?

A. It may not be exactly fair to frame it as drop in and out or to just solve problems. Sometimes there are strategic matters associated with growth, acquisitions, major decisions on insurance, or et cetera, that someone like me would be involved in.

Q. Fair enough. You would have valuable input into any discussions relating to those matters, I would assume, correct?

A. That's correct.

Q. Now, the person, and correct me if you don't agree with this, but would you describe Mr. Oszust as the point person on this contract CS-1368, your point person?

A. Inland's point person, indeed.

Q. Yes, and he was a senior vice president at Inland, correct?

A. Correct.

Q. Although I notice in the correspondence he identifies himself -- and we'll come to some of his correspondence -- as

utilities manager. That was an additional role, a role in addition to senior vice president?

A. I think it's a function of titles more than anything, so I can't speak specifically to titles, but he had a high level of responsibility and was clearly the point person on this contract.

Q. And he communicated regularly with you about what was going on on this, both the bidding of the contract and the process, and then I'm assuming the work as it developed, correct?

A. Yeah, with some regularity, yes.

Q. Yes. And of course, the two of you, in this day and age, there was a lot of communication by email where he brought you up to date on certain things, correct?

A. That's correct.

Q. And, in fact, though from what you would know about what was going on with the nitty gritty of this contract, that you got from Mr. Oszust, right?

A. The majority of it, yes.

Q. Because he was on the site, correct?

A. Correct.

Q. And additionally, there was a Walter Rozycki, correct?

A. Yes.

Q. What was Mr. Rozycki's position?

A. I can't give you his exact title, but, again, very involved in the sewer lining part of our business.

Q. On a day-to-day basis, correct?
A. Yes.
Q. So the information that you would get relating to the progress of either the work or even interactions with Mr. Ferguson, that would all come to you primarily from Mr. Oszust and Mr. Rozycki, correct?
A. That's correct.
Q. Now, let's go to the specific contract.

**MS. VAN DUSEN:** And, Your Honor, for the sake of both yourself, the jury, my fellow counsel, I'm going to try to condense this process a little bit.

**THE COURT:** That's good.

**MS. VAN DUSEN:** We've all been through it --

**THE COURT:** Everyone thanks you.

**MS. VAN DUSEN:** We've all been through it, but Ms. McCann not, so you'll have to just indulge me here a little bit, okay?

**BY MS. VAN DUSEN:**

Q. In the fall of 2001, contract 1368 was bid, correct?
A. Yes.
Q. And Inland had the low bid, correct?
A. Yes.
Q. And the high score, right?
A. That's my understanding.
Q. And it was a $50 million contract, correct?

A. Two 25's.

Q. Yes, put together, 50 million?

A. Yes.

Q. Now, when you were interviewed by FBI Special Agent Beeckman, and that interview, if you recall, was in May of 2010, do you recall that?

A. I remember the interview.

Q. Yes, and he interviewed you just once, correct?

A. I believe so.

Q. Yes, and in the course of that interview, you provided a really large number of documents which I believe you actually characterized as your 1368 file, correct?

A. I don't know that I characterized it that way, but I did supply a number of documents, yes.

Q. And they all related to that contract and/or amendments to that contract, correct?

A. In large part, I think that's true.

Q. Yes. So just to take a look at a couple of these. First, we see, this is really, at least in the package of documents that I had in terms of what you gave, this is one of the earlier documents dated December 19, 2001 in evidence as DIN1-6, and what this shows us, does it not, Ms. McCann, that Kathy Leavey as the interim director of the department is reporting that the Board of Water Commissioners has authorized her to enter into a contract with Inland Waters, correct?

A. That's my understanding, yes.
Q. Yes. And this is really the beginning of the official process after the bid, correct, this notice to you, to Inland?
A. It's early in the process. I'm not intimately familiar with every step.
Q. Well, let's just see about going through it. We see here, and I'm inviting your attention and advising you, and this is the third page of this document, and we see there under the category called "Project Management Status, Start Work Date," do you see that?
A. Yes.
Q. Could you read what it says opposite that?
A. "To be established contingent upon Detroit City Council approval."
Q. Right. And you had this document in your file, correct?
A. Yes.
Q. Reading this document, as I'm sure you did, you knew that the actual starting work on this contract was, and I quote, Contingent upon Detroit City Council approval," right?
A. They ultimately need to approve all these big contracts, yes.
Q. Right. So when you told us earlier today, in the same way that you told Agent Beeckman during the interview, that it was only when Inland added Mr. Ferguson's company that the mayor approved the contract, that was not correct.

