UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


UNITED STATES OF AMERICA,

                           Plaintiff,              Case No. 10-CR-20403
                                                   Hon. Nancy G. Edmunds
        v.

D-1 KWAME M. KILPATRICK,
D-2 BOBBY W. FERGUSON, and
D-3 BERNARD N. KILPATRICK,

                           Defendants.
_____/


JURY TRIAL
VOLUME 48

        Detroit, Michigan - Wednesday, December 12, 2012

APPEARANCES:

For the Government:

Mark Chutkow
R. Michael Bullotta
Jennifer Leigh Blackwell
Eric Doeh
United States Attorney's Office
211 W. Fort Street, Suite 2001
Detroit, Michigan 48226

Counsel for Defendant Kwame M. Kilpatrick:

James C. Thomas
Michael C. Naughton
535 Griswold, Ste. 2500
Detroit, MI 48226
313-963-2420

**Appearances(continued):**

**Counsel for Defendant Bobby W. Ferguson:**

Gerald K. Evelyn
535 Griswold
Suite 1030
Detroit, MI 48226
313-962-9190

Michael A. Rataj
535 Griswold, Suite 1030
Detroit, MI 48226
313-962-3500

**Counsel for Defendant Bernard N. Kilpatrick:**

John A. Shea
Alexandrea D. Brennan
120 N. Fourth Avenue
Ann Arbor, MI 48104
734-995-4646

—   —   —

*Suzanne Jacques, Official Court Reporter*
*email: jacques@transcriptorders.com*

*Proceedings recorded by mechanical stenography.*
*Transcript produced by computer-aided transcription.*

—   —   —

*Jury Trial Volume 48*
*Wednesday, December 12, 2012*

# I N D E X
— — —

Government's Case in Chief                              Page

**Carol Paszkiewicz**

    Direct Examination By Mr. Chutkow          7

    Cross Examination By Mr. Thomas           84


Certification of Reporter                         144

*Jury Trial Volume 48*
*Wednesday, December 12, 2012*

# I N D E X
— — —

Government's Exhibits

|  Number | Received |
| --- | --- |
| DLZ-31 | 80 |
| IN1-1 | 55 |
| IN1-2 and IN1-7 | 7 |
| IN1-5 | 67 |
| IN1-5A | 68 |
| IN1-6 | 62 |
| IN1-6A | 70 |
| IN1-6B | 71 |
| IN1-6C | 72 |
| IN1-6D | 74 |
| IN1-9 | 7 |
| IN1-11 | 8 |
| IN1-12 | 66 |
| IN1-1B | 56 |
| IN1-30 | 10 |
| IN1-32A, IN1-32B, IN1-32C | 17 |
| IN1-33 | 20 |
| IN1-34 | 23 |
| IN1-34A | 18 |
| IN1-35 | 12 |
| IN1-37 | 15 |
| IN1-38A | 29 |
| IN1-39 | 27 |
| IN1-46 | 37 |
| IN1-52 | 32 |
| IN1-58A | 79 |
| IN1-68 | 25 |
| IN1-69 | 50 |
| IN2-12 | 44 |
| RC-1 | 62 |
| RC-2 | 64 |
| RC-34 | 76 |

```
 1            Detroit, Michigan
 2            Wednesday, December 12, 2012
 3            9:03 a.m.
 4                           -   -   -
 5            THE COURT:  Good morning.  Susan is still
 6   progressing okay?
 7            MR. EVELYN:  She had a little, minor setback, so I
 8   don't think she's going to be here, it doesn't look like she'll
 9   be here this week, Judge.
10            THE COURT:  Yeah, I talked to her yesterday, but I
11   didn't know since yesterday afternoon how she's doing.
12            MR. RATAJ:  She's still having headaches, Judge.
13   She's going to call her neurologist this morning.
14            (Jury in 9:05 a.m.)
15            THE COURT:  Ms. Van Dusen is still recovering from
16   the fall that she took on Monday, so she's not here today and
17   may not be here for the rest of the week, we're not really
18   sure.  She's not through with her cross examination of
19   Ms. McCann, but we are deferring that until she can get back
20   probably sometime early next week.  We're just going to slot
21   Ms. McCann in to finish the cross whenever it works out both
22   for her and Ms. Van Dusen.
23            In the meantime, we're going on, I believe, with
24   another new chapter in this case starting this morning.  Is
25   that right?
```

*Carol Paszkiewicz - Direct*
*Wednesday, December 12, 2012*

6

1          **MR. CHUTKOW:**  Yes, that's correct, Your Honor.  We

2     have one more witness, Agent Paszkiewicz, that's going to tie

3     some things up, text messages related to the Inland chapter,

4     and then the next witness after that will be involving the

5     Heilmann Recreation Center.

6          **THE COURT:**  Okay.  Ms. Paszkiewicz, I remind you

7     that you're still under oath.

8          **THE WITNESS:**  Yes, ma'am.

9          **A JUROR:**  Can we have a minute, please?  Now, this

10    is not phase three?

11         **THE COURT:**  This is part of the Inland chapter,

12    Ms. Paszkiewicz's testimony this morning, and then we're going

13    on -- the government is going on, I should say, to another

14    chapter which they have called the Heilmann chapter.

15         **MR. CHUTKOW:**  Just a housekeeping matter before we

16    begin.  There were a couple of exhibits that I needed to move

17    to admit from the previous testimony.  One is Exhibit IN1-2

18    which is a Board of Water Commissioners agenda dated

19    December 19, 2001, and that relates to that contract 1368.

20    Also Exhibit IN1-7, and that is, I think, the cover sheet and

21    signature pages for contract 1368.

22         **THE COURT:**  What was the date of that Board of Water

23    Commissioners agenda?

24         **MR. CHUTKOW:**  That was December 19, 2001.

25         **THE COURT:**  Both received.

*10-CR-20403   USA v. Kwame Kilpatrick, et al*

*Carol Paszkiewicz - Direct*
*Wednesday, December 12, 2012*

1           (Government's Exhibits IN1-2 and IN1-7 received

2           into evidence.)

3                     **DIRECT EXAMINATION**

4    **BY MR. CHUTKOW:**

5    Q.  I wanted to show you some documents and some text messages

6    surrounding this contract 1368 that Inland Waters had

7    administered.

8           First I'd like you to take a look at what has been

9    marked as Exhibit IN1-9.

10   A.  Okay.

11   Q.  Do you recognize this?

12   A.  I do.

13   Q.  And what is this?

14   A.  This is a text message exchange between Bobby Ferguson and

15   Kwame Kilpatrick.

16           **MR. CHUTKOW:**  Move to admit IN1-9.

17           **THE COURT:**  Received.

18           (Government's Exhibit IN1-9 received into

19           evidence.)

20   **BY MR. CHUTKOW:**

21   Q.  And what is the date of this text message?

22   A.  October 30, 2002.

23   Q.  And at that time had Inland Waters begun, started work on

24   the 1368 contract with the water department?

25   A.  Yes, they had received their start-work letter in July of

*10-CR-20403   USA v. Kwame Kilpatrick, et al*

*Carol Paszkiewicz - Direct*
*Wednesday, December 12, 2012*

8

 1    2002.

 2    Q.  And can you go ahead and read this text message,

 3    identifying who the sender is in each case, and the time?

 4    A.  Mr. Ferguson sends a text at 1:11 p.m., it says, "When do

 5    you meet with Soave?"

 6            Mr. Kwame Kilpatrick responds two minutes later,

 7    "Don't know, will holla later."

 8    Q.  And from your review of the records, Mr. Soave refers to

 9    whom?

10    A.  Anthony Soave.

11    Q.  Next I'd like you to take a look at Exhibit Number IN1-11,

12    and do you recognize this?

13    A.  Yes.

14    Q.  What is this?

15    A.  This is another text message exchange between

16    Mayor Kilpatrick and Bobby Ferguson on November 4, 2002.

17            **MR. CHUTKOW:**  Move to admit IN1-11.

18            **THE COURT:**  Received.

19            (Government's Exhibit IN1-11 received into

20            evidence.)

21    **BY MR. CHUTKOW:**

22    Q.  And at this point, November 4 of 2002, was the contract

23    underway at 1368?

24    A.  Yes, it was.

25    Q.  If you can do the same for this, publish by telling the

*10-CR-20403   USA v. Kwame Kilpatrick, et al*

*Carol Paszkiewicz - Direct*
*Wednesday, December 12, 2012*

9

1  name of the sender and the time and who responds.

2  A.   The first entry is Mayor Kilpatrick at 7:23 p.m., says,

3  "I'll call you later on Graimark.  I know you met today.  It's

4  F-ed up but I'm with George now.  I'll explain later."

5          Mr. Ferguson responds at 8:54 p.m., "I meet with

6  them, I cool.  You know, I don't cry for shit that don't help

7  both of us.  I didn't push the percent issue, I turn in budget

8  numbers for site work.  What we need to talk about is that

9  F-ing Soave."

10          And then the mayor responds at 8:55, so one minute

11  later, "Yeah, I'll holla later about that."

12  Q.   Now, at this time that this text message was transmitted

13  November 4, 2002, from your review of the records, was there

14  anything going on as it related to Soave Enterprises and

15  Mr. Ferguson?

16  A.   Mr. Ferguson was in negotiations with his, for his

17  subcontract with both Inland Waters and Insituform at the time.

18  It had not been signed yet.

19  Q.   I'd like to show you what's been marked as IN1-30 and do

20  you recognize this?

21  A.   Yes, this is another text message exchange between

22  Mr. Ferguson and Mayor Kilpatrick.  This one is dated August 9

23  of 2004.

24          **MR. CHUTKOW:**  Move to admit IN1-30.

25          **THE COURT:**  Received.

*10-CR-20403   USA v. Kwame Kilpatrick, et al*

*Carol Paszkiewicz - Direct*
*Wednesday, December 12, 2012*

10

1          (Government's Exhibit IN1-30 received into

2          evidence.)

3    **BY MR. CHUTKOW:**

4    Q.   And if you can go ahead and read this text message.

5    A.   The first one is from Mr. Ferguson and it's at 6:53 p.m.

6    "Tony's very smart.  He didn't call me back, Kathleen did,

7    asking me what was the meeting I requesting pertaining to.

8    Holla later."

9          Mayor Kilpatrick responds a minute later, "Cool."

10   Q.   From your review of the surrounding records, do you know

11   who Tony refers to here?

12   A.   That would be Mr. Soave.

13   Q.   And do you know who Kathleen refers to?

14   A.   That would be Kathleen McCann.

15   Q.   And during this period of time, August 9, 2004, from your

16   review of the records, was there anything happening related to

17   Mr. Ferguson and either Kathleen McCann and Tony Soave?

18   A.   Well, with Ms. McCann, there's records that indicate

19   that -- and from the DWSD records and Soave records that there

20   were some issues with Mr. Ferguson's company's performance on

21   the contract.

22   Q.   And were there any -- there was communications with

23   Mr. Ferguson about that, you said?

24   A.   There were records that indicate communication was,

25   happened with Mr. Ferguson and Ms. McCann.

*10-CR-20403   USA v. Kwame Kilpatrick, et al*

*Carol Paszkiewicz - Direct*
*Wednesday, December 12, 2012*

11

1   Q.  I'm next going to show you what's been marked as IN1-31,

2   and this can be published because this is already in evidence.

3               And can you briefly tell us what this is, including

4   its date?

5   A.  August 19, 2004.  It's what they call a stop-work order

6   from the DWSD related to CS-1368.

7   Q.  And what is it stopping work in connection with, whose work

8   performance?

9   A.  It's directing Inland Waters to ensure that Ferguson's --

10  well, the wording is Ferguson Construction Company be stopped

11  until all issues of restoration are addressed.

12  Q.  And restoration refers to what again?

13  A.  That's where they, in essence, make it whole, so whatever

14  areas they've dug up, they have to put the sod or seed back and

15  trees and all that kind of stuff, just replace, make it the way

16  it was before the construction started.

17  Q.  And how many days after the previous text message in which

18  Mr. Ferguson and the mayor are talking about Tony and Kathleen,

19  how many days later is this?

20  A.  Ten days.

21  Q.  I want to show you what's been marked next as Exhibit

22  IN1-35.  Do you recognize this?

23  A.  I do.

24  Q.  What is this?

25  A.  This is a text message from Eugenia Blake who was an

*Carol Paszkiewicz - Direct*
*Wednesday, December 12, 2012*

12

1   employee of Ferguson Enterprises to Mr. Ferguson's PIN number

2   on September 2, 2004.

3         **MR. CHUTKOW:**  Move to admit IN1-35.

4         **THE COURT:**  Received.

5         (Government's Exhibit IN1-35 received into

6         evidence.)

7   **BY MR. CHUTKOW:**

8   Q.  Now, this date, September 2, 2004, how much later is it

9   from that stop-work order?

10  A.  Just a couple weeks.

11  Q.  And, again, who is Eugenia Blake?

12  A.  She worked at Ferguson Enterprises, she was like an

13  administrative assistant.

14  Q.  And can you publish or can you read what she's identifying

15  to Mr. Ferguson's email address?

16  A.  No, it's from her email to Mr. Ferguson's text pager.

17  Q.  Oh, I'm sorry, thank you.

18  A.  She says, "Reminder, reminder, your 4:30 p.m. meeting with

19  Kathleen McCann," and then has a phone number and, "at

20  Lafayette."

21  Q.  Do you know what, where Soave Enterprises' offices are

22  located?

23  A.  On Lafayette in Detroit.

24  Q.  From your review of Ms. McCann's notes, do you know whether

25  a meeting, in fact, took place on September 2nd, 2004 between

*10-CR-20403   USA v. Kwame Kilpatrick, et al*

*Carol Paszkiewicz - Direct*
*Wednesday, December 12, 2012*

13

1   Ms. McCann and Mr. Ferguson?

2   A.  Her notes indicate that, yes, that meeting did occur --

3   Q.  And without --

4   A.  -- on that date.

5   Q.  Without describing, you know, or publishing the notes, can

6   you just tell us generally what the subject matter of that

7   meeting was as it relates in the notes.

8   A.  The work issues or performance issues relating to 1368 and

9   a meeting that --

10          **MR. RATAJ:**  Your Honor, I'm going to object.  Let's

11  hear that from Kathleen McCann, not from this witness.

12          **MR. CHUTKOW:**  Your Honor, here's the issue, is that

13  we accommodated by switching the order of the witnesses --

14          **MR. THOMAS:**  Can we have a sidebar rather than

15  doing it in front of the jury?

16          **THE COURT:**  Yeah.

17          (The following sidebar conference was held:)

18          **MR. CHUTKOW:**  Your Honor, we were fully ready to

19  have Ms. McCann go on today and finish her cross examination

20  related to these issues, and Ms. Paszkiewicz was going to

21  simply wrap these things up.  I'm not going to go into any

22  level of detail.  I had already had an agreement with

23  Ms. Van Dusen that all of the notes to file that Ms. McCann had

24  written, we all agreed that those could be published.  I'm not

25  going to publish them, but I do just need to get a general

*10-CR-20403   USA v. Kwame Kilpatrick, et al*

*Carol Paszkiewicz - Direct*
*Wednesday, December 12, 2012*

14

1    sense of what the subject matter is because, otherwise, the

2    text messages make no sense.

3              **THE COURT:**  I don't see any problem just covering

4    the subject matter of the, what was discussed in the notes.

5    She's not going to testify substantively to what was said at

6    the meeting so ...

7              **MR. EVELYN:**  Fine, Judge.  She is kind of doing

8    that, rather than talking about the fact that there was a

9    meeting and the timing of it, which I wasn't a part of the

10   discussion he had with Ms. Van Dusen, but I said I would not

11   object to him putting the information in so that the timeline

12   made sense.  But now she's into discussing what was in the

13   notes.

14             **THE COURT:**  Well, I think the question was just what

15   was the subject of the meeting, and that question can be

16   answered.  I mean, the back and forth of what was discussed

17   cannot be answered by this witness.  We'll wait for Ms. McCann

18   to do that.

19             **MR. CHUTKOW:**  Okay.  Thank you, Your Honor.

20             (End of discussion at sidebar.)

21   **BY MR. CHUTKOW:**

22   Q.  Agent Paszkiewicz, without going about the back and forth

23   of any conversations contained in Ms. McCann's notes, can you

24   just tell the jury the general subject matter of, as it relates

25   in her notes to her conversation on September 2nd, 2004 with

*10-CR-20403   USA v. Kwame Kilpatrick, et al*

*Carol Paszkiewicz - Direct*
*Wednesday, December 12, 2012*

15

1    Mr. Ferguson?

2    A.   Again, it was issues surrounding the restoration work by

3    Mr. Ferguson's company and also a meeting that took place

4    between Mr. Soave and Mayor Kilpatrick.

5    Q.   Okay.  I'm now going to show you what has been marked as

6    Government Exhibit IN1-37.  Do you recognize this?

7    A.   I do.

8    Q.   And what is this?

9    A.   This is a text message exchange between Mr. Ferguson and

10   Mayor Kilpatrick on September 2nd, 2004.

11              **MR. CHUTKOW:**  If we can go ahead and publish this.

12              **THE COURT:**  Will be received.

13              **MR. CHUTKOW:**  Thank you, Your Honor.

14              (Government's Exhibit IN1-37 received into

15              evidence.)

16   **BY MR. CHUTKOW:**

17   Q.   Why don't we go to the third entry, starting with reply

18   from Bobby Ferguson.  If you can give the time of that and go

19   ahead and read that to the jury.

20   A.   This entry was sent by Mr. Ferguson at 7:45 p.m.  It says,

21   "I had a meeting with Kathleen, bitch had the nerve to try to

22   punk me out."

23              Reply from Mayor Kilpatrick is, "LOL," and that was

24   at 7:49 p.m.

25              Mr. Ferguson replies, "You got to hear what you said

*10-CR-20403    USA v. Kwame Kilpatrick, et al*

*Carol Paszkiewicz - Direct*
*Wednesday, December 12, 2012*                                    16

1    to me about you, big dog (LOL)."  And that was sent at

2    7:51 p.m.

3    Q.  And, again, September 2nd, this was the date that the notes

4    reflect that Ms. McCann met with Mr. Ferguson.

5    A.  Yes.

6    Q.  And discussing both the work performance issues and

7    Mr. Soave's meeting with Mr. -- with the mayor?

8    A.  Yes.

9    Q.  I next wanted to turn your attention to the sinkhole that

10   has been talked about in some of the testimony in this case up

11   in Sterling Heights.

12   A.  Okay.

13   Q.  Do you recall that testimony?

14   A.  I do.

15   Q.  I want to show you what's been marked as Exhibit IN1-32A,

16   B, and C, and if you can just tell us what these group of

17   exhibits are?

18   A.  These are aerial photographs that I obtained from Inland

19   Waters during the investigation.

20   Q.  And what do they depict?

21   A.  They depict the sinkhole itself and varying stages of their

22   response and work out there.

23              **MR. CHUTKOW:**  Move to admit IN1-32A, B and C.

24              **THE COURT:**  Received.

25              (Government's Exhibit IN1-32A, IN1-32B and

*10-CR-20403   USA v. Kwame Kilpatrick, et al*

*Carol Paszkiewicz - Direct*
*Wednesday, December 12, 2012*

17

1          IN1-32C received into evidence.)

2          **MR. CHUTKOW:**  Can you publish the first one, please.

3   **BY MR. CHUTKOW:**

4   Q.  Can you tell us what we're looking at here?

5   A.  This is the sinkhole itself, obviously early on in the

6   response from Inland Waters, and DWSD and all the other

7   individuals.

8   Q.  And approximately when did this sinkhole occur?

9   A.  In September of '04.

10  Q.  It's also known as a sewer collapse, basically?

11  A.  Yes, this is a sewer line that literally has collapsed and

12  taken some of the ground and area with it.

13  Q.  Okay.  Now, let's take a look at IN1-32B, and what are we

14  looking at here?

15  A.  So this is the sinkhole, obviously in the later stage as

16  they are making repairs to it.

17  Q.  And it looks like right up there are the homes?

18  A.  Yes.

19  Q.  And do you know what's going on down here at all?

20  A.  That's the area where they're reinforcing the sides of the

21  earth, literally, so that they can get down there and replace

22  the collapsed sewer line.

23  Q.  Okay.  Now, let's take a look at IN1-32C.

24  A.  This is an aerial perspective of kind of all the different

25  areas that were involved in the sinkhole repair.  Because of

*10-CR-20403    USA v. Kwame Kilpatrick, et al*

1    the size of it all, you can see at the very top that's actually

2    the sinkhole itself where they're doing the repairs.  As you go

3    down to the bottom, you can see the different staging areas

4    that the contractors and DWSD had to set up in order to have

5    materials available.

6            And if you even continue down just a little bit

7    further across from that office building -- a little bit up,

8    there you go -- you can see where some more equipment had to be

9    staged just because of the amount of equipment and individuals

10   they needed.

11   Q.  And the road that is going up and down along the, this

12   picture here, what road is that?

13   A.  I believe it's 15 Mile.  The intersection is 15 Mile and

14   Hayes so --

15   Q.  Now, I'd next like to show you what has been marked as

16   Exhibit IN1-34A.  Do you recognize this?

17   A.  I do.

18   Q.  And what is this?

19   A.  This is a page from Mayor Kilpatrick's calendar, official

20   calendar, and it's dated September 1, 2004.

21            **MR. CHUTKOW:**  Move to admit IN1-34A.

22            **THE COURT:**  Received.

23            (Government's Exhibit IN1-34A received into

24            evidence.)

25            **MR. CHUTKOW:**  If we could look at the second entry,

1    I believe it is right there.

2    **BY MR. CHUTKOW:**

3    Q.  Can you read for the jury the time and what the entry says?

4    A.  I will.  I just want to back up a second.  When you asked

5    me when the sinkhole occurred, this is September 1st and this

6    is what this entry is for.  It occurred in late August, but the

7    response was throughout, from September through.

8            But this entry says, "12:30 to 1:30 p.m.,

9    construction site sinkhole, Sterling Heights, 15 Mile," and

10   then you can't read the rest, "Contact Victor Mercado," has

11   "999-1500," and then, "Mayor Richard Notte," and a phone

12   number.

13   Q.  And do you recognize Mr. Mercado's, that phone number,

14   999-1500?

