UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

       Plaintiff,

v.

KWAME KILPATRICK, ET AL.,

       Defendants.

_____/

Case No. 10-20403

Honorable Nancy G. Edmunds

## OPINION AND ORDER DENYING DEFENDANTS KWAME KILPATRICK'S, BOBBY FERGUSON'S, AND BERNARD KILPATRICK'S MOTIONS FOR JUDGMENTS OF ACQUITTAL [316, 317, 319]

This matter comes before the Court on Defendants Kwame Kilpatrick's, Bobby Ferguson's, and Bernard Kilpatrick's motions for acquittal pursuant to Federal Rule Criminal Procedure 29 [316, 317, 319]. Defendants Kwame Kilpatrick and Bobby Ferguson have filed Joinders in each other's motions [323, 451], and Defendant Kwame Kilpatrick filed two additional briefs supplementing his motion [417, 450]. The government opposes Defendants' motions. For the reasons stated more fully below and on the record at the August 8, 2013 hearing, Defendants' Rule 29 motions for acquittal are DENIED.

## I. Facts

On March 11, 2013, following a lengthy jury trial that began on September 6, 2013, and after considering the testimony of over 100 government witnesses and over four hundred exhibits, the jury returned verdicts on the charges brought against Defendants. The charged counts, as set forth in a redacted indictment which was presented to the jury at the time of deliberation, included Count One, the RICO conspiracy count, and multiple

counts of extortion pursuant to the Hobbs Act, bribery, mail and wire fraud, and false subscription of federal tax returns.

Defendant Kwame Kilpatrick was found guilty on 24 of the 30 counts in which he was charged, specifically:  one count of RICO conspiracy, 18 U.S.C. § 1962(d); four counts of extortion, 18 U.S.C. § 1951; one count of attempted extortion, 18 U.S.C. § 1951; one count of bribery, 18 U.S.C. § 666(a); eleven counts of mail and wire fraud, 18 U.S.C. §§ 1341, 1343; five counts of subscribing a false tax return, 26 U.S.C. § 7206(a); and one count of income tax evasion, 26 U.S.C. § 7201.  (Verdict, 3/11/13, ECF No. 277.)  Defendant Bobby Ferguson was found guilty on 9 of the 11 counts in which he was charged, specifically: one count of RICO conspiracy, 18 U.S.C. § 1962(d); six counts of extortion, 18 U.S.C. § 1951; one count of attempted extortion, 18 U.S.C. § 1951; and one count of bribery, 18 U.S.C. § 666(a).  (*Id.*)  Defendant Bernard Kilpatrick was found guilty on 1 of the 4 counts in which he was charged, specifically, one count for filing a false tax return for the 2005 tax year in violation of 26 U.S.C. § 7206(1).  (*Id.*)

The chart below lists the jury's verdicts:

| Count | Charge | Defendant(s) | Verdict |
|-------|--------|--------------|---------|
| One | **RICO conspiracy** | Kwame Kilpatrick, Bobby Ferguson | Guilty |
| | | Bernard Kilpatrick | Mistrial |
| Two | **Extortion, Contract 1368** | | |
| | Color of official right | Kwame Kilpatrick | Guilty |
| | Wrongful fear of economic harm | Kwame Kilpatrick, Bobby Ferguson | Guilty |

2

| Three | **Extortion (CS 1368 Amendment)** | | |
|---|---|---|---|
| | Color of official right | Kwame Kilpatrick, Bobby Ferguson | Guilty |
| | Wrongful fear of economic harm | Bobby Ferguson | Guilty |
| Four | **Extortion (PC 748)** | | |
| | Color of official right | Kwame Kilpatrick, Bobby Ferguson | Guilty |
| | Wrongful fear of economic harm | Kwame Kilpatrick, Bobby Ferguson | Guilty |
| Five | **Extortion (PC 755)** | | |
| | Color of official right | Kwame Kilpatrick, Bobby Ferguson | Guilty |
| | Wrongful fear of economic harm | Kwame Kilpatrick, Bobby Ferguson | Guilty |
| Seven | **Extortion (DWS 849)** | Kwame Kilpatrick | Mistrial |
| | Wrongful fear of economic harm | Bobby Ferguson | Guilty |
| Eight | **Extortion** | Kwame Kilpatrick | Mistrial |
| | Wrongful fear of economic harm | Bobby Ferguson | Guilty |
| Nine | **Extortion (CM 2014)** | | |
| | Color of official right | Kwame Kilpatrick, Bobby Ferguson | Guilty |
| | Wrongful fear of economic harm | Kwame Kilpatrick, Bobby Ferguson | Guilty |
| Ten | **Extortion (DWS 865)** | Kwame Kilpatrick, Bobby Ferguson | Not guilty |
| Fifteen | **Attempted Extortion** | Bernard Kilpatrick | Not guilty |

| Sixteen | **Bribery – $90,000** | Kwame Kilpatrick, Bobby Ferguson | Mistrial |
|---|---|---|---|
| Seventeen | **Bribery – $75,000** | Kwame Kilpatrick, Bobby Ferguson | Guilty |
| Eighteen | **Mail Fraud** | Kwame Kilpatrick | Guilty |
| Nineteen | **Mail Fraud** | Kwame Kilpatrick | Guilty |
| Twenty | **Mail Fraud** | Kwame Kilpatrick | Guilty |
| Twenty-one | **Mail Fraud** | Kwame Kilpatrick | Guilty |
| Twenty-two | **Mail Fraud** | Kwame Kilpatrick | Guilty |
| Twenty-three | **Mail Fraud** | Kwame Kilpatrick | Guilty |
| Twenty-four | **Mail Fraud** | Kwame Kilpatrick | Guilty |
| Twenty-five | **Mail Fraud** | Kwame Kilpatrick | Guilty |
| Twenty-six | **Mail Fraud** | Kwame Kilpatrick | Guilty |
| Twenty-seven | **Mail Fraud** | Kwame Kilpatrick | Not guilty |
| Twenty-eight | **Wire Fraud** | Kwame Kilpatrick | Guilty |
| Twenty-nine | **Wire Fraud** | Kwame Kilpatrick | Not guilty |
| Thirty | **Wire Fraud** | Kwame Kilpatrick | Guilty |
| Thirty-one | **Subscribing false tax return** | Kwame Kilpatrick | Guilty |
| Thirty-two | **Subscribing false tax return** | Kwame Kilpatrick | Guilty |
| Thirty-three | **Subscribing false tax return** | Kwame Kilpatrick | Guilty |

| Thirty-four | **Subscribing false tax return** | Kwame Kilpatrick | Guilty |
|---|---|---|---|
| Thirty-five | **Subscribing false tax return** | Kwame Kilpatrick | Guilty |
| Thirty-six | **Income tax evasion** | Kwame Kilpatrick | Guilty |
| Thirty-seven | **Subscribing false tax return** | Bernard Kilpatrick | Not guilty |
| Thirty-eight | **Subscribing false tax return** | Bernard Kilpatrick | Guilty |

## II. Analysis

At the close of evidence, Defendants moved for a directed verdict of not guilty. Defendant Bobby Ferguson's motion, joined by Defendant Kwame Kilpatrick, challenged Counts 2, 3, 7, 8 and 10, but did not raise a specific challenge to Counts 1, 4, 5, 9, and 17. (Defs.' Mot. and Joinder, ECF Nos. 269, 270.)  Defendant Kwame Kilpatrick's oral motion challenged the sufficiency of the evidence as to Counts 18 through 27 for mail fraud and Counts 28 through 30 for wire fraud.  (Mot. J. Acquittal Hr'g Tr. 16-19, Feb. 8, 2013, ECF No. 310.)  The Court denied without prejudice Defendants' Bobby Ferguson's and Kwame Kilpatrick's motions finding sufficient evidence in the record to submit the charges in the challenged Counts to the jury.  (*Id.* at 16, 19; Order, Feb. 13, 2013, ECF No. 273.)  Defendant Bernard Kilpatrick's motion challenged the sufficiency of the evidence as to Counts 37 and 39, but did not raise a specific challenge to Count 38.  (Def.'s Mot. J. Acquittal, ECF No. 267.)   The Court denied without prejudice Defendant Bernard Kilpatrick's motion challenging the sufficiency of the evidence as to Count 39 and took Defendant's motion under advisement as to Count 37.  (Order, Feb. 13, 2013, ECF No.

5

273.)

The trial continued to a jury verdict of guilt as to each Defendant on the charges described above. Defendants have now filed post-trial motions for acquittal or a new trial. The Court first considers Defendants' motions for acquittal brought pursuant to Rule 29 of the Federal Rules of Criminal Procedure.

Defendants' Rule 29 motions argue that the evidence at trial was not sufficient to sustain their convictions. The Court begins its analysis with the standard of review, then addresses Defendants' arguments for acquittal.

### A. Standard of Review

"Evidence is sufficient to sustain a conviction if after viewing the evidence in the light most favorable to the prosecution, *and after giving the government the benefit of all inferences that could reasonably be drawn from the testimony*, any rational trier of fact could find the elements of the crime beyond a reasonable doubt." *United States v. Driver*, 535 F.3d 424, 428-29 (6th Cir.) (internal quotation marks and citations omitted, emphasis in original). "In examining claims of insufficient evidence, this court does not weigh the evidence presented, consider the credibility of witnesses, or substitute [its] judgment for that of the jury." *Id.* (internal quotation marks and citation omitted). As the Sixth Circuit recently observed, "defendants bear a heavy burden when asserting insufficiency of the evidence arguments." *United States v. Wettstain*, 618 F.3d 577, 583 (6th Cir. 2010). That is because "[c]ircumstantial evidence alone is sufficient to sustain a conviction and such evidence need not remove every reasonable hypothesis except that of guilt," and "that the uncorroborated testimony of an accomplice alone may support a conviction." *Id.* (internal quotation marks and citations omitted).

