UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

       Plaintiff,

v.

KWAME KILPATRICK, ET AL.,

       Defendants.

_____/

Case No. 10-20403

Honorable Nancy G. Edmunds

**OPINION AND ORDER DENYING DEFENDANTS KWAME KILPATRICK'S AND
BOBBY FERGUSON'S MOTIONS FOR A NEW TRIAL [316, 317]**

This matter comes before the Court on Defendants Kwame Kilpatrick's and Bobby Ferguson's motions for a new trial pursuant to Federal Rule Criminal Procedure 33 [316, 317]. Defendants Kwame Kilpatrick and Bobby Ferguson have filed Joinders in each other's motions [323, 451], and Defendant Kwame Kilpatrick filed two additional briefs supplementing his motion [417, 450]. The government opposes Defendants' motions. For the reasons stated more fully below and on the record at the August 8, 2013 hearing, Defendants' Rule 33 motions for a new trial are DENIED.

**I.  Facts**

On March 11, 2013, following a lengthy jury trial that began on September 6, 2013, and after considering the testimony of over 100 government witnesses and over four hundred exhibits, the jury returned verdicts on the charges brought against Defendants. The charged counts, as set forth in a redacted indictment which was presented to the jury at the time of deliberation, included Count One, the RICO conspiracy count, and multiple counts of extortion pursuant to the Hobbs Act, bribery, mail and wire fraud, and false

subscription of federal tax returns.

Defendant Kwame Kilpatrick was found guilty on 24 of the 30 counts in which he was charged, specifically:  one count of RICO conspiracy, 18 U.S.C. § 1962(d); four counts of extortion, 18 U.S.C. § 1951; one count of attempted extortion, 18 U.S.C. § 1951; one count of bribery, 18 U.S.C. § 666(a); eleven counts of mail and wire fraud, 18 U.S.C. §§ 1341, 1343; five counts of subscribing a false tax return, 26 U.S.C. § 7206(a); and one count of income tax evasion, 26 U.S.C. § 7201.  (Verdict, 3/11/13, ECF No. 277.)  Defendant Bobby Ferguson was found guilty on 9 of the 11 counts in which he was charged, specifically: one count of RICO conspiracy, 18 U.S.C. § 1962(d); six counts of extortion, 18 U.S.C. § 1951; one count of attempted extortion, 18 U.S.C. § 1951; and one count of bribery, 18 U.S.C. § 666(a).  (*Id.*)  Defendant Bernard Kilpatrick was found guilty on 1 of the 4 counts in which he was charged, specifically, one count for filing a false tax return for the 2005 tax year in violation of 26 U.S.C. § 7206(1).  (*Id.*)

The chart below lists the jury's verdicts:

| Count | Charge | Defendant(s) | Verdict |
|-------|--------|--------------|---------|
| One | **RICO conspiracy** | Kwame Kilpatrick, Bobby Ferguson | Guilty |
| | | Bernard Kilpatrick | Mistrial |
| Two | **Extortion, Contract 1368** | | |
| | Color of official right | Kwame Kilpatrick | Guilty |
| | Wrongful fear of economic harm | Kwame Kilpatrick, Bobby Ferguson | Guilty |
| Three | **Extortion (CS 1368 Amendment)** | | |

|  |  |  | Guilty |
|---|---|---|---|
|  | Color of official right | Kwame Kilpatrick, Bobby Ferguson | Guilty |
|  | Wrongful fear of economic harm | Bobby Ferguson | Guilty |
| Four | **Extortion (PC 748)** |  |  |
|  | Color of official right | Kwame Kilpatrick, Bobby Ferguson | Guilty |
|  | Wrongful fear of economic harm | Kwame Kilpatrick, Bobby Ferguson | Guilty |
| Five | **Extortion (PC 755)** |  |  |
|  | Color of official right | Kwame Kilpatrick, Bobby Ferguson | Guilty |
|  | Wrongful fear of economic harm | Kwame Kilpatrick, Bobby Ferguson | Guilty |
| Seven | **Extortion (DWS 849)** | Kwame Kilpatrick | Mistrial |
|  | Wrongful fear of economic harm | Bobby Ferguson | Guilty |
| Eight | **Extortion** | Kwame Kilpatrick | Mistrial |
|  | Wrongful fear of economic harm | Bobby Ferguson | Guilty |
| Nine | **Extortion (CM 2014)** |  |  |
|  | Color of official right | Kwame Kilpatrick, Bobby Ferguson | Guilty |
|  | Wrongful fear of economic harm | Kwame Kilpatrick, Bobby Ferguson | Guilty |
| Ten | **Extortion (DWS 865)** | Kwame Kilpatrick, Bobby Ferguson | Not guilty |
| Fifteen | **Attempted Extortion** | Bernard Kilpatrick | Not guilty |
| Sixteen | **Bribery – $90,000** | Kwame Kilpatrick, Bobby Ferguson | Mistrial |

| Seventeen | **Bribery – $75,000** | Kwame Kilpatrick, Bobby Ferguson | Guilty |
|---|---|---|---|
| Eighteen | **Mail Fraud** | Kwame Kilpatrick | Guilty |
| Nineteen | **Mail Fraud** | Kwame Kilpatrick | Guilty |
| Twenty | **Mail Fraud** | Kwame Kilpatrick | Guilty |
| Twenty-one | **Mail Fraud** | Kwame Kilpatrick | Guilty |
| Twenty-two | **Mail Fraud** | Kwame Kilpatrick | Guilty |
| Twenty-three | **Mail Fraud** | Kwame Kilpatrick | Guilty |
| Twenty-four | **Mail Fraud** | Kwame Kilpatrick | Guilty |
| Twenty-five | **Mail Fraud** | Kwame Kilpatrick | Guilty |
| Twenty-six | **Mail Fraud** | Kwame Kilpatrick | Guilty |
| Twenty-seven | **Mail Fraud** | Kwame Kilpatrick | Not guilty |
| Twenty-eight | **Wire Fraud** | Kwame Kilpatrick | Guilty |
| Twenty-nine | **Wire Fraud** | Kwame Kilpatrick | Not guilty |
| Thirty | **Wire Fraud** | Kwame Kilpatrick | Guilty |
| Thirty-one | **Subscribing false tax return** | Kwame Kilpatrick | Guilty |
| Thirty-two | **Subscribing false tax return** | Kwame Kilpatrick | Guilty |
| Thirty-three | **Subscribing false tax return** | Kwame Kilpatrick | Guilty |
| Thirty-four | **Subscribing false tax return** | Kwame Kilpatrick | Guilty |

4

| Thirty-five | **Subscribing false tax return** | Kwame Kilpatrick | Guilty |
|---|---|---|---|
| Thirty-six | **Income tax evasion** | Kwame Kilpatrick | Guilty |
| Thirty-seven | **Subscribing false tax return** | Bernard Kilpatrick | Not guilty |
| Thirty-eight | **Subscribing false tax return** | Bernard Kilpatrick | Guilty |

## II.  Analysis

At the close of evidence, Defendants moved for a directed verdict of not guilty. Defendant Bobby Ferguson's motion, joined by Defendant Kwame Kilpatrick, challenged Counts 2, 3, 7, 8 and 10, but did not raise a specific challenge to Counts 1, 4, 5, 9, and 17. (Defs.' Mot. and Joinder, ECF Nos. 269, 270.)  Defendant Kwame Kilpatrick's oral motion challenged the sufficiency of the evidence as to Counts 18 through 27 for mail fraud and Counts 28 through 30 for wire fraud.  (Mot. J. Acquittal Hr'g Tr. 16-19, Feb. 8, 2013, ECF No. 310.)  The Court denied without prejudice Defendants' Bobby Ferguson's and Kwame Kilpatrick's motions finding sufficient evidence in the record to submit the charges in the challenged Counts to the jury.  (*Id.* at 16, 19; Order, Feb. 13, 2013, ECF No. 273.) Defendant Bernard Kilpatrick's motion challenged the sufficiency of the evidence as to Counts 37 and 39, but did not raise a specific challenge to Count 38.  (Def.'s Mot. J. Acquittal, ECF No. 267.)   The Court denied without prejudice Defendant Bernard Kilpatrick's motion challenging the sufficiency of the evidence as to Count 39 and took Defendant's motion under advisement as to Count 37.  (Order, Feb. 13, 2013, ECF No. 273.)

The trial continued to a jury verdict of guilt as to each Defendant on the charges

5

described above. Defendants have now filed post-trial motions for acquittal or a new trial. The Court now considers Defendants' motions for a new trial brought pursuant to Rule 33 of the Federal Rules of Criminal Procedure.

Defendants' Rule 33 motions for a new trial argue that: (1) their convictions are against the great weight of evidence and thus this Court should set aside their guilty verdicts; (2) the Court (Chief Judge Rosen)'s decision denying Defendant Kwame Kilpatrick's motion for disclosure of jury wheel and jury selection materials, joined by Co-Defendants, violated Defendants' right to a fair trial; (3) pretrial publicity and publicity during trial prejudiced Defendants and violated their right to a fair trial; (4) receipt of a partial verdict violated Defendants' right to a fair trial; (5) the prosecutor's rebuttal closing remarks violated Defendants' right to a fair trial; (6) Defendant Kwame Kilpatrick's Sixth Amendment right to effective assistance of counsel was violated due to conflicts of interest that existed between Defendant and his trial counsel; and (7) when cumulative evidentiary errors are combined -- i.e., the admission of testimony of case agents as lay opinion testimony under Fed. R. Evid. 701; the admission of testimony from extortion victims under Fed. R. Evid. 803(3), the state-of-mind hearsay exception; the admission of testimony from extortion victims under Fed. R. Evid. 801(c) because it was not offered for the truth of the matter asserted in the out-of-court statement; and the admission testimony from Kim Harris under Fed. R. Evid. 801(d)(2)(E), the co-conspirator exception to the hearsay rule – the prejudice from these errors necessitate a new trial.

The Court begins its analysis with the standard of review, then addresses Defendants' many arguments for a new trial.

## A.  Standard of Review

6

A motion for a new trial is governed by Rule 33 of the Federal Rules of Criminal Procedure. That Rule provides that "[u]pon the defendant's motion, [a district] court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). "The rule does not define interest of justice and the courts have had little success in trying to generalize its meaning." *United States v. Munoz*, 605 F.3d 359, 373 (6th Cir. 2010) (internal quotation marks and citation omitted). It is, however, "widely agreed that Rule 33's 'interest of justice' standard allows the grant of a new trial where substantial legal error has occurred." *Id.* This would include "reversible error or violation of the defendant's substantial rights." *Id.* at 374.

Defendants raise various arguments why they should be granted a new trial. First, they argue that a new trial should be granted because of reversible error or violation of Defendants' substantial rights. Those arguments are addressed immediately below.

Defendants Kwame Kilpatrick and Bobby Ferguson also seek a new trial on the ground that the jury's verdict is against the weight of the evidence presented. (Def. K. Kilpatrick's Mot. at 19; Def. B. Ferguson's Mot. at 3-4.) As the Sixth Circuit recently observed, "[i]n deciding Rule 33 motions based on the manifest weight of the evidence, . . . a district judge may sit as a thirteenth juror and consider the evidence to ensure that there is no miscarriage of justice." *Munoz*, 605 F.3d at 373 n.9 (6th Cir. 2010). "Generally, such motions are granted only in the extraordinary circumstances where the evidence preponderates heavily against the verdict." *United States v. Montgomery*, 358 F. App'x 622, 628 (6th Cir. 2009) (internal quotation marks and citations omitted).

Finally, Defendants argue that, even if the Court does not find reversible error, a new trial should be granted because of cumulative harmless error. (Def. Ferguson's Mot. at 4,

7

an argument that Def. K. Kilpatrick joins, ECF No. 451.) The Sixth Circuit has addressed the standard of review for this argument for a new trial. "The cumulative effect of errors that are harmless by themselves can be so prejudicial as to warrant a new trial." *United States v. Sypher*, 684 F.3d 622, 628 (6th Cir. 2012), *cert. denied*, 133 S. Ct. 1650 (2013). "To warrant a new trial, however, the cumulative effect of the errors must have deprived [the defendant] of a trial consistent with constitutional guarantees of due process." *Id.* (internal quotation marks and citation omitted). And where "no individual ruling has been shown to be erroneous, there is no 'error' to consider, and the cumulative error doctrine does not warrant reversal." *Id.*

### B. Weight of Evidence Does Not Preponderate Against the Verdict

The Court rejects Defendants' arguments that theirs is one of those extraordinary circumstances where the evidence preponderates heavily against the verdict. To the contrary. The Court has already addressed and rejected Defendants' arguments that the evidence at trial was insufficient to sustain their convictions. The evidence at trial was not only sufficient to sustain Defendants Kwame Kilpatrick's and Bobby Ferguson's convictions, it weighed heavily in support of the verdicts of guilt against these Defendants. (*See* Opin. & Order Denying Motions entered this same date.)

The Court now considers Defendants' remaining arguments for a new trial, beginning with their arguments that substantial legal or reversible errors warrant a new trial.

### C. Defendants Are Not Entitled to New Trial Based on Claims of Legal or Reversible Error

### 1. The Court's Denial of Defendants' Motion For Sweeping Array of Juror-Related Materials Did Not Violate Defendants' Right to A Fair Trial

Prior to trial, Defendant Kwame Kilpatrick filed a motion, joined by Defendants Bobby Ferguson and Bernard Kilpatrick, seeking "a broad array of juror-related materials for the purposes of demonstrating a discriminatory violation of the Jury Selection and Services Act of 1968 ("JSSA"), 28 U.S.C. § 1861, *et seq.*, and violations of his constitutional rights to equal protection and to a trial before a jury comprised of a fair cross-section of the community." *United States v. Kilpatrick*, No. 10-CR-20403, 2012 WL 3133939, *1 (E.D. Mich. Aug. 1, 2012) (Rosen, C.J.). Defendants' motion specifically sought "more than 12 years' worth of records and information," and sought some information "without any time limitation whatsoever." *Id.* at *2. The requested information included twelve years of juror summonses, completed jury questionnaires and data compilations, and all data complied by the Court and jury department on undeliverable questionnaires and non-responses. *Id.* at *1-2  In their present motion, Defendants argue that they needed the materials to determine whether there was "an under-representation of African Americans in the jury pool as a result of a constitutional deprivation or systematic exclusion." (Def. K. Kilpatrick's Mot. at 6.)

As Chief Judge Rosen properly observed, "pursuant to Eastern District of Michigan Administrative Order No. 00-AO-060, the normal scope of discovery with respect to information concerning jurors and potential jurors afforded a party seeking to challenge the composition of a grand and/petit jury on the basis of race or ethnicity is limited to 'juror number; race; and Hispanic ethnicity.'" *Kilpatrick*, 2012 WL 3133939 at *1 (quoting Admin. Ord. No. 00-AO-060). That Administrative Order further provides that if "'a party moves for the provision of juror information beyond that contemplated in this Administrative Order, such motion will be referred to the Chief Judge [for] review[ ] and ruling upon the propriety

of providing such additional juror information *for good cause shown* by the movant, on a case-by-case basis.'" *Id.* (quoting Admin. Order No. 00-AO-060 (emphasis added)).

This Court properly referred Defendants' request for extensive juror information to Chief Judge Rosen who denied it based on Defendants' failure "to demonstrate good cause for the broad array of materials requested" and observing that the government did "not object to the Court allowing limited disclosure . . . of the juror number, race and Hispanic ethnicity of the jurors in the master wheel used in this case." *Id.* at *3. Chief Judge Rosen further clarified that he was only limiting Defendants' access to the current jury wheel, that Defendants could review any records relating to old jury pools, master wheels and qualified wheels that have been retained in the jury department, which were available for public inspection without court order. *Id.* at *8.

