UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

                Plaintiff,                        Hon. Nancy G. Edmunds

              -vs-                            No. 10-CR-20403

D-1 KWAME M. KILPATRICK,           Sentencing Date:  October 10, 2013

              Defendant.

_____/

## SENTENCING MEMORANDUM OF THE UNITED STATES
## AS TO DEFENDANT KWAME M. KILPATRICK

The United States submits the following memorandum regarding the

sentencing of defendant Kwame M. Kilpatrick on October 10, 2013.

                    Respectfully submitted,

                    BARBARA L. McQUADE
                    United States Attorney

s/MARK CHUTKOW                  s/R. MICHAEL BULLOTTA
Assistant United States Attorney      Assistant United States Attorney

s/JENNIFER L. BLACKWELL        s/ERIC DOEH
Assistant United States Attorney      Assistant United States Attorney

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ........................................................................iii

INTRODUCTION................................................................................. 1

ARGUMENT...................................................................................... 3

    A. The Nature and Circumstances of Kilpatrick's Crimes (18 U.S.C. § 3553(a)(1)) ...................................................................... 3

        1. Overview of the Racketeering Enterprise ............................... 3

        2. Fraud........................................................................ 7

        3. Bribes....................................................................... 11

        4. Extortion .................................................................. 13

    B. Kilpatrick's History and Characteristics (18 U.S.C. § 3553(a)(1)) ................ 24

        1. Misappropriating City Resources ........................................ 24

        2. Perjury and Cover Up of Text Messages................................. 28

        3. Refusal to Pay Restitution ................................................ 31

        4. Lack of Remorse........................................................... 32

        5. Positive Actions as Mayor ................................................ 33

    C. Seriousness of Kilpatrick's Crimes, Just Punishment, and Respect for the Law (18 U.S.C. § 3553(a)(2)(A)) ................................................. 35

    D. Deterring the Criminal Conduct of Others (18 U.S.C. § 3553(a)(2)(B)) ....... 39

    E. Protecting the Public from Further Crimes by Kilpatrick............................ 41

F. Sentences Contemplated by the Sentencing Guidelines............................ 42

   1.  Specific Offense Characteristics ........................................................ 43

   2.  Role in Offense..................................................................................... 45

G. Avoiding Sentencing Disparities Among Similarly Situated Defendants ..... 46

CONCLUSION .................................................................................................... 51

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Brown v. Mayor of Detroit*, 478 Mich. 589, 734 N.W.2d 514 (2007).................... 28

*Gall v. United States*, 552 U.S. 38 (2007) ................................................. 47

*In re Cook*, 551 F.3d 542 (6th Cir. 2009) .............................................. 32

*United States v. Anthony*, 280 F.3d 694 (6th Cir. 2002) ........................................ 45

*United States v. Benson*, 591 F.3d 491 (6th Cir. 2010).......................................... 46

*United States v. Bistline*, 665 F.3d 758 (6th Cir. 2012).......................................... 34

*United States v. Blackwell*, 459 F.3d 739 (6th Cir. 2006) ...................................... 44

*United States v. Bolar*, No. 10-30879, 483 Fed. Appx. 876, 2012 WL 1994728
   (5th Cir. 2012) ................................................................. 49

*United States v. Campbell*, 279 F.3d 392 (6th Cir. 2002) ...................................... 44

*United States v. Ciavarella*, 716 F.3d 705 (3d Cir. 2013)....................................... 48

*United States v. DeRiggi*, 72 F.3d 7(2d Cir. 1995) ................................................. 45

*United States v. Ganim*, No. 3-01-CR-263, 2006 WL 1210984
   (D. Conn., May 5, 2006)...................................................... 39

*United States v. Hamilton*, 263 F.3d 645 (6th Cir. 2001)....................................... 44

*United States v. Langford*, 647 F.3d 1309 (11th Cir. 2011) .................................. 49

*United States v. Manjate*, 327 F. App'x 562 (6th Cir. 2009) .................................. 32

*United States v. Martin*, 455 F.3d 1227 (11th Cir. 2006) ...................................... 39

*United States v. Peppel*, 707 F.3d 627 (6th Cir. 2013)......................... 34, 39, 44, 47

*United States v. Reagan*, et al., 725 F.3d 471 (5th Cir. 2013) ............................... 49

*United States v. Serafini*, 233 F.3d 758 (3d Cir. 2000)............................................ 34

*United States v. Spano*, 411 F.Supp.2d 923 (N.D. Ill. 2006)................................... 40

*United States v. Triana*, 468 F.3d 308 (6th Cir. 2006) ........................................... 44

*United States v. Vrdolayk*, 593 F.3d 676 (7th Cir. 2010) ....................................... 34

**Statutes**

18 U.S.C. § 3553(a)........................................................................................ *passim*

**Rules**

U.S.S.G. § 1B1.3(a)(1)(B) ......................................................................... 44

U.S.S.G. § 2B1.1 ....................................................................................... 44

U.S.S.G. § 2C1.1(a)(2) ...............................................................................43

U.S.S.G. § 2C1.1(b)(2) .............................................................................. 44

U.S.S.G. § 2E1.1........................................................................................ 43

U.S.S.G. § 3B1.1(a) ................................................................................... 45

## INTRODUCTION

In January 2002, Kwame Kilpatrick became the sixty-eighth mayor of Detroit. He ran for office on the slogan "*Our Future:  Right Here, Right Now!*" promising that he would devote his energy and talent to turn around a struggling city. Instead, he made its citizens endure a tumultuous period of corruption, scandal, mismanagement and greed, followed by years of civil and criminal litigation in the courts. He created a "pay-to-play" system for the provision of city goods and services which compromised vast swaths of city government, including the water and sewer system, the convention center, the pension system, casino developments and recreation centers. City government essentially became up for grabs for the right price.

This was not "politics as usual" as Kilpatrick's defense team would later argue during his trial on federal racketeering charges. Kilpatrick extorted city vendors to help his coconspirators and to line his own pockets. He rigged bids and took bribes. He defrauded non-profits to enrich himself, his wife and his associates. And worst of all, he did it all in a city where poverty, crime and lack of basic services made it one of the most vulnerable metropolitan areas in the

1

nation. The scale of his corruption was astonishing. The impact on the region was devastating.

As a career public servant and a licensed attorney, Kilpatrick was especially qualified to understand the gravity of his crimes. He understood the power and trust given to elected officials and that corruption benefits the few at the expense of the many. His crimes were not the result of a momentary lapse in judgment. He systematically exploited his office to enrich himself, his friends and his family.

Kilpatrick's crimes put him at the very top of the most significant municipal corruption cases in this country in decades. Since 2004, when the federal sentencing guidelines were amended to reflect the grave consequences of corruption on communities, the sentences imposed in major state and local corruption cases have ranged from 14 to 28 years in prison. When taking into account these cases, as well as the sentencing guidelines and the statutory factors set forth at Title 18, United States Code, Section 3553(a), a sentence of at least 28 years in prison is justified.

## ARGUMENT

### A. The Nature and Circumstances of Kilpatrick's Crimes (18 U.S.C. § 3553(a)(1))

#### 1. Overview of the Racketeering Enterprise

The evidence produced during the six-month trial established beyond a reasonable doubt that Kilpatrick ran a criminal enterprise using the office of the mayor of Detroit. He schemed with codefendant Bobby Ferguson and others to cash in on his position as mayor. He lived well beyond the means of a public servant by taking public money for himself and his associates, and away from the impoverished city he took an oath to serve.

Before Kilpatrick became mayor his finances were unremarkable:  his paychecks from the State of Michigan were direct deposited regularly into his bank account, enabling him to make withdrawals when he needed cash and to write checks to pay for ordinary household expenses. After he became mayor, his banking radically changed: cash withdrawals almost ceased, replaced by regular round number cash deposits and cash payments of his credit card bills. *See* Trial Exhs. KKF-1 & 3. As shown in the chart below, his net monthly cash activity was in the red during the entire year before he took over as mayor. It continued in the red during his first six-months as mayor until he became accustomed to the job. Thereafter, the color of his cash activity in his banks changed to green and stayed

3

that way---increasing each year until hitting a peak just before he went to jail for the first time.



In all, while he was mayor, Kilpatrick conducted more than half a million dollars in cash transactions, mostly cash deposits and cash payments of his credit card bills. His bank records alone showed more than $840,000 in unexplained expenditures above and beyond his salary as mayor. Trial Exh. KKF-30. None of this extra money was disclosed on his tax returns. And it was a bare *minimum*--- just the money and expenditures investigators could identify from his financial records. It does not account for any of the cash bribes and kickbacks that Kilpatrick kept or spent outside of his financial institutions.

