UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

    Plaintiff,

v.

KWAME M. KILPATRICK,

    Defendant.

                                     /

Case No. 10-20403

Honorable Nancy G. Edmunds

**OPINION AND ORDER CALCULATING RESTITUTION
ON REMAND FROM THE COURT OF APPEALS**

As part of a judgment entered on December 17, 2013, the Court ordered Defendant Kwame M. Kilpatrick to pay restitution in the amount of $4,584,423 to the City of Detroit's Water and Sewerage Department ("DWSD"). On appeal, the Sixth Circuit affirmed Defendant Kilpatrick's conviction and sentence, but vacated this Court's award of restitution and remanded "for proper calculation of the award." *United States v. Kilpatrick,* 798 F.3d 365, 388-91 (6th Cir. 2015). Following this remand, the Government now seeks a reduced award of restitution in the amount of $1,520,653.50,[1] while Defendant argues that the Government has failed to provide an evidentiary basis for an award in any amount. As discussed below, the Court finds that the Government has established by a preponderance of the evidence that Defendant owes restitution to the DWSD in the amount of $1,520,653.50.

---

[1] In its initial submission to the Court following the Sixth Circuit's remand, the Government asserted that restitution in the amount of $1,637,087 was warranted, but it has since reduced this figure to $1,520,653.50, based on the difference between the amount bid by contractor Lakeshore Engineering on contract CM-2014 and the amount actually awarded to Lakeshore under this contract.

## I. THE SIXTH CIRCUIT'S DECISION

As noted above, in this Court's initial December 17, 2013 judgment, Defendant Kilpatrick was ordered to pay $4,584,423 in restitution to the DWSD. In so ruling, the Court pointed to the record establishing, for purposes of computing sentencing ranges under the U.S. Sentencing Guidelines, that Defendant Kilpatrick and his co-defendants had acquired over $4 million in unlawful gains as a result of the conduct underlying their RICO and extortion convictions, and it reasoned that this was an appropriate measure of the losses suffered by the DWSD under the contracts that gave rise to the defendants' gains. (*See* Dkt. 543, 12/10/2013 Hearing Tr. at 12, Page ID 16688.)

The Sixth Circuit vacated this Court's award of restitution and remanded for further proceedings. *See Kilpatrick,* 798 F.3d at 390-91. The Court of Appeals emphasized that "restitution must be based on the victim's loss rather than the offender's gain," and that the latter could be used to compute the former only if "the government establishes such a correlation that the defendant's gain can act as a measure of — not a substitute for — the victim's loss." 798 F.3d at 388, 390 (internal quotation marks and citation omitted). The Sixth Circuit found that the record did not demonstrate such a direct correlation between the defendants' unlawful gains and losses suffered by the DWSD, and therefore set aside this Court's award of restitution. 798 F.3d at 390. The court further stated that on remand, this Court could (i) invite the Government to submit additional evidence in support of its request for restitution, (ii) hold an evidentiary hearing, or (iii) conduct "further proceedings limited to the restitution award [and] consistent with" the Court of Appeals' opinion. 798 F.3d at 390.

## II. THE PARTIES' POSITIONS ON REMAND

In its initial submission following the remand to this Court, the Government requested a reduced restitution award in the amount of $1,637,087. In support of this request, the Government pointed to a specific instance of bid-rigging that allegedly contributed to the racketeering conspiracy charged in Count One of the Fourth Superseding Indictment. As alleged in the indictment, Defendant Kilpatrick and co-Defendant Victor Mercado rigged the bidding on contract CM-2014 — a construction management contract for water main replacement projects throughout the City of Detroit — to steer this DWSD contract to "Company L,"[2] which in turn employed an entity owned by co-Defendant Bobby Ferguson as a subcontractor. (*See* Dkt. 74, Fourth Superseding Indictment at ¶¶ 63-77, Page IDs 400-03.) As a result of this alleged bid-rigging, CM-2014 was awarded to "Company L" (Lakeshore) instead of another company, Superior Engineering, that otherwise would have prevailed in the bidding process. The Government's proposed restitution award of $1,637,087 represented the difference between Superior's lower bid ($11,966,001.50) and Lakeshore's higher bid ($13,603,089). (*See* Gov't Trial Ex. LS3-18.) In the Government's view, this proposed award reflects a conservative estimate of the loss suffered by the DWSD when it awarded CM-2014 to a higher bidder, Lakeshore, as a result of the bid-rigging engaged in by Defendant Kilpatrick and his co-conspirators.[3]

---

[2] "Company L" was identified at trial as Lakeshore Engineering Services.

