# IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
### CAUSE NO.  2:10-cr-20403-NGE-MKM-1

KWAME M. KILPATRICK,
MOVANT,

vs.

UNITED STATES OF AMERICA,
RESPONDENT.



---

**MOVANT'S MOTION TO SUPPLEMENT HIS MOTION TO VACATE, SET ASIDE OR CORRECT SENTENCE (TITLE 18 U.S.C. SECTION 2255)**

---

NOW COMES Kwame M. Kilpatrick (Movant), pro se, to respectfully submit his reply to the response filed by the government on September 05, 2017.

In his Section 2255 petition, Movant did not attempt to relitigate his case.  However, Movant is provoked to thoroughly address the miscarriage of justice in this case.  Also, to show the extensive harm to his ability to receive a fair-trial, while also seeking to show cause, and to discuss the prejudice that destroyed his ability to receive a fair-trial as well.
Movant's arguments are based in fundamental violations to the United States Constitution, the Rules of Criminal Procedure, and Substantive Changes of Law by Supreme Court action.  Much of Movant's arguments, within his 2255, were not fully known, nor  available to him at trial, nor during his direct appeal.  This necessitates Movant to seek remedy by collateral review.

Section 2255 allows a federal prisoner to move to "vacate, set-aside or correct" a federal sentence upon the ground that "the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such a sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack." (28 U.S.C. Section 2255)

Moreover, section 2255 provides federal prisoners relief for additional types of claims. Claims that; 1) the federal court acted outside its limited jurisdiction, 2) that the sentence was in excess of that allowed by law, and 3) the conviction or sentence is otherwise subject to collateral attack. The Supreme Court has also ruled that section 2255 also provides relief for "an error which is neither jurisdictional nor constitutional." The Supreme Court has read a "fundamentality" requirement into the statutory maximum, or a claim that the conviction or sentence is otherwise subject to collateral attack.

Section 2255 relief is available if error constitutes "a fundamental defect which inherently results in a complete miscarriage of justice," or "an omission inconsistent with the rudimentary demands of fair procedure." (Hill v. United States, 368 U.S. 424, 428, 82 S. Ct. 468, 471, 7L.Ed.2d 417 (1962); see Peguero v. United States, 526 U.S. 23, 27-28, 119 S. Ct. 961, 964-65, 143 L.Ed.2d 18 (1999).

Another discussion that the Government raised in their response to Movant's motion is the general rule that claims not raised on direct appeal may not be raised on collateral review. This is clearly wrong. The petitioner can show cause and prejudice and raise these issues on collateral review. See United States v. Frady, 456 U.S. 152, 167-68 (1982); Bousley v. United States, 523 U.S. 614, 621.

Further, the procedural default rule is neither statutory nor a constitutional requirement, but it is a doctrine adhered to by the courts to conserve judicial resources and to respect the law's important interest in the finality of judgments.

When a criminal defendant raises an ineffective assistance of counsel claim, a Constitutional Claim, and/or a Substantive Change in Law (through Supreme Court action) during collateral review, these objectives are not negatively impacted whatsoever, but more so, these objectives are promoted.

ALL OF MOVANT'S ARGUMENTS ARE PROPERLY BEFORE THE COURT ON COLLATERAL REVIEW;

1) Challenging the incorrect jury instructions on the definition of "Official Act", per the Supreme Court decision in the McDonnell case.

   a) There is no procedural problem because the Supreme Court Decision was after Movant's case was on Direct Appeal, and clearly Movant has shown cause and prejudice of how the incorrect jury instructions and definition of "official acts", made it impossible for the jury's conclusions and decisions to be reliable.

b) The Indictment, evidence at trial, and jury instructions, all failed to satisfy the requirements of the law to establish "official acts" as elements of the RICO Offense and the Bribery Offenses (extortion under color of official right and bribery charged under State or Federal statutes. Each require an "Official Act"). Because of new law in these matters, Movant has properly moved for relief through collateral review.

c) If the government is yielding the issue of Ineffective Assistance of Counsel, because trial attorney did not raise an issue with the Jury Instructions, or the Indictment, regarding the definition of "Official Acts", then the Government is making the argument that Movant's trial attorney was extremely deficient in his representation, and maybe compromised by divided loyalty, because of his simultaneous conflict regarding these very same issues.

2) Court erred in violating the Constitution of the United States (Sixth Amendment) when it denied Movant's request and motion for new counsel because it was a "tactic for delay" and "untimely". This left Movant with No Representation for critical parts of his trial.

a) The procedural bar does not apply, however, to claims alleging Ineffective Assistance of Counsel. Massaro v. U.S., 538 U.S. 500, 508 (2003)

b) Claims based on Ineffective Assistance of Counsel may be raised for the first time in a collateral proceeding, whether or not the issue could have been raised on direct appeal. Massaro v. U.S., 538 U.S. 500, 509 (2003)

c) The U.S. Constitution's Sixth Amendment guarantees the accused the right to the assistance of counsel for his defense in all criminal prosecutions. Moreover, "the right to counsel is the right to the effective assistance of counsel." McMann v. Richardson, 397 U.S. 759, 771 (1970) There is no procedural bar in raising the failure of the court to assure this foundational fundamental right to Movant at trial. Nor was there a decision made about this issue by the 6th Circuit Court. They expressly stated that they were not deciding the issue of "delay" or "timeliness" in their opinion from the direct appeal.

3) Incorrect sentence given by the court due to wrong determination of Loss.

a) Determination of Loss is a key component to sentencing in this case. Any misapplication of the guidelines, error in calculation of loss/gain which forms the axis of a defendant's sentence effects a fundamental flaw in the sentence. This is not only cognizable under collateral attack, but also properly presented because of the Appellate Court's decision on this matter during direct appeal, as well as the ongoing activity regarding the issue of "Loss", which is currently being deliberated in the 6th Circuit.

b) There is not a single count for "bid-rigging" in Movant's indictment, nor is there a count of conviction for "bid-rigging" in Movant's case at all. The jury was not required to make any determination that "bid-rigging" occurred. The Court erred, as a matter of law, by concluding that it could determine bid-rigging by a preponderance of the evidence.

c) The figure that the court has determined as "Loss" remains arbitrary, unfounded in any evidence, nor any facts, nor was this figure (nor the underlying issues used by the court to arbitrarily come up with the figure), ever presented to the jury in any form or fashion. Its arbitrary, capricious and unjust.

4) Ineffective Assistance of Counsel
a) Movant has demonstrated that his trial attorney made significant errors, and was compromised by three egregious conflicts of interest, "so serious as to deprive him of a fair trial." Strickland v. Washington, 466 U.S. 668, 687 (1984)

b) Trial Counsel's performance was deficient and that deficient performance prejudiced Movant's defense.

c) Trial Counsel should have been disqualified because of procedural rule prohibiting an attorney-witness to act as an "advocate at trial." Trial counsel was necessary witness for crucial information for the defense of Movant, that was in his possession, which should have been divulged at trial. It could not be obtained through any other means, or alternative witnesses. Trial Counsel's deliberate and willful concealing of this information at trial, prejudiced Movant, and left him with No Representation for critical matters, during critical portions of the trial.

5) All other claims made by Movant, within his original Motion under Section 2255, are directly related to the unjust court procedures during pre-trial, trial proceedings, and post-trial as well. All of which stem from a fundamentally flawed foundation of multiple errors made by the court; particularly pre-trial rush to judgment, then incorrect jury instructions, which resulted in an inability for Movant to defend himself, because of a compromised attorney. There was a miscarriage of justice, and Movant did not receive a fair-trial.

For the foregoing reasons, the government's legal predicates of the procedural doctrine is seriously flawed. Also, the government's analysis of the record and the evidence pertaining to the issues before this court are significantly misleading.

Repeated declarations that the evidence "overwhelmingly established" Movant's guilt have already been rejected by the courts, and are no substitute for a rigorous and objective analysis of the details in the evidence about;

1) What Mr. Kilpatrick did or agreed to do that are alleged to be "Official Acts", and whether the the jury was given proper instruction as to how they should make this determination, then applying the proper process of analysis to determine guilt.

2) Whether the court erred in denying Movant new counsel, declaring it was a "delay tactic" and "untimely", instead of taking the time to make an adequate inquiry into the issues raised by Movant to fully comprehend; the depth and sources of Movant's mistrust of his Trial attorney, the nature of the issues that brought about the destruction of the Attorney/Client relationship between Movant and his trial attorney, and other potential conflicts that would have been discovered if the court followed court precedent, procedures, and professional responsibility, in protecting the rights of the accused.

The jury instructions relating to Movant's convictions; RICO, Bribery, and Extortion counts, do not comport with McDonnell and are therefore in error. The error was not harmless, because it is not clear beyond a reasonable doubt that a rational jury would have reached the same conclusion if properly instructed.
Also, the court erred when it rushed to an incorrect ruling, denying Movant new counsel, without an adequate inquiry, by saying that Movant was only using "a delay tactic" and that his request was "untimely". The court denied Movant the most foundational fundamental right of the accused; the Right to Counsel. The court's error left Movant with No Representation, at all, for critical periods of his trial proceedings.

Movant did not receive a fair trial, and therefore his conviction should be "vacated, set-aside, corrected."

# REPLY ISSUES PRESENTED

**I. MOVANT'S McDONNELL CLAIMS ARE NOT PROCEDURALLY BARRED, AND COURT SHOULD DISMISS HIS CONVICTION ON RELATED COUNTS.**

    A. Movant not procedurally barred from raising McDonnell claims.

    B. McDonnell holding applies to section 666 bribery, and the Hobbs Act instructions given to the jury at Movant's trial. The jury instructions were incorrect, and were demonstrably injurious to Movant.

    C. The so-called "special verdict", nor the "evidence at trial" overcome the McDonnell error.

**II. MOVANT'S SIXTH AMENDMENT RIGHT TO COUNSEL WAS VIOLATED BY THE COURT.**

    A. The court started trial proceedings by declaring "Detroit needs closure." There was a significant focus on "not delaying." Therefore, the court made no effort, whatsoever, to make an adequate and meaningful inquiry into the severity of the unethical nature of Movant's trial attorney's conflict of interest regarding a government witness against him; Gaspore Fiore.

    B. The court erred by denying Movant's request for new counsel.

    C. Movant's trial counsel, and his law firm, established an actual conflict of interest with Movant, when they represented clients with competing interest, regarding the very same issues, at the very same time, in the very same building.

    D. Movant has demonstrated that trial counsel's performance fell below an objective standard of reasonableness, and that counsel's deficient performance prejudiced Movant, resulting in an unreliable or fundamentally unfair and unjust outcome in his trial.

