UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,                    Case No. 10-20403

    Plaintiff-Respondent,                    Honorable Nancy G. Edmunds


v.

KWAME M. KILPATRICK (D-1),

    Defendant-Petitioner.

_____/

### ORDER DENYING PETITIONER'S MOTION UNDER 28 U.S.C. § 2255 TO VACATE, SET ASIDE, OR CORRECT SENTENCE [599]

## I.  BACKGROUND

On March 11, 2013, a jury found Defendant-Petitioner Kwame Kilpatrick guilty of twenty-four of the thirty counts brought against him:  one count of RICO conspiracy, 18 U.S.C. § 1962(d); four counts of extortion, 18 U.S.C. § 1951; one count of attempted extortion, 18 U.S.C. § 1951; one count of bribery, 18 U.S.C. § 666(a); eleven counts of mail and wire fraud, 18 U.S.C. §§ 1341, 1343; five counts of subscribing a false tax return, 26 U.S.C. § 7206(a); and one count of income tax evasion, 26 U.S.C. § 7201. (Dkt. 277.)  The Court sentenced Defendant to be imprisoned for a term of 336 months. (Dkt. 516.)  The Sixth Circuit affirmed Defendant's convictions, *see United States v. Kilpatrick*, 798 F.3d 365, 372 (6th Cir. 2015),[1] and the Supreme Court denied his

---

[1] While the Sixth Circuit affirmed Defendant's convictions, it reversed the Court's restitution award of $4,584,423 to the City of Detroit's Water & Sewerage Department. *Kilpatrick*, 798 F.3d at 387-90.  On remand, the Court ordered Defendant to pay restitution in the amount of $1,520,653.50.  *United States v. Kilpatrick*, No. 10-20403, 2017 U.S. Dist. LEXIS 140562, at *1 (E.D. Mich. Aug. 31, 2017).  The Sixth Circuit

petition for a writ of certiorari, (dkt. 577). Defendant timely filed this pro se motion to vacate his sentence under 28 U.S.C. § 2255. (Dkts. 599, 601, 605, 610.)[2] The Government has filed a response, (dkts. 613, 626), and Defendant has filed a reply as well as a number of briefs and exhibits, (dkts. 620, 621, 622, 623, 628, 629, 630, 631, 632, 633, 638). For the reasons set forth below, the Court DENIES Defendant's § 2255 motion.

## II.    ANALYSIS

Under 28 U.S.C. § 2255, "[a] prisoner in custody under sentence of a [federal] court . . . claiming the right to be released . . . may move the court which imposed the sentence to vacate, set aside or correct the sentence." To prevail on a § 2255 motion, the petitioner must allege: "(1) an error of constitutional magnitude; (2) a sentence imposed outside the statutory limits; or (3) an error of fact or law that was so fundamental as to render the entire proceeding invalid." *Mallett v. United States*, 334 F.3d 491, 496-97 (6th Cir. 2003); *see also Anderson v. United States*, 246 F. Supp. 2d 758, 760 (E.D. Mich. 2003).

Defendant argues that the Court should vacate his sentence on the basis of incorrect jury instructions under *McDonnell v. United States*, 136 S. Ct. 2355 (2016), the violation of his Sixth Amendment right to counsel, impermissible hearsay infringing on his Sixth Amendment right to confrontation, an error in his sentencing guidelines calculation, and the lack of an *Allen* charge.

---

affirmed that award. *United States v. Kilpatrick*, No. 17-2208, 2018 U.S. App. LEXIS 27132, at *1 (6th Cir. Sept. 21, 2018).
[2] Defendant filed a "Motion to Supplement" his § 2255 motion. (Dkt. 610.) The Court will treat this motion as a supplement to Defendant's petition and address the arguments made therein on the merits.

## A.    Procedural Default

The Court first notes that Defendant procedurally defaulted most of his claims by not raising them on direct appeal.  "An application under § 2255 is an extraordinary remedy and should not be considered a substitute for direct appeal." *Capaldi v. Pontesso*, 135 F.3d 1122, 1124 (6th Cir. 1998).  "In the case where the defendant has failed to assert his claims on direct appeal and thus has procedurally defaulted, in order to raise them in a § 2255 motion he also must show either that (1) he had good cause for his failure to raise such arguments and [actual] prejudice . . . or (2) he is actually innocent." *Regalado v. United States*, 334 F.3d 520, 528 (6th Cir. 2003) (citing *Bousley v. United States*, 523 U.S. 614, 622 (1998)).

"[A] claim that 'is so novel that its legal basis [wa]s not reasonably available to counsel' may constitute cause for a procedural default." *Gibbs v. United States*, 655 F.3d 473, 476 (6th Cir. 2011) (quoting *Bousley*, 523 U.S. at 622).  Also, ineffective assistance of counsel may in some cases show cause for the default and actual prejudice from it.  *See Hall v. Vasbinder*, 563 F.3d 222, 236-37 (6th Cir. 2009).  In order to show actual prejudice, the defendant must show "not merely that the errors at his trial created a *possibility* of prejudice, but that they worked to his *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *United States v. Frady*, 456 U.S. 152, 170 (1982) (emphasis in original).  To show actual innocence, the defendant must show that "it is more likely than not that no reasonable juror would have convicted him." *Bousley*, 523 U.S. at 623 (internal quotation marks and citations omitted).  "The 'hurdle' [a defendant] faces in excusing his procedural default is 'intentionally high for respect for the finality of judgments demands that

collateral attack generally not be allowed to do service for an appeal.'" *Peveler v. United States*, 269 F.3d 693, 700 (6th Cir. 2001) (quoting *Elzy v. United States*, 205 F.3d 882, 884 (6th Cir. 2000)); *see also Frady*, 456 U.S. at 166 ("[T]o obtain collateral relief a prisoner must clear a significantly higher hurdle than would exist on direct appeal.").

By not raising them on direct appeal, Defendant procedurally defaulted his claims regarding improper jury instructions, impermissible hearsay, sentencing guidelines error, and an *Allen* charge. And while Defendant did raise his ineffective assistance of counsel claim on direct appeal,[3] he also now argues that this Court erred by denying his request for substitute counsel on the eve of trial. To the extent this argument relates to the adequacy of the Court's inquiry into the conflict issues, that issue was raised on direct appeal and has been preserved. To the extent this argument relates to the Court's consideration of other factors, that issue has been procedurally defaulted because it was not raised on direct appeal and is "analytically distinct." *See Gross v. Warden*, 426 F. App'x 349, 359 (6th Cir. 2011) (unpublished).

Defendant argues, however, that he has not procedurally defaulted his claim based on improper jury instructions under *McDonnell*, because that case was not decided until after his direct appeal. While a legal argument that was not previously available may constitute cause, the standard for establishing cause on this basis, also known as the novelty standard, "is a high one: the petitioner's counsel must have had

---

[3] And even if Defendant had not raised his ineffective assistance of counsel claim on appeal, such "claims are appropriately brought by filing a motion under section 2255." *Griffin v. United States*, 330 F.3d 733, 736 (6th Cir. 2003).

'no reasonable basis upon which to formulate' the question now raised."  *Gibbs*, 655

F.3d at 476 (quoting *Reed v. Ross*, 468 U.S. 1, 14 (1984)).

Defendant's *McDonnell* argument does not meet the novelty standard.  Even

though *McDonnell* was not decided until 2016, similar arguments had been made in the

past.  *See, e.g.*, *Valdes v. United States*, 475 F.3d 1319, 1325 (D.C. Cir. 2007) (finding

error in the definition of the term "official act" given in the jury instructions).  In fact, in

*McDonnell*, the Supreme Court relied upon, and simply clarified, its previous ruling in

*United States v. Sun-Diamond Growers of Cal.*, 526 U.S. 398 (1999).  *See McDonnell*,

136 S. Ct. at 2370-72.  For these reasons, other courts have similarly held that the

argument based on *McDonnell* was reasonably available to defendants prior to the case

being decided.  *See, e.g.*, *Elgawhary v. United States*, No. DKC 14-0068, 2018 U.S.

Dist. LEXIS 7039, at *8 (D. Md. Jan. 11, 2018); *see also United States v. Ciavarella*, No.

3:09-CR-272, 2018 U.S. Dist. LEXIS 2785, at *29 (M.D. Pa. Jan. 8, 2018) (stating that

*McDonnell* was "not a case where the Supreme Court overruled its precedent,

overturned a unanimous body of lower court authority, or rebuked a practice arguably

sanctioned by its prior decisions, placing an earlier claim outside of the defendant's

reach at trial").  In sum, Defendant's argument based on *McDonnell* was available to

him on direct appeal, so he has not established cause to excuse his default of that

claim.  Nor has Defendant presented anything in his motion that would excuse his

default of the remaining claims that were not raised on direct appeal.