**MR. CHUTKOW:** Objection, that mischaracterizes her testimony. She didn't say he approved it. She said it was held up before it got to city council.

**THE COURT:** Sustained. You need to rephrase that question.

**BY MS. VAN DUSEN:**

Q. Do you recall -- we've already talked about the interview, correct, with Mr. Beeckman?

A. Yes.

Q. Inviting your attention to a report of interview, because I'm sure you noticed during that interview that Mr. Beeckman was taking notes, correct?

A. Yes.

Q. Yes. And that interview, as I believe I've already indicated, was in May of 2010, correct?

A. Give or take, yes.

Q. Yeah, and it's probably reasonable to say that your memory of events, understanding it was back in 2002, for example, was at that time eight years earlier, is it safe to say that your memory in terms of that interview with Agent Beeckman was probably better than it may be today?

A. I had the same documents then that I had today, so it's probably similar.

Q. So, really, you had to rely on the documents to bring this all back to you, is that what you're telling us?

A. Certainly, documents help you remember the facts as they occurred.

Q. Absolutely. As do your notes, I'm sure, correct?

A. Absolutely.

Q. Okay. So when you spoke to Mr. Beeckman, you definitely wanted to be as thorough as possible, correct?

A. I wanted to be as honest as possible.

Q. Absolutely. So in your efforts to be as honest as possible, which is exactly what you need to be when you're talking to an FBI agent, that you were very careful in how you remembered things, correct?

A. Again, I tried to recall to the best of my ability but be honest with what I remembered and what I didn't.

Q. Absolutely, because your intent was to be as truthful as you possibly could be based on the recollection of events that you had at the time of that interview, correct?

A. That's right.

Q. Okay.

**MR. CHUTKOW:** Ms. Van Dusen, will you please show me what you're going to show her?

**MS. VAN DUSEN:** Oh, I'm sorry.

**BY MS. VAN DUSEN:**

Q. Ms. McCann, inviting your attention to this sentence right here, and you're free to read the whole page or whatever you want, the whole document, just read that and then I'm going to

ask you a couple questions.

A. Okay. This is a --

Q. Oh, Ms. McCann --

A. Yes.

Q. -- read it to yourself.

A. Oh, thank you.

Q. Sorry.

Ms. McCann, having now read that document which reflects your interview with Special Agent Beeckman, is your memory now refreshed that you indicated to Agent Beeckman that the mayor had to approve the contract?

A. I did say that the mayor approves the contract in my interview.

Q. And what did you say at the first part of the sentence?

**MR. CHUTKOW:** Objection, this is improper impeachment. She can ask her what she remembers.

**THE COURT:** Sustained.

**BY MS. VAN DUSEN:**

Q. Yeah, what do you remember about that portion of the interview, Ms. McCann?

A. I can't say I remember this specific moment, but I'm sure, I mean, this says that in a letter from the DWSD --

**MR. CHUTKOW:** Ms. McCann --

A. Yes.

**MR. CHUTKOW:** You can simply -- well, I'll let the

judge tell you what to do.

**THE WITNESS:** Okay.

**THE COURT:** Just -- could we have a sidebar, please.

(The following sidebar conference was held:)

**THE COURT:** I know you asked for indulgence, but we have been over this so many times. Whether he had the power to approve the contract or not, she was under the impression, as was Mr. Soave --

**MR. THOMAS:** You know, Judge, the witness is right here, she can hear exactly what you're saying.

**THE COURT:** All right. Based on the memo that they received that this contract was being held up, whether he had the ultimate power to approve it or not, and we've already established that there's no signature block. I need to know what you're doing here because I don't think it's appropriate to spend another hour going over this same stuff that we've gone through with two other witnesses already.

**MS. VAN DUSEN:** I think that my intent is that, it is actually my, what I believe is Sixth Amendment right to confront this witness with her mistaken belief which, Your Honor, drove their actions. They were just dead wrong in not understanding the steps, and this contract didn't --

**THE COURT:** Well --

**MS. VAN DUSEN:** I know. And I don't know how to do it, but I feel I need to impeach her credibility in terms of

her mistaken belief.