15   A.  That's his cell phone.

16   Q.  Do you recall Ms. McCann's testimony from, I think it was

17   Monday and then the previous Friday about Mr. Ferguson, I

18   guess, taking some credit for the work or -- that Inland

19   receiving the work --

20   A.  Yes.

21   Q.  -- at 15 Mile Road?

22   A.  Yes.

23   Q.  I want to next show you what's been marked as Exhibit

24   IN1-33.  What is this?

25   A.  This is a text message exchange between Mayor Kilpatrick

*Carol Paszkiewicz - Direct*
*Wednesday, December 12, 2012*                                    20

 1   and Mr. Ferguson on September 1, 2004.

 2              **MR. CHUTKOW:**  Move to admit IN1-33.

 3              **THE COURT:**  Received.

 4              (Government's Exhibit IN1-33 received into

 5              evidence.)

 6   **BY MR. CHUTKOW:**

 7   Q.  Okay.  September 1, 2004, how does this correlate with the

 8   previous calendar entry that you showed?

 9   A.  It's the same day, and the first text that's sent by

10   Mayor Kilpatrick is within that time block that's on his

11   calendar.

12   Q.  What was the time block in his calendar again?

13   A.  12:30 p.m. to 1:30 p.m.

14   Q.  And what's the first communication with Mr. Kilpatrick?

15   A.  "You got to get with Victor" --

16   Q.  I mean what's the time of the first one?

17   A.  Oh, the time, 1:15.

18   Q.  Okay.  You can go ahead.  Thanks.

19   A.  "You got to get with Victor on this Sterling Heights job.

20   He said you were meeting him out here."

21   Q.  And then Victor, from your review of the records, refers to

22   whom?

23   A.  Victor Mercado.

24   Q.  And Sterling Heights job refers to what?

25   A.  The sinkhole at 15 Mile and Hayes.

*10-CR-20403   USA v. Kwame Kilpatrick, et al*

*Carol Paszkiewicz - Direct*
*Wednesday, December 12, 2012*

21

1   Q.  And then what is Mr. Ferguson's response?

2   A.  "Yes, sir, boss, we need to talk today about that if you

3   have time, sir.  I free after 5p.m. if you are, and Victor told

4   me he didn't have time but I insisting on," says "eeting" but

5   I'm assuming it's "meeting him anyway."

6   Q.  And then what is the mayor's response?

7   A.  Mayor Kilpatrick responds, "Come to the office at 5:30."

8           Mr. Ferguson's response is, "Yes, sir, boss."

9           The next entry is from Mr. Ferguson again, it says,

10  "I got my bike back.  Let's ride."

11          Mayor Kilpatrick replies, "I'll meet you at your

12  office at 7:00."

13          The next entry is from Mr. Ferguson, "Still come to

14  yours at 5:30."

15          Reply from Mayor Kilpatrick is, "You kill me that

16  bullshit."

17          The next one is again from the mayor and it says,

18  "No, cancel that."

19          The next entry is from Mr. Ferguson, he says, "LOL,

20  you the only F-ing boss I have besides Cookie.  I need to

21  listen to someone, don't you think?"

22          The next entry is from Mr. Kilpatrick, and it says,

23  "I hear you."

24  Q.  Okay.  Were there other text messages that occurred on that

25  day, September 1, 2004, between the mayor and Mr. Ferguson?

*Carol Paszkiewicz - Direct*
*Wednesday, December 12, 2012*
                                                                    22

1    A.  Yes.

2    Q.  I'm going to show you what's been marked as Exhibit IN1 --

3    who is Cookie?

4    A.  That is the nickname of Mrs. Ferguson, Marilyn Johnson

5    Ferguson.

6    Q.  I'm going to show you what's been marked as IN1-34.  Do you

7    recognize this?

8    A.  I do.

9    Q.  Now, do you recall, first, during the cross examination of

10   Mr. Darryl Latimer from DWSD regarding the sinkhole --

11   A.  Yes.

12   Q.  -- about homes sliding into the hole and concerns about

13   that?

14   A.  Yes.

15           MR. CHUTKOW:  Okay.  Move to admit IN1-34.

16           THE COURT:  What is it?

17           MR. CHUTKOW:  It is --

18   BY MR. CHUTKOW:

19   Q.  What is it, first?

20   A.  It's a text message exchange between Mr. Ferguson and

21   Mayor Kilpatrick, and it actually covers two dates, September 1

22   and September 2, 2004.

23   Q.  Starts in the evening and then ends in the morning?

24   A.  Yes.

25           MR. CHUTKOW:  Move to admit IN1-34.

*Carol Paszkiewicz - Direct*
*Wednesday, December 12, 2012*

23

1          **THE COURT:**   Received.

2          (Government's Exhibit IN1-34 received into

3          evidence.)

4    **BY MR. CHUTKOW:**

5    Q.   If you can go ahead and just tell us who's talking and what

6    they're saying.

7    A.   The first entry is from Mr. Ferguson, and you can see it's

8    late in the evening, late at night.   "Here's the deal, Gino was

9    called before anyone else was.   He hired all of the companies

10   you see on site except Inland.   Then Victor told Inland to take

11   the companies Gino hired and put under Inland.   Gino was call

12   first because he is on the list for emergency, C," and then it

13   cuts out.

14   Q.   From your review of the records, do you know who Gino

15   refers to?

16   A.   Gino D'Agostini.

17   Q.   And what company did he have?

18   A.   It was D'Agostini, I think, Construction.   He was another

19   sewer construction company.

20   Q.   And from your review of the records, did D'Agostini's

21   company do any sort of emergency site work up at the 15 Mile

22   sinkhole?

23   A.   Yes, they did.

24   Q.   And it says, "He hired all the companies you see except

25   Inland."   From your review of the records, did Inland also do

*Carol Paszkiewicz - Direct*
*Wednesday, December 12, 2012*

24

1   response work up there?

2   A.  Yes, they did.

3   Q.  What is the mayor's response after Mr. Ferguson describes

4   who has been called up to the site?

5   A.  Reply is, "Perfect, that's what I needed."  And that's

6   10:50 p.m.  Want me to keep going?

7   Q.  Yes, please.

8   A.  Mr. Ferguson replies, "We need to mee on how I move in.  I

9   got a great idea, sir.  Holla in the a.m.  Oh, Gino is," and it

10  says, "NY answer service (LOL) wants me to do some hauling,"

11  and that's at 11:47 p.m.

12  Q.  So I may have missed that.  When you said "we mee to" --

13  did you interpret that "to meet on how I move in"?

14  A.  I did, yeah, that's "mee."

15  Q.  Did you find any text messages in your review where the

16  mayor or Mr. Ferguson expressed any concern for the homes

17  surrounding the sinkhole?

18          A JUROR:  Can we go back to the top, please?

19          MR. CHUTKOW:  Would you like her to read it again?

20          A JUROR:  No, thank you.

21  BY MR. CHUTKOW:

22  Q.  Next I'd like to show you what's been marked as IN1-68.

23  A.  Okay.

24  Q.  And what is this?

25  A.  This is a spreadsheet or a listing of all the connections

1    between Mr. Ferguson's cell phone and Mr. Mercado's cell phone,

2    and it ranges from June of 2003 through February of '07.

3              **MR. CHUTKOW:**  Move to admit IN1-68.

4              **THE COURT:**  Received.

5              (Government's Exhibit IN1-68 received into

6              evidence.)

7    **BY MR. CHUTKOW:**

8    Q.  If we can just look at the top again so you can describe

9    what this document is?

10   A.  Again, it's a listing, spreadsheet of telephone connections

11   between the cell phone for Mr. Ferguson and the cell phone

12   subscribed to Mr. Mercado.

13   Q.  So you all didn't actually listen in on those calls?

14   A.  No, this is just from their, what we call toll records, so

15   they're cell phone records produced by their relevant

16   providers.

17   Q.  So the telephone companies just gave you who they were

18   calling at the time, or who the phone number was calling?

19   A.  Yes, the information that's there, the call time and

20   duration, just like when you get your cell phone bill.

21   Q.  Now, I've shown you some text messages from September 1,

22   2004 when the mayor was on site at the sinkhole.  Did you see

23   any telephone connections between Mr. Mercado's phone and

24   Mr. Ferguson's phone on September 1, 2004?

25   A.  Yes, there was one connection at 10:00 in the morning for

*Carol Paszkiewicz - Direct*
*Wednesday, December 12, 2012*

26

1    two minutes.

2              **MR. CHUTKOW:**  If we can highlight that.

3    **BY MR. CHUTKOW:**

4    Q.  You've also described some text messages between the mayor

5    and Mr. Ferguson that went over into September 2nd, 2004.  Did

6    you see any phone connections between Mr. Mercado's phone and

7    Mr. Ferguson's phone at that date?

8    A.  Yes, I did.

9    Q.  And how many phone connections were there?

10   A.  Looks like five on September 2nd, '04.

11   Q.  And what was the time range, what was the beginning phone

12   call between the two and what was the last phone call between

13   the two on that date?

14   A.  Looks like 9:47 a.m. is the first and 8:47 p.m. is the

15   last.  And the last one was a minute and-a-half.  All the other

16   ones were just a minute.

17   Q.  Now, September 2nd, was this the same day where there was

18   that text between Mr. Ferguson and the mayor where they needed

19   to meet because Mr. Ferguson had a great idea on how he would

20   move in?

21   A.  Well, the first one, that one is dated September 1 and 2,

22   yes, '04.

23   Q.  How much did this sinkhole up in Sterling Heights cost, the

24   water repairs?

25   A.  Approximately $50 million.

*10-CR-20403   USA v. Kwame Kilpatrick, et al*

*Carol Paszkiewicz - Direct*
*Wednesday, December 12, 2012*

27

1    Q.  Did you have -- did you find any text messages where the
2    mayor and Mr. Ferguson discussed the cost of the sinkhole?
3    A.  Billings and invoices, not necessarily the total cost.
4    Q.  Let me show you what's been marked as Exhibit IN1-39.  Do
5    you recognize this?
6    A.  Yes, this is a text message exchange between
7    Mayor Kilpatrick and Mr. Ferguson on September 7th, 2004.
8    Q.  So about how long after those previous text messages where
9    they were talking about how he was going to move in?
10   A.  About five days.
11              **MR. CHUTKOW:**  Move to admit IN1-39.
12              **THE COURT:**  Received.
13              (Government's Exhibit IN1-39 received into
14              evidence.)
15   A.  Go ahead?
16   **BY MR. CHUTKOW:**
17   Q.  Yes, please.
18   A.  First one is from Mayor Kilpatrick and it says, "What
19   happened with Gino?"
20   Q.  And before you move on, who is Gino?
21   A.  Gino D'Agostini.
22   Q.  The gentleman who was discussed in the previous text
23   messages?
24   A.  Yes.
25   Q.  And what is Mr. Ferguson's response to the mayor?

*10-CR-20403   USA v. Kwame Kilpatrick, et al*

*Carol Paszkiewicz - Direct*
*Wednesday, December 12, 2012*

28

1    A.  His response is, "I am going to talk to him today.  It's

2    the same.  He wants," and then it just says, "e to work for

3    him."

4    Q.  You interpret that to mean "me"?

5    A.  "Me," yes, "me to work for him.  Just let Victor know.  I

6    Gino makes two, FEI needs to make two also.  You will look at

7    the invoices to make sure."

8    Q.  And who is the Victor there that Mr. Ferguson is asking the

9    mayor to let him know?

10   A.  Victor Mercado.

11   Q.  When it says, "Gino makes two, FEI needs to make two as

12   well," what does FEI refer to?

13   A.  Ferguson Enterprises, Inc.

14   Q.  And when it's talking about, "We'll look at the invoices to

15   make sure," does that indicate who is to look at those

16   invoices?

17   A.  It says, "You will look."

18          **MR. THOMAS:**  Now she's interpreting what it is

19   that's being said.  The words are what they are.

20          **THE COURT:**  Sustained.

21   BY MR. CHUTKOW:

22   Q.  I want to next show you what has been marked as Exhibit

23   IN1-38A.  Do you recognize this?

24   A.  Yes, this is another entry from the mayor's official

25   calendar, and it's dated September 7, 2004.

*10-CR-20403    USA v. Kwame Kilpatrick, et al*

*Carol Paszkiewicz - Direct*
*Wednesday, December 12, 2012*

29

1      **MR. CHUTKOW:**  Move to admit IN1-38A.

2      **THE COURT:**  Received.

3      (Government's Exhibit IN1-38A received into

4      evidence.)

5      **MR. CHUTKOW:**  Ms. Facchini, if you can highlight

6  just the top entry on the calendar.

7  **BY MR. CHUTKOW:**

8  Q.  Can you go ahead and tell us what the time range there is

9  and what it says?

10  A.  The one of note is, "8:30 a.m. to 9:30 a.m.,

11  Victor Mercado, Detroit Club, 712 Cass at Fort."  It says,

12  "Contact Victor Mercado, 999-3750."

13  Q.  Now, the previous text message that you read where

14  Mr. Ferguson is talking about asking the mayor to let Victor

15  know about Gino and FEI and the invoices, what time was that

16  at?

17  A.  9:01 a.m.

18      **MR. THOMAS:**  Your Honor, I'm going to object to the

19  way that he's framing the questions because the way that the

20  questions are framed, he's implying that what it was that was

21  said at some prior time that was admitted into evidence was

22  discussed at this meeting, even if it occurred.  I don't think

23  that's proper questioning.

24      **MR. CHUTKOW:**  I'm not implying --

25      **THE COURT:**  He's just asking for the time, and

*10-CR-20403    USA v. Kwame Kilpatrick, et al*

1    that's a proper question.

2              **MR. THOMAS:**  The time is one thing; the content is

3    another.

4              **THE COURT:**  Well, he's asking for the time of an

5    entry that's already been admitted, so I mean, it's in

6    evidence.  She can answer that question.

7              **MR. CHUTKOW:**  Okay.

8    **BY MR. CHUTKOW:**

9    Q.  So at the time that Mr. Ferguson and the mayor's text

10   messages are communicating, what time was that?

11   A.  9:01 a.m. is the first, is when Mr. Kilpatrick sends it,

12   and then the response from Mr. Ferguson is 9:18 a.m.

13   Q.  On the same day that it indicates on this calendar that the

14   mayor is meeting with Mr. Mercado?

15   A.  That's what the calendar indicates, yes.

16   Q.  And then if we can just go to the top date on this.  And

17   what does that say again?

18   A.  Tuesday, September 7, 2004.

19   Q.  Now, I want to go back to Exhibit IN1-68, the telephone

20   toll connections.

21             **MR. CHUTKOW:**  Ms. Facchini, if you can go down to

22   the entries on September 7th and highlight those.

23   **BY MR. CHUTKOW:**

24   Q.  Are there any phone connections between Mr. Mercado and

25   Mr. Ferguson's phone on the same day, September 1st, that the

```
1    text message and this calendar entry were made?
2    A.  There's one.
3    Q.  And what time is it and for how long?
4    A.  Well, it says 19:07, so 7:09 [sic] at night, and it's for
5    seven minutes.
6    Q.  Do you recall Ms. McCann's testimony from Monday and the
7    previous Friday about Amendment Number 4 that related to this
8    sinkhole?
9    A.  Yes.
10   Q.  And that that was to basically fund the additional costs
11   for the sinkhole, is that right?
12   A.  That was, that's my understanding, yes.
13   Q.  First let me show you what's been marked as IN1-52 and ask
14   if you recognize this?
15   A.  I do.
16   Q.  And what is this?
17   A.  This is a -- the first page is an email that I obtained
18   from Victor Mercado's email, DWSD email account, and it's to
19   Mr. Mercado and Gary Fujita from Debra Ragland who was an
20   executive assistant for Mr. Mercado, and it's dated
21   November 21, 2005.
22            MR. CHUTKOW:  Move to admit IN1-52.
23            THE COURT:  Received.
24            (Government's Exhibit IN1-52 received into
25            evidence.)
```

*Carol Paszkiewicz - Direct*
*Wednesday, December 12, 2012*

32

1    **BY MR. CHUTKOW:**

2    Q.  If you first look at the cover sheet, and if you can tell

3    us from whom it is, to whom it is and what all their titles

4    were.

5    A.  Again, it's from Debra Ragland, sent Monday, November 21,

6    2005, to Victor Mercado and Gary Fujita.  The subject is

7    "Forward SAO's with the mayor."

8    Q.  And what do you understand SAO to refer to?

9    A.  Special administrator orders.

10   Q.  And what is that again?

11   A.  That is the special administrator, that refers to special

12   administrator powers that Mayor Kilpatrick was given by

13   Judge Feikens to oversee the water department.

14   Q.  And who is Gary Fujita?

15   A.  He was the deputy director of the DWSD at the time.

16   Q.  Let's go to Page 2 of this exhibit, please, if you can

17   highlight just the top part.  And first of all, tell us what

18   the title says.

19   A.  "Admin orders with mayor."

20   Q.  And from the review of that entire document, that refers to

21   the special administrative orders?

22   A.  It does.

23   Q.  And can you read the first entry on there?

24   A.  So, "2005-33, Award of Amendment Number 4 to CS-1368

25   (Inland Waters)," and there's a date in the right-hand column

*10-CR-20403   USA v. Kwame Kilpatrick, et al*

*Carol Paszkiewicz - Direct*
*Wednesday, December 12, 2012*

33

1    which is August 29, 2005.

2    Q.  And from your review of the records, do you know the

3    significance of that date, August 29, 2005?

4    A.  My understanding is it's the day that the special

5    administrator order was sent over the mayor's office for

6    signature for his approval.

7    Q.  I'd next like to show you what's been marked as Exhibit

8    Number IN1-47, and you can go ahead and publish that, it's been

9    admitted.  And can you give us the date of this document?

10   A.  September 17, 2005.

11   Q.  And just, if you could just read the first line of the

12   initial email and say from whom it is and to whom it is.

13   A.  It's from Kathleen McCann to Dennis Oszust, Re: Amendment

14   Number 4.  And it says, "What are the outstanding issues with

15   Bobby?"

16   Q.  And the previous email that -- if you can just read the

17   first line to give context?

18   A.  "Heard from Tim Tousignant that he got from his source in

19   administration (Bernard Parker's contact) that amendment is

20   held up because of 15 Mile issue with Bobby."

21   Q.  And who is Tim Tousignant?

22   A.  He was an official with Insituform.

23   Q.  And what about Mr. Bernard Parker?

24   A.  He -- at the time, I don't recall if he worked for

25   Insituform or Inland at the time.

*10-CR-20403   USA v. Kwame Kilpatrick, et al*

1    Q.  And when it says, "Where amendment is held up," what is the

2    date of this email again?

3    A.  September 17, 2005.

4    Q.  And how does that correlate in terms of the date where the

5    previous record says the amendment was received by the mayor?

6    A.  Well, it's after it, about three or four weeks, about three

7    weeks after.

8    Q.  Three weeks afterwards?

9    A.  Yeah, about two and-a-half, three weeks after.

10   Q.  I'll show you what's been marked IN1-50 which has been

11   admitted, so you can publish that.

12           And, again, for time and context, can you just tell

13   us from whom, to whom, date and what it says?

14   A.  From Dennis Oszust to Kathleen McCann, Tuesday, October 11,

15   2005, Subject:  Amendment Number 4.  Want me to read it?

16   Q.  Yes, please.

17   A.  Says, "Info from Bernard Parker who talked to QK during the

18   weekend and amendment is held up until FEI is satisfied."

19   Q.  Were you there when Ms. McCann said that QK referred to

20   Kwame Kilpatrick?

21   A.  I was.

22   Q.  And again, FEI refers to whom?

23   A.  Ferguson Enterprises, Inc.

24   Q.  Next I'd like to show you what has been marked as Exhibit

25   IN1-51.

*Carol Paszkiewicz - Direct*
*Wednesday, December 12, 2012*                                    35

1              **A JUROR:**  You need to slow down.

2              **MR. CHUTKOW:**  Would you like me to go back to that

3      previous one?

4              **A JUROR:**  No, we're just trying to write.

5              **MR. EVELYN:**  Judge, can -- I'm sorry, can I have

6      just a very short break?

7              **THE COURT:**  Sure, take five minutes, five-minute

8      break.

9                   (Jury out 9:50 a.m.)

10                  (Recess taken 9:50 until 9:57 a.m.)

11                  (Jury in 9:58 a.m.)

12             **THE COURT:**  Be seated.

13     **BY MR. CHUTKOW:**

14     Q.  Ms. Paszkiewicz, when we broke, we were looking at, you

15     were looking at some records related to the Amendment Number 4,

16     for $12 million for the sinkhole, do you recall that?

17     A.  Yep.

18     Q.  Based on your review of the records in this case, did

19     Dennis Oszust from Inland meet with Mr. Ferguson in December?

20     A.  December?

21     Q.  December of 2005.

22     A.  Yes.

23     Q.  And when was that that they met, and where?

24     A.  In December of '05, Ms. McCann, Mr. Oszust and Mr. Ferguson

25     met, I'm not sure where.  I do recall from the records that

*10-CR-20403   USA v. Kwame Kilpatrick, et al*

1    Mr. Ferguson had requested the meeting and so they obliged

2    that.

3    Q.  What about any sort of a lunch meeting, restaurant meeting

4    between Mr. Oszust --

5    A.  Yes, that was actually December 16 of '05, Mr. Oszust met

6    Mr. Ferguson at a restaurant called Mosaic.

7    Q.  Is that located downtown in Greektown?

8    A.  I believe so.

9    Q.  And from your review of the records, did Inland Waters pay

10   Mr. Ferguson an amount of money as it related to the sinkhole,

11   the 15 Mile sinkhole project?

12   A.  Well, just to be clear with your question, I mean,

13   Mr. Ferguson did work out at the sinkhole collapse so, yes, he

14   was paid money from that work from Inland.

15   Q.  And was there an additional payment aside from the work?

16   A.  Based on my review of the records, yes, that's my

17   understanding, is Inland agreed to pay Mr. Ferguson an

18   additional $350,000.

19   Q.  Okay.  I'm going to show you now what has been marked as

20   IN1-46.  Do you recognize this?

21   A.  I do.

22   Q.  And what is this?

23   A.  The first page is what's called a contract transmittal

24   record, it's a form that's used by the DWSD, and this is

25   related to 1368 Amendment Number 4.

*Carol Paszkiewicz - Direct*
*Wednesday, December 12, 2012*                                    37

1           **MR. CHUTKOW:**  Move to admit IN1-46.

2           **THE COURT:**  Received.  I'm sorry, had IN1-50

3    previously been admitted?  It had, right?

4           **MR. CHUTKOW:**  Yes, through Ms. McCann.

5           **THE COURT:**  So this is 1-46, the contract

6    transmittal record?