6

Applying these principles, the Court now turns to Defendants' sufficiency-of-the-evidence arguments, beginning with Defendants Bobby Ferguson's and Kwame Kilpatrick's arguments.

### B. Sufficient Evidence For Guilty Verdicts As To Defendants Bobby Ferguson and/or Kwame Kilpatrick on Counts 1, 2, 3, 4, 5, 7, 8, 9 and 17

Defendant Bobby Ferguson's post-conviction Rule 29 motion, joined by Defendant Kwame Kilpatrick, renews the arguments in Ferguson's earlier Rule 29 motion and argues here that "the government's case impermissibly consisted of 'inferences upon inferences drawn from uncorroborated testimony' and allowed the jury to "reach[ ] a conclusion in this case founded upon 'pure speculation,' rather than 'legitimate inference from proven facts.'" (Def.'s Mot. J. Acquittal, 2-3 (internal citations omitted), May 10, 2013, ECF No. 316.) Defendant Kwame Kilpatrick's post-conviction Rule 29 motion similarly lacks specifics, e.g., in his challenge to the sufficiency of evidence to convict on Count 1, the RICO conspiracy count, he merely states the conclusion that "[t]he jury's verdict is against the weight of the evidence presented." (Def.'s Mot. J. Acquittal, 19, May 10, 2013, ECF No. 317.)

Contrary to Defendants' new and renewed arguments, as described below, there is sufficient evidence in the record from which the jury could have found the elements of each crime in Counts 1, 2, 3, 4, 5, 7, 8, 9, and 17 beyond a reasonable doubt, and Defendants' Rule 29 motions as to these Counts are denied. The Court begins by addressing Defendants Bobby Ferguson's and Kwame Kilpatrick's Hobbs Act convictions in Counts 2, 3, 4, 5, 7, 8, and 9.

### 1. Sufficient Evidence Showing Defendants Committed Extortion Under Color of Official Right and/or Using Fear of Economic Harm

7

**(a)     General Principles**

To find Defendants Bobby Ferguson and Kwame Kilpatrick guilty of extortion under the Hobbs Act, the government had to prove, beyond a reasonable doubt, the following elements:  (1) that the Defendant, or a person whom he aided and abetted, knowingly and wrongfully obtained money or other property from another person or persons; (2) that the Defendant, or person whom he aided and abetted, did so by means of extortion, either under color of official right, or by wrongful fear of economic harm; (3) that the Defendant knew that the person or persons who were the subjects of the extortion gave the money or property because of the extortion; and (4) that, as a result of the Defendant's actions, interstate commerce was, or had the potential to be, affected in some way.  *See Evans v. United States*, 504 U.S. 255, 268 (1992); *United States v. Abbey*, 560 F.3d 513, 519 (6th Cir. 2009); *United States v. Ganim*, 510 F.3d 134, 145, 147 (2d Cir. 2007); Pattern Crim. Jury Instr. 7th Cir. at 612, 18 U.S.C. § 1951 Extortion - Non-Robbery - Elements (2012 ed.).

A defendant may be guilty of extortion under the Hobbs Act even if the defendant does not receive a direct benefit from the extorted property.  *See United States v. Green*, 350 U.S. 415, 420 (1956) (observing that "extortion as defined in [the Hobbs Act] in no way depends upon having a direct benefit conferred on the person who obtains the property."); *United States v. Margiotta*, 688 F.2d 108, 133 (2d Cir. 1982) (observing that "[a] Hobbs Act prosecution" for extortion under color of official right "may lie where the extorted payments are transferred to third parties . . . rather than to the public official who has acted under color of official right."), *overruled on other grounds by McNally v. United States*, 483 U.S. 350, 359 (1987).  *See also United States v. Kilpatrick*, No. 10-20403, 2012 WL 3257825,

8

*3-5 (E.D. Mich. Aug. 8, 2012) (relying on Sixth Circuit precedent and rejecting Defendants' argument "that to use [the color of official right] theory, the government must allege and prove that the public official received the extorted payment, not the private party.").

A defendant may also be found guilty of extortion under the Hobbs Act if the government proves that the defendant extorted by wrongful fear of economic harm. "For purposes of the Hobbs Act, extortion by wrongful use of fear encompasses threats of economic loss." *United States v. Collins*, 78 F.3d 1021, 1030 (6th Cir. 1996). Moreover, "[t]he fear need not be the product of the defendant's actions. 'It is enough if the fear exists and the defendant intentionally exploits it.'" *Id.* (quoting *United States v. Williams*, 952 F.2d 1504, 1513-14 (6th Cir. 1991)). Further, to prove extortion under this fear-of-economic-loss theory, it must be shown that the purpose of the payment is to avoid an economic loss, not to gain an economic benefit. *Id.* (distinguishing bribery "where the victims faced no increased risk if they did not pay, but, rather, stood only to improve their lots by paying defendants . . . .") (internal quotation marks and citation omitted). Evidence under the theory of wrongful fear of economic harm is sufficient where it shows that the payors "acted out of fear that without the payments they could lose the opportunity to compete for government contracts on a level playing field, an opportunity to which they were legally entitled. They were not merely hoping to receive government contracts. They paid out of a fear that unless they paid money to Defendant or at his direction, they would forfeit any potential business opportunity [with the governmental entity]." *Id. See also United States v. Valenzeno*, 123 F.3d 365, 369 (6th Cir. 1997) (observing that "the victims' fears were not merely based on lost business opportunity, but they were real fears of economic loss or potential imprisonment" and finding "ample evidence at trial that [the defendant] played

9

upon those fears").

### (b) Counts 2, 3, 7, and 8 - Kwame Kilpatrick's Receipt of Payments From Extortion Activity

At the close of evidence, Defendants argued that Counts 2, 3, 7, 8, and 10 should be dismissed because the government failed to prove that Defendant Kwame Kilpatrick obtained a payment from Defendant Bobby Ferguson that he was not entitled to receive. (Def.'s Mot. J. Acquittal at 3, Feb. 7, 2013, ECF No. 269; Def.'s Joinder, Feb. 7, 2013, ECF No. 270.)  Defendants renew and reassert this argument in their post-conviction motions. (Def.'s Mot. J. Acquittal at 2, May 10, 2013, ECF No. 316; Def.'s Joinder, July 10, 2013, ECF No. 451.)  Despite Defendants' arguments to the contrary, as set forth below, the government presented sufficient evidence for the jury to conclude that Defendants Bobby Ferguson and Kwame Kilpatrick shared proceeds and payments from the extorted contracts.[1]

Agent Paszkiewicz testified that out of the contracts presented at trial, Defendant Bobby Ferguson, through his companies, earned $83,829,612 in gross revenue, between 2002 and 2008.  (Gov't Ex. BFF-5A; Trial Tr. Vol. 71 at 53, Jan. 28, 2013.)  Evidence at trial showed that   Bobby Ferguson withdrew over $2.5 million in cash from his accounts between 2002 and 2008 (Gov't Ex. BFF-7A) and over half a million in cash was located in safes found in Mr. Ferguson's business in January 2009 and in a residence in which he was staying in September 2010.  (Gov't Exs. BFF-10 and BFF-11; Trial Tr. Vol. 71 at 88-89,

---

[1]Because the Court is convinced that the government presented sufficient evidence to show that payments received by Defendant Ferguson for the extorted contracts was transferred to Defendant Kwame Kilpatrick, it is unnecessary to address the government's argument that this evidence is not necessary for a conviction on the Hobbs Act crimes charged in Counts 2, 3, 7, 8, and 10.

10

97-98, 101-103, Jan. 28, 2013.)

Agent Sauer testified that his investigation into Mr. Kilpatrick's finances uncovered $531,401.72 in cash transactions, as well as more than $840,000 in unexplained expenditures above his income, during the time he was in office. (Gov't Exs. KKF-12; KKF-29; Trial Tr. Vol. 11 at 36-37, Sept. 24, 2012; Trial Tr. Vol. 69 at 75-82, Jan. 24, 2013.) Evidence at trial showed communication between the two co-conspirators, Defendants Kwame Kilpatrick and Bobby Ferguson, regarding deliveries of cash, from which the jury could reasonably infer that such deliveries occurred regularly. For example, on January 25, 2004, Bobby Ferguson and Kwame Kilpatrick communicated about cash for purchasing Super Bowl tickets, e.g., Ferguson directed Kilpatrick to the safe in his hotel room that contained $7,500 (Gov't Ex. BFF-13), and a subsequent text message on the same day between Christine Beatty and Bobby Ferguson indicated that Kwame Kilpatrick wanted Ferguson to deliver the "loot," giving rise to the inference that "loot" means the $7,500 referenced in the previous text communication. (Gov't Ex. BFF-14.)   In yet another text message, on June 16, 2003, between Kwame Kilpatrick and Bobby Ferguson, the two are again discussing cash and state "Blackman it's done.";  "Cool."; "Cash."; "Even better." (Gov't Ex. BFF-15.)  In another text message, on May 27, 2004, the two discuss additional deliveries, with Ferguson commenting that he has "it for today" for Mr. Kilpatrick, and that he will have more for him tomorrow. (Gov't Ex. BFF-22.)  Finally, on May 17, 2004, the two discuss obtaining work for Mr. Ferguson.  Bobby Ferguson states "just need to get some money" to which Kwame Kilpatrick responds "Lol! Right.  Let's get you some."  Bobby Ferguson then corrects him and replies, "us." (Gov't Ex. BCD-9.)