Chief Judge Rosen properly observed that "[a] claim that jury selection violates the 'fair cross section' requirements of the Sixth Amendment and the JSSA can be proven through direct or indirect evidence," and because "there is no direct evidence" here, Defendants had to rely "upon indirect evidence." *Id.* at *5. This required Defendants "to establish the three elements of a *prima facie* showing of a 'fair cross section' violation:

> '(1) that a 'distinctive group' is being excluded from the jury pool; (2) that the representation of this group in venires from which juries are selected is 'not fair and reasonable' in comparison to the group's representation in the community at large; and (3) that this disparity is attributable to systematic exclusion of the group in the jury selection process.'"

*Id.* at *5 (quoting *Duren v. Missouri*, 439 U.S. 357, 364 (1979)). "Each of these elements must be established in order to make out a *prima facie* case." *Id.* at 5 (citing *United States v. Allen*, 160 F.3d 1096, 1103 (6th Cir. 1998)).

Chief Judge Rosen correctly concluded that Defendants had not shown that the

additional information they requested would assist them in establishing the elements of a *prima facie* showing of a "fair cross section" violation.  *Id.* at *7.  Specifically, as to the request for "undeliverable jury questionnaires or non-responses," the Chief Judge properly observed that "the Sixth Circuit has explicitly rejected those matters as too speculative to establish a *prima facie* showing of systematic exclusion."  *Id.* at *7 (citing *Bates v. United States*, No. 10-1094, 2012 WL 1071806, *5 (6th Cir. Apr. 2, 2012) (concluding that "[t]he only evidence in the record establishing a possible cause for the underrepresentation of African-Americans is the non-response rate in Wayne County, which is more than double that of any other county.  Non-responses, however, are not a problem 'inherent' to the jury selection procedures, but are the result of individual choice.").

In sum, because Defendants were unable to show good cause that the additional information they requested would have helped them establish the elements of a *prima facie* showing of a "fair cross section" violation, the motion considered by Chief Judge Rosen was properly denied.  Defendants did not and cannot show that any alleged underrepresentation of African-Americans in the grand or petit jury pool was due to systematic exclusion inherent in this district's jury selection plan.  Defendants are not entitled to a new trial on this issue.

## 2.  Defendants Were Not Denied A Fair Trial Due to Media Attention - Cannot Show Actual Prejudice or Presumed Prejudice

The Sixth Amendment affords a criminal defendant the right to a trial by an impartial jury.  Moreover, the United States Constitution establishes that trials are to be held in the district where the offense occurred.  *See* U.S. Const., Art. III, § 2, cl. 3 ("The trial of all crimes . . . shall be held in the State where the said crimes shall have been committed");

U.S. Const., Amend. VI (observing that all criminal trials are to be conducted "by an impartial jury of the State and district wherein the crime shall have been committed."). These constitutional mandates yield only "if extraordinary local prejudice will prevent a fair trial." *Skilling v. United States*, ___ U.S. ___, 130 S. Ct. 2896, 2913 (2010).

> Fed. R. Crim. P. 21 governs venue transfers in federal court. That rule instructs that:
>
> > (a) For Prejudice. Upon the defendant's motion, the court must transfer the proceeding against that defendant to another court <u>if</u> the court is satisfied that so great a prejudice against the defendant exists in the transferring district that the defendant cannot obtain a fair and impartial trial there.

Fed. R. Crim. P. 21(a) (emphasis added).

The decision to grant a change of venue motion is committed to the trial court's discretion. *United States v. Chambers*, 944 F.2d 1253, 1262 (6th Cir. 1991) (superseded by statute on other grounds).

The Supreme Court has drawn a distinction between presumed and actual prejudice from pretrial publicity. *Murphy v. Florida*, 421 U.S. 794 (1975). "Presumptive prejudice from pretrial publicity occurs where an inflammatory, circus-like atmosphere pervades both the courthouse and the surrounding community." *Foley v. Parker*, 488 F.3d 377, 387 (6th Cir. 2007). "Where pretrial publicity cannot be presumed prejudicial, the trial court must then determine whether it rises to the level of actual prejudice. The primary tool for discerning actual prejudice is a searching voir dire of prospective jurors." *Id.* at 387 (internal citation omitted).

Defendants argue that they were denied a fair trial because of "constant and persistent media attention." This argument was previously raised in a change-of-venue motion that was brought by Defendants on September 20, 2012 (Defs.' Mot., ECF No. 234),

was responded to by the government (Gov't Resp., ECF No. 236), and rejected by the Court (Order denying Mot., ECF No. 240).  When it announced its decision denying Defendants' motion, the Court observed that Defendants had abandoned any argument based on actual prejudice and thus focused on presumptive prejudice.

> . . . I'm going to deny this motion.  Since the defendants have abandoned any argument based on actual prejudice, I don't have to go though the whole [jury selection] process that we went through in order to assure a fair, impartial and diverse jury, and I think, although it was a long, tough process, that it worked the way we all had hoped, and we have a fair, impartial, and diverse jury that can listen to the evidence and render a verdict according to what's presented here in court.
>
> Presumptive prejudice is an extremely difficult concept to apply.  As the government mentioned . . . there hasn't been a finding of presumptive prejudice in some 50 years, and if you look at the factors identified by the Supreme Court in the *Skilling* case, this case doesn't come anywhere close to a finding of presumption – presumptive prejudice.
>
> First of all, as in *Skilling*, the size and characteristics of the community in which the crime occurred weigh strongly against a finding of presumptive prejudice here.  *Skilling* took place in Houston where there are 4.5 million individuals eligible.  In the Metro Detroit area and the Southern Division of the Eastern District, there are over 4 million individuals available for jury service, so that factor weighs against a finding of presumptive prejudice.
>
> Second, as in *Skilling*, there's no sensational, gruesome factor that has been so widely reported that the jurors couldn't, could not possibly ignore it.  The prior cases finding presumptive prejudice were things where you had a filmed, videoed confession of a murder of a child in a small community, the sort of thing where the whole community was aware of heinous and gruesome details of a violent crime.  Just not the situation here, which is not to say that the defendants aren't charged with serious crimes, but there's certainly been no confession, there's been ongoing professions of innocence by all of the defendants.
>
> And indeed, most of the jurors who were individually voir dired, even if they were aware of some of the former legal problems of Mr. Kilpatrick or to a lesser extent awareness of Mr. Ferguson's problems, very, very few of them were aware at all of any of the details of the charges in this case.
>
> Third, as in *Skilling*, several years have elapsed since the defendants' alleged crimes.  It has been almost four years since Kwame Kilpatrick resigned as mayor

of Detroit, almost three years after the end of the charged RICO conspiracy, and almost two years after the defendants were initially indicted on the federal charges, so that factor weighs against a finding of presumptive prejudice.

There just isn't anything in this case that, from which the Court can presume prejudice and would warrant a change of venue.  In fact, it's been clear through jury selection and through the history of this case that there are very, very different opinions about the defendants here in the metropolitan area.

(Change of Venue Hr'g Tr. at 21-23, Sept. 20, 2012.)

Here, in their motion for a new trial, Defendants renew their arguments asking the Court to presume prejudice from pretrial publicity.  A presumption of prejudice, however, "attends only the extreme case." *Skilling*, 103 S. Ct. at 2915.  Defendant bears an "extremely heavy" burden to show that pretrial publicity will deprive him of an impartial jury. *Coleman v. Kemp*, 778 F.2d 1487, 1537 (11th Cir. 1985).  Reflecting the high bar Defendants must hurdle, "[p]rejudice from pretrial publicity is rarely presumed." *Foley*, 488 F.3d at 387.

When considering whether to presume juror prejudice, the Court properly look beyond the sheer amount, tenor, and substance of pretrial publicity.  Rather, it considered a number of factors, including the following.

### a.  Large Size and Diversity of Jury Pool

Courts have considered the "size and characteristics of the community in which the crime occurred." *Skilling*, 130 S. Ct. at 2915.  In *Skilling*, a former Enron Chief Executive Officer was charged with offenses related to deceiving investors and others about Enron's performance before its collapse in bankruptcy.  Skilling's trial took place in Houston, where Enron is based and where 4.5 million individuals eligible for jury duty resided.  The *Skilling* Court concluded that "[g]iven this large, diverse pool of potential jurors, the suggestion that

14

12 impartial individuals could not be empaneled is hard to sustain." *Id.* The same is true here.

Other cases have similarly found that the size of the area from which the venire was drawn reduced the likelihood of prejudice. *See Mu'Min v. Virginia*, 500 U.S. 415, 429 (1991) (observing that the size of the metropolitan Washington, D.C. area, with a population of over 3 million, mitigated the potential for prejudice); *Gentile v. State Bar of Nev.*, 501 U.S. 1030, 1044 (1991) (plurality opinion) (finding the likelihood of prejudice diminished where the pool of eligible jurors was over 600,000 individuals).

According to the U.S. Census Bureau data, the population of Detroit and its surrounding suburbs is nearly 4.3 million individuals. *See* http://www.census.gov/2010census. Detroit is the eighteenth largest city in the nation. As in *Skilling*, the defense contention that an impartial jury cannot be found from such a large pool is untenable and was properly rejected.

### b.  Content of Media Reports

When determining whether prejudice should be presumed, the courts also consider whether news reports contained a "confession or other blatantly prejudicial information of the type readers or viewers could not reasonably be expected to shut from sight." *Skilling*, 130 S. Ct. at 2916. Consideration of this factor here also weighed against a change in venue.

The publicity in this case has been largely impartial reporting on the public court proceedings and motions. As in *United States v. Johnson,* much of the publicity in this case has been "primarily descriptive of the indictment . . . and related proceedings." 584 F.2d 148, 154 (6th Cir. 1978). Similar to *Skilling* then, it is thus distinguishable from *Rideau*

15

*v. Louisiana*, 373 U.S. 723 (1963), where the defendant's broadcast confession "was likely imprinted indelibly in the mind of anyone who watched it."  *Skilling*, 130 S. Ct. at 2916.

### c.  Time Lapse Between Precipitating Event and Trial

In weighing whether to apply a presumption of prejudice, the courts also consider the time of the pretrial publicity and whether "trial swiftly followed a widely reported crime." *Skilling*, 103 S. Ct. at 2916.  In *Skilling*, the Supreme Court observed that four years had elapsed between Enron's bankruptcy and Skilling's trial.  Although there was news coverage throughout this period, "the decibel level of media attention diminished somewhat in the years following Enron's collapse."  *Id.*  The same is true here.  At the time of trial, several years had elapsed since Defendants' alleged crimes.  Trial commenced almost four years since Kwame Kilpatrick had resigned as mayor of Detroit, almost three years after the end of the charged RICO conspiracy, and almost two years after Defendants were initially indicted on the federal charges, so this factor also weighed against a finding of presumptive prejudice.

### d.  Other Factors Weigh Against Finding of Presumptive Prejudice

Defendants' claims of prejudice from media coverage of Defendants' five-month trial and jury verdicts are also rejected.  Just as in *Skilling*, the jury in this criminal matter rendered certain verdicts of acquittal.  The Supreme Court found that fact in *Skilling* to be "of prime significance" when evaluating a claim of presumptive prejudice because "[i]t would be odd for an appellate court to presume prejudice in a case in which jurors' actions run counter to that presumption."  *Id.* (citing and quoting *United States v. Arzola-Amaya*, 867 F.2d 1504, 1514 (5th Cir. 1989) ("The jury's ability to discern a failure of proof of guilt of

16

some of the alleged crimes indicates a fair minded consideration of the issues and reinforces our belief and conclusion that the media coverage did not lead to the deprivation of [the] right to an impartial trial.").

Moreover, the jury was repeatedly instructed not to follow social media or read about or discuss this case with anyone until after deliberations were concluded. The jury was given this instruction during preliminary jury instructions and was repeatedly reminded of this instruction throughout trial, particularly before recessing each weekend or holiday. (Prelim. Jury Instr., Sept. 19, 2012, ECF No. 232.) It is well-settled law that "[a] jury is presumed to follow its instructions." *Blueford v. Arkansas*, ___ U.S. ___, 132 S. Ct. 2044, 2061 (2012). Despite the on-going, extensive media coverage of this trial, there was never any allegation or evidence that any member of the jury had impermissibly viewed any reader commentary published in connection with an article about this case or had engaged in any illicit conversation about the trial. Accordingly, Defendants cannot show that actual prejudice or presumptive prejudice existed, cannot show that they were denied a fair trial as a result of media attention, and thus their motion for a new trial on this ground is denied.

### 3. Receipt of a Partial Verdict Is Not Grounds For a New Trial

On Monday, March 11, 2013, following a lengthy jury trial and several weeks of deliberations, the jury announced its verdict. The jurors reached unanimous agreement on 40 of the 45 charges against Defendants Kwame Kilpatrick, Bobby Ferguson, and Bernard Kilpatrick. They could not reach unanimous agreement on five of the charges:

. Count 1 (RICO conspiracy)  as to Bernard Kilpatrick,

. Count 16 (Bribery) as to Bobby Ferguson, and

. Counts 7 and 8 (extortion) and Count 16 (Bribery) as to Kwame Kilpatrick.

17

Defendant Kwame Kilpatrick's Rule 33 motion, joined by Bobby Ferguson, argues that the receipt of this verdict without the Court first rendering an *Allen*[1] charge prejudiced Defendants' "due process right to a complete deliberation, uninterrupted, on all of the counts" until receipt of a "complete verdict." (Def. K. Kilpatrick's Mot. at 14.)  Defendants cite no authority to support their argument, and the Court can find none.  Given the length of the jury's deliberation, the apparent thoroughness of their review of all of the evidence on each Count as to each Defendant, the Court's earlier written response to the jury to "try to reach unanimous agreement on as many charges/defendants as possible," and the precision with which a verdict was reached, this Court rejects Defendants' argument that they were entitled to further deliberation.  The five charges on which the jury deadlocked, as well as the jury's verdicts of guilty or not guilty on the remaining 40 charges against the three Defendants, fail to show anything other than that they carefully and thoroughly considered each charge in each Count as to each Defendant.

The note from the jury on Friday, March 8, 2013, did not indicate that it had been unable to reach a decision.  Rather, it stated that "[w]e have reached a verdict."  On Monday, March 11, 2013, the Court stated that it had "received a note actually on Friday afternoon late from the jury saying that they had reached a verdict but they wished to go home over the weekend and sleep on it before announcing it, so they did that.  They've indicated to me this morning that they have reached a verdict, and we'll bring them in."

---

[1] *Allen v. United States*, 164 U.S. 492 (1896).  In *Allen*, the Supreme Court approved the use of a supplemental instruction designed to encourage the jury to reach a verdict by requesting each juror to reconsider his or her respective position during continued deliberations.  The Sixth Circuit has observed, along with other courts, that the *Allen* charge "approaches the limits beyond which a trial court should not venture in urging the jury to reach a verdict."  *United States v. Harris*, 391 F.2d 348, 354 (6th Cir. 1968).

(Trial Tr. Vol. 83 at 4, Mar. 11, 2013.)

The jury had previously been instructed by the Court about attempting to reach unanimous agreement and to let it know if it could not do so. On February 26, 2013, counsel for Defendants and the government were notified that the jury foreperson had sent a note to the Court asking, "If we do not unanimously agree to a verdict for a particular charge for a particular defendant, what is our course of action?" (Gov't Resp., Ex. A.) After conferring with counsel, the Court instructed the jury to "try and reach unanimous agreement on as many charges/defendants as possible. If you cannot reach unanimous agreement on all charges with respect to all defendants, just let me know." (Gov't Resp., Ex. B, Court's instruction to jury in response.) The jury did as instructed. It reached unanimous agreement on as many charges/defendants as possible, and on March 11, 2013, announced a partial verdict, revealing that, after much deliberation, it could not reach a unanimous verdict on some counts as to some Defendants.