4

Bobby Ferguson was the coconspirator who benefited most from Kilpatrick's tenure as mayor. Kilpatrick made Ferguson rich, improperly steering tens of millions of dollars of city contracts to Ferguson or companies associated with him. Before Kilpatrick came to office, Ferguson did some demolition and excavation work for the city, but he was not a major player. After Kilpatrick took office, Ferguson and his companies received city-related gross revenues of more than $120 million, at least $73 million of which came from extortion and bid-rigging. The relationship was not a one-way street. It benefited both men as illustrated by a text exchange between the two regarding the restoration of the Book-Cadillac Hotel overseen by the city:

> KMK:  Anything happens on Book Caddy will be on the News.
>
> BWF:  Lol, what have you gotten me into, any thing with kwame kill, next to it is news worthy. i am famous now. just need to get some money.
>
> KMK:  Lol! Right. Let's get you some.
>
> BWF:  Us.

Trial Exh. BCD-09.

At the same time that Kilpatrick's bank accounts showed a regular influx of cash, the cash in his partner Ferguson's accounts---brimming with money from

5

city projects---flowed the other way. Their text messages give a partial snapshot of why their cash-streams went in opposite directions:  furtive meetings at parks and other locations around the city; promises by Ferguson and thank-yous from Kilpatrick for cash; codes to a hotel safe containing $7,500 in "loot." In all, during Kilpatrick's time as mayor, Ferguson withdrew more than $2.5 million in cash from his bank accounts.

In the fall of 2008, as Kilpatrick's partnership with Ferguson in city contracts was coming to an end, Ferguson's cash withdrawals increased. At the same time, as shown in the chart above, Kilpatrick's cash deposits spiked---with more than $50,000 in cash going into his accounts in just the two month period from September to the end of October, when he began his jail sentence. On September 4, 2008, the day Kilpatrick pled guilty to the state charges and announced his intention to resign as mayor, one of Ferguson's associates obtained $50,000 in cash using a check from Ferguson's company, Xcel Construction. The next day a different Ferguson associate obtained another $30,000 in cash from Xcel's account. With the news media pursuing Kilpatrick because of the scandal, Ferguson could not easily get to him so he recruited Mahlon Clift, a friend of Kilpatrick's from Chicago, to deliver $90,000 cash to

Kilpatrick. Clift hid the cash in a vacuum cleaner for safekeeping, then delivered the cash to Kilpatrick in two installments:  once in Detroit and once in Texas.

On September 17, 2008, the day before Kilpatrick left office, Ferguson cashed a certificate of deposit worth $1.1 million representing prior payments on DWSD contracts. He used those funds to purchase twenty sequential cashier's checks of $50,000 or more, each made payable to Xcel. Several months later --- shortly before Kilpatrick was to be released from jail for his first state sentence --- federal agents executed a search warrant at Ferguson's offices. They found a large safe concealed behind a wall in Ferguson's personal office. Ferguson told the agents that the safe contained only "personal" items, but when the agents opened it they found it stuffed with over $260,000 cash. Later, at a different location, agents found another safe owned by Ferguson with more than $275,000 in cash, as well as $500,000 in cashier's checks.

### 2. Fraud

Even before Kilpatrick took his oath of office as mayor, he and Ferguson had a plan to take public money for themselves. As a member of the Michigan House of Representatives, Kilpatrick secured a half-million dollar grant from a state arts, culture and quality of life fund for a non-profit set up by Ferguson. Ferguson claimed he would use the grant to help seniors and runaway youth.

But the very first thing Ferguson did after receiving the state funds was to wire $100,000 of it to Kilpatrick's wife, Carlita. Ferguson then took another $100,000 and used it to renovate his new corporate headquarters. This had nothing to do with helping seniors or runaways, the cover story Ferguson gave the state to justify his expenses. When Kilpatrick learned that the state had refused to give Ferguson the second installment of money because of Ferguson's lack of documentation, Kilpatrick became livid, accusing state administrators of bias in their scrutiny of grant recipients.

Kilpatrick also persuaded his pastor to apply for a state arts grant on the condition that the pastor give a portion of the money to Kilpatrick's wife, Carlita, to teach non-violent conflict resolution at local schools. When the pastor's non-profit organization received the grant, it paid Carlita $37,500, which was the first installment of a promised $75,000 payment to her. After the payment, Carlita did not teach any schoolchildren despite repeated attempts by the non-profit to get her to fulfill her promise. When Kilpatrick learned that his pastor's non-profit coordinator had told the state about Carlita's involvement, he angrily scolded the coordinator about the disclosure. Carlita did not return the money, so the non-profit had to use its own funds to reimburse the state.

After he became mayor, Kilpatrick cooked up more fraudulent schemes, including misappropriating funds from other non-profits. The most important of these new schemes involved a non-profit he created called the "Kilpatrick Civic Fund." He promised donors to the civic fund that he would use the money to improve Detroit neighborhoods and the lives of city youth, and that he would not use it for personal purposes or for his political campaigns. *See, e.g.,* Trial Exh. KCF-99. In a televised debate during his first campaign for mayor he declared emphatically, "We haven't used one penny, one penny of the civic fund in this campaign because it's not allowed by law." Trial Exh. KCF-1A. Contrary to his assurances, he used $159,000 from the civic fund to finance his campaigns. This was not for city neighborhoods or for children as he promised but to keep himself in office and thus in a position to continue to enrich himself.

Kilpatrick's donor solicitation letters boasted that the civic fund helped support local youth football leagues and educational seminars. The civic fund did in fact make token contributions to these activities, but they paled in comparison to the more than $200,000 of donor money Kilpatrick used for personal purposes like a getaway weekend to Vail with his Chief of Staff Christine Beatty; spa treatments; yoga sessions; high-end golf clubs and lessons; anti-bugging equipment; and private preschool, waterparks and summer camp for his children.

Kilpatrick did not hesitate to cover up his improper uses of the civic fund when caught. He instructed his communications director, Matt Allen, to tell the news media that Kilpatrick had personally paid for a family vacation to the four-star La Costa Resort & Spa outside San Diego. After the media got a copy of the $8,605 civic fund check Kilpatrick used to pay for the resort, Kilpatrick switched his story, falsely claiming that he had traveled to the upscale retreat to find wealthy West Coast donors to the civic fund.

When the text message scandal broke, Kilpatrick used $100,000 in civic fund money to hire a nationally-renowned crisis manager to minimize the damage to his reputation. As his grip on the mayor's office loosened, he drained the civic fund, handing out nearly $200,000 more to his friends and family, including $50,000 to his father Bernard Kilpatrick and another $110,000 to his Chief of Staff Christine Beatty for supposed services to the non-profit. As he prepared to depart from Detroit, he used the civic fund to pay for his relocation expenses, including hotels, rental homes and moving vans. On his way out, he even offered the caretaker of the Manoogian mansion a $10,000 civic fund check for the furniture in the mayoral residence. In total, Kilpatrick used his civic fund to siphon away at least half a million dollars in expenses that had nothing to do with the fund's purpose of helping the community of Detroit.

The civic fund was not the only non-profit Kilpatrick raided for personal gain. He required Emma Bell, his fundraiser for his non-profits and a woman who had known him since he was a child, to kick back nearly half of her commissions to him. Through this scheme, he took over $250,000 in cash from his non-profit campaign and inaugural funds, none of which he declared on his income taxes.

### 3. Bribes

While he was mayor, Kilpatrick also took bribes from local vendors who wanted city business. On at least three occasions, he took $5,000 to $10,000 cash from businessman Karl Kado to protect Kado's cleaning and electrical contracts at Cobo Civic Center. Derrick Miller, Kilpatrick's Chief Administrative Officer, delivered thousands more in cash from Kado to Kilpatrick for Kado's Cobo contracts. In addition, Miller gave Kilpatrick about $50,000 of Miller's own cash kickbacks that he had received from a real estate broker who did business with the city. Near the end of Kilpatrick's time in office, Miller met Kilpatrick in a restaurant bathroom to give him another $10,000 cash kickback from a businessman who received financing from the city's pension funds.