[3] As noted earlier, the Government has further revised its request for restitution, and now seeks an award in the amount of $1,520,653.50. This additional downward adjustment is due to a difference between the amount initially bid by Lakeshore for the CM-2014 contract ($13,603,089) and the slightly smaller amount specified in the contract that ultimately was awarded to Lakeshore ($13,486,655). (*See* Gov't Trial Ex. LS3-18 at 1, 3.)

Although Defendant Kilpatrick opposes the Government's request on a number of grounds, his principal objection is that the Government's calculation of a proposed restitution award is overly speculative. In Defendant's view, the testimony of the relevant witnesses at trial revealed a complex bidding process that is not amenable to but-for comparisons of the DWSD's financial position in the presence or absence of bid-rigging. He notes, for example, that two separate adjustments altered the rankings among the bidders for CM-2014, and that there is a degree of inconsistency in the testimony at trial concerning (i) the individuals responsible for these adjustments, and (ii) the impact of these adjustments upon the bidding process for this contract. In addition, Defendant suggests that the many factors involved in the bidding process — including, for instance, the use of multiple, anonymous evaluators — make it difficult, if not impossible, to conclude that the outcome of this process was the product of bid-rigging, such that the DWSD can be said to have suffered a definite, discernible loss as a result of this alleged bid-rigging.

## III. ANALYSIS

The pertinent legal principles governing this Court's calculation of an award of restitution are set forth in the Sixth Circuit's ruling and in the underlying statute, the Mandatory Victims Restitution Act ("MVRA"), 18 U.S.C. § 3663A, and need not be recounted at any length here. Briefly, under the MVRA, when the Court sentences a defendant for a property offense, it must order "that the defendant make restitution to the victim of the offense." 18 U.S.C. § 3663A(a)(1). The MVRA defines a "victim" as "a person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered." § 3663A(a)(2). Thus, an award of restitution "is intended to compensate victims only for losses caused by the conduct underlying the offense of

conviction," and it "must be based on the victim's loss rather than the offender's gain." *Kilpatrick,* 798 F.3d at 388 (internal quotation marks and citations omitted). The Government "bears the burden of proving a victim's actual loss by a preponderance of the evidence," *Kilpatrick,* 798 F.3d at 388, and the Court may forgo an award of restitution if it finds that "determining complex issues of fact related to the cause or amount of the victim's losses would complicate or prolong the sentencing process to a degree that the need to provide restitution to any victim is outweighed by the burden on the sentencing process," § 3663A(c)(3)(B).

Following the Sixth Circuit's remand, the Government's request for restitution is limited to the losses allegedly suffered by the DWSD as a result of Defendant Kilpatrick's and his co-defendants' alleged racketeering activity in connection with the bidding for the CM-2014 contract. As shown through the evidence presented at trial, after various contractors submitted their bids for the CM-2014 contract, the bid put forward by Superior Engineering initially was ranked first, while the bid submitted by Lakeshore Engineering — a proposal that included as a subcontractor a business owned by co-Defendant Bobby Ferguson — was ranked fifth. (*See* Dkt. 359, 11/27/2012 Trial Tr. at 98-99, Page IDs 9056-57; *see also* Gov't Trial Ex. LS3-36 at 1.) According to Darryl Latimer, the DWSD's contracts and grants manager, this initial ranking was based on a "standard" scoring methodology, under which the lowest-cost bidder is "given a higher score" and all other bidders are "scored against that lowest cost." (11/27/2012 Trial Tr. at 98, Page ID 9056.)

When Mr. Latimer presented this ranking to the DWSD director, Defendant Victor Mercado, Mr. Mercado expressed his concern about the "wide range" of the bids submitted for the CM-2014 contract, and he also opined that "some of the low [bids] were too low."