    E. Movant was constructively denied counsel at critical stages of his trial.

**III. MOVANT IS NOT PROCEDURALLY BARRED FROM COLLATERAL REVIEW, DUE TO THE COURT'S VIOLATION OF HIS RIGHT OF CONFRONTATION, BY PERMITTING IMPERMISSIBLE HEARSAY, THAT WAS TESTIMONIAL EVIDENCE.**

**IV. MOVANT SEEKS RELIEF FROM HIS SENTENCE BECAUSE OF A MISAPPLICATION OF THE SENTENCING GUIDELINES, DUE TO ERROR IN CALCULATION OF LOSS/GAIN. THIS CLAIM IS COGNIZABLE ON COLLATERAL REVIEW.**

**V. MOVANT MAY SEEK RELIEF ON COLLATERAL REVIEW, FOR VIOLATION OF HIS DUE PROCESS RIGHTS BECAUSE NO "ALLEN CHARGE" WAS GIVEN TO THE JURY. THE VERDICT IN HIS TRIAL WAS INCOMPLETE.**

**VI. MOVANT HAS PRESENTED FACIALLY VALID CLAIMS, THAT HAVE LEGAL MERIT. MOVANT IS ENTITLED TO RELIEF. AN EVIDENTIARY HEARING SHOULD BE REQUIRED.**

# ARGUMENT

## I. MOVANT'S McDONNELL CLAIMS ARE NOT PROCEDURALLY BARRED, AND COURT SHOULD DISMISS HIS CONVICTION ON RELATED COUNTS.

Movant has asked the court to set aside his convictions on counts that depend on the term "Official Act" as an element because the Supreme Court has substantially narrowed the term's meaning in McDonnell v. U.S., 136 S. Ct. 2355 (2016).  The court said, "Our more constrained interpretation of section 201(a)(3) avoids this "vagueness shoal."  It also avoids federalism concerns by "a more limited interpretation of "official act." Id. at 2373

McDonnell was decided on June 27, 2016, 10-months after Movant's appeal from this court was decided and is an intervening change in law.  The counts he asks this court to dismiss are: Count One RICO Conspiracy, 2 through 5 and 9 Extortion in violation of 18 USC section 1951 on alternative theories of "color of official right" or "fear of economic harm", and 17 Bribery in violation of 18 U.S.C. section 666.  All of these convictions are NOT crimes in light of McDonnell.

McDonnell narrows the meaning of "Official Act" and the scope of statutes in which it is an element.

In United States v. Silver, 864 F.3d 102 (2nd Cir. 2017), the court said "We conclude that the District Court's jury instruction defining an official action in its honest services fraud and Hobbs Act extortion charges was erroneous under McDonnell." Id. at 118.

In United States v. Skelos, 2017 WL 4250021 (2nd Cir. 2017), the court said "Rather, even in context, that instruction invites conviction on acts outside Dean Skelos, official duties as defined by McDonnell." Id. at 2.  Also, United States v. Jefferson, 2017 WL 4423258 (E.D. Va., 2017) the court said "McDonnell is a new 'substantive' rule that applies on collateral review because the Supreme Court's decision altered the scope of section 201(a)(3) definition of "Official Act." Id. at 10.

### A) Movant not procedurally barred from raising McDonnell claims on collateral review.

McDonnell should apply retroactively in collateral review.

Davis v. United States, 417 U.S. 333, 346 (1974) says a "conviction and punishment for an act that the law does not make criminal...inherently results in a complete miscarriage of justice and presents exceptional circumstances that justify collateral relief under section 2255."  Further, "a new interpretation of the substantive criminal law 'intangible rights mail fraud'...resembles Davis..." Callahan v. United States, 881 F.2d 229, 231 (6th Cir. 1989).  In Callahan, the court reversed denial of the habeas relief for RICO and mail fraud convictions.  Callahan argued at trial this his charges were beyond the reach of the statue, but "the fact that the point appeared to be settled constituted cause for not raising it." Id. at 231, citing United States v. Frady, 456 U.S. 152, 167-68 (1982).

The same rationale applies here to Movant's arguments that there was insufficient evidence to convict him of these offenses, or that the court's denial of his Rule 29 motion should be different in light of McDonnell.  United States v. Kilpatrick, 2013 WL 4041866, at 3-19 (E.D. Mich. 2013).

Movant was prejudiced.  The outcome for his convictions now should be reversed in light of McDonnell.

**B) McDonnell holding applies to section 666 bribery, and the Hobbs Act instructions given to the jury at Movant's trial.  The jury instructions were incorrect, and were demonstrably injurious to Movant.**

Prior to McDonnell, the law of this circuit for a Hobbs Act conviction only required proof that a public official "was expected to exercise some influence on the payor's behalf as opportunities arose."  United States v. Abbey, 560 F.3d 513, 518 (6th Cir. 2009).

Abbey applied the same lenient standard of proof for the government section 666 bribery. Id. at 521.  Specifically, neither section 666, nor the Hobbs Act, contains the "official act" language that the Sun-Diamond court found "pregnant with the requirement that some particular 'official act' be identified and proved."  McDonnell abrogated Abbey.

Abbey has not been specifically overruled, but the intervening change in law by the higher court must control.

McDonnell specifically confirms that the language of the "official act" statute, 18 U.S.C. section 201(a)(3), that the 6th Circuit rejected in Abbey, is the source for the meaning of "official act."

McDonnell explains that section 201(a)(3) provides that "any decision or action on any question, matter, cause, suit, proceeding or controversy, which may at any time be pending, or which may by law be brought before any public official, in such official's Official capacity, or in such official's place or trust or profit."  Id. at 2365

McDonnell also identifies four elements of an "official act" that together radically distinguish "official act" from lesser standard used in Abbey, "exerting influence." Id. at 518:

1) It "is a decision or action on a 'question, matter, suit, proceeding or controversy",

2) The "question, matter, suit, proceeding or controversy" must involve a formal exercise of governmental power that is similar in nature to a lawsuit before a court, a determination before an agency, or a hearing before a committee;"

3) "It must be something specific and focused that is 'pending' or 'may by law be brought before a public official;" and,

4) "To qualify as an 'official act', the public official must make a decision or take an action on that 'question, matter, suit, proceeding or controversy', or agree to do so." Id. at 2371-72

It is clear from McDonnell that each of these four components are essential elements of a bribery offense, such as Hobbs Act extortion. The same analysis must also apply to bribery offenses under 18 U.S.C. section 666 and state law that have been previously interpreted by this court based on Abbey (i.e., MCL 750.213, extortion, and MCL 750.118, public official accepting a bribe, alleged violated in Count One).

A jury instruction on the elements of an offense that has become erroneous because of an intervening narrowing of a criminal law is to be judged on a harmless error standard, "not cause and prejudice" for an unpreserved trial error as the government contends. "Brecht's 'substantial and injurious effect' governs harmless error analysis on federal habeas." Brecht v. Abramson, 507 U.S. 619, 623 (1993). Instructional error must have a "substantial and injurious effect or influence in determining the jury's verdict." Sorich v. United States, 2011 WL 3420445 (ND Ill. 2011) Id. at 7.

Based on McDonnell, this court's bribery jury instructions were clearly erroneous. They did not instruct the jury that it had to follow section 203(c)(3). They did not instruct the jury on any definition of official action.

***Instead, as per Abbey, they told the jury that it only needed to focus on influence, Not Acts. (R406: Instructions, 2/11/13, Pg ID 14420-14425).

***Instead of instructing the jury that it had to find there was "question, matter, cause, suit, proceeding or controversy," Id, the instructions told the jury that the government did not have to prove that the defendant "even intended to take action" or that he was "in position to take action." Id. at 14422.

***Instead of instructing the jury that it was required to find that Movant must have either made or agreed to a decision, it told the jury that it was sufficient that only an implicit promise of public influence was enough.

These instructions were erroneous. Evidence at trial that only conformed to these standards does not establish the alleged bribery offense.

The section 666 bribery instructions were similarly erroneous. (R406: Instructions, at Pg ID 14427-29, 14442).

These mirror the extortion instructions. They allowed the jury to convict based only on finding of "influence." (i.e., to act corruptly, means to act "with the understanding that something of value is to be offered or given to reqad[sic] or influence [the official] in connection with his official duties.") Id. at 14428

These erroneous instructions were also demonstrably injurious to Movant. They allowed the government to ask the jury to convict based on influence and not official acts. The government was not required, and did not prove for each offense, that there was;

1) a "decision or action on a question, matter, suit, proceeding or controversy; 2) that involved a formal exercise of governmental power; 3) that is specific and focused that is or may be brought before the public official; and, 4) that the official agreed or made a decision on the matter. McDonnell, Id at 2371-72.

The government's arguments and evidence integrated the alternative extortion theories of "color of official right" and "fear of economic harm" for each of the Hobbs Act counts into one common theme focused on their mantra ("no deal without me"), that Movant had misused his office and influence for personal enrichment. (R301: TR 9/21/12, Opening, Pg ID 4659).

The alternative theory of "fear of economic harm" alleged in each of the extortion counts, depended - in the evidence and instructions - on the element of influence and is similarly impacted by McDonnell.

In his opening statement, Mr. Chutkow told the jury that an ingredient of the extortion charges was Mr. Ferguson's entre to the Mayor; Ferguson had unparalled access to the upper reaches of City Hall. Id, Pg ID 4667; and, that he used their informal relationship to his benefit by which the mayor "steered [INFLUENCED] large amounts of city contracts to Ferguson." Id, Pg ID 4663.

Chutkow told the jury that "Bribery happens, as the judge has told you, if the mayor took money to 'influence' his actions as mayor. The money and the action do not need to be close in time. If the mayor took the money in order to be 'influenced', the crime is complete." (Id. Pg ID 4665-66). For example, the prosecutor told the jury that Kilpatrick took money (bribes) from Karl Kado "in order to protect him," (Id. Pg ID 4666), another form of influence (There was no specific evidence of an official decision to be made); or "held hostage a $50 million contract," (Id. Pg ID 4668), another ambiguous allusion to influence.

Similarly, Chutkow told the jury on another contract scenario, that it was a Ferguson demand for a piece of a general contractor's work that "he didn't make without backup," (Id. Pg 4669), apparently referring to Ferguson's use of his close relationship with the mayor - a reference to Ferguson's ability to call on the mayor's influence.

All of this was to paint a picture to the jury of influence forming the basis for both Hobbs Act theories, "color of official right" and "economic fear."