And even if Defendant could establish cause, either due to the unavailability of

the *McDonnell* argument or due to the alleged deficiencies in Defense Counsel's

performance, Defendant falls far short of showing that the alleged errors "worked to his

*actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions," as discussed below. *See Frady*, 456 U.S. at 170. Nor can Defendant show actual innocence. As this Court has previously discussed at length, the evidence at trial weighed heavily in support of the verdicts of guilt against Defendant. *See United States v. Kilpatrick*, No. 10-20403, 2013 U.S. Dist. LEXIS 111723, at *6-61 (E.D. Mich. Aug. 8, 2013). Most of Defendant's claims are therefore barred, and even if they were not barred, those claims would fail on the merits, as discussed below.

**B.    Jury Instructions**

Defendant argues that because the jury instructions did not comport with the Supreme Court's intervening decision in *McDonnell*, he may have been convicted for conduct that was not unlawful. In *McDonnell*, 136 S. Ct. at 2365, 2368, the Supreme Court narrowed the definition of "official act" under the federal bribery statute, 18 U.S.C. § 201(a)(3), which the parties in that case had used to define "official act" for purposes of honest services fraud under 18 U.S.C. §§ 1343, 1349 and "official action" under the Hobbs Act, 18 U.S.C. § 1951(a). McDonnell had challenged the definition of "official action" in the jury instructions on the ground that it encompassed virtually all of a public official's activities, no matter how minor. *McDonnell*, 136 S. Ct. at 2367. The Supreme Court held that an official act, under § 201(a)(3), "is a decision or action on a 'question, matter, cause, suit, proceeding or controversy' . . . [that] must involve a formal exercise of governmental power that is similar in nature to a lawsuit before a court, a determination before an agency, or a hearing before a committee." *McDonnell*, 136 S. Ct. at 2371-72. In addition, "the public official must make a decision or take an action on that 'question, matter, cause, suit, proceeding or controversy,' or agree to do so." *Id.*

at 2372.  The Supreme Court therefore found that "[s]etting up a meeting, talking to another official, or organizing an event (or agreeing to do so) – without more – does not fit that definition of 'official act.'"  *Id.* at 2368.

Defendant argues that his convictions for a RICO conspiracy, extortion, attempted extortion, and bribery should be vacated because the jury was not properly instructed on the meaning of an "official act" and there was insufficient evidence that he committed an "official act."

First, the Court notes that the Sixth Circuit Court of Appeals has recently held that *McDonnell* does not apply to the federal bribery statute, 18 U.S.C. § 666.[4]  *See United States v. Porter*, No. 17-5064, 2018 U.S. App. LEXIS 3291, at *5 (6th Cir. Feb. 12, 2018).  The Sixth Circuit first noted that *McDonnell* limited the interpretation of the term "official act" in the context of § 201, "an entirely different statute than the one at issue here."  *Id.* at *4.  Moreover, the court stated that it remained bound by its decision in *United States v. Abbey*, 560 F.3d 513 (6th Cir. 2009), because *McDonnell* was not "on point."  *Porter*, 2018 U.S. App. LEXIS 3291, at *5.  In *Abbey*, the Sixth Circuit had held that § 666 "says nothing of a quid pro quo requirement to sustain a conviction, express or otherwise:  while a quid pro quo of money for a specific act is sufficient to violate the statute, it is not necessary."  *Abbey*, 560 F.3d at 520 (internal quotations and citation omitted).  Thus, *McDonnell* is inapplicable to Defendant's bribery conviction.

---

[4] The Sixth Circuit's holding in *Porter*, finding *McDonnell* inapplicable to § 666, is consistent with other circuit courts that have considered the issue.  *See United States v. Boyland*, 862 F.3d 279, 291 (2d Cir. 2017) (finding the *McDonnell* standard inapplicable to the defendant's bribery counts under § 666); *United States v. Maggio*, 862 F.3d 642, 646 n.8 (8th Cir. 2017) (stating "*McDonnell* had nothing to do with § 666").

With regard to Defendant's extortion counts, the jury was instructed, in relevant part, as follows:

> Extortion under color of official right occurs when a public official, or someone acting with the public official, receives money or property to which the public official is not entitled, knowing or believing that the money or property is being given to the public official in return for the taking, withholding, or otherwise influencing of an official act.
>
> Although the official or someone acting with him must obtain the money or property, the government does not have to prove that the public official or person acting with him asked for or first suggested the giving of money or property. In addition, the payment can occur either before or after the expected official action.
>
> While [the] official or someone acting on behalf of the public official must obtain the money or property in return for the expectation of an official action, the government does not have to prove that the official actually took or even intended to take that action, or that the official was in a position to take the action in return for which payment was made, or that the official would have acted differently or would have taken the same action even without payment.
>
> The government does not have to prove an explicit promise to perform a particular act made at the time of the payment. Rather, it is sufficient if the public official understands that he is expected as a result of the payment to exercise particular kinds of influence as specific opportunities arise.
>
> The public official need not have any intention of actually exerting his influence on the payor's behalf. The question is whether the official or someone with whom he was acting obtained money through implicit or explicit promises that the public official would use his public influence in return.

(Dkt. 406, Pg ID 14421-22.)

Although the Court did not include a specific definition of "official act" in its instructions, Defendant's extortion convictions stand because, even assuming *arguendo* that there was an error in light of *McDonnell*, any such error was harmless. The only acts at issue were approving, awarding, or withholding Department of Water & Sewerage for the City of Detroit ("DWSD") contracts, *see Kilpatrick*, 2013 U.S. Dist. LEXIS 111723, at *15-35, and those acts satisfy *McDonnell*'s narrower definition of

"official act," *see, e.g.*, *United States v. Repak*, 852 F.3d 230, 253-54 (3d Cir. 2017) (stating that "[t]he awarding of a [municipal] contract is not only akin to an agency determination—it *is* an agency determination" and holding that a recommendation to an agency as to which contractors to hire constituted an "official act" under *McDonnell*) (emphasis in original); *United States v. Skelos*, 707 F. App'x 733, 737 (2d Cir. 2017) ("Using one's influence as a high ranking state official to push through county legislation and to bestow a county-issued contract are indisputably formal exercises of governmental power constituting official acts under *McDonnell*.") (unpublished); *Miserendino v. United States*, 307 F. Supp. 3d 480, 493 (E.D. Va. 2018) (holding that providing advice and recommendations about who should receive a government contract is an "official act" under *McDonnell*).

And while Defendant points to testimony and evidence regarding meetings and other discussions with officials, that was properly before the jury as "evidence of an agreement to take an official act." *See McDonnell*, 136 S. Ct. at 2371. As the Supreme Court made clear in *McDonnell*, "setting up a meeting, hosting an event, or making a phone call is not always an innocent act, or is irrelevant." *Id.* Rather, those acts, "without more," are not official acts. *Id.* at 2368. Here, as noted above, there was more—each extortion conviction was based upon the approval of a different DWSD contract, which involved a formal exercise of governmental power constituting an official act under *McDonnell*. This is in contrast to the cases cited and relied upon by Defendant, where any *McDonnell* error was found not to be harmless because some of

the underlying acts did not satisfy *McDonnell*.[5]  *See, e.g.*, *United States v. Fattah*, 902 F.3d 197, 238-39 (3d Cir. 2018) (holding that the *McDonnell* error was not harmless because only one category of the charged acts were clearly official acts under *McDonnell*); *United States v. Silver*, 864 F.3d 102, 119-24 (2d Cir. 2017) (holding that the *McDonnell* error was not harmless because most of the acts proven by the government did not clearly fall within the definition of "official act" under *McDonnell*); *Skelos*, 707 F. App'x at 737 (holding that the *McDonnell* error was not harmless because the government had argued that meetings satisfied the official act requirement); *see also United States v. Tavares*, 844 F.3d 46, 57 (1st Cir. 2016) (holding that evidence that the defendant had met with another public official was insufficient to satisfy the definition of an "official act" under *McDonnell*).  In sum, even if Defendant could overcome his procedural default, any alleged error was harmless and all of Defendant's extortion counts stand.  *See Boyland*, 862 F.3d at 291 (affirming defendant's convictions despite erroneous jury instructions under *McDonnell* because those errors did not affect the outcome of the case).