**THE COURT:** Her mistaken belief has nothing to do with this. I will tell you that, I mean, I've heard this argument now for the last two weeks with all these witnesses. The fact is, whether he had the power, they believed he had the power, and it was being held up, and the salient fact is what occurred at that meeting and what happened afterwards.

**MS. VAN DUSEN:** Occurred at which meeting, Your Honor?

**THE COURT:** The meeting that Mr. Soave had with the mayor.

**MS. VAN DUSEN:** Oh, okay.

**THE COURT:** So, you know, if they were wrong, they were wrong. Big deal. We've done this, like, at least four times.

**MR. THOMAS:** Judge, they keep on putting witnesses up to say what their motivation was. We have to be able to challenge the motivation. If it was based on Mr. Soave's representation, and we want to argue that it didn't -- it did not occur the way Mr. Soave remembers --

**THE COURT:** What did not occur?

**MR. THOMAS:** That Mr. Soave had a conversation with the mayor and that the mayor had a, he had a clear impression that the mayor wanted Bobby Ferguson. Let's say, for the sake of argument, that we argue Mr. Soave's credibility, and that

his credibility has been in some fashion challenged, okay, then the mistaken belief on their part is relevant because the mayor has no power.

**THE COURT:** I'll give you some latitude on this but, you know --

**MR. THOMAS:** They put on witnesses every time and ask the question. We need to be able to rebut it, each witness.

**THE COURT:** Well, I'm not going to give you hours of cross examination on this, I'll tell you right now. You better move through this more quickly.

**MR. CHUTKOW:** Judge, can I just add one thing? We've already talked about a summary statement of a, of an agent not being -- I mean, she's, in essence, by going line by line through it, is doing what you're not supposed to do, which is to impeach the witness on it.

And, you know, this whole concept is misleading. The fact someone approves something doesn't mean they have to sign the document. That just means that they say go forward.

**MS. VAN DUSEN:** You can argue that.

**THE COURT:** You ask it, too, but you can't use it that way.

**MS. VAN DUSEN:** I've got to kind of think of a way to switch things around now, you know, to condense a few chapters.

**THE COURT:** Please do.

**MS. VAN DUSEN:** I'll do my best, Your Honor.

(End of discussion at sidebar.)

**BY MS. VAN DUSEN:**

Q. Ms. McCann, we're back. With your familiarity with the documents -- and by the way, did you review documents prior to testifying here today?

A. Yes, certain documents, not all documents, clearly.

Q. Did you review what was the file that you had turned over to Agent Beeckman?

A. How recently would you like to know?

Q. Well, I would like to know any time you did that.

A. I've -- probably when I had my preparatory meetings with my attorneys, I reviewed that file for getting ready to testify.

Q. You spoke to your own attorneys, but I'm assuming you also spoke to the government attorneys, correct?

A. Yes.

Q. And did you review the 302 prepared by Agent Beeckman of his interview of you in May of 2010?

A. Not prior to meeting with him, but subsequently.

Q. So before you came on the witness stand today, you reviewed that document, correct?

A. Within the last couple weeks I've reviewed it, yes.

Q. And did you make any changes or corrections in that document that you advised the government did not reflect your

statement?

A. I advised my attorneys of a few, what I'll call, nits and lice that don't change substantively the message of what's in that document.

Q. And to your knowledge, did they convey that, those nits and lice to the government?

A. I don't know.

Q. Have you seen the 302 in its entirety that I was showing you earlier, and did you notice if any of those changes had been made?

A. If the 302 is my interview summary --

Q. I apologize, it's --

A. I have only seen the one copy that I was given originally.

Q. The original copy from May of 2010, correct?

A. That's right.

**MS. VAN DUSEN:** And for the jury's benefit, Your Honor, I should say when I call it a 302, it's an FBI 302. That's our number for it. It's kind of like a tax return being a 1040. It's just a federal number that's assigned to that document. Thank you, Your Honor.

**THE COURT:** Generally speaking, it's a report of an agent of an interview that they have taken of a witness.

**BY MS. VAN DUSEN:**

Q. Now, just going to the approval of this contract, that was an approval by the Board of Water Commissioners during the

tenure of Mayor Dennis Archer, correct?

A. Yes, it was.

Q. Now, you are familiar with the fact that in February of 2002, Mr. Oszust, you know, who I know reported to you regularly, advised you that he had furnished certain documents to DWSD, correct? And you look puzzled, so let me show you.