7           **MR. CHUTKOW:**  Correct, Your Honor.

8           (Government's Exhibit IN1-46 received into

9           evidence.)

10   **BY MR. CHUTKOW:**

11   Q.  And behind the contract transmittal record is some

12   additional documents, is that right?

13   A.  Yes, it's related to this amendment.  They're all, again,

14   DWSD records and court records.

15   Q.  Why don't we look at this first page and you can tell us,

16   first of all, based on your familiarity with the DWSD files,

17   what exactly is this, what does it mean?

18   A.  This is a form that they attach it to the contract

19   documents as they're getting routed through the various city

20   departments, so whether it's an initial contract or an

21   amendment such as this, it's basically, in essence, like a

22   routing slip, and certain officials sign off on it as it goes,

23   passes through their department, whether they approve it or

24   not.

25   Q.  And looking at this, it has right on the, right up here,

*10-CR-20403    USA v. Kwame Kilpatrick, et al*

*Carol Paszkiewicz - Direct*
*Wednesday, December 12, 2012*

38

1   can you tell us what that says, date prepared?

2   A.  It says, "Date prepared August 12 of '05."

3   Q.  And from your understanding from your review of the

4   records, who prepares this initial record?

5   A.  One of Mr. Latimer's staff does it on his behalf, and he

6   authorizes it through Contracts and Grants.

7   Q.  And from the previous email, or the previous records that

8   you had described, when was this Amendment Number 4 sent to the

9   mayor's office?

10  A.  Around August 29 of '05.

11  Q.  So about, I guess, a couple weeks after it was initiated?

12  A.  The special administrator order for this amendment was sent

13  to him.  It's -- my understanding is this form doesn't go to

14  him, just the order and a memo from the director explaining the

15  need for it, goes to the mayor's office, so I don't know if the

16  whole contract goes or the amendment, but certainly not this

17  sheet.

18  Q.  If we can go to the next page of this document so you can

19  just describe for the jury what it is.

20  A.  This is the cover page for the Amendment Number 4 for 1368.

21  Q.  And then let's go to Page 3, and if we can highlight the

22  top, tell us what this is.

23  A.  So this is what I was referring to earlier, is the special

24  administrator order, you can see where it says "Order Number

25  2005-33," so that means it was the 33rd order sent to

*10-CR-20403   USA v. Kwame Kilpatrick, et al*

*Carol Paszkiewicz - Direct*
*Wednesday, December 12, 2012*

39

1   Mayor Kilpatrick as special administrator in the year 2005.
2   Q.  If we can go to the last paragraph on this, now, this is a
3   document that's signed by whom?
4   A.  This one is signed by Mayor Kilpatrick as the special
5   administrator.
6   Q.  And why don't you just go ahead and read that paragraph.
7   A.  "The orders as continued by the December 3, 2001 order
8   further provides me that, as special administrator, I shall
9   have full power and authority to control, manage and operate
10  the DWSD, including all functions and powers of the Detroit
11  City Council, the Detroit Board of Water Commissioners, the
12  DWSD and any other departments, boards or divisions of the City
13  of Detroit to the extent that they affect my ability to meet
14  the requirements of sustained compliance with the NPDES permit,
15  the second amended consent judgment, and other specific
16  responsibilities outlined in those orders."
17  Q.  And let me just stop you there.  It refers to "I" and "my."
18  Who again signed this document?
19  A.  Mayor Kilpatrick as special administrator.
20  Q.  Okay.  And please go ahead.
21  A.  "They also provide me the power to enter into and perform
22  all contractual obligations of the system related to the
23  operation of the DWSD, and to hire such consultants,
24  contractors, engineering firms or counsel, which I deem
25  necessary or appropriate to carry out my responsibilities as

*10-CR-20403   USA v. Kwame Kilpatrick, et al*

*Carol Paszkiewicz - Direct*
*Wednesday, December 12, 2012*

40

1    special administrator."

2    Q.  And if we can go to the next page.  If we can just look at

3    the last line and the signature.  You go ahead and read that

4    last line.

5    A.  "I hereby authorize DWSD Director Victor M. Mercado, to

6    enter into Amendment Number 4 to contract CS-1368 with Inland

7    Waters Pollution Control, Inc."

8    Q.  And it's signed by whom?

9    A.  Kwame M. Kilpatrick, Mayor, Special Administrator, Detroit

10   Water and Sewerage Department.

11   Q.  Now, and what is the date that this was signed?

12   A.  December 23, 2005.

13   Q.  And earlier you talked about a lunch meeting between

14   Mr. Oszust of Inland and Mr. Ferguson.  What was the date of

15   that lunch meeting?

16   A.  December 16 of '05.

17   Q.  And so about a week before this?

18   A.  Yeah, yep.

19   Q.  And how long, according to the previous records, had this

20   special administrator order been with the mayor's office?

21   A.  About four months, just shy of.

22   Q.  If we can go back to the cover page, the transmittal record

23   that you had described, the actual very first page, please.

24   And, now, you said that Mr. Kilpatrick signed it on August 29,

25   2005.  When does Mr. Mercado, does he sign this as well, or a

*10-CR-20403   USA v. Kwame Kilpatrick, et al*

 1    city acknowledgment?

 2    A.  Your question asked me if Mayor Kilpatrick signed it

 3    August --

 4    Q.  I'm sorry, yes.

 5    A.  You said August, signed in August, he didn't sign anything

 6    in August.

 7    Q.  I'm sorry, December 23rd, is that right?

 8    A.  Yes.

 9    Q.  All right.

10    A.  Mr. Mercado, he signs this.  There is not a date next to

11    his signature.

12    Q.  Is there any sort of city acknowledgment that talks about

13    when the city received it?

14    A.  You need to go to the last, it's a different page,

15    Mr. Chutkow.

16    Q.  Okay.

17    A.  It's actually part of the, part of the amendment.

18    Q.  Oh, I see.  Okay.

19    A.  Be Page S2 for you.

20    Q.  S2?

21    A.  No, not for her, for you.  I don't -- for her it would be

22    Page --

23              **MR. THOMAS:**  Is there a question, Your Honor?

24    A.  -- 1, 2 --

25              **THE COURT:**  The question was when it was signed by

 1    the city, by someone on behalf of the city, is that --

 2             **MR. CHUTKOW:**  Yes, Your Honor.  I wanted to see if

 3    there was any acknowledgment of when Mr. Mercado received it.

 4    **BY MR. CHUTKOW:**

 5    Q.  If we can go to Page 9 of this exhibit.  Can you tell us

 6    what we're looking at here?

 7    A.  This is the city acknowledgment for, as you can see up in

 8    the upper right-hand corner, contract CS-1368 Amendment

 9    Number 4, so this was part of the earlier actual amendment

10    contract document.

11    Q.  And what is the date of this?

12    A.  This is January 12, 2006.

13    Q.  And it's by whom?

14    A.  Victor M. Mercado, Director, Water and Sewerage Department.

15    Q.  So this is about three weeks after the mayor signed the

16    special administrator order?

17    A.  Yeah, approximately.

18    Q.  Now, if we can go back to the very first page, Page 1 of

19    this exhibit.  When does the finance director sign this?

20    A.  February 3rd, 2006.

21    Q.  Again, that's after the mayor has authorized it?

22    A.  After the mayor has signed, yes, authorizing via the

23    special administrator order.

24    Q.  And then what about the law department, when do they sign

25    this document?

*Carol Paszkiewicz - Direct*
*Wednesday, December 12, 2012*

43

1   A.  For that, you have to scroll down and look at the big

2   "Received" date stamp, February 13, 2006.  It says, "City of

3   Detroit Contract Section, Law Department."

4   Q.  Right there.  And when does city council approve this?

5   A.  They approved -- well, it's the last line, it says

6   April 19, 2006.

7   Q.  Okay.  I'd now like you to take a look at Exhibit BFF-31

8   which is already entered into evidence so you can go ahead and

9   publish that.

10          Why don't we go to -- all right.  We'll start off

11  with the right-hand column.  Can you tell us what we're looking

12  at here.

13  A.  Again, this is the chart that I created based on my review

14  of financial records, and this is for CS-1368, the sewer

15  contract that Inland was the prime contractor on.

16  Q.  And I guess Williams stands for Charlie Williams?

17  A.  It does.

18  Q.  And how much money did Ferguson Enterprises make on the

19  1368 contract?

20  A.  Well, their revenues were approximately $20.8 million.

21  Q.  And of that amount, how much did Ferguson Enterprises make

22  in revenues from the sinkhole?

23  A.  Approximately 3.1 million.

24  Q.  I'm going to show you what's been marked as Exhibit IN2-12,

25  and what is this document?

*10-CR-20403    USA v. Kwame Kilpatrick, et al*

*Carol Paszkiewicz - Direct*
*Wednesday, December 12, 2012*

44

1    A.   This was a spreadsheet produced by Inland Waters during our

2    investigation.   It was something that came from their internal

3    accounting, internal financial files related to 1368.

4    Q.   And it has costs and breakdown of costs on the project?

5    A.   Well, it has a breakdown of contractors and subcontractors

6    and billings and invoice amounts, amount of monies paid to

7    them.

8            **MR. CHUTKOW:**   Move to admit IN2-12.

9            **THE COURT:**   Received.

10           (Government's Exhibit IN2-12 received into

11           evidence.)

12           **MR. CHUTKOW:**   Ms. Facchini, if we can go down to

13   this area here and highlight it.

14   **BY MR. CHUTKOW:**

15   Q.   Ms. Paszkiewicz, can you tell us how much -- who is

16   W. McCormick and Associates?

17   A.   William McCormick and Associates, he's an excavation

18   subcontractor.

19   Q.   And was McCormick -- and is he also a minority business

20   enterprise and a Detroit-based business?

21   A.   Yes, he is.

22   Q.   Was he on the initial bid to do the excavation work on

23   1368?

24   A.   Yes, he was.

25   Q.   And how much money does it indicate that McCormick and

*10-CR-20403    USA v. Kwame Kilpatrick, et al*

*Carol Paszkiewicz - Direct*
*Wednesday, December 12, 2012*

45

1    Associates made on excavation work?

2    A.   $308,062.49.

3            **THE COURT:**  I'm sorry, that number is a revenue

4    number or a profit number, or what?

5            **THE WITNESS:**  It's a revenue number.

6            **THE COURT:**  Revenue number.

7            **MR. CHUTKOW:**  And to make the record clear, the

8    previous exhibit is also revenue related, not profit.

9            **THE COURT:**  Okay.

10   **BY MR. CHUTKOW:**

11   Q.   Now, next, there's an entry for a Superior Construction, do

12   you see that?

13   A.   Yes.

14   Q.   Was Superior Construction also listed on the 1368 bid to do

15   excavation work?

16   A.   Yes.

17   Q.   How much money in excavation work did Superior Construction

18   get on 1368?

19   A.   $448,990.01.

20   Q.   Now, is Superior Construction a minority business

21   enterprise?

22   A.   They were, yes.

23   Q.   A Detroit-based business?

24   A.   Yes.

25   Q.   Was Ferguson Enterprises listed as an excavator on the 1368

*10-CR-20403    USA v. Kwame Kilpatrick, et al*

*Carol Paszkiewicz - Direct*
*Wednesday, December 12, 2012*

46

1    bid for Inland Waters?

2    A.  No, they were not.

3    Q.  And if we can go to the entries for Ferguson Enterprises,

4    can you tell the jury how much money in revenues they made?

5    A.  You'll see that there's three entries, line items for

6    Ferguson.  The first one is point repair, clean and TV

7    laterals, and the far right column -- well, the "Total

8    Cumulative Invoice" column says $11,306,386.80.

9    Q.  So that's right up on the top right-hand corner right

10   there?

11   A.  Correct.

12   Q.  Why don't we just keep the figures right here and then you

13   can describe what each of the entries are.

14           Okay.  So after that $11 million figure, what is the

15   next line item for?

16   A.  This one is Ferguson Lining.  Now, I want to make sure it's

17   clear that this number was what Inland thought that Insituform

18   had paid Mr. Ferguson for lining, related to the lining work.

19   So -- but when I totaled my numbers for the previous exhibit, I

20   used Insituform records, not Inland, so --

21   Q.  Okay.  What does the Inland record say?

22   A.  $9,441,476.67.

23   Q.  And then what is the next figure for underneath that?

24   A.  Ferguson ER-37, 15 Mile and Hayes Road.

25   Q.  And that's an additional how much?

*Carol Paszkiewicz - Direct*
*Wednesday, December 12, 2012*

47

1    A.   This one says $3,017,007.62.

2    Q.   And what -- do you know what that refers to, what that

3    revenue stream is for?

4    A.   That's the sinkhole.

5    Q.   And these are all monies that went to Ferguson Enterprises?

6    A.   Yes.

7    Q.   Now, if we can go back to Exhibit BFF-31 and go to the

8    Page 4, can you tell us what we're looking at on the left-hand

9    column on this page of the exhibit?

10   A.   This is DWS-864, which is east side sewer contract.

11   Q.   And this was -- who were the bidders on this particular

12   sewer contract?

13   A.   The prime contractor on this contract was a joint venture

14   between Inland Waters and Xcel Construction Services.

15   Q.   That's a company associated with Mr. Ferguson?

16   A.   Yes.

17   Q.   And then who were some of the subcontractors on that bid?

18   A.   On the bid, it was Ferguson Enterprises and Insituform.

19   Q.   And how much did Xcel Construction end up making on this

20   sewer, east side sewer contract?

21   A.   Xcel received $191,000 in revenues, Ferguson Enterprises

22   received $4.6 million in revenues.

23             **MR. CHUTKOW:**  Your Honor, if I may have a moment

24   just to discuss with counsel, or maybe we could just go briefly

25   to sidebar.  Let me talk to Mr. Rataj and see if we -- how to

*10-CR-20403   USA v. Kwame Kilpatrick, et al*

```
 1    proceed.
 2              THE COURT:  All right.  Go ahead.
 3              (Brief discussion off the record.)
 4    BY MR. CHUTKOW:
 5    Q.  Ms. Paszkiewicz, there's been some questioning in this case
 6    about the mayor's power and authority over the water
 7    department.  Have you been here when those questions were
 8    asked?
 9    A.  Yes, I was here.
10    Q.  I would just like to ask you some questions, to read into
11    the record certain portions of the Detroit City Charter.
12    A.  Okay.
13    Q.  And do you have that in front of you?
14    A.  Let me look.
15    Q.  Have you found it?
16    A.  No, I don't.
17              MR. CHUTKOW:  May I approach, Your Honor?
18              THE COURT:  Yes.
19    BY MR. CHUTKOW:
20    Q.  Did you have an occasion to look up the Detroit City
21    Charter that was in effect during the time period that
22    Mr. Kilpatrick was the mayor of Detroit?
23    A.  Yes, I did.
24    Q.  And first I'd like to turn your attention to Article 5,
25    Section 5-101.  Do you see that?
```

*Carol Paszkiewicz - Direct*
*Wednesday, December 12, 2012*

49

1   A.  Yes.

2   Q.  Can you read for the jury what that section says?

3   A.  "The mayor is the chief executive of the city and, as

4   provided by this charter, has control of and is accountable for

5   the executive branch of city government."

6   Q.  I'd also like you to take a look at, while we're talking

7   about the charter section, what has been identified as IN1-69.

8   Do you recognize this?

9   A.  I do.

10  Q.  And what is this?

11  A.  The first page is the cover sheet of the comprehensive

12  annual financial report for the fiscal year end June 30, 2002.

13  Q.  And then what are the succeeding pages about?

14  A.  The next page is City of Detroit organizational chart dated

15  June 30, 2002.

16  Q.  And what is the next section of it?

17  A.  The next one is the cover sheet of the annual financial

18  report for the fiscal year ending June 30, 2005.

19  Q.  And where did you find these documents?

20  A.  I obtained them off the City of Detroit website.

21         **MR. CHUTKOW:**  Your Honor, the government moves to

22  admit IN1-69.

23         **THE COURT:**  Received.

24         (Government's Exhibit IN1-69 received into

25         evidence.)

*10-CR-20403   USA v. Kwame Kilpatrick, et al*

*Carol Paszkiewicz - Direct*
*Wednesday, December 12, 2012*

50

1   **BY MR. CHUTKOW:**

2   Q.  First, can you tell the jury what we're looking at here?

3   A.  Yes, this is the City of Detroit's comprehensive annual

4   financial report for the fiscal year ended June 30, 2002.

5   Q.  And then it's -- who are the names listed here?

6   A.  Kwame M. Kilpatrick as mayor, Sean K. Werdlow as chief

7   financial officer, finance director.

8   Q.  Will he be testifying later in this case?

9   A.  Yes.

10  Q.  Next I'd like to, can you tell us what we're looking at

11  here?

12  A.  This is the organizational chart for the City of Detroit

13  dated June 30th, 2002.

14  Q.  Okay.  And so it lists on the top, if you can just tell us,

15  across the top row here, what are the different branches that

16  it identifies?

17  A.  It's the legislative agencies, executive agencies and then

18  a box for other agencies.

19  Q.  And then who do all these agencies report to?

20  A.  The people of Detroit.

21  Q.  And underneath the executive branch of the city government,

22  who is listed?

23  A.  The mayor.

24  Q.  And then there appears to be a tree, a line of different

25  agencies underneath that, is that right?

*10-CR-20403   USA v. Kwame Kilpatrick, et al*

*Carol Paszkiewicz - Direct*
*Wednesday, December 12, 2012*

51

1   A.   That's right.

2   Q.   And what is your understanding, just generally, are all

3   these agencies reporting to the mayor?

4   A.   Yes, that's what the flow chart or chart depicts.

5   Q.   Now, you initially read something from the code that said

6   the mayor has control over the executive branch, is that right?

7   A.   I did, yes.

8   Q.   So that's this branch right here.  Now, could you go ahead

9   and read into the record Article 5, Section 5-103 of the city

10  charter?

11  A.   "The mayor shall appoint for each department of the

12  executive branch a director who serves at the pleasure of the

13  mayor as head of the department."

14  Q.   Okay.  And when it talks about the mayor appointing various

15  directors of the departments, what are all of these things

16  here, these boxes?

17  A.   Those are, they all represent the departments within the

18  executive branch.

19  Q.   Okay.  And Article 6, Section 6-301, what does that say?

20  A.   "The finance department is headed by the finance director."

21  Q.   And that's this department right here?

22  A.   Yes, it is.

23  Q.   And that's also within the executive branch?

24  A.   Yes, it is.

25  Q.   And that reports to whom?

*10-CR-20403   USA v. Kwame Kilpatrick, et al*

1    A.  The mayor.

2    Q.  Now, can you read Article 6, Section 6-306?

3    A.  "The purchasing division is headed by the purchasing

4    director.  The finance director, with the consent of the mayor,

5    shall appoint the purchasing director who serves at the

6    pleasure of the finance director."

7    Q.  So the purchasing director is within the finance department

8    of the city?

9    A.  Yes.

10   Q.  And that reports to the mayor?

11   A.  Yes.

12   Q.  Can you read Article 6, Section 6-101 of the city charter?

13   A.  "The budget department is headed by the budget director."

14   Q.  And the budget director reports to whom?

15   A.  The mayor.

16   Q.  I'd now like to have you read Article 6, Section 6-401.

17   A.  "The law department is headed by the corporation counsel.

18   The mayor shall appoint the corporation counsel, subject to

19   approval of the city council.  The mayor may remove the

20   corporation counsel without cause."

21   Q.  According to this org. chart, who does the head of the law

22   department report to?

23   A.  The mayor.

24   Q.  And who has the power to remove the corporation counsel?

25   A.  The mayor.

*Carol Paszkiewicz - Direct*
*Wednesday, December 12, 2012*                                53

1   Q.  Next I'd like to ask you about the Human Rights Department.

2   Can you read Article 7, Section 7-1001 of the city charter?

3   A.  "The Human Rights Department is headed by the Human Rights

4   director.  The director and deputy director -- and a deputy

5   director shall be appointed by the mayor to four-year terms.

6   The mayor may remove the director or deputy director for

7   cause."

8   Q.  Now, you've heard testimony in this case that Gerard

9   Grant Phillips was the director of the Human Rights Department?

10  A.  Yes.

11  Q.  Who did he report to, according to this organizational

12  chart?

13  A.  The mayor.

14  Q.  And who had power to remove Mr. Phillips?

15  A.  The mayor.

16  Q.  You've also heard testimony about a gentleman by the name

17  of Kim Harris.  What was his position at the time that he

18  described in his testimony?

19  A.  Chief compliance officer.

20  Q.  He wasn't the deputy director?

21  A.  Not at that time, no.

22  Q.  But the deputy director of the Human Rights Department can

23  be removed by whom?

24  A.  The mayor.

25  Q.  Next I'd like to talk to you about the Water and Sewerage

*10-CR-20403   USA v. Kwame Kilpatrick, et al*

*Carol Paszkiewicz - Direct*
*Wednesday, December 12, 2012*

54

1    Department.  According to the organizational chart, who does

2    the -- who controls the water and sewerage department?

3    A.  The mayor.  This shows that he reports to the mayor.

4    Q.  All right.  Why don't you go ahead and read Article 7,

5    Section 7-1501 of the city charter.

6    A.  "The water and sewerage department is headed by a

7    seven-member board known as the board of water commissioners.

8    The members of the board shall be appointed by and serve at the

9    pleasure of the mayor.  The board shall appoint, with the

10   approval of the mayor, a director and a deputy director for the

11   department.  The director and deputy director serve at the

12   pleasure of the board."

13   Q.  Okay.  Have you seen other documents that refer to the

14   mayor's power as a special administrator over the water

15   department?

16   A.  Yes.

17   Q.  And does that alter some of his reporting authorities in

18   the charter?

19   A.  Yes.

20   Q.  We'll get to those in a moment.  First I'd like to show you

21   what's been marked as Exhibit IN1-1.  Do you recognize this

22   document?

23   A.  Yes, I do.

24   Q.  And what is this?

25   A.  This is an order continuing the special administratorship

*10-CR-20403    USA v. Kwame Kilpatrick, et al*

*Carol Paszkiewicz - Direct*
*Wednesday, December 12, 2012*

55

1   for the Detroit Water and Sewerage Department.  It's actually

2   from the court files from Judge Feikens.

3             **MR. CHUTKOW:**  Move to admit Exhibit IN1-1.

4             **THE COURT:**  Received.

5             (Government's Exhibit IN1-1 received into

6             evidence.)