In addition, the testimony regarding Mahlon Clift's delivery of cash from Bobby

11

Ferguson to Kwame Kilpatrick can serve as circumstantial evidence to show a pattern and practice of delivery of cash from Defendant Bobby Ferguson to Defendant Kwame Kilpatrick.  Mr. Clift testified that he delivered $90,000 "to Black," a.k.a. Kwame Kilpatrick, on behalf of Bobby Ferguson, in September and October 2008, in two separate installments, in stacks of 100s and 50s.  (Trial Tr. Vol. 12 at 25-27, 29-33, Sept. 25, 2012.)

As shown above, there was sufficient evidence in the record from which the jury could have determined that Defendant Kwame Kilpatrick received proceeds from Defendant Bobby Ferguson.

The Court now considers the sufficiency of the evidence on Defendants Bobby Ferguson's and Kwame Kilpatrick's Hobbs Act counts.

### (c) Evidence Was Sufficient to Sustain Convictions on Hobbs Act Counts

There was sufficient evidence supporting the jury's verdict that Defendant Bobby Ferguson was guilty of each of the Hobbs Act counts, Count 2, 3, 4, 5, 7, 8, and 9, and that Defendant Kwame Kilpatrick was guilty of Counts 2, 3, 4, 5, and 9.

### (1) Count 2:  Contract 1368

Count 2 charged that Defendants Bobby Ferguson and Kwame Kilpatrick obtained payments from Inland, induced by wrongful fear of economic harm and under color of official right, because Kwame Kilpatrick held up a $50 million sewer lining contract (Contract 1368) that had previously been awarded to Inland Waters  Pollution Control, Inc. ("Inland") until Inland replaced another minority contractor with Defendant Ferguson's company.  Specifically, in October 2001, before Kwame Kilpatrick became Mayor of Detroit, the Department of Water and Sewerage for the City of Detroit ("DWSD") sent out a request

for proposal ("RFP") for Contract No. CS-1368, a $50 million contract to inspect and reline sewer pipes in the City of Detroit. Inland submitted a proposal, and the Board of Water Commissioners entered into a contract with Inland in December 2001, after which time it sat on the Mayor's desk for months. Anthony Soave, Inland's owner, testified at length regarding the manner in which Inland was extorted to award the subcontract to Defendant Ferguson's company. (Trial Tr. Vol. 44 at 97-121, 137, Dec. 5, 2012; Trial Tr. Vol. 45 at 4-6, 28-139, Dec. 6, 2012; Trial Tr. Vol. 46 at 27-51, Dec. 7, 2012.) He testified that he scheduled a meeting with Mayor Kilpatrick to discuss the contract. (Trial Tr. Vol. 44 at 107, 109, 115, Dec. 5, 2012; Govt's Ex. IN1-3.) When Soave met with Kwame Kilpatrick, Kilpatrick informed Soave that Inland had the wrong subcontractor. (Trial Tr. Vol. 44 at 107, Dec. 5, 2012.) When Soave asked "[w]hat's the right one? [Kilpatrick] said Bobby Ferguson was the right one." (*Id.*) Pursuant to those discussions, Inland replaced its minority subcontractor with Ferguson and his company.

McCann testified about the threat Inland felt they were under because of Ferguson's demands and his relationship with the mayor. (Trial Tr. Vol. 46 at 52-134, Dec. 7, 2012; Trial Tr. Vol. 47 at 5-50, Dec. 10, 2012.) In conversations regarding the contract, Ferguson took credit for Contract 1368 and other contracts Inland had with the Detroit Water and Sewer Department saying that "we [Inland] were there only because of him," and Inland was concerned that there might be consequences if it did not contract with Ferguson. (Trial Tr. Vol. 46 at 77, 79, 84-93, 97-98, Dec. 7, 2012.) McCann stated that Inland was "essentially in a forced marriage," and that "that there were these ongoing, sometimes direct, sometimes veiled threats, we knew that the risk of losing the work was kind of hanging over our heads." (Trial Tr. Vol. 46 at 77, 98 (Dec. 7, 2012.) Soave testified that

13

Inland felt threatened by Bobby Ferguson.  (Trial Tr. Vol. 44 at 118-119, Dec. 5, 2012.) Soave decided to meet with Kwame Kilpatrick and when he did so Soave asked Kilpatrick if he still wanted Inland to work with Ferguson, asking if Ferguson was still "your guy." Kwame Kilpatrick said "[y]es, he's still my guy."  (Trial Tr. Vol. 44 at 120, Dec. 5, 2012.)

Derrick Miller, Kilpatrick's Chief Administrative Officer, testified that he talked to Ferguson about Ferguson's interest in the contract, and that Kwame Kilpatrick was present for such discussions and had an interest in Bobby Ferguson being on the contract.  (Trial Tr. Vol. 59 at 34-36, Jan. 18, 2013.)  At Kilpatrick's direction, Miller contacted Dennis Oszust at Inland and also met with McCann at a conference on Mackinac Island about replacing Charlie Williams with Ferguson as the minority subcontractor on the contract. (Trial Tr. Vol. 59 at 36-39, Jan. 8, 2013.)

As part of Ferguson's work on Contract 1368 as a subcontractor for Inland, he received $20.8 million in gross revenues.  (Gov't Ex. BFF-31; Trial Tr. Vol. 41 at 107-08, Nov. 30, 2012.)  The parties stipulated to the effect of this contract, and the others discussed below, on interstate commerce.  (Gov't Ex. RC-54.)

The evidence set forth above, in addition to other evidence introduced at trial, is sufficient to show that Defendants Kwame Kilpatrick and Bobby Ferguson knowingly and wrongfully obtained money from Inland; that Defendant Ferguson did so by means of extortion induced by fear of economic harm, and Defendant Kwame Kilpatrick did so by both fear of economic harm and under color of official right; that Inland parted with the money because of the extortion; and that interstate commerce had the potential to be affected.

**(2) Count 3:  Contract 1368, Amendment No. 4**

14

The jury convicted Defendants Bobby Ferguson and Kwame Kilpatrick of extortion for obtaining payments from Inland of $175,000 in connection with an amendment to a sewer lining contract (Amendment #4 to Contract 1368), with the consent of Inland induced under color of official right (for both Kwame Kilpatrick and Ferguson) and by wrongful fear of economic harm (as to Ferguson only).

As with Count Two, there is sufficient evidence in the record to support this conviction. On August 22, 2004, an 11-foot diameter section of sewer pipe in Sterling Heights failed, causing a massive sinkhole along 15 Mile Road.  Victor Mercado, a Co-Defendant and the then-Director of DWSD, designated Inland as the project manager for the emergency work, assigning the work under Inland's existing CS-1368 contract.  Nonetheless, while the amendment to Contract 1368 was prepared on August 12, 2005, and sent to the mayor's office on August 29, 2005, it was not signed by the mayor until December 23, 2005.  (Trial Tr. Vol. 46 at 97, 101-109, Dec. 7, 2012; Trial Tr. Vol. 59 at 39-47, Jan. 8, 2013; Trial Tr. Vol. 53 at 25-29, 34-38, Dec. 19, 2012; Gov't Ex. IN1-55.)

McCann received an email from an Inland project manager, Dennis Oszust, on September 15, 2005, stating that Amendment #4 was being held up because of Inland's outstanding issues with Ferguson.  (Gov't Ex. IN1-47; Trial Tr. Vol. 46 at 103-104, Dec. 7, 2012.)  In an email dated October 11, 2005, Oszust stated that the amendment would be held up until Inland met Ferguson's demands.  (Gov't Ex. IN1-50; Trial Tr. Vol. 46 at 104-105, Dec. 7, 2012.)  McCann testified that "Inland . . . still essentially, had this sword dangling over their head, the fact that Mr. Ferguson acted as if he had full power in order to keep Inland getting work or not getting work.  This was going to be his decision about whether or not he went forward with us." (Trial Tr. Vol. 46 at 107-108, Dec. 7, 2012.)  She

15

further testified that Inland would not have kept its relationship with Ferguson if they had not been concerned about keeping contracts with the city.  (Trial Tr. Vol. 46 at 109, Dec. 7, 2012.)  Derrick Miller confirmed that Ferguson wanted more payment from Inland for work on the sewer collapse, and that Kwame Kilpatrick said that payments to Inland would not move until Ferguson was paid. (Trial Tr. Vol. 59 at 39-47, Jan. 8, 2013.)  Miller testified that Kwame Kilpatrick stated that he would hold the amendment until the situation with Ferguson was resolved.  (*Id.* at 40.)

Testimony from Bernard Parker, at that time InsituForm's business development manager who was contracting with Inland to provider sewer liners, corroborated the testimony of Miller and the Inland employees. Specifically, Parker asked Ferguson why they were not being paid on the contract, and Ferguson informed Parker that "the amendment wouldn't move" unless he got more money.  (Trial Tr. Vol. 53 at 25-26, 28-29, Dec. 29, 2012; Gov't Ex. IN1-66.)

On December 23, 2005, after Ferguson's dispute with Inland had been resolved, Kwame Kilpatrick signed a Special Administrator order authorizing DWSD to pay Inland the $12 million amendment to the sewer lining contract.  (Gov't Ex. IN1-55; Trial Tr. Vol. 59 at 46-47, Jan. 8, 2013; Trial Tr. Vol. 53 at 34-38, Dec. 19, 2012.)