Pursuant to Rule 31(b)(2) of the Federal Rules of Criminal Procedure, "[i]f the jury cannot agree on all counts as to any defendant, the jury may return a verdict on those counts on which it has agreed." The Sixth Circuit reviews the district court's decision to accept a partial verdict under an "abuse of discretion" standard and has observed that "[t]he trial judge treads a fine line in deciding whether to accept a partial verdict: [s]he must neither pressure the jury to reconsider what it had actually decided nor force the jury to turn a tentative decision into a final one." *United States v. Heriot*, 496 F.3d 601, 608 (6th Cir. 2007) (internal quotation marks and citation omitted) (affirming the district court's decision to accept a partial verdict despite defense counsel's request for an *Allen* charge). After more than five months of trial and three weeks of deliberations, and given the

19

overwhelming trial evidence supporting the jury's unanimous guilty verdicts, their thorough consideration of each charge against each Defendant as reflected in their various unanimous verdicts of guilty and not guilty on 40 of the 45 charges against these Defendants, the Court properly exercised its discretion and accepted the jury's partial verdict in this matter. It rejects Defendants' unpersuasive and speculative arguments that its decision to do so violated their due process rights.

### 4. Prosecutor's Rebuttal Remarks Did Not Violate Defendants' Right To A Fair Trial

Defendants argue that, during the government's 90-minute rebuttal portion of its closing argument, the prosecutor impermissibly appealed to the jury to act as a conscience for the community, that the prosecutor's "inflammatory and prejudicial" remarks deprived Defendants of their right to a fair trial, and the Court erred when it failed to declare a mistrial after Defendants objected. (Def. Ferguson's Mot. at 35-38.) This Court disagrees. The prosecutor's rebuttal remarks were proper and certainly not flagrant, and Defendants' motion for a new trial on this ground is denied.

The Supreme Court has long recognized "that the adversary system permits the prosecutor to prosecute with earnestness and vigor" and has cautioned that although the prosecutor "may strike hard blows, he is not at liberty to strike foul ones." *United States v. Young*, 470 U.S. 1, 7 (1985) (internal quotation marks and citations omitted). The same applies to defense counsel. As the *Young* Court observed "counsel on both sides of the table share a duty to confine arguments to the jury within proper bounds. Just as the conduct of prosecutors is circumscribed, the interests of society in the preservation of courtroom control by the judges are no more to be frustrated through unchecked

improprieties by defenders.  Defense counsel, like the prosecutor, must refrain from interjecting personal beliefs into the presentation of his case." *Id.* at 8 (internal quotation marks and citations omitted).

In deciding whether a prosecutor's remarks rise to "prosecutorial misconduct" requiring a new trial, the Supreme Court has acknowledged that "it is not enough that the prosecutors' remarks were undesirable or even universally condemned." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (internal quotation marks and citation omitted). Rather, "[t]he relevant question is whether the prosecutors' comments so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Id.* (internal quotation marks and citation omitted).

Applying these legal principles, the Sixth Circuit has adopted a two-part test for evaluating motions based upon prosecutorial misconduct. *United States v. Wettstain*, 618 F.3d 577, 589 (6th Cir. 2010).  A mistrial or new trial will be granted only after determining whether the prosecutor's remarks are improper and flagrant.  "Improper remarks that are flagrant amount to *per se* reversible error; improper remarks that are not flagrant may amount to reversible error in certain circumstances."  *Id.* (internal quotation marks and citation omitted).  "To determine the flagrancy of the prosecutor's remarks," the following factors are considered:  "(1) whether the statements tended to mislead the jury and prejudice the defendant; (2) whether the statements were isolated or pervasive; (3) whether the statements were deliberately placed before the jury; and (4) whether the evidence against the accused is otherwise strong."  *Id.* (internal quotation marks and citation omitted).  That portion of the prosecutor's rebuttal argument Defendants challenge is neither improper nor flagrant.

21

The challenged language (in bold), along with that portion of the rebuttal immediately before the contested language, is as follows:

   Now, you've been together for five months now and you all come from different backgrounds, but you share a common goal, to see justice done and to achieve a verdict.   You were selected together and you represent the community.  You've sat together, you've listened to the evidence, you've taken notes and you've been very patient.  It's now your time to work together toward a verdict.

   In your deliberations, keep an open mind, listen thoughtfully to what each other has to say, be willing to be persuaded.  If you work together in good faith, you can reach a decision that is wiser than any single person in this room.  **You together represent the community and you together can do what's right.**

   **Throughout this trial it has become completely clear that Mayor Kilpatrick and his accomplices, his partners, used the public that he was elected to serve.  Mr. Kilpatrick was elected by the citizens of Detroit to represent their interests, not the defendants', to look out for their welfare, not his own wallet.  He was not elected so that he could quietly stuff a half a million dollars into his bank accounts, so that he could make sure that Bobby Ferguson got $83 million in city revenues, so that he could make sure that his father was a middleman in deals with the city.  He was entrusted to act for the people of Detroit.**

   Now, this isn't the first case of corruption in this country, and it's not going to be the last.  Mr. Evelyn, during his closing, read from the Profiles of Courage, a wonderful book by then Senator John F. Kennedy, who back in 1973, President Kennedy's sister, Eunice Kennedy Shriver, spoke eloquently about the corrosive effects of corruption in a commencement address that she gave at a women's college outside Boston.  Ms. Shriver had her own moral standing to speak on these issue because of her commitment to public service, exemplified by her founding of the Special Olympics.

   Unlike Mr. Ferguson and his Detroit Three Dimensional and Mr. Kilpatrick and his Kilpatrick Civic Fund, Ms. Shriver had a genuine, lifelong commitment to the most vulnerable members of our society.  She was horrified by an unfolding corruption scandal in our nation's capital, and here's what she told the college students that day, words that have a special meaning even now, and even in this courtroom.

   She said, "These are most bitter days and yet as our leaders stand revealed, we see not evil men but shallow and pathetic men.  The final charge against

22

these men, I think, will not be their shabby deals, their frantic coverups, no, it will simply be that having been given the extraordinary power and opportunity to make life better in this nation and the world, they scarcely tried.  Their message was grab what you can and run.  Let us see if we can make something grow in the desert they left behind."

I'm sorry to say that the bitter days that Ms. Shriver lamented those 40 years ago visited this city during the administration of Kwame Kilpatrick, and the scale of corruption was breathtaking.

**Corruption depends on indifference.  We cannot turn away and ignore the corruption that occurred in this city.  It is time for the former mayor and his accomplices to be held accountable for their crimes.  It is past time. What you are here to do is assess the responsibility for the shameful events that transpired in this city.  That is something that you can do. We've given you the tools to do it, the evidence, the law, the lawyers and the judges, and the judge in this case took great care to select you as jurors.  You are specially qualified to render a decision in this case, and make no decision – and make no mistake, this case is a case that can be decided, that should be decided.  All of us in this room know beyond a reasonable doubt that you are just the people to do it.**

With that, we wish you the best in your deliberations, and we hand this case to you.

Thank you.

(Trial Tr. Vol. 81 at 49-51, Feb. 15, 2013 (emphasis added).)   Immediately after the prosecutor finished with his rebuttal argument, defense counsel objected arguing that the prosecutor's comments were an improper "call to community action," to "clean up the city," to "convict [Defendants] as a public duty," rather than "a request for the jury to deliberate based on the evidence in this case."  (*Id.* at 52.)

A prosecutor's reference to the jury as representatives of or conscience of the community are generally not objectionable unless those comments are designed to inflame and appeal to the jury's prejudices or to urge them to use the verdict to cure some broader societal problem rather than carry out the traditional role of the jury to listen to the

23

evidence, apply the law as instructed by the Court, listen to each other, and reach a verdict on the charges in the case before them.  The prosecutor's rebuttal argument was not objectionable.  Rather, it acknowledged the jury's traditional role.  It referenced evidence presented at trial and focused on Defendants' culpability, i.e., Kwame Kilpatrick's "stuff[ing] a half a million dollars into his bank accounts,"  "mak[ing] sure that Bobby Ferguson got $83 million in city revenues," and "mak[ing] sure that his father was a middleman for deals with the city."  (*Id.* at 49-50.)  The prosecutor contrasted Kwame Kilpatrick's culpable conduct with that expected of an elected official, i.e., "serv[ing]," "represent[ing]," and "act[ing] for the people of Detroit" rather than for his or his accomplices' own personal gain.  (*Id.*)  These rebuttal comments permissibly responded to defense closing suggesting that Defendant Kwame Kilpatrick was unfairly singled out for prosecution.

Moreover, the prosecutor properly urged the jury to hold Defendants "accountable for *their* crimes," not to cure some broader social evil.  (*Id.* at 51.)  He reminded the jurors that it was their job to "assess responsibility" for events in the city that gave rise to the charges against Defendants, reminding them that, "What you are here to do is assess the responsibility for the shameful events that transpired in this city.  That is something that you can do.  We've given you the tools to do it, the evidence, the law. . . ."  (*Id.*)

As the Sixth Circuit has observed, a prosecutor's "community conscience" comments are permissible if "not calculated to incite the passions and prejudices of the jurors" and not "directed to the jurors' desire to end a social problem" like a current, national drug epidemic. *Hicks v. Collins*, 384 F.3d 204, 219 (6th Cir. 2004) (holding that the prosecutor's comments to the jury that "it's time you sent a message to the community" and "the people in the community have a right to expect that you will do your duty" did not rise to the level

24

of a due process violation because they "were arguably proper general references to the societal need to punish guilty people."). *See also, United States v. Wiedyk*, 71 F.3d 602, 610 (6th Cir. 1995) (holding that the prosecutor's "send a message" remarks in his closing "did not rise to the level of denying the defendant of a fair trial" because it did not involve "[a]n appeal to the community interest in ending a societal evil and thus, the danger that such an appeal would arouse the jury's passion and prejudice, if it existed at all, did not exist to the same degree in this case [as in *United States v. Solivan*, 937 F.2d 1146 (6th Cir. 1991)].").

As discussed above, the prosecutor's rebuttal remarks were not improper.  Even if they were, however, after consideration of the relevant factors, this Court concludes that they could not be classified as "flagrant."   As explained above, the challenged rebuttal remarks did not mislead the jury as to their task or unfairly prejudice Defendants by improperly stoking the passions and prejudices of the jurors.  The rebuttal remarks that Defendants challenge were isolated, plucked from almost four hours of the government's opening statement, closing argument, and rebuttal argument.  And, the evidence introduced during Defendants' five-month trial was more than sufficient to convict.  *See Wettstain*, 618 F.3d at 589-90 (examining factors and concluding the prosecutor's statements -- calling the defendants "monsters" and describing them as the center of the community "epidemic" drug problem – were not flagrant).

Moreover, as the Sixth Circuit observed in *United States v. Roberts*, 986 F.2d 1026, 1031 (6th Cir. 1993), "the prejudicial effect of improper comments may be negated by curative instructions to the jury."  So, even if the prosecutor's challenged rebuttal remarks here were found to be improper, any possible prejudice from those remarks was dispelled

25

by the Court's instruction to the jury that the lawyers' arguments are "not evidence" and that they "must make [their] decision based only on the evidence that [they] saw and heard here in Court." (Trial Tr. Vol. 78 at 9-10, Feb. 11, 2013.)

The jurors' behavior likewise reinforces the conclusion that the prosecutor's challenged rebuttal remarks were neither improper nor flagrant; rather, they properly urged the jury to render a verdict based on the evidence . The jury deliberated for three weeks following the closing arguments. The notes they sent to the Court revealed how meticulous they were – methodically requesting nearly every piece of evidence submitted by the government and Defendants over the course of the five month trial. The jury's guilty and not guilty verdicts on the multiple charges involved in this criminal matter also reflects their careful and considered judgment as to each charge against each Defendant. Their conduct reveals careful reflection, not unbridled passion.

For all these reasons, Defendants' motion for a new trial on this ground is denied.

### 5. Defendant Kwame Kilpatrick's Sixth Amendment Right to Conflict-Free  Representation Was Not Violated

This argument concerns only Defendant Kwame Kilpatrick. He argues that he was denied his Sixth Amendment right to have a conflict-free counsel when the Court denied his request, on the eve of trial, that his appointed counsel, Jim Thomas and Michael Naughton, be disqualified and that new counsel be appointed because (1) Thomas previously represented Gasper Fiore, who was the "Towing Contractor" described in paragraphs 306-312 of Count 1 and in Count 12 of the Fourth Superseding Indictment, and (2) as of April 1, 2012, Thomas and Naughton began an "of counsel" relationship with O'Reilly Rancilio P.C., the law firm that represents the plaintiff in a civil lawsuit in which

26

Kwame Kilpatrick was a defendant (until his dismissal in October 2012) and that alleged a civil RICO claim with some of the same conduct alleged in charges brought against Kilpatrick in his criminal indictment. *See United States v. Kilpatrick*, No. 10-20403, 2012 WL 3465805 (E.D. Mich. Aug. 15, 2012). After a thorough review of the briefs on the conflict issue, Mr. Kilpatrick's affidavit, and a thorough inquiry into the matter at hearings held on August 7 and August 14, 2012, the Court denied Kwame Kilpatrick's request to disqualify his counsel. It determined that (1) "any actual or potential conflict of interest arising out of defense counsel Jim Thomas's successive representation of Mr. Fiore and Mr. Kilpatrick [was] eliminated by the government's commitment to dismiss all allegations related to Gasper Fiore . . . and their representation that they will not call him as a witness in their case; and (2) under the facts presented, the protections taken by counsel for Kwame Kilpatrick and the O'Reilly firm adequately protected him against any actual or potential conflict of interest and did not disqualify Thomas or Naughton as Defendant Kilpatrick's appointed counsel in this criminal matter. *Id.* at *1, 3, 4. As further protection against any potential conflict, however, the Court stated that it would appoint a fourth attorney "to cross-examine all government witnesses connected to the Macomb Interceptor Drainage District litigation." *Id.* at *4. It observed that, because the government did not plan to call any of those witnesses for a few months, "a new attorney will have plenty of time to learn the case, coordinate strategy . . . and adequately prepare for cross-examination." *Id.*

The Court did as it promised. On August 16, 2012, the Court entered an Order appointing attorney Harold Gurewitz for this purpose. (ECF No. 200.) On October 31, 2012, Judge Cleland entered an Order dismissing all claims against Kwame Kilpatrick in

the Macomb Interceptor Drain Drainage District litigation.  (*Macomb Interceptor Drain Drainage District v. Kwame Kilpatrick, et al.*, Case No. 11-13101, ECF No. 237, Oct. 31, 2012.)  Thus, at the time the cross-examination of the government's witnesses connected to the Macomb Interceptor Drain Drainage District litigation – Anthony Soave and Kathleen McCann – took place in December 2012, all claims brought against Kwame Kilpatrick in the Macomb Interceptor Drain Drainage District civil litigation had been dismissed.  (Trial Tr. Vol. 44, Dec. 5, 2012; Trial Tr. Vol. 45, Dec. 6, 2012; Trial Tr. Vol. 46, Dec. 7, 2012; Trial Tr. Vol. 47, Dec. 10, 2012.)

Defendant Kwame Kilpatrick's new trial arguments appear in his motion for a new trial (ECF No. 317) and two supplemental briefs (ECF Nos. 417, 450).  For the reasons discussed more fully below, Defendant's Sixth Amendment arguments for a new trial are rejected.

Kilpatrick's motion for a new trial re-litigates the conflict and dissatisfaction issues addressed in the Court's August 15, 2012 Order and argues that the Court's denial of his request to remove Thomas and Naughton as appointed counsel violated his Sixth Amendment rights because (1) his earlier waiver as to Fiore was not knowing and voluntary (Mot. at 18-19), and (2) the conflict created by Thomas's and Naughton's "of counsel" affiliation with the O'Reilly Rancilio firm was not previously disclosed to him[2] (Mot. at 17).