Jon Rutherford, a homeless shelter owner who pulled $650,000 a year from his publicly-financed homeless shelter and adult foster care service, gave much of that money to politicians and their campaigns so he could land a casino on

Detroit's riverfront. Kilpatrick was the biggest beneficiary. Rutherford gave several hundred thousand publicly-derived dollars to Kilpatrick, his father, and his non-profit and campaign organizations. This included several thousand dollars in cash Rutherford gave Kilpatrick in Las Vegas and another $10,000 in cash he gave Kilpatrick to buy custom-made dress suits on a trip to Dubai.

Others were drawn into Kilpatrick's corrupt orbit. Construction contractor Johnson Akinwusi won a contract to build the city's Heilmann recreation center after paying off Kilpatrick's outstanding bills for custom-made suits and partnering with one of Ferguson's companies. Investment advisor Chauncey Mayfield, who received tens of millions of dollars of city pension funds to invest, gave $50,000 to the Kilpatrick Civic Fund and more than $100,000 worth of entertainment expenses and private jets to Kilpatrick and his friends for junkets to Las Vegas, Bermuda and Florida. *See* Rule 11 Plea Agreement of Chauncey Mayfield, No. 12-CR-20030-NGE (E.D. Mich., Feb. 7, 2013). Kilpatrick took flights worth over $300,000 from Anthony Soave, including a shopping trip to New York City where Soave bought him a Rolex watch, to ensure that Soave's Detroit-based companies would not be harmed by Kilpatrick.

Kilpatrick also directed city vendors to pay his father, Bernard Kilpatrick, in order to receive favorable treatment on city contracts and pension deals. This

included Kilpatrick's college friend, Marc Andre Cunningham, who paid regular

cash kickbacks to Bernard Kilpatrick, at Kilpatrick's direction, for $30 million in city

pension fund financing for a venture capital firm run by Cunningham's uncle.

### 4. Extortion

But none of these bribers got anywhere near the largesse Kilpatrick

reserved for Ferguson. After Kilpatrick became mayor, he and Ferguson

dramatically scaled up their criminal ambitions from their initial theft of state arts

grants. Kilpatrick's authority and influence over public resources as mayor far

outstripped his power as a state legislator, enabling him to steer stunning

amounts of city business to Ferguson. City contractors quickly learned that they

had to cut in Ferguson or their city contracts would be held hostage, even

canceled. It did not matter whether the contractors needed or wanted Ferguson,

or whether he would do anything for the payouts. Tens of millions of dollars of

city business went to Ferguson, some of it for no work at all.

Early on, Kilpatrick and Ferguson figured out that the Detroit Water &

Sewerage Department (DWSD) was one of the few remaining sources of ready

capital in the cash-strapped city, with more than $1 billion available to use for

contracts with outside vendors. Adding to its allure was the fact that the mayor

had been appointed as "special administrator" over the DWSD which allowed him

to approve large DWSD contracts without oversight or scrutiny by the Detroit City Council.

Ferguson used threats of financial harm to pressure businessmen to hand over money or city business to Ferguson. Kilpatrick backed up these threats by holding up or canceling public contracts when businessmen did not play ball. The partnership extorted and bid rigged at least $73 million in city contract revenues to Ferguson. Shortly after taking office, Kilpatrick held hostage a $50 million contract to fix aging sewers beneath the city until Inland Waters, the company awarded the contract, agreed to Kilpatrick's demand to dump its minority subcontractor for Ferguson.

Kilpatrick and Ferguson used this same formula throughout Kilpatrick's tenure as mayor to extort and steer contracts for Ferguson's benefit. DLZ, a minority-based company with a subsidiary headquartered in Detroit, was the top bidder for another sewer project, besting Ferguson's team. So Kilpatrick quietly summoned his Human Rights Department Director, Gerard Grant Phillips, to the Manoogian mansion, took him to a side-room, turned up the television to full volume, and ordered Phillips to pull DLZ's Detroit headquarters certification. *See* Report of Interview of G. Phillips, dated June 9, 2010. Phillips did as he was

14

told which caused Ferguson's team to leapfrog DLZ for the bid award, costing
taxpayers more than $1.6 million. Trial Exhs. LS3-11, LS3-18 & LS3-36.

Another Detroit-based minority-owned construction company, Lakeshore
Engineering, had its $10 million contract for sewer repairs canceled because it
declined to give Ferguson 25% of the deal. Before making his demand, Ferguson
text messaged Kilpatrick to make sure he would hold up the contract long enough
so Ferguson could make his move. *See* Trial Exh. LS1-11. After Lakeshore declined,
Ferguson and Kilpatrick mulled over the best approach to benefit Ferguson. *See,
e.g.,* Trial Exh. LS1-12. According to Kilpatrick's Chief Administrative Officer,
Derrick Miller, Ferguson decided he wanted the contract canceled so Kilpatrick
directed Miller to tell DWSD Director Victor Mercado to cancel it. The work was
given instead to Inland Waters, the company that previously had agreed to play
ball with Ferguson by dumping its minority partner for Ferguson.

When the DWSD announced the next major contract to repair sewer
outfalls, Lakeshore had learned its lesson and made sure Ferguson was on its
team. During the negotiations, Ferguson gloated to Miller that Lakeshore had
"gotten smart" that there would be "no deal without me [Ferguson]." Trial
Exh. LS2-2. To ensure it did not lose the contract, Lakeshore made $1.7 million in
"no show" payments to Ferguson.

15

Other local companies also had to enter into dubious deals with Ferguson to ensure they did not lose city contracts they had legitimately earned. Early in the Kilpatrick administration, Detroit-headquartered construction firm Walbridge Aldinger was confident that it had submitted the lowest equalized bid to construct the Baby Creek combined sewer overflow facility near the Rouge River. After the bids were opened, Chief Administrative Officer Derrick Miller, at Kilpatrick's request, told a Walbridge official that his company needed to put Ferguson in the deal. Although Walbridge had prepared its bid without any involvement by Ferguson, it signed a one-page handwritten agreement with Ferguson promising him that if Walbridge were awarded the contract, Walbridge would give $12.73 million of the work to Ferguson. Trial Exh. WA1-14. Walbridge already had its team in place, but it felt it had to give a sizeable piece of the project to Ferguson to ensure it did not lose the contract.

One week after Walbridge signed this hastily-drafted side agreement, DWSD director Victor Mercado recommended Walbridge for the contract, which Kilpatrick later approved in his role as special administrator. When subcontractors later bid on the project, Ferguson wanted to influence the results for his benefit without interference by DWSD, so he told Kilpatrick: "Baby Creek, I told you I

would call your when I need help, help f--king victor [*Mercado, expletive deleted*], I don't need DWSD to set in on the bid opening." Trial Exh. WA1-33.

City contractors had gotten the message loud and clear:  no deal without Ferguson. Much of the contracting community was convinced that they had to hire Ferguson if they wanted a city job. Many of the largest city projects now had Ferguson on them. And it was not because he had the lowest prices. The scheme worked so well that Ferguson needed to use a second company he controlled, Xcel Construction, so he would not attract attention by being on so many major city projects.

The steering of city business to Ferguson became so extreme that it trumped family ties. Even Kilpatrick's sister, Ayanna, complained to Kilpatrick and Derrick Miller that she wanted to make money from her brother's administration too, but she could not compete against Ferguson in obtaining city contracts: "Here we go with this Bobby bull again!  [*Kilpatrick political operative Michael*] Tardiff cancelled meeting with my guys today. Just stated bobby wants to do same thing.. (Waste Hauling). Great if its room for him, terrible if he's holding us up!  Can we make $ too?!!" Trial Exh. RC-46.

Kilpatrick did not consider costly public works disasters to be a setback for the city but a financial opportunity for Ferguson and ultimately himself. A huge

sewer collapse in Sterling Heights cost DWSD customers in southeast Michigan tens of millions of dollars. Kilpatrick's immediate concern was making sure Ferguson got a piece of it, so he directed him to meet with DWSD Director Mercado at the site of the emergency response. Ferguson texted Kilpatrick that he had a "great idea" on how Ferguson would "move in," then sketched out his plan. Kilpatrick responded enthusiastically, saying, "Perfect! That's what I needed." Trial Exh. IN1-34. Inland, the general contractor overseeing the emergency response, gave Ferguson more than $3 million worth of work, but he thought he deserved more. When an amendment to Inland's contract was sent to the mayor's office in August 2005 to cover part of the cost of the repairs, Kilpatrick did not sign off on it as special administrator until December 23, 2005, after Inland finally agreed to give Ferguson more money. Trial witnesses like Derrick Miller and Bernard Parker III confirmed that Kilpatrick would not approve Inland's payments until the situation with Ferguson was resolved.