5

(*Id.* at 102, Page ID 9060.) Accordingly, after Mr. Latimer proposed various alternatives for addressing these concerns, such as discarding the two lowest bidders, Mr. Mercado instructed him to re-rank the bids using the "average cost" method, under which each contractor's bid is compared against the average of all of the bids and the bidders that are closest to the average receive the highest ranking. (*Id.* at 102-05, Page IDs 9060-63; *see also* Dkt. 348, 10/22/2012 Trial Tr. at 78-79, Page IDs 7558-59.) This re-scoring of the bids was carried out by DWSD grant manager Daniel Edwards at the direction of his supervisor, Mr. Latimer, and it resulted in Superior Engineering retaining its top ranking while Lakeshore moved from fifth to fourth position. (*See* 10/22/2012 Trial Tr. at 78-79, Page IDs 7558-59; 11/27/2012 Trial Tr. at 110, Page ID 9068; *see also* Gov't Trial Ex. LS3-36 at 1.) Both Mr. Latimer and Mr. Edwards testified that they had never used the "average cost" method to evaluate bids for any other construction management project, and both men expressed reservations with using this approach in the CM-2014 bidding process, particularly since the contractors lacked notice that this method would be applied. (*See* 10/22/2012 Trial Tr. at 79, 82, Page IDs 7559, 7562; 11/27/2012 Trial Tr. at 105-06, 108-09, Page IDs 9063-64, 9066-67.)

Just a few days after the re-scoring of the bids with the "average cost" methodology and the resulting change in rankings, these rankings underwent a further adjustment. At a May 2006 meeting with Defendant Kilpatrick and DWSD director Victor Mercado, Mr. Latimer was asked about the weight given in the bid scoring process to a "local economic development" factor, and he responded by expressing his concern that this factor was sometimes given too much weight, thereby discouraging national and international contractors from bidding on complex projects. (*See* 11/27/2012 Trial Tr. at 112-14, Page

6

IDs 9070-72.) Defendant Kilpatrick then asked about national firms that had been certified as eligible for treatment as Detroit-based companies, and he cited as a specific example a company, DLZ, that was included as a subcontractor in Superior Engineering's then-leading bid on the CM-2014 contract. (*See id.* at 114, Page ID 9072.) In response, Mr. Latimer expressed his understanding that DLZ was headquartered in Columbus, Ohio, and not the City of Detroit, and he observed to Defendant Kilpatrick that the distinction between "a company having a certification [as a Detroit-based business] or not having a certification is the difference between winning and losing" a bid. (*See id.* at 114-15, Page IDs 9072-73.)

The next day, Mr. Latimer was instructed by Mr. Mercado to send a letter to Gerald Grant Phillips, the director of Detroit's human rights department, requesting that DLZ's status as a Detroit-headquartered business be verified. (*See id.* at 117-18, Page IDs 9075-76.) A few days later, Mr. Edwards sent an email to a compliance officer in the human rights department, Kim Harris, inquiring about the status of the investigation into DLZ's certification as a business headquartered in Detroit. (*See* 10/22/2012 Trial Tr. at 73-74, Page IDs 7553-54.)[4] Mr. Harris, for his part, testified that he received phone calls in May of 2006 from Mr. Mercado and Mr. Latimer inquiring whether DLZ was certified as a Detroit-headquartered business, and that Mr. Latimer had stated more specifically that DLZ was "in line to be awarded a large contract" if it had this certification. (Dkt. 361, 11/29/2012 Trial Tr. at 121-22, Page IDs 9368-69.) Shortly thereafter, Mr. Harris met with his supervisor, Mr. Phillips, who instructed him to decertify DLZ as a Detroit-headquartered business. (*See*

---

[4]Mr. Edwards further testified that he drafted the earlier letter sent by Mr. Latimer to Mr. Phillips calling for an investigation of DLZ's status as a Detroit-based business. (*See id.* at 72-73, Page IDs 7552-53.)

*id.* at 123-24, Page IDs 9370-71.)  Although Mr. Harris resisted this directive, explaining that there had been "no changes in the structure of" DLZ that would warrant its decertification, Mr. Phillips responded that "the mayor wants it done." (*Id.* at 124-25, Page IDs 9371-72.)

Although Mr. Harris felt that "the contracting process was being tampered with," he drafted a letter on behalf of Mr. Phillips stating that effective February 2, 2006, DLZ's certification as a Detroit-headquartered business had been revoked. (*Id.* at 127-28, Page IDs 9374-75.)  As explained by Mr. Edwards, the effective date of February 2 was significant, because it pre-dated the March 2006 deadline for submission of bids on the CM-2014 contract. (*See* 10/22/2012 Trial Tr. at 76, Page ID 7556.) Accordingly, Superior Engineering's bid was reevaluated in light of the fact that one of Superior's subcontractors, DLZ, was no longer certified as a Detroit-headquartered business, and Superior's bid dropped from first to third in the rankings as a result. (*See id.* at 77-78, Page IDs 7557-58; *see also* 11/27/2012 Trial Tr. at 125, Page ID 9083; Gov't Trial Ex. LS3-36 at 1.)