That was the pattern in the government's presentations and arguments on each of the contracts, USE OF INFLUENCE, as a carrot and a stick, sometimes referring to the specific status of a contract, but NEVER ESTABLISHING THE FOUR MCDONNELL CRITERIA FOR AN OFFICIAL ACT WITHIN THE MEANING OF SECTION 203(C)(3).

The same theme was presented in the government closing, again focusing on influence and not the specifics required by McDonnell.  (R406: TR 2/11/13, Closing, Pg ID 14452); "No deal without me.  That tells you almost everything you need to know about this case."  "When you're a public official and you accept cash...you know that that person expects you to treat them well with their contract or do something in your official position to help them." Id. Pg ID 14467-68.

The Supreme Court opined that this type of theory and broad implications will have a "chilling effect on politics, and also those who would want to be involved in our system of democracy."

According to this court's decision on Movant's Rule 29 motion, if found sufficient evidence to support the extortion and bribery counts from evidence of influence without meeting the requirements of McDonnell to establish proof of an official act beyond a reasonable doubt.

Count 2 - (inducing payments from Inland Waters).  The court relied on testimony that Movant did not act - that he "held up a contract, without any evidence of a decision on a "question, matter, cause, suit, proceeding or controversy, within the meaning of McDonnell.  2013 WL 4041866 at 6.

Count 3 - (Contract 1368, Amendment No. 4).  The court relied on evidence of delay, by the mayor, from August to December to sign a contract amendment.  This does not meet the McDonnell criteria.

Count 4 - (Contract 748).  The court concluded that Movant was guilty of extortion, completely, because he "signed an order awarding the contract to Walbridge." Kilpatrick, 2013 WL 4041866 at 8.

Count 5 - (Contract 755).  The court relied on evidence of Ferguson's reputation "cognizant of Ferguson's ties with Kilpatrick, Walbridge approached Ferguson about bidding the project as a joint venture." Id at 9.

Count 9 - (Contract 2014).  The court relied on evidence of bid manipulation, but absent from this complicated scenario is ANY EVIDENCE OF AN ACT THAT MEETS THE MCDONNELL CRITERIA.  Id. at 11-12

Count 17 - (Bribery).  The court followed Abbey.  It only required evidence of an intent to influence.  Id. at 13.  "The government is not required to establish a direct link from some specific payment to a promise of some specific official act." Id. at 13

Count 1 - (RICO Conspiracy - Bribery).  This court found evidence of payments for influence to suffice.  Id. at 16.  "A gift or gratuity, and that the gift or gratuity was made with an understanding that Kwame Kilpatrick would exercise his official judgment in a particular manner."  It more particularly found that cash from Karl Kado "to ensure that Kado maintained his contract for work in Cobo Hall," that flights (much of the same evidence found insufficient in McDonnell) in return for favorable treatment, and that payments to Marc Cunningham to support his investments and payments by Johnson Akinwusi to ensure he got business from the city.  All of this may have satisfied the requirements of the state bribery law that require only the same influence standard REJECTED BY MCDONNELL.

The jury deliberated on multiple types of racketeering acts and was only required to be unanimous as to the types of racketeering acts, NOT THE SPECIFIC ACTS. Id. at 14.

It therefore, cannot be determined, in any way, that the jury did not conclude that Movant was guilty of RICO Conspiracy based on both erroneous instruction and insufficient evidence of state law bribery.

## C)  The so-called "special verdict", nor the "evidence at trial" overcome the McDonnell error.

The government's legal predicates of procedural default, harmless error, and also that section 666 bribery and Hobbs Act Extortion are outside of the ruling in McDonnell is a serious flawed argument.  The government's analysis of the record and the evidence pertaining to the only issue before the court, regarding this matter: whether there were any "official acts" within the meaning of section 201(a)(3), and also were presented to the jury for proper analysis under the McDonnell criteria.

Repeated declarations that the evidence "overwhelmingly established" Movant's guilt are no substitute for a rigorous and objective analysis of the details in the evidence about what Movant did or agreed to do that are alleged to be "official acts", on the record, and then presented to the jury for their determination, under the McDonnell critera.

For the following reasons, the court should dismiss convictions for Counts 1, 2, 3, 4, 5, 9, and 17.

## II. MOVANT'S SIXTH AMENDMENT RIGHT TO COUNSEL WAS VIOLATED BY THE COURT

**A) The court started trial proceedings by declaring "Detroit needs Closure." There was a significant focus on "not delaying". Therefore, the court made no effort, whatsoever, to make an adequate and meaningful inquiry into the severity of the unethical nature of Movant's trial attorney's conflict of interest regarding a government witness against him; Gaspore Fiore.**

The court has a duty to avoid potential conflicts. "If the defendant or defense counsel makes timely objection to Joint Representation based on a Conflict of Interest claim, and trial court fails to inquire into the conflict of interest, prejudice is presumed and reversal is automatic." Harris v. Carter, 337 F.3d 758, 761-62 (6th Circuit 2003)

"Courts inquiry into potential conflict of interest did not satisfy Rule 44(c) whether defendant fully understood the potential conflict and its implications on his defense." U.S. v. Osborne, 402 F.3d 626, 631-34 (6th Circuit 2005)

The inquiry process has been put in place by the courts to protect the rights of the defendant. To assure that he is receiving conflict-free, effective assistance of counsel. To protect justice and fairness...not to protect the court's self-imposed time schedule.

"Counsel's successive representation of possible witness and defendant required evidentiary hearing to determine whether conflict created adverse effect." Hall v. U.S., 371 F.3d 969, 974-76 (7th Circuit 2004)

The government's claim that there was no actual conflict "from attorney James Thomas' prior representation of Gaspore Fiore" is mired in deception.

These same government attorneys spoke with James Thomas (trial counsel) while he was representing Fiore, during their investigation of the Kilpatrick Mayoral Campaign, about issues regarding Movant, and his campaign. They directly engaged in conversations and exchanges of information.

The government also spoke with Thomas prior to, during, and after, Fiore's testimony at the Grand Jury against Movant. The government attorneys even granted permission to Fiore (on the record) to "step outside and speak with Mr. Thomas" during his Grand Jury testimony against Movant. Thomas coached Fiore during his testimony, and also advised and counseled him during the same.

The government attorneys participated in, and benefitted from, the actual conflict of interest involving Fiore.

The day after Thomas accompanied his client (Fiore), to the Grand Jury against his other client (Movant), the government moved a 3rd Superseding Indictment against Movant. The government attorneys discussed this with Thomas the day of the Grand Jury testimony of his client Fiore, and again the next day. James Thomas and the same government attorneys, who are supervising their responses in this present action, were intimately involved in conversations about two individuals, with completely antagonistic positions and interests, but having the same lawyer.

None of these activities were ever disclosed to the court, nor to Movant. The depth of manipulation, divided loyalty, and intentional misleading, that Movant's counsel engaged regarding his representation of Fiore, could not be cured by an incorrect and rushed judgment to simply remove the counts regarding Fiore from the indictments.

The attorney/client relationship was destroyed.

These same government attorneys spoke on Thomas' behalf in two in-chambers conferences (prior to trial) when these Fiore conflict issues were raised by Movant. Government attorneys arrived to that conference with a ready made solution for the court to simply withdraw the counts in the indictment regarding Fiore. It was obvious that there was a prior meeting or conversations without Movant. The court, without doing any meaningful inquiry into Movant's claims, accepted the government's "cure". The government (and Thomas) failed during the in-chambers conferences, or at any other time, to fully disclose their participation, coordination, and conversations with Thomas regarding his representation of Fiore.

There was an egregious and impermissible actual conflict of interest, which destroyed the trust and communication within the attorney/client relationship between Movant and his trial attorney; James Thomas.


**B) The court erred by denying Movant's request for new counsel.**

The right to effective assistance of counsel is impaired when defense counsel operates under conflict of interest because "counsel breaches the duty of loyalty, perhaps the most basic of counsel's duties." Strickland, 466 U.S. at 692.

"Failure to raise an ineffective assistance of counsel claim on direct appeal does not bar the claim from being brought in later collateral proceedings." Massaro v. U.S., 538 U.S. 500, 509 (2003)

The fact is, the right to counsel is the most basic and foundational fundamental right of the accused.  The right to counsel is also the right to effective counsel.  There is no procedural bar with this claim.

Also, the issue of timeliness, or more specifically, the court making the erroneous decision to deny new counsel to Movant because "it was merely a tactic to delay the trial" was not deliberated or decided by the 6th Circuit.  They explicitly stated such in their opinion.

Movant's right to effective counsel was destroyed by the erroneous decision of the court.  The court forced Movant to proceed through trial with an attorney who significantly breached "the duty of loyalty" to his client, which worked to destroy the attorney/client relationship altogether.  Movant was left with No Representation for critical portions of the trial proceedings.

The government deceitfully describes Movant's motion for new counsel as an "eleventh-hour motion."  They espouse this position after having full knowledge that neither James Thomas, nor the government attorneys themselves, ever disclosed to the court, nor to Movant, their communications, activities, and interactions, regarding Gaspore Fiore.  Movant raised these issues with the his attorney the moment he knew, and with the court less than 24-hours later, after flying from Dallas, Texas to Detroit, Michigan.

The descriptions of Movant's motion being filed "last minute" is not only disingenuous, and misleading, but also malicious in its intent.  One that intends to absolve the government attorneys themselves, Movant's trial attorney, and the court from taking some responsibility for the dereliction of their duty to protect the rights of the accused.

Movant has been recently made aware of additional issues of conflict of interest regarding the Kilpatrick Civic Fund.  But the government and trial counsel knew of this when the courts ordered the attorneys to brief "EVERY possible conflict".

The failure by the court to do any further or meaningful inquiry, in these matters, destroyed Movant's ability to have a fair-trial.


**C)  Movant's trial counsel, and his law firm, established an actual conflict of interest with Movant, when they represented clients with competing interest, regarding the very same issues, at the very same time, in the very same building.**

Seemingly the only defense or protection from trial counsel's unethical and egregious conflict is to proclaim that all is cured by a mysterious "Ethical Wall".

On August 7, 2017, Movant presented information to the court, about the only conflict of interest that he was aware of, at that time, the Gaspore Fiore Conflict.  Then he returned home by airplane to Dallas, Texas.

On August 8, 2012, the Detroit Free Press wrote an article about "Possible Conflict of Interest" for James Thomas, Movant's trial counsel.  Movant was not aware of the article, nor did trial counsel speak with him about the article.  No "ethical wall"!

On August 9, 2012, the trial court emailed all the attorneys (not their clients), and ordered them to "fully brief ALL conflicts and address EVERY possible conflict...specifically the potential conflict mentioned in the new article..."  Movant was not aware of this email, nor this communication at all, nor did trial counsel disclose this email from the court to Movant.  No "ethical wall"!