Any *McDonnell* error was harmless for an additional reason for all of Defendant's extortion counts, except one.  On the jury verdict form, the jury specified that it had found beyond a reasonable doubt that all of Defendant's extortion convictions, except for count three, rested on a wrongful fear of economic harm theory (either exclusively or in addition to also resting on a color of official right theory).  *See* Dkt. 277.  These

---

[5] In those cases, the *McDonnell* argument was considered on direct appeal. Even if Defendant had not procedurally defaulted his *McDonnell* claim, "the harmless error standard as applied to §2255 proceedings is more favorable to the government than the harmless error standard on direct review."  *Dimora v. United States*, No. 1:17-cv-1288, 2018 U.S. Dist. LEXIS 180870, at *21-22 (N.D. Ohio Oct. 22, 2018).

convictions stand as long as there was sufficient evidence to prove either theory. *See United States v. Upshaw*, 114 F. App'x 692, 709 (6th Cir. 2004), *judgment vacated on other grounds sub nom. Rice v. United States*, 545 U.S. 1136 (2005). *McDonnell* is inapplicable to the wrongful fear of economic harm theory, and thus all of Defendant's extortion counts that were based upon this theory stand for this reason as well.

Finally, with regard to Defendant's RICO conspiracy conviction, the government was required to prove, in relevant part, an agreement to commit at least two predicate acts. *See United States v. Tocco*, 200 F.3d 401, 426 (6th Cir. 2000). In this case, the jury was instructed that those predicate acts could have been extortion, mail fraud, wire fraud, obstruction of justice, malicious threats to extort money, or bribery, or any combination of two of those acts. (Dkt. 406, Pg ID 14439.) To the extent the jury may have relied upon extortion as one or both of the predicate acts underlying Defendant's RICO conspiracy conviction, as discussed above, the extortion of a DWSD contract constitutes an official act under *McDonnell*. Thus, any alleged *McDonnell* error was harmless, and Defendant's RICO conspiracy conviction stands.

## C.     Sixth Amendment Right to Counsel

Defendant makes a number of arguments relating to his Sixth Amendment Right to Counsel. First, Defendant argues that he was denied his constitutional right to conflict-free counsel. Second, he argues that this Court erred when it denied his request for substitute counsel prior to trial, because the Court did not conduct an adequate inquiry into the conflict of interest issues, and the Court erred when it found that his request for new counsel was an improper attempt to delay trial. Third, Defendant argues that his counsel was deficient for a number of reasons and those

deficiencies prejudiced his defense, constituting ineffective assistance of counsel. Finally, Defendant argues that he was constructively denied counsel. The Court addresses each argument in turn.

### 1. Right to Conflict-Free Representation

Under the Sixth Amendment, a defendant has a right to "have the Assistance of Counsel for his defense." U.S. Const. amend. VI. This includes a "correlative right to representation that is free from conflicts of interest." *Wood v. Georgia*, 450 U.S. 261, 271 (1981). A criminal defendant can demonstrate a Sixth Amendment violation resulting from a conflict of interest if he establishes both that his counsel "actively represented conflicting interests and that an actual conflict of interest adversely affected his lawyer's performance." *Burger v. Kemp*, 483 U.S. 776, 783 (1987) (internal quotation marks and citations omitted). In such cases, prejudice warranting reversal will be presumed by the court. *See id.*

Defendant first raised the issue of a potential conflict of interest—due to his lead attorney Jim Thomas's ("Defense Counsel") prior representation of Gasper Fiore, the "Towing Contractor" described in Counts 1 and 12 of Defendant's Fourth Superseding Indictment—on August 7, 2012. Trial was scheduled to begin approximately one month later—on September 6, 2012. On August 9, 2012, the Court ordered the parties to brief "every possible conflict," including "the conflict discussed in the [Detroit] Free Press this morning concerning the Macomb Interceptor [Drain] Drainage District." This alleged conflict was due to Mr. Thomas's and his co-counsel Michael Naughton's "of counsel" relationship with the O'Reilly Firm, which represented the plaintiff in a civil complaint brought against Defendant with regard to the Macomb Interceptor project, which was

one of the city sewer department projects at issue in the criminal case. Mr. Thomas had

filed an answer on Defendant's behalf to prevent default in the civil case but had filed a

motion to withdraw shortly thereafter. The court in the civil case granted that motion

after being informed by Mr. Thomas that he would become "of counsel" to the firm that

represented the plaintiff.

The Court held a hearing on August 14, 2012, and issued a detailed order the

next day, denying Defendant's request that Mr. Thomas and Mr. Naughton be

disqualified and new counsel be appointed.[6] The Court found that 1) "any actual or

potential conflict of interest arising out of defense counsel Jim Thomas's successive

representation of Mr. Fiore and Mr. Kilpatrick [was] eliminated by the government's

commitment to dismiss all allegations related to Gasper Fiore . . . and their

representation that they will not call him as a witness," and 2) the protections taken by

counsel for Defendant and the O'Reilly firm adequately protected him against any actual

or potential conflict of interest and did not disqualify Thomas or Naughton as

Defendant's appointed counsel. *United States v. Kilpatrick*, No. 10-20403, 2012 U.S.

Dist. LEXIS 115127, at *2-3, 8 (E.D. Mich. Aug. 15, 2012). The Court also stated that

as further protection against any potential conflict it would "appoint a fourth attorney to

cross-examine all government witnesses connected to the Macomb Interceptor

---

[6] Defendant now argues that Mr. Thomas was the one with the conflict of interest
and that he, in fact, prevented Mr. Naughton from meeting with Defendant, "thwart[ing]
and eventually destroy[ing] Naughton's attempts" to defend Defendant. (*See* dkt. 620,
Pg ID 17715.) Defendant does not explain, however, why the alleged conflict of interest
adversely affected Mr. Thomas's performance but not Mr. Naughton's despite both
attorneys having the same "of counsel" relationship with the O'Reilly firm. Nor does he
present any evidence that supports this argument. Thus, while the Court will address
Defendant's arguments regarding Mr. Thomas, it notes that its analysis regarding the
conflict of interest and effectiveness of counsel issues applies to both attorneys.

Drainage District litigation." *Id.* at *12. After a consideration of all other relevant factors, the Court denied Defendant's request to appoint new counsel. *Id.* at *24.

Both this Court and the Sixth Circuit later rejected Defendant's argument that the denial of his request for new counsel violated his Sixth Amendment right to conflict-free counsel. *See United States v. Kilpatrick*, No. 10-20403, 2013 U.S. Dist. LEXIS 111732, at *39 (E.D. Mich. Aug. 8, 2013); *Kilpatrick*, 798 F.3d at 375.

### a. Defense Counsel's Prior Representation of Fiore

Defendant argues that Defense Counsel's representation of Gasper Fiore was more extensive than what was previously known. More specifically, Defendant alleges that Defense Counsel advised Fiore during his grand jury testimony against Defendant and, thus, his representation of Fiore was related to the charges in this case and took place after he was already retained by Defendant.

Even if the Court were to accept these factual allegations as true, they do not change its previous analysis. Because the government dismissed the Fiore-related charges against Defendant and did not call Fiore as a witness during trial, this eliminated any actual, or even potential, conflict of interest that would give rise to a Sixth Amendment violation. *See Kilpatrick*, 2013 U.S. Dist. LEXIS 111732, at *60-61. In other words, there was no active representation of conflicting interests during trial and, thus, Defense Counsel's representation of Fiore became a non-issue. *See id.* at *61. And even if there was an actual conflict of interest, it did not adversely affect Defense Counsel's performance, as will be dismissed more fully below.

### b. Defense Counsel's "Of Counsel" Relationship with O'Reilly

Defendant rehashes his arguments regarding the purported conflict of interest due to Defense Counsel's "of counsel" relationship with the O'Reilly firm.  He also disputes the existence of an ethical wall between Defense Counsel and the firm.

As this Court previously held, there was no actual or imputed conflict based on Mr. Thomas's and Mr. Naughton's "of counsel" relationship with the O'Reilly Firm because of "the attenuated nature of [their relationship], the precautions taken, and the Court's appointment of independent counsel."  *See id.* at *50-51.  On appeal, the Sixth Circuit found, in light of these factors, that this Court properly determined that no actual conflict existed.  *See Kilpatrick*, 798 F.3d at 375.  The Sixth Circuit further found, due to the ethical wall and the physical distance between the two offices, this Court properly concluded that the O'Reilly firm's conflict of interest should not be imputed to Mr. Thomas and Mr. Naughton.  *Id.* at 375 (citing *Hempstead Video, Inc. v. Inc. Vill. of Valley Stream*, 409 F.3d 127, 132-36 (2d Cir. 2005)).  And while Defendant argued on appeal that there were no facts presented to the Court to support its conclusion that Thomas's and Naughton's relationships with the O'Reilly Firm were attenuated, *see id.* at 377 (stating "this argument is best left for a motion under 28 U.S.C. § 2255"), the government has now provided a sworn affidavit from Mr. Thomas, attesting to the facts set forth in Defendant's brief at the time the Court denied the motion for substitute counsel.  (*See* dkt. 613-7.)