I'm now showing you what's in evidence as DIN1-9, and you'll tell us if that is what, in your recollection, is the document that Mr. Oszust furnished.

A. This looks like a document that Dennis would have signed, and it's very possible it was in my records.

Q. Finished?

A. Just the first page.

Q. Well, take a look at the attachments, please.

**MR. CHUTKOW:** Your Honor, I'm going to object. At least my exhibit here says "Kilpatrick subpoena" on it, so this must have been subpoenaed from the city. I don't know see how it could have been in her office and at the city at the same time.

**MS. VAN DUSEN:** Your Honor, that document is specifically identified in, as being furnished by her in the FBI 302. My actual copy of it, or that which came in as DIN1-9, may have come from the Kilpatrick subpoena, but it's the exact document referenced in her FBI 302.

**THE COURT:** I'll permit it. Just using it to

refresh her recollection at this point anyway --

**MS. VAN DUSEN:** Yes.

**THE COURT:** -- and it's already in evidence from some other source.

**BY MS. VAN DUSEN:**

Q. Just to summarize this document for the jury, what we see here is that, in February, Mr. Oszust was just furnishing these required documents to DWSD including documents relating to the bond, insurance, that type of thing, correct?

A. According to that document.

Q. Yes. So, in fact, the approval process was in place, correct?

A. Again, I'm not intimately familiar with all the steps in the approval process, so the timing of the filing of this is really outside my scope of understanding, but I see that he did it on that date.

Q. Now, you knew, did you not, that Inland had actually even submitted an invoice for payment as early as March of 2002, correct?

A. I wouldn't necessarily know that. Again, I was not in the granular detail.

Q. Okay. Mr. Oszust didn't advise you of that?

A. I don't recall if he did or didn't, but it would be unusual for him to advise me of submitting individual invoices.

Q. All right. So to find out about that, we have to ask

Mr. Oszust, correct?
A. I don't have any detail about it.
Q. All right. But getting all the way ahead to the latter stages of this process, Ms. McCann, this document is in evidence as DIN1-14A, and it's the signature page on the back of Inland's contract. Do you recognize that document?
A. Not specifically, but I'll accept that that's what it is.
Q. You've seen the Inland contract, correct?
A. Yes, sure.
Q. And you saw, I'm assuming when you reviewed it, that the approval process continued through the spring of 2002 culminating in the contract being approved, if you'll look there at the screen, please, June 26, 2002, correct?
A. I see that it was approved on June 26th.
Q. Right. By the city council, correct?
A. Yes.
Q. By the, in the very same way in which the first document we looked at said that the start-work date letter would be issued once city council approved it, correct?
A. Yes.
Q. Do you recall that?
A. Yes.
Q. And on this document, we don't see any signature line for the mayor, correct?
A. That's correct.

Q. So he has no signing off authority on this, does he?

A. It depends on whether you're talking about written signatures or approvals, and our understanding was that the contract went through the mayor's office before it got to city council.

Q. Ms. McCann, if I could just take you back, what did you say about written sig -- signatures versus written approval? I need you to say that again.

**MR. CHUTKOW:** I'll object. She said approval, not written approval.

**MS. VAN DUSEN:** That's why I needed to hear it again because I wasn't --

**BY MS. VAN DUSEN:**

Q. Could you just repeat your last answer, please?

A. I think --

**THE COURT:** Do you want the court reporter to read it back?

**MS. VAN DUSEN:** Yes.

**THE COURT:** Suzanne, please.

(The record was read by the court reporter as follows:

"Question: So he has no signing off authority on this, does he?

"Answer: It depends on whether you're talking about written signatures or approvals, and our

understanding was that the contract went through the mayor's office before it got to city council.")

**BY MS. VAN DUSEN:**

Q. Ms. McCann, see if you agree with me, the contract has to go through the budget office, correct?

A. Again, I'm not intimately familiar with every step of the process, so I may have a difficult time agreeing or disagreeing with you.

Q. Did you know if it went through the budget office?

A. Sounds reasonable.

Q. Did you know if it went through the purchasing office?

A. Yes.

Q. You knew that?

A. Again, sounds reasonable.

Q. Did you know that the contract had to go to the law department, correct?

A. Sounds reasonable.

**MR. CHUTKOW:** Your Honor, at this point, this seems to be a waste of time. I mean, she doesn't have the foundation. She's just saying what is reasonable or not.