7   **BY MR. CHUTKOW:**

8   Q.  Why don't we just look at the cover page of it, and what --

9   first of all, just tell us the case caption, not the case

10  caption, but the title of the document.

11  A.  "Order Continuing Special Administratorship for the Detroit

12  Water and Sewerage Department."

13  Q.  And without going through all the lines of this, what does

14  this order from Judge Feikens do?

15  A.  He, after Mayor Kilpatrick was elected but prior to him

16  being sworn in, he was noting in this order the transfer of

17  special administratorship from Mayor Archer to the mayor-elect,

18  Mr. Kilpatrick, and it says it will be effective, I believe,

19  January 1st of 2002.

20  Q.  Next I'd like to show you what's been marked as Exhibit

21  IN1-1B.  Do you recognize this document?

22  A.  Yes.

23  Q.  And what is it?

24  A.  This is also an order from Judge Feikens approving the

25  special administrator order that Mr. Kilpatrick signed which

*10-CR-20403    USA v. Kwame Kilpatrick, et al*

*Carol Paszkiewicz - Direct*
*Wednesday, December 12, 2012*

56

1   was for the contract employment for Mr. Mercado.  In essence,

2   the mayor transmitting to the judge that he would like to hire

3   Mr. Mercado, and it includes his employment agreement.

4          **MR. CHUTKOW:**  Move to admit Exhibit IN1-1B.

5          **THE COURT:**  Received.

6          (Government's Exhibit IN1-1B received into

7          evidence.)

8   **BY MR. CHUTKOW:**

9   Q.  Why don't we just look at the first case caption and if you

10  can just read the title into the record.

11  A.  "Order approving the City of Detroit Order Number 2002-3,

12  Re: Execution of Employment Agreement with Victor Mercado and

13  Contract of Employment, Dated May 23, 2002 by Special

14  Administrator Mayor Kwame M. Kilpatrick."

15  Q.  Well, since it's short, why don't you go ahead and read the

16  order.

17  A.  "The Court notes its approval both of Order Number 2002-3,

18  approving the execution of employment agreement with

19  Victor Mercado and the contract of employment dated May 23,

20  2002, entered into on behalf of the Detroit Water and Sewerage

21  Department by Mayor Kwame M. Kilpatrick in his capacity as

22  special administrator of the Detroit Water and Sewerage

23  Department and Victor Mercado as director of the Detroit Water

24  and Sewer Department."

25  Q.  Let's go to Page 3 of this order, and if you can just

*Carol Paszkiewicz - Direct*
*Wednesday, December 12, 2012*

57

1  highlight the top of it and tell us what this is?

2  A.  So this is order number 2002-3, Subject:  Execution of

3  employment agreement with Victor Mercado.

4  Q.  If we can go to Page 4 so we can see who is actually

5  submitting this.  Who does it indicate is submitting this

6  document?

7  A.  Kwame M. Kilpatrick, mayor, special administrator.

8  Q.  And what's the date of it?

9  A.  May 23, 2002.

10        **MR. CHUTKOW:**  Going back to Page 3, Ms. Facchini, if

11  you can just highlight this paragraph right here.

12  **BY MR. CHUTKOW:**

13  Q.  Can you read what the mayor as special administrator is

14  saying here?

15  A.  "The orders as continued by the December 3, 2001 order

16  further provides that as special administrator, I shall have

17  full power and authority to control, manage and operate the

18  WWTP," which I know to be wastewater treatment plant,

19  "including all functions and powers of the Detroit City

20  Council, the Detroit Board of Water Commissioners, the DWSD and

21  any other departments, boards or divisions of the City of

22  Detroit to the extent that they affect my ability to meet the

23  requirements of sustained compliance with the NPDES permit, the

24  second amended consent judgment and other specific

25  responsibilities outlined in those orders."

*10-CR-20403   USA v. Kwame Kilpatrick, et al*

*Carol Paszkiewicz - Direct*
*Wednesday, December 12, 2012*

58

1   Q.  If you can go to Page 5 of this exhibit and highlight the

2   top.  Tell us what this document is, please.

3   A.  This is Mr. Mercado's employment agreement with the City of

4   Detroit.

5   Q.  And it's signed and dated when?

6   A.  May -- well, it's dated May 23, 2002.

7   Q.  And if we can go to the first paragraph that says

8   "Employment."  Can you go ahead and read that into the record?

9   A.  "The city agrees to employ Mercado as director of the

10  Detroit Water and Sewerage Department during the employment

11  term as defined in Section 3 and Mercado accepts such

12  employment and agrees to serve the city subject to the general

13  supervision, advice, and direction of the mayor of the City of

14  Detroit or his designee and upon the terms and conditions set

15  forth in this agreement."

16  Q.  So this indicates that Mr. Mercado is to be supervised,

17  advised and directed by the mayor?

18  A.  It does.

19  Q.  And who was the mayor at the time?

20  A.  Kwame Kilpatrick.

21  Q.  And then if we can go to the employment term which is right

22  there, what does it indicate that Mr. Mercado's term is going

23  to be as director of the Water and Sewerage Department?

24  A.  The term is to commence on June 24th, 2002, and terminate

25  on the close of business on December 31, 2005.

*10-CR-20403   USA v. Kwame Kilpatrick, et al*

*Carol Paszkiewicz – Direct*
*Wednesday, December 12, 2012*
59

1          **MR. CHUTKOW:**  I was going to move on to a different
2     document if no one has any objections.
3               **THE COURT:**  Let's take our 20-minute break.
4               (Jury out 10:35 a.m.)
5               (Recess taken 10:35 a.m. until 10:59 a.m.)
6               (Jury in 10:59 a.m.)
7          **THE COURT:**  Be seated.
8          **MR. CHUTKOW:**  We're ready to proceed, Your Honor.
9          **THE COURT:**  Okay.  Go ahead.
10   **BY MR. CHUTKOW:**
11   Q.  Ms. Paszkiewicz, I neglected to mention a couple of other
12   items on this organizational chart for the City of Detroit.
13   First, do you see this department right -- do you see this
14   department right here?
15   A.  I do.
16   Q.  And that's what?
17   A.  Recreation.
18   Q.  And that's the next chapter, the Heilmann Recreation Center
19   that we're going to be talking about in this case?
20   A.  Yes, it is.
21   Q.  And who does the director of the recreation department
22   report to?
23   A.  The mayor.
24   Q.  And then, finally, we've talked about the executive branch
25   and the mayor.  I just wanted to briefly ask you about the

                *10-CR-20403   USA v. Kwame Kilpatrick, et al*

*Carol Paszkiewicz - Direct*
*Wednesday, December 12, 2012*

60

```
 1    legislative branch headed by the city council.  How many
 2    agencies or departments does the city council have direct
 3    control over in the City of Detroit?
 4    A.  According to this flow chart, three.
 5    Q.  And does the city council have a direct reporting -- or do
 6    any of the departments that we've described previously have
 7    direct reporting obligations to the city council?
 8    A.  No.
 9    Q.  So not the budget, the finance or the law department?
10    A.  Correct.
11    Q.  Or the Detroit Building Authority?
12    A.  Correct.
13    Q.  And by the way, what is the Detroit Building Authority?
14    A.  My understanding it's like a quasi-governmental agency that
15    is involved in construction projects in the city.
16    Q.  And will there be witnesses regarding the Detroit Building
17    Authority in the next chapter, the Heilmann Recreation Center
18    chapter?
19    A.  Yes.
20    Q.  And then does the city council have direct authority over
21    the Human Rights Department?
22    A.  No, they do not.
23    Q.  Or the recreation department?
24    A.  No, they do not.
25    Q.  Or the water and sewerage department?
```

*10-CR-20403    USA v. Kwame Kilpatrick, et al*

*Carol Paszkiewicz - Direct*
*Wednesday, December 12, 2012*

61

1    A.  No, they do not.

2    Q.  Other than, the city council does ultimately approve

3    contracts that come out of the executive branch, is that

4    correct?

5    A.  They approve -- yes, they approve contracts coming out of

6    the executive branch with the exception of the water department

7    contracts that are authorized by special administrator order.

8    They just get an acknowledgment that -- and that's sent to them

9    for review so they know what's going on, but it's not

10   technically approved by them, it's approved by the special

11   administrator.

12   Q.  So all of these other departments that we've talked about

13   here, to the extent that they have contracts over $25,000,

14   ultimately does that make its way from the executive branch to

15   the legislative branch for approval?

16   A.  Yes, it does.

17   Q.  I'd like to now show you what has been marked as Exhibit

18   Number IN1-6.  Do you recognize this document?

19   A.  I do.

20   Q.  And what is this?

21   A.  This is a text message between Mayor Kilpatrick and one of

22   his administrative assistants, first name is Linda.

23            **MR. CHUTKOW:**  Move to admit IN1-6.

24            **THE COURT:**  Received.

25            (Government's Exhibit IN1-6 received into

*10-CR-20403    USA v. Kwame Kilpatrick, et al*

*Carol Paszkiewicz - Direct*
*Wednesday, December 12, 2012*

62

1          evidence.)

2      **BY MR. CHUTKOW:**

3      Q.  And can you go ahead and read into the record what it says?

4      A.  This one is dated June 13, 2002, it's from

5      Mayor Kilpatrick, it says, "Call me when Bobby and Victor get

6      to the office."

7              Reply from Linda is, "Will do."

8      Q.  Now, from your review of the -- when did Victor Mercado

9      sign his employment agreement with Mayor Kilpatrick?

10     A.  It was in May of 2002.

11     Q.  So about three weeks before this text message?

12     A.  Yes, May 23, 2002.

13     Q.  And from review of the text messages, Bobby refers to whom?

14     A.  Bobby Ferguson.

15     Q.  I'm going to show you now what's been marked as Exhibit

16     Number RC-1.  Do you recognize this document?

17     A.  I do.

18     Q.  And what is this?

19     A.  This is a text message exchange between Bernard Kilpatrick

20     and Kwame Kilpatrick on June 21, 2002.

21             **MR. CHUTKOW:**  Move to admit RC-1.

22             **THE COURT:**  Received.

23             (Government's Exhibit RC-1 received into

24             evidence.)

25

*10-CR-20403    USA v. Kwame Kilpatrick, et al*

*Carol Paszkiewicz - Direct*
*Wednesday, December 12, 2012*

63

1    **BY MR. CHUTKOW:**

2    Q.  Can you go ahead and read that into the record?

3    A.  Yes.  The first text is from Bernard Kilpatrick, says,

4    "Just met with Bobby Ferguson.  The three of us need to meet at

5    least twice a month for an hour for awhile."

6              And the reply from Kwame Kilpatrick is, "Cool."

7    Q.  Now, June 21st, this is approximately how much longer after

8    the previous text message talking about the meeting with Bobby

9    and Victor?

10   A.  It's about a week.

11   Q.  And when did Mr. Mercado officially start as the water

12   department director?

13   A.  I believe it was June 24th, yes.

14   Q.  So about three days after this text message?

15   A.  Yes.

16   Q.  Next I'd like you to take a look at what's been marked as

17   Exhibit RC-2.  Are you familiar with this document?

18   A.  Yes.

19   Q.  And what is this?

20   A.  This is a text message exchange between three individuals;

21   Bernard Kilpatrick, Derrick Miller and Kwame Kilpatrick, on

22   July 2nd, 2002.

23              **MR. CHUTKOW:**  Move to admit Exhibit RC-2.

24              **THE COURT:**  Received.

25              (Government's Exhibit RC-2 received into

*10-CR-20403   USA v. Kwame Kilpatrick, et al*

1        evidence.)

2    **BY MR. CHUTKOW:**

3    Q.  What is Derrick Miller's role with the city at this time?

4    A.  Chief administrative officer.

5    Q.  Can you go ahead and start with the initial text message?

6    A.  The first one is from Bernard Kilpatrick, "The real problem

7    with DWSD is the evaluation committee.  Warren has some ideas

8    how you can proceed."  It says, "Cn," which I'm interpreting to

9    be "can we meet with him tomorrow evening?"

10           Reply from Kwame Kilpatrick is, "I will meet with

11   him and Victor Mercado.  I'm" -- it says, "n space o-t," so,

12   "not just meeting with him."

13   Q.  Let me stop you for a moment.  There's a reference to a

14   Warren from your review of the records.  Do you know who Warren

15   is?

16   A.  Warren Evans, he was on the Board of Water Commissioners at

17   this time.  He was a commissioner.

18   Q.  If you can continue onto Bernard Kilpatrick's response?

19   A.  Bernard Kilpatrick's response is, "No problem.  I was just

20   thinking short term on some stuff," s-t-f-f, "that's already

21   out there.  He has met with Mercado," n-d, so, "and feels he

22   is" -- that's o-i-n, so, "on the right track, but it will take

23   time which I do not possess a whole lot of."

24           Reply from Derrick Miller is, "Don't want to meet

25   with this guy.  He needs to talk the new guy."

*Carol Paszkiewicz - Direct*
*Wednesday, December 12, 2012*

65

1   Q.   Okay.  And does Bernard Kilpatrick respond to that?

2   A.   Yes.  Bernard Kilpatrick's response is, "He already" --

3   Q.   Just a moment.  Let's let it get on the screen.

4   A.   Oh, I'm sorry.

5   Q.   Thank you.

6   A.   Bernard Kilpatrick's reply is, "He already did and said he

7   is going, I repeat, going to be real good, however, there are

8   some pressing issues to deal with now.  I think you and Water

9   are missing the boat on this one."

10  Q.   From your review of text messages, do you know what "Water"

11  refers to?

12  A.   It's a nickname for Kwame Kilpatrick.

13  Q.   I next want to show you what's been marked as exhibit --

14  and, again, this text message here was dated July 2nd, 2002.

15  About where in time is that from Mr. Mercado's official start

16  date with the city?

17  A.   It's a little over a week after his official start date.

18  Q.   Next I want to show you what's been marked as Exhibit

19  Number IN1-12.

20  A.   This is a text message between Mr. Ferguson and

21  Mr. Kwame Kilpatrick on November 6, 2002.

22          **MR. CHUTKOW:**  Move to admit IN1-12.

23          **THE COURT:**  Received.

24          (Government's Exhibit IN1-12 received into

25          evidence.)

*10-CR-20403   USA v. Kwame Kilpatrick, et al*

1    **BY MR. CHUTKOW:**

2    Q.  If you can go ahead and read that into the record.

3    A.  The first text is from Bobby Ferguson, "I need to talk to

4    you," it says actually, "I need to talk to to you, and it's

5    important, DWSD, five minute, whenever you can today.  It's

6    about funds."

7              Reply from the mayor is, "Cool, come over at 5:00."

8              Reply from Bobby Ferguson is, "Will arrive 5 M."

9    Q.  Five minutes, is that how you interpret that?

10   A.  It could be p.m. or minutes, yes.

11   Q.  Oh, okay.  Next did you see a series of text messages

12   regarding an extension of Mr. Mercado's contract as the water

13   department director?

14   A.  I did.

15   Q.  I want to show you what's been marked as Exhibit IN1-5.  Do

16   you recognize this?

17   A.  I do.

18   Q.  And what is this?

19   A.  This is a text message exchange between Carolyn Williams

20   Meza, which is M-e-z-a, and Ruth Carter on June 11, 2003.

21   Q.  And who is Carolyn Williams Meza?

22   A.  At the time, she was the COO, chief operating officer, for

23   the City of Detroit.

24   Q.  And she reported to whom?

25   A.  The mayor.

*Carol Paszkiewicz - Direct*                              67
*Wednesday, December 12, 2012*

1    Q.  And who is Ruth Carter?

2    A.  At the time, she was corporation counsel, which is the head

3    of the law department.

4    Q.  And she reported to whom?

5    A.  The mayor.

6               **MR. CHUTKOW:**  I move to admit Exhibit IN1-5.

7               **THE COURT:**  Received.

8               (Government's Exhibit IN1-5 received into

9               evidence.)

10              **THE COURT:**  What was the date of it again?

11              **THE WITNESS:**  June 11, 2003.

12   **BY MR. CHUTKOW:**

13   Q.  If you could go ahead and start with Ms. Meza's text

14   message?

15   A.  She says, "Ruth, Mayor KMK does not want to give a contract

16   extension to Victor.  Glad I checked.  No new assignment for

17   you."

18              Reply from Ruth Carter is, "Me too.  Didn't sound

19   right to me either.  I'm a bit surprised at Victor."

20              Ms. Meza's response is, "So is KMK."

21   Q.  And KMK refers to whom?

22   A.  Kwame Malik Kilpatrick.

23   Q.  Next I'd like to --

24              **A JUROR:**  Can you give me one moment to look at

25   that?

*10-CR-20403   USA v. Kwame Kilpatrick, et al*

*Carol Paszkiewicz - Direct*
*Wednesday, December 12, 2012*

68

1              (Brief pause.)

2              **A JUROR:**  Thank you.

3    **BY MR. CHUTKOW:**

4    Q.  Next I'd like to show you what's been marked as Exhibit

5    IN1-5A.  See that?

6    A.  I do.

7    Q.  What is this?

8    A.  It's a text message between Victor Mercado and

9    Mayor Kilpatrick on June 13, 2003.

10   Q.  So about two days after that text message between the

11   corporation counsel and the chief operating officer?

12   A.  Correct.

13            **MR. CHUTKOW:**  Move for the admission of IN1-5A.

14            **THE COURT:**  Received.

15            (Government's Exhibit IN1-5A received into

16            evidence.)

17   **BY MR. CHUTKOW:**

18   Q.  It looks like Mr. Mercado has a couple different subjects

19   here.  Maybe we can just read the last line of what he says

20   where it says "also"?

21   A.  "Also, are we still on tomorrow?"

22            Reply from the mayor is, "Talk to," there's a

23   misspelling, but, "you about everything tomorrow at your

24   house."

25   Q.  And this is the mayor responding to whom?

*10-CR-20403   USA v. Kwame Kilpatrick, et al*

*Carol Paszkiewicz - Direct*
*Wednesday, December 12, 2012*                                        69

1    A.   Victor Mercado.

2    Q.   Now, he has what looks like an Arch Wireless account, is

3    that right?

4    A.   That's correct.

5    Q.   So he didn't have at the time a SkyTel pager like,

6    obviously, the other administrative folks?

7    A.   No, he did not.

8    Q.   Next I want to show you a text message from the same day as

9    this text exchange between Mr. Mercado and Mr. Kilpatrick,

10   Exhibit IN1-6.

11   A.   Okay.

12   Q.   Do you recognize this?

13   A.   I do.

14   Q.   And it's between whom and whom?

15   A.   Between Mayor Kilpatrick and Linda, his administrative

16   assistant.

17            **MR. CHUTKOW:**  Move to admit IN1-6.

18            **THE COURT:**  Received.

19            (Exhibit IN1-6 was previously received.)

20   **BY MR. CHUTKOW:**

21   Q.   If you can go ahead and read this into the record.

22   A.   Mayor Kilpatrick says, "Call me when Bobby and Victor get

23   to the office."

24            Reply from Linda is, "Will do."

25            **MR. RATAJ:**  We did this one.

*10-CR-20403    USA v. Kwame Kilpatrick, et al*

*Carol Paszkiewicz - Direct*
*Wednesday, December 12, 2012*

70

1              THE COURT:  It's already in.

2    BY MR. CHUTKOW:

3    Q.  We did this one already?

4    A.  Yes.

5    Q.  Let's move on then.  I won't ask you any questions about

6    this one.

7              Next, Exhibit IN1-6A, this would be the next day.

8    Do you see that?

9    A.  Yes.

10   Q.  And what's the date of it?

11   A.  June 14, 2003.

12   Q.  And what day of the week is that?

13   A.  That's a Saturday.

14   Q.  Okay.  And it's between whom and whom?

15   A.  It's between Christine Beatty and Kwame Kilpatrick.

16             MR. CHUTKOW:  Move to admit IN1-6A.

17             THE COURT:  Received.

18             (Government's Exhibit IN1-6A received into

19             evidence.)

20   BY MR. CHUTKOW:

21   Q.  Okay.  Go ahead and read that.

22   A.  The first text is from Christine Beatty -- the first text

23   on this page, I should say, "So it's a date?"

24             Reply from the mayor is, "I have a meeting with

25   Bobby and Victor at 8:00.  I'll meet you afterwards."

*10-CR-20403   USA v. Kwame Kilpatrick, et al*

2:10-cr-20403-NGE-MKM   Doc # 374   Filed 06/13/13   Pg 71 of 144   Pg ID 10480

*Carol Paszkiewicz - Direct*
*Wednesday, December 12, 2012*

71

1              Reply from Christine Beatty is, "For real?  I was

2    actually just talking stuff.  That would be wonderful to hear

3    from you then."

4    Q.  And from your review of the text messages, who do Bobby and

5    Victor refer to?

6    A.  Bobby Ferguson and Victor Mercado.

7    Q.  And this is on what day of the week?

8    A.  Saturday.

9    Q.  And here it looks like there's, there was obviously an

10   embedded reply in the very beginning.  Is this just an excerpt

11   of a longer conversation between the mayor and Ms. Beatty?

12   A.  Yes, it is.

13   Q.  Okay.  So we're only seeing an excerpt?

14   A.  Exactly.

15   Q.  I'd like to now show you what's been marked as IN1-6B.  Do

16   you recognize this?

17   A.  Yes, this is another entry from Mayor Kilpatrick's official

18   calendar.  This one is dated June 14 of 2003.

19            **MR. CHUTKOW:**  Move to admit IN1-6B.

20            **THE COURT:**  Received.

21            (Government's Exhibit IN1-6B received into

22            evidence.)

23            **MR. CHUTKOW:**  First, if we can highlight the top of

24   it so we can get the date and time, or the date and the day of

25   the week it is.

*10-CR-20403   USA v. Kwame Kilpatrick, et al*

*Carol Paszkiewicz - Direct*
*Wednesday, December 12, 2012*

72

1    A.   Saturday, June 14, 2003.

2              MR. CHUTKOW:   And if you can highlight the entry for

3    the time period of 8:00 p.m. to 9:00 p.m. at night.

4    BY MR. CHUTKOW:

5    Q.   Can you go ahead and read this entry into the record?

6    A.   "Meeting with Victor Mercado, 7277 White Oak Drive, West

7    Bloomfield," and in parens it says, "Victor's house, Commerce

8    and Orchard Lake," and then the rest of it is what appears to

9    be directions, how to get to Mr. Mercado's home.

10   Q.   This is the same day as the text message with Ms. Beatty

11   about the whereabouts of the mayor?