The above evidence, in addition to other evidence introduced at trial, was sufficient for the jury to conclude that Defendants Kwame Kilpatrick and Bobby Ferguson knowingly and wrongfully obtained money from Inland, under color of official right (and by wrongful fear of economic harm for Ferguson), and that Defendants Kwame Kilpatrick and Ferguson knew that Inland was parting with the money because of the wrongful extortion.

**(3) Count 4:  Contract 748**

The jury convicted Defendants Kwame Kilpatrick and Bobby Ferguson of extortion by obtaining from Walbridge Aldringer Company ("Walbridge") more than $5 million in work for Ferguson and his affiliated companies at Baby Creek and Patton Park, with the consent of Walbridge induced under color of official right and by fear of economic harm.

On September 28, 2002, DWSD sent out a request for proposal for bids to perform DWSD contract PC-748, to construct the Baby Creek combined sewer overflow facility near the Rouge River.  As part of the project, DWSD had to obtain property from the City of Detroit Parks and Recreation Department, and in exchange, DWSD agreed to renovate the adjoining Patton Park recreation facility for $10 million.  (Trial Tr. Vol. 53 at 41-42, 43, 47, Dec. 19, 2012.)

Walbridge, a large Detroit headquartered engineering and construction firm, bid on the Baby Creek work. When the bids were opened in February 2003, Walbridge was the second-lowest bidder.  The lower bidder, Walsh Construction, did not have the same equalization credits.  (Trial Tr. Vol. 53 at 47-52, Dec. 19, 2012.)

Bernard Parker, who, at that time, was Walbridge's Director of Business Development, testified that after the bid opening, he met with Derrick Miller to argue that Walbridge should be the lowest bidder after accounting for the equalization credits.  (Trial Tr. Vol. 53 at 53-54, 65-77, Dec. 19, 2012.)  Miller told Parker that Walbridge had to put Ferguson on its team.  Parker responded that they could not do this because Walbridge had already agreed to team with another subcontractor, to which Miller replied that they had to find a way to have Ferguson on the bid.  (*Id.* at 54-59, 65-77; Trial Tr. Vol. 59 at 67-86, Jan. 8, 2013.) Miller also testified that he talked to Kilpatrick about the Baby Creek opportunity and that Ferguson wanted in on it.  Kilpatrick advised Miller to talk to Parker about it.  (Trial Tr. Vol.

17

59 at 67-86, Jan. 18, 2013.)

In early February 2003, Parker, Ron Hausmann, a Walbridge executive, and another Walbridge employee met with a Ferguson employee, at which time Hausmann came up with the idea of giving Ferguson the job of constructing the Patton Park recreation facility. On Monday, February 10, 2003, Ferguson and Miller had the following text exchange:

> BWF (9:48a):    Zeke *[i.e., Derrick Miller]* I know why you called, I won't know what kind of deal it will be untile [sic] 3:00, about the walbrige *[Walbridge]* issue.
>
> DAM (9:49a):    Cool
>
> BWF (9:51a):    Thank you

(Gov't Ex. WA1-8.)  Miller also testified that he talked to Bobby Ferguson about the results from the bid process, prior to the official announcement, and that Walsh was the lowest bidder prior to equalization.  (Trial Tr. Vol. 59 at 74-80, Jan. 8, 2013.)  Later that afternoon, DWSD notified Walbridge that it was the lowest equalized responsive bidder after applying equalization credits.  (Gov't Ex. WA1-9.)  Between February 10, 2003 and February 14, 2003, Walbridge negotiated with Ferguson, and on February 14, 2003, one of Ferguson's employees signed a one-page handwritten agreement with Walbridge indicating that if Walbridge were awarded the contract, Walbridge would subcontract $2.73 million in site work at the facility to Ferguson, as well as the $10 million provisionary allowance to improve the Patton Park recreational facility.  (Gov't Ex. WA1-14.)  In April 2003, Kilpatrick signed an order awarding the contract to Walbridge.  (Gov't Ex. WA1-18.)  Ferguson received almost $13.5 million in proceeds from the contract with Walbridge for Baby Creek and Patton Park.  (Trial Tr. Vol. 63 at 8-9, Jan. 15, 2013.)

Based on the above, and other evidence in the record, there was sufficient evidence

18

from which the jury could have concluded that Defendants Ferguson and Kwame Kilpatrick knowingly and wrongfully obtained money from Walbridge; that these Defendants did so by means of extortion under color of official right and wrongful fear of economic harm; and that Walbridge parted with its money because of the extortion.

### (4) Count 5:  Contract 755

The jury convicted Defendants Kwame Kilpatrick and Bobby Ferguson of attempted extortion of Walbridge for pressuring Walbridge to partner with Ferguson in a $140 million construction project at the Oakwood pump station, under color of official right and wrongful fear of economic harm.

In January 2007, Walbridge sought a $140 million contract with the Detroit Water and Sewer Department ("DWSD") to repair the Oakwood Pump station.  Cognizant of Ferguson's ties with Kwame Kilpatrick, Walbridge approached Ferguson about bidding the project as a joint venture.  Parker testified that in a meeting with Ferguson, Parker, and other Walbridge executives, Ferguson indicated that he wanted 35% of the deal.  According to Parker, the bid date was delayed in order to permit Ferguson to negotiate a deal with Walbridge.  In April 2007, when Walbridge refused to agree to Ferguson's joint venture terms, DWSD awarded the contract to a different joint venture team.  (Trial Tr. Vol. 53 at 77-90, Dec. 19, 2012.)  Agent Beeckman also testified regarding a meeting at the Mayor's mansion, scheduled at Ferguson's behest, between John Rakolta, a Walbridge executive, and Kwame Kilpatrick, during the time of the bidding of the Oakwood Pump Station.  (Trial Tr. Vol. 63 at 72-73, Jan. 15, 2013; Gov't Ex. WA2-1A.)

There was sufficient evidence in the record from which the jury could have concluded that Defendants Bobby Ferguson and Kwame Kilpatrick attempted to extort Walbridge to

19

include Ferguson in this contract, and that when Walbridge refused, Walbridge lost the contract.

### (5) Count 7:  Contract 849

The jury convicted Defendant Bobby Ferguson of extortion of Lakeshore Engineering Services ("Lakeshore") and A&H Contractors ("A&H") of more than $1.5 million from a sewer outfalls[2] contract (Contract 849) for no services rendered, with the consent of Lakeshore and A&H induced by wrongful fear of economic harm.

Contract 849 was an as-needed design/build contract to install and line ten outfalls from Jefferson Avenue to the Detroit River.  Thomas Hardiman, a one-time Lakeshore executive, testified at length about two contracts that Lakeshore believed they had lost because Lakeshore had not negotiated with Bobby Ferguson, prior to Contract 849 being put out for bid.  (Trial Tr. Vol. 31 at 27-36, 48-61, 73-79, 116-118, 126-127, 129-131, Oct. 26, 2012.)  Based on their negative experiences on those two prior contracts, Lakeshore reached the conclusion that Ferguson was "the right person to have on the team."  (Trial Tr. Vol. 31 at 65-66, 68-69, 77, Oct. 26, 2012.)  Hardiman testified that Lakeshore agreed to give to Ferguson $1 million on Contract 849 for "no work." (Trial Tr. Vol. 31 at 77-79, Oct. 26, 2012.) He further testified that Ferguson indicated that he wanted 5% of the change orders on the contract for six more outfalls, which totaled $375,000 for Ferguson's requested percentage.  (Trial Tr. Vol. 31 at 84-98, Oct. 26, 2012.) Ferguson provided Lakeshore with a fake invoice titled "Johnson Consulants (sic)" to Sky Group Grand, a company affiliated with Lakeshore, dated September 23, 2005, shortly before the change

---

[2]Outfalls refer to that part of the City's drainage system that leads to the Detroit River.  (Trial Tr. Vol. 31 at 61, Oct. 26, 2012.)

order was signed by the Board of Water Commissioners on September 28, 2005. (Gov't
Ex. LS2-17; Trial Tr. Vol. 31 at 81-88, 88-96, Oct. 26, 2012; Trial Tr. Vol. 35 at 124-128,
Nov. 15, 2012; Trial Tr. Vol. 36 at 6, Nov. 16, 2012.)

The government introduced a text message between Ferguson and Miller dated
January 26, 2004, a date Hardiman met with Ferguson and another subcontractor ("Lanzo")
regarding Contract 849. The text message stated:

> BWF:    Lanzo is pissed off about me  being here about
>         this job, and I mean pissed.
>
> DAM:    They knew all along. They mentioned you to me.
>
> BWF:    That's was only to get you to listen to them, and they are
>         saying you told them that this was the make up fom (sic)
>         1361.
>
> DAM:    Bullshit! I told them 1361  was a managemnt (victor)
>         decision. Fuck them liars.
>
> BWF:    Only lanzo,tom [Hardiman] is here saying the same thing
>         you are saying and telling them **no deal without me**, he
>         gotten smart, I am just sitting here listening,

(Gov't Ex. LS2-2 (emphasis added).)