_____

[2]This assertion in Kwame Kilpatrick's pro se motion is refuted by the fact that he acknowledged receipt of an April 18, 2012 Order by Judge Cleland in the *Macomb Interceptor Drain Drainage District v. Kwame Kilpatrick, et al.*, civil case. (Case No. 11-13101, proof of service, ECF No. 201, Apr. 25, 2012.)  Judge Cleland's April 18, 2012 Order grants attorneys James Thomas's and Michael Naughton's motion to withdraw as counsel for Defendant Kwame Kilpatrick and expressly states that "[e]ffective April 1, 2012, both Mr. Thomas and Mr. Naughton are joining the law firm of O'Reilly Rancilio, P.C., one of the firms retained by Plaintiff Macomb Interceptor Drain Drainage District in this matter,"

He further argues, as he did earlier, that these non-disclosures led to a total breakdown in the attorney/client relationship (Mot. at 17).

Kilpatrick's first supplemental brief (ECF No. 417) argues that, because the Court failed to make an adequate inquiry about the potential conflict of interest created by Mr. Thomas's prior representation of Mr. Fiore, his Sixth Amendment right to conflict-free counsel was violated.  (Def. K. Kilpatrick's 1st Suppl. Br. at 5, 11-13.)  In support, Kilpatrick relies on decisions addressing circumstances where appointed counsel represents more than one defendant in the same criminal trial, *see Holloway v. Arkansas*, 435 U.S. 475 (1978), *McFarland v. Yukins*, 356 F.3d 688, 706 (6th Cir. 2004), *Harris v. Carter*, 337 F.3d 758, 761 (6th Cir. 2003), a vastly different circumstance than that presented here.

Kilpatrick's second supplemental brief (ECF No. 450) focuses on the conflict that arose from Mr. Thomas's and Mr. Naughton's "of counsel" association with the O'Reilly firm beginning on April 1, 2012.  Kilpatrick argues that rules of ethics required that Mr. Thomas and Mr. Naughton be disqualified from continued representation of Kwame Kilpatrick in this criminal matter; and, because the Court failed to do so, his Sixth Amendment right to conflict-free counsel at trial was violated, thus entitling him to a new trial.  Specifically, Kilpatrick argues that, because Thomas's and Naughton's "of counsel" association with the O'Reilly firm created a conflict requiring their mandatory withdrawal as appointed counsel for Kwame Kilpatrick in this criminal matter, pursuant to Michigan Rule of Professional

---

and that "[t]he court agrees with counsel's conclusion that, pursuant to Michigan Rule of Professional Conduct 1.16(a)(1), their move to O'Reilly Rancilio creates a conflict of interest justifying their mandatory withdrawal as counsel without further delay."  (Case No. 11-13101, order at 1-2, ECF No. 199, Mar. 28, 2012.)  Judge Cleland further ordered that Mr. Thomas and Mr. Naughton serve the order granting their motion on Defendant Kwame Kilpatrick (*id.* at 2), and as the proof of service reflects, they did so.

Conduct 1.16(a)(1), this Court should have granted Kwame Kilpatrick's August 2012 request to have new counsel appointed in their place and its failure to do so requires that he be granted a new trial.  In support, Kilpatrick relies on a California Supreme Court decision concluding that a law firm should have been disqualified from representing clients on the opposite side of the <u>same litigation</u> of parties represented by an attorney who had an "of counsel" relationship with that law firm, *see People v. Speedee Oil Change Systems, Inc.*, 980 P.2d 371 (1999), a vastly different circumstance than the facts presented here.

Kilpatrick further argues that this Court's conclusion in its August 15, 2012 Order that Thomas's and Naughton's "of counsel" relationship with the O'Reilly firm did not disqualify them as Kilpatrick's appointed counsel in this criminal matter was erroneous because it failed to consider the requirement in Michigan Rule of Professional Responsibility 1.7(a) that the client consent, after consultation, to the "adverse relationship" created by that "of counsel" relationship.

Putting aside for the moment considerations whether Michigan Rule of Professional Conduct 1.16(c) renders the first argument moot[3] and whether Kwame Kilpatrick impliedly waived his objection and consented to Thomas's and Naughton's adverse relationship by failing to express any objection after it was disclosed to him in April 2012 by Mr. Naughton's service of Judge Cleland's Order granting Thomas's and Naughton's motion to withdraw

---

[3]Michigan Rule of Professional Conduct 1.16(a) has an express exception – that stated in Rule 1.16(c).  Rule 1.16(c) provides that "[w]hen ordered to do so by a tribunal, a lawyer <u>shall continue representation</u> notwithstanding good cause for terminating the relationship."  MRCP 1.16(c) (emphasis added).

in the Macomb Interceptor Drain Drainage District litigation,[4] this Court considers Kilpatrick's more substantive new trial argument – whether he was denied his Sixth Amendment right to be represented at trial by conflict-free counsel.  As discussed below, the Court concludes that he was not and is not entitled to a new trial.

The Sixth Amendment right to have a conflict-free counsel requires a different analysis than an inquiry whether counsel has violated a rule of professional responsibility.  *See Nix v. Whiteside*, 475 U.S. 157, 165 (1986) (observing that "breach of an ethical standard does not necessarily make out a denial of the Sixth Amendment guarantee of assistance of counsel").  A criminal defendant can only demonstrate a Sixth Amendment violation resulting from a conflict of interest if he establishes both that his counsel "actively represented conflicting interests," and "an actual conflict adversely affected his lawyer's performance."  *Burger v. Kemp*, 483 U.S. 776, 783 (1987) (internal quotation marks and citations omitted).  *Accord, Mickens v. Taylor*, 535 U.S. 162, 170-71, 172 n.5 (2002) (rejecting the habeas petitioner's argument that "where the trial judge neglects a duty to inquire into a potential conflict, the defendant, to obtain reversal of the judgment, need only show that his lawyer was subject to a conflict of interest, and need not show that the conflict adversely affected counsel's performance," because "[a]n 'actual conflict' for Sixth Amendment purposes, is a conflict of interest that adversely affects counsel's performance.").

In *Burger v. Kemp*, the Supreme Court considered a habeas petitioner's claim that his

---

[4] *See City of Kalamazoo v. Michigan Disposal Serv. Corp.*, 125 F. Supp. 2d 219, 243 (W.D. Mich. 2000) (observing that "[a] client may expressly or impliedly waive his objection and consent to the adverse representation.")

appointed counsel's representation was constitutionally defective due to a conflict of interest. *Id.* at 782. Defense counsel had been appointed to represent Burger and his partner had been appointed to represent the defendant's co-indictee in a later, separate trial and Burger's defense counsel had provided some assistance in his partner's later representation. *Id.* at 780-781. Moreover, "each of the two defendants sought to emphasize the culpability of the other in order to avoid the death penalty." *Id.* at 781. The *Burger* Court began its analysis by acknowledging that these circumstances create "a possible conflict that could prejudice either or both clients," but noted that the Court would "presume prejudice only if the defendant demonstrates that counsel actively represented conflicting interests and that an actual conflict of interest adversely affected his lawyer's performance." *Id.* at 783 (internal quotation marks and citations omitted). It explained that:

> There is certainly much substance to petitioner's argument that the appointment of two partners to represent coindictees in their respective trials creates a possible conflict of interest that could prejudice either or both clients. Moreover, the risk of prejudice is increased when the two lawyers cooperate with one another in the planning and conduct of trial strategy, as [petitioner's counsel] and his partner did. Assuming without deciding that two law partners are considered as one attorney, it is settled that "[r]equiring or permitting a single attorney to represent codefendants, often referred to as joint representation, is not *per se* violative of constitutional guarantees of effective assistance of counsel." *Holloway v. Arkansas*, 435 U.S. 475, 482 (1978). We have never held that the possibility of prejudice that "inheres in almost every instance of multiple representation" justifies the adoption of an inflexible rule that would presume prejudice in all such cases. See *Cuyler v. Sullivan*, 446 U.S. 335, 348 (1980). Instead, we presume prejudice "only if the defendant demonstrates that counsel 'actively represented conflicting interests' and that 'an actual conflict of interest adversely affected his lawyer's performance.'" *Strickland* [*v. Washington*,] 466 U.S. [688], 692 [(1984)] (citation omitted). See also *Cuyler*, 466 U.S. at 348.

*Id.* at 783.

Despite the potential for a conflict of interest, the *Burger* Court found no Sixth Amendment violation, agreeing with the district court "that the overlap of counsel, if any,

did not so infect [the habeas petitioner]'s representation as to constitute an active representation of competing interests." *Id.* at 783. It rejected the petitioner's arguments that he had established that there was "an actual, deleterious conflict of interest between" his counsel's representation of him "and his partner's representation" of his co-indictee in a later, separate trial. *Id.* at 788. It acknowledged that "[t]here was undoubtedly a conflict of interest between Burger and [his co-indictee] because of the nature of their defenses" but concluded nonetheless that there was no Sixth Amendment violation by petitioner's appointed counsel. *Id.* at 787.

### a. Thomas's and Naughton's "Of Counsel" Relationship With the O'Reilly Firm

There are numerous reasons why Thomas's and Naughton's "of counsel" relationship with the O'Reilly firm likewise did not violate Kwame Kilpatrick's Sixth Amendment right to conflict-free representation.

### (1) The Attenuated Nature of Thomas's and Naughton's "Of Counsel" Relationship, The Precautions Taken, and The Court's Appointment of Independent Counsel Ensured That Thomas and Naughton Did Not Actively Represent Conflicting Interests

As revealed in the Court's August 15, 2012 Order and transcript of the August 14, 2012 hearing, it thoroughly examined Thomas's and Naughton's "of counsel" affiliation with the O'Reilly firm that began on April 1, 2012, and examined the precautions taken both before and after they joined the O'Reilly firm that ensured they would not be actively representing conflicting interests. *See Kilpatrick*, 2012 WL 3465805 at *2-3. At the August 14, 2012 hearing, Mr. Thomas assured the Court that, "I am confidant that there has not been a breach of the confidential relationship" between attorney and client. (Conflict of

Interest Hr'g Tr. at 13-14, Aug. 14, 2012.)  In addition to the other precautions taken, Thomas assured the Court that he and Naughton had no financial interest in the Macomb Interceptor Drain Drainage District litigation and no financial interest in the O'Reilly firm other than their "of counsel" relationship thus eliminating any possible conflict that could arise from shared fees.  (*Id.* at 13; Def. K. Kilpatrick's Conflict Br. at 5, ECF No. 203, Aug. 13, 2012.)  The O'Reilly firm similarly confirmed to Judge Cleland in the Macomb Interceptor case that:

> Prior to the affiliation of Messrs Thomas and Naughton with O'Reilly Rancilio P.C., a screen was established segregating Kilpatrick files from O'Reilly Rancillio P.C., and another screen segregating Macomb Interceptor Drain files from Messrs Thomas and Naughton.  Macomb Interceptor Drain matters have not been discussed with Messrs Thomas and Naughton; Kilpatrick matters have not been discussed with O'Reilly Rancilio P.C.  The Macomb Drain files are kept in a separate and secured area at the O'Reilly Rancilio P.C. offices.  Messrs Thomas and Naughton do not have physical nor computer access to those files.  Kilpatrick files are kept in the Detroit office of Thomas & Naughton P.C.; O'Reilly Rancilio P.C. does not have physical nor computer access to those files.  O'Reilly Rancilio P.C. and Thomas & Naughton P.C. do not share their computers with each other.  Messrs Thomas and Naughton do not have a financial interest in O'Reilly Rancilio P.C., however, they may share revenue on individual files on which they work together.

(*Macomb Interceptor Drain Drainage District v. Kwame Kilpatrick, et al.,* Case No. 11-13101, ECF No. 235, Aug. 20, 2012.)

The Court also ensured that Thomas and Naughton did not actively represent conflicting interests by immediately appointing independent counsel, Harold Gurewitz, a well-respected and experienced criminal defense attorney to consult with Kilpatrick and to cross-examine the witnesses connected to the Macomb Interceptor case, i.e., Anthony Soave and Kathleen McCann.  Moreover, by December 2012, when defense counsel did cross-examine those witnesses, Judge Cleland had already dismissed all claims brought

34

against Kwame Kilpatrick in the Macomb Interceptor case.  (*Macomb Interceptor Drain Drainage District v. Kwame Kilpatrick, et al.,* Case No. 11-13101, ECF No. 251, Oct. 31, 2012.)

Independent counsel extensively cross-examined Anthony Soave, the most important witness against Kilpatrick on the Inland and Macomb Interceptor-related extortion charges. (Trial Tr. Vol. 45 at 91-146, Dec. 6, 2012; Trial Tr. Vol. 46 at 4-26, Dec. 7, 2012.)  It appears, however, that independent counsel, as well as other defense counsel, made a strategic decision not to request that Ms. McCann be recalled for additional cross-examination after her initial extensive cross-examination by Bobby Ferguson's counsel. (Trial Tr. Vol. 46 at 115, 119, 127, 131-132, Dec. 7, 2012; Trial Tr. Vol. 47 at 8-18, 24-29, 36-45, Dec. 10, 2012.)  Perhaps this was because, unlike Soave, McCann did not interact much with Kwame Kilpatrick.  (Trial Tr. Vol. 46 at 87, Dec. 7, 2012.)  Rather, she primarily dealt with Bobby Ferguson and others when negotiating the contracts involving Inland that were the topic of extortion charges.  (*Id.* at 83-86, 88-100.)  Independent counsel was present for the entire cross-examination of Ms. McCann.  (Trial Tr. Vol. 46 at 2, Dec. 6, 2012; Trial Tr. Vol. 47 at 2, Dec. 10, 2012.)  Under the terms of his appointment by the Court, it was his responsibility to decide whether he wanted to recall Ms. McCann for further cross-examination.  He chose not to do so, not initially or at any time during the trial, apparently making the strategic legal decision that Kilpatrick's interests did not require it. That strategic choice does not give rise to a claim that Kilpatrick was denied his Sixth Amendment right to conflict free representation, the argument raised in Kilpatrick's motion for a new trial.

The decisions that Kilpatrick relies upon to support his argument are easily

distinguished.  As noted above, in *People v. SpeeDee Oil Change Systems, Inc.*, 980 P.2d 371 (Cal. 1999), the California Supreme Court concluded that a law firm should have been disqualified from representing clients on the opposite side of the <u>same litigation</u> of parties represented by an attorney who had an "of counsel" relationship with the firm.  And, *Holloway, McFarland,* and *Harris*, address circumstances where appointed counsel represented more than one defendant <u>in the same criminal trial</u>, commonly referred to as joint, multiple, or simultaneous representation (*see United States v. Moss*, 323 F.3d 445, 456 n.15 (6th Cir. 2003)).

### (2) Kilpatrick Has Not and Cannot Show That Thomas's or Naughton's "Of Counsel" Relationship With The O'Reilly Firm Adversely Affected Their Performance

In addition to failing to show that Thomas and Naughton actively represented conflicting interests, Kilpatrick has not and cannot show that their "of counsel" relationship with the O'Reilly firm adversely affected their performance in this criminal matter.  As the Sixth Circuit recently observed in *Moore v. Mitchell*, 708 F.3d 760 (6th Cir. 2013), "the defendant must show that his attorney performed deficiently by demonstrating that the attorney actively represented conflicting interests."  *Id.* at 777.  It explained that "[a]n actual conflict of interest is one that adversely affects counsel's performance."  *Id.* (citing *Mickens*, 535 U.S. 171 n.5).  And, provided an example:  "[I]f counsel fails to pursue an obvious defense that would have inculpated counsel's other client and there is no benefit from foregoing the defense or other explanation, the defendant has presented evidence of his counsel's conflict of interest."  *Id.* (citing *McFarland*, 356 F.3d at 707).  Prejudice to a defendant's defense is presumed only "[i]f the defendant shows an actual conflict of interest."  *Id.*  As the *Moore* court emphasized, the federal courts "do not find per se

36

conflicts.  We look for actual conflicts:

> "To find an actual conflict, we require petitioner to point to specific instances in the record to suggest an actual conflict or impairment of [his] interests and demonstrate that the attorney made a choice between possible alternative courses of action, such as eliciting (or failing to elicit) evidence helpful to one client but harmful to the other."