By this time Kilpatrick was running out of time to exploit his power as special administrator to help Ferguson. On January 5, 2006, less than two weeks after Kilpatrick signed Inland's contract amendment for the emergency repairs, U.S. District Judge John Feikens terminated Kilpatrick's authority as special administrator over the DWSD. Kilpatrick rushed over to the judge's chambers,

pleading with him to rescind the order because Kilpatrick had a number of important things he needed to do as special administrator, including getting payment on five DWSD contracts. *See* Report of Interview of V. Brader, dated Sept. 23, 2011; Trial Exh. DLZ-31. The judge declined to reconsider his order, but Kilpatrick persuaded him to approve the five contracts. Four of them involved Ferguson.

Even after Kilpatrick lost his special administrator authority in 2006, he still wielded enormous influence over the DWSD and its director, Victor Mercado, who served at the pleasure of the mayor. For example, in 2007, Ferguson demanded that Walbridge make him a 35% joint venture partner in a $140 million DWSD contract to repair the Oakwood pump station, even though Ferguson refused to assume any downside risk if there were losses on the job. Before the bids were submitted, Mercado added pressure to Walbridge's decision by inappropriately contacting a Walbridge executive to encourage its partnership with Ferguson. *See* Email from R. Hausmann to J. Rakolta, dated Feb. 1, 2007. Chief of Staff Christine Beatty caused the bidding deadline to be delayed specifically so Ferguson could work out a deal with Walbridge. Ferguson even arranged for Walbridge's president to meet privately with Kilpatrick at the Manoogian mansion about Ferguson's demands. *See* Email from J. Rakolta to

R. Hausmann, dated Feb. 8, 2007. After Walbridge decided it could not accept Ferguson's unreasonable terms, they lost the contract.

If Ferguson did not get a city contract, there could be consequences not only for the winning bidder, but for any official who allowed it to happen. Toward the end of his tenure as mayor, Kilpatrick became furious when he learned that the director of the Detroit Economic Growth Corporation (DEGC) had not awarded Ferguson's team the contract to demolish old Tiger Stadium, even though Ferguson's bid was $300,000 higher than the winner, a joint venture which included a qualified Detroit-based minority demolition company. Kilpatrick lacked the power to outright fire the DEGC director so he sent one of his top aides, Kandia Milton, to ask that the director resign his position. *See* Reports of Interviews of G. Jackson, dated July 7, 2010, at 5-6, and K. Milton, dated July 8, 2010.

Throughout Kilpatrick's time in office, he and Ferguson paid lip service to the advancement of minority businesses. It was a smokescreen for their real agenda---helping themselves and their associates to the city's limited resources. In reality, Kilpatrick and Ferguson were equal opportunity extortionists---pushing out both black and white contractors who got in their way. If minority business enterprises did not play ball, they crushed them, then laughed when the company

officials went to Kilpatrick and his staff for redress. When minority construction

contractor Odell Jones confronted Ferguson about Ferguson's failure to provide

his workers with safety protection, Ferguson was offended that Jones had the

nerve to question him, adding that he would simply get Kilpatrick to call the

governor to get the violations dismissed. After the encounter, Jones's invitations

to bid for city business dried up. He went to the administration and Kilpatrick's

mother, U.S. Representative Carolyn Cheeks-Kilpatrick, for help, only to be

laughed at by Kilpatrick and Ferguson:

> BWF:  Odel jones call your moma [*Cheeks-Kilpatrick*], lol
>
> KMK:  I know. And my sister [*Ayanna*].
>
> BWF:  Ok, I thought it was funny, should have followed
>          my first mind I know he wasn't s--t [*expletive
>          deleted*]
>
> KMK:  Yep.

*See* Trial Exh. DBB-1.

Similarly, minority contractor Tom Hardiman was shut out when he tried to

find out why Lakeshore's sewer contracts had been canceled and whether it had

anything to do with not giving Ferguson a piece of Lakeshore's business. After

Hardiman reached out to Kilpatrick's mother for help, Ferguson and Kilpatrick

mocked him, just like before with Jones:

> BWF:  Tom hardiman, lakesure they called your mother
> office on us. Zeke [*Chief Administrative Officer
> Derrick Miller*] just called me.

> KMK:  Lolol!

> BWF:  You got to talk to dedan [*Kilpatrick's executive
> assistant Dedan Milton*] and zeke [*Miller*], this s--t
> [*expletive deleted*] is funy about the s--t [*expletive
> deleted*] the union and lakesure is saying. Hey I
> didn't know I would become the motherf--king
> man [*expletive deleted*] of The real man 'kmk'

*See* Trial Exh. LS1-13.

For Kilpatrick's criminal partnership with Ferguson to survive and prosper,

they needed to conceal their activities from the public and from law enforcement.

At least initially, they sent text messages to each other instead of talking on the

phone. During his promotional tour for his 2011 memoir, Kilpatrick told a

reporter, "The FBI investigated mayor Coleman Young and they had all these

tapes of his phone calls. So my thing was, 'I'm doing this new texting thing. They

can't listen to this.'" Midway through his tenure as mayor, however, Kilpatrick got

wise to the risks of text messaging using his city-owned SkyTel pager when his

executive assistant Marc Andre Cunningham told him that SkyTel was storing the messages and that un-stored PIN-to-PIN messaging on a Blackberry was a safer course. Kilpatrick and Ferguson quickly dumped their Skytel pagers and Ferguson bought each of them Blackberry devices so they could continue their communications without any paper trail.

In order to hide the true nature of their relationship from the news media, Kilpatrick and his public relations team strategized closely with Ferguson about what they should tell the press about Ferguson's financial support of Kilpatrick's political campaigns, whether they traveled together, and how much work Ferguson was getting from the city. *See, e.g.,* Trial Exh. RC-31. At the same time, Kilpatrick tried to protect Ferguson's increasingly tattered reputation when more and more of his questionable behavior came to light. After Ferguson was convicted of bludgeoning one of his employees with the butt of a pistol, Kilpatrick quickly came to Ferguson's defense, issuing a statement to the press calling him "a dedicated family man and one of the hardest-working people I know." The wounded employee was later awarded $1.6 million by a judge after suing Ferguson for the permanent brain damage Ferguson caused by the brutal beating.

Despite their efforts, the public and the news media started taking notice of the sheer number of city projects Ferguson was winning. So, Kilpatrick and

Ferguson strategized about how to hide Ferguson's success from public view. In one telling exchange, Chief of Staff Christine Beatty texted Kilpatrick about a proposal to construct a new police department headquarters, asking, "Why not Bobby in this?" Kilpatrick responded, "Bobby wanted to strategically lose a major bid. He will be on this one at bid time." Trial Exh. RC-28. What contractor would spend the time and money bidding on a city contract in order to lose it on purpose? Someone who did not really have to bid because he was partners with the mayor. And someone who needed to conceal that partnership.

**B. <u>Kilpatrick's History and Characteristics</u> (18 U.S.C. § 3553(a)(1))**

Kilpatrick's history and characteristics also strongly support a very substantial prison sentence. The bribery, extortion and fraud exposed during Kilpatrick's six-month racketeering trial was just one portion of the self-dealing and abuse of trust he inflicted on the city during his turbulent six years as mayor.

**1. Misappropriating City Resources**

As mayor, Kilpatrick lived a luxury lifestyle his city salary could not possibly support: jetting around the country in private planes supplied by city contractors and pension fund investment recipients; treating himself to resort vacations and a seemingly limitless wardrobe of custom-made suits. On those occasions when his globe-trotting included a legitimate governmental purpose---like a conference of

mayors---he often arrived with a head-turning entourage of bodyguards, associates and friends befitting a foreign head of state. Meanwhile, on the home-front, the city he was supposed to govern faced a projected $230 million deficit, its citizens lacked basic services like street lights and police protection, and one-third of its adults and one-half of its children were living below the poverty line.

Seemingly oblivious to these stark realities, Kilpatrick did not hesitate to grab the city's dwindling resources for his own personal use. In his first three years in office, Kilpatrick charged over $200,000 on his city-issued credit card for expensive dinners, champagne, entertainment, spa treatments in Las Vegas, and travel. Detroit taxpayers were not the only ones rankled by his behavior. The Washington, D.C., police announced that they would no longer provide Kilpatrick after-hours security protection when he and his associates partied at nightclubs after difficulties encountered during his previous trips to the nation's capital. The Kilpatrick administration lashed out that the statements by the Washington police were part of an effort to ruin him.