At around the same time, Mr. Latimer was provided with a certification that one of Lakeshore's subcontractors, A&H Contractors, was a Detroit-headquartered business, and he was told by Mr. Mercado that although this certification was obtained "late in the process," it nonetheless should be used to modify the scoring of Lakeshore's bid. (11/27/2012 Trial Tr. at 128--29, Page IDs 9086-87.)  With this adjustment, Lakeshore moved from fourth to second in the rankings and was awarded the CM-2014 contract. (*See id.* at 129, Page ID 9087; *see also* Gov't Trial Ex. LS3-36 at 1; Gov't Trial Ex. LS3-18.)[5]

---

[5]The CM-2014 and CM-2015 contracts were bid at the same time, and Mr. Mercado advised Mr. Latimer that he planned to award one of these contracts to the highest-ranked

Under this record, the Court finds that the Government has established by a preponderance of the evidence that Defendant Kilpatrick should be ordered to pay $1,520,635.50 in restitution to the DWSD. The record amply demonstrates that as a result of bid-rigging activity that formed a part of the RICO conspiracy charged in the first count of the indictment, Lakeshore leapfrogged over Superior in the ranking of bids for the CM-2014 contract and was awarded this contract. Absent this bid-rigging activity, Superior rather than Lakeshore would have secured this contract. Because Superior's bid was $1,520,653.50 less than the amount paid to Lakeshore under the CM-2014 contract, (*see* Gov't Trial Ex. LS3-18 at 2-3 (reflecting Superior's bid of $11,966,001.50 and the contract price of $13,486,655 paid to Lakeshore)), the DWSD suffered a loss of at least $1,520,653.50 due to the bid-rigging activity that occurred in the process of awarding this contract. Indeed, the Sixth Circuit specifically cited the circumstances surrounding the bidding process for CM-2014 as providing "some evidence the district court may use to establish actual loss" in determining an appropriate award of restitution. *Kilpatrick,* 798 F.3d at 391 n.3. Having reviewed this record, the Court agrees that it provides a basis for the restitution award sought by the Government.

Defendant challenges this result on various grounds, but none is persuasive. First, Defendant notes that the MVRA defines a "victim" as a person who is "directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered," 18 U.S.C. § 3663A(a)(2), and he argues that the Government has not forged

---

bidder and the other to the second-ranked bidder. Accordingly, the top-ranked company, DPM, was awarded the CM-2015 contract, and Lakeshore was awarded the CM-2014 contract as the bidder with the second-highest score. (*See* 11/27/2012 Trial Tr. at 98-99, 129-30, Page IDs 9056-57, 9087-88.)

a sufficient link between an offense he committed and the loss suffered by the DWSD in the bidding process for the CM-2014 contract. Yet, while the Court agrees with Defendant that the extortion offense charged in Count Nine of the indictment caused direct harm to third-party contractors rather than the DWSD, the same cannot be said for the RICO conspiracy charged in Count One of the indictment. Rather, as the above-cited record makes clear, the DWSD suffered direct harm as a result of bid-rigging activity in connection with the award of the CM-2014 contract, and this bid-rigging is expressly identified in the indictment as among the means and methods by which Defendant Kilpatrick and his co-conspirators carried out their unlawful conspiracy. (*See* Dkt. 74, Fourth Superseding Indictment at ¶¶ 63-77.)[6] In light of this causal connection between the RICO conspiracy and harm suffered by the DWSD, this agency qualifies as a "victim" under the MVRA.

Defendant next asserts that the DWSD's bidding process is too complex to permit a determination that Lakeshore was awarded the CM-2014 contract as a result of bid-rigging activity. It is true, as far as it goes, that the testimony at trial revealed a "DWSD contract award process [that] is inherently complicated and involves subjective evaluation of a contractor's ability to perform by a team of contract professionals at the DWSD." (Dkt. 591, Defendant's 2/7/2017 Opposition Br. at 10.) The conclusion that Defendant seeks to draw from this proposition, however, overlooks certain aspects of the specific process through which the CM-2014 contract was awarded. In particular, after the complex process