On August 13, 2012, trial counsel files a brief with the court about the Macomb County Interceptor (Detroit Free Press issue), and that his law firm is representing Macomb County in civil action against Movant, regarding the very same issues in the criminal case.  Trial counsel did not discuss the production, nor the substance of his brief with Movant.  Nor did he discuss anything about any other "possible conflicts of interest", including the one with his law firm.  No "ethical wall"!

On the same day, August 13, 2012, the government files short statement stating that they "we have no problem with it", regarding Thomas' representation of two conflicting clients simultaneously.  This is something that already worked well for the government and Thomas during the Fiore representation.

On the morning of August 14, 2012, after Movant returned to Detroit, Michigan from Dallas, Texas, he walked into the law offices of James Thomas.  Movant had not spoken to Thomas since August 7, 2012.  The mistrust, broken communication, and divided loyalty had destroyed the attorney/client relationship.  When Movant walked into the office, Mike Naughton, the law partner of James Thomas said to Movant, "I think we have a big problem."

Movant and Mike Naughton walked into the personal office of James Thomas.  This was the first time that Thomas spoke to Movant about his conflict relationship.  Thomas also looked Movant in his eyes and asked if he truly wanted him "off of this case" for the second time.  Movant looked at him in his eyes and told him "YES! I need you off of this case.  I don't trust you."  This was minutes before walking over to the court.  No "ethical wall"!

**Movant's trial attorney never disclosed this relationship with him, and is now hiding behind an "ethical wall".**

**There was no "ethical wall" for the aforementioned, nor the following:**

**During the time between August 8, 2012 and August 14, 2012, when the issue of "Conflict of Interest" involving Thomas and his law firm, as it relates to Movant, was in the Detroit Newspapers. There was an order from the court. Then a brief was prepared by Thomas in response. There was no communication with Movant, whatsoever, about any of this.

**When trial counsel spoke before the court, he never said anything about an "ethical wall". On August 14, 2012, he said to the court, "I regretfully ask you to allow me to remove myself, because of the conflict." Nothing about an "ethical wall."

**When protected discovery materials from the criminal case were presented in filings of Thomas' law firm in the civil matter.

**When trial counsel was barred from questioning "conflict witnesses" from Inland Waters, he was allowed to send one witness away (Kathleen McCann), without being questioned by the defense, and another Inland Waters witness, Walter Rocziki, he was allowed to simply "have no questions for." This was done without substitute counsel being present in the court, without the court making any attempt to notify substitute counsel, and without his knowledge. Nor without any consent from Movant.

**When Derrick Miller testified at trial for 3-days. The government asked Miller a number of questions about RICO Conspiracy, and other issues, companies, and individuals, related to the civil matter (Thomas' law firm was against Movant). Thomas did not ask one question, nor confront the witness in any form or fashion, regarding the RICO issue, nor any other issues, related to those in the civil matter, during his 2-days of cross-examination.

This idea of an "ethical wall" was created by the court on August 15, 2012 to rush the trial proceedings. The "wall" may have served to hide Thomas' unethical behavior, relationships, and activities, but it did not protect Movant's right to counsel.

The government states in their response that they obtained "a sworn declaration from Thomas, confirming factual accuracy of the record..." The "sworn declaration" conspicuously and completely ignores all of the aforementioned issues, and also could not possibly address the harm, deficiency of counsel's performance, and the prejudice that was provoked by the nature of this conflict.

This conflict infected the pre-trial and post-trial parts of the trial, caused great harm to Movant's ability to confront certain witnesses, and have a zealous defense. Also, counsel's complete silence regarding the issues related to this conflict; RICO Conspiracy (Count One), the Macomb County Interceptor Contract (three Counts of Conviction), and related witnesses (witnesses that relate to at least Six Counts of Conviction).

The "ethical wall" actually worked to provoke trial counsel to remain silent on critical matters during trial proceedings, send away witnesses who were involved in this conflict relationship, and hide behind notions of "trial strategy" as excuses not to confront trial witnesses regarding serious issues related to this conflict relationship. "Separate files...Separate offices" is not an "ethical wall". In this case, its ethical deception and an argument for malfeasance.

The "sworn declaration" does nothing more than repeat the government's argument in their response to Movant. The government attorneys and Thomas are working together again against Movant, which is exactly how the trial proceedings started, persisted through, and ended.

The court erred when it denied Movant's motion for new counsel because it said it was a "delay tactic."

"Courts cannot properly resolve substitution motions without probing why a defendant wants a new lawyer." Martel v. Clair, 565 U.S. 648, 664, 132 S. Ct. 1276 (2012)

The court left Movant with No Representation for ALL issues related to the civil matter in this case. This denied Movant his Sixth Amendment right to counsel, as well as his right to confront witnesses on the issues asserted against him. "Actual or constructive denial of the assistance of counsel altogether is not subject to...prejudice analysis." Strickland, 466 U.S. 668, 692, 104 S. Ct. 2052 (1984).

There is no procedural bar against raising this issue. The appellate court did not make a decision about the court's error when it chose to protect the "trial schedule" over protecting the rights of the accused.

Movant's trial counsel gave deficient performance to him at trial. Movant's conviction should be overturned because he was not provided with conflict-free effective counsel to represent him at trial. For the following reasons, Movant states these facts:

1. There was no "ethical wall" between Thomas and his firm. The two proceedings at issue were deliberating the very same issues, the very same contract, and the very same individuals/companies in both matters. This simultaneous conflict of interest, that trial counsel and his firm had with Movant, infected and contaminated trial counsel's ability to perform. The rhetoric about the "ethical wall" was a result of the court refusing to do any meaningful inquiry into this impermissible conflict relationship, and the breadth of the issues, witnesses, and companies, that were jointly involved in both matters, because of "trial schedule."

2. Thomas' conflict of interest with his law firm (representing clients with antagonistic and adverse positions in the very same matters, at the very same time, in the very same building), seriously and significantly adversely affected Thomas' performance at-trial.

**D) Movant has demonstrated that trial counsel's performance fell below an objective standard of reasonableness, and that counsel's deficient performance prejudiced Movant, resulting in an unreliable or fundamentally unfair and unjust outcome in his trial.**

The government begins their response to this specific issue of Ineffective Assistance of Counsel, with a discussion of two government witnesses; Anthony Soave and Kathleen McCann.

These two government witnesses, along with a third witness (Walter Rocziki), and the company (Inland Waters) they represent, relate to the most serious counts of conviction in this case, including the RICO and Extortion Counts.

Trial Counsel, James Thomas, was barred by the court to question these witnesses, because of his impermissible conflict of interest with his law firm and Movant.

Substitute Counsel was appointed "to provide the defendant with counsel to cross-examine the Inland Witnesses."

The government asserts that there was "extensive cross-examination" given to Anthony Soave.

Substitute Counsel had no meetings, nor any meaningful conversations with trial counsel, nor anyone in the defense team about this particular witness as it relates to trial strategy, his connection to specific counts in the indictment, other witnesses due to testify at trial, other companies, specific contracts at issue in the case, or other trial discovery. The discovery materials in this 6-month trial was voluminous, and it was impossible for substitute counsel to digest, in the few weeks that he had to prepare for this and other witnesses. Trial counsel did not discuss, nor advise, nor counsel, nor produce any writings to help substitute counsel. This was an "extraordinary procedural position" for any attorney. No attorney placed in this position would be effective.

Substitute counsel had one, 30 minute meeting with Movant a few days before his cross examination of Anthony Soave.

This "extensive cross-examination" was done without any guidance from Movant, trial counsel, or anyone working in the defense of Movant.

The government states in their response, "although independent counsel opted not to cross-examine Kathleen McCann, that was a legitimate choice."

This is a deceptive and intentional misleading statement. The government is fully aware, were present in court, when "independent" or substitute counsel was not notified by the court at all, nor made aware of at all, nor given any opportunity to address the court for the purposes of exercising the defendant's (Movant's) right to cross-examine Kathleen McCann. The government has full knowledge that James Thomas, the attorney barred by the court from questioning this witness, who was in an actual conflict of interest with Movant regarding this

witness told the court that "the defense had no questions for Mrs. McCann." The government also is fully aware that this was done in a secret meeting in-chambers, without the knowledge of Movant, nor substitute counsel.

When the court was called back in-session, the announcement was made by the judge that there would be no further questions for Mrs. McCann, and "she was excused." Movant had absolutely No Representation at this critical moment in the trial. Trial counsel was silent, barred from participating, and substitute counsel was not present, nor notified by the court at all.

Movant had a more than 10-year professional working relationship with Kathleen McCann. She knew most about Movant's job, and how Movant interfaced with her company, and the individuals in it, than any of the other witnesses from this company. She worked with Movant well. Not only when he was Mayor of the City of Detroit, but also when he was a State Legislator. During her testimony, while being questioned by co-defendants counsel, her last statement about Movant was, "Mr. Kilpatrick was always professional."

The government is asserting a position that Movant's co-defendant's cross-examination, through his counsel, addressed all of the issues for Movant's case. And therefore, Movant didn't need an attorney present.

Movant had No Representation, at all, for 2 of the three witnesses from this company, and an unprepared, unfairly positioned, under informed substitute counsel, for the other witness from this company; Mr. Soave. These witnesses were directly related to the most serious counts of conviction in this case. Trial Counsel's performance was deficient, and adversely affected Movant.

Because of the court's incorrect "cure" for trial counsel's conflict of interest, Movant had no representation at critical stages of his trial, and "failed to subject the prosecutions case to meaningful adversarial testing." U.S. v. Coleman (6th Cir. 2016)

In the remaining responses provided to Movant's argument; ineffective assistance of counsel, the government is attempting to relitigate their case against Movant regarding the issues of the Kilpatrick Civic Fund and others.

In doing so, the government asserts in their response that Thomas "did not conduct the review, the other attorney did."

For the first time, the government acknowledges that another attorney conducted a review of the Kilpatrick Civic Fund (KCF) expenditures. That "other" attorney is Heather Miserlian. The government asserts that Thomas "had no personal knowledge" of her work. Miserlian worked in the office with James Thomas. They coordinated efforts, did joint phone calls, and discussed the dissolution of the organization together. They also spoke on the phone and met with William Phillips, KCF Attorney, and Ayanna Kilpatrick, KCF Board President. Thomas had direct

personal knowledge of Fund expenditures and KCF Board Approval of those Expenditures, Board Meetings, KCF Dissolutions processes, and the complete lack of Movant's involvement with any of these matters. Thomas also worked with these same government attorneys to receive the Kilpatrick Civic Fund subpoena.