More specifically, Defense Counsel's affidavit confirms the following facts: Defense Counsel was first retained by Defendant to represent him in state court in March 2008.  (*Id.* at Pg ID 17583.)  At Defendant's request, Defense Counsel began representing him in connection with this criminal case in July 2010.  (*Id.* at Pg ID

17584.)  At the time, he was affiliated with the law firm of Plunkett Cooney.  That affiliation ended in April 2012 when he became affiliated "of counsel" with the law firm O'Reilly Rancilio, P.C.  (*Id.*)  This was a referral only relationship.  As a result, on March 28, 2012, Defense Counsel was permitted to withdraw from representing Defendant in the civil case.  (*Id.*)  Defense Counsel served a copy of that order on Defendant on April 18, 2012.

Prior to withdrawing from the civil case, Defense Counsel had never been formally retained to represent Defendant in that case but had filed an answer on his behalf to preserve him from default and with the understanding that he would soon retain other counsel.  (*Id.* at Pg ID 17585.)  Moreover, Defense Counsel had no substantive discussions with Defendant about the case, did not participate in any witness interviews or depositions, and performed no legal research.  (*Id.*)  And with the exception of discussions for the purpose of establishing protections to prevent any sharing of information related to the case, Defense Counsel did not have any substantive discussions relating to the civil case with any member of the O'Reilly firm.  (*Id.*)

After Defense Counsel began its relationship with the O'Reilly firm, and continuing through the end of his representation of Defendant in the federal criminal case, the O'Reilly firm "erected a physical and ethical wall" between Defense Counsel's representation of Defendant and its representation of the plaintiff in the civil case.  (*Id.* at Pg ID 17586.)  Defense Counsel continued to maintain and work from his office in Detroit, while the O'Reilly firm's offices were located in Sterling Heights.  (*Id.*)  Although the O'Reilly firm made space available to Defense Counsel in their offices, he rarely

used that space during his representation of Defendant.  (*Id.*)  All of his physical files pertaining to Defendant remained in his Detroit office and no one from the O'Reilly firm was permitted or able to access those files.  (*Id.*)  Similarly, all of his electronic files remained on his own password-protected server, and no one from the O'Reilly firm was permitted or able to access those files.  (*Id.* at Pg ID 17586-87.)  All of the O'Reilly firm's files related to the civil case were stored on the firm's sperate computer system, and Defense Counsel was not able to access those files nor did he otherwise share computers with the attorneys or staff at the firm.  (*Id.* at Pg ID 17587.)  Finally, Defense Counsel did not share in any of the O'Reilly firm's revenue or profits stemming from their representation of the plaintiff in the civil case or have any financial interest, or any other interest, in that representation.  (*Id.* at Pg ID 17587-88.)

Defense counsel's affidavit further supports this Court's previous findings regarding the attenuated nature of the relationship between Defense Counsel and the O'Reilly firm and the substantial ethical wall they maintained.  Thus, Defendant cannot establish that Mr. Thomas actively represented conflicting interests.  Nor can Defendant show that the purported conflict adversely affected Defense Counsel's performance.  To the contrary, the record shows that Mr. Thomas was loyal and diligent in his representation.  In sum, there was no actual or imputed conflict of interest due to the relationship between Defense Counsel and the O'Reilly firm and the firm's representation of the plaintiff in the Macomb Interceptor litigation.[7]

_____

[7] In its response to Defendant's motion, the government raises another potential conflict of interest regarding the O'Reilly firm.  After Defendant's direct appeal, the prosecution team learned that another attorney from the O'Reilly firm was retained in 2010 to collect student loans for the United States Department of Education.  After investigating further, they were able to "confirm that the same ethical wall separating

While Defendant argues that "there was no ethical wall," he presents no evidence to support this assertion. Instead, he points to alleged deficiencies in Defense Counsel's performance as evidence there was a conflict of interest and that no wall existed. The only alleged deficiency that relates to the Macomb Interceptor litigation is Defendant's argument that Defense Counsel should have subjected Derrick Miller to further cross-examination. However, Defendant is not able to establish that Defense Counsel was deficient in this regard or on any other basis, as will be discussed more fully below.

Defendant also alleges Defense Counsel was providing protected discovery to the plaintiff in the civil case. In support of this allegation, he notes that the plaintiff in the civil case sought leave to amend its complaint based on the allegations in the criminal case. That motion was denied by the court in the civil case, *see Macomb Interceptor Drain Drainage District v. Kilpatrick*, Case No. 11-13101, dkt. 251, and does not demonstrate that Defense Counsel shared any confidential information.[8]

Defendant also argues independent counsel was not allowed to cross-examine all of the government witnesses connected to the civil case. In support of this contention, he provides a sworn affidavit from independent counsel, Mr. Harold

_____

Thomas from the *Macomb Interceptor* case also separated Thomas from the student-loan cases." (*See* dkt. 613, Pg ID 17547; dkt. 613-8.) Thus, the Court agrees with the government that this representation did not create an actual or imputed conflict of interest. And because Mr. Thomas did not learn of the retention of O'Reilly as private counsel for the United States in the student loan cases until over two years after he withdrew as counsel in this case, (*see* dkt. 613-7, Pg ID 17588), even if there was a conflict of interest, it could not have adversely affected his performance.

[8] The plaintiff's motion for leave to file its first amended complaint stated that the new information had come "from the City of Detroit, the City of Sterling Heights and federal prosecutors," as well as "extensive pre-discovery disclosures from multiple of the Defendants." (*See* Case No. 11-13101, dkt. 240, Pg ID 4048.)

Gurewitz, stating that while he was informed of and present during the testimony of Anthony Soave and Kathleen McCann, he was not informed of two other witnesses, Walter Rozycki and Derrick Miller, who provided testimony relevant to the Macomb Interceptor litigation. (*See* dkt. 628, Pg ID 17864-65.) Mr. Gurewitz's affidavit also states he later learned that a decision had been made in his absence to waive further examination of Ms. McCann. (*Id.* at Pg ID 17864.)

As this Court previously noted, independent counsel extensively cross-examined Anthony Soave, the most important witness related to the Macomb Interceptor litigation matter. (*See* dkts. 371, 372.) Independent counsel was also present during the entire cross-examination of McCann by Ferguson's counsel. (*See* dkts. 372, 373.) And even though it is unclear who made the decision not to recall McCann for additional cross-examination and why that decision was made, Defendant points to no evidence showing Defense Counsel's "of counsel" relationship with the O'Reilly firm played a role in that decision. And while Defendant now argues independent counsel should have also been present during the testimony of Rozycki and Miller, the Court notes that Mr. Thomas himself questioned Miller at length. (*See* dkts. 387, 388, 389.) While Mr. Thomas did not directly ask Miller questions regarding the Inland extortion counts, he did question his credibility. Moreover, Ferguson's counsel cross-examined Miller regarding the Inland and Macomb-related matters. (*See* dkt. 389.) As for Rozycki, who did not give any testimony regarding any interactions with Defendant, he too was cross-examined by Ferguson's counsel. (*See* dkt. 391.) In sum, in light of independent counsel's extensive cross-examination of Soave and the fact that he was only appointed "to further protect against any potential conflict," his absence during the testimony of two government

witnesses who provided testimony relevant to the Inland extortion counts did not

diminish the protection independent counsel provided nor does it alter the Court's

holding there was no conflict of interest in this case.

## 2. Denial of Request for Substitute Counsel

"A motion for new court-appointed counsel based upon defendant's

dissatisfaction with his counsel previously appointed is addressed to the sound

discretion of the trial court" and is reviewed "for an abuse of discretion."  *United States*

*v. Trujillo*, 376 F.3d 593, 606 (6th Cir. 2004) (citations omitted).  Factors considered in

that review include:

> (1) the timeliness of the motion, (2) the adequacy of the court's inquiry into
> the matter; (3) the extent of the conflict between the attorney and client and
> whether it was so great that it resulted in a total lack of communication
> preventing an adequate defense, and (4) the balancing of the factors with
> the public's interest in the prompt and efficient administration of justice.

*Id.*

Defendant argues this Court should have granted his request for substitute

counsel prior to trial, because the extent of the conflict between himself and Defense

Counsel outweighed any concerns regarding the untimeliness of his request.  He

asserts their relationship had deteriorated so much that after the August 14, 2012

hearing, they had a "heated quarrel" during which Defendant attempted to "physically

harm trial counsel."  (*See* dkt. 605, Pg ID 17433.)  Defendant also argues this Court did

not adequately inquire into the conflict issues.