**MS. VAN DUSEN:** Your Honor --

**THE COURT:** Go ahead. I'll overrule it. You can ask.

**BY MS. VAN DUSEN:**

Q. Ms. McCann, not a single one of those departments is a part of the mayor's office, correct?

A. That's my understanding. Again, intimate familiarity is lacking.

Q. Well, you didn't let your lack of intimate familiarity stop you from drawing the conclusion that this contract had been held up in the mayor's office. You didn't say to yourself, "I don't know enough about this to make that judgment," did you?

A. That's because there are other people that have familiarity that were part of our team that thought that was what had happened, and indeed, I would suggest that after Mr. Soave met with the mayor and things started moving that it proved out that supposition.

Q. That was your conclusion based on what Mr. Soave told you, correct?

A. Correct.

Q. You have no personal knowledge of that, correct?

A. Correct.

Q. Now, you say there were people within. Would that be within Soave Enterprises or Inland Waters who knew what had happened?

A. What I was referring to is the specific process, that Inland folks have knowledge of the specific process.

Q. So who are these individuals within Inland who knew what

was happening?
A. Well, Dennis Oszust, as I indicated, was the point person on the contract and had worked intimately with the DWSD through repeated bids, so he would, he would have that knowledge.
Q. So if I can just distill this down, it's Dennis Oszust who told you and/or Mr. Soave that this contract was being held up, is that a correct -- do I understand that correctly?
A. Well, it was obvious to everyone we didn't have a contract yet, so we didn't need to be told that it wasn't done, so we knew that. And then beyond that, it's figuring out why not, why not, and we couldn't figure out why not, so that was -- it was concluded that it was in the mayor's office.
Q. You just automatically concluded that that's where it was, you didn't stop and think, well, maybe it's still in purchasing, maybe it's in budget, maybe it's in the law department? You didn't think that?
A. My recollection is that to the extent that those facts could be determined, there wasn't anything that led Dennis to believe that the contract was in any of those places, so ultimately the decision was made to check with the mayor.
Q. Okay. Now, now, the fact that this contract was awarded in the fall of 2001 and now we're in the spring of 2002 and it's a $50 million contract, there's a lot at stake here, that's not a long time, if you know, for these things to wend their way to final approval by the city council.

A. All I do know is that there was enough concern that the contract had not been let yet. It seemed long to those that were familiar with the process.

Q. So Dennis got anxious.

A. I think everyone was anxious.

Q. But he was the source of the information as to this conclusion that the contract was being held up, right?

A. I can't say he was the exclusive source. The fact is the contract had not been let, and it had seemed to take a very long time. Inland was running out of work to do on its remaining contract, and there was concern about why it was not being issued.

Q. The concern really was, may I suggest, that you were running out of work on the other contract, not that there was a time lag with this other one. That's what he was concerned about, correct?

A. The two go hand in hand.

Q. He needed a reason to explain why that 1368 had not been approved yet by city council, correct?

A. He didn't need a reason with us.

Q. He was getting no static from anybody?

A. Not static, no. Inquiries, support, where is the contract.

Q. So in order to answer the inquiries of his bosses he needed to come up with a reason, correct?

**MR. CHUTKOW:** Objection, calls for speculation.

**THE COURT:** Overruled. You may answer.

A. He wasn't getting pressure from his bosses. He would legitimately seek an answer. Everyone was curious as to the reasons the contract had not been issued. It's seemed unusual.

**BY MS. VAN DUSEN:**

Q. I understand that, but curiosity and fact, you would agree, are two very different things, correct?

A. Curiosity and fact are indeed different.

**MS. VAN DUSEN:** Your Honor, I'm in a totally different chapter.

**THE COURT:** All right. We can stop. So it's Friday. Have a nice weekend everyone.

(Jury out 12:55 p.m.)

(Proceedings adjourned at 12:55 p.m.)

\- - -

**C E R T I F I C A T I O N**

I, Suzanne Jacques, Official Court Reporter for the United States District Court, Eastern District of Michigan, Southern Division, hereby certify that the foregoing is a correct transcript of the proceedings in the above-entitled cause on the date set forth.

Date: December 7, 2012

s:/Suzanne Jacques
Suzanne Jacques

Official Court Reporter