12   A.   Not his whereabouts at the moment, but that he has a

13   meeting at 8:00, yes.

14   Q.   I'm going to now show you -- so we'll leave that weekend,

15   and I want to go to the next Wednesday, June 18, 2003.  Can you

16   take a look at Exhibit IN1-6C?

17   A.   Yes.

18   Q.   Do you recognize this?

19   A.   I do.  It's a text message exchange between

20   Mayor Kilpatrick and Mr. Ferguson on June 18, 2003.

21             MR. CHUTKOW:   Move to admit IN1-6C.

22             THE COURT:   Received.

23             (Government's Exhibit IN1-6C received into

24             evidence.)

25

*10-CR-20403    USA v. Kwame Kilpatrick, et al*

*Carol Paszkiewicz - Direct*
*Wednesday, December 12, 2012*

73

1    **BY MR. CHUTKOW:**

2    Q.  And why don't we just read the first three entries, it

3    looks like they go into some other topics after that.

4    A.  The first one is from Mayor Kilpatrick, and it says, "Talk

5    to Victor, 999-1500 cell.  I meet with him at 10:00."

6                    Reply from --

7    Q.  What time is the mayor sending this text message?

8    A.  8:45 in the morning.

9    Q.  Sending it to Mr. Ferguson?

10   A.  Yes.

11   Q.  And what is Mr. Ferguson's response?

12   A.  "Okay, I need to meet you today with the out of the country

13   stuff.  I have it."

14                   Reply from the mayor is, "Come to my office at

15   10:30."

16   Q.  And then the rest of i,t, there's some scheduling of when

17   they're going to be meeting?

18   A.  Correct.

19   Q.  I'm going to show you what has been marked as Exhibit

20   IN1-6D, as in David.  Do you recognize this document?

21   A.  I do.  It's a text message exchange between Ms. Meza and

22   Mayor Kilpatrick on June 18, 2003.

23   Q.  So the same day as the previous text message you just

24   described?

25   A.  Yes.

*10-CR-20403   USA v. Kwame Kilpatrick, et al*

*Carol Paszkiewicz - Direct*
*Wednesday, December 12, 2012*

74

1        **MR. CHUTKOW:**  Move to admit IN1-6D.

2        **THE COURT:**  Received.

3        (Government's Exhibit IN1-6D received into

4        evidence.)

5    BY MR. CHUTKOW:

6    Q.  You can go ahead and read that into the record.

7    A.  The first text is from Ms. Meza, says, "How did the meeting

8    with Victor go?  Should we plan to talk tomorrow?  I can

9    schedule with Iris if you wish."

10   Q.  And what time is this particular text message?

11   A.  11:45 a.m.

12   Q.  It says CDT on that?

13   A.  Central time.

14   Q.  So --

15   A.  11 -- or 12:45 eastern time.

16   Q.  Do you recall Mr. Oshinsky's testimony before, how they had

17   a, kind of a centralized area in, I guess it was in --

18   A.  Missouri.

19   Q.  -- Mississippi?

20   A.  Mississippi, yeah, Mississippi.

21   Q.  Yeah, where sometimes the time differences would be

22   reflected in the text?

23   A.  Yes.

24   Q.  I interrupted you.

25   A.  Reply from the mayor is, "Meeting went well, no extension,

*10-CR-20403   USA v. Kwame Kilpatrick, et al*

*Carol Paszkiewicz - Direct*
*Wednesday, December 12, 2012*

75

1    and he's doing PLD."

2    Q.  Do you know what PLD stands for?

3    A.  Public lighting department.

4    Q.  That's another utility within the city?

5    A.  Yes.

6    Q.  Okay.  And you can go ahead.

7    A.  "I do agree that there are some political things I need to

8    do first."  Do you want me to go on?

9    Q.  Sure.

10   A.  Ms. Meza says, "Okay, I'll talk with him to get the change

11   plan ready and provide you with some specific rationale

12   language and list of people we'll recommend you call."

13   Q.  I'd like to show you a few more text messages relating to

14   Mr. Ferguson or Mr. Kilpatrick discussing either Mr. Mercado or

15   water department contracts, and then we'll be done.

16           First I'd like to show you Exhibit RC-34, do you

17   recognize this?

18   A.  Yes, I do.

19   Q.  And what's this?

20   A.  This is a text message exchange between Bobby Ferguson and

21   Christine Beatty on August 23, 2002.

22           **MR. CHUTKOW:**  Move to admit RC-34.

23           **THE COURT:**  Received.

24           (Government's Exhibit RC-34 received into

25           evidence.)

*10-CR-20403    USA v. Kwame Kilpatrick, et al*

1    **BY MR. CHUTKOW:**

2    Q.  You can go ahead and read that into the record.

3    A.  It's from Mr. Ferguson, it says, "Good morning.  Are you in

4    your office?  If so, I need the name of Motor City's DWSD job,

5    or do you want me to call Victor the name and number of the

6    job?"

7    Q.  Let me stop you there.  What is Motor City?

8    A.  Motor City Electric was a contractor for many years with

9    the City of Detroit with DWSD.

10   Q.  And other departments as well?

11   A.  And other departments, correct.

12   Q.  And Victor, from the context, is who?

13   A.  Victor Mercado.

14   Q.  And then what is Ms. Beatty's response to Mr. Ferguson?

15   A.  She says, "I am actually in a training.  You may have to

16   call Victor."

17   Q.  What was Ms. Beatty's official position with the city at

18   this time?

19   A.  I believe she was chief of staff.

20   Q.  To the mayor?

21   A.  Yes.

22   Q.  And then what is Mr. Ferguson's response?

23   A.  "Will call later."  Want me to keep going?

24   Q.  Yes, please.

25   A.  Ms. Beatty says, "Thank you."

*Carol Paszkiewicz - Direct*
*Wednesday, December 12, 2012*

77

1            Mr. Ferguson says, "Are you sure the company is

2     Motor City?  Victor says 26 million is Posen and 6 million is

3     Motor City."

4     Q.  Let me stop you there.  What is Posen?

5     A.  Posen Construction, they're another DWSD and city

6     contractor.

7     Q.  And what is Ms. Beatty's response?

8     A.  "That may be right.  I just know I saw a contract with

9     Motor City's name on it."

10            Mr. Ferguson replies, "What's next, pursue Motor

11    City under the same directions?"

12            Ms. Beatty replies, "Do you mean for what we talked

13    about last night?"

14            Mr. Ferguson replies, "Yes, exactly."

15            Reply from Ms. Beatty is, "Let me talk to

16    Mr. Mayor."

17            Bobby Ferguson says, "Okay, get back with me."

18    Q.  Now, from your review of the records, were you able to

19    identify what DWSD contract is being described here?

20    A.  You know, I wasn't.  At the time I did learn from my review

21    that both contractors had contracts either in existence or

22    being awarded, evaluated at the time, but the dollar values

23    that these individuals were talking about didn't match, so we

24    couldn't say which contracts in particular they were talking

25    about.

*10-CR-20403   USA v. Kwame Kilpatrick, et al*

*Carol Paszkiewicz - Direct*                                  78
*Wednesday, December 12, 2012*

1    Q.   Thank you.  I'd now like to show you what's been marked as

2    Exhibit Number LS1-8A.  And, again, LS is for Lakeshore.

3                THE COURT:  LS1 dash --

4                MR. CHUTKOW:  8A.

5                THE COURT:  -- 8A.

6    BY MR. CHUTKOW:

7    Q.   Do you recognize this document?

8    A.   Yes.  This is a text message exchange between

9    Mr. Kilpatrick and Mr. Ferguson.

10               MR. CHUTKOW:  I believe this one has already been

11   admitted into evidence, so I'll just go ahead and publish that.

12   BY MR. CHUTKOW:

13   Q.   If you can just read the top two lines of it.

14   A.   This is from Mr. Ferguson, "Are you going to call Victor

15   today?  Three of us break bread this evening."

16               And the mayor replies, "Yeah, I'll holla after I get

17   to work."

18   Q.   And I want to show you what's been marked as Exhibit

19   IN1-58A.  Do you recognize this document?

20   A.   Yes.  This is another entry from Mayor Kilpatrick's

21   official calendar.

22   Q.   And for what date again?

23   A.   The one I have is March 8, 2003.

24               MR. CHUTKOW:  Move to admit IN1-58A.

25               THE COURT:  Received.

*10-CR-20403   USA v. Kwame Kilpatrick, et al*

*Carol Paszkiewicz - Direct*
*Wednesday, December 12, 2012*

79

1              (Government's Exhibit IN1-58A received into

2              evidence.)

3    **BY MR. CHUTKOW:**

4    Q.  First going to look at the day of the week and the date.

5    A.  Saturday, March 8, 2003.

6    Q.  If you can go down to the entry for 9:00 p.m. that evening.

7    A.  Says, "9:30 to 11:30 p.m., Mayor, Bobby, Victor," and in

8    parens says, "Victor's house."

9    Q.  Next, let's see, I don't want you to -- well, we'll just

10   skip the next exhibit.

11             Now, at some point did Mayor Kilpatrick lose his

12   power as the special administrator over the Water and Sewerage

13   Department?

14   A.  Yes.

15   Q.  Approximately when did that occur?

16   A.  January of 2006.

17   Q.  I want to show you what's been marked as DLZ-31.  Do you

18   recognize this document?

19   A.  I do.

20   Q.  And what is it?

21   A.  The first page is a letter to Judge Feikens dated

22   February 27, 2006, and it's signed by Kwame Kilpatrick.

23             **MR. CHUTKOW:**  Move to admit DLZ-31.

24             **MR. THOMAS:**  Hold on one second, please, Judge.

25             **THE COURT:**  Received.

*10-CR-20403    USA v. Kwame Kilpatrick, et al*

1              (Government's Exhibit DLZ-31 received into

2              evidence.)

3    **BY MR. CHUTKOW:**

4    Q.  If we can go ahead and publish the first page of DLZ-31,

5    see if you can tell us what this is.

6    A.  This is the letter, again, dated February 27, 2006,

7    addressed to Judge Feikens from Kwame Kilpatrick.  You can see

8    the "Regarding" line says, "Request for order approving

9    contracts subsequent to termination of special

10   administratorship of Detroit Water and Sewerage Department."

11   Q.  And if we can just move to the first paragraph.  I just

12   want to highlight the date.  It talks about January 5, 2005

13   Opinion and Order.  Can you just read that part?

14   A.  "In its January 5, 2005 Opinion and Order, the Court

15   terminated the special administratorship but recognized" --

16   Q.  Well, let's go on.  I just wanted -- I was going for the

17   date there.  Is that date, in fact, correct?

18   A.  No.

19   Q.  When did the special administratorship get canceled --

20   A.  It was --

21   Q.  -- or terminated?

22   A.  -- January 5, 2006.

23   Q.  Okay.  So it's just a year off.

24              Let's go to Page 2 of this document, and if we can

25   highlight the very first paragraph, and why don't you go ahead

*Carol Paszkiewicz - Direct*
*Wednesday, December 12, 2012*

1   and read that into the record.

2   A.   "While all of the work under those contracts has been

3   completed, change orders to three of those contracts (WS-650,

4   WS-657 and WS-651) need to be issued to complete payment for

5   unanticipated work (differing field conditions) performed."

6   Q.   Let me just stop you.  At this point, Mayor Kilpatrick is

7   no longer the special administrator over the water department?

8   A.   Correct.

9   Q.   And he's writing to Judge Feikens for what purpose?

10  A.   Asking for him to approve these orders.  The judge also had

11  that ability as the overseer of the consent decree with EPA.

12  Q.   Okay.  Why don't you go ahead and continue on then.

13  A.   "Contract WS-623 needs change orders in order to complete

14  main replacement prior to MDOT street resurfacing.  Contract

15  DWS-812C needs a change order in order to complete work on our

16  facilities in an expeditious and cost effective manner.  Since

17  I am no longer in a position to approve payment under the

18  contracts I previously authorized, I require the Court's

19  assistance to ensure the orderly transition of responsibility

20  from the special administrator to DWSD."

21  Q.   And then go ahead and identify what change orders the mayor

22  is asking the judge to approve --

23  A.   W --

24  Q.   -- which is the next line.

25  A.   "Change orders for the following contracts need to be

*10-CR-20403   USA v. Kwame Kilpatrick, et al*

*Carol Paszkiewicz - Direct*
*Wednesday, December 12, 2012*

82

1   approved."  Want me to read them?

2   Q.  Yes, please.

3   A.  WS-650, contractor is Ferguson Enterprises, the amount

4   is $170,767.

5          The next one is WS-657, which is Willie McCormick,

6   the amount is $158,266.

7          The next one is WS-651, contractor is Ferguson

8   Enterprises, the amount is $276,135.

9          WS-623 is Ferguson Enterprises, is $7,516,505.10.

10         DWS-812C was L D'Agostini & Sons, $3,955,595.72.

11  Q.  When you earlier talked about a gentleman by the name of

12  Gino D'Agostini, is that the name of his company right there?

13  A.  That is, yes.

14  Q.  Do you understand whether Mr. Ferguson had an affiliation

15  with the change order reflected in DWS-812C?

16  A.  He did, he was part of a joint venture.

17  Q.  With whom?

18  A.  The joint venture name was DFT.  It stood for Detroit

19  Contracting, Inc.; Ferguson Enterprises, Inc.; and let me get

20  this right, Tucker, Young, Johnson, it's a consulting firm.

21  Q.  And they, it was a contract to do what?

22  A.  This was regarding upgrades and installation of security

23  systems for various water treatment facilities owned and

24  operated by the DWSD.

25  Q.  And from your review of the records, was this particular

*10-CR-20403   USA v. Kwame Kilpatrick, et al*

*Carol Paszkiewicz - Direct*
*Wednesday, December 12, 2012*

83

 1    change order here a -- to basically fund the work being done by

 2    DFT?

 3    A.   Yes.  This is, DWSD put this change order in through

 4    Mr. D'Agostini's contract.  My review of the record shows that

 5    Mr. D'Agostini's company had no role in the actual --

 6              **MR. THOMAS:**  Objection, Your Honor, hearsay.

 7              **THE COURT:**  Sustained.

 8    **BY MR. CHUTKOW:**

 9    Q.   From your review of the records, were you able to

10    determine --

11    A.   Yes.

12              **MR. THOMAS:**  Again, hearsay.

13              **THE COURT:**  Got the record here.  I suppose you

14    could put it in, but I'll sustain it otherwise.

15    **BY MR. CHUTKOW:**

16    Q.   Let me ask you this, of the five companies listed here for

17    change orders, are four of them affiliated in some way with

18    Mr. Ferguson's projects?

19    A.   Yes.

20    Q.   Now, this particular letter to Judge Feikens in February,

21    is this about a couple months after Mr. Kilpatrick had signed

22    that special administrative order authorizing that Amendment

23    Number 4 for the sinkhole?

24    A.   Yes.

25    Q.   And going down further on this letter, it indicates,

*10-CR-20403   USA v. Kwame Kilpatrick, et al*

```
1   without reading everything, what is Mr. Kilpatrick, or
2   Mayor Kilpatrick also asking for in addition to the five change
3   orders reflected above?
4   A.  He's asking to extend, to approve the extension of
5   Mr. Mercado's employment agreement because, you recall from the
6   earlier exhibit, it was set to expire at the end of 2005.
7   Q.  And how long was he asking to extend Mr. Mercado's
8   employment agreement?
9   A.  The remainder of Mayor Kilpatrick's term in office.
10           MR. CHUTKOW:  One moment, Your Honor.
11           (Brief pause.)
12           MR. CHUTKOW:  That's all the questions I have,
13  Your Honor.
14           THE COURT:  Okay.
15                                         (11:34 a.m.)
16                    CROSS EXAMINATION
17  BY MR. THOMAS:
18  Q.  Morning, Ms. Paszkiewicz.
19  A.  Good morning.
20  Q.  Can -- what I'd like to do is I'd like to run through the
21  documents as they had been done on direct examination, and so
22  can we take a look at IN1-9, please.
23           Now, Agent Paszkiewicz, you indicated that you have
24  reviewed these text messages and there's already been cross
25  examination regarding the nature of your review of these
```

*10-CR-20403    USA v. Kwame Kilpatrick, et al*

*Carol Paszkiewicz - Cross*
*Wednesday, December 12, 2012*

85

1    messages, and what I believe has been established, and maybe

2    correct me if I'm wrong, is you took a look at all of the text

3    messages to see where they would fit in your investigation, is

4    that correct?

5    A.  Well, there's a couple components to your question.  To be

6    clear, I didn't look at all 300,000 of them individually

7    myself.  I did a variety of searches, as I've talked about

8    before, to either corroborate other things that I'd learned in

9    the investigation or going along a timeline to see if there

10   were communications between certain people.

11   Q.  And, obviously, you were engaged in this investigation

12   after the year of 2004 or '5, correct?

13   A.  It was 2009.

14   Q.  And what you're doing is you're looking backward in time

15   over this period of time to try and see what it is that makes

16   sense to you in your investigative process.

17   A.  I would -- I don't think I would characterize it as "makes

18   sense."  I think it would be what facts fit into the pattern of

19   evidence.

20   Q.  The pattern of evidence that you were trying to establish

21   to show culpability on the part of Mr. Kilpatrick and

22   Mr. Ferguson.

23   A.  I'm not going to agree with "pattern of culpability."  I

24   just looked at the evidence for what it was.

25   Q.  And so then when you saw things that didn't make sense to

*10-CR-20403    USA v. Kwame Kilpatrick, et al*

*Carol Paszkiewicz - Cross*
*Wednesday, December 12, 2012*

86

1   you, did you discount them?

2   A.  No.

3   Q.  Did you try and make them fit within the pattern of

4   evidence that you were looking to establish as the person who

5   was investigating this case?

6   A.  Make them fit, no.

7   Q.  All right.  So we are now looking at Inland message -- and

8   this is Exhibit IN1-9.  "When do you meet with Soave?"

9             And you've indicated that you knew who that was, and

10  that's Anthony Soave who has testified here in court, correct?

11  A.  Correct.

12  Q.  The response doesn't say or answer directly, "When do you

13  meet with Soave," does it?

14  A.  No, it says he does not know.

15  Q.  It answers that he does not know and that he will holla

16  later, correct?

17  A.  Correct, that's what it says.

18  Q.  Now, wiretaps weren't up in 2002, correct?

19  A.  Not that I know of.  And to be clear, Mr. Kilpatrick's

20  phone was never tapped.

21  Q.  Never tapped.  Obviously, if he was on a phone conversation

22  with somebody and it was culpable, we would have heard about

23  it, right?

24  A.  Yes.

25  Q.  And this does not establish that there was a meeting with

*10-CR-20403    USA v. Kwame Kilpatrick, et al*

*Carol Paszkiewicz - Cross*
*Wednesday, December 12, 2012*

87

1   Anthony Soave, this particular text message?

2   A.  Correct.

3   Q.  "I don't know" is not an answer that he's going to meet

4   with Mr. Soave, correct?

5   A.  Correct.

6   Q.  But we do know at later points in time he does meet with

7   Mr. Soave.

8   A.  Yes.

9   Q.  And other than hearing from Mr. Soave what it is that he

10  says occurred at these meetings which we have not yet

11  established at this point, we don't know what was discussed.

12  A.  I know what I was told was discussed.

13  Q.  Well, you know that there is a difference between hearsay

14  and direct evidence, correct?

15  A.  I do.

16  Q.  And you know that you can't testify as to what it was you

17  were told --

18  A.  I know --

19  Q.  -- because that would be hearsay.

20  A.  I know there are exceptions to hearsay.

21  Q.  Yes, and so you're trying to imply to the jury that you're

22  going to be able to tell them what Tony Soave told you, and you

23  can't do that, can you?

24  A.  I'm not trying to imply that, sir.

25  Q.  Okay.  I don't know what you were doing, but can we move on

*10-CR-20403   USA v. Kwame Kilpatrick, et al*

*Carol Paszkiewicz - Cross*
*Wednesday, December 12, 2012*

88

1    now?  Is this the entirety of 1.9?

2              All right.  Can we see then 1.11, please -- I'm

3    sorry, this is IN1-11.

4              All right.  Now, this is something that you've

5    reported was a text message that occurred between

6    Mr. Kilpatrick and Mr. Ferguson because you've identified the

7    devices, 7164 and 1313, correct?

8    A.   Correct.

9    Q.   And this conversation was reported to have occurred five or

10   six days after the previous exhibit that we looked at, IN1-9?

11   A.   Correct.

12   Q.   All right.  Now, I believe it's your testimony that this is

13   somehow related to the prior conversation.

14   A.   I didn't make -- I just testified to the text message date

15   and what it said.

16   Q.   Okay.  Do you know in your investigation what Graimark is?

17   Maybe the spelling could be different, but do you know what

18   Graimark is?

19   A.   I have an understanding, yes, it was a housing development.

20   Q.   That was a housing development from the Archer

21   administration, is that right?

22   A.   I don't know if it was from -- I'm just not aware if it was

23   from the Archer or not.

24   Q.   If you don't know, you don't know.

25   A.   No.

*10-CR-20403    USA v. Kwame Kilpatrick, et al*

*Carol Paszkiewicz - Cross*
*Wednesday, December 12, 2012*

1   Q.  Do you know that Graimark was stalled?

2   A.  I do not know that.

3   Q.  Do you know that Bobby Ferguson was involved in trying to

4   clean up the mess at Graimark that had been established by

5   prior contractors?

6   A.  I have no knowledge of that.

7   Q.  Do you know what he meant when he said -- and that's

8   Mr. Ferguson, correct -- "It's fucked up."  And I apologize,

9   ladies and gentlemen, if I'm offending anybody.

10  A.  The first entry where it says that is Mayor Kilpatrick.

11  Q.  Okay.  That's Mr. Kilpatrick.  All right.  "It's a mess,

12  it's fucked up"?

13  A.  Correct.

14  Q.  "I'm with George now," do you know who that is?

15  A.  George Jackson.

16  Q.  You are saying that with a question in your voice.  Do you

17  know who it is?

18  A.  Well, George Jackson at the time was the head of the DEGC

19  which had -- the Detroit Economic Growth Corporation.

20  Q.  Uh-huh.

21  A.  -- which had a role in Graimark.

22  Q.  Did you think that Detroit Economic Growth Corporation

23  might have something to do with a project that was stalled and

24  was having some difficulty?

25  A.  Again, I didn't know it was stalled or having difficulty,

*10-CR-20403   USA v. Kwame Kilpatrick, et al*

*Carol Paszkiewicz - Cross*
*Wednesday, December 12, 2012*

90

 1    but I would think that they -- from this and other

 2    investigations, I know that they are involved in these types of

 3    developments.