Avinash Rachmale, a Lakeshore executive, testified that it was a huge loss to
Lakeshore to lose two earlier contracts – Contract 1387 for $5 million and Contract 1361
for $10 million.  Rachmale testified that Lakeshore had originally offered Ferguson 10
percent of Contract 1361, in response to his inquiries regarding participation in the contract
with Lakeshore, but Ferguson wanted more (25 percent) and rejected this offer.
Lakeshore's bid for the $5 million Contract 1387 was subsequently removed from the Board
of Water Commissioners' agenda, and in May 2003, the DWSD wrote Lakeshore informing
it that all proposals on Contract 1387 were rejected and the project was cancelled.  Then

in July 2003, Lakeshore received a letter from the DWSD informing it that its $10 million Contract 1361 had been cancelled.  (Trial Tr. Vol. 35 at 73-99, Nov. 15, 2012.)  Based on that experience, Lakeshore offered Ferguson one-third of Contract 849, which Rachmale testified was unusual.  (Trial Tr. Vol. 35 at 105-107, Nov. 15, 2012.)  Rachmale also verified that Lakeshore gave Ferguson $1 million for Contract 849, for no services rendered.  (Trial Tr. Vol. 36 at 8, Nov. 16, 2012; Trial Tr. Vol, 38 at 10-12, Nov. 26, 2012.)

Ferguson received a total of $1.52 million associated with the outfalls contract, for no work performed.  (Gov't Ex. BFF-31; Trial Tr. Vol. 41 at 108-109, Nov. 30, 2012.)

Based on the above, and on other evidence introduced at trial, including text messages between Ferguson and others regarding Contracts 1387 and 1361, there was sufficient evidence in the record from which the jury could have concluded that Ferguson knowingly and wrongfully obtained money from Lakeshore; that he did so by means of extortion induced by wrongful fear of economic harm; and that he knew that Lakeshore gave him the money because of the extortion.

### (6)  Count 8:  Asbestos Abatement Contract

The jury convicted Defendant Bobby Ferguson of extortion of Lakeshore by obtaining $75,000 in relation to an asbestos contract he had not worked on, with the consent of Lakeshore being induced by wrongful fear of economic harm.

Rachmale and Hardiman both testified about paying Ferguson for an asbestos abatement contract Lakeshore held, despite the fact that Ferguson did not work on the contract.  As Hardiman and Rachmale testified, Lakeshore did not want to lose the change order for the asbestos abatement contract, which was valued at $1.5 million.  Hardiman informed Rachmale that there was a 5% fee on that contract that would to go Ferguson.

22

(Trial Tr. Vol. 36 at 23-25, Nov. 16, 2012.)  An October 16, 2005 email from an individual affiliated with Ferguson's company to Ferguson indicated that "5% of $1.5 million should be jobs profit, abatement work = $75,000."  (Gov't Ex. LS2-12; Trial Tr. Vol. 31 at 96-97, Oct. 26, 2012; Trial Tr. Vol. 36 at 23-27, Nov. 16, 2012.)  Lakeshore, through its affiliate, Sky Group Grand, paid $75,000 to Ferguson's wife's company, Johnson Consultants, on February 2, 2007.  (Trial Tr. Vol. 36 at 24-30, Nov. 16, 2012.)

Rachmale indicated that they paid this money because "[w]e did not want any of our work to be stopped, we don't want any of our contracts to be stopped . . . ."  (Trial Tr. Vol. 36 at 30, Nov. 16, 2012).  Rachmale repeatedly testified that he paid Ferguson money because he felt threatened that Ferguson would have a contract cancelled or would have a job taken away from Lakeshore.  (Trial Tr. Vol. 36 at 47, 58-64, Nov. 16, 2012.)

Based on this evidence, and the evidence set forth above, there was sufficient evidence from which the jury could have concluded that Ferguson knowingly and wrongfully obtained money or other property from Lakeshore; that he did so by means of extortion induced by wrongful fear of economic harm; and that he knew that Lakeshore was parting with the money because of the extortion.

### (7) Count 9:  Contract 2014

The jury convicted Defendants Bobby Ferguson and Kwame Kilpatrick of extortion in Count 9, which charged that Ferguson and his related company, Xcel Construction Services, obtained payments from Lakeshore and A&H Contractors worth more than $12.9 million from a contract to repair water mains on the east side of the city, with consent induced by wrongful fear of economic harm and under color of official right.

In January 2006, DWSD sent out requests for bid proposals for the eastside water

23

main contract.  Ferguson told representatives of Lakeshore that Ferguson Enterprises, Inc. could not join their team's bid proposal for the east and west side water main contracts because Ferguson's affiliated company, Xcel Corporation, was already teaming with another company and was submitting a bid proposal on the same contract.  Ferguson introduced Lakeshore to E & T Trucking, the entity that Lakeshore partnered with on its bid for Contract 2014.  Rachmale testified that he understood E & T Trucking to be a Ferguson affiliated company, and Lakeshore submitted a bid on Contract 2014 using E & T Trucking. Lakeshore's bid proposal misrepresented Ferguson Enterprises, Inc.'s work experience as that of E & T Trucking.  (Trial Tr. Vol. 31 at 108-11, Oct. 26, 2012; Trial Tr. Vol. 36 at 36-41, Nov. 16, 2012.)

Bid evaluations revealed that the bid proposal for Lakeshore and the Ferguson-affiliated company were ranked behind a rival bidder.  Daniel Edwards, a DWSD employee assisting with the bid evaluation process, was ordered to use the average-cost method of calculating the bids, a process which had never been used for this kind of contract.  (Trial Tr. Vol. 27 at 78-82, October 22, 2012.)  This procedure resulted in a higher placement for Lakeshore, although not high enough to secure one of the contracts.  (*Id.* at 82-84; Trial Tr. Vol. 38 at 100-112, Nov. 27, 2012.)

Kim Harris, an employee of the City of Detroit's Human Right's Department, testified that his supervisor and the then-head of the department, Gerard Phillips, told him to revoke the Detroit Headquarters certification of DLZ – a subcontractor partnered with the higher ranked rival company.  (Trial Tr. Vol. 40 at 125-126, Nov. 29, 2012.)  On May 18, 2006, the Department of Human Rights revoked DLZ's headquarters certification, effective as of February 2, 2006, thus eliminating the rival company from competition for the bid.  Bid

24

proposals were due on March 23, 2006 for this project.  (Gov't Ex. LS3-11; Trial Tr. Vol. 27 at 74-78, Oct. 22, 2012.)  When the rival company lost points in the re-evaluation of the bids, Lakeshore was ranked higher than the other company, resulting in an award of the bid to Lakeshore and Ferguson's affiliated company.  (Trial Tr. Vol. 27 at 91-95, Oct. 22, 2012; Trial Tr. Vol. 38 at 125, 129, Nov. 27, 2012.)  Ferguson received over $4 million from the award of contract 2014 to Lakeshore.  (Gov't Ex. BFF-31; Trial Tr. Vol. 41 at 109-110, Nov. 30, 2012.)

Based on the above evidence, in addition to other evidence introduced at trial with regard to the extortion of Lakeshore by Defendant Ferguson, there was sufficient evidence for the jury to conclude that Defendants Bobby Ferguson and Kwame Kilpatrick knowingly and wrongfully obtained money from Lakeshore; that they did so by means of extortion under color of official right and by fear of economic harm; and that they knew that Lakeshore parted with its money because of the extortion.

### 2. Sufficient Evidence For Guilty Verdicts As To Defendants Bobby Ferguson and Kwame Kilpatrick on Count 17 - Bribery

In Count 17, the jury found Defendants Kwame Kilpatrick and Bobby Ferguson guilty of bribery, and aiding and abetting in bribery, of a public official.  To establish guilt for bribery involving a program receiving federal funds under 18 U.S.C. § 666(a)(1)(B), the government had to prove that:  (1) Defendant Kwame Kilpatrick was the Mayor of the City of Detroit; (2) the Defendant solicited, demanded, accepted or agreed to accept anything of value; (3) the Defendant did so corruptly with the intent to be influenced or rewarded in connection with a transaction of the City of Detroit; (4) the transaction involved anything of value of $5,000 or more; and (5) the City of Detroit, in a one-year period, received benefits

of more than $10,000 under any federal program involving some form of federal assistance. *See* Pattern Crim. Jury Instr. 7th Cir. at 254, 18 U.S.C. § 666(a)(1)(B) Accepting a Bribe (2012 ed.); *United States v. Abbey*, 560 F.3d 513, 520 (6th Cir. 2009).

The government is not required to establish a direct link from some specific payment to a promise of some specific official act. As the Sixth Circuit recently observed, "[t]he agreement between the public official and the person offering the bribe need not spell out which payments control which particular official acts. Rather, 'it is sufficient if the public official understood that he or she was expected to exercise some influence on the payor's behalf as opportunities arose.'" *United States v. Terry*, 707 F.3d 607, 612 (6th Cir. 2013) (quoting *Abbey*, 560 F.3d at 518 and citing supporting decisions from the Second, Fourth, and Seventh Circuit Courts of Appeal). The text of the federal bribery statute "says nothing of a quid pro quo requirement to sustain a conviction, express or otherwise: while a 'quid pro quo of money for a specific . . . act is sufficient to violate the statute,' it is 'not necessary.'" *Abbey*, 560 F.3d at 520 (quoting *United States v. Gee*, 432 F.3d 713, 714 (7th Cir. 2005) (italics omitted)). "If an official receives money 'through promises to improperly employ his public influence,' he has accepted a bribe." *Terry*, 707 F.3d at 613 (quoting *Abbey*, 560 F.3d at 519).