*Id.* (quoting *McElrath v. Simpson*, 595 F.3d 624, 631 (6th Cir. 2010) (internal quotation marks omitted).

Defendant Kwame Kilpatrick has not and cannot point to specific instances in the record to suggest an actual conflict or impairment of his interests by Thomas or Naughton. At most, Kilpatrick merely states the fact that witness Kathleen McCann was never recalled for additional cross-examination after her cross-examination by one of Ferguson's counsel, Ms. VanDusen.  Kilpatrick insinuates, without actually saying or explaining why, Thomas and Naughton should shoulder responsibility for the "decision . . . not to recall Ms. McCann for additional examination."  (Def. K. Kilpatrick's 2d Suppl. Br. at 13, ECF No. 450, July 9, 2013.)  This implied argument is rejected.  It was independent counsel, not Thomas or Naughton, who was appointed specifically for the purpose of handling the defense of the extortion charges related to the Macomb Interceptor civil case, including the cross-examination of witnesses like Anthony Soave and Kathleen McCann.  Independent counsel, not Thomas or Naughton, was in charge of the strategic decision whether to recall McCann for further cross-examination.  This is evidenced by attorney Thomas's reaction of surprise when Ferguson's counsel's informed the Court at side-bar that Ms. McCann would not be recalled for further questioning, explaining that it was a "technical" matter. (Trial Tr. Vol. 61 at 142, Jan. 11, 2013.)  As discussed above, nothing prevented independent counsel from recalling Ms. McCann, and he made the strategic decision not

to do so.  Defendant Kilpatrick provides no explanation and points to no evidence in the record showing that Thomas's and Naughton's "of counsel" relationship with the O'Reilly firm played any role whatsoever in independent counsel's or Ferguson's or Bernard Kilpatrick's counsel's decisions not to recall Ms. McCann for further questioning.  In fact, Defendant Kwame Kilpatrick fails to point to any specific instance in the record to support his claim of an "actual conflict" that would give rise to a Sixth Amendment violation.

Despite Kwame Kilpatrick's arguments to the contrary, this Court's decision not to appoint new trial counsel for him and to instead appoint independent counsel to handle that portion of the trial related to the Macomb Interceptor civil case was appropriate.  The facts presented here are vastly different from those found in decisions where the federal courts have presumed prejudice to the defendant arising out of a conflict of interest and found a Sixth Amendment violation of the right to conflict free representation.  Unlike *Holloway*, *McFarland,* and *Harris*, there was no joint representation of multiple defendants by the same attorney at trial.  Unlike *Moss*, this is not a situation where either Thomas or Naughton represented a co-defendant of Kwame Kilpatrick's during the pre-indictment phase of the same criminal proceeding where they also represented Kilpatrick and "the attorney's former and current clients collaborate[d] to mount a defense."  *See Moss*, 323 F.3d at 462.

Kwame Kilpatrick has not and cannot show an actual conflict of interest arising from Thomas's and Naughton's "of counsel" relationship with the O'Reilly firm adversely affected their defense of him at trial.  Because prejudice to Kilpatrick cannot be presumed, he must show prejudice by demonstrating that any conflicted-related errors in his trial "were so serious as to deprive [him] of a fair trial, a trial whose result is reliable."  *See Strickland*, 466

38

U.S. at 687; *see also Mickens*, 535 U.S. at 174-76. This is a burden that Kilpatrick has not and cannot satisfy. As discussed in the Court's Rule 29 opinion, the evidence against Kilpatrick on the Inland extortion counts was overwhelming. Moreover, Ferguson's counsel cross-examined Ms. McCann extensively. In light of independent counsel's failure to recall Ms. McCann for further cross-examination, this Court can only draw the conclusion that he made the strategic decision not to do because Ferguson's counsel's cross-examination adequately covered the defense theories Kilpatrick would have used.

The Court now addresses Thomas's prior relationship with Gasper Fiore

### b. Thomas's Prior Representation of Gasper Fiore Is a Non-Issue Because the Government Dismissed the Fiore-Related Charges

As discussed in the Court's August 15, 2012 Order, the government's decision to dismiss the Fiore-related charges in the indictment eliminated any actual, or even potential conflict of interest that would give rise to a Sixth Amendment violation. *See Kilpatrick*, 2012 WL 3465805 at *1-2.) The trial in this matter confirms this. As the government promised, it dismissed the Fiore-related charges against Kwame Kilpatrick after the jury was sworn. (Order of dismissal, ECF No. 238.) There was no attempt by the government at trial to introduce any evidence that Kilpatrick had tried to extort Fiore. Thomas's prior representation of Fiore thus became a non-issue.

Although Kilpatrick continues to complain that the Fiore dismissal affected his trial strategy, he offers no explanation as to what that strategy was, how inculpatory evidence of him extorting Fiore could fit into his defense strategy, or how any Fiore-related evidence would be admissible. (Def. K. Kilpatrick's 1st Suppl. Br. at 8-11, ECF No. 417.) Kilpatrick's claim that the Fiore conflict so adversely affected his relationship with Thomas that he

required new appointed counsel was previously rejected by the Court in its August 15, 2012 Order, *see Kilpatrick*, 2012 WL 3465805 at *5-9, and is discussed below.

**c. This Court Correctly Concluded That Kilpatrick's Request For New Appointed Counsel on The Eve of Trial Was Unwarranted and an Improper Attempt to Delay Trial**

In its August 15, 2012 Order, the Court also denied Kwame Kilpatrick's request for new appointed counsel based on his dissatisfaction with Thomas and Naughton. It concluded that Kwame Kilpatrick's motion was untimely, that his professed explanation for the delay lacked credibility, that neither Kilpatrick nor Thomas had demonstrated that any dispute here was so great that it had resulted in a total lack of communication preventing an adequate defense, that Kilpatrick's inability to put the Fiore issue behind him in light of the government's agreement to dismiss all Fiore-related allegations suggested that he was manufacturing a wedge issue in an effort to delay trial, and the public's interest in the prompt and efficient administration of justice outweighed Kilpatrick's interest in substituting new appointed counsel on the eve of trial. *Kilpatrick*, 2012 WL 3465805 at *5-8.

Nothing in Kilpatrick's motion for a new trial or his supplemental briefs undermines the Court's earlier findings and decision not to appoint new counsel for Kwame Kilpatrick. Rather than the complete breakdown in communication that Kwame Kilpatrick claims was present during his trial, the Court witnessed Thomas and Kilpatrick conferring together numerous times in the courtroom about many of the witnesses who were testifying or about exhibits or other trial-related matters. The Court was aware that they entered and left the courtroom together each day of trial. During trial, they appeared to be cooperating and working together in presenting Kwame Kilpatrick's defense. Unlike other matters, e.g., his detention pending sentencing, Mr. Kilpatrick did not repeat his earlier request that Mr.

40

Thomas be replaced with new appointed counsel during his lengthy trial.  It was not until May 23, 2013, well after he was convicted, that he again raised the issue of having new counsel appointed because of a breakdown in the attorney/client relationship.  As this Court stated on the record, based on its observation, Mr. Thomas and Mr. Naughton represented Kilpatrick vigorously and "with great personal effort through a long, long trial, including the extensive voir dire that was undertaken, the cross examination of witnesses, the filing of many, many motions and exhibits, . . . the preparation of argument to the Court, and jury instructions. . . .  that you have had extremely effective assistance of counsel all the way through this matter.  (Status Conf. Hr'g Tr. at 7-8, 10, May 23, 2013.)

### D.  Defendants Are Not Entitled to a New Trial Based on Claims of Evidentiary Error

#### 1.  Lay Opinion Testimony by Case Agents Was Properly Admitted

In Defendant Bobby Ferguson's Rule 33 motion for a new trial, joined by Defendant Kwame Kilpatrick, Defendants argue that the Court erred when it overruled their objections at trial and permitted the government, under the guise of eliciting lay opinion testimony under Federal Rule of Evidence 701, to have government case agents Carol Paszkiewicz and Robert Beeckman (1) interpret, beyond their personal knowledge, Defendants' text messages and intercepted phone conversations, and (2) summarize other evidence in a manner that supported the government's theory of prosecution.[5]  (Def. B. Ferguson's Mot. at 7.)  The government responds that the admission of lay opinion testimony interpreting,

---

[5]Defendants Bobby Ferguson and Kwame Kilpatrick initially raised this argument in a pretrial motion filed by Defendant Bernard Kilpatrick (ECF No. 89) and joined by Defendants Ferguson (ECF No. 96) and Kwame Kilpatrick (ECF No. 111) that was denied by the Court without prejudice (ECF No. 178).

from context, certain words and phrases found in text messages and wiretap communications by government case agents was a proper exercise of the Court's discretion under Rule 701 because (1) their testimony was rationally based on their perceptions from their investigations, was helpful to the jury's determination of facts in issue, and was not based on specialized knowledge reserved for expert opinion testimony, and (2) they did not improperly testify as summary witnesses. This Court rejects Defendants' arguments for a new trial. The foundation for the government's case agents' lay opinion testimony was properly shown to be "rationally based on the agent's first-hand perception" of the text messages and "the intercepted phone calls about which [they] testified as well as [their] personal, extensive experience" with this particular public corruption investigation. *United States v. Rollins*, 544 F.3d 820, 831-32 (7th Cir. 2008).

As revealed pretrial and at trial, during the government's investigation of Defendants' criminal conduct it had gathered about 300,000 text messages, as well as hundreds of thousands of records from the City of Detroit, municipal contractors, accountants, and financial institutions. It argued that many of these text messages were highly relevant to the jury's understanding of the facts in this criminal case but were so cryptic they often could only be understood from the context of other messages, records, and events that took place at the same time. This Court agreed. Because the text messages and recorded conversations between Defendants were communicated in an informal short-hand with little or no explanatory detail, the Court agreed that the jury would not understand these communications without some context and background that helps explain, or provides a lay opinion, as to the meaning of the abbreviations, shorthand, or nicknames used in Defendants' communications to reference individuals, companies, or business transactions.

42

The foundation for those explanations or lay opinion was the agents' multi-year investigation and review of tens of thousands of text messages, thousands of wiretap recordings, and hundreds of records and pieces of information. It was not the agents' specialized knowledge gained from their law enforcement training, education, and experience in public corruption cases generally. Contrary to Defendants' arguments here, Agents Paszkiewicz and Beeckman did not offer sweeping conclusions or generalizations that intruded on the jury's responsibility to determine the key facts at issue and to determine whether the government had established, beyond a reasonable doubt, the elements of each charged offense. They did not offer legal conclusions that directly implicated the jury's fact-finding and decision-making functions. Rather, the case agents' lay opinion testimony was properly limited after the required foundation was established.

The Court's decision to allow the case agents' testimony as lay opinion testimony finds support in decisions from First, Fifth, Seventh, and Eleventh Circuit Courts of Appeal. The proposed lay opinion testimony is similar to that found admissible in *United States v. Albertelli*, 687 F.3d 439, 445-48 (1st Cir. 2012) (finding government agent's testimony admissible Rule 701 lay opinion testimony because he had "for years" investigated the large, illegal gambling operation that gave rise to the defendants' criminal charges, "had became familiar with the voices of the major participants, had interviewed witnesses related to the investigation, and had reviewed materials seized from the defendants" and observing "[t]hat his understanding of the oblique statements in the wiretaps might be 'helpful' to the jury is an understatement;" that "some of the defendants' wiretapped statements could be entirely unintelligible to the jury absent some context-based

43

interpretation."), *cert. denied*, 133 S. Ct. 566 (2013); *United States v. Jayyousi*, 657 F.3d 1085 (11th Cir. 2011), *cert. denied*, 133 S. Ct. 29 (2012) (discussed below); *United States v. Rollins*, 544 F.3d 820 (7th Cir. 2008) (discussed below); *United States v. El-Mezain*, 664 F.3d 467, 514 (5th Cir. 2011) (affirming admission of agents' lay opinion testimony because they "were extensively involved in the investigation . . . and their testimony was either descriptive or based on their participation in, and understanding of, the events in *this* case), *cert. denied*, 133 S. Ct. 525 (2012), and *United States v. Miranda*, 248 F.3d 434 (5th Cir. 2001) (observing that the agent's testimony was admissible under Rule 701 as lay opinion testimony because his "extensive participation in the investigation of this conspiracy, including surveillance [of] undercover purchases of drugs, debriefings of cooperating witnesses familiar with the drug negotiations of the defendants, and the monitoring and translating of intercepted telephone conversations, allowed him to for opinions concerning the meaning of certain code words used in this drug ring based on his personal perceptions.").

In *Rollins*, the Seventh Circuit affirmed the trial court's admission of an agent's testimony about "his 'impressions' of intercepted telephone conversations" as lay opinion testimony under Rule 701. *Rollins*, 544 F.3d at 830-32. The *Rollins* court determined that "the trial judge did not err in concluding that Agent McGarry's 'impressions' testimony was rationally based on his first-hand perceptions of the intercepted phone calls about which he testified as well as his personal, extensive experience with this particular drug investigation." *Id.* at 831-32. Specifically,

> [t]he agent listened to every intercepted conversation from February through July 2005 on the phones used by [the defendants]. Agent McGarry testified that he became "very familiar" with the voices he heard. Law enforcement surveillance

44

of the conspirators' activities assisted in giving meaning to various words used in the recorded conversations.  The officers' observations of the conspirators' activities often confirmed that their understanding of a recorded conversation was accurate.  Agent McGarry participated in the interviews of witnesses who were familiar with the defendants and the drug conspiracy and in obtaining proffers from members of the conspiracy.  These bases for Agent McGarry's testimony defeat [defendant] Rollins Sr.'s claim the government laid an insufficient foundation for this testimony.

*Id.* at 832.  The *Rollins* court also found "that the 'impressions' testimony assisted the jury in understanding Agent McGarry's testimony about the intercepted conversations – what the parties to the conversations said and what they meant."  *Id.*  It explained that "[t]his testimony also assisted the jury in determining several facts in issue, including whether the defendants knowingly and intentionally participated in the charged conspiracy and their roles and extent of their involvement in that conspiracy."  *Id.*

In *Rollins*, the Seventh Circuit expressly disagreed "with the Second Circuit's view of what is and what is not impermissible lay opinion testimony," as expressed in a decision that Defendant relies upon, *United States v. Grinage*, 390 F.3d 746 (2d Cir. 2004).  *Rollins*, 544 F.3d at 832.  Rather, its decision was guided by an earlier Seventh Circuit decision finding an agent's testimony proffered as lay opinion testimony impermissible because it was based on specialized knowledge and experience gained generally in the field of drug investigations and "not limited to what he observed in the search or to other facts derived exclusively from *this particular* investigation.  *Id.* (discussing and quoting *United States v. Oriedo*, 498 F.3d 593, 603 (7th Cir. 2007)).  As additional support, the *Rollins* court cited and quoted a Fifth Circuit decision, *United States v. Miranda*, 248 F.3d 434, 441 (5th Cir. 2001), that held an "agent's testimony about code words used in recorded calls [was] admissible because it was based on the agent's 'extensive participation in the investigation

45

of *this* conspiracy . . . [which] allowed him to form opinions concerning the meaning of certain code words used in *this* drug ring based on his personal perceptions." *Id.* at 833 (quoting *Miranda*, 248 F.3d at 441 and adding emphasis).