Then there were the extravagant gifts that Kilpatrick's office staff was expected to give him. Kizzi Montgomery---an office staffer who made just one-fifth the salary given to Kilpatrick---testified that during Kilpatrick's six years in office she was expected to give money twice a year so he could get opulent

birthday and Christmas gifts like getaway golf vacations and a $22,000 Rolex watch. Private parties got into the action, too. Kilpatrick enjoyed large gatherings where city business people and officials could lavish him with gifts. William Tandy, the coach of the West Side Cubs charity league football team, testified that he had to eat ramen noodles for a week in order to afford the $100 contribution partygoers were handing over at the "Splash of Red" party for Kilpatrick's birthday.

It was not a one-way street of giving to Kilpatrick for all city employees, though. City payroll records showed that more than two dozen of Kilpatrick's appointees were family members or close friends. News media analysis of city employment records showed that during a time-period when Kilpatrick was slashing city jobs, his family and friends received an average 36% salary increase while other city workers received only a 2% raise.

Kilpatrick also used city resources to pamper his immediate family. During his first term in office, text messages show that Kilpatrick arranged for the city to lease a series of high-end Lincoln Navigator sports utility vehicles for his wife, Carlita. In his first year in office, the police department leased a maroon Navigator for her at a cost of $14,000, followed by a red Navigator with a 2-year lease costing the city $24,995, just $5 below the threshold requiring city council review.

Once the news media got wind of the expenditures, Kilpatrick and his staff at first denied the SUV was for Carlita. Police officials claimed the fully-loaded Navigator (with an aftermarket DVD player installed for his children), was leased for undercover police work. The recently-appointed Deputy Mayor denied the police department had leased vehicles for the mayor. Kilpatrick followed, "I need to be absolutely clear. When the Deputy Mayor stands up and says there was never a vehicle ordered for my wife, that is absolutely true."

This was all a charade. According to Kilpatrick cabinet officials Derrick Miller and Sean Werdlow, after the media took notice of the pricey SUV, Kilpatrick and Beatty authorized aides to mislead the public about the Navigator. *See* Reports of Interviews of D. Miller, dated Oct. 12, 2012, at 2, and S. Werdlow, dated Nov. 7, 2012, at 4. Finally, after weeks of denying it, Kilpatrick admitted that the city paid to lease the SUV for his wife, chalking it off to "some screw-ups in communication," then criticized the media for aggressively pursuing his family.

Kilpatrick's selfish attitude had ramifications for other important city initiatives. After the city entered into a federal consent decree to reform how the police department treated criminal suspects, *see United States v. City of Detroit,* No. 03-CV-72258 (E.D. Mich.), Kilpatrick jeopardized the integrity of the process by having romantic liaisons with the court-appointed monitor overseeing the

reforms. The monitor resigned her position after text messages uncovered by criminal investigators revealed the affair. The city later sued to recover the $10 million in fees it had paid the monitor and her employers, which was resolved in an undisclosed settlement in 2011. *See City of Detroit v. Sheryl Robinson Wood et al.,* No. 11-12584 (E.D. Mich.).

### 2. Perjury and Cover Up of Text Messages

Gary Brown, head of the police department's internal affairs unit, and Harold Nelthrope, a member of the mayor's executive protection unit (EPU), obtained jury verdicts against Kilpatrick and the city in lawsuits complaining they were fired in part in retaliation for their roles in an investigation into misconduct by Kilpatrick's EPU staff as well as a rumored party at the mayor's residence. *See Brown v. Mayor of Detroit,* 478 Mich. 589, 734 N.W.2d 514 (2007). During the trial and in pretrial depositions, Kilpatrick and Beatty falsely testified that they did not fire Brown, but instead ended his appointment as a deputy police chief so that he would return to work as a police lieutenant. Their testimony was refuted by their own internal text exchanges. Within days of firing Brown, Beatty texted Kilpatrick, "I'm sorry that we are going through this mess because of a decision that we made to fire Gary Brown. . ." Kilpatrick replied, "True! It had to happen though. I'm all the way with that!" Kilpatrick later texted his staff, "We must answer the

question. 'Why was Gary Brown fired.' It will be asked. I need short, powerful answer!"

The jury found that Kilpatrick and his administration had unlawfully retaliated against Brown and Nelthrope, awarding them $6.5 million in damages. Kilpatrick immediately vowed to appeal, but then approved an even larger $8.4 million settlement for Brown, Nelthrope and a third officer after learning that they had obtained text messages showing that Kilpatrick and Beatty perjured themselves in their testimony. Kilpatrick attempted to cover up the text messages by using public funds to pay for the return of the messages and the silence of the officers. The Detroit City Council and the trial court, unaware of the secret side deal or the text messages, approved of the settlement.

The scheme began unraveling after news outlets received some of the text messages and began publishing stories about Kilpatrick's and Beatty's lies and concealment of information relating to the settlement. As news of the scandal intensified, Kilpatrick accepted Beatty's resignation, saying it was "the right thing to do." He did not tell the public that Beatty would get $150,000 in non-profit money for taking the fall for the scandal --- $110,000 from the Kilpatrick Civic Fund and $40,000 from the "Next Vision Foundation," his sister's non-profit.

But Kilpatrick defiantly refused to leave office himself. Instead, he engulfed the city and the region in another seven months of non-stop civil and criminal litigation. Fed up with the spiraling scandals and gridlock, the Detroit City Council entered a resolution calling for Kilpatrick's resignation and, when that did not work, petitioned the governor of Michigan to remove him from office.

The Wayne County Prosecutor filed criminal charges against Kilpatrick for his cover-up in the whistleblower suit. *See People v. Kilpatrick,* No. 08-58169 (Wayne County Circuit Court). As Kilpatrick's trial date neared he assaulted a sheriff's detective who was trying to serve a subpoena on Bobby Ferguson to appear as a witness in the case. According to the detective and his partner, Kilpatrick emerged from the house with his armed bodyguards nearby, began shouting expletives at the investigators, then grabbed the detective and shoved him into his partner causing him to fall. The Michigan Attorney General filed charges against Kilpatrick for the incident, stating, "In my almost twenty years as a prosecutor and now as Attorney General, I cannot recall one case where someone ever assaulted a police officer as he or she tried to serve a witness."

The months of legal tumult paralyzing the city finally ended when Kilpatrick agreed to plead guilty to two felony counts of obstruction of justice for lying on the witness stand in the whistleblower case and no contest to assaulting the

sheriff's detective. As part of the plea, Kilpatrick agreed to resign his position as mayor, serve four months in jail, and pay $1 million in restitution to the city.

### 3. Refusal to Pay Restitution

Immediately upon Kilpatrick's release from jail, he departed Detroit in a private jet for a rented mansion in Texas. Almost as quickly, he lost interest in paying his restitution obligations to the financially distressed city he left behind. He fell into arrears, at one point telling the judge overseeing his probation that he could only afford to repay $6 per month to the city. The judge had to conduct four days of hearings to get to the bottom of Kilpatrick's claimed lack of resources. During the hearings it came out that Kilpatrick received $240,000 from four Detroit-area businessmen. One of the businessmen gave Kilpatrick a $180,000 per year salary plus commissions to be a software salesman in Dallas. A local bridge owner kicked in another $50,000 for Kilpatrick's wife and children.

Rather than paying off his restitution with all this money, Kilpatrick used the windfall (as well as Ferguson's cash bribes) in an attempt to recreate the luxury lifestyle he enjoyed as mayor of Detroit. The restitution hearing revealed that Kilpatrick paid a remarkable $75,000 up-front for a 13-month lease of a 5,866 square foot mansion in a wealthy Dallas suburb, leased luxury vehicles and sent his children to private schools.

31

Following the hearings, the judge revoked Kilpatrick's probation and sent him back to jail, finding that he had repeatedly lied during the proceedings about his ability to repay the city, which was contradicted by the hundreds of thousands of dollars flowing through his bank accounts. The judge found that Kilpatrick perjured himself when he falsely claimed that he did not know whether his wife had a job, how much he paid for their home, or even who paid the family's bills. The judge concluded, "Most substantially, most compelling, is that you lied to this court. You continued to lie, after pleading guilty to lying in court. Obviously, there has been no rehabilitation. You have not changed." *People v. Kilpatrick,* No. 08-010496 (Wayne County Circuit Court, May 25, 2010).