---

[6]While Defendant points out that the jury's guilty verdict on Count One does not necessarily reflect a jury finding that this particular instance of bid-rigging formed a part of the overall RICO conspiracy, he acknowledges that this uncertainty in the jury verdict does not preclude the Court from finding, under the governing preponderance standard, that bid-rigging in the process of awarding the CM-2014 contract was part of the Count One conspiracy offense. The Court has now made this requisite finding.

described by Defendant was complete, the DWSD arrived at a ranking in which Superior held the top position and Lakeshore was fifth. (*See* Gov't Trial Ex. LS3-36 at 1.) Although this process might have involved the myriad subjective factors and complexities cited by Defendant, the subsequent adjustments to the rankings did not. Rather, the record discloses that Lakeshore rose to the second position and Superior dropped to third as a result of two discrete developments driven by purely objective factors: (i) the use of an "average cost" rather than "standard" methodology for scoring the bids, and (ii) the revocation of one subcontractor's (DLZ's) certification as a Detroit-headquartered business, and the grant of this certification to another subcontractor (A&H). Any antecedent complexities in the bidding process do not prevent the Court from finding, by a preponderance of the evidence, that the award of the CM-2014 contract to Lakeshore was the product of discrete bid-rigging activity demonstrated in the trial record.

Nonetheless, Defendant insists that the Government has not made its case for restitution because (i) the record is unclear as to which of the two above-cited developments, the change in scoring methodology or the grant/revocation of Detroit-headquartered business certifications, was "the" determining factor in Lakeshore winning the CM-2014 bid, and (ii) nothing in the record suggests that Defendant Kilpatrick was involved in the decision to use a different scoring methodology. In the Court's view, however, the record demonstrates that these two developments together operated to steer the CM-2014 contract to Lakeshore. Even accepting that there is no evidence linking Defendant Kilpatrick to one of the two adjustments in the rankings of the CM-2014 bidders, the law does not demand that the Court somehow ascertain and apportion discrete responsibility for these two bid manipulations among Defendant Kilpatrick and his co-

11

conspirators. Rather, the Sixth Circuit has held that under the MVRA, the Court is authorized to hold each defendant co-conspirator liable in restitution for the full extent of the harm suffered by a victim as a result of the unlawful conspiracy. *See United States v. Williams,* 612 F.3d 500, 513 (6th Cir. 2010) (citing 18 U.S.C. § 3664(h)). Accordingly, having found that bid-rigging activities in connection with the award of the CM-2014 contract were part of the Count One RICO conspiracy offense, the Court may properly order Defendant Kilpatrick to pay restitution to DWSD for the full amount of the loss sustained by this agency as a result of the manipulation of the CM-2014 bidding process by Defendant Kilpatrick and his co-conspirators.

Finally, Defendant suggests that a hearing is warranted before the Court makes the findings called for under the MVRA in order to support an order of restitution. As the Government observes, however, the Sixth Circuit stated that this Court "may" convene an evidentiary hearing or conduct further proceedings, *Kilpatrick,* 798 F.3d at 390, not that it must do so. Having thoroughly reviewed the pertinent portions of the trial record, the Court concludes that this record provides a sufficient evidentiary basis for determining whether the Government has met its burden of proving by a preponderance of an evidence that the DWSD suffered a loss as a result of the RICO conspiracy found by the jury at Defendant's trial. While Defendant points to minor inconsistences in the trial testimony of various DWSD employees concerning the precise chronology and details of the bid manipulations through which Lakeshore secured the CM-2014 contract, nothing in this record gives rise to material factual disputes that would necessitate further exploration at an evidentiary hearing. Neither is it necessary to convene a hearing so that the parties and their counsel may advance their differing views of the record, where the parties have had ample

opportunity to do so in their written submissions to the Court. Rather, the Court is satisfied that this matter is ripe and appropriate for resolution in the present opinion and order.

## IV. CONCLUSION

For these reasons,

The Court hereby GRANTS the Government's request that Defendant Kwame M. Kilpatrick be ordered to pay restitution to the Detroit Water and Sewerage Department in the amount of $1,520,653.50. The Court will enter an amended judgment reflecting this revised award of restitution.

SO ORDERED.

       s/Nancy G. Edmunds
       Nancy G. Edmunds
       United States District Judge

Dated: August 31, 2017

I hereby certify that a copy of the foregoing document was served upon counsel of record on August 31, 2017, by electronic and/or ordinary mail.

       s/Carol J. Bethel
       Case Manager