The government continues to mislead the court by spewing the very same grossly inaccurate arguments about Fund expenditures, and also carefully avoids to disclose their involvement with Thomas and "the other attorney" during their investigation of the KCF.

The "other attorney", Heather Miserlian, was incapacitated during the trial. She could not testify, attend trial, nor even offer advice. She was non-speaking, immobile during trial proceedings. The only other person with personal knowledge of the KCF issues relating to Movant, who participated in the dissolution, shared the office space, and could be a witness for Movant was Thomas. Thomas was the only person who could absolve Movant from the gross inaccuracies and arbitrary assignment of responsibility to the Fund, by the government.

Why didn't Movant's trial counsel stand up and say that there was another attorney who did a complete financial report and reconciliation of the KCF? Why did he not talk about the work of Heather Miserlian? Why was he completely silent regarding these issues that represent at least 8 counts of conviction in this case? He was significantly compromised, and could not be a zealous advocate for Movant. There was no "ethical wall."

Thomas was a "necessary" witness at trial. Concealing the information that he should have been forced to bring forward prejudiced Movant and prevented the court from making a just decision.

Movant was left with No Representation at all. Thomas was silent, "his lips were sealed" on critical matters related to the KCF. He hired an "expert" with no experience in working with 501(c)4 organizations, nor any political organizations of any kind (Leemon Testimony). He refused to confront witnesses regarding serious and critical matters that would have exposed his conflict. Counsel should have withdrawn from his representation, and was asked several times by Movant to do so. He could not be a zealous advocate for Movant.

Movant has attached an email that he sent to his attorney, James Thomas, during the post-trial period.

Michael Naughton, law partner of James Thomas, attempted to work to organize case discovery, build strategy, and create good communication between Movant and Thomas. Thomas thwarted and eventually destroyed Naughton's attempts. Naughton was prevented from speaking to Movant by Thomas, and further prevented from attending trial proceedings. Thomas knew very little about Movant's case, his specific issues, nor what was in the discovery materials. This broken and destructive "representation" persisted through the post-trial period.

Trial counsel was extremely deficient in his representation of Movant, and his performance at trial. There were several impermissible conflicts of interest that paralyzed his ability to be a zealous advocate for Movant. His deficient performance prejudiced Movant, resulting in a fundamentally unfair and unjust trial, which produced an unreliable result.

### E) Movant was constructively denied counsel at critical stages of his trial.

"The Court has uniformly found constitutional error without any showing of prejudice when counsel was either totally absent, or prevented from assisting the accused during a critical stage of the trial proceeding." U.S. v. Cronic, 466 U.S. 648, 659 (1984)

The government's response celebrates the prominence and reputation of Movant's trial counsel. Prominence and reputation is not a defense to Ineffective Assistance of Counsel. The court used this "defense" of trial counsel in pre-trial proceedings as well; "Mr. Thomas has a good reputation in this building." (In-Chambers Conference transcript)

Trial counsel's reputation in the court building has nothing to do with his breach of duty and loyalty to his client whatsoever.

Movant was constructively denied counsel during the pre-trial period. This lack of duty and breach of loyalty persisted as trial began, leaving Movant with a completely broken attorney/client relationship, where communication and trust were completely destroyed.

This deformed relationship provoked an extremely deficient performance by trial counsel during trial proceedings. Movant was left with No Defense, No Representation for critical portions of the trial, and denial of his right to confront witnesses.

This deficient performance prejudice Movant, and made it impossible for him to have a fair-trial, and a reliable result from that trial. This all resulted in a guilty verdict, then a severe over-sentencing.

Movant was forced to endure the tremendous miscarriage of justice, egregious procedural posture of the court, and the extraordinary circumstances of a defense attorney beginning a trial with two known simultaneous impermissible conflicts of interest. Then, this same conflicted attorney, was allowed by the court to represent the accused, without any meaningful inquiry into the nature, scope, and depth of these conflicts, which made it impossible for Movant to have a zealous defense. The accused was doing everything he could, with the limited knowledge that he had at the time, to tell the court about the broken communication and trust with his trial counsel, the court chose "trial schedule" over protecting the rights of the accused.

This left Movant with No Representation for critical stages of his trial.

Defendant is entitled to "a presumption of prejudice where his attorney failed to subject the prosecution's case to meaningful adversarial testing, or where the case's extraordinary or egregious procedural posture would have prevented any attorney from providing effective assistance." United States v. Coleman, 835 F.3d 606, 612 (6th Cir. 2016)

Movant has given the critical stages throughout his trial proceedings, when constructive denial of counsel is specifically stated in his Petition (2255).

This argument is not "repackaged" as the government would assert. It is the result of understanding the profound nature of trial counsel's three conflicts of interest, and how all the counts of conviction, and trial witnesses, related to these same conflicts. Further to also develop an understanding after reviewing the transcripts to know the profound impact on Movant's due process rights to a fair-trial. And finally to understand the significant destruction of his right to effective counsel at every stage of his trial.

Movant was constructively denied effective conflict-free counsel, and was left with no representation, whatsoever, at critical stages of his trial.

### III.  MOVANT IS NOT PROCEDURALLY BARRED FROM COLLATERAL REVIEW, DUE TO THE COURT'S VIOLATION OF HIS RIGHT OF CONFRONTATION, BY PERMITTING IMPERMISSIBLE HEARSAY, THAT WAS TESTIMONIAL EVIDENCE

The hearsay testimony of Kim Harris was one of the most egregious parts of this trial.  This testimony was mired in old folklore from stories about former Detroit Mayor, Coleman Young, mixed with an episode of The Sopranos television show.

A story about a late night meeting at the Mayor's Mansion, television sets being turned up loudly, and seedy whispers about a city contract.  It was absolutely ridiculous.  But, the jury relied on this information, as it did other hearsay in this trial, because it was consistently and overwhelmingly offered (over objection) for the truth of the matter it asserted, throughout the entire proceedings.

There is no procedural default with raising this issue.  The hearsay issue was raised by co-defendant's counsel on direct appeal, and Movant joined in his argument.  The 6th Circuit decision does not bar Movant from raising the issue of violation of his right of confrontation on collateral review.

Movant is the subject of the hearsay.  The words and actions of the hearsay are specifically attributed to him.  There was great harm to Movant's ability to defend himself because of this impermissible hearsay testimony.

Using this prior hearsay statement does the opposite of what the court says it should; provide for the witnesses "state of mind."  It only works to make believable that which is lower in probative value.  Kim Harris' testimony is an outright lie, and it re-characterize the comments and case that the government crafted.  And most importantly, it usurped the jurors' fact finding function with regard to matters that were not in evidence.

This was a stand alone out-of-court statement that had no basis in fact.  This impermissible hearsay is attached to the most serious count of conviction in the trial; RICO Conspiracy.

There is not any other evidence in this case, nor any other witness testimony at trial, involving Movant in contract scoring, contract negotiations, contract bidding, contract analysis, or tabulations for contract decision-making.  Nor was there any testimony or evidence, from any other sources, that implicated Movant with involvement with the particular contract issue that was the focus of Harris' testimony.  Movant never had a single conversation with Kim Harris, never met with him, nor had any personal knowledge of him, nor relationship with him at all.

"Confrontation Clause violation caused by denying cross-examination of key prosecution witness not harmless error because witness's highly damaging testimony not cumulative and prosecution's case otherwise weak." U.S. v. Anderson, 881 F.2d 1128, 1140 (D.C. Cir 1989)

Kim Harris' testimony, and the subject contract, was submitted to the jury for consideration as a RICO act, for the purposes of finding guilt for the RICO Conspiracy count.  The government attorneys argued it to the jury, the jury questioned it, considered it, and it had an effect on the verdict against Movant.

The court erred when it allowed hearsay evidence that was "testimonial" evidence, against Movant, without him having the opportunity to cross-examine the declarant.  This significantly harmed Movant.

A man who was deceased (Gerard Grant Phillips) was allowed to testify at Movant's trial, without any opportunity for Movant to have a "full and effective cross-examination", nor any prior opportunity to do so.  It was "testimonial" evidence and violated his Sixth Amendment Right of Confrontation.

The admission of out-of-court statements violates the Confrontation Clause of the Sixth Amendment if;

1)  The declarant does not testify as a witness at the trial, and

2)  The declarant is not able to be subject to full and effective cross-examination concerning his or her prior statements against a criminal defendant.

This implicates the Confrontation Clause because defendant is not afforded the opportunity to confront the out-of-court declarant.

In Crawford v. Washington, the Supreme Court made a distinction between "testimonial" and "non-testimonial" evidence.  The court held that the admission of a "testimonial" hearsay statement violates the Confrontation Clause unless;

1) The declarant is unavailable, **AND,**

2)  **The defendant had a prior opportunity to cross-examine the declarant.**

The government hides behind the court's error based on two issues;

1)  Procedural Default, and,

2)  There was no violation of the Confrontation Clause because this was an out-of-court statement by a co-conspirator of Movant.

The law is clear on this issue.  Even if you arbitrarily name Gerard Grant Phillips, the declarant, as a "co-conspirator", he would still have to be available for cross-examination.


"Confrontation Clause not violated by admission of co-conspirator's hearsay statement incriminating defendant BECAUSE (bold "BECAUSE") co-conspirator testified at trial AND (bold "AND") available for cross-examination." Crawford v. Washington, 541 U.S. 36, 53-54 (2004); U.S. v. Morsley, 64 F.3d 907, 918-919 (4th Cir. 1995)

Gerard Grand Phillips was not available to testify at trial.  Nor was he available for cross-examination.  He was deceased.  Mr. Phillps' immediate supervisor, and direct report; Sharon McPhail (General Counsel for the Mayor's Office), gave testimony to the court that Mr. Phillips never met with the Movant, nor would he ever do so, because of the established chain of command that was established. (Sharon McPhail testimony)

There was no secret meeting between Mr. Phillips and Movant.  And there is not any other evidence, nor witness testimony at-trial, that supports any part of this fabricated impermissible hearsay testimony.

Movant's trial counsel attempted to introduce evidence, from within the case discovery, proving that the actions that Mr. Harris' testified that he took, in regards to the subject contract, were completely proper and consistent with the rules and regulations of the City of Detroit, and were also a routine part of his job.

Also, within the case discovery, there was evidence that determined that the actions that he took were absolutely correct  regarding the scoring processes for this particular contract.  There was no crime.  There was no need for a Sopranos type of conversation with Movant, nor any late-night meeting with the "televisions turned up loudly."