With regard to the timeliness of Defendant's request, the Court found the timing

of Defendant's request weighed heavily against granting it.  *See Kilpatrick*, 2012 U.S.

Dist. LEXIS 115127, at *18.  Trial was scheduled to begin in less than one month at the

time of his request and the appointment of new counsel would have led to a delay of at least six months. *Id.* at *15. Moreover, at that point, Defense Counsel had represented Defendant for almost four and a half years in a number of state and federal cases and had represented him in this case from the very beginning. *See id.* at *17.

The Court rejected Defendant's professed explanation for the delay—that he did not fully appreciate the significance of the Fiore conflict until the week before—due to his execution of a conflict waiver in January 2011 acknowledging that he was "aware of the potential for conflict" arising from Thomas's prior representation of Fiore as well as having received a copy of the Fourth Superseding Indictment and other discovery describing Fiore's involvement in this case several months prior to trial. *See id.* at *18-19. Defendant also argues Mr. Thomas should have disclosed the potential conflict of interest due to his affiliation with the O'Reilly Firm at the time it arose and alleges he did not become aware of it until August 9, 2012. But this assertion is belied by the fact that Defendant was served with, and acknowledged receipt of, an order issued by Judge Cleland in the civil case, granting Thomas's and Naughton's motion to withdraw, on April 18, 2012. *See Macomb Interceptor Drain Drainage District v. Kilpatrick*, Case No. 11-13101, dkt. 201. That order expressly stated that "[e]ffective April 1, 2012, both Mr. Thomas and Mr. Naughton are joining the law firm of O'Reilly Rancilio, P.C., one of the firms retained by Plaintiff Macomb Interceptor Drain Drainage District in this matter." *See id.*, dkt.199.

With regard to the second factor, as the Sixth Circuit stated,

The record . . . shows the court promptly investigated and resolved the conflict. [Defendant] first informed the court of a potential conflict on August 7, 2012. At that point, [Defendant] was concerned about Thomas's representation of Fiore because Fiore had alleged before a grand jury that

> [Defendant] had extorted him.  On August 9, 2012, the district court ordered
> the parties to brief "every possible conflict," including "the conflict discussed
> in the [Detroit] Free Press this morning concerning the Macomb Interceptor
> [Drain] Drainage District."  Recall that [Defendant] knew about Thomas's
> and Naughton's of-counsel affiliations with the O'Reilly Firm by April 2012,
> when he was served with a copy of the court's order allowing Thomas and
> Naughton to withdraw.  Nevertheless, it was the district court itself that first
> raised the potential O'Reilly Firm conflict after reading about it in the
> newspaper.  The court promptly ordered briefing on the matter, heard
> argument on August 14, and resolved the conflict.

*Kilpatrick*, 798 F.3d at 376.  The Court therefore adequately and thoroughly investigated

the conflict of interest matters, satisfying its obligation to inquire into the source of the

attorney-client conflict.  *See United States v. Marrero*, 651 F.3d 453, 465 (6th Cir. 2011)

(noting that "to meet this requirement, the district court simply must allow a defendant

the opportunity to explain the attorney-client conflict as he perceives it").

With regard to the third factor, the Court noted that just a few days prior to his

request for new counsel, at the August 7, 2012 conference, Defendant had told the

Court he "love[d]" Thomas and had no "separate reason apart from the [Fiore] conflict"

to request that Thomas withdraw.  *See Kilpatrick*, 2012 U.S. Dist. LEXIS 115127, at *17-

18.  Thus, the Court found Defendant's claims regarding an irreconcilable dispute not

credible.  *Id.* at *18.

Finally, with regard to the final factor, the Court properly considered the public's

interest in the prompt and efficient administration of justice, especially because, at the

time, the case was "consuming the resources of 400 potential jurors, at least 10 defense

attorneys, almost 200 witnesses, and much of the Court's staff."  *Id.* at *21.  In sum,

after carefully considering all of the relevant factors, the Court denied Defendant's

request for substitute counsel.

The Court's observations during trial only confirmed its previous findings:

> Rather than the complete breakdown in communication that [Defendant] claims was present during his trial, the Court witnessed Thomas and [Defendant] conferring together numerous times in the courtroom about many of the witnesses who were testifying or about exhibits or other trial-related matters. The Court was aware that they entered and left the courtroom together each day of trial. During trial, they appeared to be cooperating and working together in presenting [Defendant]'s defense. Unlike other matters, e.g., his detention pending sentencing, [Defendant] did not repeat his earlier request that Mr. Thomas be replaced with new appointed counsel during his lengthy trial. It was not until May 23, 2013, well after he was convicted, that he again raised the issue of having new counsel appointed because of a breakdown in the attorney/client relationship.

*Kilpatrick*, 2013 U.S. Dist. LEXIS 111732, at *62-63. Thus, the Court finds any new factual allegations Defendant makes regarding a complete breakdown in the attorney-client relationship are similarly not credible and contradicted by the record. The conflict between Mr. Thomas and Defendant did not outweigh the untimeliness of the request or the public's interest in the prompt and efficient administration of justice. The Court adequately inquired into the matter and properly denied Defendant's request for substitute counsel on the eve of trial.

### 3. Ineffective Assistance of Counsel

A defendant has a right to "reasonably effective assistance" of counsel. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). To establish an ineffective assistance of counsel claim, defendant must prove both 1) "counsel's performance was deficient" and 2) "the deficient performance prejudiced the defense."[9] *Id.* The first prong "requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.*

---

[9] As discussed above, the analysis differs if the ineffective assistance of counsel claim is based on a purported conflict of interest.

The second prong "requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.*

"[T]here is a strong presumption that legal counsel is competent." *United States v. Osterbrock*, 891 F.2d 1216, 1220 (6th Cir. 1989). In addition, "a reviewing court must give a highly deferential scrutiny to counsel's performance." *Ward v. United States*, 995 F.2d 1317, 1321 (6th Cir. 1993). "The reasonableness of counsel's performance is to be evaluated from counsel's perspective at the time of the alleged error and in light of all the circumstances." *Kimmelman v. Morrison*, 477 U.S. 365, 384 (1986). "The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. The defendant bears the burden of proving both prongs of the analysis. *Id.* at 687.

### a. Cross-Examination of Witnesses

Defendant argues he received ineffective assistance of counsel because several government witnesses related to the Inland extortion counts were not cross-examined. He argues this violated his Sixth Amendment right to confrontation.

As discussed above, independent counsel extensively cross-examined Anthony Soave, the most important witness related to the Inland Waters extortion charges. And while independent counsel did not cross-examine McCann, he was present during her testimony and cross-examination by Ferguson's counsel. And even though Defense Counsel did not ask Miller questions regarding the Macomb litigation specifically, he did impeach his credibility and Ferguson's counsel did ask him questions in this regard.

Rozycki—who did not testify regarding any interactions with Defendant himself—was also cross-examined by Ferguson's counsel.

Defendant does not suggest any additional questions that should have been asked of these government witnesses nor does he explain what kind of effect any additional cross-examination would have had on this case. Moreover, in light of the overwhelming evidence against Defendant on these counts, any error in this regard did not prejudice Defendant. For example, with regard to Contract 1368, Amendment No. 4, in addition to the testimony of McCann and Miller, the government submitted emails from an Inland project manager, Dennis Oszust, stating that the amendment was being held up because of ongoing issues with Ferguson. (*See* dkts. 613-3, 613-4.) Moreover, testimony from Bernard Parker, who was cross-examined by Defense Counsel, corroborated the testimony of Miller and the Inland employees. (*See* dkt. 379, Pg ID 11153-57.) In sum, there is no reasonable probability that if Miller and Rozycki had been asked additional questions, the result of the trial would have been different.

### b. Testimony Regarding the Review of the Civic Fund

Defendant argues that Defense Counsel was a necessary witness in his case. Defendant asserts he made certain payments to the Kilpatrick Civic Fund based on the advice of an attorney who had reviewed the finances of the fund. He states he recently discovered that Mr. Thomas had been involved in that review process and argues that he therefore should have testified at trial on his behalf because the other attorney was unavailable to testify.