 4    Q.  Do you know, do you know whether or not there is any

 5    evidence in your investigation that the city had already spent

 6    millions on that contract and that they were facing the

 7    possibility that this site would be abandoned?

 8    A.  I have no knowledge of that.

 9    Q.  You think that that might be something of importance to

10    George Jackson who has a position with the, with Detroit?

11    A.  Again, I have no knowledge of that.  If I assume that

12    that's true, then, yes, there's -- Mr. Jackson would be

13    involved.

14    Q.  Do you know whether or not Graimark was finished?

15    A.  I do not know.

16    Q.  So you did not know that Graimark was actually completed

17    and people are living over there now?

18    A.  I have no idea.

19    Q.  Do you know what Jefferson Village apartments are and

20    Jefferson Village housing project was?

21    A.  I have heard of that, yes.

22    Q.  Did you know that Graimark became Jefferson Village?

23    A.  I did not know that.

24    Q.  We had heard testimony from Mr. Soave about a project that

25    he had in Virginia and Mayor Kilpatrick going out to Virginia

*10-CR-20403    USA v. Kwame Kilpatrick, et al*

*Carol Paszkiewicz - Cross*
*Wednesday, December 12, 2012*                    91

1    to visit a housing project.

2    A.  Yes.

3    Q.  Do you know whether or not Jefferson Village was a similar

4    project to the project that Mr. Soave had done out in Virginia?

5    A.  I have no knowledge one way or another.

6    Q.  You did not learn that in your investigation?

7    A.  I didn't investigate Jefferson Village.

8    Q.  All right.  Thank you.

9            **MR. THOMAS:**  Can we see IN1-35, please.

10   **BY MR. THOMAS:**

11   Q.  This is a communication between, you had indicated,

12   E. Blake who is a, an administrative assistant to

13   Bobby Ferguson, is that right?

14   A.  At Ferguson Enterprises, yes.

15   Q.  And in -- and relating to a meeting that he might have with

16   Kathleen McCann?

17   A.  It's a reminder of a meeting he is to have, yes.

18   Q.  This issue of communication between Mr. McCann -- I'm

19   sorry, Ms. McCann and Mr. Ferguson, you would expect that if

20   there was going to be work that was going to be done by FEI

21   that he might have communication with Kathleen McCann, would

22   you agree?

23   A.  Yes, yes, in her role at Inland, is that what you're -- or

24   Soave Enterprises, is that your question?

25   Q.  Right.  Well, I'm talking about September 2nd, 2004.

*10-CR-20403   USA v. Kwame Kilpatrick, et al*

*Carol Paszkiewicz - Cross*
*Wednesday, December 12, 2012*

92

1   What's the significance of that date?

2   A.   This is just a reminder -- oh, this date?  There's records

3   that indicate that Ms. McCann met with Mr. Ferguson on that

4   date.

5   Q.   Yes, and what was going on in September of 2004?

6   A.   Relevant to the contract?  Could you be more specific,

7   please?

8   Q.   Could we see IN1-37, please.  This is a series of text

9   messages between Mr. Ferguson and who?

10  A.   Mayor Kilpatrick.

11  Q.   And there's a remark here from Mr. Ferguson.  Do you know

12  what it is in relationship to?

13  A.   It is the same date as his meeting and after his meeting

14  with Ms. McCann, and I say "after" based on the text messages

15  and her records.

16  Q.   All right.  Obviously, what was going on in September of

17  2004?

18  A.   I just want to clarify, for your question, are you asking

19  me relevant to this contract or something else that's going on?

20  Q.   Well, was the sinkhole going on at that point in time, is

21  what I'm trying to get to.

22  A.   I'm sorry, was the --

23  Q.   Was the sinkhole going on at that time?

24  A.   Yes, it was.

25  Q.   All right.  You knew that the sinkhole had occurred in the

*10-CR-20403    USA v. Kwame Kilpatrick, et al*

1    last week of August 2004.

2    A.   Yes.

3    Q.   People had been called to go out there to do work right

4    away because it was an emergency situation.

5    A.   That's true.

6    Q.   And the reason why, of course, is because it was a huge

7    water main.

8    A.   Yes.

9    Q.   And how big was that, 72 inches?

10   A.   That sounds right.  I'd have to look at the records.  It

11   sounds right, it was very, very large.

12   Q.   So it was servicing a large part of Macomb County?

13   A.   Yes, it's what they call, like, an intercepter line,

14   meaning other lines feed into that line to send it down to the

15   wastewater treatment plant.

16   Q.   And this is not -- this is a sewer?

17   A.   Yes.

18   Q.   And so, obviously, there's issues when sewers are backing

19   up and sewers are not being serviced appropriately, right?

20   A.   Correct, they're not flowing properly.

21   Q.   Well, I mean, I can't imagine any better emergency -- and

22   you've been working with EPA for a long time -- than when

23   you've got that stuff flowing?

24   A.   Yes.

25   Q.   And it's not flowing right.

*Carol Paszkiewicz - Cross*
*Wednesday, December 12, 2012*

94

1    A.  Correct.

2    Q.  And so this is September 2nd, do you remember that the

3    sinkhole happened on August 24th?

4    A.  Sitting here, I was thinking it was August 29th, but it

5    could be the 24th as well.

6    Q.  And that people were out there immediately analyzing the

7    situation and surveying what it is that needs to be done?

8    A.  Correct.

9    Q.  And were you out there?

10   A.  No, that's not part of my duties with EPA.

11   Q.  Okay.  But you were aware of this from your investigation.

12   A.  Correct.

13   Q.  And they didn't sit around and wait for somebody to

14   authorize payment before work got started.  People got up there

15   and started doing work right away.

16   A.  Well, yes, under their existing emergency contracts.

17   That's from my review of the records, yes.

18   Q.  Yes.  So you have this big hole in the ground, you got

19   water, black water, flowing everywhere, you want to contain

20   that, correct?

21   A.  Correct.

22   Q.  So you have people out there that are going to be doing

23   that, and it's expected that they would do it and that they'd

24   worry about the money later?

25   A.  Correct.

*10-CR-20403    USA v. Kwame Kilpatrick, et al*

*Carol Paszkiewicz - Cross*
*Wednesday, December 12, 2012*

95

1   Q.  You knew, did you not, that Mayor Kilpatrick had gone out
2   there to the site?
3   A.  Yes.
4   Q.  And that he had gone out there well in advance of this
5   September 2nd date?
6   A.  I didn't know that, no.
7   Q.  You didn't know that?
8   A.  No.
9   Q.  Did you know that there were press conferences that had
10  occurred between him, the authorities in Macomb County, the
11  mayor of the City of Sterling Heights, because this happened in
12  Sterling Heights, relating to the situation and the response?
13  A.  I knew there were press conferences.  If you're questioning
14  did I know it was before September 2nd or 1st, no, I didn't
15  know the timing of them.  I knew there were -- there was also
16  one at the end when they finished completion so, yes, I'm aware
17  that there were press conferences with those individuals.
18  Q.  And do you know whether or not there was praise given by
19  the mayor for his response and his ability to work with these
20  various municipalities and agencies that were engaged in
21  analyzing and addressing the situation?
22  A.  Yeah, I recall seeing a document to that effect.
23  Q.  Now, we have all of these lines of authority.  We have the
24  Macomb County commission, we have the mayor of the City of
25  Detroit, we have the mayor of Sterling Heights.  This is a

*10-CR-20403   USA v. Kwame Kilpatrick, et al*

*Carol Paszkiewicz - Cross*
*Wednesday, December 12, 2012*

96

1    situation that's guided not only by contracts, but it's guided

2    by the emergency of the situation, would you agree?

3    A.  Yes.

4    Q.  And you would expect, then, that this particular

5    arrangement, this particular situation, would be something that

6    would have to be addressed without the niceties of politics or

7    without the considerations of contracts?

8    A.  I guess I don't understand your question, the nicety of --

9    Q.  As of September 2nd of 2004, you know that Mayor Kilpatrick

10   had special administrative authority to address the issues at

11   this sinkhole.

12   A.  I know that as special administrator he had the power to

13   authorize the execution of contracts.

14   Q.  And that ultimately that, although Judge Feikens is the

15   person who was in charge of the Detroit Water and Sewerage

16   Department, that that authority had been vested in

17   Mr. Kilpatrick almost immediately after he had become mayor.

18   A.  Before he was even sworn in.

19   Q.  Before he was even sworn in, and so we've been talking

20   about a lot of different contracts in this case.  We've been

21   talking about 864, 865, 2014, 2015.  These were contracts that

22   were administered while Mr. Kilpatrick was the mayor of the

23   City of Detroit, correct?

24   A.  Yes.

25   Q.  And while he was the mayor, there were two different

*10-CR-20403    USA v. Kwame Kilpatrick, et al*

*Carol Paszkiewicz - Cross*
*Wednesday, December 12, 2012*

97

1    processes by which he could get contracts approved.

2    A.  Yes.

3    Q.  One of which is the lengthy process that we went through

4    when we showed the different approvals that had to be done when

5    a contract was in the design-build phase, do you remember that

6    document?

7    A.  Are you referring to one of your defense exhibits when you

8    said "design-build"?

9    Q.  Uh-huh, yes.

10   A.  I recall seeing that, yes.

11   Q.  And you recall the testimony, do you not, about the fact

12   that that process was cumbersome and that it took a great deal

13   of time to run through that process, whether it be the initial,

14   the initial approval -- for example, we have the DLZ people

15   come in and thought that they had an award and that they could

16   rely on that award.  There are a lot of steps that in the

17   ordinary process would be required for the actual completion of

18   the contracting process.

19   A.  Yes.  I just want to clarify.  The beginning of your

20   question was design-build, and my understanding from my

21   investigation is all contracts go through those stages.  I want

22   to be clear, it's not just design-build because there are a

23   variety of types of contracts.

24   Q.  And I agree with you on that, but the exhibit itself was an

25   exhibit of the design-build process, and we then extrapolated

*10-CR-20403    USA v. Kwame Kilpatrick, et al*

```
1    that to all contracting.
2    A.  Yes, I just wanted to be clear about my answer.
3    Q.  And the testimony regarding Judge Feikens' ability to cut
4    through that process for the, whatever purposes that he deemed
5    necessary, as the, we call it, the water czar, as the judge
6    that was administering the consent order, that would avoid that
7    cumbersome process.
8    A.  Judge Feikens' powers and special administrator powers,
9    yes, whoever he has given them to.
10   Q.  I want to take it step by step.
11   A.  Okay.
12   Q.  You knew that Judge Feikens had that power?
13   A.  Yes.
14   Q.  And you know that he had designated that power to special
15   administrators over time.  Previously to Mayor Kilpatrick, it
16   was Mayor Dennis Archer.
17   A.  Correct.
18   Q.  And when Mayor Kilpatrick came into office, he became the
19   special administrator.
20   A.  Yes.
21   Q.  And those purposes were to -- actually, in contemplation of
22   such an emergency just like the Detroit Water and Sewer
23   Department had with this sinkhole on 15 Mile Road?
24   A.  The language of -- I agree with your statement.  The
25   language isn't that specific.
```

*Carol Paszkiewicz - Cross*
*Wednesday, December 12, 2012*

99

1    Q.  No.

2    A.  But it was allowable, yes.

3    Q.  Right.  And you would contemplate that that would be

4    something that was thought about.  Here's a contracting process

5    that's ordinarily in place, but now you've got the ability for

6    the special administrator or for the judge to say, "Look-it, we

7    need to get something done quickly," right?

8    A.  Correct.

9    Q.  And certainly there's nothing more emergent than when

10   you've got a sewer that busts and you've got people's refuse or

11   black water spilling out in neighborhoods?

12   A.  Correct.  I just want to be clear, though, that there were

13   existing emergency contracts that that work was done under, and

14   1368 is an example of that.

15   Q.  All right.

16   A.  But that wasn't via the special administrator authority, it

17   was just an existing contract.

18          Now, if you're talking about the later amendments

19   that helped fund that emergency work, then, yes, that's just to

20   be clear about the process and what happened.

21   Q.  Well, we're talking about Mayor Kilpatrick's participation

22   in the amendments.

23   A.  Okay.  I just wasn't sure.

24   Q.  Well, I want to talk about how that occurs, but we've been

25   talking about a lot of contracts in this case, have we not?

*10-CR-20403    USA v. Kwame Kilpatrick, et al*

*Carol Paszkiewicz - Cross*
*Wednesday, December 12, 2012*

100

```
 1    A.  Yes.

 2    Q.  1361.

 3    A.  Yes.

 4    Q.  1365.

 5    A.  25?

 6    Q.  1325, 2014 and 2015?

 7    A.  Yes.

 8    Q.  864 and 865?

 9    A.  Yes.

10    Q.  All of those contracts went through the ordinary process of

11    approval by city council?

12    A.  Well, 1361 was canceled.

13    Q.  Wait.  Before it was canceled, it had to be approved.

14    A.  Before it was canceled, it had to be approved?

15    Q.  Are you talking about -- it was canceled before any work

16    was done on it?

17    A.  1361, yes.

18    Q.  Okay.  So let's leave that one out.

19    A.  1325 was combined with 1368.

20    Q.  All right.  That's the last time I'm taking notes from --

21    2014, 2015?

22    A.  Yes, I believe those went through the normal -- actually,

23    that was after Mayor Kilpatrick's special administrator powers

24    were terminated so, yes, those went through city council.

25    Q.  So the only two that we know and that we've been talking
```

*Carol Paszkiewicz - Cross*
*Wednesday, December 12, 2012*

1   about here with the jury about the use of special administrator

2   powers was the amendments as it relates to 1368, correct?

3   A.  Yes.

4   Q.  And then 2012 was a, was a pilot project, right?

5   A.  No, it was the actual -- the pilot was before that.

6   Q.  Okay.  But it was based upon the fact that we had things

7   going on in the City of Detroit?

8   A.  Yes.

9   Q.  Now, they did seven years' worth of work in less than a

10  year and-a-half?

11  A.  Something like that.

12  Q.  All right.  And just to point out the emergency situation,

13  can we see IN1-A, and then 1-B?

14  A.  Are you looking for the pictures, Mr. Thomas?

15  Q.  Yes.

16  A.  They're 32, they're IN1-32A, B and C.

17  Q.  Okay.  I'm sorry.  We were going so fast.  All right.

18  Here's 1-32.  And do you know when this picture was taken?

19  A.  I don't know the exact date, no.  I have it back in my

20  records, I just don't know.

21  Q.  I don't see any water there.

22  A.  Correct.

23  Q.  Do you expect that at that point the water had been

24  contained, the wastewater had been contained?

25  A.  I don't -- the pictures that are not in evidence but I've

*10-CR-20403    USA v. Kwame Kilpatrick, et al*

*Carol Paszkiewicz - Cross*
*Wednesday, December 12, 2012*

```
 1   seen that were taken immediately when the sinkhole erupted, I
 2   didn't see water.
 3   Q.  You're talking about stuff that's not in evidence.
 4   A.  No, I'm just saying, I didn't see water in the initial one,
 5   so you're asking me, would I expect to see water here or has it
 6   been contained, I don't know.
 7   Q.  Okay.  And then can we do 32B, IN1-32B.  Looks like
 8   significant work has been done here.
 9   A.  Yes.
10   Q.  All right.  People went out and did the work before there
11   was a contract in place, would you agree with me on that?
12   A.  No, I would not agree with that.
13   Q.  People went out and did the work based upon a, an emergency
14   situation, correct?
15   A.  Yes.
16   Q.  And there were several contractors that were required to
17   actually coordinate their efforts to do the work.  Is that
18   what --
19   A.  I lost you halfway through that.
20   Q.  Who were the contractors that were on this job?
21   A.  Who were the contractors?
22   Q.  Uh-huh.
23   A.  There was Inland, D'Agostini, Ferguson.  There were a
24   number of, like, Mersino Pump Company, you know, they actually
25   handle that huge pump, pump devices that were used.  I mean,
```

*10-CR-20403    USA v. Kwame Kilpatrick, et al*

*Carol Paszkiewicz - Cross*
*Wednesday, December 12, 2012*

1    there's a slew, NTH, a slew of contractors.

2    Q.  A lot of minorities out there?

3    A.  There were some, not -- I don't know, I couldn't

4    characterize it a lot.  There were some minority-owned

5    companies.

6    Q.  Mr. Ferguson's reference to the fact that he went to a

7    meeting, there was only two black people there?

8    A.  In that earlier text?

9    Q.  It's a text.

10   A.  Yeah, I don't know where, what meeting, I don't know the

11   context of that.

12   Q.  You understand that, obviously, Mr. Ferguson was concerned

13   with minority participation in contracts?

14   A.  I think that's been established, yes.

15   Q.  Okay.  And this was a contract that was authorized through

16   the Detroit Water and Sewer Department, correct?

17   A.  Correct.

18   Q.  All right.  With all of the attendant Detroit-based

19   business, Detroit-headquartered business and all the other

20   principles that we've been discussing throughout this trial.

21   A.  Requirements, is that what you're asking me?

22   Q.  Yes.

23   A.  Yes.

24   Q.  All right.  Now, we had seen IN1-34A, and this is a

25   calendar for Mr. Kilpatrick for September 1, 2004.

*10-CR-20403   USA v. Kwame Kilpatrick, et al*

```
 1    A.  Yes.
 2    Q.  Now, let's talk about calendars, per se.  Do you discount
 3    the possibility that there are things that were scheduled
 4    throughout that day that were not included on the mayor's
 5    calendar?
 6    A.  No, I don't discount that.
 7    Q.  And do you discount the fact that there may have been
 8    things that were scheduled that maybe had to be rescheduled and
 9    that they did not occur?
10    A.  That is a possibility.
11    Q.  We can't take this calendar as the gospel of what it is
12    that did occur in any particular day, would you agree?
13    A.  I agree with that.
14    Q.  All right.  But we were referring to different things that
15    were going on.  Now, you recognize Mayor Kilpatrick obviously
16    had a family life before his day started.
17    A.  Yes.
18    Q.  And you know that, as we all do, I'm sure you do, too, we
19    all have obligations that are outside of our business life that
20    may take precedence, correct?
21    A.  Yes.
22    Q.  And it appears as if -- and I wonder whether you'll give me
23    this because you're so tough, but it appears as if he's a
24    pretty busy guy?
25    A.  I would assume that the mayor of Detroit, whomever it is,
```

*Carol Paszkiewicz - Cross*
*Wednesday, December 12, 2012*

105

1   is a very busy person, yes.

2   Q.  All right.  Now, he has -- we went through the

3   organizational cart, we saw about, you know, the number of

4   departments that he has, as you have described, under the

5   auspices of the mayor of the City of Detroit, right?

6   A.  Correct.

7   Q.  And each one of those departments has a department head?

8   A.  Yes.

9   Q.  And, I mean, I don't know if you know this, but when he

10   became mayor, did you know that he had 20,000 employees?

11   A.  I didn't know that, no.

12   Q.  And that was reduced down to about 15,000 by the time he

13   was in his second administration, did you know that?

14   A.  No, I did not.

15   Q.  And, obviously, he's got people tugging at him from a lot

16   of different directions.

17   A.  I would assume so.

18   Q.  All right.  One of whom is Bobby Ferguson, who is sitting

19   over at this table here, you understand, we've seen these text

20   messages.

21   A.  Yes.

22   Q.  But when Mr. Ferguson says to the mayor, "Hey, you know, I

23   got this issue, I want to talk to you about it," some of these

24   things basically are not really responsive, they're deferrals,

25   "I'll talk to you, I'll holla at you later," we've seen that,

*10-CR-20403    USA v. Kwame Kilpatrick, et al*

1     right?

2     A.  I've seen that, yes.

3     Q.  Or, you know, he's got a comment, the mayor gives something

4     "LOL," right?

5     A.  Yes.

6     Q.  Now, you're an agent, right?

7     A.  I am, yes.

8     Q.  And you've been working for a long time, correct?

9     A.  Fifteen years, yes.

10    Q.  And we've talked about mind-reading.  You don't really know

11    what was going on in the mind of the person when he puts down

12    "LOL."

13    A.  No, I don't.  Laugh out loud is all I can read it as, you

14    know, what's on paper is what I can read it as.

15    Q.  Okay.  And the same thing about "I'll holla at you later,"

16    without any follow-up, you don't know whether or not there were

17    any conversations that did occur?

18    A.  Without any other records, phone records, text messages,

19    no, I don't.

20    Q.  I'm not discounting the fact that he's talking to

21    Bobby Ferguson.  He talks to Bobby Ferguson.  But what was

22    being said, we don't have that?

23    A.  If it's not in the text message, then I don't know what's

24    being said, correct.

25              **MR. THOMAS:**  Okay.  Now, did we already have up

*Carol Paszkiewicz - Cross*
*Wednesday, December 12, 2012*

107

1  1-34A?  And that's of what date, September 1st of 2004, okay,

2  and then can we scroll down, Ms. Facchini, please.  All right.

3  I think you're going to have to make it bigger for me.

4  **BY MR. THOMAS:**

5  Q.  Now, you would imagine that on September 1st that

6  Mr. Kilpatrick would have had an interest in what was going on

7  out there at the sinkhole at 15 Mile, right?

8  A.  Absolutely.

9  Q.  And it looks like there is a confirmation here of a, at

10  least an appointment for a meeting at the sinkhole on September

11  the 1st.

12  A.  Yes.

13  Q.  Were you aware that there was a news conference there that

14  day?

15  A.  No.

16  Q.  Okay.  But you know who Richard Notte is, right?

17  A.  I believe he's the mayor of Sterling Heights, or was at the

18  time.

19  Q.  He was at the time, and Victor Mercado at that point was

20  the head of the Detroit Water and Sewer Department?

21  A.  Yes.

22  Q.  Obviously, here it is, let's say that the sinkhole occurred

23  on August 23rd.  We're within a week of that and he's out,

24  Mayor Kilpatrick is out at the site.

25  A.  Yes.

*10-CR-20403    USA v. Kwame Kilpatrick, et al*

*Carol Paszkiewicz - Cross*
*Wednesday, December 12, 2012*

108

1    Q.  Now, were you aware from your investigation that he had

2    been out at the site on the day after the sinkhole had

3    occurred?

4    A.  No.

5    Q.  If he did do that, that probably would have been four days

6    earlier than George Bush went out to New Orleans, right?