In mid-March 2008, around the time that Defendant Kwame Kilpatrick was winding down the affairs of his non-profit, the Kilpatrick Civic Fund ("KCF" or "Civic Fund"), Defendant Bobby Ferguson's company, Ferguson Enterprises, Inc., paid $75,000 to the Civic Fund. (Gov't Ex. 47-B; Trial Tr. Vol. 24 at 6-7, Oct. 17, 2012). The evidence at trial, including testimony regarding the relationship between Defendants Bobby Ferguson and Kwame Kilpatrick, the time of the payment, the actions Kwame Kilpatrick took to ensure

that Ferguson received lucrative contracts, including those discussed above, and the uses to which Kwame Kilpatrick put the Civic Fund, as described below, was sufficient to show that this payment was accepted by Kwame Kilpatrick, and that in accepting it, Kwame Kilpatrick was acting corruptly with the intent to be influenced or rewarded with respect to City of Detroit business.  There is likewise sufficient evidence from which a jury could have convicted Defendant Bobby Ferguson of aiding and abetting Kwame Kilpatrick in the receipt of a bribe.  *See also United States v. Kilpatrick*, Case No. 10-20403, 2012 WL 3236839, at *3 (E.D. Mich. Aug. 7, 2012) (holding that Count 17 "properly charges Defendant Ferguson as an aider and abettor of Defendant Kwame Kilpatrick's crime of accepting a bribe in violation of § 666(a).").

### C. Sufficient Evidence For Guilty Verdict As To Defendants Bobby Ferguson and Kwame Kilpatrick on Count 1 - RICO Conspiracy

The jury found Defendants Kwame Kilpatrick and Bobby Ferguson guilty of Count 1 of the Fourth Superseding Indictment which charged them with participating in a RICO conspiracy in violation of 18 U.S.C. § 1962(d).  On Count 1, the government had to prove that:  (1) the Kilpatrick enterprise existed; (2) the Defendant was associated with the Kilpatrick enterprise; (3) the Defendant knowingly agreed to participate in the conduct of the Kilpatrick enterprise; (4) the Defendant and at least one other conspirator agreed that the Defendant or a conspirator would commit at least two acts of racketeering in furtherance of the Kilpatrick enterprise; and (5) the activities of the Kilpatrick enterprise affected interstate commerce.  *See Salinas v. United States*, 522 U.S. 52, 62-65 (1997); *United States v. Applins*, 637 F.3d 59, 80-82 (2d Cir. 2011); *United States v. Browne*, 505 F.3d 1229, 1263-64 (11th Cir. 2007); *United States v. Tocco*, 200 F.3d 401, 424-25 (6th

Cir. 2000).

### 1. General Principles

A group or association of people can be an "enterprise" if these individuals have "associated together for a common purpose of engaging in a course of conduct." *United States v. Turkette*, 452 U.S. 576, 583 (1981). *See also, Boyle v. United States*, 556 U.S. 938, 944 (2009). The enterprise must have "at least three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Id.* at 946.

Moreover, "[t]o prove a RICO conspiracy charge, it is not necessary to show that the defendant committed two predicate acts himself or agreed to commit two predicate acts himself." *United States v. Driver*, 535 F.3d at 432 (citing *United States v. Saadey*, 393 F.3d 669, 676-77 (6th Cir. 2005) and *Salinas*, 522 U.S. at 65-66). Rather, a "RICO conspiracy conviction can be sustained if there is evidence sufficient to prove that [the defendant] agreed that *someone* would commit two predicate acts. *Id.* (italics in original). Also, "for a charge of RICO conspiracy, a jury need only be unanimous as to the types of predicate racketeering acts that the defendant agreed to commit, not to the specific predicate acts themselves." *United States v. Randall*, 661 F.3d 1291, 1299 (10th Cir. 2011) (joining the similar conclusion reached by the Seventh and Second Circuit Courts of Appeal in *United States v. Glecier*, 923 F.2d 496, 500 (7th Cir. 1991) and *United States v. Applins*, 637 F.3d 59, 80-82 (2d Cir. 2011)).

"Section 1962(d), like all conspiracy provisions, has as its target the act of agreement – here, the agreement to engage in activity that implicates section 1962(c)." *Glecier*, 923

28

F.2d at 500.  Moreover, "[b]ecause conspirators normally attempt to conceal their conduct, the elements of a conspiracy offense may be established solely by circumstantial evidence. The agreement, a defendant's guilty knowledge and a defendant's participation in the conspiracy all may be inferred from the development and collocation of circumstances." *United States v. Posada-Rios*, 158 F.3d 832, 857 (5th Cir. 1998) (internal quotation marks and citations omitted).

### 2. Evidence of Enterprise and Defendants Kwame Kilpatrick's and Bobby Ferguson's Association With Enterprise

Applying the above principles here, there is ample evidence from which the jury could find that an enterprise, or association in fact, existed between Defendants Kwame Kilpatrick and Bobby Ferguson (the "Kilpatrick enterprise"), and that these Defendants were associated with that enterprise.  (Trial Tr. Vol. 58 at 121-24, Jan. 7, 2013; Gov't Ex. RC-1, text message dated June 21, 2002 between Defendants Bernard Kilpatrick and Kwame Kilpatrick stating "Just met with Bobby Ferguson . . . The 3 of us need to meet at least twice a month for an hour for a while . . . ."; Gov't Exs. RC-5, RC-6, RC-7, RC-8, IN1-29B, RC-10, RC-11, RC-12, RC-13, RC-14, RC-15.)

Derrick Miller testified that he, and Defendants Kwame Kilpatrick, Bobby Ferguson, and Bernard Kilpatrick had frequent sit-down meetings to discuss business opportunities and political strategy.  (Trial Tr. Vol. 58 at 121-124, 132, Jan. 7, 2013.)  Miller also testified that Kwame Kilpatrick said that Ferguson needed to be part of city contracts; that Ferguson had SkyTel text pagers like the other members of the Kwame Kilpatrick administration; and contractors recognized that they had to deal with Ferguson.  (Trial Tr. Vol. 58 at 134, 138-140, Jan. 7, 2013; Trial Tr. Vol. 59 at 40, 44, 116-117, 118, Jan. 8, 2013.)

29

The government introduced numerous text messages demonstrating the association between the members of the RICO conspiracy.  These included text messages where Kwame Kilpatrick's sister, Ayanna Kilpatrick, complained to Miller that she kept losing work to Ferguson (Gov't Ex. RC-46).  Miller indicated that it was standard for him to inquire about business opportunities for Ferguson.  (Trial Tr. Vol. 58 at 118, Jan. 7, 2013.)  When Rachmale and Hardiman were upset that Lakeshore lost Contract 1361 because it was rolled into another Contract, they asked first to meet with Kwame Kilpatrick but did meet with Miller, who Kwame Kilpatrick instructed to "listen and be vague."  (Trial Tr. Vol. 59 at 57-60, Jan. 8, 2013; Gov't Ex. LS1-16.)

The Kilpatrick enterprise, and Defendants' association with it, is demonstrated by numerous text messages between Defendants Ferguson and Kwame Kilpatrick discussing cash and proceeds.  (*See, e.g.*, Gov't Exs. listed above.)  These elements are further supported by evidence of Ferguson's text message to Derrick Miller when meeting with Lakeshore with regard to Contract 849  -- other City contractors knew that there was "no deal without me [Ferguson]." (Gov't Ex. LS2-2.)  When Kwame Kilpatrick commented to Ferguson about negotiating contracts, i.e., "let's get you some money," Ferguson tellingly corrected him by stating "us." (Gov't Ex. BCD-9.)  This evidence, as well as other evidence introduced at trial, including that introduced through the testimony of Derrick Miller and other text messages between Co-Defendants, is sufficient to establish the existence of an enterprise, that it had a purpose, that it existed over a long period of time, and that relationships existed among the people associated with and involved in the Kilpatrick enterprise. There is sufficient trial evidence to show Defendants Bobby Ferguson and Kwame Kilpatrick's association with the enterprise, and their agreement to participate in the

30

enterprise's affairs.

As discussed above, the agreement to commit a RICO offense is the essential aspect of a RICO conspiracy offense. The jury may find that a defendant has entered into the requisite agreement to violate RICO when the government has proven beyond a reasonable doubt that the defendant agreed with at least one other co-conspirator that at least two racketeering acts of the type or types of racketeering activity listed in the indictment would be committed by a member of the conspiracy in the conduct of the affairs of the enterprise. *See Salinas*, 522 U.S. at 62-65; *See also, United States v. Lawson*, 535 F.3d 434, 445 (6th Cir. 2008).

In this case, evidence was presented about multiple racketeering acts from which the jury could have concluded that Kilpatrick and Ferguson agreed that at least one co-conspirator would commit in the conduct of the affairs of the enterprise.

### 3. Evidence Regarding Agreement and Racketeering Acts

#### a. Bribery Under State Law

At trial, witnesses testified about multiple acts. As set forth in the jury instructions, there are three elements to the Michigan law of bribery by a public official. The government had to prove, beyond a reasonable doubt, that Kwame Kilpatrick was a public official, that while being a public official, Kwame Kilpatrick accepted a gift or gratuity, and that the gift or gratuity was made with an understanding that Kwame Kilpatrick would exercise his official judgment in a particular manner, or on a particular side of any question, cause or proceeding, which was by law before him in an official capacity. A jury could have concluded that there was sufficient evidence that Defendants Kwame Kilpatrick and Bobby Ferguson agreed that one or more of these types of racketeering activities in violation of

31

the Michigan law prohibiting a public official from accepting bribes would be committed by Kwame Kilpatrick, in furtherance of the affairs of the enterprise, i.e., to earn money and power for the Kilpatrick Enterprise.