This Court, following the cautionary advice in *Rollins*, was careful not to allow the case agents' testimony to be "cloaked with an 'aura of expertise'" by allowing them to testify that "his [or her] testimony [is] based on his [or her] specialized knowledge," that the agent's testimony about the meaning of certain words used in communications be corroborated by the testimony of other witnesses or evidence, and that the agent not be allowed to "act[ ] as a summary witness" with respect to the intercepted telephone conversations or text messages. *Id.*

A recent decision from the Eleventh Circuit also supports this Court's admission of the case agents' testimony as lay opinion testimony under Rule 701. In *United States v. Jayyousi*, the court rejected the defendants' argument that similar testimony was not admissible under Rule 701. After acknowledging earlier decisions where it found admissible lay opinion testimony of other government witnesses who "rationally based" their opinions "on their perception of business records," the Eleventh Circuit determined that the agent's lay opinion testimony at issue in *Jayyousi* was similarly "rationally based on his perception" gleaned from his five year investigation where he "read thousands of wiretap summaries plus hundreds of verbatim transcripts, as well as faxes, publications, and speeches" and "listened to the intercepted calls in English and Arabic." *Id.* at 1102-03.

The *Jayyousi* court also rejected the defendants' argument that the agent's lay testimony was not helpful to the jury. It explained:

Agent Kavanaugh's knowledge of the investigation enabled him to draw

46

> inferences about the meanings of code words that the jury could not have readily drawn.   His testimony helped the jury understand better the defendants' conversations . . . .   In his testimony he linked the defendants' specific calls to checks, wire transfers, and other discrete acts of material support that put the code words in context.

*Id.* at 1103.   The lay opinion testimony the government introduced at trial was similarly helpful to the jury.   The jury was  not instructed to presume that the agents' interpretations were the only possible interpretations of Defendants communications.   Defense counsel, who through discovery had been provided access to the foundational information forming the agents' interpretations and lay opinions, had the opportunity to challenge the accuracy and foundation of those lay opinions during cross-examination or to present their own interpretation.   The jury was able to consider all cross-examination, as well as defense submissions, when evaluating the appropriate weight to give to each agent's interpretation or lay opinion.

Although the Sixth Circuit is currently considering the issue presented here as part of a pending appeal, *United States v. Freeman*, Appeal No. 11-1798,[6] it has not previously addressed it.   In a recent opinion, however, the Sixth Circuit held that it was not error for the trial court to permit witnesses, with the requisite personal knowledge, to interpret wiretapped conversations between a defendant and a third party even though the witness was not a party to the wiretapped conversation.   *See United States v. Kelsor*, 665 F.3d 684, 697-98 (6th Cir. 2011).   In *Kelsor*, the Sixth Circuit rejected the defendant's argument that "the witnesses could not have testified with personal knowledge about recorded calls to

---

[6]Although the appeal was argued before a Sixth Circuit panel (Cole, Cook, and Katz, JJ.) on June 13, 2013, an opinion has not yet issued.   Unlike here, in *Freeman*, an FBI agent was allowed to give both lay and expert opinion testimony, thus giving rise to legal issues not present here.

which they were not a party." *Id*. at 697.  It affirmed the admission of the challenged testimony because the witness had "provided a foundation showing that he had personal knowledge of the matter." *Id*.

This Court finds the decisions Defendants rely upon from the Fourth, Eighth, and Second Circuit Courts of Appeal to be distinguishable and/or less persuasive than the decisions from the First, Fifth, Seventh, and Eleventh Circuit Courts of Appeal discussed above, *see, e.g., United States v. Johnson*, 617 F.3d 286, 293 (4th Cir. 2010) (concluding that it was error to admit an FBI agent's testimony as lay opinion testimony because his "opinions regarding [wiretapped] calls were not based on his own perception, but rather on his experience and training"); *Grinage*, 390 F.3d at 750-51 (holding that, because the agent interpreted both calls the jury heard and those they did not, "the agent's testimony as to his interpretations of the calls went beyond permissible lay opinion under Rule 701(b) because, rather than being helpful to the jury, it usurped the jury's function."); and *United States v. Peoples*, 250 F.3d 630, 640-41 (8th Cir. 2001) (rejecting a special agent's testimony about the meaning of words and phrases "not limited to coded, oblique language," and testimony that "included her opinions about what the defendants were thinking during the conversations" and limiting lay opinion testimony under Rule 701 to circumstances "only when the law enforcement officer is a participant in the conversation, has personal knowledge of the facts related to the conversation, or observed the conversations as they occurred.").

As shown below, all of the testimony that Defendants challenge was properly admitted as Rule 701 lay opinion testimony.

### a.  Agent Paszkiewicz's Trial Testimony

48

Defendants argue that this Court failed to properly limit Agent Paszkiewicz's testimony to permissible lay opinion testimony under Rule 701, i.e., testimony that is "rationally based" on the agent's perception of wiretapped conversations or text messages, is "helpful" to the jury, and "yet not based on expert knowledge within the meaning of Rule 702." *Albertelli*, 687 F.3d at 447.   This Court rejects Defendants' argument that Special Agent Paszkiewicz's trial testimony improperly allowed her to narrate the government's theory of prosecution, to over-interpret the content of text messages, and to provide a history of Contract CM 2012 that was not based on her personal knowledge gained from her extensive investigation in this case.

First, examination of the initial portion of Agent Paszkiewicz's challenged testimony (Trial Tr. Vol. 29 at 97-105, Oct. 24, 2012) reveals that she did not narrate or litigate the government's theory of prosecution or impermissibly define the law.  Rather, she explained what her investigation encompassed, the "allegations" she was assigned to investigate, and did not offer any factual or legal opinions.  Moreover, her statements were not offered for the truth of the matter asserted, were not hearsay, but rather were offered for another permissible reason – to lay a proper foundation for her subsequent lay opinion testimony. *See Rollins*, 544 F.3d at 831-32.  As the Sixth Circuit observed in *United States v. Aguwa*, 123 F.3d 418, 421 (6th Cir. 1997), statements that are "not offered 'for the truth of the matter asserted,' *see Fed. R. Evid.* 801(c), but only to provide background information and to explain how and why the agents even came to be involved with this particular defendant" are permissible.  Further, this challenged testimony was not offered nor admitted under Rule 701 as lay opinion testimony.

Second, Defendants argue that Agent Paszkiewicz was improperly allowed, under

Rule 701, to over-interpret a text message in her October 24, 2012 testimony. (Trial Tr. Vol. 29 at 126-132, Oct. 24, 2012). This argument is rejected as well. Agent Paszkiewicz published Government Exhibit DLZ-17 to the jury – a March 18, 2004 text exchange between Kwame Kilpatrick ("KMK") and Bobby Ferguson (BWF). In pertinent part, and with the Agent's challenged interpretation in bold, the text message was as follows:

> BWF: You're welcome, boss, just left victor **[Victor Mercado]**, the date has been change to my benifit, but we still have problem on the big one **[CM-2012]**, he thinks he is slickman, with this white folks.
>
> KMK: His **[Victor Mercado's]** slick shit is running out. I got his ass on something. I aint happy.
>
> BWF: Damn, I not the noisy **[nosy]** one, but I will find you today to here this and tell you minds.
>
> KMK: TRUE!

(*Id.* at 128-132; Gov't Ex. DLZ-17.) Agent Paszkiewicz testified that, from her review of the surrounding text messages, the phrase "the big one" referred to a Detroit Water and Sewer Department ("DWSD") contract known as "CM-2012" (also known as the Downtown Water Main project). (*Id.* at 126, 129-30.) Providing context, she explained that on the same day as this text exchange – March 18, 2004 – records, including previously admitted Government Exhibit DLZ-16, showed that DWSD Director, Victor Mercado, had personally approved contracts for the three lowest bidders for CM-2012 – Posen Construction, L. D'Agostini & Sons, and Lanzo Construction – all of whom were majority-owned, rather than minority-owned companies. (*Id.* at 127-28, 130; Gov't Ex. DLZ-16.) Finally, Agent Paszkiewicz, concluded from the context and content of the text exchange, that the "his" in Kwame Kilpatrick's "His slick shit" response referred to the "victor" Ferguson had

50

mentioned earlier in the text exchange, i.e., Victor Mercado.  (*Id.* at 130-31.)[7]

Contrary to the first segment of challenged testimony, this testimony was offered under Rule 701 in accordance with the Court's pretrial ruling on this issue.  The proper foundation for this testimony was properly laid.  Her interpretation was rationally based on her perceptions gained by her review of text messages and DWSD records in her extensive investigation in this case and was undeniably helpful to the jury who heard countless hours of testimony over the course of five months.  It was not based on specialized knowledge, skill, education or experience that Agent Paszkiewicz had obtained over the course of her career.  Rather, she based her testimony on her review of text messages and documentary evidence introduced in this case.  Moreover, Defendants had the opportunity to cross-examine Agent Paszkiewicz about her interpretation of this text exchange and to have the jury consider other text messages or documents that they believed contradicted her interpretation.

Third, Defendants argue that the Court improperly allowed Agent Paszkiewicz, over their objection, to act as a summary witness and provide testimony about Contract CM-2012, known as the Downtown Water Main project.  (Trial Tr. Vol. 29 at 145-156, Oct. 24, 2012.)  Defendants are wrong.  Based upon her investigation in this case and review of

---

[7]Additional text exchanges and documents admitted into evidence during trial supported Agent Paszkiewicz's context/content based interpretations.  For example, on March 15, 2004, three days before the challenged text exchange, the project manager for the Downtown Water Main work sent a letter to DWSD recommending awarding contracts to three contractors other than Defendant Bobby Ferguson. (Gov't Ex. DLZ-10.)  On March 16, 2004, two days before the challenged text exchange, Victor Mercado texted Kwame Kilpatrick to set up an "urgent" meeting that evening.  (*Id.*)  That same evening, Kwame Kilpatrick texted Ferguson that it was "VERY IMPORTANT" that Ferguson come to Kwame Kilpatrick's office that evening "ABOUT DOWNTOWN PROJECT."  (Gov't Ex. DLZ-12.)

Government Exhibit DLZ-10, Agent Paszkiewicz testified about an attachment to a March 15, 2004 letter from DLZ to DWSD – a bid tabulation sheet titled "CM 2012 - Downtown Water Main Replacement Evaluation of Bids, Price Comparison - Washington Boulevard." She testified that Washington Boulevard was used as a "sample piece of work" for bidders to give pricing information for the award of other water main projects in the Downtown core. (*Id.* at 146; Gov't Ex. DLZ-10.)

The Court also properly overruled a defense objection that the Agent's testimony was impermissibly based on witness interviews and thus presented Sixth Amendment confrontation issues.  The Agent never referenced witness interviews as the source of her testimony.  (*Id.* at 148.)  Rather, the first two pages of Government Exhibit DLZ-10 fully support Agent Paszkiewicz's testimony.  (Gov't Ex. DLZ-10 at 1-2.)  On those two pages, the project manager supervising the bidding for the Downtown Water Main work advised the DWSD that "to arrive at a per foot cost for a given water main replacement project DLZ computed each contractor's unit prices for *an already awarded emergency contract on Washington Boulevard.*" (*Id.* at 1 (emphasis added).)  In recommending awarding contracts to the three lowest bidders – Posen Construction, L. D'Agostini & Sons, and Lanzo Construction – the project manager noted that "[t]hose three bidders have submitted reasonable unit prices and there [sic] per foot price on *the sample project* (Washington Boulevard) are in line with the DLZ estimate."  (*Id.* at 2 (emphasis added).)  Thus, rather than providing testimony that exceeded the scope of acceptable Rule 701 lay opinion testimony, Agent Paszkiewicz properly analyzed a bid tabulation attached to a letter admitted into evidence by referring to language from that letter.  Just as above, Defendants had the opportunity to cross-examine her about her testimony, using documents they

believed contradicted her testimony, and to let the jury decide whether she was credible. (Trial Tr. Vol. 29 at 147, Oct. 24, 2012.)

Fourth, Defendants once again argue that Agent Paszkiewicz was impermissibly allowed to insert her own words into a text message during her testimony about the Downtown Water Main project.  (Trial Tr. Vol. 29 at 11-23, Oct. 24, 2012; Gov't Ex. DLZ-9; Trial Tr. Vol. 30 at 133-35, Oct. 25, 2012.)  The challenged testimony concerns a text exchange on February 18, 2004 between Ferguson ("BWF") and City of Detroit Chief Administrative Officer Derrick Miller ("DAM") where Ferguson requested a meeting with Miller to discuss the Downtown Water Main project.  In pertinent part, and with the Agent's challenged interpretation in bold, the text exchange was as follows:

BWF:  I need to see you sir,

DAM:  Cool holla about 330.

BWF:  I him with the boss **[Mayor Kilpatrick]** this is real urgent.

DAM:  You are there **[at the Mayor's office]**?  cool.

BWF:  Just to let him know, what was going on, to see how he wonted you to handle it, so were to meet you at 3pm

DAM:  I will just talk to him when I get back.

BWF:  Derrick I need to give you the complete details, you don't won't to meet with you boy. lol

DAM:  I just didn't want you to have to come back big dog.  Just come down about 330.

BWF:  No I do what ever, just to let you know what we need to do see you at 3:30

(Gov't Ex. DLZ-9 (emphasis added).)

Agent Paszkiewicz testified that, based on her review of other text messages in her

53

investigation in this criminal matter, she was aware that when Ferguson used the term "Boss," he was referring to Mayor Kwame Kilpatrick.  (Trial Tr. Vol. 29 at 120, Oct. 24, 2012.)  Based on this same foundation, she testified that Ferguson was with Kwame Kilpatrick at the time he had this text exchange, explaining that shortly before this text exchange with Miller, Ferguson had texted Kwame Kilpatrick (Gov't Ex. DLZ-8) asking whether "you **[Kilpatrick]** still in the office" because Ferguson needed to tell him that "Pratap people stoped negoitions, with my people and is trying to give the watermain job to one of the other contractors."  (Gov't Exs. DLZ-8, DLZ-9; Trial Tr. Vol. 29 at 117-21, Oct. 24, 2012.)  She testified that "Pratap people refers to Pratap Rajadhyaksha's employees at DLZ. (Trial Tr. Vol. 29 at 117, Oct. 24, 2012.)  Defendants never objected to Agent Paszkiewicz's direct examination above.   Rather, the next day, Defendant Kwame Kilpatrick's attorney cross-examined her, eliciting further testimony about the basis for her interpretations, i.e., that she read the text message string in context, read it along with later text messages telling Mr. Miller what Ferguson and Kilpatrick wanted Miller to talk to Mercado about.  (Trial Tr. Vol. 30 at 133-35, Oct. 25, 2012.)  Despite Defendants' arguments to the contrary, this is proper lay opinion testimony under Rule 701 because Agent Paszkiewicz's interpretations were rationally related to her perceptions gained from her investigation in this criminal matter, including her review of the text exchanges in evidence and other record evidence; were helpful to the jury; and defense counsel had the opportunity and did cross-examine her about the basis for her lay opinion testimony.

Fifth, Defendants argue that, in her re-direct testimony on December 13, 2012, Agent Paszkiewicz was impermissibly allowed to interpret text messages and allowed to go beyond the scope of their cross-examination.  (Trial Tr. Vol. 49, 131-35, Dec. 13, 2012.)

54

These arguments are rejected.

During Defendants' cross-examination of Agent Paszkiewicz on December 13, 2012, she was asked a number of questions about whether it would be unusual for DWSD employees to talk with City contractors about upcoming City projects. (*Id.* at 131.) So, on re-direct, the government asked her whether her review of Mayor Kilpatrick's text messages revealed that he was communicating with City contractors other than Ferguson about City projects and displayed several text message exchanges between Kwame Kilpatrick and Bobby Ferguson discussing upcoming City business, i.e., LS1-11 (Ferguson asks Kilpatrick to hold a contract from being released for a long time) and LS1-12 (Ferguson tells Kilpatrick about prices for Contract 1361). (*Id.* at 131-32; Gov't Exs. LS1-11, LS1-12.) After being shown the text exchanges in Government Exhibits LS1-11 and LS1-12, Agent Paszkiewicz was asked whether, upon her review of Mayor Kilpatrick's text messages in this investigation, she saw where he had similar conversations about City contracts with any contractor other that Ferguson, and she replied "No." (Trial Tr. Vol. 49 at 132-35, Dec. 13, 2012.) Contrary to Defendants' argument here, Agent Paszkiewicz's challenged testimony did not require any interpretation of a text message and did not elicit her lay opinion about any words or phrases in a text message exchange. Rather, she was asked and answered a question whether her review of Mayor Kilpatrick's numerous text messages revealed communications similar to those in Government Exhibits LS1-11 and LS1-12 between him and a City contractor other than Ferguson. Defendants had every opportunity on re-cross to come forward with evidence that contradicted Agent Paszkiewicz's testimony on this topic, and they did not.