**4. Lack of Remorse**

Even now, after years of civil and criminal litigation, there is no evidence that Kilpatrick has accepted responsibility for his crimes in office, nor is there any sign of remorse or contrition. *See In re Cook,* 551 F.3d 542, 551 (6th Cir. 2009)("It is well established that a defendant's remorse-or lack thereof-is an appropriate consideration in meting out punishment."); *United States v. Manjate,* 327 F. App'x 562, 573 (6th Cir. 2009)(considerations such as lack of remorse come squarely within the ambit of § 3553(a) factors). In a memoir he wrote in jail, Kilpatrick claims that he has faced down his demons and become a new man.

But in his book and other recent media pronouncements, he minimizes the crimes for which he pleaded guilty, implying that he was railroaded by a disdainful county prosecutor out to destroy him, who, along with the news media, "executed the most coordinated efforts since the Super Bowl" against him. *See Surrendered: the Rise, Fall & Revelation of Kwame Kilpatrick,* K. Kilpatrick with K. Turner (2011), at 232, 262. He further claims that the Wayne County Sheriff perfectly timed a "set up" of Kilpatrick to lure him to assault one of his detectives. *Id.* at 251-52. He claims that the Wayne County judges assigned to his case were influenced by the "dastardly" prosecutor as well as their own vanity and desire for media attention to treat him harshly and illegally. *Id.* at 252-66, 294-304. Incredibly, he now even claims that he was lying under oath when he stood up in court and pled guilty to obstructing justice. *Id.* at 263.

### 5. Positive Actions as Mayor

The government anticipates that Kilpatrick will emphasize to this court the positive accomplishments that occurred during his tenure as mayor. The government does not contest that he frequently attended to his official duties. It was the job for which he was elected and for which he was given a generous salary and benefits, including a mansion, a driver and numerous other perquisites of office. It does not set him apart from other criminals who oftentimes are

33

productive members of society when not otherwise engaging in criminal activity.

Indeed, it would be astonishing if Kilpatrick had not taken some positive official

actions as mayor given the authority and influence he had over how the city spent

millions of dollars for citizen services and capital improvements.

It is in part for this reason that the Sixth Circuit cautions sentencing courts

against placing too much weight on factors like a defendant's prior civic,

charitable and good works, as well as the defendant's special qualifications to

help the community. *United States v. Peppel*, 707 F.3d 627, 640-41 (6th Cir. 2013)

(citing *United States v. Bistline,* 665 F.3d 758, 766-67 (6th Cir. 2012); *see also*

*United States v. Serafini*, 233 F.3d 758, 773 (3d Cir. 2000)("if a public servant

performs civic and charitable work as part of his daily functions, these should not

be considered in his sentencing because we expect such work from our public

servants."). Defendants should not be sentenced more lightly on the ground that

they offer more to society than those who do not possess similar knowledge and

skill; otherwise criminals with privileged backgrounds would be treated better

than those with nothing left to lose. *Peppel*, 707 F.3d at 641; *United States v.*

*Vrdolayk*, 593 F.3d 676 (7th Cir. 2010)(defendants who do good deeds because

they are in a position to do so should not gain advantage over those who do not

because they cannot).

34

**C. Seriousness of Kilpatrick's Crimes, Just Punishment, and Respect for the Law (18 U.S.C. § 3553(a)(2)(A))**

A very substantial prison sentence is necessary to reflect the seriousness of Kilpatrick's crimes, to provide just punishment for those crimes and to promote respect for the law. Kilpatrick pervasively and systematically corrupted city government during his six years as mayor of Detroit. A pay-to-play culture infected large sectors of city contracting and the city's pension systems. Important infrastructure projects were delayed or shelved if Ferguson and Kilpatrick's other associates were not included in deals, costing ratepayers in the region money and proper service.

As the top public official of the state's largest city, Kilpatrick's behavior reverberated throughout the city's vast bureaucracy. Rather than inspiring his city managers and employees to serve the public, he set a powerful and distressing example for how to abuse public office. An alarming number of the department heads and advisors he handpicked for high-level city positions followed in his footsteps, resulting in their convictions for felony corruption offenses in office. In all, at least eighteen city officials and sixteen private parties who did business with the city were convicted of corruption offenses during Kilpatrick's tenure as mayor. These include Kilpatrick's Chief of Staff Christine Beatty (perjury and obstruction),

his Chief Administrative Officer Derrick Miller (bribery), his Deputy Mayor Kandia Milton (bribery), his DWSD director Victor Mercado (extortion), his two executive assistants DeDan Milton and Marc Andre Cunningham (bribery), and his two Cobo Civic Center directors Glenn Blanton and Lou Pavledes (bribery-related offenses).

Kilpatrick's cousin Nneka Cheeks---who Kilpatrick selected to run the non-profit which oversaw restorations of the Manoogian mansion where Kilpatrick resided as mayor---was convicted of stealing from that non-profit. Kilpatrick's college friend Jeffrey Beasley---who became a trustee of the city's two pension funds by virtue of Kilpatrick's appointment of him as Treasurer of the city---awaits trial on felony charges of extortion and bribery in discharging his fiduciary duties to the pension funds. Many of the allegations against Beasley involve shaking down pension fund investment advisors for lavish trips for Kilpatrick and Beasley and their associates, as well as more than $250,000 in payments to the Kilpatrick Civic Fund. The indictment, which names Kilpatrick as a coconspirator, alleges that the corruption caused more than $84 million in losses to the financially imperiled pension funds.

It is difficult to quantify the total cost of the devastating corruption instigated by Kilpatrick and his criminal confederates. In addition to the tens of millions of dollars of extorted city revenues which flowed into the bank accounts

of Ferguson and others, the tens of millions of dollars in losses from corrupt

pension fund deals, and the bribes Kilpatrick took from various city vendors, there

is the harder-to-quantify costs of the corrosive pay-to-play system Kilpatrick set

into motion. No one can assess the number of qualified, hard-working, ethical

contractors and vendors who simply sat on the sidelines or went elsewhere rather

than compromise themselves by working in a corrupt municipal environment. But

one thing is certain: it was the citizens of Detroit who were left holding the bag

when they handed over their hard-earned tax dollars to the city but in return did

not get the best services at the best price.

Kilpatrick is not the main culprit of the city's historic bankruptcy, which is

the result of larger social and economic forces at work for decades. But his

corrupt administration exacerbated the crisis. Economists widely recognize the

adverse effects of corruption on a region's economic health by reducing the

productivity of public expenditures, distorting the allocation of resources, and

frightening off investors, suppliers and service providers. The World Bank

estimates that corruption worldwide increases the cost of doing business by 10%

and consumes more than 5% of global gross domestic product. It should come as

no surprise then that those countries with the highest rates of corruption are

typically countries with high levels of political repression and dysfunction, and low levels of economic productivity and social well-being.

More corrosive than the financial costs of Kilpatrick's crimes was the intangible harm caused by his abuse of the public trust. One of the things separating our country from despotic regimes elsewhere in the world is our principle that no citizen is above the law regardless of his or her station in life. During Kilpatrick's six years as mayor, he acted as though the rules did not apply to him. The citizens had the right to expect honesty, integrity and responsibility when they elected Kilpatrick. What they got instead was widespread graft, extortion and theft. His crimes eroded the public's confidence in city government. As described by a federal judge in the prosecution of a corrupt mayor of Bridgeport, Connecticut:

> Government corruption breeds cynicism and mistrust of elected officials. It causes the public to disengage from the democratic process because . . . the public begins to think of politics as "only for the insiders." Thus corruption has the potential to shred the delicate fabric of democracy by making the average citizen lose respect and trust in elected officials and give up any hope of participating in government through legitimate channels.

*United States v. Ganim*, No. 3-01-CR-263, 2006 WL 1210984, at *5

(D. Conn., May 5, 2006).

After enduring six years of widespread corruption in city government

created and shaped by Kilpatrick, a very substantial sentence is necessary not only

to sufficiently punish Kilpatrick, but to renew public confidence in the rule of law.