The court erred when the court sustained the government's objection to introduce these materials.

The court permitted the admission of impermissible hearsay evidence.  The evidence was "testimonial" and the court denied Movant the opportunity to cross-examine the declarant; a deceased man.  There was no other evidence, nor witnesses, that support any part of this impermissible testimony.  Movant was denied his right of confrontation, and it was not harmless error, because the testimonial evidence related to the most serious count of conviction in this case, and the jury relied on it for their verdict.

## IV.  MOVANT SEEKS RELIEF FROM HIS SENTENCE BECAUSE OF A MISAPPLICATION OF THE SENTENCING GUIDELINES, DUE TO FUNDAMENTAL FLAW IN CALCULATION OF LOSS/GAIN.  THIS CLAIM IS COGNIZABLE ON COLLATERAL REVIEW.

Resentencing is required because this error is a "miscarriage of justice." Griffin v. United States, 330 F.3d 733, 736 (6th Cir. 2003)

The process to arrive at this result was extremely flawed and arbitrary, as demonstrated by the Government's concession in connection with remand restitution proceedings that in fact there is no reasonable basis on which to correlate the "gain" amount this Court used at Movant's sentencing to ANY DWSD LOSS.

Movant's sentence is based on an erroneous and unreliable guideline computation of "gain" attributable to co-defendant.  A "gain", in he amount of $4,584,423.00, was used at sentencing to increase Movant guideline score 8 levels.  The guideline used to compute Movant's offense score for RICO and bribery or Hobbs Act offenses (including Extortion counts), U.S.S.G section 2B1.1, however, requires the court to determine "loss" that would increase the guideline score, and if so, the amount.  "Gain", for purposes of this rule, can never be a substitute for a reasonably reliable measure of victim's loss.

This Court should grant resentencing because this error clearly impacted the outcome of Movant's sentence.

Also, the court accepted the PSR rationale to use gain without investigating whether a loss amount could be determined.  It then went on to use unfounded opinions, and an arbitrary approximation of a "gain" at about $4.5 million, adding 18 levels to Movant's Total Offense Level.

The Government's current position in this court on restitution to the DWSD is that gain can ONLY be calculated for ONE CONTRACT; CM-2014.  This clearly shows that there was error. Movant's opposition to this new theory shows that there is actually no loss for CM-2014 at all.

The appeals court reversed the restitution order because it concluded that before a "defendant's gain" can be converted into a victim's loss, it was necessary for the government to "establish a 'direct correlation' between the two." Id at 27.

On remand for restitution, the government reversed positions 180 degrees on this "gain/loss" dispute.  The government now claims the opposite of its position at sentencing in 2013...NOW, it can calculate loss. (R581: Gov't Response to 6th Cir. COA Remand & Restitution Order, Pg ID 17136)

The government, NOW, takes the position that CM-2014 is the ONLY contract for which it wants to quantify loss. It recommends about $1.5 million. Which is yet another arbitrary and unfounded figure. The government doesn't say there is a loss on ANY OTHER CONTRACTS now, although it declared this at trial, repeatedly.

On remand from the Court of Appeals after it determined that this court's use of "gain", and its calculation of restitution was in error, and contrary to the government's rationale at sentencing, the government has adopted the position it rejected before. Now they assert that loss can be calculated, in the amount of about $1.5 million. Its reversal of positions demonstrates the process was fundamentally unreliable at best, but much more likely to be misleading, arbitrary and capricious.

The district court has not agreed with the government at this amount of "loss". The court has attributed this arbitrary number to "bid-rigging allegations." Movant does not have a single count of "bid-rigging in his indictment. Movant does not have a single count of conviction for "bid-rigging". And, the jury in this case never were asked to deliberate, nor make a decision about any bid-rigging. Once again, there is no foundation for this figure, nor the court's decision.

A sentencing guideline error that is a "fundamental defect which inherently results in a complete miscarriage of justice" can and should be corrected in a 2255 proceeding. Reed v. Farley, 512 U.S. 339, 354 (1994); Jones v. U.S., 178 F.3d 790, 796 (1999). This court's calculation of an 8 level increase for "gain" is a fundamental defect.

The court was presented with information, at trial, concerning at least 11 contracts. The PSI reviewed factual circumstances relating to each and every one of these contracts, but failed to provide any information for the court's consideration to evaluate "loss" for ANY OF THEM. Instead, the PSR opted for an arbitrary, unreliable, guessing, involving a random percentage to factor so-called "profits" (also a random number) on contract amounts.

Where the specific offense characteristic of loss was a substantial factor in determining Movant's Total Offense Level, use of ONLY unreliable information was a "miscarriage of justice."

"It is clear that, in sentencing, a miscarriage of justice cognizable under section 2255 occurs when the sentence is in excess of that authorized by law." This court should grant resentencing for these reasons.

## V. MOVANT MAY SEEK RELIEF ON COLLATERAL REVIEW FOR VIOLATION OF HIS DUE PROCESS RIGHTS BECAUSE NO "ALLEN CHARGE" WAS GIVEN TO THE JURY. THE VERDICT IN HIS TRIAL WAS AN INCOMPLETE VERDICT.

The denial of the fundamental right to a fair trial is "subject to collateral attack."

Movant asserts that he has a due process right to a complete deliberation, uninterrupted, on all of the counts until he has received what has been commonly accepted as a complete verdict. There was not a complete verdict in this case. The defendants were not advised of the fact that there were unresolved counts nor were they allowed to be given the opportunity to weigh in on whether the Court should give the jury and "Allen Charge", which would have allowed for further deliberation, or compromise on counts that had been preliminarily agreed to.

The trial started with wrong jury instructions, particularly related to the very broad definition of "Official Act". The Supreme Court acted upon these wrong jury instructions, given to the jury at Movant's trial. The Supreme Court made a decision to make a substantive change in law regarding the issues surrounding the definition of "Official Act" and also how juries should make a determination of guilt in these matters.

This is particularly important for this case, because we cannot know what was going on in the jury's minds during this entire trial. They had a fundamentally flawed foundation for determining guilt, further making their result unreliable. Then, after all of these critical problems relating to the jury, they ended their deliberations without a complete verdict.

-The court erred in pre-trial proceedings, when it chose "trial schedule" over protecting the rights of the accused.

-The jury received the wrong jury instructions.

-The court erred by allowing impermissible hearsay that was testimonial evidence, without Movant having an opportunity to confront the declarant.

-The court erred by not giving the jury an Allen Charge, in order for them to have further deliberation, or compromise on counts that had been preliminarily agreed to.

Movant's Constitutional Rights to a Fair Trial were completely destroyed from start to finish.

## VI. MOVANT HAS PRESENTED FACIALLY VALID CLAIMS, THAT HAVE LEGAL MERIT. MOVANT IS ENTITLED TO RELIEF. AN EVIDENTIARY HEARING SHOULD BE REQUIRED.

"Standard of review for denial of evidentiary hearing is abuse of discretion." Pough v. U.S., 442 F.3d 959, 964 (6th Cir. 2006)

Movant has presented a factual claim, with legal merit, that a substantive change in law by Supreme Court decision, has changed the legal correctness of the jury instructions given at his trial. The incorrect jury instructions effected his fundamental rights to a fair-trial.

Also, Movant has not presented bare allegations in his habeas petition, but specific details; time-lines, dates, circumstances and actions, of his trial counsel's ineffectiveness. And specifically how his trial counsel's ineffective assistance of counsel destroyed his ability to receive a fair-trial.

The government has argued that the trial judge should be able to make the decision of whether to grant an evidentiary hearing by simply relying on her own "recollections."

"Only where the section 2255 motion raises 'detailed and specific' factual allegations whose resolution requires information outside of the record or the judge's 'personal knowledge or recollection' must a hearing be held." U.S. v. Pollard, 959 F.2d 1011, 1031 (D.C. Cir. 1992)...(quoting Machibroda v. U.S., 368 U.S. 487, 495 (1962))

In order for the court to make an informed decision, about the issues argued within Movant's petition, it would need a great deal of information that is not in the record:

***The record does not reflect the conversations between the government attorneys and James Thomas, during his simultaneous representation of a government witness in Movant's case; Gaspore Fiore.

Nor would the record reflect information from the day that Thomas attended the Grand Jury proceedings against Movant, with this same government witness; Fiore, in order to advise, counsel, and coach him during his Grand Jury testimony.

***The trial record would not reflect that on two separate occasions during Fiore's testimony, he asked to "step out and speak with Mr. Thomas" before answering a question.

***The trial record wouldn't show that government attorneys Chutkow and Bullata were both questioning this witness at separate times, and also allowed him to step out and speak with Mr. Thomas, while having full knowledge that Thomas was representing Movant in the same action related to the Grand Jury hearing.

***The trial record does not include information about the nature of the conversations between Thomas and the government attorneys, while at the Grand Jury testimony of Thomas' client (Fiore), nor why these Officers of the Court failed to disclose any of this activity to the court.

There should be a record established at an evidentiary hearing, as to how Thomas and the government attorneys to worked together at the Grand Jury, and also what discussions they had about a 3rd Superseding Indictment against Movant, which was presented the very next day after Fiore's Grand Jury testimony.

***There is not a single record from trial that helps the judge "recollect" or understand the conflict relationship between Thomas and Movant regarding the Kilpatrick Civic Fund (KCF). We have no record that establishes who this "other attorney" (Heather Miserlian) is, and also what her relationship was to Thomas, to the KCF, and what discussions she had with the government attorneys.

There should be a record established that shows Attorney Miserlian worked, together, with James Thomas (in the very same office) on the dissolution of the KCF, and that she and James Thomas accepted the Government Subpoena for the Fund, and that none of their conversations about any of the details of this work with the fund, was discussed, nor disclosed to Movant.

There should be a record that there were no "Separate Files or Separate Offices", that there was no "ethical wall."

***There is no trial record that would give us information as to why Thomas, nor the government, ever discussed this "other attorney" at trial, nor the work of dissolution and financial reconciliation that she was hired by the KCF to perform.

***There is no trial record, nor can the court "recollect" the near physical altercation between Movant and his trial counsel.  There is no record of the broken communication, broken trust, lies about his prior representation, and the ugly relationship between Thomas and Movant.  Thomas did not say on the record to Movant, "You are on parole, I will have you thrown in jail for the rest of the trial."  There should be a record established for this in an evidentiary hearing. Because there was no meaningful inquiry into these matters, and there was no evidentiary hearing during the pre-trial phase when these issues were raised by Movant, no record of these egregious issues exist.