First, the Court notes that Mr. Thomas did not have personal knowledge of the review conducted by another attorney and, therefore, could not have testified as to that

review.  Nor does this collaboration between Mr. Thomas and the other attorney create

a conflict of interest.  And even if Defense Counsel should have presented evidence

that Defendant paid back money to the Civic Fund because of the other attorney's

review, and not because the Civic Fund received a grand jury subpoena, Defendant

cannot show prejudice.  The evidence showed Defendant used the Civic Fund for

hundreds of thousands of dollars in personal luxuries, cash kickbacks, campaign

expenses, and payments to his co-conspirators.  *See Kilpatrick*, 2013 U.S. Dist. LEXIS

111723, at *47-50.  Thus, there is no reasonable probability that if Defense Counsel had

presented evidence of the other attorney's review, the result of the trial would have

been different.

### c.  Retention of Expert Witness

Defendant argues Defense counsel was deficient in his questioning of the

forensic accounting expert, Gary Leeman.  Defendant also argues the expert did not

have the requisite knowledge or experience to testify in his case and Defense Counsel

should have sought a different expert.  In support of this contention, Defendant has

submitted a declaration from an attorney by the name of Joseph Sandler, stating he had

discussed with Defendant the possibility of serving as an expert witness during trial in or

about June 2012, but Defense counsel never contacted him.  (Dkt. 629, Pg ID 17870.)

Defendant claims Defense Counsel "lied" to him about contacting Mr. Sandler.

The Court refuses to second guess Defense Counsel's choice of an expert in this

case.  The expert witness Defense Counsel retained was a certified public accountant

from Michigan, (see dkt. 401, Pg ID 14102), while Mr. Sandler's affidavit states he

practices law in Washington D.C.  More importantly, Defendant does not explain how

Mr. Sandler's testimony would have differed from Mr. Leeman's nor how it would have helped his defense. And even though the expert witness was not able to return to court to continue his testimony due to a medical condition, the government waived any additional cross-examination and the defendants waived any redirect. (*See* dkt. 405, Pg ID 14372.) Defendant therefore cannot show deficient performance related to the retention of the expert witness. Nor can Defendant show prejudice. No expert witness testimony could overcome the substantial evidence that was presented to the jury relating to both the Kilpatrick Civic Fund and Defendant's personal income taxes. Thus, Defendant cannot meet his burden of showing that there is a reasonable probability that if Defense Counsel had retained Mr. Sandler as the expert witness in this case or asked the expert who was retained additional questions, the result of the trial would have been different.

### d. Additional Evidence

Defendant argues Defense Counsel was deficient by not presenting evidence that Ferguson was not the only contractor writing checks to the Kilpatrick Civic Fund during the same time Ferguson had written the $75,000 check that was the basis for Defendant's bribery conviction. Defendant argues such evidence would demonstrate that this check was a donation and not a bribe. Defendant also argues Defense Counsel should have presented additional evidence of "gifting."

The Court first notes Ferguson's counsel did present evidence that other contractors were writing similar checks at the same time, (*see* dkt. 341, Pg ID 7017-18), and yet, the jury found the government had satisfied its burden of establishing this check was a bribe. Defense Counsel thus did not perform deficiently, nor was

Defendant prejudiced, by failing to present duplicative evidence.  Similarly, any alleged evidence of "gifting" could not overcome the substantial evidence that demonstrated Defendant's cash came from kickbacks, fraud, and extortion.

### e.  Post-Trial Motions

Defendant argues he was forced to represent himself during the post-trial stage of this case.  The Court notes, however, that when Defendant filed his post-trial motion pro se, it convened a status conference on May 23, 2013, during which it allowed Defense Counsel to withdraw and appointed Mr. Gurewitz as counsel for Defendant.[10] (*See* dkts. 328, 444.)  The Court also granted Defendant's motion to appoint Ms. Margaret Raben as co-counsel for the purpose of assisting Mr. Gurewitz.  (See dkt. 412.)  After the Court allowed him to do so, Mr. Gurewitz filed two supplement briefs in support of Defendant's post-trial motion.  (*See* dkts. 417, 450.)  Thus, the Court finds that Defendant received effective assistance of counsel during the post-trial stage of this case.

### 4.  Constructive Denial of Counsel

Defendant argues he was constructively denied counsel when the Court denied his motion for substitute counsel.  He also asserts he was left without representation during critical stages of his case—for example, during the August 7 conference addressing the Fiore conflict issue and the August 14 hearing addressing Defendant's request for substitute counsel.

---

[10] Mr. Gurewitz had served as independent counsel during trial and later represented Defendant during his appeal.

A defendant can bring a constructive denial of counsel claim in any one of three scenarios: 1) "where there has been a 'complete denial of counsel' at a 'critical stage' of the criminal proceedings," 2) "'if counsel entirely fails to subject the prosecution's case to meaningful adversarial testing,'" and 3) where "counsel is present and available to assist the accused . . . [but] 'the likelihood that any lawyer, even a fully competent one, could provide effective assistance' is minimal." *United States v. Coleman*, 835 F.3d 606, 612 (6th Cir. 2016) (quoting *United States v. Cronic*, 466 U.S. 648, 659-60 (1984)). Defendant bases his claim on the first scenario.

The Court first notes that because it properly denied Defendant's motion for substitute counsel, there was no constructive denial of counsel on that basis. And even though the Court allowed Defendant to speak on his own behalf during the hearings addressing the conflict of interest matters, Defense Counsel also made arguments reflecting his client's wishes. For example, during the August 14 hearing, Mr. Thomas noted that despite having spent three and-a-half years preparing for trial, he was requesting that the Court "allow [him] to remove himself, because of the conflict, at my client's request." (Dkt. 362, Pg ID 9395.) Thus, setting aside the issue of whether these hearings were "critical stages" of the criminal proceedings, Defendant was never "left with no representation." To the contrary, rather than a complete denial of counsel, Defendant was represented by multiple court-appointed attorneys, including some of the most experienced and prominent defense attorneys in southeastern Michigan. And as the Court previously stated on the record:

> from my observation, Mr. Thomas and Mr. Naughton represented you
> vigorously and at great personal – with great personal effort through a long,
> long trial, including the extensive voir dire that was undertaken, the cross

examination of witnesses, the filing of many, many motions and exhibits[,] . . . the preparation of argument to the Court, and jury instructions.

(Dkt. 444, Pg ID 15275.) Thus, the Court finds that Defendant received effective assistance of counsel during all stages of his defense.

### D.     Testimony of Kim Harris

Defendant argues the Court erred by allowing Kim Harris to provide impermissible hearsay testimony during trial, and that this admission was an error of constitutional dimension because it abridged on his Sixth Amendment right to confrontation. The Court has considered the admissibility of Kim Harris's testimony twice before and both times concluded it was admissible under Federal Rule of Evidence 801(d)(2)(E).

Kim Harris, the former Chief Compliance Officer of the City of Detroit's Human Rights Department, testified during trial regarding an out-of-court conversation he had had with his boss, Gerard Grant Phillips, who was deceased at the time of trial but at the time of the conversation was the Director of the City of Detroit's Human Rights Department. In that conversation, Phillips directed Harris to decertify DLZ, a company in line to win a large City water contract. (Dkt. 361, Pg ID 9371.) The significance of this testimony was that the decertification of DLZ meant it would not get the contract, paving the way for a company in which Ferguson had a financial interest to get it instead. Harris testified that when he told Phillips he could not do so, Phillips insisted that he pull the certification because "the mayor want[ed] it done." (*Id.* at Pg ID 9372-73.) Harris also testified that Phillips had him draft the letter revoking DLZ's certification retroactive to February 2, 2006, which was a date before DLZ submitted its bid for the water contract. (*Id.* at Pg ID 9376.)

Under Federal Rule of Evidence 801(d)(2)(E), a co-conspirator's statements made "during and in furtherance of the conspiracy" are "not hearsay." To admit a statement under this exception, the government "must show by a preponderance of the evidence (1) that a conspiracy existed, (2) that the defendant against whom the hearsay is offered was a member of the conspiracy, and (3) that the hearsay statement was made in the course and in furtherance of the conspiracy." *United States v. Vinson*, 606 F.2d 149, 152 (6th Cir. 1979). Under Federal Rule of Evidence 104(a), the Court has the gatekeeper role of determining whether evidence is admissible. *Id.*

During trial, Defendant filed a motion in limine, seeking to exclude Kim Harris's testimony. In its response to the motion, the government proffered evidence showing that Phillips was a co-conspirator in Defendant's extortion scheme and that he was called upon to assist the Enterprise when it wanted to use the City's Human Rights Department to benefit one of its members. (*See* dkt. 447.) The Court allowed the testimony, finding the government had satisfied its burden of proving by a preponderance of the evidence that Phillips was a co-conspirator. (Dkt. 424, Pg ID 15057.)