7    A.  I wouldn't know.

8            **MR. THOMAS:**  I have to do it, I'm sorry.

9    A.  I wasn't there.

10   **BY MR. THOMAS:**

11   Q.  I wasn't either.

12           **MR. THOMAS:**  Can we scroll down some more, please.

13   **BY MR. THOMAS:**

14   Q.  But that was not the end of his day, he had other things to

15   do as well, correct?

16   A.  Based on his calendar, yes.

17   Q.  All right.  Which would include, you know, meeting with

18   other people, speech presentations, and his day ended -- I

19   can't see it, Ms. Facchini -- but it looks like it ended around

20   6:00 p.m. that day?

21   A.  According to this calendar, yes.

22           **MR. THOMAS:**  All right.  Now, can we see IN1-33,

23   please.

24   **BY MR. THOMAS:**

25   Q.  This is another series of text messages, and this is, this

*10-CR-20403   USA v. Kwame Kilpatrick, et al*

*Carol Paszkiewicz - Cross*
*Wednesday, December 12, 2012*

1    is from Mr. Ferguson, is that correct?

2    A.   Between Mayor Kilpatrick and Mr. Ferguson, yes.

3    Q.   Now, as of September 1, 2004, were you aware that

4    Mr. Ferguson was already out on the job site?

5    A.   Actually, based on my investigation, his equipment didn't

6    come out until September 14.

7    Q.   But that's not what I said.

8    A.   You asked me --

9    Q.   Were you aware that Mr. Ferguson had already been out to

10   the job site?

11   A.   But your question is, was I aware, and my answer was, no,

12   he was not out at the time, based on my investigation.

13   Q.   Based on your investigation, his equipment was not out

14   there until later?

15   A.   Are you asking me personally?

16   Q.   Yes, ma'am.

17   A.   Oh, I'm sorry, no, I don't know.

18   Q.   All right.  Would you see it as unusual, first of all, that

19   Victor Mercado might have any conversation relating to the

20   sinkhole with Bobby Ferguson?

21   A.   Yes.

22   Q.   He shouldn't be talking to Victor Mercado?

23   A.   You asked me --

24   Q.   I asked you, did you --

25   A.   Right, if I thought it was unusual, my answer is yes.  So

*10-CR-20403    USA v. Kwame Kilpatrick, et al*

```
1    ask me again, I'm sorry, Mr. Thomas.  Ask me again.
2    Q.  I want to build on that.
3    A.  Okay.
4    Q.  All right.  I want to talk to you about the fact that --
5    what is Victor Mercado's role at this point with Detroit Water
6    and Sewer?
7    A.  He's the director.
8    Q.  At this point, would you agree with me that Victor Mercado
9    at this point has an emergency situation going on?
10   A.  Absolutely.
11   Q.  That Victor Mercado was aware of the fact that wastewater
12   was spewing all over Sterling Heights?
13   A.  Yes.
14   Q.  And that he, as the head of the Detroit Water -- the
15   director of the Detroit Water and Sewer Department, may be
16   concerned about the expeditious marshaling of assets to fight
17   this battle, and that is to contain the wastewater, as of
18   September 1st?
19   A.  Yes.
20   Q.  Okay.  Would you expect that Mayor Kilpatrick, as the
21   special administrator, with the charge that he has to make sure
22   that we have clean water, to make sure that we have waste that
23   is properly disposed of, that he might have a conversation with
24   Victor Mercado about this?
25   A.  Sure.
```

*Carol Paszkiewicz - Cross*
*Wednesday, December 12, 2012*

111

1   Q.  And would you expect that Bobby Ferguson might have a

2   conversation with his friend, Mayor Kilpatrick, about what's

3   going on and what his feelings are about it?

4   A.  On a friendship level, I can accept that.

5   Q.  All right.  Do you expect that the mayor of the City of

6   Detroit is supposed to sit up there on the 11th floor and

7   isolate himself from people who have knowledge about how to

8   deal with this problem?

9   A.  No.

10   Q.  You would expect, would you not, that he would have

11   conversations not only with people like Bobby Ferguson but also

12   with other contractors?

13   A.  I would not be surprised if he did.

14   Q.  Okay.  And certainly what we're looking at is a text

15   message between Mayor Kilpatrick and with Bobby Ferguson.  You

16   didn't have wiretaps on Mayor Kilpatrick's phone at that point.

17   A.  Right.

18   Q.  Never did.

19   A.  Right.

20   Q.  Not at the office, not on his cell, not in his home?

21   A.  Right.  Just, can I be clear about something?  I as EPA

22   don't have authority to do that.  Just the FBI does, so they

23   did not have --

24   Q.  Yes, ma'am, it's refreshing to hear that, but we -- in this

25   investigation, there was a wiretap.

*10-CR-20403   USA v. Kwame Kilpatrick, et al*

*Carol Paszkiewicz - Cross*
*Wednesday, December 12, 2012*

112

1   A.   Right, I just want to be clear about my role, that's all,

2   Mr. Thomas.  But to my knowledge, they did not have one, no.

3   Q.   So you don't know who Mayor Kilpatrick talked to about this

4   in September of 2004?

5   A.   I don't know if he had other conversations, no.

6   Q.   Correct.  So we do know that, from your investigation,

7   Gino D'Agostini had done fundraisers for Mayor Kilpatrick and

8   was concerned about having a visual presence with

9   Mr. Kilpatrick, right?

10  A.   No, not Mr. D'Agostini.  I don't know that.

11  Q.   You were not aware of the fact -- I'm sorry, let me do it

12  another way.  We certainly know that Tony Soave had had

13  meetings with the mayor before.

14  A.   Yes.

15  Q.   And that he certainly had had -- and he testified to the

16  number of contacts that he had, right?

17  A.   Yes.

18  Q.   I mean, we met Tony Soave, he's kind of an interesting guy.

19  Does he look like the kind of guy that would be text messaging

20  people?

21  A.   I don't know; he may.

22  Q.   I got a feeling he might just pick up the phone and say,

23  "Hey, you know, I need to talk to you," and you'd be there in a

24  minute.

25              **MR. CHUTKOW:**  Objection.  This is now becoming a

*10-CR-20403   USA v. Kwame Kilpatrick, et al*

*Carol Paszkiewicz - Cross*
*Wednesday, December 12, 2012*

113

1    speech, not a question.

2              **MR. THOMAS:**   That was a speech.  I'll withdraw it,

3    Judge.

4              **THE COURT:**   Good.   Thanks.

5              **MR. THOMAS:**   Well, I'd like to look at, if I could,

6    Exhibit 1-33.  Was that what we just had up there?  It was.

7    **BY MR. THOMAS:**

8    Q.  Bobby Ferguson:  "We need to talk today about that if you

9    have time," and that would be Sterling Heights, and we've

10   covered that.

11             Can we move down to the next set of dialogue.  This

12   is a, "Come to the office," request, and then a response is,

13   "Yes, sir."  But then this appears to be a social context, and

14   that is that, "I got my bike back, let's ride."

15             That doesn't appear to fit in there.  This looks

16   like a purely personal comment.  Would you agree with me on

17   that?

18   A.  Yeah, it was just in the chronology of their conversation

19   that was the next -- they talked about getting their bikes and

20   riding.

21   Q.  Well, these text messages are not complete.  You don't show

22   every text message that Mayor Kilpatrick sent or received from

23   the time of the initial text message to the end, correct?

24   A.  In this one, yes.  No, we did.  We took it from -- if

25   Ms. Facchini will scroll up, you can see that the initial one

*10-CR-20403    USA v. Kwame Kilpatrick, et al*

*Carol Paszkiewicz - Cross*
*Wednesday, December 12, 2012*

114

1    is just that, there's no reply, so this is the initiation of a

2    text, and we included those with the bike reference just

3    because look at the timing of them, it is continuous, and then

4    they get back to meeting at the office.

5              So we didn't extract the, "Let's get our bikes and

6    ride," part.  It was just in the continuum of them, of the text

7    exchange.

8    Q.  Well, on this particular one, we've done a lot of

9    extractions, and there's certainly, these aren't the only text

10   messages that Mayor Kilpatrick had that day, is that right?

11   A.  I'd have to go -- I don't know.  I'd have to go back and

12   look at the database.  I would assume not but --

13   Q.  In any event, they're talking about coming to the office at

14   5:30, and then another -- they lapse into the bike ride, and

15   then, "I'll meet you at the office at 7:00," and then the

16   question is, "Still come to the office at 5:30," but there's no

17   response to that?

18   A.  When you go to the next one, there is.

19   Q.  Okay.  Now, is this regarding the, a phone call that had

20   been made between Mr. Kilpatrick and Mr. Ferguson?

21   A.  A phone call?

22   Q.  Yes.  They had phones.  They would call each other on the

23   phone.

24   A.  Yeah, but I just am reading the text as the words and the

25   time, you know, based on the date stamp and timestamp and their

*10-CR-20403    USA v. Kwame Kilpatrick, et al*

2:10-cr-20403-NGE-MKM   Doc # 374   Filed 06/13/13   Pg 115 of 144   Pg ID 10524

*Carol Paszkiewicz - Cross*
*Wednesday, December 12, 2012*

1    reply, so there is no mention of a phone call.

2    Q.  No, but are you telling the jury that you think that the

3    only communication that they've had that day is based on those

4    text messages and nothing else?

5    A.  Sir, to me that wasn't your question.  If I misunderstood

6    it, maybe you can rephrase it, but you asked if this was in

7    reference to a phone call, and there's nothing in this text

8    message that references a phone call, so that's why I answered.

9    No, I'm not saying that they couldn't have picked up the phone

10   and called; I just don't know.  I mean, maybe I misunderstood

11   your question.

12   Q.  So I just, I want to form the limitation of what it is that

13   is in this text, series of texts that we're looking at.  You

14   may or may not have had --

15            **THE COURT:**  Excuse me.  It might be helpful if we

16   could see the previous couple of entries, just so that we get

17   the timing sequence --

18            **MR. THOMAS:**  Sure.

19            **THE COURT:**  -- and the jury can see what the timing

20   is, because otherwise you lose --

21            **MR. THOMAS:**  Okay.

22            **THE COURT:**  -- context.  I don't know if you can

23   show them both.

24            **MR. THOMAS:**  Please.

25            **THE COURT:**  Put the first page on at the same time.

*10-CR-20403    USA v. Kwame Kilpatrick, et al*

*Carol Paszkiewicz - Cross*
*Wednesday, December 12, 2012*

116

1    **BY MR. THOMAS:**

2    Q.   Okay.  So the judge has asked us to take a look at the --

3    let's take a look at at least half of the page so that we can

4    see what the sequence is.

5              Here we go.  This is 1:15, is the first part about

6    getting with Victor?

7    A.   Correct.

8    Q.   And then after that we have a 1:19 from Bobby?

9    A.   Yes.

10   Q.   Right?

11   A.   Yes.

12   Q.   "We need to talk today if you have time at 5:00 p.m.,"

13   right?  Correct?

14   A.   Yes.

15   Q.   And then the reply from the mayor comes in about 10 minutes

16   later?

17   A.   Yes.

18   Q.   And that is, "Come to the office," correct, "at 5:30"?

19   A.   Yes.

20   Q.   And then continue, please.  Okay.  A few minutes later,

21   "Yes, sir, boss."  Right?

22   A.   Yes.

23   Q.   And then within two minutes, it looks like the conversation

24   goes in a different direction regarding a motorcycle.

25   A.   Yes.

*Carol Paszkiewicz - Cross*
*Wednesday, December 12, 2012*

117

1    Q.  All right.  And then back on 1:39, which is about six

2    minutes later, "Meet at the office at 7:00"?

3    A.  Yes.

4    Q.  Correct?  And then another two minutes later, "I'll meet

5    you at the office at 7:00."  I'm sorry.

6    A.  No.

7    Q.  Reply is, "Still come to yours at 5:30."

8    A.  Yes.

9    Q.  Now, did you see that that was a question mark, a question,

10   or a declaration?

11   A.  It could be either.  I mean, it doesn't have punctuation so

12   it could be a question by Mr. Ferguson, it could be a

13   declaration.

14   Q.  Can't tell.

15   A.  Right.

16          **MR. THOMAS:**  So then let's move down, Ms. Facchini,

17   again then.

18   **BY MR. THOMAS:**

19   Q.  Okay.  Now, reply from the mayor is, "You kill me, that

20   bullshit."  Okay.  Do you know whether or not that is a

21   response to the motorcycle or whether or not it is a response

22   to what it is that has previously been said within the last 40

23   minutes, 35 minutes?

24   A.  Within the last 25 minutes or so.

25   Q.  Okay.

*10-CR-20403   USA v. Kwame Kilpatrick, et al*

*Carol Paszkiewicz - Cross*
*Wednesday, December 12, 2012*

118

1    A.  I don't.  It just says what it says.

2    Q.  And then it looks as if the mayor says, "Cancel that."

3    Does that mean cancel the meeting?

4    A.  I don't know.

5    Q.  Okay.  Can we go to, that is at 1:41, and then at 1:51,

6    Ferguson says, "You're the only boss I have besides Cookie."

7    Who is Cookie?

8    A.  Marilyn Johnson Ferguson.

9    Q.  Are you telling me that Mr. Ferguson, who has been reputed

10   to be so difficult, has a boss, and that's his wife?

11   A.  Yes.

12   Q.  His wife?

13   A.  That's what he's saying.

14   Q.  Okay.  All right.  Can we move down, please?

15            Looks like somebody agrees that Mrs. Ferguson is the

16   boss in the house?

17   A.  Says, "I hear you."

18   Q.  Is it that way in your house?

19   A.  I plead the Fifth.

20   Q.  And then it appears as if there is now some other

21   conversation.  Who does that come from?

22   A.  This is from Mayor Kilpatrick at 5:02 p.m.

23   Q.  So there has been now a large gap of almost three hours,

24   2:00 to 5:02.  What does this have to do with the prior

25   conversations?

*10-CR-20403   USA v. Kwame Kilpatrick, et al*

*Carol Paszkiewicz - Cross*
*Wednesday, December 12, 2012*

119

1    A.  I have no idea.  I believe I didn't read that into the

2    record.

3    Q.  You may not have.

4    A.  I know I didn't.

5    Q.  But the reason why I'm doing this cross examination is that

6    I want to highlight to you the fact that there are

7    possibilities of other conversations that did occur between

8    Mayor Kilpatrick and Mr. Ferguson.

9    A.  Whether phone or in person, that's quite possible.

10   Q.  And it looks as if, from this trail of emails, that the

11   meeting that was originally scheduled did not take place.

12   A.  If you're referring to the 5:30 at his office?

13   Q.  Yes.

14   A.  Right, if you go down to the next entry, Mr. Ferguson says,

15   at 5:03 says, "I will meet you at your house so we can talk

16   before we ride."

17           **MR. THOMAS:**  And then I'd like you to go up to the

18   second entry on the second page, if you could, Ms. Facchini.

19   **BY MR. THOMAS:**

20   Q.  What is he talking about, "Cancel that"?

21   A.  I don't know, and that's at 1:43.

22   Q.  There are several different conclusions that we can come to

23   reading these text messages, would you agree?

24   A.  Conclusions of what?  Just to be clear for my answer.

25   Q.  Well, first of all, the conclusions of replies from

*10-CR-20403   USA v. Kwame Kilpatrick, et al*

*Carol Paszkiewicz - Cross*
*Wednesday, December 12, 2012*

120

1   Mayor Kilpatrick that occurred three hours later and whether or
2   not they're related to the prior trail of conversations.
3   A.   The 5:02 entry, yeah, I can't conclude what that's related
4   to.
5   Q.   And you can't conclude whether or not there had been any
6   communication or whether there had, either by phone or in
7   person?
8   A.   Correct.
9   Q.   All right.  Can we go to -- was the summary, IN1-68 the
10  summary of the phone calls?
11  A.   I believe so.
12  Q.   We talked about the telephone connections in I1-68 between
13  a cell subscribed to by Mr. Ferguson and a cell that was
14  subscribed by Mr. Mercado, correct?
15  A.   Yes.
16  Q.   And I just want to talk about the limitations of this.
17  This is a document that was put together by you?
18  A.   No.
19  Q.   Who did that?
20  A.   It was an analyst at FBI, someone that works with
21  Agent Beeckman.
22  Q.   When you say analyst, do you mean like a clerk?
23  A.   No, I don't honestly know her official title.  I know
24  they're called analysts.  They're not agents and they're not
25  clerks.  They're investigative assistants, in essence.

*10-CR-20403   USA v. Kwame Kilpatrick, et al*

*Carol Paszkiewicz - Cross*
*Wednesday, December 12, 2012*

121

1  Q.  Okay.  Were you the person that tasked this analyst to do

2  this search?

3  A.  Yes.

4  Q.  And in this search, you see that Bobby Ferguson's cell

5  number and cell numbers subscribed by Victor Mercado are there,

6  correct?

7  A.  Yes.

8  Q.  And obviously this is to identify the sum total of

9  communications between them as it relates to cell phone

10  contacts, correct?

11  A.  Correct.

12  Q.  You don't dis -- you don't dispute the fact that Mercado

13  had a home phone, right?

14  A.  Yes.

15  Q.  Ferguson had a home phone?

16  A.  Right.

17  Q.  Mercado had office phones, correct?

18  A.  Yes.

19  Q.  And Ferguson had office phones?

20  A.  Yes.

21  Q.  And that Mercado and Ferguson could have known other people

22  and had conversations with them and conveyed a message through

23  that third party, correct?

24  A.  Yes.

25  Q.  So let's take a look at the sinkhole timeframe and let's go

*10-CR-20403   USA v. Kwame Kilpatrick, et al*

*Carol Paszkiewicz - Cross*
*Wednesday, December 12, 2012*

1    from August 23rd, we see communication on August the 26th,

2    August 31, September 1st and thereafter, quite a few

3    thereafter, correct?

4    A.  Yes.

5    Q.  These are not lengthy conversations.

6    A.  The longest one, there's two on this page, or on this

7    highlighted portion that are seven minutes.  That's the longest

8    that's shown that's blown up right now.  It's anywhere from a

9    minute, right, to two seven-minute entries.

10   Q.  But the August 18th would have been before the sinkhole?

11   A.  Correct.

12   Q.  So we've got -- these one-minute communications, they could

13   be actual communication between Mr. Mercado and Mr. Ferguson,

14   right?

15   A.  They could be.

16   Q.  But they might also -- would they be text messages?

17   A.  No, that's recorded in a different form.

18   Q.  And --

19   A.  And -- go ahead.  No, I was just going to say, the SkyTel

20   pagers might be different accounts.

21   Q.  I'm trying not to talk over you.

22   A.  I'm sorry.

23   Q.  All right.  But it could be a message left?

24   A.  It could be, it could be a message left, right.

25   Q.  Right.  All right.  And then -- all right.  Can I see

*10-CR-20403    USA v. Kwame Kilpatrick, et al*

*Carol Paszkiewicz - Cross*
*Wednesday, December 12, 2012*

123

1   IN1-39, please.  This is, again, between Mr. Ferguson and
2   Mr. Kilpatrick?
3   A.  Yes.
4   Q.  And would you expect that Mr. Ferguson at this point on
5   September 7th would be talking to Mr. D'Agostini?
6   A.  It's possible.
7   Q.  Mr. D'Agostini was going to be doing work on the sinkhole
8   project?
9   A.  He was already doing work on the sinkhole by this point.
10  Q.  And there was discussions that were ongoing as to what
11  Mr. Ferguson's participation was going to be in this contract,
12  ongoing at this point?
13  A.  There were conversations, there were questions being asked
14  of what his role was going to be, yes.
15  Q.  And what was Mr. D'Agostini's specialty?
16  A.  He was a sewer repair, excavation, complete, almost
17  complete package company to do this kind of work.
18  Q.  Was -- was Mr. D'Agostini a Macomb County resident?
19  A.  Yes.
20  Q.  Was his business in Macomb County?
21  A.  Yes.
22  Q.  Did he have Detroit-headquartered business?
23  A.  No.
24  Q.  Did he have Detroit-based business?
25  A.  No.

*10-CR-20403   USA v. Kwame Kilpatrick, et al*

*Carol Paszkiewicz - Cross*
*Wednesday, December 12, 2012*

124

1   Q.  And it looks as if there is some discussion regarding equal

2   parity between the work that's being done by FEI and by

3   Mr. D'Agostini?

4   A.  Work or invoicing.

5   Q.  Well, invoices are usually for work, right?

6   A.  No, I -- yeah.

7   Q.  Okay.  Mr. Ferguson apparently has some discussion here to

8   the effect that Mr. Ferguson is being requested to work for

9   Mr. D'Agostini?

10  A.  It appears that he is --

11  Q.  "He wants e," meaning me, "to work for him."

12  A.  D'Agostini, right.

13  Q.  Right.  And we've already had discussions on the record and

14  I'm sure that you're aware of the fact, are you not, that when

15  you're working for somebody, they dole out the work to you and

16  you don't get to participate in the plum projects.

17  A.  I wouldn't agree with the plum projects, but it is the

18  purview of the prime contractor to assign work to

19  subcontractors.

20  Q.  And if you were the prime contractor, would you be giving

21  all the work that you're going to make the most money on to

22  your subcontractor, or would you put that in your own business

23  if you were a prudent business person?

24          **MR. CHUTKOW:**  Objection, this calls for speculation.

25  She's not a construction contractor.

*10-CR-20403    USA v. Kwame Kilpatrick, et al*

1          **THE COURT:**  Sustained.

2          **MR. THOMAS:**  Can we see IN1-38, please, A.

3   BY MR. THOMAS:

4   Q.  This is Tuesday, September 7, correct?

5   A.  Yes.

6   Q.  Again, it's the mayor's calendar?

7   A.  Yes.

8   Q.  And you can see that there was a meeting with Mr. Mercado

9   apparently at 8:30 a.m. after he takes his boys to school.

10  A.  Yes.

11  Q.  This is, this calendar, I would submit, is a typical day in

12  the day of the mayor, correct?

13  A.  Yeah, I have no reason not to believe so.

14  Q.  He has family life, it's on his calendar, correct?

15  A.  Yes.

16  Q.  And he has his work life as well?

17  A.  Correct.

18  Q.  And Mercado obviously would be involved in many things,

19  many projects, but one of which was the sinkhole project,

20  right?

21  A.  Yes.

22          **MR. THOMAS:**  And then can we scroll down a little

23  bit further, Ms. Facchini.