Karl Kado, a City contractor, testified that he paid bribes of between $200,000 and $300,000 to Defendant Bernard Kilpatrick to ensure that Kado maintained his contracts for work within Cobo Hall. Kado also testified that he gave Defendant Bernard Kilpatrick $100,000 for Defendant Kwame Kilpatrick's campaign to be re-elected as Mayor. (Trial Tr. Vol. 42 at 38-39, 43, Dec. 3, 2013.) Kado's testimony was corroborated by that of Derrick Miller. Miller testified that Kwame Kilpatrick told him to pick up money from Kado for the Mayor's campaign. He also testified that, although he knew it was not appropriate to take cash for the campaign, he accepted the cash from Kado and gave it to Defendant Kwame Kilpatrick. Miller also testified that several other times he picked up large amounts of cash from Kado and delivered it to Kwame Kilpatrick even though he knew it was wrong to take cash from a contractor for whom he was responsible for overseeing his operations. (Trial Tr. Vol. 58 at 86-92, Jan. 7, 2013.) Kado also testified that, on three or four occasions, after Kwame Kilpatrick called and asked him for money, he delivered to Kwame Kilpatrick cash in amounts of between $5,000 and $10,000 either directly or through Derrick Miller or another individual close to Kwame Kilpatrick. (Trial Tr. Vol. 42 at 13-17, 26-29, Nov. 3, 2012.)

Anthony Soave, an Inland executive, testified that Kwame Kilpatrick took flights worth over $300,000 from Inland in return for favorable treatment of Inland on City contracts. Soave gave him the free flights because "I didn't want to get on the wrong side of him," and "I [didn't] want him holding another job up. . . ." (Trial Tr. Vol. 44 at 137, Dec. 5, 2012;

32

Gov't Ex. JET3.)

Marc Cunningham, a consultant and friend of Kwame Kilpatrick, testified that he paid money to Defendant Bernard Kilpatrick; that Kwame Kilpatrick was aware of and approved these payments from Cunningham to Bernard Kilpatrick; and that Cunningham made the payments to Bernard Kilpatrick so Kwame Kilpatrick would support investments Cunningham recommended for the retirement system and pension funds.  (Trial Tr. Vol. 55 at 17-33, 139-140, Dec. 21, 2012.)

Johnson Akinwusi, a businessman who regularly received construction contracts with the City prior to the Kilpatrick administration, testified that he paid for suits for Kwame Kilpatrick because he wanted to ensure that he got City business; and, sometime after he paid for Kwame Kilpatrick's suits, he received a bid proposal for the Heilmann Recreation Center construction project.  (Trial Tr. Vol. 50 at 18, 21-24, Dec. 14, 2012.)

### b.  Evidence Supporting Kwame Kilpatrick's Mail and Wire Fraud Convictions

Defendant Kwame Kilpatrick was convicted of multiple counts of mail (Counts 18-26) and wire fraud (Counts 28 and 30), all of which could have been considered by the jury in its determination whether Defendants Kwame Kilpatrick and Bobby Ferguson agreed that a co-conspirator would commit at least two acts of racketeering activity in furtherance of the affairs of the Kilpatrick enterprise.  Those mail and wire fraud counts stemmed from Kwame Kilpatrick's scheme to obtain donations for the Kilpatrick Civic Fund, Kwame Kilpatrick's social welfare nonprofit organization, and to use those donations for himself, his friends, and his family.

The following trial testimony and exhibits is sufficient to sustain the jury's guilty verdict as to Defendant Kwame Kilpatrick on the mail and wire fraud counts and to support a

33

finding that Defendants Kilpatrick and Ferguson agreed that a co-conspirator would commit at least two racketeering acts to further the affairs of the Kilpatrick enterprise:

### (1) Solicitations for Donations to the Kilpatrick Civic Fund

Government exhibits KCF-92, KCF-93, KCF-94, KCF-97, KCF-99, and KCF-100B all relate to solicitations for the Kilpatrick Civic Fund, which listed as its purposes: the promotion of community activities that enhance Detroit neighborhoods and contribute to the betterment of Detroit; providing information to Michigan residents about legislative issues affecting their lives; educating Detroit residents on the importance of voting; participating in activities that contribute to the development of a positive image of Detroit; and supporting crime prevention or economic empowerment initiatives.

### (2) Uses of the Kilpatrick Civic Fund

Other government exhibits pertain to Defendant Kwame Kilpatrick's use of the Kilpatrick Civic Fund that did not correspond to the purposes for which the donors gave money. These uses included yoga lessons (Gov't Ex. KCF-11), personalized golf clubs (Gov't Ex. KCF-10), trips to a high-price resort in Colorado with his paramour (Gov't Exs. KCF-18, KCF-20), a trip to LaCosta Resort in Carlsbad, California with his family (Gov't Ex. KCF-21), airline tickets for his father and friend, Defendants Bernard Kilpatrick and Bobby Ferguson (Gov't Ex. KCF-27), camp for his children and his colleague's child (Gov't Ex. KCF-62), and expenses related to a political consultant and political survey conducted for the mayoral campaign (Gov't Exs. KCF-3A, KCF-6, KCF-35).

### (3) Testimony from Victims of Fraud

Multiple witnesses, including Mary Pugh, Michael Nairene, Nicholas Degel, and Ken

Hudson, testified that they were not aware that funds donated to the Kilpatrick Civic Fund were being used by the Mayor and his associates for personal purposes, and testified that they would not have donated to the Fund if they had known about this personal use. (*See, e.g.,* Trial Tr. 23 at 16, 31-32, 43, 54-55, 62, 67, 79-80, Oct. 16, 2012.)

### (4) Kwame Kilpatrick's Statements And Directives Regarding Uses of the Kilpatrick Civic Fund

A clip of a televised debate between mayoral candidates Kwame Kilpatrick and Gil Hill was played multiple times during trial. In it, Kwame Kilpatrick states "[n]ot one penny of the civic fund donations were used for the political campaign because it's not allowed by law." (Gov't Ex. KCF-1A.)  Derrick Miller testified that Kwame Kilpatrick knowingly asserted that Civic Fund money was not used for political campaign purposes because Kwame Kilpatrick knew that he did not have to disclose the donors or purposes for which the funds were used for and thus his assertion could not be disproved.  (Trial Tr. Vol. 58 at 49-52, Jan. 7, 2013.)  This testimony was corroborated by the City's former communications official, Matthew Allen, who testified that Kwame Kilpatrick rejected his idea of revealing donors that Kwame Kilpatrick had met with when he went to the LaCosta resort using Civic Fund money.  (Trial Tr. Vol. 21 at 142-143, Oct. 10, 2012.)  April Edgar, who became treasurer of the Kilpatrick Civic Fund in 2007, also testified that Kwame Kilpatrick directed her to use Civic Fund checks for thousands of dollars of personal expenditures for Kwame Kilpatrick, his family, and his friends.  (*See, e.g.*, Trial Tr. Vol. 22 at 40-41, 46-55, Oct. 11, 2012.)

### c. Additional Evidence Supporting Other Acts of Mail and Wire Fraud To Show Defendants Kwame Kilpatrick's and Bobby Ferguson's Agreement That Someone Would Commit Acts of Mail and/or Wire Fraud To Further the Affairs of the Kilpatrick Enterprise

In addition to the evidence discussed above on those mail and wire fraud counts on which Defendant Kwame Kilpatrick was found guilty, the jury could also have considered the following evidence supporting other acts of mail and wire fraud to conclude that Defendants Bobby Ferguson and Kwame Kilpatrick agreed that Kwame Kilpatrick, and other co-conspirators, would commit acts of mail and wire fraud in order to further the affairs of the Kilpatrick enterprise during the course of the conspiracy.

As the evidence at trial showed, Defendants Bobby Ferguson and Kwame Kilpatrick, while Kwame Kilpatrick was a member of the State House of Representatives, committed fraud on the State of Michigan by directing over $280,000 in grant money from the State of Michigan to nonprofit entities controlled by Kwame Kilpatrick's wife and Ferguson. The state grant money, which was designated to help children and seniors in the Detroit area, was spent by Kwame Kilpatrick or his wife on personal expenses, and by Ferguson to refurbish the offices of Ferguson Enterprises on Wyoming Avenue in Detroit.

For example, testimony at trial revealed that when Kwame Kilpatrick was the Democratic floor leader in 2001, he supported a grant to Detroit Three Dimensional Community Development Corporation ("Detroit 3D"), a Ferguson-affiliated charitable organization, and Vanguard through a letter to the State Budget Office, and that he asked a Vanguard representative to hire his wife. (Gov't Ex. SG-7; Trial Tr. Vol. 13 at 96-97, 42-45, Sept. 27, 2012.)[3] Mary Lannoye of the State of Michigan Budget Office testified that, when she discovered that the money had gone to Kwame Kilpatrick's wife, she felt this was

---

[3]This evidence also supports the longevity of the Kilpatrick enterprise, its purpose of obtaining money for Defendants Kwame Kilpatrick and Ferguson and their associates, and their association with the enterprise.

inappropriate because the grant money was intended to help a local community and not meet to go directly to a legislator's wife for her personal gain. (Trial Tr. Vol. 13 at 44-47, Sept. 27, 2012.)

Evidence at trial also showed that $250,000 in state grant money was directed to Detroit 3D, then transferred to U.N.I.T.E., the non-profit corporation run by Kwame Kilpatrick's wife Carlita Kilpatrick, and then to expenses associated with Ferguson Enterprises, Inc.'s office space, including money paid to AirTec, Detroit Interiors, B-Safe Security Systems, Velcon Construction, and Doeren Mayhew. (Trial Tr. Vol. 15 at 119-129, Oct. 1, 2012; Gov't Exs. SG-31, SG-32, SG-32A.) These expenses were paid in connection with Ferguson Enterprises, Inc. despite a June 11, 2001 letter to the State of Michigan from Detroit 3D indicating that Detroit 3D had used the grant money it received to mediate peers, for conflict resolution, and for multi-unit housing. (Gov't Exs. SG-13, SG-17.)