**b. Agent Beeckman's Testimony**

55

Defendants also argue that this Court impermissibly allowed Agent Beeckman to provide testimony that did not satisfy the requirements of Rule 701 lay opinion testimony.

First, Defendants argue that FBI Agent Beeckman's testimony on December 18, 2012 about Detroit Building Authority ("DBA") Director Elizabeth "Ayanna" Benson's role with respect to the committee evaluating bids for the construction of the Heilmann Recreation Center was not proper Rule 701 lay opinion testimony. (Trial Tr. Vol. 52 at 30-35, Dec. 18, 2012.) This argument is rejected.

Agent Beeckman testified that, based on his review of documents involved in his investigation of this matter and the record evidence and witness testimony already introduced at trial, DBA employee Tyrone Clifton was in charge of the committee that was evaluating bids, and he gave the evaluation committee's recommendation to Benson, DBA's Director. (*Id.* at 32-33.) Defendants did not cross-examine Agent Beeckman about the foundation for his testimony. Moreover, the Agent's testimony was, as he stated, corroborated by DBA employee Clifton's testimony that the Heilman evaluation committee would have presented its findings to Director Benson, telling her, "These are the facts and what do you want to do?" (Trial Tr. Vol. 51 at 125-26, Dec. 17, 2012.) Clinfton confirmed that Director Benson was the one who made the choice to select the joint venture team of JOA/XCEL to build the Heilmann Recreation Center. (*Id.* at 132.) Also, DBA Director Benson's name was displayed prominently on many of the key Heilmann documents in evidence. (*See, e.g.,* Gov't Exs. HLM-4 (request for proposal), HLM-5 (interview solicitation letter), HLM-14 (new contract award memorandum), HLM-15 (DBA Bd. of Comm'rs Mtg.).)

Second, Defendants argue that Agent Beeckman's January 14, 2013 testimony about

56

a June 17, 2003 text exchange was improper expert rather than proper lay opinion testimony.  (Trial Tr. Vol. 62 at 144-51, Jan. 14, 2013.)  This argument is also rejected.

Agent Beeckman testified on January 14, 2013 about a June 17, 2003 text exchange between Ferguson ("BWF") and Detroit Recreation Department employee Vincent Anwunah ("VA") discussing the Patton Park Recreation Center construction project.  In pertinent part, and with the Agent's challenged interpretation in bold, the text exchange was as follows:

> VA:  They want wldbrisgwe **[Walbridge, the general contractor at Patton Park]** to xollect 500,000 o this contract **[as a construction management fee]** what do you think?
>
> BWF:  Hell no that's 5% they are crazy, 2% fuck them and walbridge that's theft.
>
> VA:  Ok
>
> BWF:  You were right, they got a deal going this is bullshit.
>
> VA:  The guy **[DWSD Engineer John McGrail]** insisted that they must pay them 5% and you have to submit your price to them as the general.  I told him to tell them they can be paid not more than 2.5% and also should allow FEI to put a team together the I will b

(Gov't Ex. WA1-20 (emphasis added).)

Agent Beeckman testified that, based on his review of the records involved in his investigation in this case, the two main parties involved in the Patton Park construction project were Walbridge and Ferguson (Trial Tr. Vol. 62 at 145, Jan. 14, 2013); the "500,000" and "5%" in the text exchange refers to a construction management fee that Walbridge was to be paid for overseeing the $10 million Patton Park Recreation Center construction project (*id.* at 145-46).  Agent Beeckman confirmed, based on his review of

City of Detroit records, that 5% was a standard oversight fee for DWSD contracts. (*Id.* at 146.)  Also based on his review of documentary evidence in this case, including DWSD records, recreation department records, text messages about the Patton Park and Baby Creek projects, Agent Beeckman identified John McGrail as the individual at the DWSD who was in charge of administering the Patton Park portion of the Baby Creek/Patton Park construction project and "the guy" referenced in the June 17, 2003 text exchange. (*Id.* at 149-51.)  Contrary to Defendants' arguments here, the Agent's testimony was not based on any specialized knowledge and was not improper expert testimony.  Rather, this testimony was properly introduced after the required foundation was laid.  Moreover, Defendants had the opportunity to cross-examine and impeach the Agent's credibility with the same record evidence that he used to support his testimony or other evidence produced in discovery.

Third, Defendants contend that, on January 23, 2013, Agent Beeckman was improperly allowed to identify several people referenced in a February 14, 2008 intercepted telephone conversation between Bobby Ferguson and Bernard Kilpatrick about the Book-Cadillac Hotel. (Trial Tr. Vol. 68 at 115-125, Jan. 23, 2013.)  This Court disagrees. The challenged testimony was properly admitted under Rule 701 as lay opinion testimony.

In pertinent part, and with the Agent's challenged interpretation in bold, the intercepted phone call was as follows:

BWF:  On what job you talkin' bout?

BNK:  At the uh, Book.

BWF:  . . . so what you need, what you want, what you want, what you tellin' me you need to do?

BNK:   I want to, I want to uh, I really would like to run him **[Jim Jenkins]** out of town, but basically, he took, he let these guys uh, take, take and use my guys who was dumpin' the, takin' the trash . . .

BWF:   Yeah.

BNK:   He let them guys just take them out, just arbitrarily, took them out and then so he told me, you know, which is, you know, same line of bullshit.  Oh, I'm gonna go, I'm gonna take care of that.  Now this is the time when they need to be on the gig when they take on the night shift.  And uh, and he still got them people doin' it.

BWF:   Who it put it –, Who he put on it though?

BNK:   Some, somebody, some white boys from out of town.  Some white boys from the suburbs.  And he took uh, you know he took uh, guy across the street from you, John and them **[John Runco and John Francis of Capital Waste]** off.  And he just arbitrarily did it, it, it wasn't no price, nothin', it wasn't no argument, he just took 'em off and put these other guys in.  That's what I been –

(Gov't Ex. BCD-13A (emphasis added); Trial Tr. Vol. 68 at 125, Jan. 23, 2013.)

Agent Beeckman explained that in February 2008, the Book Cadillac was under renovation, that demolition was going on, and that demolition debris was being trucked off the job site.  Based on his investigation in this case, he learned that Jenkins Construction Company was working at the site in a joint venture with Marous Brothers, and Jim Jenkins was the principal owner of Jenkins Construction Company.  (*Id.* at 118-19.)  Agent Beeckman testified that the man Bernard Kilpatrick wanted to run "out of town" was Jim Jenkins and the "John and them" in the call referred to John Runco and John Francis of Capital Waste, a company that hauled away construction debris.  (*Id.* at 118-119; Gov't Ex. BCD-10A (payments by Jenkins as general contractor to Ferguson for Book Cadillac).)  He also testified that Capital Waste had paid Bernard Kilpatrick's consulting firm, Maestro & Associates, over $222,000 between 2002 and 2008.  (Trial Tr. Vol. 68 at 115-18; Gov't Exs.

59

BKF-6 at 2-4 (summary of payments by Capital Waste to Maestro), BKF-17 at 11 (same).)

This testimony was properly admitted under Rule 701. When Agent Beeckman provided context for and interpreted cryptic statements in this intercepted phone call, he did so based on his review of the records and evidence in this case. His interpretations were amply supported by the evidence. Just moments before the Agent's challenged testimony, the jury listened to a February 14, 2008 intercepted telephone call between John Francis of Capital Waste and Bernard Kilpatrick where John Francis complained to Bernard Kilpatrick that "Jim Jenkins" had hired a company called Americal, rather than Capital Waste, to haul waste from the Book Cadillac. (Trial Tr. Vol. 68 at 120-21; Gov't Ex. BCD-11A.) During that call, John Francis asked Bernard Kilpatrick if he could find a "regulatory board that could give these guys trouble . . . [by] writing [them] up for every little fucking violation." (Gov't Ex. BCD-11A at 1.) Next, the jury heard the first portion of the same telephone call that Defendants are challenging where Bernard Kilpatrick explicitly references "Jim Jenkins" by name, asking Ferguson, "Can . . . George Jackson . . . at the DGC [Detroit Economic Growth Corporation] . . . can he uh make trouble for uh, Jim Jenkins over there? . . . Can he, can he run him out of there?" (Gov't Ex. BCD-12A at 1.) Also, in another intercepted phone call, Bernard Kilpatrick calls Shakib Deria to discuss Jim Jenkins, the Book Cadillac, Capital Waste, Americal, and waste hauling. (Gov't Ex. BCD-14A.)

Fourth, Defendants argue that, on January 29, 2013, the Court improperly allowed Agent Beeckman to provide lay opinion testimony about the meaning of some words and the context for two text messages relating to news media inquiries about Ferguson and

60

improperly allowed the Agent to "argue" on the government's behalf by linking government exhibits to text messages. (Trial Tr. Vol. 72 at 91-101, Jan. 29, 2013; Gov't Exs. RC-29, KFM-3.) Both arguments are rejected.

The first challenged text exchange is from July 14, 2003 and is between Bobby Ferguson and Kwame Kilpatrick. (*Id.* at 91-92; Gov't Ex. RC-29.) Ferguson informed Kwame Kilpatrick that he had spoken with Detroit News reporter Darci McConnell, who had called Ferguson with questions about Ferguson's role on the Board of the Downtown Development Authority. (*Id.* at 91-93.) In pertinent part, and with the Agent's challenged interpretation in bold, the text exchange was as follows:

> BWF: Darci (det news) **[Detroit News reporter Darci McConnell]** just call me about DDA **[Downtown Development Authority]**.
>
> KMK: Don't call her **[McConnell]** back.
>
> BWF: DAMN, I ALREADY DID, YOU KNOW I NEVER CALL THEM BACK BUT I KNEW WHAT SH WONTED AND PLAYED DUMB, BUT ALOS **[ALSO]** ASK HER WHY WAS IT A PROBLEM BECAUSE IF YOU SIT ON THE **[DDA]** BOARD YOU MUUST RECUSES YOURSELF.
>
> KMK: Ok. You should not have said shit.
>
> BWF: OK, I REALLY Didn't SAY SHIT, THAT MEANT ANY THING.

(Gov't Ex. RC-29 (emphasis added).)

Agent Beeckman testified that the words "Darci (det news)" referred to Detroit News reporter Darci McConnell, an uncontroversial fact substantiated by other text messages and testimony at trial. (*See, e.g.,* Gov't Exs. RC-31 (Ferguson notified Kwame Kilpatrick that "Darci is asking me are we friends"), RC-32 (Kwame Kilpatrick's communication director, Dave Manney, informing Kilpatrick that "Bobby handled Darci very well").) His testimony

61

that the "Board" referenced in the text was the Downtown Development Authority Board was properly based upon his extensive investigation in this matter and review of the record evidence, including text messages and other documents in connection with the Book Cadillac renovation project. And, his interpretation of the phrase "you muust recuses yourself" as meaning a Board member must recuse himself from a Board vote if he was going to get work from a project that the Board was supervising, was likewise based on materials he reviewed in his investigation in this matter. This is also true of his statement that Ferguson did in fact recuse himself from the Board's vote regarding work on the Book Cadillac renovation. (Trial Tr. Vol. 72 at 93, Jan. 29, 2013.)

Defendants next challenge Agent Beeckman's January 29, 2013 testimony about a June 29, 2004 text exchange. In this text exchange, Bobby Ferguson informs Kwame Kilpatrick how he responded to questions from a Crain's Business reporter about how Ferguson and Kwame Kilpatrick knew each other and whether "FEI" had given campaign contributions or cash to Kilpatrick. (*Id.* at 96-97; Gov't Ex. KFM-3.) Ferguson assured Kwame Kilpatrick that he didn't remember how the two met and that all FEI had done for his campaign was just grass roots, passing out literature, et cetera. (*Id.* at 96.) Ferguson's exact words in the challenged text exchange, with the Agent's additions in bold, are as follows: "Robert **[a reporter]** from crains **[a business news magazine]**, only ask one ? About you, how did we know each other, I said that I didn't remember, he asked did fei give contributions cash, I said no, just grass roots passing out liteture etc." (Gov't Ex. KFM-3 (emphasis added).) Because Agent Beeckman's testimony was not based on any specialized knowledge, but rather was rationally based on his perceptions formed from his investigation in this case and his review of the documents and exhibits in this matter, and

62

was helpful to the jury, it was permissible Rule 701 lay opinion testimony. *See Rollins*, 544 F.3d at 831-32.

Defendants also argue that Agent Beeckman was improperly allowed to make a closing argument by contrasting the above text message about FEI (Ferguson Enterprises, Inc.) not making cash contributions to the Kilpatrick campaign with previously admitted government exhibits. Specifically, after reading a portion of Government Exhibit KFM-3, the text message described above where Ferguson told Kilpatrick that he had denied to a Crain's reporter that FEI gave contributions to the Kilpatrick campaign, Agent Beeckman was asked to identify several roughly contemporaneous checks from FEI employees to the Kilpatrick campaign, each in the amount of $3,400. (Trial Tr. Vol. 72 at 97-99; Gov't Exs. KFM-5 (checks to FEI, endorsed by Ferguson and George Brown), KFM-6 ($3,400 money orders purchased with checks to FEI), KFM-7 (same).) Defendants' argument is rejected. Rule 701 was not implicated by this testimony because Agent Beeckman never expressed an opinion that the text and government exhibits were contradictory. Nor did Agent Beeckman make any argument linking the text to the exhibits. He did not draw any inferences from this evidence, and did not ask the jury to do so. Rather, based on his investigation in this matter, he merely identified the content of previously admitted documents. It was left to counsel, and eventually to the jury, to determine what inferences could be drawn, if any, from the sequence of events made evident by the evidence presented.

### c.  Cross-Examination of Defense Witness Lewis McVay

Finally, Defendants argue that, during the government's cross-examination of defense witness Lewis S. McVay on February 4, 2013, it was impermissibly allowed to have this

witness interpret a March 17, 2004 text exchange between Ferguson and Kwame Kilpatrick about Hayes Excavation.  (Trial Tr. Vol. 75 at 80-83, Feb. 4, 2013; Gov't Ex. DLZ-15.)  This argument is also rejected.

Defendants called Lewis McVay to testify about his experiences working as a foreman for FEI and Hayes Excavation.  (Trial Tr. Vol. 75 at 69-70, 76-77, Feb. 4, 2013.)  On cross-examination, the prosecutor showed McVay a previously admitted text exchange between Ferguson and Kwame Kilpatrick about Hayes Excavation (Gov't Ex. DLZ-15) and then asked McVay:

> Q:     This is a text message between Mr. Ferguson and the mayor, it says – Mr. Ferguson says, "You want to hear something funny?  Hayes Excavation cussed out Victor and told him to stuff his job.  Five minutes later he calls me to find out how fast can we do the job.  What is the dates and what do we need?"
>
>     And the mayor says, "LOLOL."
>
>     Mr. Ferguson says, "I will tell you the rest tonight.  Victor told me he don't want to hear why the problem exists, just how to fix it."
>
>     Do you see that?
>
> A:  Yes, sir, I see it.
>
> Q:  Did Mr. Ferguson ever tell you that he laughed about Hayes Excavating losing work with the city?
>
> A:  No, sir.
>
> * * * * *
>
> Q:  Did Mr. Ferguson ever tell you that he and the mayor laughed about Hayes Excavation?
>
> A:  No, sir.
>
> Q:  Would that have upset you if you had heard that they had?

64

* * * * *

A:  Would you ask the question again, sir?

Q:  You said that Mr. Hayes was a good man and a good friend, is that right?