## D. <u>Deterring the Criminal Conduct of Others</u> (18 U.S.C. § 3553(a)(2)(B))

Imposing a significant prison sentence for Kilpatrick also serves the

important purpose of deterring future public officials in this district and beyond

from engaging in similar misconduct. *See* 18 U.S.C. § 3553(a)(2)(B). General

deterrence has its greatest impact in white-collar cases, like this one, because

these crimes are committed in a more rational and calculated manner than

sudden crimes of passion or opportunity. *United States v. Peppel*, 707 F.3d 627,

637 (6th Cir. 2013)(quoting *United States v. Martin,* 455 F.3d 1227, 1240

(11th Cir. 2006)). As a federal judge in Chicago stated:

> We need not resign ourselves to the fact that
> corruption exists in government. Unlike some criminal
> justice issues, the crime of public corruption can be
> deterred by significant penalties that hold all offenders
> properly accountable. The only way to protect the public
> from the ongoing problem of public corruption and to
> promote respect for the rule of law is to impose strict
> penalties on all defendants who engage in such conduct,

> many of whom have specialized legal training or
> experiences. Public corruption demoralizes and unfairly
> stigmatizes the dedicated work of honest public
> servants. It undermines the essential confidence in our
> democracy and must be deterred if our country and
> district is ever to achieve the point where the rule of law
> applies to all --- not only to the average citizen, but to all
> elected and appointed officials.

*United States v. Spano,* 411 F.Supp.2d 923, 940 (N.D. Ill. 2006).

Unfortunately, the prosecutions and resulting penalties in past public

corruption cases in this region have not been sufficient. They clearly did not

dissuade Kilpatrick and his associates from using the mayor's office to engage in a

brazen 6-year crime spree. To the contrary, Kilpatrick and his confederates acted

with impunity, as if they were above the law. For many years now, the citizens of

this region have endured corrupt governance as though it were an inevitable cost

of living here. Kilpatrick's defense team mistook the resulting weariness for

cynicism, telling the jurors that they may not like how the sausage of government

is made, but it still tastes good. The jury rejected this message decisively with its

overwhelming verdicts against the former mayor. Responding to these historic

verdicts, then-Detroit City Councilman Gary Brown declared, "A 'culture of

corruption' existed in Detroit for far too long. . . . It is time for Detroit – for all

Detroiters – to close the era of wrong-doing, corruption and lack of integrity

40

within our city. . . . The young people in our city have watched this case and have been shown that values, integrity and character do count – they are all worth fighting for."

The young people of Detroit are not the only ones watching this case, of course. So are officials serving the public throughout the region and the state, some of whom may be tempted---like Kilpatrick---to enrich themselves at the expense of their constituents. While most of these current and future generations of public servants will serve honorably, those inclined otherwise need to know that there are severe consequences for violating the public trust. A very substantial sentence in this case will demonstrate to them and to the citizens of the region that corruption will be seriously addressed and deterred when discovered.

## E. Protecting the Public from Further Crimes by Kilpatrick (18 U.S.C. § 3553(a)(2)(C))

Kilpatrick has shown no appreciation of the gravity of his crimes. He has continued to flout the law by disregarding court orders and blaming his predicament on his perceived enemies, his defense lawyers, and the prosecutors and judges who have handled his cases. This lack of contrition does not give any confidence that he will not commit new crimes if given the liberty to do so.

41

That said, it is unlikely that Kilpatrick will hold an elected office again or a position of trust in which he has significant decision-making authority over public funds. After he was convicted of his state felony charges, he ended his speech resigning his position as mayor by saying, defiantly, "I want to tell you, Detroit, that you done set me up for a comeback." The voters in Detroit and throughout the state felt otherwise, overwhelmingly approving a ballot proposal amending the state's constitution to place a 20-year ban on public officials like Kilpatrick---who are convicted of felonies alleging violations of the public trust---from holding an elected or appointed position with control over public assets or public policy. Voters in Texas and elsewhere presumably will also hesitate to put Kilpatrick in charge of their public assets given the notoriety of his crimes in Michigan. Accordingly, it is unlikely that Kilpatrick will be given the chance to commit crimes as significant as those of which he has been convicted in this case.

## F. Sentences Contemplated by the Sentencing Guidelines (18 U.S.C. § 3553(a)(4)(A), (b)(1) & (c))

The government concurs with the factual findings and calculations contained in the presentence investigation report (PSIR). The PSIR correctly assigns Kilpatrick a total offense level of 43, which when combined with his criminal history category of IV, puts his guidelines range of imprisonment at life.

### 1. Specific Offense Characteristics

As a starting point, Kilpatrick's base offense level is fourteen because he committed his racketeering and extortion crimes while acting as a "public official." U.S.S.G. §§ 2E1.1 & 2C1.1(a)(2). Adding to the severity of his crimes is the fact that he was not a run-of-the-mill public official, but was an elected mayor responsible for running a large city government, including serving as special administrator over the DWSD. Accordingly, his base offense level should be increased by four levels because he was both "an elected public official" and a public official in a "high-level decision making or sensitive position." *Id.* at § 2C1.1(b)(3). His offense level should be increased by another two (2) levels because he accepted multiple bribe payments from various local businessmen, including Bobby Ferguson, Derrick Miller, Karl Kado and Jon Rutherford. *Id.* at § 2C1.1(b)(1).

Kilpatrick's offense level must be further adjusted upward because of the benefit received or the loss suffered as a result of his racketeering conspiracy. *Id.* at § 2C1.1(b)(2). To calculate this adjustment, the court must make a reasonable estimate, by a preponderance of the evidence, of the greater of the "actual" benefit/loss and the "intended" benefit/loss. U.S.S.G. § 2B1.1, cmt., app. n. 3(C); *United States v. Blackwell*, 459 F.3d 739, 772 (6th Cir. 2006); *United States v. Triana*, 468 F.3d 308, 320 (6th Cir. 2006). The court need not establish the value of

the benefit/loss with precision, but simply must publish its resolution of contested factual matters forming the basis for its valuation. *United States v. Peppel,* 707 F.3d 627, 645 (6th Cir. 2013).

As the leader of a criminal conspiracy, Kilpatrick is responsible for all the financial losses or gains within the scope of the conspiracy so long as they were reasonably foreseeable. U.S.S.G. § 1B1.3(a)(1)(B); *United States v. Campbell*, 279 F.3d 392, 399-400 (6th Cir. 2002); *United States v. Hamilton,* 263 F.3d 645, 654 (6th Cir. 2001). Accordingly, the best measure of the harm caused by Kilpatrick's racketeering conspiracy is the "net value of benefits" (i.e., the profits) Ferguson derived from the city revenues Kilpatrick helped him illegally obtain through extortion and bid-rigging. U.S.S.G. § 2C1.1(b)(2), cmt., app. n. 3. Applying a conservative average profit margin of 10% to Ferguson's $73 million in revenues from the city contracts comprising the counts of conviction, as well as a 10% profit margin to the other contracts that were part of the conspiracy, Ferguson obtained a total illegal profit of $9.6 million. (*See* United States' Sentencing Memorandum as to Defendant Bobby W. Ferguson, Docket No. 470.) This total falls comfortably within the $7-20 million loss range found in section 2B1.1(b)(1), increasing Kilpatrick's offense level by another twenty levels, which is the adjustment contained in the PSIR. *Id.* at § 2B1.1(b)(1)(K).

44

## 2.  Role in Offense

Kilpatrick's role in the conspiracy supports a four-level enhancement under section 3B1.1(a) because he was an organizer or leader of a criminal activity involving five or more participants or that was otherwise extensive. U.S.S.G. § 3B1.1(a). A conspiracy is "otherwise extensive" when "the combination of knowing participants and non-participants in the offense is the functional equivalent of an activity involving five criminally responsible participants." *United States v. Anthony*, 280 F.3d 694, 699 (6th Cir. 2002). "[W]hen a business's top officer knows of corruption in the business and implicitly approves it by participating in the corruption, a four-level enhancement under § 3B1.1(a) is proper." *United States v. DeRiggi,* 72 F.3d 7, 8-9 (2d Cir. 1995)(per curiam).

The evidence at trial clearly demonstrated that Kilpatrick's racketeering conspiracy was extensive. It also showed that Kilpatrick was not merely a participant, but was one of the conspiracy's leaders and organizers, directing numerous others, including Derrick Miller, Victor Mercado, Christine Beatty, Gerard Grant Phillips and Marc Andre Cunningham. Kilpatrick also organized and led private parties in criminal activity including Bobby Ferguson, Bernard Kilpatrick, Karl Kado, Jon Rutherford and Emma Bell. A four-level enhancement is therefore warranted.

**G. Avoiding Sentencing Disparities Among Similarly Situated Defendants (18 U.S.C. § 3553(a)(6))**

Kilpatrick is more culpable—and his misconduct more pervasive—than any other public corruption defendant sentenced in recent memory. His guideline range reflects that. So should his sentence.