***There is no trial record that tells us about Michael Naughton, Thomas' law partner, who knew the most about Movant's case, organized the discovery materials, and was most familiar with the issues, witnesses, and counts in the case, but was forbidden from communicating with Movant by Thomas.  He was later prevented from attending trial proceedings.  Thomas was extremely deficient in his representation of Movant, and his performance was even worse after he forbid Naughton to participate, even though the court appointed Naughton as co-counsel for his trial, and Thomas/Naughton firmed billed the court as such.

***There is no trial record for any of the moments that Thomas' "lips were sealed" on important matters at trial, or explain why he chose not to confront conflict witnesses, nor confront other government witnesses about conflict matters.

***There is also no trial record of why the "sworn statement" of Thomas, introduced in the government attorneys response to Movant's petition did not contradict, rebut, nor refute any of these issues. Thomas' "sworn statement" fails to address ANY OF THESE ISSUES THAT ARE NOT IN THE CURRENT COURT RECORD.

Where, as in this case, "the allegations in the section 2255 motion are not negated by the record, the district court must hold an evidentiary hearing to 'decide all of these unresolved factual allegations which, if true, might support [Movant's] constitutional claim.'" U.S. v. Briggs, 939 F.2d 222, 228 (5th Cir. 1991)

In Smith v. U.S. (6th Cir. 2003), the district court judge was "required to hold evidentiary proceedings on ineffective assistance of counsel claim, though judge presided over original trial and was allowed to rely on memory during collateral review.

If the court can, in fact, "recollect" any of these issues, circumstances, and moments, that are not in the record, or has "personal knowledge" of these matters at all, then there should also be a record made at an evidentiary hearing to establish this fact as well.

Movant is entitled to relief if charges within his petition are proven to be true. Movant's argument is founded upon "detailed and specific factual allegations" to support his petition, and an evidentiary hearing should be required in this case.

# CONCLUSION

Movant did not receive a fair-trial.  His Due Process rights were continuously violated in the pre-trial period, during trial proceedings, through post-trial activities, and also at his sentencing.

The government did not directly address most of the issues and claims within Movant's petition in their response.  The government's request to the court can be summarily understood to be a wrong notion of procedural default for all of his claims.
Movant prays that the court would not yield to the governments continuous manipulation and deliberate actions to mislead this court.

Movant prays that the court will grant his motion to vacate, set aside or correct his sentence (under Title 18 U.S.C. section 2255), for the violations of his Constitution Rights, of Court Precedence, and Court Error, that have been specifically addressed and supported within his petition.  All of Movant's claims are cognizable under collateral review.

Respectfully Submitted,

Kwame Kilpatrick
pro se

Dated:  November 6, 2017

# CERTIFICATE OF SERVICE

I, Kwame M. Kilpatrick, hereby certify that on the 6th day of November, 2017, the foregoing instrument was forwarded to the Court Clerk located at U.S. District Court, Eastern District of Michigan, 231 West Lafayette Blvd, Detroit, Michigan 48226 via first class, U.S. prepaid postage.

---

DECLARATION OF PERJURY

I hereby declare the foregoing is true and correct under the laws of perjury.
(28 U.S.C. Section 1746)

# EXHIBITS

**KCF Contribution Summary**

| Year | Donor Contributions | | KMK Personal Expenses KKF-31 | |
|------|---------------------|--|------------------------------|--|
| 2003 | $ | 37,450.00 | $ | 900.00 |
| 2004 | $ | 177,753.90 | $ | - |
| 2005 | $ | 453,290.00 | $ | - |
| 2006 | $ | 503,233.14 | $ | 11,655.93 |
| 2007 | $ | 553,891.20 | $ | 1,397.08 |
| Total | $ | 1,725,618.24 | $ | 13,953.01 |



KCF Donor Contributions to
KMK Personal Expenses 2003-2007

$13,953.01

KMK Personal Expenses $13,953.01=.80%

KCF Total Donor Contributions $1,725,618.24

KCF EXPENDITURES

1) Years 2003-2007 the KCF raised more than $1.7M.
2) The Government has raised issue with four (4) expenditures during the entire timeframe
   a. The total amount of those expenditures is $13,952.11
   b. This amount is less than 1% of what was raised in the fund
   c. This amount is less than 1% of all the other expenditures.
3) The 4 expenditures that the government has made an issue.
   a. Yoga Lessons $900
      i. We have seen this item several times during the trial.
      ii. We even had witness come and testify about this item.
      iii. Our Tax Expert even said "Not even close," and laughed.
      iv. BUT, KK wasn't on the board when this check was written
      v. KK did not sign this check.
      vi. And no evidence has been offered that it was written with any malice.
   b. LaCosta Resort and Spa $8,605.03
      i. We have heard this item throughout the trial.
      ii. NO EVIDENCE HAS BEEN OFFERED THAT THIS TRIP DID NOT ALIGN WITH THE PURPOSES OF THE KCF.
      iii. The government says because he took his family.
      iv. Or because it was a nice resort.
      v. They have not offered any evidence that his family doesn't positively promote the image of Detroit.
      vi. They have no evidence that he didn't meet with business leaders and do a speech while there.
      vii. They are telling you that you should be upset because he took a business trip with his family, using no public funds, and it was in the Media.
      viii. The trip promoted a positive image for Detroit and raised money for the Civic Fund. Aligned itself to the purposes of KCF. (MISLEADING!)
   c. SPY OPS $1,397.08
      i. We have heard about this during trial.
      ii. Equipment purchased for the Detroit Police Department that is still being used by DPD today. Nothing wrong with that. Completely aligns with the purposes of the KCF. (MISLEADING!)
   d. Tom Deaton's Driving Ranges Inc. $3,050.00
      i. We have heard about this. The Government has called it Golf Clubs.
      ii. The Government called a witness that had No Knowledge of who these Clubs, Golf Bag or Lessons were for.
      iii. The Government NEVER called the man who actually did the transaction, Butch Jones. They mentioned him, but never called him.
      iv. There is NO Evidence as to what this expenditure was for, and why it didn't align to the purposes of the KCF. (MISLEADING!)

4) All of these "shocking" expenditures add up to $13,952.11.
   a. And there are explanations for those. BUT NOBODY ASKED.
   b. The Government ignored the $1.7M of good expenditures, and went after KK criminally for KCF expenditures (which he was not a signer on the checks, nor member of the Board of Directors), that added up to only $13,952.11.
   c. This is not criminal intent. This is an audit issue. And if at the end of the day, if Yoga Lessons should not have been paid for by KCF, then all who participated would have a very small Tax liability.
   d. You heard testimony that Appointees, Mayor Staff, & Police Officers participated in the Yoga Lessons. It was not just KK. They all would have to bear the responsibility of the Yoga Benefit.
   e. And ladies and gentlemen, they would all owe less than $20 in taxes for that benefit.
   f. (MISLEADING!)

5) KCF EXPENDITURES 2008
   a. Marriott Cypress Harbor, Orlando FL
      i. KK didn't stay at that hotel
      ii. KK didn't sign the check
      iii. KK not a board member
   b. Rental Cars
      i. The government has brought NO EVIDENCE that these expenditures were outside of the purposes of the KCF.
      ii. The jury has heard testimony from the KCF accountant, KCF donors, as well as "Tax Experts" that the expenses that are paid by the fund to accomplish its purposes are completely within realm of the uses of monies from the fund.
   c. Four Seasons
      i. KK and CK had meetings with Bishop T.D Jakes and First Lady Serita Jakes during the text message scandal.
      ii. KCF was seeking to align itself with National Figures to help repair the image of its figure-head KK.
      iii. Engaged in meetings to that end.
      iv. Obtained valuable consulting, counseling and strategy information.
      v. KCF also gave a donation to The Potter's House on this trip.
      vi. Completely aligned with the purposes of KCF.
   d. Supercamp
      i. One week educational and academic camp at Cornell University in Ithaca, NY.
      ii. The Educational Camp accepted scholarships for participants.
      iii. KCF sent 3 children to the camp. 2 of them were named Kilpatrick.
      iv. No prohibition on fund dollars being used to assist anyone named Kilpatrick or in the Kilpatrick Family.
      v. The incredibly valuable educational experience completely aligned itself to KCF purposes.

e. Impact Strategies $70,464.24
   i. Image Consulting, Communication Services and Message management for the figure-head leader of the KCF, KK.
   ii. You heard testimony that the image of the leader of the organization would be very important for fundraising, and other overall purposes of KCF.
   iii. You met the real life Olivia Pope. That is for you Scandal fans.
   iv. She told you that she is brought in to manage crisis.
   v. When Olivia Pope goes in to a situation, she is paid by Corporations, Individuals, Friends of Individuals, Related parties, and yes, sometimes Non-Profit Organizations.
   vi. The mission and goal is to help fix the problem so the person, organization get back on mission.
   vii. Whether that mission is fundraising, running a city, running a corporation, or even running a country, that is her job.
   viii. The KCF had a vested interest in the image of KK. We know this is true, because as soon as KK went into jail in 2008, the Civic Fund never raised another dime, and it was shortly after dissolved.
   ix. This expenditure was approved by the board, its lawyer and completely aligned with the purposes of the KCF.

f. MOVING EXPENSES $34,842.69
   i. BDM Transport
   ii. Regality Management Services
   iii. University Moving Co.
   iv. YOU HEARD TESTIMONY FROM ERIK RAYFORD THAT THESE ITEMS WERE APPROVED BY THE BOARD IN A FORMAL VOTE.
      1. Board Chair, Ayanna Kilpatrick, called the meeting.
      2. KK was not present when the board took the vote.
      3. KCF Lawyer was present approved of fund direction at this meeting.
      4. The Board unanimously approved transitional moving expenses to be paid for KK and his family.

g. Hotel Stays PAID BACK $13,027.73
   i. Expenses were reviewed by an independent attorney hired by KCF.
   ii. KK was not involved in hiring this attorney, and never met her.
   iii. KK was sent materials, while in Texas, of what he needed to pay back to the fund by the Tax Deadline of April 15, 2009
   iv. Those expenses added up to $13,027.73.
   v. KK sent a check in that amount on $13,027.73.
   vi. That Check covered several expenditures:
      1. Great Wolf Lodge
         a. You have heard about this expenditure several times. It was paid back.

           2.   Hilton Dallas/Southlake Town Square

                a.   The check covered all stays at this hotel.

    vii.  This is how a normal auditing process would work.  There was not any knowing and willful intent to evade paying ANY taxes.  Nobody ever asked.  Because the government wanted to charge KK criminally.  This investigation has been flawed from the very beginning.

    viii.  Mr. Ballata also put a subpoena date of KCF records on the big screen, in an attempt to mislead the jury, yet again.