For example, the government proffered, and later produced at trial, evidence of a phone conversation between Bernard Kilpatrick and John Francis, a contractor and client of Bernard Kilpatrick, regarding having Phillips issue the general contractor citations in retaliation for it having removed Francis's company from a project it was working on. (Dkt. 395, Pg ID 13460-63.) During that conversation, Bernard Kilpatrick stated he had asked Phillips to intervene on his own behalf on past occasions. The government also noted Kim Harris's testimony was consistent with the grand jury

testimony of Phillips himself, who testified regarding being called to the Manoogian Mansion (Defendant's home at the time) and being directed by him to pull the certification.[11] (*See* dkt. 447, Pg ID 15300.)

As this Court previously found, contrary to Defendant's attempts to characterize Harris's statements as impermissible hearsay, this testimony was properly admitted under the co-conspirator exception to the hearsay rule. *See Kilpatrick*, 2013 U.S. Dist. LEXIS 111732, at *113. First, the government proved beyond a reasonable doubt, as the jury's guilty verdict on the RICO conspiracy count shows, the existence of a conspiracy and that Defendant was a member of that conspiracy. Second, the government proved by a preponderance of the evidence that Phillips was at least a small player in the conspiracy and his statements to Harris were made "in the course of and in furtherance of" that conspiracy. Having found that the Court correctly ruled that the testimony fell within Federal Rule of Evidence 801(d)(2)(E), the Court now turns to Defendant's arguments regarding his right to confrontation.

The Sixth Amendment's Confrontation Clause "prohibits the introduction of testimonial statements by a nontestifying witness, unless the witness is 'unavailable to testify, and the defendant had had a prior opportunity for cross-examination.'" *Ohio v. Clark*, 135 S. Ct. 2173, 2179 (2015) (quoting *Crawford v. Washington*, 541 U.S. 36, 54 (2004)). Statements are testimonial when "the primary purpose of the conversation was to create an out-of-court substitute for trial testimony." *Id.* at 2180 (internal quotation

---

[11] Defendant points to Phillips's grand jury testimony and argues the jury improperly relied on it. (*See* dkt. 620, Pg ID 17717.) However, this testimony was not presented to the jury. As noted above, the government only relied on it to satisfy its burden of proving that Phillips was a co-conspirator of the Kilpatrick Enterprise.

marks and citation omitted).  If this was not the primary purpose of a statement, then "its admissibility is the concern of . . . [the] rules of evidence, not the Confrontation Clause." *Id.*

In *United States v. Mooneyham*, 473 F.3d 280 (6th Cir. 2007), the Sixth Circuit considered whether statements admitted under Rule 801(d)(2)(E), similar to the statements at issue here, implicated the defendant's right to confrontation.  The Sixth Circuit reasoned that statements made by co-conspirators in furtherance of a conspiracy are not testimonial because "the one making them has no awareness or expectation that his or her statements may later be used at a trial." *Id.* at 286 (internal quotation marks and citation omitted).  Moreover, the court noted such statements are "both inherently trustworthy and firmly rooted" within an exception to the hearsay rule, and thus do "not require a court to embark on an independent inquiry into the[ir] reliability." *Id.* at 287 (quoting *Bourjaily v. United States*, 483 U.S. 171, 183-84 (1987)).  Therefore, the Sixth Circuit concluded the testimony did not violate the defendant's right to confrontation. *Id.* at 287.

Similarly, here, because Kim Harris's testimony was properly admitted under the co-conspirator exception to the hearsay rule, its admission did not implicate Defendant's right to confrontation.  In sum, the Court finds Defendant cannot show his constitutional rights were violated based on the admission of Kim Harris's testimony.

### E.    Sentencing Guidelines Calculation

Defendant argues that using the $4,584,423 fraud loss figure for his sentencing guidelines calculation was erroneous because it was not based on the amount of "loss" to the City of Detroit or DWSD.  He argues his claim is cognizable on collateral review

because this error was a "miscarriage of justice." *See, e.g.*, dkt. 620, Pg ID 17720 (quoting *Griffin*, 330 F.3d at 736).

In its initial judgment, the Court ordered Defendant to pay $4,584,423 in restitution to DWSD. The Sixth Circuit vacated that award, holding "restitution must be based on the victim's loss rather than the offender's gain."[12] *Kilpatrick*, 798 F.3d at 388 (internal quotation marks and citation omitted). The Sixth Circuit's holding regarding restitution is inapplicable to Defendant's sentencing guidelines calculation.

Defendant's sentencing guidelines calculation for his racketeering and extortion counts was made pursuant to U.S.S.G. § 2C1.1(b)(2), which states:

> If the value of the payment, the benefit received or to be received in return for the payment, the value of anything obtained or to be obtained by a public official or others acting with a public official, or the loss to the government from the offense, whichever is greatest, exceeded $6,500, increase by the number of levels from the table in § 2B1.1 (Theft, Property Destruction, and Fraud) corresponding to that amount.

Here, Defendant's offense level was increased based on "the value of anything obtained or to be obtained by a public official or others acting with a public official." *See id.* This covered the profits from the contracts that Defendant, a public official, improperly steered to one of his co-defendants, Bobby Ferguson, as part of their extortion scheme.

At the sentencing hearing, the Court found the probation department had correctly scored Defendant at a base offense level of 43, which included a 20-point enhancement pursuant to U.S.S.G. § 2B1.1(b)(1)(K) based on a total fraud loss figure of $9,654,553. Ferguson's financial records showed profit margins between 10 and 71

---

[12] On remand, the Court ordered Defendant to pay $1,520,653.50 in restitution to DWSD, *Kilpatrick*, 2017 U.S. Dist. LEXIS 140562, at *1, and the Sixth Circuit later affirmed that award, *Kilpatrick*, 2018 U.S. App. LEXIS 27132, at *1.

percent on any given contract. The probation department took a conservative approach, using a 10 percent figure for each contract, except for those contracts for which Ferguson or his companies performed no work, in which case the full amount of revenue was used.

The Court adopted the conservative 10 percent figure, which the Court found was supported by Ferguson's financial records, (dkt. 492, Pg ID 16160-63), but took an even more conservative approach than the probation department and excluded the contracts for which Defendant was not separately convicted by the jury, (*id.* at Pg ID 16166). This brought the total fraud loss figure down to $4,584,423, which resulted in a lesser 18-point enhancement pursuant to § 2B1.1(b)(1)(J). (*Id.* at Pg ID 16167.) This in turn resulted in a lower base offense level of 42 and a guideline sentence range of 360 months to life in prison.[13] (*Id.* at Pg ID 16221.) The Court ultimately sentenced Defendant to a total term of imprisonment of 336 months, below the guideline range. (*Id.* at Pg ID 16233.)

Defendant has not shown any error in his sentencing guidelines calculation. The Court properly based the calculation on the $4,584,423 fraud loss figure representing the estimated profits that Ferguson obtained from the contracts underlying Defendant's convictions. This was a conservative estimate of "the value of anything obtained," *see* § 2C1.1(b)(2), and, unlike an award of restitution, did not need to be limited to the amount

---

[13] As the Court explained during Defendant's sentencing hearing, the probation department had found that Defendant was at a total offense level of 44, but the top guideline level permitted is 43. (Dkt. 492, Pg ID 16220-21.) So, even though the enhancement was reduced by two points, this only resulted in a one-point reduction of the base offense level. (*Id.*)

of "actual loss" to the City of Detroit or DWSD.[14]  And while Defendant cites to application note 3(B) of § 2B1.1 and caselaw addressing the use of "gain" as an alternative measure of loss, that analysis is inapplicable here.  As explained above, the Court based its sentencing guidelines calculation for Defendant's racketeering and extortion counts on § 2C1.1, not § 2B1.1.[15]  Thus, the Court finds there was no sentencing error, let alone any "miscarriage of justice."

### F.    Lack of an *Allen* Charge

Defendant argues that the Court's decision to accept a partial verdict in this case without first rendering an *Allen* charge to the jury violated his due process rights.  After more than five months of trial and three weeks of deliberations, the jury reached unanimous agreement on 40 of the 45 charges brought against the three defendants in this case.  With regard to Defendant, who had been charged with 30 counts, the jury found him guilty of 24 counts and not guilty of three counts but could not reach an agreement on the remaining three counts.  (*See* dkt. 277.)