24  BY MR. THOMAS:

25  Q.  "Directors' meeting at the fire department," so that's

*10-CR-20403   USA v. Kwame Kilpatrick, et al*

*Carol Paszkiewicz - Cross*
*Wednesday, December 12, 2012*

126

1    somebody that's under the mayor of the City of Detroit,

2    correct?

3    A.   Actually, this FYI directors' meeting is at the fire

4    department.  Based on my investigation, I know that directors'

5    meetings occurred on a regular basis.  All the directors would

6    get together.

7    Q.   Do you know whether or not the mayor went there that day?

8    A.   I don't know if he went there that day or not.

9    Q.   Do you understand that having the address and directions

10   might be to direct him to go to that meeting?

11   A.   If he so chose to.

12   Q.   Okay.  And then again at 10:00 a.m. another meeting?

13   A.   10:30, yes.

14   Q.   10:00 a.m., I'm referring to the timeframe on the left of

15   the calendar.

16   A.   Yeah, I was just -- 10:30 to 11:30.

17   Q.   And then again at 12:00?

18   A.   Yes.

19   Q.   Continue on, please.  "Meeting at 1:00 with Brooks

20   Patterson."  Do you know who he is?

21   A.   He is the Oakland County executive.

22   Q.   And, again, directions on how to get there?

23   A.   Yes.

24   Q.   Obviously, having the mayor of the City of Detroit meet

25   with the Oakland County executive would be a function?

1    A.  An official function, yes.

2    Q.  Would you know whether or not the sinkhole project in any

3    way was related to wastewater coming from Oakland County?

4    A.  I don't know, one way or another, I don't know.

5    Q.  And then continue on.  Again, meetings throughout the day

6    with Carolyn Meza, who is his COO at the time, correct?

7    A.  Again, it's a FYI, PLD director interview with Carolyn Meza

8    in the mayor's office, Victor Mercado and Carolyn, mayor to

9    meet candidate.

10   Q.  You had seen the organizational chart for the City of

11   Detroit.  That was, I've got it right here, I believe, IN1-69.

12   All right.  Well, this is the one without the yellow markings.

13   A.  Highlighting, uh-huh.

14   Q.  And this is what the jury is going to get.

15              **MR. THOMAS:**  Can we blow that up a little bit?

16   **BY MR. THOMAS:**

17   Q.  All right.  This is the organization chart which was part

18   of an exhibit that was shown to you on direct testimony, and it

19   was part of a financial report, and obviously it shows that

20   there is the -- that the people of the City of Detroit are over

21   everybody, and we're not disputing that, are we?

22   A.  No.

23   Q.  When you talk about executive agencies that are over the

24   mayor, do you know who they are?

25   A.  They're defined in the charter.

*Carol Paszkiewicz - Cross*
*Wednesday, December 12, 2012*

128

1   Q.   And who would those be?

2   A.   Those that are listed underneath the, in the next -- well,

3   you can't see on this until she scrolls down, but all the

4   different department heads.

5   Q.   Okay.  Well, let's go back to the chart at the top part

6   where it says, "Executive agencies over the mayor of the City

7   of Detroit."

8   A.   No, it just is reflective of that branch, the mayor is the

9   head of the executive branch of government.

10  Q.   Right.  Well, you would expect that -- oh, I see, and so

11  you're defining executive agencies, and executive agencies

12  would include the mayor and the people below him.

13  A.   Exactly.

14  Q.   So then would you agree with me, then, that there is --

15  that the legislative agencies that they're talking about are

16  city council?

17  A.   Yes.

18  Q.   And while the mayor is elected by the citizens of the City

19  of Detroit, so are city council?

20  A.   Yes.

21  Q.   And as it is with executive versus legislative versus other

22  agencies, they are co-equal branches of government?

23  A.   Yes.

24  Q.   And the charter guides how it is that government is going

25  to be run in the City of Detroit, right?

*10-CR-20403   USA v. Kwame Kilpatrick, et al*

*Carol Paszkiewicz - Cross*
*Wednesday, December 12, 2012*

129

1    A.  Yes.

2    Q.  We don't have to look at it with intimate detail, but city

3    council has a long history of having an arm's length, for

4    better -- relationship with the executive, the mayor, would you

5    agree?

6    A.  Meaning, like, are you asking like an adversarial, or I

7    guess I don't, I just want to be clear what you mean by "arm's

8    length."

9    Q.  Well, I'm using a term that I thought that the government

10   had used, "arm's length," but in this respect the charter

11   dictates what it is that city council can and cannot do.

12   A.  I did not read that part of the charter.

13   Q.  Okay.  You understand that the fact that they are co-equal

14   branches in government gives each one of them certain powers.

15   A.  Agreed.

16   Q.  And that city council has, otherwise, unless there is

17   something that is done outside of the charter, city council has

18   the financial ability to withhold support for whatever programs

19   the executive has.

20   A.  Meaning -- if I understand your question, they can vote no

21   or hold a contract that the executive branch has sent for

22   approval?

23   Q.  Yes.

24   A.  Yes.

25   Q.  And we know, obviously, from the history, that city council

*10-CR-20403    USA v. Kwame Kilpatrick, et al*

1   and the mayor do not enjoy, whether it be Mayor Kilpatrick or

2   any of the people that followed after him, do not enjoy a

3   harmonious relationship.

4   A.  I would agree on that based on media reports I've seen.

5   Q.  If you can believe anything you see in the media.

6              But can we go down to the, scroll down to the --

7   where is this?  There we go.  Law department.  Okay.  The law

8   department is apparently, under this financial report, is under

9   the City of Detroit -- I'm sorry, the mayor of the City of

10  Detroit.

11  A.  Yes.

12  Q.  He has the ability to hire a, an attorney who will head the

13  law department, correct?

14  A.  Yes.

15  Q.  And they call that person corporation counsel, right?

16  A.  Yes.

17  Q.  But that person is hired with the advice and consent of

18  city council?

19  A.  Yes.

20  Q.  And the mayor doesn't have the ability to fire corporation

21  counsel, does he?

22  A.  I'd have to go back to the charter because it specifically

23  says or -- either it speaks to it or it doesn't, it depends on

24  which department head it is.

25  Q.  Well, do you remember Mayor Bing trying to fire

*Carol Paszkiewicz - Cross*
*Wednesday, December 12, 2012*

1    Krystal Crittendon just about two weeks ago?

2              **MR. CHUTKOW:**  I'm going to object.  The charter has

3    been changed and the mayor has a totally different relationship

4    with corporation counsel.

5              **THE COURT:**  Sustained.

6    **BY MR. THOMAS:**

7    Q.  So we'll go back to the fact that the person is hired with

8    the advice and consent of city council.

9    A.  Yes, but I believe the wording was -- oh, yes, to answer,

10   yes, advice of and agreement of city council.

11             **MR. THOMAS:**  Can we scroll back up to the mayor,

12   please.

13   **BY MR. THOMAS:**

14   Q.  All right.  Now, the mayor of the City of Detroit, we

15   talked about the fact that he has a lot of responsibilities

16   regarding employees and agencies within.  He has a staff under

17   him that is not reflected in this particular organizational

18   chart, would you agree?

19   A.  Yes.

20   Q.  Under the mayor, you would have the deputy mayor, correct?

21   A.  Yes.

22   Q.  You would have a -- and the deputy mayor, what's the deputy

23   mayor's job?

24   A.  Well, it's kind of, as the name says, it's the number two

25   person in charge.  I think the charter speaks to, if the mayor

*Carol Paszkiewicz - Cross*
*Wednesday, December 12, 2012*

132

1   is unavailable, they assume the position of mayor, take on

2   those duties in his or her absence, so akin to, like, a vice

3   president to the president of the United States.

4   Q.  So certainly the mayor would have the ability to delegate

5   responsibilities to the deputy mayor as it relates to his

6   function as the mayor of the City of Detroit, correct?

7   A.  Yes.

8   Q.  And those responsibilities could be anything from PR to

9   working with city council to anything that he thought was

10  appropriate under his job description, correct?

11  A.  I would assume so, yes.

12  Q.  And then he has a COO, and we know about Carolyn Meza.

13  Where does that person fit in in the organizational line?

14  A.  She's a part of the mayor's office.

15  Q.  And would you expect that the COO would be interacting,

16  then --

17          **MR. THOMAS:**  And can you just scroll about an inch

18  or two, and if the jury can't see it, we'll go up a little bit

19  higher, please.  We don't need to see the mayor.  Can we go

20  down?  There we go.

21  **BY MR. THOMAS:**

22  Q.  All right.  These staff members that are working under the

23  mayor, and we've heard about Christine Beatty, we've heard

24  about Carolyn Meza, we've heard about Anthony Adams, these

25  people might have responsibility for different agencies by a

*10-CR-20403    USA v. Kwame Kilpatrick, et al*

*Carol Paszkiewicz - Cross*
*Wednesday, December 12, 2012*

133

1   mayor who delegates that responsibility to his staff or to his

2   cabinet.

3   A.  Yes.

4   Q.  And so having direct contact with these people or the mayor

5   being directly responsible for administering these people, that

6   might be something that he might have delegated out to other

7   people, right?

8   A.  He may have.

9   Q.  Now, we know and we -- I want to get into another area,

10  Judge, but we know from this that this process was somehow

11  different with the mayor being the special administrator for

12  the Detroit Water and Sewer Department, correct?

13  A.  Different, yes, as it pertains to the Detroit Water and

14  Sewerage.

15  Q.  And we've already isolated certain contracts away from that

16  process, the special administrator process.  Most of the

17  contracts that we've been talking about were not under the

18  special administrator's auspices.  Would you agree?

19  A.  Yes.

20  Q.  Okay.  And while the mayor did have the authority and the

21  power to do certain things, he did go and, for those processes

22  that were outside of the special administrator process, go to

23  city council, ask them for their input and for their approval?

24  A.  For their approval, yes.

25  Q.  All right.  Certainly, the order that Judge Feikens gave to

*10-CR-20403    USA v. Kwame Kilpatrick, et al*

*Carol Paszkiewicz - Cross*
*Wednesday, December 12, 2012*

134

1    Mayor Kilpatrick, that order could have obviated that whole

2    process, city council could have been neutralized as it relates

3    to that under the special administrator policy?

4    A.  Yes, that's -- yes.

5    Q.  But he did not do that?

6    A.  For certain contracts, no.

7    Q.  For most of them, except for what we're talking about, 1368

8    and 20 -- 2012?

9    A.  And some other contracts under the umbrella of 2012, right.

10   Q.  Right.

11   A.  Right.

12   Q.  And those were, as we talked about, they were emergency

13   situations, things that needed to be done fast.

14   A.  Right.

15   Q.  All right.  Now, can we take that off.

16           We saw a bunch of text messages and we've seen these

17   messages and we've seen them from Kathleen McCann, we've seen

18   them from other people, people who are engaged in the

19   contracting process with the City of Detroit?

20   A.  Just to understand, your question is text messages, you

21   said, from Kathleen, did you mean regarding?

22   Q.  Well, there were emails.

23   A.  Oh, emails, yes.

24   Q.  And we've also seen some text messages, but to the extent

25   that a contractor is working for the City of Detroit and

*10-CR-20403   USA v. Kwame Kilpatrick, et al*

*Carol Paszkiewicz - Cross*
*Wednesday, December 12, 2012*
135

```
1    looking to get more business, you would expect that they'd want
2    to try and talk to people about what's coming up and what's
3    going on.
4    A.  Yes.
5    Q.  And much of that would be based on prior relationships that
6    they might have had or friendships that they might have that
7    might have been developed or just plain picking up the phone
8    and making a phone call to say, "Well, what's going on?"
9    A.  Between just anyone in general?
10   Q.  Anyone in general.
11   A.  Your question?
12   Q.  Yes.
13   A.  Okay, just to be clear.  Yes.
14   Q.  And I want to make it specific to Inland at some point --
15   A.  Okay.
16   Q.  -- but, you know, certainly we have DLZ, we have all these
17   other contractors that we've heard from.  Those people have
18   relationships with people that are working for the Detroit
19   Water and Sewer Department?
20   A.  They have relationships with the staff, is that what you're
21   asking?
22   Q.  Yes.
23   A.  Certainly the ability to pick up the phone and ask a
24   question, yes.
25   Q.  Well, certainly, when you're in the middle of a contracting
```

*Carol Paszkiewicz - Cross*
*Wednesday, December 12, 2012*

1    process, you don't discount the fact that they're going to be

2    interacting with Detroit Water and Sewer?

3    A.  Yes.

4    Q.  And that that interaction is not going to be in a vacuum,

5    somebody is going to bring lunch, somebody is going to develop

6    a social relationship, somebody's going to develop an ethnic

7    relationship; for example, DLZ with the Indian people at

8    Detroit Water and Sewer, right?

9    A.  I don't have any basis that they had an ethnic

10   relationship, no.

11   Q.  Ethnic meaning the Indians?

12   A.  Right, and that's what you -- I understood your question to

13   be is, in specifics, DLZ and the Indian contractors, I don't

14   know if they had an ethnic relationship.  Did they have a

15   collegial, colleague relationship or business relationship?  I

16   think they have testified to that.

17   Q.  What about Lakeshore?

18   A.  What about them?

19          **MR. CHUTKOW:**  Your Honor, I'm going to object at

20   this point.  This is way beyond the scope of her testimony.

21          **THE COURT:**  Let's, let's move through this,

22   Mr. Thomas, please.

23          **MR. THOMAS:**  I'm sorry?

24          **THE COURT:**  I mean, I don't even know what an ethnic

25   relationship is, other than, you know, you're an Indian and I'm

*10-CR-20403    USA v. Kwame Kilpatrick, et al*

*Carol Paszkiewicz - Cross*
*Wednesday, December 12, 2012*

137

1   an Indian or whatever, but let's move along, please.

2            Sustain the objection.

3   **BY MR. THOMAS:**

4   Q.  All right.  This is as a result of a, an email that was

5   shown.  Do you remember the one where McCann says that she

6   spoke to somebody and somebody said that somebody was sitting

7   on a contract?

8   A.  I recall an exhibit where there's a text message that says

9   Tim Tousignant spoke to his contact which was Bernard Parker,

10  who said that the amendment was being held, yes.

11  Q.  Now, who is Bernard Parker?

12  A.  Bernard Parker has worked for a number of these contractors

13  through time.

14  Q.  And what was his job working for those contractors?

15  A.  He was business development.

16  Q.  And what is a business developer?

17  A.  They worked to identify potential contracts and work for

18  their employer, they make contacts with other contractors and

19  other individuals.  They, as Mr. Hardiman talked about, you

20  know, identified team members, who was going to be the best fit

21  for these companies.  They're there to go out and get work for

22  their employers.

23  Q.  So prior to the contracting process, a person like

24  Mr. Parker might be available to advise people of upcoming

25  contracts?

*10-CR-20403   USA v. Kwame Kilpatrick, et al*

*Carol Paszkiewicz - Cross*
*Wednesday, December 12, 2012*

138

1   A.  He's out there to seek information about what contracts are

2   coming out, yes.

3   Q.  Okay.

4   A.  And then tell his employer, right.

5   Q.  Before?

6   A.  Right.

7   Q.  And to identify the work that's going to be done.

8   A.  Yes.

9   Q.  And to identify, you know, whether or not there is any

10  rumor or speculation about who it is that may be in the running

11  for that contract?

12  A.  I don't know if I would agree that fits in his position

13  description.  I mean, if that's -- witnesses have told me that

14  people talk, clearly, right?  I mean, that there's rumors and

15  things.  If you're asking me did Bernard Parker do that, you'd

16  have to wait and hear from him.  He's going to testify.

17          But that is common, that people will talk, what is

18  coming up, what is being evaluated, what were the results, that

19  type of stuff, and that is, what, if any, issues are in

20  existence.

21  Q.  So I'm going to show you what has previously been

22  introduced into evidence, DIN1-26.  This is the, so that we can

23  introduce it, this is the Amendment Number 4 to the DWSD

24  contract 1368 and this is an amendment that was relating to the

25  sinkhole project, correct?

*10-CR-20403   USA v. Kwame Kilpatrick, et al*

*Carol Paszkiewicz - Cross*
*Wednesday, December 12, 2012*                    139

1   A.  Well, Amendment Number 4 was an amendment to 1368.  There

2   are records that indicate that this was related to the

3   sinkhole.  When you read the actual language of the special

4   administrator order, it just says there's more work that needs

5   to be done in the rehabilitation of these sewers.  So

6   there's -- we'd have to look at numerous documents to say, yes,

7   this is part of the sinkhole.

8   Q.  All right.  Well --

9   A.  But this clearly happened after the sinkhole.

10  Q.  This is something that was occurring at or about -- some of

11  the dates on here are '05, and it apparently was received on

12  February 13 of '06 by the City of Detroit contract section,

13  correct?

14  A.  Of the law department, yes.

15  Q.  Correct.  There have been numerous sign-offs on this by

16  different agencies that have weighed in as it relates to this

17  particular amendment, would you agree?

18  A.  Yes.

19  Q.  Now, by this time, the sinkhole project was in the process

20  of being addressed by the parties that had actually been

21  authorized to do so, correct?

22  A.  Correct.  This is about a year after the sinkhole.  The

23  initial date of this is about a year after the sinkhole

24  occurred.

25  Q.  And we know that it took approximately three years for the

*10-CR-20403   USA v. Kwame Kilpatrick, et al*

*Carol Paszkiewicz - Cross*
*Wednesday, December 12, 2012*

140

1   sinkhole to be completed, the work that was done?

2   A.  I thought it was a year.

3   Q.  Only one year?

4   A.  I think so, yes.

5   Q.  Okay.

6   A.  They may have had some restoration or whatever issues, but

7   that was my understanding from Inland.

8   Q.  Okay.  Now --

9   A.  It may have taken three, I just --

10  Q.  Rumor was that Mayor Kilpatrick was holding onto this

11  contract for some reason?

12  A.  There were individuals who were told that the mayor was

13  holding onto it.  In fact, one of them was Derrick Miller that

14  was involved in this communication and has expressed that as

15  well to me in an interview.

16  Q.  Where is it that this -- this is a transmittal document,

17  okay, this transmittal document is signed by Victor Mercado,

18  correct?

19  A.  It is signed by him, yes.

20  Q.  All right.  We don't have a date for his signature, is that

21  right?

22  A.  Correct.

23  Q.  But I'm assuming that the contract and the department head

24  signature went on it at or about the time that this transmittal

25  document was generated, right?

*10-CR-20403   USA v. Kwame Kilpatrick, et al*

*Carol Paszkiewicz - Cross*
*Wednesday, December 12, 2012*

141

1   A.   Yeah, it could be.  There's no date.  I believe that's the

2   order of things, is that you can see the department contact

3   person is Darryl Latimer, and he creates it and sends it on for

4   Mr. Mercado to then release forward into the other departments.

5   Q.   Okay.  And the address is on Schaefer Highway in Detroit,

6   Michigan.  Do you know who that is?

7   A.   That was at the time Inland Waters' office.

8   Q.   Okay.

9   A.   One of their offices.

10  Q.   And it's a $12 million change order.

11  A.   Yes.

12  Q.   Okay.  Now, the purpose of the contract is to inspect and

13  in-place rehabilitation of circular or noncircular sewers.

14  It's obviously related to the sinkhole project, would you

15  agree?

16  A.   In part, yes.  Yeah, it's related to it.

17  Q.   Okay.  And who is SCW?

18  A.   DCW?

19  Q.   Oh, DCW?  I'm sorry.

20  A.   I don't know.  I read that as a D, I don't know.

21  Q.   It might be.

22  A.   Yeah.

23  Q.   You don't know.  Signed off on August 12, 2005?

24  A.   Yeah, I don't know.

25  Q.   And then you have other signatures again on August the

*10-CR-20403   USA v. Kwame Kilpatrick, et al*

*Carol Paszkiewicz - Cross*
*Wednesday, December 12, 2012*

142

1    12th, correct?

2    A.   Yes.

3    Q.   Darryl Latimer's signature, who is the department

4    representative, right?

5    A.   Yes.

6    Q.   Requesting department, you probably would agree with me,

7    wouldn't you, that this would have been signed by Latimer

8    before anybody else signed off on it?

9    A.   Yes.

10   Q.   And now we have budget weighing in, correct?

11   A.   We have budget, and actually, on my copy, which is the

12   original, should be the jury's copy, you can read the date.

13   Q.   And what is the date?

14   A.   It says February 2nd, 2006.

15   Q.   Budget signs off?

16   A.   Yes.

17   Q.   Grant management signs off.  No, it looks like --

18   A.   No, they don't.

19   Q.   -- they had not signed off yet.  On your document -- and

20   what exhibit is that that you're looking at?

21   A.   IN1-46.

22   Q.   Do you see anybody signing off on that?

23   A.   No.

24   Q.   So we wouldn't expect that there would be grant management

25   because this isn't grant funds?

*10-CR-20403   USA v. Kwame Kilpatrick, et al*

*Carol Paszkiewicz - Cross*
*Wednesday, December 12, 2012*                                    143

1    A.   Exactly.

2    Q.   So then finance department signs off, and the date that

3    they sign off is February 3rd of '06, correct?

4    A.   Correct.

5    Q.   And the law department signs off, and is that John

6    Johnson's signature?

7    A.   I have no idea.

8    Q.   John Johnson was the head of the law department during

9    Mr. Kilpatrick's administration in 2005 and 2006.

10   A.   I know he held that title.  I'm not aware of the years.

11   Q.   And then the purchasing department signed off, and it

12   doesn't look -- do you have a date on yours?

13   A.   I do.  It's the April 6 -- no, April 10, 2006.

14   Q.   And city council has approved this as of April 19th, 2006.

15   A.   Yeah, that's the date stamp.

16          **MR. THOMAS:**  This would be a good place for me to

17   stop.

18          **THE COURT:**  Okay.  We'll stop for the day.  Thank

19   you very much.

20              (Jury out 12:55 p.m.)

21              (Proceedings adjourned at 12:56 p.m.)

22

23

24

25

*Carol Paszkiewicz - Cross*
*Wednesday, December 12, 2012*

144

1

2                          **-   -   -**

3                  **C E R T I F I C A T I O N**

4    I, Suzanne Jacques, Official Court Reporter for the United States

5    District Court, Eastern District of Michigan, Southern Division,

6    hereby certify that the foregoing is a correct transcript of the

7    proceedings in the above-entitled cause on the date set forth.

8
     Date: December 12, 2012
9

10
     s:/Suzanne Jacques
11     Suzanne Jacques

12   Official Court Reporter

13

14

15

16

17

18

19

20

21

22

23

24

25