Despite Defendants Kwame Kilpatrick's and Bobby Ferguson's arguments to the contrary, a RICO conspiracy offense does not require proof that a defendant committed any predicate act, or even that a conspirator personally agreed to commit any specific predicate racketeering act. Rather, it is sufficient if trial evidence shows that the defendant *agreed* to further or facilitate some of the conduct leading to a substantive RICO offense, and *agreed* that at least one conspirator would commit at least two racketeering acts in the conduct of the affairs of the enterprise. *See Salinas*, 522 U.S. at 65-66, *Driver*, 535 F.3d at 432, *Glecier*, 923 F.2d at 500. The evidence at trial was sufficient to establish Defendants Kwame Kilpatrick's and Bobby Ferguson's convictions on Count 1 alleging a RICO conspiracy in violation of 18 U.S.C. § 1962(d). The jury's findings of guilt on the

37

2:10-cr-20403-NGE-MKM   Doc # 462   Filed 08/08/13   Pg 38 of 42   Pg ID 15631

substantive counts of extortion (Counts 2, 3, 4, 5, 7, 8, and 9), all of which were incorporated into Count 1, the RICO conspiracy count, are sufficient to allow a rational juror to find a pattern of racketeering activity and to infer that Defendants Kwame Kilpatrick and Bobby Ferguson agreed that either they or someone else would commit at least two RICO predicate acts.  *See Lawson*, 535 F.3d at 445 (observing that "because the evidence shows that [the defendant] committed three RICO predicate acts, a rational jury could infer that [the defendant] agreed that either he or someone else would commit at least two RICO predicate acts.").  *See also, United States v. Corrado*, 304 F.3d 593, 608 (6th Cir. 2002) (observing that "other verdicts of the same jury may serve the function of a special verdict on the predicate acts, where those other verdicts necessarily required a finding that the RICO defendant had committed the predicate acts." (internal quotation marks and citation omitted)).

### D. Sufficient Evidence For Guilty Verdict As To Defendant Bernard Kilpatrick on Count 38 - False Subscription of 2005 Tax Return

Defendant Bernard Kilpatrick is charged in Count 38 with subscribing a false tax return for the 2005 tax year, in violation of 26 U.S.C. § 7206(1).  To establish a violation of this statute, the government must prove the following five elements, beyond a reasonable doubt:  (1) the defendant made or caused to be made a tax return for the 2005 tax year; (2) the 2005 tax return contained a written declaration that it was made under penalty of perjury; (3) when the defendant made or helped to make the 2005 tax return, he knew that it contained false, material information; (4) when the defendant did so, he intended to do something he knew violated the law; and (5) the false matter in the 2005 tax return related to a material statement.  *See* Pattern Crim. Jury Instr. 11th Cir. at 605, 109.1, Filing a False

Tax-Related Document, 26 U.S.C. § 7206(1) (2010 ed.); *United States v. Oggoian*, 678 F.2d 671, 673-74 (7th Cir. 1982).

Despite Defendant Bernard Kilpatrick's arguments to the contrary, there is sufficient evidence in the record for the jury to find that he authorized his tax preparer to file his 2005 tax return on his behalf, knowing that it was a false statement of his total income for 2005. In addition to government exhibits, three witnesses testified with regard to the preparation and filing of the 2005 tax return.

Cassandra Jones, one of the two tax preparers, testified that she explained to Bernard Kilpatrick the information that she needed to compute his taxes, and that Bernard Kilpatrick understood how she calculated his income and his taxes, that it was important to document all taxable income, and that it was important that she have all the information she needed to do so. (Trial Tr. Vol. 56 at 29-30, 70-71, Jan. 3, 2013.) She testified that based on her calculations, derived from the information provided to her by Bernard Kilpatrick, his total income for 2005 was $220,259. (Trial Tr. Vol. 56 at 36-37, Jan. 3, 2013; Gov't Ex. BKF-2.) She testified that she did not review what was going into his personal bank accounts because that was not standard practice. (Trial Tr. Vol. 56 at 50-51, Jan. 3, 2013.) She further testified that she was not aware of a disbursement from an employee profit sharing plan in 2005, and that any such disbursement would be considered taxable income, and would be included on Line 16a of the income tax return. (*Id.* at 36-37.) She stated that if she had known of such a disbursement, it would have impacted her calculations of the tax return. (*Id.* at 37-38.)

When preparing tax returns for a client, Jones testified that it is her firm's practice to have someone sit down with the client to review the return before filing it. (*Id.* at 38, 42.)

39

She testified that, after she prepared Bernard Kilpatrick's 2005 return, she did not make any corrections prior to it being filed, and further testified that she would have been notified if there were any changes that needed to be made after someone from the firm met with the reviewing client.  (*Id*. at 38, 41-42.)

Jones also testified that it was a requirement at her firm, Alan C. Young and Associates, that a taxpayer sign an authorization form, authorizing the firm to file electronically on the taxpayer's behalf.  (*Id*. at 56-57, 65.)  The government admitted into evidence proof that Bernard Kilpatrick signed such a form with respect to the firm's filing of his 2005 tax return.  (Gov't Ex. BKF-27.)

Alan Young, one of Bernard Kilpatrick's tax preparers, reiterated that when preparing tax returns, it is important that clients provide them with all sources of income so it can be accurately reported.  (Trial Tr. Vol. 56 at 78-79, Jan. 3, 2013.)  He also testified that he had a conversation with Bernard Kilpatrick when the firm started preparing his taxes about how the firm calculated the taxable income, and that the firm did not review the taxpayer's personal accounts.  (*Id*. at 78-79, 94-95.)  Young testified that he reviewed Bernard Kilpatrick's 2005 tax return, and that the majority of the reportable income was from the subchapter S corporation. (*Id*. at 81-82.) He further stated that he was not aware of any disbursements in 2005 from an employee profit sharing plan, and that if he had been, it would have been reported in the taxable income for 2005.  (*Id*. at 82, 114-115.)  Young testified that Bernard Kilpatrick executed a form for the 2005 tax year authorizing the tax firm to file his return electronically.  (*Id*. at 83-85; Gov't Ex. BKF-27.)

Special Agent Rowena Schuch from the Internal Revenue Service testified that she determined, using the specific item method, that Bernard Kilpatrick under-reported his

40

income for the 2005 tax year by $180,000.  (Trial Tr. Vol. 56 at 146-147, Jan. 3, 2013.)
She testified that Bernard Kilpatrick received disbursements from his employee profit
sharing plan in 2005, and that $180,000, out of $280,000, went into his personal bank
account.  (Trial Tr. Vol. 56 at 144-147, Jan. 3, 2013; Trial Tr. 57 at 44-47, Jan. 4, 2013.)
She testified that the distribution should have been recorded on a Form 1099-R, and that
it was Bernard Kilpatrick's subchapter-S corporation, Maestro's, responsibility to issue the
Form 1099-R.  (Trial Tr. Vol. 56 at 147-148, Jan. 3, 2013; Trial Tr. Vol. 57 at 60, Jan 4,
2013.)  She stated that there was no way in which the tax preparers would have been
aware of the disbursement into his personal bank account, for purposes of computing his
tax liability, unless Bernard Kilpatrick informed them.  (Trial Tr. Vol. 57 at 60, Jan. 4, 2013.)
She stated that there was no indication that the tax preparers were aware of such a
deposit, and that it is the taxpayer's responsibility to provide information regarding sources
of income.  (*Id.* at 61.)  She further testified that inclusion of the additional $180,000 would
have affected Bernard Kilpatrick's tax liability for the 2005 tax year, and that the additional
tax due and owing was over $60,000.  (Trial Tr. Vol. 56 at 148, Jan. 3, 2013.)

There is more than sufficient evidence in the record from which the jury could have
concluded that Bernard Kilpatrick was aware that the 2005 tax return contained false,
material information.  Testimony from Bernard Kilpatrick's tax preparers shows that he was
aware of how these preparers calculated his taxes and knew that they did not include
information from his personal bank accounts. It shows that the tax preparers were unaware
of the disbursement from Maestro, Bernard's subchapter-S corporation, because instead
of depositing the entire disbursement of $280,000 into his corporate bank account, which
was used to calculate his taxable income, he diverted $180,000 into his personal bank

41

account, which he knew, based on discussions with the tax preparers, would *not* be incorporated into his taxable income for 2005. Agent Schuch testified that it was Maestro's responsibility to issue a Form 1099R, and that absent such notification or information given to his tax preparers, they would have no knowledge that he disbursed money from his employee profit-sharing plan into his personal bank account. The evidence submitted at trial showed that Bernard Kilpatrick knew from 2002, when he rolled over the retirement monies into Maestro to avoid its taxation at that time, that any subsequent disbursement should have been included as income. Bernard Kilpatrick's 2005 tax liability would have been more than $60,000 greater than the computed tax liability if the disbursement had been included.

## III.   Conclusion

For the above-stated reasons, Defendants Kwame Kilpatrick's, Bobby Ferguson's, and Bernard Kilpatrick's Rule 29 motions for judgments of acquittal are DENIED.


S/Nancy G. Edmunds
Nancy G. Edmunds
United States District Judge

Dated: August 8, 2013

I hereby certify that a copy of the foregoing document was served upon counsel of record on August 8, 2013, by electronic and/or ordinary mail.

S/Johnetta M. Curry-Williams
Case Manager
Acting in the Absence of Carol A. Hemeyer