A:  Correct.

* * * * *

Q:  And he did good work for the city, didn't he?

A:  Yes, sir.

Q:  You wouldn't want to see him lose any sort of work, would you?

A:  No.

Q:  Would it upset you if the mayor and Mr. Ferguson were laughing about Mr. Hayes like this?

* * * * *

A:  You want my personal opinion, sir?

Q:  That's the only one I want.

A:  My man.  I find that people – I wouldn't like that.

(Trial Tr. Vol. 75 at 80-83, Feb. 4, 2013.)  Defendants' misconstrue the prosecutor's cross-examination and Mr. McVay's testimony.  He was not asked to interpret this text exchange. Rather, he was asked whether Ferguson ever told him that Ferguson and Kilpatrick had laughed about Mr. Hayes and was asked him how he would feel if they had in fact done so. His response was properly admitted into evidence.

### 2. Court Properly Distinguished Between Testimony that Was Not Hearsay and That Admissible Under a Hearsay Exception And Gave Proper Limiting Instruction to Jury When Required

Defendants argue that this Court should only have admitted the testimony of extortion

victims (third-party declarants) under the state-of-mind exception to the hearsay rule, Fed. R. Evid. 803(3), and not admitted any testimony as non-hearsay, Fed. R. Evid. 801(d), because this testimony can only be relevant if it is admitted for the truth of the matter asserted.  (Def. Ferguson's Mot. at 20, 33.)  This Court disagrees and denies Defendants' motion for a new trial based on the Court's evidentiary rulings concerning hearsay. Defendants' arguments ignore the Sixth Circuit's holding in *United States v. Williams*, 952 F.2d 1504, 1517-18 (6th Cir. 1991), recognizing that this type of testimony is relevant even if not admitted for the truth of the matter asserted.

Two key Sixth Circuit decisions guided and continue to guide this Court's rulings on Defendants' hearsay objections with regard to testimony by extortion victims.  In the first, *United States v. Williams*, 952 F.2d 1504 (6th Cir. 1991), the Sixth Circuit affirmed a district court's decision admitting witness testimony similar to that at issue here because it allowed "the government to show [the extortion victim]'s fearful state of mind and reasonableness." *Id.* at 1517.  This evidence was not introduced under the state-of-mind exception to the hearsay rule, Fed. R. Evid. 803(3).  Rather, it "was admitted to establish the victims' state of mind and was not hearsay as defined by Fed. R. Evid. 801(c) because it was not offered to prove the truth of the matter asserted." *Id.* at 1518.  As the *Williams* court explained, "[w]here the extortionate scheme alleged exploits a victim's fear of economic harm, the prosecution must establish the victim's state of mind as an essential element of the crime charged." *Id.* (internal quotation marks and citations omitted).  Therefore, the district court properly admitted this testimony "because the testimony of victims as to what others said to them, and the testimony of others as to what they said to victims is admitted not for the truth of the information in the statements but for the fact that the victim heard them and that

66

they would have tended to produce fear in his mind." *Id.* (internal quotation marks and citation omitted). Because the statements were not admitted for their truth, they "did not meet the definition of hearsay," and their admission did not infringe the defendant's Sixth Amendment rights to confront witnesses against them. *Id.*

In the second key case, *United States v. Collins*, 78 F.3d 1021 (6th Cir. 1996), the Sixth Circuit observed that "[i]n a prosecution based upon extortion through fear of economic loss, the state of mind of the victim of extortion is highly relevant." *Id.* at 1036. Accordingly, it held that testimony attributed to an unindicted co-conspirator that was admitted into evidence through the testimony of another witness was properly admitted under the state-of-mind exception to the hearsay rule – Fed. R. Evid. 803(3). *Id.*

As one treatise explains, out-of-court statements are often admissible for non-hearsay uses, especially in the context of federal extortion cases:

> In a great many cases, it is necessary to prove what someone knew or understood, or what information he had, or what pressures and considerations affected him at a crucial moment.
>
> In these settings, an out-of-court statement that the person heard or read is usually viewed as nonhearsay because this use does not involve taking the statement as proof of what it asserts. Usually the statements being offered do, of course, tend to prove whatever realities about the world they may happen to describe. The justification for nonhearsay treatment appears where the purpose of the proponent, and the use to which the statement is put, is not to prove these realities, but instead to prove what someone who heard or read the statements knew or had reason to believe.
>
> * * * * *
>
> In extortion cases, one critical question is whether the victim was afraid of the defendant. In this setting, the things that the victim was told about the defendant can prove or suggest that he had reason to fear the defendant (or did not have such reason). If the information imparted in statements recited to the victim is startling or shocking enough, those words can be circumstantial evidence that in all probability the victim *did* fear the defendant. In a similar vein, threats

67

spoken or written by the defendant and communicated to the victim, or threats coming from someone else who purports to be speaking for the defendant, sometimes merely by saying as much, can help establish the basis for fearing the defendant, and can amount to circumstantial evidence that the victim probably did fear the defendant.

Sometimes the point is to explain why a person behaved as he did, since words read in print or heard in conversation can motivate or inform the person who reads them or hears them spoken. . . .  In these cases, once again, the statements that were spoken or written may help explain the behavior of the listener or reader, suggesting what he likely did or explaining why he spoke as he did.  Such statements may be crucial in making other proof of his conduct or statements understandable.

4 *Federal Evidence* § 8:20, Nonhearsay uses - Effect on listener or reader (3d ed. June 2012 Suppl.) (footnotes omitted).  In a footnote to the paragraph about extortion cases, decisions from the First, Fifth, and Sixth Circuit Courts of Appeal are cited as support, i.e., *United States v. DeVincent*, 632 F.2d 147, 151 (1st Cir. 1980) ("victim was told defendant 'had been in jail for loansharking' and 'was a pretty bad guy'"); *United States v. Lynn*, 608 F.2d 132, 135 (5th Cir. 1979) ("testimony by extortion victim describing statements to him"); *United States v. Williams*, 952 F.2d 1504, 1518 (6th Cir. 1991) ("in extortion trial, admitting statements to victim to prove his fear").  *Id.* at n.3.  The Sixth Circuit's decision in *Williams* provides ample support for this Court's challenged evidentiary rulings.

In their motions for a new trial, Defendants Bobby Ferguson and Kwame Kilpatrick argue that this Court erred when it admitted testimony from some of the victims of Defendants' extortion crimes – Thomas Hardiman (Trial Tr. Vol. 116-117, 129-130, Oct. 26, 2012), Avinash Rachmale (Trial Tr. Vol. 36 at 49-50, Nov. 16, 2012), Anthony Soave (Trial Tr. Vol. 44 at 116-121, Dec. 5, 2012), Kathleen McCann (Trial Tr. Vol. 46 at 69-71, 100-101, Dec. 7, 2012), and Bernard Parker III (Trial Tr. Vol. 53 at 23-25, 58-65, 101-103, Dec. 19, 2012).  (Def. Ferguson's Mot. at 18-34; Def. K. Kilpatrick's Mot. at 4-6.)  Defendants are

wrong.  At trial, Defendants made numerous objections, raising the same arguments presented here –  the challenged testimony is only relevant to the government's extortion charge if it is offered to prove the truth of the matter asserted and thus can only be admitted under Fed. R. Evid. 803(3), the state-of-mind exception to the hearsay rule.  When overruling Defendants' hearsay objections, this Court properly distinguished between hearsay and nonheasay uses of the challenged testimony by examining its proposed use, i.e., whether it was being offered for the truth of the matter asserted or not and when shown to be the latter, gave a proper limiting instruction to the jury.  (*Compare, e.g.,* Trial Tr. Vol. 31 at 35-36, 41-43, Oct. 26, 2012 (ruled not hearsay and limiting instruction provided), *with* Trial Tr. Vol. 46 at 69-71, Dec. 7, 2012 (ruled hearsay that fell within Fed. R. Evid. 803(3) exception and thus no limiting instruction provided); *See also* Trial Tr. Vol. 61-62, Dec. 19, 2012 (where the Court explains this distinction and instructs the witness not to offer hearsay; rather, if the prosecutor asks him what somebody else said, let the judge rule on it, don't volunteer it).)

### 3. Kim Harris's Testimony Was Properly Admitted Under the Co-Conspirator Exception to the Hearsay Rule

Defendants also argue that the Court erred, over their objection, by allowing Kim Harris to testify about out-of-court statements (to pull the Detroit Headquartered Business ("DHB") certification of DLZ and "the Mayor wants it done") made to him by Gerard Grant Phillips, the now-deceased former Director of the City of Detroit's Human Rights Department.  (Trial Tr. Vol. 40 at 123-129, Nov. 29, 2012; Def. K. Kilpatrick's Mot. at 3-4.)[8]

---

[8]Defendants also argue (Def. K. Kilpatrick's Mot. at 3-4) that the Court erred when it ruled, on cross-examination of Mr. Harris, that defense counsel could not introduce documents and question Mr. Harris as to the propriety of DLZ being certified in the first

After reviewing the government's and Defendants' briefs, this Court ruled that it would permit this testimony, that it was admissible under Fed. R. Evid. 801(d)(2)(E) for all the reasons cited in the government's response brief.  (Motion *in limine* Hr'g Tr. at 14, Nov. 29, 2012; Gov't Resp., ECF No. 447, Nov. 28, 2012; Def. K. Kilpatrick's Reply, ECF No. 448, Nov. 28, 2012.)

At issue was testimony of Kim Harris, the former Chief Compliance Officer of the City of Detroit's Human Rights Department, regarding a conversation he had with his boss, Gerard Grant Phillips, who at the time was the Director of the Human Rights Department. In that conversation, Phillips directed Harris to decertify DLZ, to pull its DHB certification. At the time, DLZ was in line to win a large City water contract.  The effect of pulling DLZ's DHB certification meant that DLZ would not get the water contract.  A company in which Ferguson had a financial interest would get it instead.  Harris testified that initially when Phillips told him to pull DLZ's DHB certification, he explained to Phillips that he could not do so because DLZ qualified for the certification and there was a legal opinion to that effect from the City law department.  (Trial Tr. Vol. 40 at 123-25, Nov. 29, 2012.)  Harris testified that Phillips insisted that he pull DLZ's DHB certification, telling him "the mayor wants it done." (*Id.* at 125.)  Harris also testified that Phillips had him draft a letter in May 2006 to the Water Department Director revoking DLZ's DHB certificate *retroactive* to February 2, 2006, a date before DLZ submitted its March 2006 bid for the water contract.  (*Id.* at 127-130.)

Under Fed. R. Evid. 801(d)(2)(E), a co-conspirator's statement made "during and in

---

instance because certification was not Mr. Harris's responsibility.  (Trial Tr. Vol. 41 at 40-48, Nov. 30, 2012.)

furtherance of the conspiracy" is "not hearsay."  The government may therefore use it at trial against any of the co-conspirators to prove the truth of the matter asserted.  Fed. R. Evid. 801(d)(2)(E).  To admit a statement under Rule 801(d)(2)(E), the government "must show by a preponderance of the evidence (1) that a conspiracy existed, (2) that the defendant against whom the hearsay is offered was a member of the conspiracy, and (3) that the hearsay statement was made in the course and in furtherance of the conspiracy." *United States v. Vinson*, 606 F.2d 149, 152 (6th Cir. 1979).  Under Fed. R. Evid. 104(a), the Court has the gatekeeper role of determining whether a co-conspirator statement satisfies that criteria.  *Id.*

To qualify as a co-conspirator, a person must have knowingly and voluntarily joined the conspiracy intending to help advance or achieve its goals.  *See* Pattern Crim. Jury Instr. 6th Cir. at 78, § 3.03 Defendant's Connection to the Conspiracy (2011 ed.).   The government does not have to prove "a defendant knew everything about the conspiracy, or everyone else involved, or that he was a member of it from the very beginning.  Nor does it require proof that a defendant played a major role in the conspiracy, or that his connection to it was substantial.  A slight role or connection may be enough."  *Id.* at § 3.03(2).

"A statement is 'in furtherance of' a conspiracy if it is intended to promote the objectives of the conspiracy."  *United States v. Clark*, 18 F.3d 1337, 1342 (6th Cir. 1994) (citation omitted).  Statements that "prompt a listener to act in a manner that facilitates the carrying out of the conspiracy are admissible under [Rule 801](d)(2)(E)."  *United States v. Jerkins*, 871 F.2d 598, 606 (6th Cir. 1989).  A statement by a co-conspirator need not be made to a fellow co-conspirator to be admissible under Rule 801(d)(2)(E).  *See United*

71

*States v. Ayotte*, 741 F.2d 865, 869 (6th Cir. 1984) (affirming admission, under Rule 801(d)(2)(E), of co-conspirator's statement to an undercover agent identifying the defendant as the drug supplier).

In its brief on the admissibility of Harris's challenged testimony, the government proffered evidence showing that Gerard Grant Phillips was a co-conspirator in Defendants' extortion scheme. (Gov't Resp., ECF No. 447, Nov. 28, 2012.) It convincingly explained how Gerard Grant Philips was a co-conspirator in the Kilpatrick Enterprise who was called upon to assist the Enterprise from time-to-time when it wanted to improperly use the City's Human Rights Department to benefit one of its members.

For example, the government proffered, and later produced evidence at trial, an FBI intercepted a call that took place on February 14, 2008 between Bernard Kilpatrick and John Francis, a contractor and regular client of Bernard Kilpatrick who had paid him over $220,000 between April 2002 and March 2008. Francis's company had been removed from waste hauling work at the Book Cadillac renovation project by the general contractor, Jenkins Construction. During the intercepted call, Bernard Kilpatrick and Francis discussed having Gerard Grant Phillips go to the job site to retaliate against Jenkins by having Phillips issue the company citations, apparently for being in violation of minority hiring rules. In the call, Bernard Kilpatrick told Francis that he had caused Phillips to intervene on his behalf on past occasions. (Trial Tr. Vol 68 at 115-125, Jan. 23, 2013.)

The Court held an in-chambers hearing where it considered the parties' briefs and oral arguments. It ruled as follows:

> I'm going to permit this testimony [of Kim Harris]. I believe that there's enough evidence within the context of the phone call between Bernard and Mr. Francis to establish by a preponderance of the evidence that Mr. Phillips was at least a

small player in the conspiracy that the government has alleged.

I think that at the very least – I mean, this is consistent with [Mr. Phillip's] grand jury testimony that he was called to the Manoogian Mansion [Mayor Kilpatrick's home], that he was directed by the mayor to accomplish this decertification, . . . the fact that he was directed by the mayor to do this, I believe is admissible for all the reasons cited in the government's brief, and the cases are consistent with that.  There are a number of cases cited by the government in its brief which support this, and I don't see anything to contradict it. . . .

(Motion *in limine* Hr'g at 14, Nov. 29, 2012.)

Contrary to Defendants' arguments here, the Court correctly ruled that the statements by Phillips to Harris met the requirements of Fed. R. Evid. 801(d)(2)(E).  First, the government proved beyond a reasonable doubt, as the jury's guilty verdict on Count One attests, the existence of a conspiracy and that Defendants Kwame Kilpatrick and Bobby Ferguson were members of the conspiracy.  The Court was also justified in its ruling that there was a preponderance of evidence establishing that Gerard Grant Phillips was at least a small player in the conspiracy and that the statement by Phillips to Harris directing him to pull DLZ's DHB certification was made "in the course and in furtherance of" the conspiracy.

## III.   Conclusion

For the above-stated reasons, Defendants Bobby Ferguson's and Kwame Kilpatrick's Rule 33 motions for a new trial are DENIED.

S/Nancy G. Edmunds
Nancy G. Edmunds
United States District Judge

Dated:  August 8, 2013

I hereby certify that a copy of the foregoing document was served upon counsel of record on August 8, 2013, by electronic and/or ordinary mail.

S/Johnetta M. Curry-Williams
Case Manager
Acting in the Absence of Carol A. Hemeyer