Section 3553(a)(6) instructs courts to consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." That subsection "is concerned with national disparities among the many defendants with similar criminal backgrounds convicted of similar criminal conduct." *United States v. Benson*, 591 F.3d 491, 505 (6th Cir. 2010). A court's careful review of the guideline range "necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities." *Gall v. United States*, 552 U.S. 38, 54 (2007). And indeed, one of the "central reasons" for adopting the sentencing guidelines in the first place "was to ensure stiffer penalties for white-collar crimes and to eliminate disparities between white-collar sentences and sentences for other crimes." *United States v. Peppel*, 707 F.3d 627, 638-39 (6th Cir. 2013).

That national consensus for stiffer white-collar penalties has intensified in public corruption cases. In November 2004, the Sentencing Commission even

amended the guidelines to increase the punishment for corrupt public officials. The Commission explained that "public corruption offenses previously did not receive punishment commensurate with the gravity of such offenses," especially when compared with other white-collar crimes. USSG, App'x C, Vol. III, at 82 (Amendment 666). The Commission thus increased the base offense level for public officials because "offenders who abuse their positions of public trust are inherently more culpable than those who seek to corrupt them, and their offenses present a somewhat greater threat to the integrity of governmental process." *Id.*

Since then, federal courts have increasingly handed out substantial sentences in public corruption cases where state and local elected officials have inflicted serious damage on the community. For example:

- **James C. Dimora and Frank P. Russo**, Nos. 10-CR-387 and 10-CR-384 (N.D. Ohio); *appeal by Dimora pending,* No. 12-4004 (6th Cir.). In 2011, former Cuyahoga County Commissioner Jimmy Dimora was convicted of racketeering and bribery-related crimes for accepting items of value in return for helping contractors obtain county contracts, grants, and loans, and helping others secure county employment and salary raises. He was sentenced to 336 months (28 years) in prison based on his receipt of $451,000 in personal benefits. In a related case, former Cuyahoga County Auditor Frank Russo—who pleaded guilty to accepting more than $1 million in return for $21.4 million in county real estate appraisal contracts, as well as other bribery schemes involving jobs and salary increases—

received a prison sentence of 262 months (almost 22 years). He is awaiting a hearing on a Rule 35 motion to reduce his sentence based on his testimony in the Dimora trial and others.

- **Mark Ciavarella and Michael Conahan**, No. 09-CR-00272 (M.D. Pa.), *aff'd*, *United States v. Ciavarella,* 716 F.3d 705 (3d Cir. 2013). In 2009, Ciavarella and Conahan, both judges with the Luzerne County Court of Common Pleas, were charged with racketeering for accepting a total of $2.8 million from the owners of several juvenile detention centers in return for the judges' support in the construction and operation of the facilities, as well as for the judges' failure to disclose their conflicts of interest when placing juvenile offenders at the facilities. Ciaveralla was convicted at trial and sentenced to 336 months (28 years) in prison. Conahan pleaded guilty and was sentenced to 210 months (17.5 years) in prison.

- **Donald W. Hill**, No. 3-07-CR-289-M (N.D. Tex.), *aff'd*, *United States v. Reagan, et al.,* 725 F.3d 471 (5th Cir. 2013). In 2009, Hill, a Dallas City Councilman, was convicted of bribery and extortion for helping provide public financing, zoning clearance, and political support to affordable housing developers in exchange for the developers' employment of Hill's associates and appointees as consultants. The evidence at sentencing showed that Hill's associates received about $270,000 in fees and other benefits through the scheme, and that losses totaled about $4.8 million, but there was little if any evidence that Hill himself received money from the scheme. Despite his lack of personal enrichment, Hill was sentenced to 216 months (18 years) in prison.

- **Jonathan Bolar**, No. 09-CR-00138 (E.D. La.), *aff'd*, *United States v. Bolar,* No. 10-30879, 483 Fed. Appx. 876, 2012 WL 1994728 (5th Cir. 2012). In 2010, Bolar, a Gretna, Louisiana city councilman,

was convicted of extortion for pressuring people to hire his construction firm or give him campaign donations in return for his support in various land-use matters. Although Bolar extorted a total of only $122,000, the trial court applied an upward variance from the guideline range of 121-151 months because of Bolar's "pervasive extortion," as well as his obstructive conduct. The resulting 204-month (17 year) prison sentence was affirmed by the Fifth Circuit.

- **Larry P. Langford**, No. 08-CR-00245 (N.D. Ala.), *aff'd, United States v. Langford,* 647 F.3d 1309 (11th Cir. 2011). Langford, the president of the Jefferson County Commission and later the mayor of Birmingham, Alabama, was convicted in 2009 of accepting bribes for steering county bond work to an investment banking firm in exchange for $240,000 in cash, clothing, and jewelry. Langford was sentenced to 180 months (15 years) in prison based on a net benefit to the investment banking firm of $5.5 million. The corrupted bond deals later contributed to Jefferson County's $4 billion bankruptcy filing, the largest municipal bankruptcy in U.S. history before the $18 billion filing by the city of Detroit.

- **Rod R. Blagojevich**, No. 08-CR-888-1 (N.D. Ill.), *appeal pending,* No. 11-3853 (7th Cir.). Blagojevich, the former governor of Illinois, was found guilty of a bribery and extortion conspiracy for attempting to trade an appointment to the U.S. Senate and state funding for a hospital and a horse race track, in exchange for $1.6 million in campaign contributions or a private sector job for him. Only one of Blagojevich's extortion attempts actually succeeded, resulting in $25,000 in campaign contributions. In 2011, he was sentenced to 168 months (14 years) in prison.

Kilpatrick's widespread and corrosive breach of the public trust—lasting throughout his six-year tenure in office—exceeds even the worst of these state

and local corruption cases. None of the other public officials disrupted his community as profoundly as Kilpatrick did. The closest analogue is Jimmy Dimora, who received a 28-year sentence for corruption as a Cuyahoga County Commissioner. Dimora, like Kilpatrick, was convicted of a racketeering conspiracy and had a guideline range of life imprisonment. But Dimora received only $451,000 from his crimes, far below the $840,000 in corrupt personal benefits that Kilpatrick pocketed here. Dimora also shared power in Cuyahoga County with two other commissioners; as mayor of Detroit, Kilpatrick's power was almost unchecked—his corruption seeping from the apex of the executive branch into all levels of city government. And unlike Dimora, Kilpatrick's past criminal conduct includes such things as perjury, assault, probation violations, and committing these federal offenses while under the supervision of other courts.

Thus, although there are no identical comparisons, Kilpatrick's crimes straddle the upper tier of state and local corruption cases sentenced under the guidelines in effect since 2004. His guideline range accounts for that—and calls for a severe sentence to avoid unwarranted disparities with other defendants. The court therefore should sentence Kilpatrick to at least 28 years in prison.

## **CONCLUSION**

Kwame Kilpatrick was entrusted by the citizens of Detroit to guide their city through one of its most challenging periods. The city desperately needed resolute leadership. Instead it got a mayor looking to cash in on his office through graft, extortion and self-dealing. Detroit has now entered a painful period of reassessment and unprecedented financial constraints. With hard work and good fortune, the city will rise again. But it will do so without—and in spite of—its former leader. For Kilpatrick similarly to move forward, he will need to recognize and accept the true nature and scale of his wrongdoings—how many people he let down and exploited, the enormous consequences of his criminal choices, and the fact that he was not the victim but the cause of the painful circumstances he now faces.

Based on the foregoing, the court should sentence defendant Kwame Kilpatrick to a term of imprisonment of at least 28 years.

Respectfully submitted,
BARBARA L. McQUADE
United States Attorney

s/MARK CHUTKOW
Assistant United States Attorney

s/R. MICHAEL BULLOTTA
Assistant United States Attorney

s/JENNIFER L. BLACKWELL
Assistant United States Attorney

s/ERIC DOEH
Assistant United States Attorney

## **CERTIFICATE OF SERVICE**

I hereby certify that on October 3, 2013, I electronically filed the foregoing

document with the Clerk of the Court using the ECF system, which will send

notification of such filing to the following:

Harold Z. Gurewitz
*Attorney for Kwame Kilpatrick*

Margaret Sind Raben
*Attorney for Kwame Kilpatrick*

s/MARK CHUTKOW
Assistant U. S. Attorney

Dated:  October 3, 2013