           1.   No subpoena was ever sent to KK.

           2.   KK was not a member of the KCF Board, or a check signer.

           3.   The check was written in accordance with an independent review of KCF expenditures.

           4.   The check was written before the 2008 Tax deadline of April 15, 2009.

           5.   NOTHING WRONG OR IMPROPER ABOUT THAT AT ALL!

6) Simple Math on 2008 Expenditures

| | | |
|---|---|---|
| a. | Impact Strategies | $70,464.24 |
| b. | Moving Expenses | $34,842.69 |
| c. | Hotel Repayment | $13,027.73 |
| d. | Supercamp | $ 7,140.00 |
| e. | Spy Ops | $ 1,397.08 |
| f. | Four Seasons | $ 1,150.00 |
| g. | Marriot Orlando | $   735.78 |
| h. | Rental Cars | $ 4,635.31 |

7) Total Expenditures that align with fund purposes and approved by the Board of Directors for 2008, that were also discussed in this trial are $133,392.83.

--------------------------------------------------------------------------------

FROM: 44678039
TO: Naughton, Michael; Poles-Kilpatrick, Ebony; Thomas, Jim
SUBJECT: RE: RE: MOTION
DATE: 04/28/2013 10:03:11 PM

Jim,
Thank you for your response.
In short, the Corrlinks system is not an efficient, nor effective way for us to communicate.
It can be on some matters, but not others, particularly those where the attorney/client privilege needs to be protected (if that relationship even exist between us at all). The Corrlinks system now takes about 4 hours (sometimes longer) to send my messages to their intended person(s) , more than 12 hours for me to receive a message that have been sent to me, from you, family and/or friends. It is clearly not the "most efficient nor timely way" for us to communicate. That is completely wrong.

Jim, you are the leader of your firm. You have delegated a great deal of the research and writing to Michael Naughton. As a matter of fact, you mentioned the Flagg Case in your email, which I appreciate and thank you for your service, and also know that Judge Rosen wouldn't allow you to leave the case. I sent Mike congratulations on the successful decision in the 6th Circuit. As you know, he did the majority of the research, writing, organizing, traveling and even performed the argument in the 6th Circuit for that case. He has become the person in your firm that has a better mastery of the factual basis, substantive materials and pertinent issues regarding the cases that you oversee within your firm. This is particularly true of my Federal Case, which is the only case at issue for me at this time. With all due respect to you, your experience as a lawyer, and your legal skills, its become incredibly difficult for you to grasp and manage all of the necessary concepts, substantive issues, as well as properly prepare for all the legal matters that you are handling without Mike, Bonnie and sometimes others.

Michael Naughton has a far better grasp and understanding, than you have ever had, of the issues involved in my federal case. He also had the overwhelming majority of the organizing of the discovery materials in my case as well. To be forbidden or prohibited from speaking to Mike, and communicating with you ONLY, when it is necessary to ask questions about the vast amount of discovery, trial transcripts and other substantive information, that must be thoroughly examined over the next 2 weeks before Post-Trial Motions are due is deformed, egregious and an exercise in futility. You don't know the depth of most of the issues in my case Jim. You certainly have opinions about them. You have theories, but you don't know them. This type of unnecessary and irresponsible control continues the disastrous relationship between us that started at the beginning of this trial.

I would again request that you CALL me, here at the Detention Facility, so we may talk about this very important continuing communication issues, instead of subscribing emotions, interpretations and erroneous translations of our words. My Case Manager is expecting you to call and set up a legal call at anytime. We can speak in private, and address all issues so there is a complete understanding between us. Not you dictating to me, then hanging up. But rather a mature conversation that truly moves toward understanding. If that can't be done, I truly don't believe that we should continue to work together at all. We should speak with the Judge immediately, and you can be honest about our relationship this time (as opposed to the beginning of trial when I was very honest about our relationship, and you not so much), and move on to other matters.
I only want to put the best, most substantive motions forward, as to create the best opportunity for a winning appeal. Again, I have NEVER been a part of a criminal enterprise, never accepted a bribe, never extorted anyone, nor am I guilty of any of the charges in this case. I want to finish this post-trial phase with the best chance of moving forward. I asked you when you were here, at the facility a few weeks ago, were you committed to helping me finish this case the way that I must.
You said "Yes." I am having trouble believing that you will commit the time, diligence and resources to finish the job. I am not upset about that at all. I just want you to be honest with me and the Judge so I can move forward.
Please give me a call here so we can discuss 1) Bond Motion, 2) Motion for New Trial and 3) Issues moving forward (PSI, Sentencing, etc). It shouldn't take long, but we should be on the same page after the call.

I know that you don't expect the 6th Circuit to change Judge Edmunds's decision on bond. The issues that I wrote in my notes to you were absolutely NOT included in your reconsideration motion. You did not directly attack the Government's argument about probation and parole, you did not discuss any specifics about my notoriety, you did not discuss specifics about my being indigent, you did not discuss specifics about my health issues, you did not discuss appeal issues, you did not discuss ANY issue with any degree of specificity. We see things very differently. We have done so for a very long time. It has significantly infringed on my ability to create or develop a strategy of defense, or even move forward with a strong defense with you in this case.

Jim, when you came down to the lockup after the verdict, I asked you was there another opportunity for me to get a bond. You response to me was "No. She said No." You did not mention reconsidering the decision, nor even think about doing a reconsideration motion until you heard that Gerald was going to do one for Bobby. You didn't think about going to the prosecutor or Judge before filing a motion for reconsideration to meet privately to discuss the issues first, because you had

TRULINCS  44678039 - KILPATRICK, KWAME MALIK - Unit: MIL-D-A

------------------------------------------------------------------------------------------------------------

already quit, and moved on.  I know that when you believe that something is futile or impossible, you tend not to want to make a record, put energy into developing a strategy, nor pursue justice with any vigor, creativity or tenacity.  The problem (one problem) is that you are a pessimist, Jim.  :-)

You rarely see the win in most things.  The Motion for Bond could challenge Judge Edmunds use of her discretion because she did not take many of the raised issues into account before she ruled, she is treating me different than ALL of the political defendants that I can find in recent history, and also the serious health risk of post-op rehabilitative services may be beyond the scope of that original discretion.  She rushed to that ruling just as she did in the case, by starting with the words "Detroit needs closure."  Who is Detroit?

But this would take fight, vigor, tenacity, creativity and an unyielding belief that your client should be free.  That is what I want from my lawyer.

I will be back on appeal.  I will have my day in court again.  All I really need for you to do is YOUR job.  The ONLY way to do that is to include me FULLY in your Motion presentations, strategy and conversations.  Its the ONLY way to represent ME.  And, without the help, assistance and support of Michael Naughton, you nor I would have the appropriate information to research, write and/or have the proper strategy for post-trial motions.

I ask that you reconsider your continuing prohibition on communication with Mike.  You had this same prohibition at the beginning of trial.  It was wrong and a terrible obstruction to pursuing justice then, and its the same now.

I will only have my wife Carlita call, and no other family members for efficiency and clear communications.  To shut my wife and I out from communicating with Mike, and he with us, is once again egregious, irresponsible and wrong.

Jim, you argued on Friday to the 6th Circuit and apparently said something to them about the length of time that you have been practicing law, and that "you are still learning new things everyday."  My God I wish this was a true statement, and not some self-depricating defense tactic to ingratiate yourself to the Appellate Court Judges.  Or a filler to mask unpreparedness (I KNOW YOU TOO WELL).

Because if you truly wanted to keep learning, keep challenging yourself, keep growing in your field then you must know that you can't do it all, control it all, nor know everything.  If your statement to the 6th Circuit was true, and not false humility, but real understanding, bad communication, lack of ideas and efforts of self-preservation would cease, and give way to honest dialogue, new ideas on strategy, as well as re-energized efforts to truly represent your clients.

Either let's finish strong together, or speak honestly to the judge and go our separate ways.

I submit this in respect to you and your office.  As well as the process of the so called justice system.  But most of all in respect to my wife and children who need me to continue to put what's right, just and fair at the forefront.  Ridding ourselves and our team of all misplaced ego and arrogance.  Not only that of my own spirit, but also that of others who have endeavored to work with me as well.

Kwame Kilpatrick

TRULINCS  44678039 - KILPATRICK, KWAME M - Unit: ERE-A-A

--------------------------------------------------------------------------------------------------

FROM: Gurewitz, Harold
TO: 44678039
SUBJECT: Restitution
DATE: 04/14/2017 01:51:05 PM

Kwame

Hope all is well.

Here's some news. Bullotta has told me that he will ask the court to withdraw their request for Restitution as to you. I have not yet seen what ever it is that he will submit, but he was pretty clear that is what he intends to do. He told me that they have collected some amount in excess of $2 million from  a Ferguson account, but I just looked at the Ferguson Judgment. The restitution amount ordered against him is well in excess of that.

iwill of course send you what ever it is that the Government files and the court's order.

Best,

Harold Gurewitz

Kwame M. Kilpatrick 44678-039
Federal Correctional Institution
P.O. Box 1500
El Reno, Oklahoma 73036

November 6, 2017

Clerk, United States District Court
Eastern District of Michigan
Theodore Levin United States Courthouse
231 West Lafayette Blvd
Detroit, Michigan 48226

**RE: Kilpatrick v. United States of America**
     **Cause No. 2:10-cr-20403-NGE-MKM-1**

Dear Clerk,

Enclosed please find and accept for filing Movant's Reply to the Government's Response to his
Motion to Vacate, Set Aside, or Correct Sentence under Title 28 U.S.C. Section 2255.

Thank you for your assistance in this matter.

Respectfully Submitted,

Kwame M. Kilpatrick
pro se



**UNITED STATES POSTAL SERVICE**

Retail

**US POSTAGE PAID**
**$9.75**

Origin: 78240
Destination: 48226
1 Lb 6.70 Oz
Nov 06, 17
44622400240-48

1008

**PRIORITY MAIL 2-Day ®**

C008

Expected Delivery Day: 11/08/2017

USPS TRACKING NUMBER

9505 5104 7224 7310 1306 18

U.S. M...

RECEIVED
NOV - 8 2017
CLERK'S OFFICE
DETROIT

Kwame Kilpatrick 44678-039
Federal Correctional Institution
P.O. Box 1500
El Reno, Oklahoma 73036

Clerk, United States District Court
Theodore Levin United States Courthouse
231 West Lafayette Boulevard
Detroit, Michigan 48226

**PRIORITY MAIL ®**
UNITED STATES POSTAL SERVICE
Visit us at usps.com
Label 107R, January 2008