During the jury's deliberations, on February 26, 2013, the jury foreperson sent a note to the Court asking, "[i]f we do not unanimously agree to a verdict for a particular charge for a particular defendant, what is our course of action?"  (Dkt. 454-2, Pg ID 15502.)  After conferring with counsel, the Court instructed the jury to "try to reach

_____

[14] Because Defendant's sentencing guidelines calculation did not depend on the amount of loss, there is no need to discuss Defendant's assertion that there was no loss in this case.  The Court notes, however, that the Sixth Circuit has since affirmed this Court's finding that DWSD suffered a loss of at least $1,520,653 as a result of the bid-rigging activity that formed a part of the RICO conspiracy Defendant was convicted of. *See Kilpatrick*, 2018 U.S. App. LEXIS 27132, at *7.
[15] As set forth in § 2C1.1(b)(2), the number of levels of the enhancement properly came from the table in § 2B1.1.

unanimous agreement on as many charges/defendants as possible.  If you cannot reach unanimous agreement on all charges with respect to all defendants, just let me know."  (Dkt. 454-3, Pg ID 15503.)  On Friday, March 8, 2013, the jury sent a note stating, "[w]e have reached a verdict."  The following Monday, March 11, 2013, the Court stated that it had "received a note actually on Friday afternoon late from the jury saying that they had reached a verdict but they wished to go home over the weekend and sleep on it before announcing it, so they did that.  They've indicated to me this morning that they have reached a verdict, and we'll bring them in."  (Dkt. 411, Pg ID 14811.)

In *Allen v. United States*, 164 U.S. 492 (1896), the Supreme Court "approved the giving of supplemental instructions to a jury which had been unable to agree."  *United States v. Harris*, 391 F.2d 348, 353-54 (6th Cir. 1968).  An *Allen* charge encourages a deadlocked jury to render a unanimous verdict by requesting each juror reconsider his or her respective position during continued deliberations.  *United States v. Clinton*, 338 F.3d 483, 487-89 (6th Cir. 2003).  However, Federal Rule of Criminal Procedure 31(b)(2) explicitly sets forth that "[i]f the jury cannot agree on all counts as to any defendant, the jury may return a verdict on those counts on which it has agreed."  The Sixth Circuit has stated that "'[t]he trial judge treads a fine line in deciding whether to accept a partial verdict: [s]he must neither pressure the jury to reconsider what it had actually decided nor force the jury to turn a tentative decision into a final one.'"  *United States v. Heriot*, 496 F.3d 601, 608 (6th Cir. 2007) (quoting *United States v. Wheeler*, 802 F.2d 778, 781 (8th Cir. 1986)) (affirming the district court's decision to accept a

partial verdict despite defense counsel's request for an *Allen* charge). Due to the "delicacy" of this decision, the Sixth Circuit reviews it for an abuse of discretion. *Id.*

Here, after lengthy deliberations in which the jury considered the extensive evidence, the jury informed the Court it had reached a verdict. There is no evidence the jury wished to deliberate any further or that the jurors intended to change their minds on any of the counts where they had reached unanimous agreement.[16] The jury had previously been instructed by the Court to attempt to reach unanimous agreement and to let the Court know if it could not do so. Moreover, as this Court previously observed, "[t]he five charges on which the jury deadlocked, as well as the jury's verdicts of guilty or not guilty on the remaining 40 charges against the three Defendants, fail to show anything other than that they carefully and thoroughly considered each charge in each Count as to each Defendant." *See Kilpatrick*, 2013 U.S. Dist. LEXIS 111732, at *25. And after announcing the verdict, the Court polled the jury and its members unanimously affirmed the verdict they had reached in this case. (Dkt. 411, Pg ID 14817-19.) Therefore, the Court properly exercised its discretion by accepting the jury's partial verdict. Its decision to do so did not violate Defendant's due process rights.

### G. Defendant's Request for an Evidentiary Hearing

Along with his § 2255 motion, Defendant filed a request for an evidentiary hearing, discovery, and the appointment of counsel. However, an evidentiary hearing is not required if "the record conclusively shows that the petitioner is entitled to no relief." *Valentine v. United States*, 488 F.3d 325, 333 (6th Cir. 2007) (quotations and citation

---

[16] In fact, considering that the jury reached a verdict of guilty on 24 of the 30 counts brought against Defendant, further deliberations may have resulted in more convictions, rather than less.

omitted).  In other words, a hearing is not required if "the petitioner's claims cannot be accepted as true because they are contradicted by the record, inherently incredible, or [are] conclusions rather than statements of fact."  *Id.*  Moreover, "[w]here, as here, the judge considering the § 2255 motion also presided over the trial, the judge may rely on her recollections of the trial."  *Ray v. United States*, 721 F.3d 758, 761 (6th Cir. 2013) (citation omitted).

Defendant argues he has made detailed and specific factual allegations that are not part of the record and, therefore, an evidentiary hearing should be required in this case.  First, Defendant argues the record does not reflect the extent of Defense Counsel's prior representation of Fiore.  As discussed above, however, in light of the government dismissing the Fiore-related charges and not calling Fiore as a witness at trial, this prior representation is a non-issue.  And while Defendant argues Defense Counsel was privy to information regarding the review of the Civic Fund by another attorney, this did not create a conflict of interest for Defense Counsel, nor was he required to provide testimony about that review.  With regard to the allegations regarding the complete breakdown of the attorney-client relationship, as discussed above, the Court finds these allegations incredible and contradicted by the record.  And while Defendant disputes the existence of an ethical wall between Defense Counsel and the O'Reilly firm, he presents no evidence that supports this assertion.  In light of Mr. Thomas's sworn affidavit, the Court is satisfied that the record has been sufficiently developed in this regard.  With respect to the retention of an expert witness in this case, even if the Court were to accept the assertions in the declaration of Mr. Sandler as true, they do not establish that Defense Counsel's performance was deficient.  Similarly,

even though Mr. Gurewitz may not have been present during the testimony of two government witnesses, the Court has concluded this did not detract from the protection that the independent counsel provided, nor did it result in ineffective assistance of counsel.

Thus, after carefully reviewing all of the factual allegations made by Defendant, the Court finds there is no material factual dispute that is of consequence to his § 2255 motion. *See Cochran v. United States*, 153 F. App'x 366, 369, 371 (6th Cir. 2005) (noting that "a material factual dispute must be shown to warrant an evidentiary hearing" and holding that there were no "facts that would justify expenditure of judicial resources to conduct an evidentiary hearing" in that case) (unpublished). This is in contrast to the case cited by Defendant, where an evidentiary hearing was required to establish whether counsel failed to provide the defendant advice regarding his sentence exposure prior to a plea, which may constitute deficient assistance of counsel. *See Smith v. United States*, 348 F.3d 545, 553-54 (6th Cir. 2003).

In sum, because the record conclusively shows Defendant is entitled to no relief, an evidentiary hearing is not required in this case. Therefore, he is also not entitled to the appointment of counsel. *See* Rule 8(c) of the Rules Governing Section 2255 Proceedings (requiring the appointment of counsel "[i]f an evidentiary hearing is warranted"); *see also Pennsylvania v. Finley*, 481 U.S. 551, 555 (1987) (declining to establish a right to counsel for prisoners mounting collateral attacks upon their convictions). Defendant's request for an evidentiary hearing, discovery, and the appointment of counsel is denied.

## III. CERTIFICATE OF APPEALABILITY

Federal Rule of Appellate Procedure 22(b) provides that an appeal may not proceed unless a certificate of appealability is issued under 28 U.S.C. § 2253(c). Rule 11 of the Rules Governing Section 2255 Proceedings requires that a "district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant. . . . If the court issues a certificate, the court must state the specific issue or issues that satisfy the showing required by 28 U.S.C. § 2253(c)(2)."

A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). A court must either issue a certificate of appealability indicating which issues satisfy the required showing or provide reasons why such a certificate should not issue. 28 U.S.C. § 2253(c)(3); *In re Certificates of Appealability*, 106 F.3d 1306, 1307 (6th Cir.1997). To receive a certificate of appealability, "a petitioner must show that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003) (internal quotation marks and citation omitted).

For the reasons stated in this opinion, the Court will deny Defendant a certificate of appealability because he has failed to make a substantial showing that his due process rights were compromised.

## IV.   CONCLUSION

Based upon the foregoing, IT IS ORDERED that Defendant's petition for post-conviction relief is DENIED WITH PREJUDICE.  IT IS FURTHER ORDERED that a certificate of appealability is denied.

SO ORDERED.

s/Nancy G. Edmunds
Nancy G. Edmunds
United States District Judge

Dated: March 19, 2019

I hereby certify that a copy of the foregoing document was served upon counsel of record and on Kwame M. Kilpatrick 44678-039, FCI Fort Dix, PO Box 2000, Fort Dix, NJ  08640 on March 19, 2019, by electronic and/or ordinary mail.

s/M. Beauchemin
Deputy Clerk